Jeffrey L. Kessler (*pro hac vice* forthcoming)
jkessler@winston.com
David L. Greenspan (*pro hac vice* forthcoming)
dgreenspan@winston.com
Isabelle Mercier-Dalphond (*pro hac vice* forthcoming)
imercier@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: 212-294-6700
Facsimile: 212-294-4700

Diana Hughes Leiden (SBN: 267606)
dhleiden@winston.com
Shawn R. Obi (SBN: 288088)
sobi@winston.com
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA  90071-1543
Telephone:  213-615-1700
Facsimile:   213-615-1750

Attorneys for Plaintiff
WILLIAM MORRIS ENDEAVOR
ENTERTAINMENT, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC,<br><br>Plaintiff,<br><br>v.<br><br>WRITERS GUILD OF AMERICA, WEST, INC. and WRITERS GUILD OF AMERICA, EAST, INC.,<br><br>Defendants. | Case No. 2:19-cv-05465<br><br>**COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff William Morris Endeavor Entertainment, LLC ("WME"), by its undersigned counsel, alleges, upon knowledge as to itself and its own acts and on information and belief as to all other matters, against Defendants Writers Guild of America, West, Inc. ("WGAW") and Writers Guild of America, East, Inc. ("WGAE") as follows:

## I.   INTRODUCTION

1.   This Complaint concerns defendants WGAW and WGAE's wanton abuse of union authority in violation of antitrust law.

2.   Hollywood talent representation is fiercely competitive.   There are hundreds of agencies and thousands of talent agents competing to represent, among others, writers for television and film productions.  And the writers, in turn, compete to obtain agents' representation services.

3.   Defendants WGAW and WGAE (together, "WGA") are the two labor unions who represent writers in the entertainment industry.   They serve as their members' exclusive collective bargaining representatives.  Plaintiff WME is a talent agency that—up until April 12, 2019—had been franchised by WGA to represent its writer-members (and showrunner-members) in their individual negotiations for employment with television and film studios.

4.   WGA's leadership, however, has orchestrated a series of anticompetitive agreements to prevent WME (and other talent agencies) from representing writers if the agencies (i) do not stop their long-accepted, industry-standard practice of "packaging" talent to studios in exchange for packaging fees, and (ii) do not stop affiliating with companies that produce or distribute content.  WME has not agreed to these illegal conditions set forth in WGA's so-called "Code of Conduct" (attached hereto as Exhibit A), and thus WGA has organized an unlawful group boycott to prevent WME from continuing to represent WGA member-writers.  To date, approximately 1,300 writers (television and film) and showrunners have fired WME as their talent agency for work as writers because of WGA's boycott.

5.     Antitrust law's protection of market competition can be in conflict with labor law's protection of collective bargaining.  Balancing the two, Congress and the courts have granted certain union activity a limited statutory or non-statutory labor exemption to the antitrust laws.  When a union crosses the limits of activity protected by the labor exemptions, its conduct becomes fully subject to antitrust scrutiny just like any other organization.  WGA has crossed those limits here by coercing members and non-members alike into a network of anticompetitive agreements that restrain competition in commercial markets over which WGA lacks any legitimate labor law authority or interest.

6.     Specifically, WGA's leadership has orchestrated a group boycott of WME and other talent agencies who have refused to agree to WGA's categorical prohibitions of agency packaging and agency-affiliated content companies.  Packaging is an important way that shows and movies get made in the market(s) for TV and film content production, and agency-affiliates who produce shows and movies are important new competitors in these markets.  The group boycott, which stifles this competition, as well as competition in the market to represent writers, is a classic, *per se* violation of the antitrust laws.

7.     To effectuate its boycott, WGA leaders have coerced their member-writers and showrunners into agreeing to refuse to deal with WME and other talent agencies who will not agree to stop packaging or affiliating with content companies by threatening these individuals with expulsion and other union discipline that would imperil their ability to work, and threatening their healthcare without a legitimate basis to do so.  WGA has coerced certain talent agencies to join its illegal boycott under the threat of losing their writer-representation businesses.  And WGA has tried, and continues to try, to coerce Hollywood studios to refuse to deal with agents who will not sign the Code of Conduct by, among other things, threatening the studios with objectively bad faith litigation.  Finally, WGA is inducing certain unlicensed managers and lawyers into joining the conspiracy by telling them that they should perform the

work of boycotted talent agents even though it is illegal for them to do so.  In particular, California (and New York) statutory law limits unlicensed managers or lawyers—as opposed to *licensed agents*—from procuring film and television employment for writers and other talent.  But WGA has wrongly told unlicensed managers and lawyers that pursuant to a "limited delegation of [WGA's] bargaining authority" they can and should procure employment for writers.

8.    WGA leadership has engaged in an unprecedented abuse of union authority that has pushed their Guilds beyond the protection of the labor exemptions.  Their tactics are unlawful, and WGA's outright bans on agency packaging and content affiliates do not serve any legitimate union interest.

9.    WGA has a legitimate interest in ensuring that potential conflicts are managed and disclosed, and in protecting its members from the adverse effects of *actual* conflicts of interest, if and when they arise.  But WGA's boycott to enforce the Code of Conduct is intended to block agents from competing to sell *any* packages, and to block agency-affiliates from facilitating production or distribution of *any* content, regardless of whether there is an actual conflict with, or harm to, WGA members.  This distinction is critical because, in reality, agency packaging and agency-affiliated content companies generally provide an economic *benefit* to the writers that the agencies and WGA represent.  And the writers who participate in packaging, and seek opportunities from agency-affiliate content companies, do so because of the economic benefits they receive (*e.g.*, obtaining work that might not otherwise be available and saving a 10% commission on packaged programming).

10.    WGA's absolute bans on agency packaging and content affiliates are thus grossly over-restrictive, unnecessary to redress any legitimate union concern, and intrude upon commercial activities in markets that WGA has no authority to regulate.  Moreover, WGA's actions will not only harm the economic interests of its own writer-members, including the showrunners who work as producers, but they will also harm

the economic interests of talent represented by *other* entertainment guilds (*e.g.*, actors and directors) who want to benefit from packaging and agency content affiliates.

11. What WGAW President David Goodman has aptly conceded to be a WGA "power grab" by its leadership in order to "conquer" the most successful talent agencies like WME, is also a whiplash-inducing about-face of seismic proportion. Up until April 12, 2019, ***WGA had expressly permitted packaging for more than forty years.*** For a generation, WGA utilized narrowly-tailored agent regulations to prevent any harm to union members from actual—not potential—conflicts of interest.

12. Whatever WGA's leadership might argue about agency packaging or agency-affiliate content companies in the abstract, forming a group boycott to wipe it all out and to restrict competition in commercial markets outside of the union's labor law authority is *per se* illegal. Any legitimate interest that WGA has in protecting its members from the potential harms of conflicted agents could be accomplished by continuing to implement a rule (like the one that WGA had for more than 40 years) prohibiting agents from acting contrary to the interests of their writer-clients, with a case-by-case determination of any allegation that a writer was in fact harmed by any conflict.

13. WGA has never offered a cogent explanation for why the agency regulations permitting packaging and content affiliates that served its members so well for more than 40 years would not continue to do so now. Even so, WME tried—over-and-over in discussions with WGA—to address any arguably *bona fide* WGA concern about these practices. WGA's leadership responded—when they responded at all—with dismissiveness and derision and made no bones about their self-proclaimed objective to effectuate a "power grab" and "conquer" the major talent agencies and restrain trade in commercial markets. That is not a legitimate union interest. Indeed, being perceived as "powerful" is not a pejorative status for a talent agency—influence and clout with the studios are features and services that many writers *want* agents to have.

14.     The challenged WGA agreements to enforce the Code of Conduct provisions banning agency packaging and agency-affiliate content companies—including the participation of showrunners (producers), unlicensed managers and attorneys, and other non-labor parties—should be enjoined and declared illegal under Section 1 of the Sherman Act; WGA should be found liable for triple the damages to WME's writer-representation and packaging businesses that WGA has caused, or will cause, by virtue of its antitrust violation; and WGA should be ordered to pay WME's attorney's fees and litigation costs.

## II.     PARTIES

15.     Plaintiff WME is a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Los Angeles, California. WME's predecessor, the William Morris Agency ("WMA"), was formed in 1898. WMA became WME following its merger with the Endeavor agency in 2009.  WME is a talent agency that represents top performing artists, authors and entertainers, including writers for television and film productions and showrunners.

16.     Defendant WGAW is a California non-profit corporation headquartered in Los Angeles, California.  WGAW is a labor union representing thousands of writers in the motion picture, television and new media industries.

17.     Defendant WGAE is a New York non-profit corporation headquartered in New York City, New York.  WGAE is a labor union representing thousands of members who write content for motion pictures, television, news and digital media.  Writers who live east of the Mississippi River at the time of their initial membership are enrolled as members of WGAE, whereas those to the west are members of WGAW.

18.     Although WGAW and WGAE are separate entities, they work in tandem to represent their member-writers.  Among other things, WGAW and WGAE negotiated and entered into an industrywide collective bargaining agreement, the "Minimum Basic Agreement" or "MBA" (relevant excerpts are attached hereto as Exhibit B), with the Alliance of Motion Picture and Television Producers, Inc. ("AMPTP").  AMPTP is the

multi-employer collective bargaining representative for hundreds of motion picture and television producers who employ writers.

19.    Together, WGAW and WGAE have orchestrated the conspiracy to enforce the Code of Conduct and implement an unlawful group boycott of WME and other talent agencies who refuse to sign the Code.

20.    WGA is empowered under federal labor law, as the writers' exclusive collective bargaining representative, to designate (or "franchise") licensed agents to represent union members in individual negotiations for employment with the production studios (*i.e.*, AMPTP members).[1]  But WGA's authority to designate and regulate agents in their representation of writers is limited to this labor market and by state licensing laws.

21.    From September 22, 1976 through April 12, 2019, WGA regulated talent agents through the Artists' Manager Basic Agreement ("AMBA") between WGA and the Association of Talent Agents ("ATA"), attached hereto as Exhibit C.[2]  Up until April 12th, WGAW and WGAE had designated and authorized WME and numerous other talent agencies under the AMBA to represent their members in individual bargaining with AMPTP members; WME has now lost its designation because of the illegal "power grab" by WGA's leadership.

### III.    JURISDICTION AND VENUE

22.    This Court has subject-matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

23.    This Court has personal jurisdiction over WGAW under 15 U.S.C. § 15 because it resides in this District.  This Court has personal jurisdiction over WGAE because it is a corporation that transacts business in this District under 15 U.S.C. § 22.

---

[1]    Such individual negotiations are subject to the limitations of the MBA, *e.g.*, which sets minimum scales for compensation.

[2]    ATA was previously known, at the time the AMBA was signed, as the Artists Managers Guild.  *See* Ex. C, AMBA, at 1.

Indeed, WGAE performs services on behalf of its members in this District; in conjunction with WGAW, WGAE entered into the Minimum Basic Agreement with AMPTP, which is located in this District; and, in conjunction with WGAW, WGAE attempted to negotiate a new AMBA with ATA, which is also located in this District. The Court also has personal jurisdiction over both WGAW and WGAE because they are engaged in a conspiracy to adopt and implement a Code of Conduct that was directed at, and has a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities located in this District, including Plaintiff WME. As such, WGAE's activities in this District are continuous and systematic or, at the very least, WGAE purposefully directed its activities toward this District, WME's claims arise in significant part out of WGAE's activities in this District, and this Court's exercise of personal jurisdiction would be reasonable.

24. Venue is proper in this District under 15 U.S.C. § 15 and 28 U.S.C. §§ 1391(b), (c) and (d) because WGAW and WGAE are subject to this Court's personal jurisdiction with respect to this action, and a substantial part of the events giving rise to the claims for relief stated herein occurred in this District. Furthermore, WME has suffered and will continue to suffer harm in this District as a result of the conspiracy entered into by WGAW and WGAE averred herein.

25. This action should be assigned to the Western Division. Plaintiff WME and Defendant WGAW both reside in Los Angeles County.

## IV.   FACTUAL BACKGROUND

26. WME has earned its place at the vanguard of writer talent representation the way that any agency (or individual agent) succeeds in the market for representing writers:  by making the clients' interests paramount. Any agency that put its own interests ahead of a client's would not represent that client for very long. Accordingly, WME has always committed—and continues to commit—to refrain from any and all behavior that would harm the interests of its clients. Indeed, WME made this commitment to WGA through the AMBA for over 40 years. But WME will not agree

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

to WGA's total and anticompetitive bans on agency packaging and agency-affiliate content companies because of unsupported and counter-factual allegations of harm to writers from purported conflicts of interest.  The reality is that agency packaging and content affiliates provide significant benefits to writers who (used to be able to) exercise their freedom of choice to take advantage of such practices. In the words of WGA's leadership, the boycott to enforce their unlawful bans is nothing more than a "power grab" masquerading as a legitimate exercise of union authority.

**A.**   **Packaging Helps Content Get Produced, Saves Writers' Commissions, and Has Been Expressly Permitted by WGA for More Than 40 Years**

27.    Packaging refers to a long-standing practice—dating back to at least the 1950s—through which talent agencies provide a "package" of talent (*e.g.*, writers, actors, and directors) to a studio in exchange for "packaging fees."  Writers—and the rest of the packaged talent—do not pay any commission to their agents (customarily, 10%) in a packaged deal.

28.    By putting the creative elements together for the production companies, agency packaging facilitates the development of television and film projects that might otherwise not get produced.  Packaging, therefore, is not the means by which talent agents negotiate the terms and conditions of writers' employment; it is instead a service that talent agencies provide to amass the various elements of new TV shows and films and facilitate their production. Packaging creates more opportunities for writers, directors, and actors.  Moreover, talent agencies like WME support and provide talent for packaged programming throughout the life of the project.

29.    Packaging is an important part of WME's business because it helps WME get its clients' shows and films made.  When WME pitches a packaged show or film, it provides "packageable element(s)" (*e.g.*, writer(s), actor(s), and director(s)) to a studio in exchange for "packaging fees."  WME's incentive is to build the best elements into a package to maximize the chances that the project will be sold and that it will last for as long as possible.  Packaging—which can be, and often is, conducted by multiple

agencies (who then "share" the packaging fee)—thus puts talent agencies in the business of helping to get their clients' shows and films made, and helping these projects succeed. This of course creates more job opportunities for both WME and non-WME represented writers. Without packaging, some shows and films would never have been produced, and the writing opportunities these productions create would never have existed.

30. Unsurprisingly, therefore, many writers have hired WME *because* of its packaging services. Writers want to benefit from meeting with, and being paired with, in-demand directors and actors. The "package" of talent often enhances demand for the writer's script and services and leads to the production of TV shows and movies that would not otherwise get made.

31. Packaging arrangements are often idiosyncratic and always separately negotiated, but in broad strokes, television packages include an upfront license fee, a deferred (but capped) license fee, and a percentage of the profits of the rare series that is profitable (and the profits percentage, in the case of WME, keys off of revenue definitions that vary from package-to-package, based upon the profit-sharing definition of WME's top earning client on the show).

32. Although WGA regularly refers to packages as a 3% (upfront license fee)—3% (deferred license fee)—10% (backend fee) formula, this is not an accurate description of how packaging works in general, much less in any particular package:

      a.    The upfront license fee, for example, is often times not a percentage at all, but a fixed base number that studios will pay per episode. And when the upfront fee is a percentage, it is capped. The upfront license fee depends on the distribution channels (*e.g.*, basic versus premium cable versus streaming video on demand) and on the content (*e.g.*, drama versus comedy).

      b.    The deferred license fee—sometimes referred to as the "middle 3" in a 3%-3%-10% package—is rarely paid anymore. In the past 20

years, for example, WME believes it had just a tiny handful of series earn a "middle 3" deferred license fee.  And, again, when the deferred fee is on a percentage basis, it is capped.

c.   The backend fee is also rarely paid for the simple reason that only a small fraction of shows ever achieve profitability (which, again, is defined differently from package-to-package).  Upon information and belief, over the past 5 years, roughly (and merely) **5** series on the big four broadcast networks (ABC, CBS, FOX, and NBC) have achieved backend fees.[3]  Indeed, WGAW President David Goodman recently acknowledged that, more than ever in today's Hollywood of studio "short orders and streaming vertical integrations," "[w]e have no idea what profits are going to be on future shows."

33.   WGA claims that its about-face in banning talent agency packaging is proper because *all* packages create a harmful conflict of interest.  Specifically, WGA contends that talent agencies like WME will always care more about their package fees (which increase when a show or movie is profitable) than their clients' compensation, and thus do not work to maximize writers' or showrunners' pay in a packaged production.

34.   This contention of harmful conflicts is not only false, but astounding in its implausibility after WGA expressly endorsed agency packaging for more than 40 years.  From September 22, 1976 until April 12, 2019, WGA's agent regulations were set forth in the AMBA which provided, among other things, that whenever a talent agency took a package fee, it could not additionally commission the writers who were part of the package.  *See* AMBA, § 6(c).  In other words, up until April 12, WGA did not merely

---

[3]   As averred above, talent agency work on a packaged show exists for the life of the series.  To give a few examples, WME continues to represent its talent on the show, may need to identify new talent for the show, and may need to find a new network for a cancelled series.

fail to ban packaging as a supposedly invariable harmful conflict to writers' interests, WGA **affirmatively endorsed** packaging for more than 40 years as a practice that benefitted its members by eliminating the 10% commission they would otherwise have to pay, and by facilitating the production of shows and films that might not otherwise get made.

35.   The claim by WGA's current leadership that all packaging is uniformly bad for writers is even more implausible given the significant differences between the terms of different packages negotiated by different agencies with different studios under different circumstances for different programming.

36.   Furthermore, industry data refutes WGA's claim that writers are worse-off economically by being included in a package rather than paying commissions to their agents.  Indeed, WME's experience is that its packages have been supported by, and economically benefitted, its writer-clients.

37.   According to WGA itself, packaging has become the industry norm in scripted television.  For example, WGA alleges in a lawsuit it filed against WME and other talent agencies that "[a]pproximately 90% of all television series are now subject to such packaging fee arrangements."  As such, WGA's prohibition on packaging impacts how the vast majority of series are developed and will lead to a reduction in output of television shows.  It will similarly lead to a reduction in the output of feature films.

38.   Further, WGA freely admits that its agency packaging ban will impact not only the writers that it represents, but actors and directors as well as the production businesses of the studios:  "Can't the agencies just get a package fee with actors and directors?  It is possible but very unlikely. . . ."  *See* WGA Agency Campaign FAQ No. 19, attached hereto as Exhibit D.  And, just as with writers, when WME-represented actors or directors are included in a package, they do not pay any commission to WME.

39.   WGA has also structured its group boycott to enforce its packaging ban in a way that requires WGA members to participate in the boycott even when they work

as showrunners or producers rather than writers. *See* Agency Code of Conduct Implementation FAQ, attached hereto as Exhibit E, at 1 ("What if I'm a TV writer/producer? Some unsigned agencies have been telling clients they can still represent them as producers. This isn't true. Because your writer and producer functions are inextricably linked, and are deemed covered writing services under the MBA, you cannot continue to be represented as a producer by an agency not signed to the Code of Conduct."). But WGA itself recognizes that it does not have the authority to do so. *See* Ex. D, WGA FAQ No. 48 ("The Guild cannot direct you to leave your agency for non-writing areas of work."). The anticompetitive impact of WGA's packaging ban thus is intended to—and does—extend far beyond the labor market for writers that is WGA's only legitimate union interest. Indeed, one need look no further than WGA's own membership, which includes showrunners who act as producers and hire and supervise writers, and thus are non-labor parties in this capacity.

### B.  Agency-Affiliated Content Companies Have Created New Jobs and Enhanced Competition Against Traditional Hollywood Studios

40.  WME has, for many years, represented films and shows (*e.g.*, helped promote the sale and distribution of films overseas), and represented clients who are producers and financiers of television and film content without any objection or ban by WGA.

41.  WME's parent company, Endeavor, sought to expand its content offerings with the formation, in 2017, of Endeavor Content. Endeavor Content promotes itself as a competitive alternative to existing studios that empowers talent by giving writers and other talent greater creative control and better financial terms than would otherwise be available. As such, Endeavor Content is an alternative to, and competitor of, the traditional Hollywood studios that comprise AMPTP's membership. The additional competition that Endeavor Content and other agency-affiliates provide directly benefits writers, actors and directors, as well as consumers of television and film content.

42.     Endeavor Content is a separate entity from WME, by corporate structure, and housed in a different building, although the two are affiliated through their common parent company.  WME has no ownership interest in Endeavor Content.  WME and Endeavor Content have separate day-to-day management.  WME agents do not (and may not) work for Endeavor Content.  WME agents do not have any creative control over Endeavor Content projects.  WME agents do not hire or fire writers (or anyone else) on Endeavor Content projects.  And WME does not share any confidential client information with Endeavor Content.

43.     Endeavor Content often pays more for writers' intellectual property than other studios and gives writers greater creative control.  WGA itself concedes that talent agency-affiliates like Endeavor Content may pay writers *more* than traditional studios. *See* Ex. D, WGA FAQ No. 15 (writers "have received beneficial deals with the new producing entities connected to the agencies" because "offering a better deal to some creators is a common approach of new entrants—like Netflix, Amazon, and Apple").

44.     In fact, there have been public reports that WGA Negotiating Committee Co-Chair and former WGA West President Chris Keyser is the executive producer and writer on a new project with Endeavor Content.  Public reports further indicate that Mr. Keyser agreed to a packaging arrangement on the production.  He wrote in response to the public reports that "***Every additional studio that provides work for writers is a good thing.  That includes Endeavor Content, WiiP and CCM***."  Mr. Keyser is hardly alone.  Beau Willimon—the President of WGA East—also had a show with Endeavor Content.

45.     Indeed, Endeavor Content creates *more* opportunities for writers.  Many of these writers are not represented by WME.  And WME-represented writers (or, for that matter, any writer) may choose to pursue these opportunities with Endeavor Content or not, just as they may choose whether to retain a talent agent whose agency has an affiliated content company, or not.  Writers can and do change agencies with regularity; writers can and do choose the content companies with which they want to work.  And if a writer prefers not to pursue opportunities from an agency content affiliate, Endeavor

Content's creation of new writing opportunities frees-up more opportunities for the writers who prefer to look elsewhere.  No matter what an individual writer prefers about working with an agency-affiliated content company, the emergence of these companies increases output and the opportunities for writers and other talent and is thus undeniably *procompetitive*.

46.    WME's corporate affiliation with Endeavor Content is known to all of its writer-clients, who often seek opportunities from Endeavor Content specifically because of its affiliation with WME.  And WME requires that WME-represented writers who seek writing opportunities from Endeavor Content be represented by independent counsel in their negotiations with Endeavor Content (and, in some circumstances, WME has even reimbursed the legal fees).

47.    Any potential for a harmful conflict of interest arising out of a WME writer-client who chooses to pursue an opportunity with Endeavor Content is eliminated by the series of prophylactic measures described above that WME has voluntarily put in place to protect against any such potential harm.

48.    But WGA's new regulations flatly bar talent agencies from being "affiliated with[] any entity or individual engaged in the production or distribution of motion pictures."[4]

### C.    Through the AMBA, WGA Permitted Agency Packaging and Agency-Affiliate Content Companies for More Than 40 Years

49.    In 1976, WGA and ATA, of which WME is one of the more than 100 members, entered into an agent-franchise agreement known as the AMBA, *i.e.*, the

---

[4]  "Motion pictures" in WGA's Code of Conduct is defined as works written by writers under the collective bargaining agreement with AMPTP, which refers to motion pictures for exhibition on television and in a theater or similar location in which a fee or admission charge is paid by the viewing audience.  *See* Ex. B, MBA, Art. 1(A)(1)-(2).  What WGA means by "engaged in" production or distribution is less clear, but in any event, WGA has stated that it intends to ban agency affiliation with entities like Endeavor Content through this language.

Artists' Manager Basic Agreement.  Last year, however, WGA decided to exercise its termination right and, as a result, the AMBA expired on April 12, 2019, after it was extended from its earlier April 6 termination date.  The AMBA was in place for nearly 43 years.

50.     As averred above, through the AMBA, WGA designated and authorized (or "franchised") agents to represent WGA members in individual contract negotiations with AMPTP members.  The AMBA expressly endorsed packaging for all of this time through narrowly-tailored regulations, such as (i) a regulation preventing agents from taking their 10% commissions from writers on projects for which they are receiving a packaging fee (Ex. C, AMBA, § 6(c)) and (ii) a regulation prohibiting agents from conditioning their representation of writers upon the writers' agreement to participate in packages (*see id.*, § 6(c) ¶¶ E, G, H).  The AMBA further required talent agencies to fund a WGA Negotiator to be available for writers who wanted assistance negotiating package terms.  *See id.*, Exhibit N.  And the AMBA did not prohibit franchised agencies from having content affiliates.

51.     To the extent that packaging-specific or other WGA regulations were insufficient to protect WGA members from a potentially harmful conflict of interest, WGA additionally included a requirement in the AMBA that an agent "act with reasonable diligence, care and skill at all times in the interest of his Writer-Client and shall not act against his Writer-Client's interest."  *Id.*, § 8(e).

52.     In the event a writer—or, for that matter, WGA itself—believed that any talent agency had breached its obligations under the AMBA to act in the interests of the writers the agent represented, there were mechanisms for arbitration of the dispute set forth in the AMBA.  *See id.*, § 3.  Upon information and belief, not one writer has ever

filed a claim under the AMBA against WME based on any claimed failure by WME to act in her/his best interests.[5]

53.     Although package terms, packaging fees and the ubiquity of packaging have evolved over time, WGA's unsupported claims about why *all* packages supposedly give rise to injurious conflicts of interest would have been as applicable to packaging in 1976 as to packaging in 2019.  For example, WGA currently contends that talent agencies:

> a.     always seek to maximize their packaging fee instead of the writer's compensation;
>
> b.     always have an incentive to reduce the amount paid to a writer because the packaging fee is tied to a show's revenues and profits;
>
> c.     always seek to prevent writers from working on projects with talent represented by a competitor agency to avoid splitting the packaging fee; and
>
> d.     always pitch their writer clients' work to production companies that will pay the highest packaging fee, rather than to production companies that will pay the highest compensation to the client.

While WME believes that each of these claims is false, nothing about the fundamentals of packaging has changed in the last 43 years such that WGA could not have made these very same assertions in 1976.  Yet, for 43 years, WGA endorsed talent agency packaging through the AMBA and never took the position that it should be banned because it was harmful to its members.

54.     Another fact that has not changed in 43 years is WGA's labor law duty of fair representation to its members.  If banning all packaging by agents were actually required to protect the interests of WGA members, and a lawful exercise of union

---

[5] The AMBA also provided for the appointment of a standing committee to consider and recommend proposed changes to the agreement.  Ex. C, AMBA, § 1(d).  Such a committee was never appointed.

authority, then WGA's duty of fair representation would have caused it to implement a packaging ban decades ago.  Instead, however, WGA recognized that packaging benefitted its members, and used tailored regulations in the AMBA (to the extent any protections were needed) to ensure that agents acted in the interests of their writer-clients who were included in a packaged project.  And, again, the AMBA was silent on agency content affiliates.

55.   The sufficiency of the tailored regulations in the AMBA to prevent any harm to WGA members from potential agent conflicts of interests arising from packaging or content affiliates is confirmed by 43 years of history.

56.   Not only does WGA's boycott to enforce its Code of Conduct turn this history on its head, as WGA has admitted, its boycott will effectively prohibit actors and directors—who are not represented by WGA—from continuing to benefit from agency packaging and agency content affiliates.  It would also prohibit WGA's own members who choose to benefit from these commercial activities from continuing to do so when they work as showrunners or producers.

**D.   WME's Negotiations with WGA Over the Code of Conduct Were an Exercise in Futility—WGA's Leadership Was Intent on Implementing its Group Boycott to Effectuate its "Power Grab" and to "Divide and Conquer" the Major Agencies**

57.   WGA provided a termination notice under the AMBA in April 2018.  As averred below, terminating the AMBA was the first step in what WGAW President David Goodman called the union's "power grab."  Specifically, WME and ATA learned that one of the main reasons for this termination was WGA leadership's decision to try to ban all agency packaging and agency-affiliate content companies in order to "grab power" from the agencies who engaged in such activities to benefit their clients.

58.   WME—independently and through ATA—attempted to engage WGA in negotiations over a new AMBA.  WME offered to provide data on packaging, to answer questions about Endeavor Content, to be transparent, and to engage in a meaningful dialogue about any arguably *bona fide* WGA concerns and to identify any adjustments

to the AMBA—short of outright and anticompetitive prohibitions on packaging and content affiliates—that might assuage any legitimate WGA concerns.

59.    WGA, however, would not even meet with ATA's negotiating committee, of which WME is a member, until February 5*, 2019*.  In this meeting, the WGA negotiating committee members who attended simply read out loud their Code of Conduct proposals and responded to a few questions from ATA representatives by providing incomplete and elusive answers.  WGA's representatives also refused to provide any context or explanation for its proposals to ban all agency packaging and affiliation with content companies.

60.    ATA (and WME) met with WGA leadership again on February 19, 2019. ATA explained packaging and content affiliates in detail, provided an overview of the industry landscape, and answered WGA's questions.  ATA further explained why WGA's proposals would harm—not help—WGA member-writers and other talent.  But it was more of the same from WGA leadership—no meaningful, substantive engagement with the talent agencies who were trying to address WGA's own ostensible concerns.

61.    Subsequently, WGA publicly released a February 13 speech by WGAW's President (Goodman) in which he declared war on WME and the other major talent agencies, admitting that the union was "making a power grab" and intended to "divide and conquer" the agency business.  There can be little doubt from statements like this, and WGA's tactics overall, that WGA's leadership has decided to misuse WGA's power as a union to specifically target and cause injury to WME and a handful of the other most prominent talent agencies.  Indeed, WGA is seeking to induce, and has induced, a number of smaller agencies to join its illegal boycott by devising the Code of Conduct to force the larger agencies out of the writer-representation market based on their participation in the market for content (whether through packaging or content affiliates or both).

62.   On February 21, 2019, WGA circulated its "new set of agency regulations"—which WGA named the "Code of Conduct"—to the then-franchised agencies.  Its key new features were the bans on agency packaging and agency content affiliates.  WGA would also require that the agencies turn over to the unions the confidential employment contracts of the agencies' clients, writers and showrunners alike, without the permission of those clients.

63.   Less than two weeks later, on March 4, WGA publicly declared that negotiations with ATA had reached an "impasse."  Further efforts by ATA and WME to engage WGA in negotiations about the Code of Conduct led to more meetings, but ultimately proved to be exercises in futility.  WGA went so far as to encourage agents at the four largest agencies—including WME—to quit employment with their agencies and form new companies that would sign the Code of Conduct.

64.   On March 12, 2019, ATA responded to each WGA proposal with a specific counter-proposal.  Following meetings with hundreds of writer-clients, ATA drafted and presented to WGA the "Statement of Choice" through which the talent agencies were prepared to commit to a series of tailored agent regulations that would have eliminated any plausibly legitimate WGA concern about packaging.  At the same meeting, ATA and WME proposed regulations to provide for protection against any claimed adverse effects on writers from agency-affiliate content companies.  ATA's proposals were rejected out of hand.

65.   On March 14, 2019, WGA proposed a new "WGA Franchise Agreement," as the successor to the AMBA.  The WGA Franchise Agreement was essentially the Code of Conduct re-purposed as a draft agreement between WGA and talent agencies.  It thus included the complete bans on agency packaging and agency-affiliated content companies that WGA's leadership had been threatening from the outset.  WGA leadership further articulated its belief that only the guilds—not talent agents—are capable of advising writers, and that it had decided that all agency packaging and agency-affiliated content companies must be eliminated.  ATA once again explained

1    that it could not agree to these absolute bans—which would hurt not only the agencies,

2    but also writers and showrunners, as well as actors, directors, and consumers—and

3    urged continued negotiations.

4        66.    On March 21, 2019, ATA submitted a new proposal to WGA, which

5    included comprehensive provisions that would preserve the ability of agents to engage

6    in packaging and have a content affiliate, but with tailored regulations and protections

7    to prevent any purported risk of harm to WGA members.  *See* ATA Comprehensive

8    Proposal to WGA, attached hereto as Exhibit F, at 6-9.

9        67.    All of these proposals were again summarily rejected by WGA's

10   leadership and negotiating committee, which was intent on stopping at nothing short of

11   banning agency packaging and agency-affiliate content companies in order to "grab

12   power" from and "divide and conquer" the largest talent agencies.

13       68.    From March 27 through March 31, 2019, WGA called for a vote of its

14   members on the following question: "Do you authorize the Board and Council to

15   implement an Agency Code of Conduct, if and when it becomes advisable to do so,

16   upon expiration of the current Artists' Managers Basic Agreement on April 6, 2019?"

17   On March 31, 2019, WGA announced that a substantial majority of its members had

18   voted "yes" to this question.

19       69.    Despite the limited nature of the question that was put to a vote—

20   authorizing "a" code of conduct "if and when it becomes advisable to do so"—WGA

21   leadership seized-upon the results as a supposed proxy for it to order the membership

22   to fire their agents and to order a collective agreement to boycott WME and any other

23   agents who did not agree to follow whatever Code of Conduct WGA leadership

24   preferred.[6]

25

26

27

28
_____

[6] Upon information and belief, over half of WGA's members do not even have agents,
yet they were permitted to participate in a vote to boycott certain agency practices.

70.    On April 6, 2019—the day on which the AMBA was then-scheduled to expire—a small group of representatives from ATA initiated a meeting with WGA, during which WGA agreed not to implement its group boycott and Code of Conduct until the end of the day on Friday, April 12, in order to determine if a new AMBA could be negotiated.  WGA then informed its members of the brief extension, but further warned that: "Unless we have an agreed-upon deal, the WGAW Board and WGAE Council have voted that the Code of Conduct will go into effect at 12:01 am on Saturday, April 13th."

71.    From April 6 to April 12, 2019, ATA representatives met with WGA and presented further proposals in an effort to address WGA's purported concerns without agreeing to a flat ban on packaging or content affiliates.  But WGA was not willing to accept anything short of absolute bans.  These negotiations also proved to be futile and the unlawful group boycott directed by WGA's leadership was implemented on April 13.  Despite this hostile and unlawful conduct by WGA leadership, WME continued to work towards a negotiated solution with the WGA, to no avail.

72.    As recently as June 7, in a last-ditch effort to avoid filing this action, WME—through ATA—made yet another proposal to WGA, doing what it would never advise a writer-client to do:  negotiate against herself.  WME participated in this effort because, above-all-else, WME wants to be able to serve its clients, and remains open to agreeing to additional protections for writers against actual, harmful conflicts of interest without banning the packaging or content affiliates that benefit writers and other talent. For its part, WGA did not even bother to show up to the meeting with its full negotiating committee, declined to engage in any meaningful discussion at the meeting, and then waited nearly two weeks to respond—via a web-posted video directed to its members— that it would not offer any counter-proposal whatsoever to ATA.

73.    As recounted above, the conduct of the WGA leadership has demonstrated that they never intended to negotiate in good faith with ATA or the talent agencies. WGA's prohibitions on agency packaging and agency-affiliate content companies—

and its group boycott to enforce them—were a *fait accompli* from the beginning of the negotiations because anything less than these outright bans would not have served WGA leadership's "power grab" and desire to "divide and conquer" the major agencies.

**E.   WGA Enforces the Code of Conduct Against WME and Other Talent Agencies Through a Conspiracy to Boycott Non-Compliant Agents**

74.    On April 13, 2019, WGA leadership began to implement its group boycott and Code of Conduct and instructed its members that they were prohibited from being represented by an agent who does not agree to the Code of Conduct: "No Current WGA member can be represented by an agency that is not franchised by the Guild in accordance with Working Rule 23." Ex. E, Agency Code of Conduct Implementation FAQ, at 1.  Working Rule 23, in turn, provides that:  "No writer shall enter into a representation agreement whether oral or written, with any agent who has not entered into an agreement with the Guild covering minimum terms and conditions between agents and their writer clients." *Id.*  As WGA explained, "[a]s of April 13, 2019 that agreement is the WGA Agency Code of Conduct." *Id.*

75.    The Code of Conduct includes the same provisions banning all agency packaging and content affiliation that WGA had proposed at the outset of its negotiations with ATA.  Specifically, the following Code of Conduct provisions are now being implemented by WGA through its unlawful group boycott:

   a.    No Agent shall have an ownership or other financial interest in, or shall be owned by or affiliated with, any entity or individual engaged in the production or distribution of motion pictures.[7]

   b.    No Agent shall have an ownership or other financial interest in, or shall be owned by or affiliated with, any business venture that would

---

[7]    The term "motion pictures" refers to work written by writers under the Minimum Basic Agreement.  *See* n.4 *supra*.

create an actual or apparent conflict of interest with Agent's representation of a Writer.

c.    No Agent shall derive any revenue or other benefit from a Writer's involvement in or employment on a motion picture project, other than a percentage commission based on the Writer's compensation or fee.

d.    No Agent shall accept any money or thing of value from the employer of a Writer.

Ex. A, Code of Conduct, at 2.

76.    WGA has engaged in a conspiracy and group boycott to enforce these prohibitions against WME and other agencies in a variety of ways with both labor and non-labor parties.

77.    Within less than two weeks of implementing its boycott, WGA publicly declared that over 7,000 of its members had fired their agents.  Roughly 1,300 WGA members have fired WME as their agent—including showrunners and television and feature film writers.

**F.    WGA Leadership Coerces Most of its Members into a Horizontal Group Boycott Against WME and Other Non-Compliant Talent Agents**

78.    WGA Working Rule 23 provides that members can only be represented by agencies that sign a franchise agreement with WGA.  WGA asserts that talent agents who do not sign the Code of Conduct may not represent WGA members with respect to the option and sale of literary material or the rendition of writing services in a field of work covered by the Minimum Basic Agreement (and even for fields of work not covered by the MBA, such as when a writer works as a showrunner or producer).

79.    WGA's Executive Director (David Young) and President (David Goodman) have instructed WGA members that they must join the "collective action by WGA members" to refuse to deal with any agents or agencies who refuse to sign the

Code of Conduct. *See* Ex. E, Agency Code of Conduct Implementation FAQ, at 1 ("If my agency does not sign the Code of Conduct, do I have to tell them they cannot represent me? Yes, but you will do so as part of a collective action by WGA members.").

80.     WGA leadership has also threatened union discipline against any of its members who continue to work with such "non-franchised" agencies and agents. *See id.*, at 3 ("How will Working Rule 23 be enforced? … While individual members have a voice and vote, after the Guild decides on collective action members are obligated to follow Guild rules, which will be enforced. … Article X of the WGAW and WGAE Constitutions guides Guild disciplinary procedures."); *see also* Rules for Implementation of the WGA Code of Conduct for Agents, attached hereto as Exhibit G, ¶ 4 ("Members in violation of Working Rule 23 shall be subject to discipline in accordance with Article X of the WGAW Constitution.").

81.     Among other things, WGA's current leadership is attempting to compile a record of which members fire their non-franchised agents, and which members continue to work with their non-franchised agents. The latter group could be subject to discipline by a tribunal of WGA members, and the penalty could be a significant monetary fine or expulsion from WGA. Expulsion from WGA would prohibit AMPTP members (*i.e.*, Hollywood studios) from hiring such writers or showrunners. In other words, WGA members are under threat from WGA leadership that they could become unemployable if they decide against joining WGA's boycott and choose to work with a non-franchised talent agent. WGA leadership could not have made a more coercive threat to union membership.

82.     WGA members who want the freedom of working with their preferred talent agent—whether franchised or not—theoretically have the option of turning Financial Core (or "Fi-Core"). This means ceasing to be a WGA member, but paying a fee to WGA to cover the basic costs of representation by the union. Many WGA members understandably feel conflicted about this option because of the potential stigma of not maintaining a WGA membership. Exploiting this, WGA leadership has

threatened to publish the names of members who take Fi-Core status and to encourage WGA members not to work with Fi-Core writers.  Upon information and belief, no WGA member who has ever taken Fi-Core status has been subsequently accepted back into the union.  WGA leadership has thus been able to use coercive threats of public shaming, combined with the pressure to join WGA's boycott, to prevent most members from using Fi-Core to continue working with WME and other talent agents who have refused to sign the Code of Conduct.

83.     Significantly, many of the WGA members who have been coerced into participating in the group boycott—in particular, showrunners—primarily work as producers.  Among other things, showrunners set budgets for television shows, oversee the production of the shows, and retain the services of WGA writers (*i.e.*, showrunners *hire* other WGA members).  They function as supervisors and are thus non-labor parties.

84.     In fact, WGA encourages showrunners to hire other WGA members:  "To ensure that writers seeking employment have a way to get their samples in front of showrunners with jobs to fill, the Guild has created … the Staffing Submission System," which "allow[s] writers and showrunners to connect directly."  *See* Resources for Writers Without Agents, *available at:* https://www.wgaeast.org/negotiations/amba/what-happens-after-april-6/ (last visited June 22, 2019); *see also* C. Lee, VULTURE, How Hollywood Writers Are Finding Jobs After Firing Their Agents, *available at:* https://www.vulture.com/2019/04/how-wga-writers-are-finding-jobs-after-firing-agents.html   (Apr. 23, 2019) (WGA's Staffing Submission System "connect[s] Hollywood screenwriters with potential employment opportunities" "within the guild with showrunners").

85.     Because showrunners are *not* primarily engaged to perform the functions of writers, they are non-labor parties with respect to WGA and most of its members.  Whether voluntarily or by coercion, however, these non-labor party showrunners have been enlisted to participate in the group boycott.

86.     In sum, WGA's leadership has organized a group boycott in which they have banned all agency packaging and content affiliation, and both willing and coerced writers and showrunners have agreed to boycott WME and other talent agents who will not sign the Code of Conduct.

### G.     WGA's Leadership Orchestrates and Coerces Various Smaller Talent Agencies into Joining the Group Boycott

87.     Because WGA requires talent agencies to sign the Code of Conduct in order to represent WGA writers, WGA's Code of Conduct constitutes an agreement among compliant talent agencies to boycott non-signatory talent agencies.  WGA claims that, to date, approximately seventy talent agencies have signed the Code of Conduct (including, *e.g.*, Pantheon and other smaller talent agencies).

88.     These talent agencies are horizontal competitors who compete with one another, and compete with WME, to sell their representation services to writers.

89.     WGA has coerced these and other talent agencies in an attempt to force them to join the group boycott by presenting them with a Hobson's choice:  either agree to the Code of Conduct, or be prohibited from representing any WGA member-writers.

90.     For many smaller talent agencies that are not involved in packaging, or affiliated with content companies, the group boycott through the WGA Code of Conduct provides them with an anticompetitive advantage over non-complying agencies like WME.  Because the packaging and content bans do not practically affect such agencies, they can sign-on to the anticompetitive Code of Conduct without suffering any harm.  At the same time, by participating in and facilitating WGA's group boycott of non-compliant talent agencies, they will inflict anticompetitive injury upon competitors like WME.

### H.     WGA Leadership's Coercion of AMPTP Members—Non-Labor Parties—to Join the Group Boycott

91.   WGA's collective bargaining agreement with AMPTP—the MBA—is effective through May 1, 2020.  It does not specifically require AMPTP members to negotiate only with agents that are designated (or "franchised") by WGA.

92.   On February 9, 2019, WGA leadership sought to change this by requesting that AMPTP re-open negotiations regarding the MBA in order to add a clause that would prohibit AMPTP members from doing business with any talent agency that fails to agree to WGA's Code of Conduct.

93.   Upon information and belief, at the very same meeting, WGA representatives also threatened AMPTP and its members with objectively baseless litigation regarding their participation in packaging deals, unless they agreed to the following amendment (in bold/underscored text) to the MBA:

### ARTICLE 9 – MINIMUM TERMS (GENERAL)

The terms of this Basic Agreement are minimum terms; nothing herein contained shall prevent any writer from negotiating and contracting with any Company for better terms for the benefit of such writer than are here provided, excepting only credits for screen authorship, which may be given only pursuant to the terms and in the manner prescribed in Article 8.  **Unless conducted by an individual writer without assistance of any other person, such negotiations may be conducted or assisted only by agents who, at the time of such negotiations, are bound to an agreement with the Guild concerning the terms of such representation or are otherwise certified by the Guild to assist with or to conduct such negotiations.**  The Guild only shall have the right to waive any of the provisions of this Basic Agreement on behalf of or with respect to any individual writer.

### ARTICLE 3 – WORK LISTS, LOAN-OUTS AND RECOGNITION

…

B. RECOGNITION (THEATRICAL)

1. The Company hereby recognizes the Guild as the exclusive representative for the purpose of collective bargaining for all writers in the motion picture industry, **except that an individual writer may designate an agent to negotiate on his or her behalf, or to assist him or her in the negotiation of better terms than are here provided, provided that such agent is, at the time of such negotiations, bound to an agreement with the Guild concerning the terms of such representation or is otherwise certified by the Guild.**

94.     Upon information and belief, WGA threatened to sue AMPTP members if they did not agree to the proposed amendments to the MBA, which would prohibit them from continuing to do business with writers' agents who did not sign the Code of Conduct.

95.     Upon further information and belief, WGA shared with AMPTP and its members a draft complaint that WGA had prepared against WME and other major talent agencies based on their involvement in the packaging business.[8] This complaint alleged that agency packaging violated Section 302 of the Labor Management Relations Act ("LMRA") because paying packaging fees to talent agencies purportedly constituted *criminal* kickbacks by the studios in violation of the LMRA. WGA verbally threatened to sue AMPTP and the studios under the same legal theories set forth in the draft complaint—in effect, accusing them of criminal behavior—if they would not acquiesce to the MBA amendment and thus participate in WGA's group boycott.

96.     WGA leadership's threat of filing a civil case alleging that packaging was criminal behavior by the AMPTP members was objectively baseless. Indeed, because WGA itself has endorsed packaging for more than 40 years in the AMBA, it was frivolous for WGA to assert that such behavior was now suddenly criminal. This reality, however, did not stop WGA leaders from attempting to extort AMPTP and its members into joining WGA's group boycott to enforce the Code of Conduct.

97.     On March 25, 2019, AMPTP rejected WGA's invitation to re-open the MBA to include the amendment requiring that AMPTP members refuse to deal with agents who do not sign the Code of Conduct. AMPTP President Carol Lombardini stated in a publicly reported letter to WGAW Executive Director David Young that such

---

[8] WGA filed such a complaint against WME and other major talent agencies on April 17, 2019 before the California Superior Court for the County of Los Angeles. On May 20, 2019, the day before WME was set to file a demurrer to dismiss the complaint, WGA amended its complaint. The case has been designated a complex case and is temporarily stayed.

an amendment "would subject [AMPTP], the WGA and individual writers to a substantial risk of liability for antitrust violations," and AMPTP members "would also be at risk for violation of federal labor laws as well as state laws."

**I.** **WGA Leadership's Inducement of Unlicensed Managers and Lawyers—Non-Labor Parties—to Violate State Law and Participate in the Group Boycott**

98.    The group boycott orchestrated by WGA leadership is harming WGA's own members by leaving thousands of them without licensed talent agents to represent them in their individual negotiations with AMPTP producer-members.

99.    WGA leadership has tried to fill this void—which threatens the sustainability of its group boycott—by seeking to induce unlicensed Hollywood managers and lawyers to join the boycott by taking over the representation of WGA writer-members in their negotiations with film and television production companies. Pursuant to California, New York, and certain other state laws, however, unlicensed managers and lawyers are prohibited or limited in their ability to procure employment with the studios.  As such, they may not lawfully represent writers in their individual negotiations with the studios absent the involvement of a licensed talent agent.

100.    Specifically, on March 20, 2019, WGA—upon information at belief, at the direction of WGA leadership—sent a letter to managers and lawyers who represent WGA members titled "Limited Delegation of Authority to Negotiate Overscale Terms with Guild-Signatory Companies."   The letter asserted that, as the exclusive representative for all writers employed under the MBA, WGA could temporarily authorize unlicensed managers and lawyers "to procure employment and negotiate overscale terms and conditions of employment for individual Writers."[9]   WGA's position is wrong.  WGA has no legal authority to override state licensing requirements.

---

[9] *See also* Ex. E, Agency Code of Conduct Implementation FAQ, at 2 ("[Q.] The agencies say it is against state laws for managers and lawyers to help writers find work or negotiate without being connected to an agent. [A.] As a matter of practice, managers and sometimes attorneys already get work for clients. In addition, as the exclusive

101.   WGA falsely told unlicensed managers and lawyers that, if they agree to this limited delegation, WGA will somehow shield them from the consequences of violating California's Talent Agency Act ("TAA"), which provides that only *licensed agents* may procure employment for writers with television and film producers.  Other states, like New York, impose similar legal restrictions on the ability of managers and lawyers to procure employment for a writer without the involvement of a licensed agent. WGA falsely represented that it can protect unlicensed managers and lawyers from liability under these other state laws as well.

102.   Continuing to ignore the TAA and other state licensing laws, WGAW Executive Director David Young wrote to members on April 16, 2019 that: "If a talent manager or attorney who provides such procurement services at a writer's direction and in good faith is not otherwise paid for those services because of an alleged violation of the [TAA], the Guild will reimburse the talent manager or attorney in question for those services."

103.   In short, as part of its group boycott and in an effort to achieve its "power grab," WGA has combined with certain unlicensed managers and lawyers—*i.e.*, non-labor parties—in violation of various state licensing laws.  WGA leadership's actions have the purpose and effect of inducing these non-labor parties to replace WME and other non-franchised talent agents, or to force the non-franchised agents to submit to the Code of Conduct.  And the leadership's actions also lay bare that their crusade against agency packaging and content affiliates is about "conquer[ing]" the agencies rather than about any supposed conflicts of interest.  WGA is *not* requiring lawyers or managers to sign the Code of Conduct in order for WGA members to work with them.

---

bargaining representative for writers, the Guild has the right under federal law to delegate authority to other representatives, and on a temporary basis has now delegated that authority to managers and attorneys.").

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

## V.     COUNT ONE:  SECTION 1 OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 1)

104.   WME incorporates by reference and re-alleges all previous paragraphs as though fully set forth herein.  WGA's Code of Conduct and group boycott are illegal restraints of trade in violation of Section 1 of the Sherman Act.

105.   The Sherman Act prohibits agreements that unreasonably restrict competition; some such agreements—including group boycotts and concerted refusals to deal, like the WGA conspiracy challenged here—are condemned as *per se* illegal.

### A.     <u>The Limited Statutory Labor Exemption to the Antitrust Laws Does Not Shield WGA's Restraint of Trade</u>

106.   Labor law grants unions the exclusive authority to negotiate with employers over the terms and conditions of the union-members' employment.  This labor law authority thus gives unions absolute control—monopoly power—over the labor markets for their members' services.  There is a tension between labor law and the Sherman Act's prohibition against unreasonable restraints on competition because virtually all union activity would constitute an unreasonable restraint of trade if there were not a labor exemption to protect it from the antitrust laws.

107.   Congress, therefore, created the statutory labor exemption to shield from antitrust scrutiny certain union activity that is in pursuit of legitimate labor union goals.  Unions, however, do not have *carte blanche* to restrict competition however they like under the pretext of a labor objective.  Courts have instead strictly limited the scope of the statutory labor exemption to union conduct that is both (i) not in conjunction with a non-labor group *and* (ii) in furtherance of a *legitimate* union interest.

108.   Here, WGA may not invoke the protection of the statutory labor exemption for the threshold reason that it has imposed its Code of Conduct in combination with non-labor groups.  Showrunners—who primarily operate as producers—are part of the group boycott.  And, furthermore, WGA leadership has tried to induce (i) AMPTP and its members, *and* (ii) various unlicensed managers and lawyers to participate in WGA's

boycott. Each of these parties—the showrunner-producers, AMPTP and its members, and the unlicensed managers and lawyers—are non-labor groups. Therefore, the statutory labor exemption does not apply to WGA's group boycott on this ground alone because it involves non-labor parties.

109.   Even if, however, WGA were not acting in combination with a non-labor group, it still would not be entitled to protection under the statutory labor exemption. A group boycott to enforce prohibitions against agency packaging and agency-affiliate content companies goes beyond any lawful union interest.

110.   WME does not dispute the legitimacy of WGA seeking regulations tailored to prevent franchised talent agents from acting contrary to the interests of WGA members—just as talent agencies and WGA had agreed to through the AMBA for multiple decades. WGA's boycott, however, oversteps by a country mile any such claimed objective by flatly banning agency packaging and agency-affiliate content companies, without regard to the existence of any *actual* harm to writers resulting from potential conflicts of interest. Such blanket bans on industrywide commercial practices, which extend far beyond the labor market for writer services, do not fall within WGA's labor law authority or legitimate union interests. WGA also does not have any legitimate union interest to deny the benefits of agency packaging and content affiliation to actors and directors—who are not represented by WGA—nor to WGA members when they work as showrunners or producers rather than writers.

111.   In fact, WGA's packaging and content bans would hurt WGA's member-writers and other talent while economically shielding *AMPTP members—i.e.*, the non-labor parties that sit *across* the bargaining table from WGA—from both packaging fees and content competition. This is the antithesis of a legitimate union interest that would support application of the statutory labor exemption.

112.   Another reason why the boycott orchestrated by WGA leadership to eliminate agency packaging and affiliate content companies does not constitute a legitimate union interest within the meaning of the statutory labor exemption is because

the boycott does not concern the terms and conditions of employment for union members. While union regulation of agent commissions indirectly impacts wages, that is not what the challenged provisions of the Code of Conduct do here. On the contrary, the agency packaging ban eliminates *packaging fees* (not commissions) *paid by studios* (not by writers) to agents; and the ban on agency content companies has nothing to do with agency fees or the terms and conditions of writer employment. Both provisions stand in stark contrast to the now-expired AMBA, which regulated agent *commissions* by prohibiting them on projects for which agents were receiving packaging fees.

113.   Preventing agents from acting against their clients' interests in procuring employment as writers is a proper WGA concern. But that is neither the motivation nor effect of WGA's group boycott. The statutory labor exemption may not be invoked merely by parroting a mantra about purported union concerns about potential conflicts of interest. WGA managed packaging and content affiliates for more than 40 years with tailored regulations, including a specific requirement that agents not act against their writer-clients' interests. WGA leadership's self-proclaimed political agenda to "grab power" from, and to "divide and conquer," large talent agencies by prohibiting long-standing commercial behavior does not further any legitimate union interest.

114.   Another factor courts assess in considering the applicability of the statutory labor exemption is whether the challenged behavior resembles traditional union activity. WGA's (i) absolute packaging and content affiliate bans in business markets, (ii) "limited delegation of authority" to unlicensed managers and lawyers in violation of California and other state licensing laws, and (iii) threats to bring an objectively frivolous lawsuit asserting criminal conduct by AMPTP members if they do not join the boycott, do not bear any resemblance to traditional union activity like collective bargaining, calling strikes, picketing, or hand-billing.

115.   Nor is there any legitimate union interest in WGA's leadership threatening its own members with public shaming, discipline, and a loss of their livelihood if they continue to be represented by their agents.

116.   For all of these reasons, and those averred above, the statutory labor exemption does not apply.

**B.**      **The Non-Statutory Labor Exemption Also Does Not Apply**

117.   Because courts (not Congress) created the second labor law exemption from the antitrust laws, it is known as the non-statutory exemption.  The non-statutory exemption also does not shield the Code of Conduct and WGA's group boycott to ban agency packaging and content affiliates from the antitrust laws.

118.   The non-statutory labor exemption exists to provide unions and employers with the ability to bargain over wages, hours, and working conditions (the mandatory subjects of collective bargaining).  But, as averred above, the provisions at issue in the Code of Conduct do *not* concern wages, hours, working conditions, or even agent commissions.

119.   Additional factors that courts consider in determining whether the non-statutory labor exemption applies include:  Do the restraints primarily affect the parties to a collective bargaining agreement and no one else?  Do the restraints affect business markets, and if so, directly or indirectly?  And could the union's restraints be achieved through less restrictive means?  As averred throughout this Complaint, the answer to all of these questions is a resounding "yes"—thereby establishing that the non-statutory labor exemption does not apply.

120.   The purpose and effect of the challenged boycott is to ***directly*** impact the business market for producing and distributing TV shows and movies.  Boycotting talent agencies who will not adhere to the Code of Conduct also adversely impacts the markets for the services of, *e.g.*, directors and actors, who WGA has no authority to represent and who will no longer benefit from agency packaging or the existence of content affiliates.  Indeed, WGA has affirmatively stated that its packaging ban will impact actors and directors and the businesses of the studios (*see* Ex. D, WGA FAQ No. 19), as well as WGA members who work as showrunners or producers (*see* Ex. E, Agency Code of Conduct Implementation FAQ, at 1).   The non-statutory labor

1  exemption does not protect anticompetitive WGA activity that directly impacts either
2  business markets *or* labor markets for the services of workers that WGA does not
3  represent.

4       121.   With respect to the availability of less restrictive alternatives, WGA's
5  history demonstrates the availability of much less restrictive ways to address any
6  purported union concerns about the possible harmful effects on writers from conflicts
7  of interest.  As for packaging, it would be far less restrictive for WGA to rely upon the
8  AMBA rules that sanctioned packaging but also required that agents refrain from acting
9  against the best interests of their clients.  WGA could additionally require that agents
10 make disclosures sufficient to provide writers with the information they need to assess
11 whether participating in a particular package is something they want to do.  With respect
12 to affiliated content companies, any WGA concern about potential harmful effects on
13 writers from conflicts of interest could be addressed by regulations requiring firewalls
14 and disclosures like those that WME already utilizes vis-à-vis Endeavor Content, rather
15 than an unduly restrictive, outright ban on all such content affiliates.

16      122.   The over breadth of WGA's regulations is readily illustrated.  Even WGA
17 has publicly conceded that in many packages, a writer's net compensation will be higher
18 without paying a 10% commission and being part of a package.  Yet, under the Code of
19 Conduct, these writers will always have to pay 10% commissions and be economically
20 worse-off.  Furthermore, when purportedly "delegating" its exclusive bargaining power
21 to "authorize" unlicensed managers and writers to negotiate on behalf of individual
22 writers, WGA did not require them to subscribe to the Code of Conduct. This hypocrisy
23 further demonstrates that WGA's bans on agency packaging and content affiliates are
24 overly restrictive and just a "power grab" by union leadership.

25      123.   As another example, many television shows and films would not be
26 produced at all if an agency were not packaging the talent or if there were no agency-
27 affiliate to produce the content.  Under the Code of Conduct, however, these jobs for
28 WGA members will not exist.  In short, the categorical prohibition of output-enhancing

commercial behavior presenting only *theoretical* conflicts—rather than the prohibition of *actual* conflicts that harm WGA members—will eradicate agent behavior that *benefits* writers and thus is far more restrictive than necessary.  Indeed, by banning all agency content affiliates, the Code of Conduct would take job opportunities away from writers (and other talent) who are not even represented by the affiliated agency.

124.   For all of the foregoing reasons, the anticompetitive Code of Conduct and group boycott organized by WGA's leadership are not entitled to the protection of the non-statutory labor exemption.

**C.**   **The Group Boycott is a *Per Se* Violation of Section 1 of the Sherman Act**

125.   With WGA unable to invoke the protection of any labor exemption to the antitrust laws, the group boycott and concerted refusal to deal with talent agents who will not sign the Code of Conduct should be condemned as a classic, *per se* violation of Section 1 of the Sherman Act (15. U.S.C. § 1).

126.   The first element of a Section 1 claim is the existence of a contract, combination, or conspiracy.  Here, WGA has orchestrated a series of such agreements as part of its overall conspiracy.

127.   At the inducement of the two WGA unions acting in concert, a majority of WGA writer-members and showrunners—who compete with one another to acquire the services of talent agents—have voted for the Code of Conduct and entered into an unlawful horizontal agreement to boycott and refuse to deal with non-complying agencies.  WGA leadership, under the auspices of the union's Working Rules, has threatened members with disciplinary action (including expulsion and an effective blackball from the industry), if they do not agree to boycott non-franchised talent agents.  And, as averred above, WGA leadership has also threatened members from taking Fi-Core status and declining to participate in WGA's group boycott with public shaming and threats to their ability to find opportunities as writers.

128.   Also at WGA leadership's behest, certain smaller talent agencies—who compete with one another and with WME to sell their representation services to writers—have signed WGA's Code of Conduct, which operates as a horizontal agreement to boycott non-complying agencies like WME.

129.   WGA leaders have also tried, and continue to try, to induce AMPTP members—who are horizontal competitors in the market(s) for producing television and film content—to join the group boycott against talent agencies who refuse to subscribe to the Code of Conduct.

130.   WGA's leadership has further tried to induce, and continues to induce, unlicensed managers and lawyers into agreeing to participate in the group boycott by, among other things, purporting to provide a "limited delegation" of bargaining authority to procure employment on behalf of individual writers in violation of California and other state licensing laws.

131.   Such contracts, combinations, or conspiracies among various horizontal competitors to refuse to deal with and boycott talent agencies like WME who will not agree to the Code of Conduct is the type of pernicious, anticompetitive group boycott agreement that is subject to *per se* condemnation under Section 1 of the Sherman Act.

132.   WGA itself recognized that such agreements are *per se* illegal in an April 16, 2019 email to all its members: "***a combination in restraint of trade in violation of federal antitrust law … would likely constitute a group boycott that is per se unlawful under longstanding Supreme Court precedent***."[10]

**D.    The Group Boycott Would Also Constitute an Unlawful Restraint of Trade Under a "Quick Look" or Full-Blown Rule of Reason Analysis**

133.   Even if the Court were to decline to apply a *per se* test, and to instead evaluate the boycott under either the full-blown rule of reason or a "quick look" mode

---

[10] This statement was made in the context of WGA leadership threatening lawyers and managers who might decline to participate in their boycott conspiracy.

of analysis, the conduct at issue would still constitute an illegal restraint of trade in violation of Section 1 of the Sherman Act.

134.   Under a full-blown rule of reason analysis, the Court would weigh the anticompetitive harm caused by WGA's restrictions (*e.g.*, the elimination of scores of talent agents as competitors to represent writers) against any ostensible procompetitive benefit of those same restrictions.   This inquiry would include defining the relevant economic market(s) in which WGA is restraining competition, assessing WGA's market power in these markets, considering whether WGA could achieve any ostensible procompetitive benefit of its agency packaging and agency-affiliate content bans in a less restrictive manner, and potentially balancing the anti- and procompetitive effects against one another.   As an alternative to a full-blown rule of reason analysis, the Court could also conduct a "quick look" rule of reason review of WGA's conduct to determine whether to summarily condemn it as an unreasonable restraint because of its clear horizontal anticompetitive impact on competition and lack of any plausible justification (*e.g.*, without the need to define the relevant economic markets or assess WGA's market power).   The bottom line, however, is that no matter what antitrust standard is applied, WGA's anticompetitive agreements cannot withstand scrutiny under Section 1 of the Sherman Act.

135.   ***Relevant markets and market power.***   WME and other talent agencies compete in a relevant market to sell their representation services to writers negotiating with AMPTP producer-members.   The flip-side of this market is that the writers compete with each other to acquire the representation services of agents.   The geographic scope of this relevant market is the United States.   *See, e.g.*, Ex. B, MBA, Art. 5 (application of collective bargaining agreement between WGA and AMPTP focuses on whether writer lives or provides services in the U.S.).   There are no substitutes for the representation services provided in this market and there is no cross-elasticity of demand with unlicensed managers or lawyers or other potential representatives because, under California and a number of other state laws, only

licensed talent agents may independently procure employment for writers in their negotiations with studios. WGA has stifled competition in this relevant market through its group boycott to enforce the Code of Conduct.

136. WGA has market power—indeed, monopoly power—over the relevant market for the representation of writers in the United States. This is because of WGA's status as the exclusive collective bargaining representative of all writers for unionized television and film productions. Indeed, the very reason for the creation of the statutory and non-statutory labor exemptions to the antitrust laws is because, without them, virtually all union behavior—including agreements with its members—would constitute an unreasonable restraint of trade given unions' monopoly power over their respective labor markets. This is also the reason why the labor exemptions to the antitrust laws have specific limitations—because, without them, union leaders like the WGAW's and WGAE's could abuse their organizations' monopoly power to impose agreements that either unreasonably restrain competition in commercial markets or extend beyond any legitimate union interest.

137. Another relevant market is the market to produce and/or distribute television shows and films.[11]  There are no close substitutes or cross-elasticity of demand with producers of other forms of entertainment (*e.g.*, sports or theater or opera) because such organizations do not have the unique experience, talent, reputation or motivation to produce television shows and movies. The geographic scope of this market is the United States—the dominant market for television and film production.

138. WGA's ban on agency packaging has unreasonably restrained competition in the market for producing films and television shows by abusing and leveraging its monopoly power in the labor market for writers to eliminate agencies as competitors for packaging in the relevant market for producing films and television shows. As

---

[11]  Alternatively, the production and distribution of films, and the production and distribution of television shows may either constitute separate relevant markets or sub-markets of the relevant market for film and television production.

averred above, writers are essential components of packages, and most television programming is packaged. The anticompetitive effects are thus substantial because many (or all) agents will be driven out of packaging if the conspiracy and group boycott orchestrated by WGA leadership were to succeed.

139. With respect to WGA's agency-affiliate content ban, WGA has unreasonably restrained competition by abusing and leveraging its monopoly power in the labor market for writers to eliminate agency-affiliates as competitors with the established studios in the relevant market for producing and distributing films and television shows. WGA's group boycott to eliminate important new entrants in a market that has seen substantial consolidation and concentration has significant anticompetitive effects. To the extent that studios are participating in this boycott, they directly benefit from the reduction in competition.

140. WGA's group boycott also further unreasonably restrains competition in the relevant market to represent writers by providing an anticompetitive advantage to unlicensed managers and lawyers who WGA's leadership has tried to threaten and coerce into replacing the boycotted agents, such as WME, in their representation of writers. These unlicensed managers and lawyers are permitted to participate in packaging and content production without being required to sign the Code of Conduct.

141. ***No procompetitive justifications.*** There is no plausible pro-*competitive* justification for completely banning agency packaging and agency-affiliate content companies. Instead, WGA leadership designed these prohibitions to try to drive the top agencies out of the business of representing writers. This fact alone requires condemnation under either a quick look or full-blown rule of reason analysis.

142. The main questions for purposes of evaluating any claimed procompetitive justification are whether the challenged bans and group boycott enhance or suppress competition, and if so, whether on balance the challenged restraints are more procompetitive than anticompetitive. Here, however, the *only* competitive effect of the challenged restraints is to eliminate WME and other agencies who refuse to sign the

Code of Conduct as competitors in the relevant markets. These restraints, on their face, thus reduce—not enhance—competition. There is also no plausible procompetitive justification for WGA's boycott to enforce these anticompetitive rules. And even if there were, WGA could achieve any purported procompetitive objective through far less restrictive alternatives that would be virtually as effective as the absolute packaging and content affiliate bans set forth in the Code of Conduct.

143. To the extent the Court were to reach the final step of a full-blown rule of reason inquiry—the balancing step—WGA's group boycott and anticompetitive Code of Conduct would similarly fail. The absolute bans on agency packaging and affiliate-content companies inflict significant anticompetitive effects in the relevant markets with *no* offsetting procompetitive benefits. Indeed, the group boycott to enforce these restraints has significant anticompetitive effects with no offsetting competition-enhancing aspects at all.

144. ***Antitrust injury.*** Finally, WME has suffered and will continue to suffer antitrust injury to its business and property as a direct and proximate result of WGA's unlawful conspiracy. WME's refusal to agree to the Code of Conduct has subjected its writer-representation business to a group boycott and refusal to deal. WME has and will continue to lose work, lose clients (1,300 so far), lose packaging fees, and suffer irreparable harm to its business and property as a result of WGA's unlawful conspiracy. In addition, the ultimate consumers of film and television shows will be injured by the reduction in film and television output caused by WGA's conspiracy. WME will prove the amount of damages it has suffered as a result of WGA's antitrust violation at trial and is entitled to both triple damages and attorney's fees.

## VI.   PRAYER FOR RELIEF

WHEREFORE, WME respectfully requests that the Court enter judgment against WGA:

1. Declaring that WGA's bans on agency packaging and content affiliates, and concerted refusal to deal and group boycott to enforce these

1    prohibitions, is an illegal contract, combination, or conspiracy constituting

2    an unreasonable restraint of trade in violation of Section 1 of the Sherman

3    Act, 15 U.S.C. § 1;

4        2.    Permanently enjoining the challenged conduct;

5        3.    Awarding WME treble damages, as well as costs and attorney's fees, in an

6    amount to be proven at trial;

7        4.    Awarding pre- and post-judgment interest at the maximum rate allowable

8    by the law; and

9        5.    Ordering such other relief as the Court may deem just and equitable.

10

11

12    Dated:  June 24, 2019          WINSTON & STRAWN LLP

13                    By: */s/ Diana Hughes Leiden*

14                        Jeffrey L. Kessler
                    David L. Greenspan

15                        Diana Hughes Leiden
                    Shawn R. Obi

16                        Isabelle Mercier-Dalphond

17                        Attorneys for Plaintiff
                    WILLIAM MORRIS ENDEAVOR

18                        ENTERTAINMENT, LLC

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

1

**DEMAND FOR JURY TRIAL**

2       Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff WME demands a

3 trial by jury on all issues so triable.

4

5 Dated:  June 24, 2019               WINSTON & STRAWN LLP

6

7                           By: */s/ Diana Hughes Leiden*
                                  Jeffrey L. Kessler

8                                   David L. Greenspan
                                  Diana Hughes Leiden

9                                   Shawn R. Obi
                                  Isabelle Mercier-Dalphond

10                                   Attorneys for Plaintiff
                                  WILLIAM MORRIS ENDEAVOR

11                                   ENTERTAINMENT, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT