Stephen P. Berzon (SBN 46540)
sberzon@altber.com
Stacey Leyton (SBN 203827)
sleyton@altber.com
P. Casey Pitts (SBN 262463)
cpitts@altber.com
Rebecca C. Lee (SBN 305119)
rlee@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

Anthony R. Segall (SBN 101340)
asegall@rsglabor.com
Juhyung Harold Lee (SBN 315738)
hlee@rsglabor.com
ROTHNER, SEGALL &
GREENSTONE
510 South Marengo Avenue
Pasadena, California 91101
Telephone: (626) 796-7555
Facsimile: (626) 577-0124

W. Stephen Cannon (*pro hac vice* pending)
scannon@constantinecannon.com
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave, NW, Ste. 1300N
Washington, DC 20004
Telephone: (202) 204-3500
Facsimile: (202) 204-3501

Ethan E. Litwin (*pro hac vice* pending)
elitwin@constantinecannon.com
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701

*Attorneys for Defendants and Counterclaimants*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC,

    Plaintiff and Counterclaim Defendant,

      v.

WRITERS GUILD OF AMERICA, WEST, INC. and WRITERS GUILD OF AMERICA, EAST, INC.,

    Defendants and Counterclaimants,

and MEREDITH STIEHM,

    Counterclaimant.

Case No. 2:19-cv-05465-AB-AFM

**ANSWER AND COUNTERCLAIMS**

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

## INTRODUCTION

1.     This case arises out of efforts by two labor unions representing writers in the entertainment industry to protect their members against an unlawful compensation system for talent agents—packaging fees—that gives rise to inherent conflicts of interest between those agents and the writers they represent, and out of the agents' collusive efforts to maintain that system through agreed upon price structures and group boycotts of those opposed to the system.  This system of packaging fees has, over time, significantly depressed writers' compensation, employment opportunities, and choice of talent for audiovisual entertainment projects, as well as the quality of those projects, while greatly enriching the talent agencies.

2.     Writers are the creative heart of the television and film businesses. They are responsible for providing the stories, plots, dialogue, and other content of television shows and movies that are enjoyed by audiences around the world and that generate billions of dollars in revenue every year.  Without the work and creative content provided by these writers, the television and film industries could not operate.

3.     The base compensation and benefits paid to writers for their work are governed by a collectively-bargained contract between Writers Guild of America, West, Inc. ("WGAW") and Writers Guild of America, East, Inc. ("WGAE") (collectively "Guilds" or "WGA") and hundreds of studios and production companies.  Because the entertainment industry is a freelance industry, and because writers may negotiate compensation above the minimum levels established by the Guilds' contract with the studios, the vast majority of working writers have historically procured employment through talent agents they have retained to help them find work and negotiate for the best possible compensation.  These agents owe a fiduciary duty to their clients under California law, and must provide their clients

with conflict-free representation.

4. Talent agencies have represented writers for almost a century. But what began as a service to writers and other artists in their negotiations with the production companies has become an unlawful price-fixing cartel dominated by a few powerful talent agencies that use their control of talent first and foremost to enrich themselves. Historically, the agents whom writers retained were compensated by receiving a portion of any payments made to the writers by production companies for work that the agents helped them procure. By tying the agents' compensation to the writers' compensation, this arrangement aligned the interests of the agents with the interests of their writer-clients, as required by blackletter agency law principles.

5. Today, however, the four largest talent agencies—Counterclaim Defendant William Morris Endeavor Entertainment ("WME"), and co-conspirators Creative Artists Agency ("CAA"), United Talent Agents ("UTA"), and International Creative Management Partners ("ICM") (collectively, "the Agencies" or "the Big Four")—make money not by maximizing their clients' earnings and charging a commission, but through direct payments from the production companies known as "packaging fees." Packaging fees are not directly tied to Agencies' clients' compensation but instead come directly from television series and film production budgets and profits.

6. The power exerted by the Big Four in Hollywood is enormous and pervasive. Even the Hollywood studios—powerful entities in their own right—agree to pay hundreds of millions of dollars in packaging fees annually to the Big Four for "what amounts to extortion"[1] according to industry insiders, because they are "afraid of not getting pitches and opportunities if they take a hard line against

---

[1] Gavin Polone, *TV's Dirty Secret: Your Agent Gets Money for Nothing*, The Hollywood Reporter (Mar. 26, 2015), https://www.hollywoodreporter.com/news/gavin-polone-tvs-dirty-secret-783941.

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

[packaging fees]."[2]  The studios, like everyone else in Hollywood, "[are] afraid to challenge the agencies for fear of being blackballed."[3]

7.      Agency compensation via packaging fees is possible because, after substantial consolidation within the industry, the Big Four now control access to the lion's share of the key talent necessary to create a new television show or feature film, including not only writers but also actors and directors.  The Big Four leverage this control to negotiate packaging fees with television and film production companies, which are paid directly by the studios to the Big Four simply because the Big Four represent the writers, directors, and actors who will be employed by the production companies in producing the show.  The packaging fees paid by production companies to the Agencies are unrelated to their own clients' compensation and generate hundreds of millions of dollars in revenue for the Agencies each year.

8.      Rather than compete with each other over the terms of these packaging arrangements, the Big Four have instead colluded among themselves to set a standard structure for packaging fees, the so-called "3-3-10" model for agency compensation described later herein, as well as on the range of "base license fees" used to calculate the upfront 3% packaging fee.  The scope and degree of the Agencies' collusion was successfully kept secret from the Guild and its members for years.

9.      Packaging fees have created numerous conflicts of interest between writers and WME and the other Agencies, wherein WME and the other Agencies enrich themselves at their writer-clients' expense, in most cases without those

---

[2] David Ng, *Talent agencies are reshaping their roles in Hollywood.  Not everyone is happy about that*, L.A. Times (Apr. 6, 2018), https://www.latimes.com/business/hollywood/la-fi-ct-talent-agencies-20180406-story.html.

[3] *Id.*

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

clients' knowledge and in all cases without their valid consent. Unlike in a commission-based system, the economic interests of the agents at WME that represent writers and other creative talent are no longer aligned with those of their writer-clients. Rather than seeking to maximize how much writers are paid for their work, WME is incentivized instead to maximize the packaging fee it will be paid for a particular project or program. Further, WME has the incentive to, and does, prioritize the studios' interests over those of its clients in order to protect its continuing ability to negotiate new packaging fees from those studios. Moreover, because WME's packaging fee is generally tied to a show's profits, WME has an incentive to *reduce* the amount paid to writers and other talent for their work on a show. Further, WME seeks to prevent the writers it represents from working with talent represented by other Agencies in order to avoid having to split the packaging fee with other Agencies—even where the project would benefit by drawing from a larger talent pool. WME also pitches writers' work to the production companies it believes will agree to the most lucrative license fees and profit definition within the agreed-upon range (the remaining negotiable elements of a "3-3-10" package deal), rather than to the companies that will pay the most to its writer-clients. Agencies have not disclosed these conflicts of interest or the terms of their packaging fee arrangements to the writers they represent.

10. The Agencies' collusive actions and conflicts of interest have resulted in tremendous financial harm to the Guilds and their members, including Individual Counterclaimant Meredith Stiehm. Packaging fees have depressed writers' compensation, as money that would otherwise be paid to writers is instead paid to WME and the other Agencies as part of the packaging fee or is left on the table. Writers have also lost employment opportunities as a result of agency packaging and, where they are hired, have an artificially reduced universe of talent with which to staff their shows. Packaging fees reduce, dollar for dollar, the production budget

5

for a project and, accordingly, can diminish the quality of the finished product. Because of the conflicts of interest created by packaging fees, writers have also been required to retain other professionals (such as lawyers and personal managers) to monitor WME and the other Agencies, protect the writers' interests, and provide conflict-free services that agents should otherwise provide.

11.    Because the Guilds are the exclusive representatives of writers under federal labor law, talent agents may represent individual writers to negotiate above-scale employment only pursuant to the Guilds' delegated authority.  Historically, the Guilds have delegated that authority through a franchise agreement.  And as a condition of being franchised, agents are subject to regulations promulgated by the Guilds.  The Guilds may dictate, among other things, how and how much agents may be paid for their services.

12.    In April 2018, in part in response to the inherent conflicts of interest created by packaging fees, the Guilds served notice on the agencies of their intent to terminate the Artists' Managers Basic Agreement ("AMBA"), the franchise agreement negotiated with the Association of Talent Agents ("ATA") that had historically governed the relationship between writers and their agents.  At the same time, the Guilds submitted to the ATA a set of proposals for a new franchise agreement with talent agencies.  A critical aspect of these proposals was the Guilds' insistence that franchised agents no longer accept packaging fees from production companies on projects where a writer-client is employed.  The Guilds subsequently formalized these proposals, including the bar on packaging fees, in a new Code of Conduct for franchised agents.

13.    The Agencies collectively responded to the Guilds through the ATA, categorically rejecting the Guilds' demands and questioning the well-established principle that writers may collectively agree "to use only agents who have been 'franchised' by [the Guilds]" and that, "in turn, as a condition of franchising, the

6

[Guilds] may require agents to agree to a code of conduct and restrictions on terms included in agent-[writer] contracts." *Marathon Entm't, Inc. v. Blasi*, 42 Cal.4th 974, 983 (2008).

14.     The ATA categorically refused to negotiate any terms that would end packaging fees on projects where a writer-client is employed or any other practices giving rise to similar inherent conflicts of interest. Accordingly, following a June 7, 2019 meeting with the ATA, the Guilds revoked their consent to collective negotiations through the ATA, announcing that they would only negotiate with individual agencies going forward. That revocation of consent meant that the ATA and its members, including the Big Four, were no longer covered by federal antitrust law's "labor exemption," which immunizes certain labor union conduct and grants a limited derivative exemption to non-labor entities to negotiate with labor unions.

15.     After the Guilds' revocation of consent to multiparty negotiations, the Agencies unlawfully and collusively circled their wagons inside the ATA—a trade association comprised entirely of competing sellers of agency services—and publicly threatened to retaliate against any agency that broke ranks and concluded an individual deal with the Guilds. Despite the Guilds' revocation of the prior limited consent they had granted the Agencies to collectively negotiate a new deal through their trade association, the Big Four and other talent agencies have continued to collusively discuss and plan their negotiations with the Guilds, and to coordinate with respect to their dealings with the Guilds and their individual dealings with the Guilds' members, through the ATA, in violation of the antitrust laws.

16.     WME and the other Agencies have also colluded to issue threats of baseless litigation against lawyers and to blacklist former clients who seek unconflicted representation by agents that have agreed to abide the Guild's Code of Conduct, harming the Guilds and their members, in violation of the antitrust laws.

17.     Counterclaimants bring these counterclaims to end WME's harmful

7

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

and unlawful practice of packaging fees and their joint conduct in attempting to fix and preserve those fees, and to seek compensation for the injuries suffered as a result of these practices. First, as asserted in Counterclaimants' first through fourth claims for relief, WME and the other Agencies have engaged in unlawful *per se* price fixing and unlawful *per se* group boycotts in violation of the Sherman Act, 15 U.S.C. §1 *et seq.*, and the Cartwright Act, California Business and Professions Code §16700 *et seq.* Second, as asserted in Counterclaimants' fifth claim for relief, WME's packaging fees violate the fiduciary duty that agents owe to their writer-clients and deprive them of the conflict-free representation to which they are entitled. Third, as asserted in Counterclaimants' sixth claim for relief, WME's breaches of its fiduciary duty to its writer-clients also constitute constructive fraud under California Civil Code §1573. Fourth, as set forth in Counterclaimants' seventh claim for relief, for these reasons, and because the payments made from production companies to WME as part of any package constitute unlawful kickbacks from an employer to a "representative of any of his employees" prohibited by Section 302 of the federal Labor-Management Relations Act, 29 U.S.C. §186(a)(1), packaging fees are an unlawful or unfair business practice for the purposes of the California Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et seq.* ("UCL"). Fifth, as set forth in Counterclaimants' eighth through eleventh claims for relief, WME's repeated Section 302 violations also constitute an unlawful "pattern of racketeering activity" within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962 *et seq.* ("RICO").

18. Packaging fees should therefore be declared unlawful and WME should be enjoined from continuing to seek or receive them, Counterclaimants should be awarded disgorgement of unlawful profits, the costs of suit, and reasonable attorneys' fees, and Stiehm should further be awarded restitution and damages. WME should further be enjoined from jointly seeking with the other Agencies to

negotiate, or strategizing with the other Agencies regarding their individual negotiations with the Guilds, absent the Guilds' express consent to do so.

## ANSWER TO COMPLAINT

Defendants and Counterclaimants Writers Guild of America, West, Inc. and Writers Guild of America, East, Inc. hereby answer Plaintiff and Counterclaim Defendant William Morris Endeavor Entertainment, LLC's Complaint as follows:

19.    The Guilds admit that the Complaint alleges that the Guilds violated antitrust law.  The Guilds deny the remaining allegations in Paragraph 1.

20.    The Guilds lack knowledge or information sufficient to respond to the allegations in Paragraph 2, and on that basis deny the allegations therein.

21.    The Guilds admit that WGAW and WGAE are labor unions that serve as the exclusive collective bargaining representatives of certain writers in the entertainment industry.  The Guilds further admit that they previously franchised WME to represent their members in individual employment negotiations with television and film studios.  The Guilds deny the remaining allegations in Paragraph 3.

22.    The Guilds admit that they have adopted a "Code of Conduct" for talent agencies that represent writers for work covered by a Guild collective bargaining agreement.  The Guilds further admit that, as a result of WME's refusal to sign the Code of Conduct, approximately 1,300 Guild members have chosen to terminate their representation by WME with respect to writing services.  The Guilds deny the remaining allegations in Paragraph 4.

23.    Paragraph 5 states legal conclusions to which no response is required. To the extent a response to any allegations in Paragraph 5 is required, the Guilds deny those allegations.

24.    The Guilds lack knowledge or information sufficient to respond to the allegation regarding the role of packaging in producing television and film content,

9

and on that basis deny that allegation.  The Guilds deny the remaining allegations in Paragraph 6.

25.    The Guilds admit that that they granted a limited delegation of their authority to lawyers and managers.  The Guilds deny the remaining allegations in Paragraph 7.

26.    The Guilds deny the allegations in Paragraph 8.

27.    The Guilds admit that they have a legitimate interest in protecting their members from the adverse effects of talent agencies' and talent agents' conflicts of interests, including by ensuring that potential and actual conflicts of interests are managed and disclosed.  The Guilds lack knowledge or information sufficient to respond to the allegations regarding the motivations of writers who participate in packaging and/or seek opportunities from agency-affiliated content companies, and on that basis deny those allegations.  The Guilds deny the remaining allegations in Paragraph 9.

28.    The Guilds deny the allegations in Paragraph 10.

29.    The Guilds admit that WGAW President David Goodman made the quoted statements, but deny WME's characterization of those statements.  The Guilds further admit that they have sought to protect their members from the harm caused by packaging-related conflicts of interest.  The Guilds deny the remaining allegations in Paragraph 11.

30.    The Guilds deny the allegations in Paragraph 12.

31.    The Guilds lack knowledge or information sufficient to respond to the allegation regarding the perception of talent agencies as "powerful," and on that basis deny that allegation.  The Guilds deny the remaining allegations in Paragraph 13.

32.    The Guilds deny the allegations in Paragraph 14, deny that the Guilds are liable to WME, and deny that WME is entitled to any relief.

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

33.    The Guilds admit that WME is a talent agency that represents writers for television and film productions.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 15, and on that basis deny them.

34.    The Guilds admit the allegations in Paragraph 16.

35.    The Guilds admit the allegations in Paragraph 17.

36.    The Guilds deny that they "entered into" a collective bargaining agreement with the Alliance of Motion Picture and Television Producers, Inc. ("AMPTP").  The Guilds admit the remaining allegations in Paragraph 18.

37.    The Guilds deny the allegations in Paragraph 19.

38.    The Guilds admit that federal labor law empowers the Guilds to serve as their members' exclusive collective bargaining representatives and to designate agents who may represent the Guilds' members in individual employment negotiations with production studios.  The Guilds further admit that such negotiations are subject to limitations set forth in the Writers Guild Theatrical and Television Basic Agreement ("MBA") negotiated by the Guilds and the AMPTP. The Guilds deny the remaining allegations in Paragraph 20.

39.    The Guilds admit that, during the period from September 22, 1976, to April 12, 2019, they were parties to the AMBA with the ATA, previously known as the Artists' Managers Guild.  The Guilds further admit that, pursuant to the AMBA, the Guilds previously designated WME and other talent agencies to represent the Guilds' members in individual employment negotiations with members of the AMPTP.  The Guilds also admit that, commencing on or around April 13, 2019, the Guilds no longer designate WME as a talent agency that may represent the Guilds' members in individual employment negotiations with members of the AMPTP.  The Guilds deny the remaining allegations in Paragraph 21.

11

40.     In response to Paragraph 22, the Guilds admit that this Court has subject-matter jurisdiction over the instant action.

41.     The Guilds admit that this Court has personal jurisdiction over WGAW and WGAE for purposes of the instant action.  The Guilds admit that WGAE is a corporation that transacts business, performs services on behalf of its members in this district, and worked with WGAW to attempt to negotiate a new franchise agreement with the ATA in this district.  The Guilds deny the remaining allegations in Paragraph 23.

42.     The Guilds admit that venue is proper in this District.  The Guilds deny the remaining allegations in Paragraph 24.

43.     In response to Paragraph 25, the Guilds admit that the instant action should be assigned to the Western Division.

44.     The Guilds lack knowledge or information sufficient to respond to the allegations regarding WME's standing in the talent-agency market, the likelihood of clients remaining with a talent agency that places its own interests before its clients, and WME's commitments to its clients.  On that basis, The Guilds deny those allegations.  The Guilds deny the remaining allegations in Paragraph 26.

45.     The Guilds admit that "packaging" refers to a practice by which talent agencies assemble various elements of a television or film production and present those elements to a production studio.  The Guilds further admit that under the now-expired AMBA writers employed to work on packaged productions could not be required to pay 10% commission to their talent agents.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 27, and on that basis deny the remaining allegations therein.

46.     The Guilds lack knowledge or information sufficient to respond to the allegations in Paragraph 28, and on that basis deny the allegations therein.

12

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

47.     The Guilds admit that agencies engage in joint packaging.  The Guilds deny that packaging creates job opportunities for writers.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 29, and on that basis deny the allegations therein.

48.     The Guilds lack knowledge or information sufficient to respond to the allegations in Paragraph 30, and on that basis deny the allegations therein.

49.     The Guilds admit that packaging arrangements include a license fee, a deferred license fee, and a percentage of profits.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 31, and on that basis deny the remaining allegations therein.

50.     The Guilds admit that WGAW President David Goodman made the statements quoted in subparagraph 32(c), but deny WME's characterization of those statements.  The Guilds further admit that the upfront license fee is often "a fixed base number" reflecting both distribution method and content.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 32 (including all subparagraphs thereof), and on that basis deny the remaining allegations therein.

51.     The Guilds admit that they oppose the representation of their members by talent agencies that are compensated for that representation through packaging fees because of the conflicts of interest inherent in the practice.  The Guilds deny the remaining allegations in Paragraph 33.

52.     The Guilds admit that, during the time period from on or around September 22, 1976, to on or around April 12, 2019, the cited provision of the AMBA provided that talent agencies could not collect a commission from writers who worked on packaged productions.  The Guilds affirmatively allege that the text of the AMBA is the best evidence of its contents.  The Guilds deny the remaining allegations in Paragraph 34.

13

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

53.    The Guilds lack knowledge or information sufficient to respond to the allegations in Paragraph 35, and on that basis deny the allegations therein.

54.    The Guilds deny that packaging benefits writers economically.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 36, and on that basis deny the allegations therein.

55.    The Guilds admit that they alleged the quoted statement in a lawsuit filed against WME and other talent agencies.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 37, and on that basis deny the remaining allegations therein.

56.    The Guilds admit that Exhibit D to the Complaint is a document prepared and distributed by the Guilds and that the exhibit contains the quoted statement, but deny WME's characterization of that statement.  The Guilds lack knowledge or information sufficient to respond to the allegation regarding the commissions that WME-represented actors or directors pay to WME, and on that basis deny that allegation.  The Guilds deny the remaining allegations in Paragraph 38.

57.    The Guilds admit that Exhibit E to the Complaint is a document prepared and distributed by the Guilds and that the exhibit contains the quoted statement, but deny WME's characterization of that statement.  The Guilds also admit that Exhibit D to the Complaint contains the quoted statement, but deny WME's characterization of that statement.  The Guilds deny the remaining allegations in Paragraph 39.

58.    The Guilds lack knowledge or information sufficient to respond to the allegations regarding WME's representation of films, shows, and clients, and on that basis deny those allegations.  The Guilds deny the remaining allegations in Paragraph 40.

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

59.     The Guilds deny that the additional competition that Endeavor Content and other agency-affiliates provide directly benefits writers.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 41, and on that basis deny the remaining allegations therein.

60.     The Guilds lack knowledge or information sufficient to respond to the allegations in Paragraph 42, and on that basis deny the allegations therein.

61.     The Guilds admit that Exhibit D to the Complaint contains the quoted statement, but deny WME's characterization of that statement.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 43, and on that basis deny the remaining allegations therein.

62.     The Guilds admit that "public reports" have indicated that the Guilds Negotiating Committee Co-Chair and former Guild President Chris Keyser is the executive producer on a packaged project with Endeavor Content.  The Guilds further admit that Keyser made the quoted statement.  The Guilds also admit that Endeavor Content produced a previous project by WGAE President Beau Willimon.  The Guilds deny the remaining allegations in Paragraph 44.

63.     The Guilds deny that the emergence of Endeavor Content and other agency-affiliates increases opportunities for writers and "is thus undeniably procompetitive" (emphasis omitted).  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 45, and on that basis deny the remaining allegations therein.

64.     The Guilds lack knowledge or information sufficient to respond to the allegations in Paragraph 46, and on that basis deny the allegations therein.

65.     The Guilds deny the allegations in Paragraph 47.

66.     The Guilds admit that the Code of Conduct prohibits talent agencies from being "affiliated with … any entity or individual engaged in the production or distribution of motion pictures," and that the Code of Conduct defines "motion

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

pictures" as "works written by Writers under a Guild CBA."  The Guilds deny the remaining allegations in Paragraph 48.

67.    The Guilds admit that in 1976, they entered into a written agreement known as the AMBA with the ATA, then known as the Artists' Managers Guild. The Guilds further admit that the AMBA expired on April 12, 2019, after being in effect for approximately 43 years.  The Guilds deny the remaining allegations in Paragraph 49.

68.    The Guilds admit that, pursuant to the AMBA, they authorized talent agents to represent their members in individual contract negotiations with companies signatory to a Guild collective bargaining agreement.  The Guilds further admit that Exhibit C to the Complaint is the AMBA, the text of which is the best evidence of its content.  The Guilds deny the remaining allegations in Paragraph 50.

69.    The Guilds admit that the cited provision of the AMBA contained the quoted statement, but deny WME's characterization of that statement.  The Guilds deny the remaining allegations in Paragraph 51.

70.    The Guilds admit that the cited provisions of the AMBA provided for the arbitration of certain disputes and for the appointment of a standing committee to consider and recommend changes to the AMBA.  The Guilds lack knowledge or information sufficient to respond to the allegation regarding the frequency with which writers have filed claims under the AMBA against WME, and on that basis deny that allegation.  The Guilds deny the remaining allegations in Paragraph 52.

71.    The Guilds lack knowledge or information sufficient to respond to the allegations regarding the evolution of packaging over time or the extent to which WME disagrees with the Guilds' alleged beliefs regarding packaging, and on that basis deny those allegations.  The Guilds admit that they oppose the representation of their members by talent agencies engaged in the practice of being compensated

16

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

through packaging fees because of the conflicts of interest inherent in the practice. The Guilds deny the remaining allegations in Paragraph 53.

72.    The Guilds admit that under federal labor law, they owe a duty of fair representation to their members.  The Guilds further admit that the AMBA did not contain a provision expressly regarding agency-content affiliates.  The Guilds deny the remaining allegations in Paragraph 54.

73.    The Guilds deny the allegations in Paragraph 55.

74.    The Guilds lack knowledge or information sufficient to respond to the allegations regarding non-writers' participation in packaged productions, and on that basis deny those allegations.  The Guilds deny the remaining allegations in Paragraph 56.

75.    The Guilds admit that they provided a termination notice under the AMBA in April 2018.  The Guilds further admit that WGAW President David Goodman made the quoted statement, but deny WME's characterization of that statement.  The Guilds deny the remaining allegations in Paragraph 57.

76.    The Guilds admit that they discussed a successor agreement to the AMBA with WME and the ATA.  The Guilds further admit that, as part of these discussions, the Guilds and WME discussed packaging and agency content affiliates.  The Guilds deny the remaining allegations in Paragraph 58.

77.    The Guilds admit that their negotiating-committee members met with ATA negotiating-committee members on or around February 5, 2019.  The Guilds further admit that, during this meeting, the Guilds' negotiating-committee members discussed the Guilds' proposals and answered questions from ATA negotiating-committee members.  The Guilds deny the remaining allegations in Paragraph 59.

78.    The Guilds admit that the Guilds' negotiating-committee members met with ATA negotiating committee members on or around February 19, 2019.

The Guilds further admit that, at this meeting, members of both negotiating committees discussed packaging and content affiliates.  The Guilds deny the remaining allegations in Paragraph 60.

79.    The Guilds admit that the cited speech by WGAW President David Goodman contained the quoted statements, but deny WME's characterization of those statements.  The Guilds deny the remaining allegations in Paragraph 61.

80.    The Guilds admit that on February 21, 2019, they circulated a draft version of their Code of Conduct to then-franchised talent agencies.  The Guilds further admit that this version of the Code of Conduct prohibited talent agencies from engaging in packaging or affiliate content production of projects where a writer-client is employed.  The Guilds deny the remaining allegations in Paragraph 62.

81.    The Guilds admit that, on or around March 4, 2019, they made the quoted statement.  The Guilds deny the remaining allegations in Paragraph 63.

82.    The Guilds admit that the ATA's March 12, 2019 proposal for a successor agreement to the AMBA, which the ATA referred to as a "Statement of Choice," was not accepted.  The Guilds lack knowledge or information sufficient to respond to the allegation that the ATA met with hundreds of writer-clients, and on that basis deny that allegation.  The Guilds deny the remaining allegations in Paragraph 64.

83.    The Guilds admit that on or around March 14, 2019, they proposed a "WGA Franchise Agreement" to replace the AMBA.  The Guilds further admit that the proposed WGA Franchise Agreement prohibited signatory talent agencies from engaging in packaging and affiliated content production.  The Guilds also admit that the ATA rejected the proposed WGA Franchise Agreement.  The Guilds deny the remaining allegations in Paragraph 65.

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

84. The Guilds admit that, on or around March 21, 2019, the ATA submitted to the Guilds what the ATA described as a comprehensive proposal for a successor agreement to the AMBA. The Guilds admit the authenticity of Exhibit F to the Complaint. The Guilds deny the remaining allegations in Paragraph 66.

85. The Guilds admit that they did not accept the ATA's March 21, 2019 proposal for a successor agreement to the AMBA. The Guilds deny the remaining allegations in Paragraph 67.

86. The Guilds admit the allegations in Paragraph 68.

87. The Guilds deny the allegations in Paragraph 69.

88. The Guilds deny WME's characterization of their conduct as a "group boycott." The Guilds admit the remaining allegations in Paragraph 70.

89. The Guilds admit that ATA and Guild representatives met and discussed proposals for a successor agreement to the AMBA during the period from April 6, 2019 to on or around April 12, 2019, and that no agreement was reached. The Guilds deny the remaining allegations in Paragraph 71.

90. The Guilds admit that, on or around June 7, 2019, ATA negotiating-committee members met with and submitted to the Guilds' negotiating committee members a proposal for a successor agreement to AMBA. The Guilds further admit that the Guilds later notified their members that it would not offer a counterproposal at that time. The Guilds lack knowledge and information sufficient to respond to the allegations regarding the advice that WME dispenses to its clients, WME's interest in serving its clients, and the extent to which WME is willing to protect writers. On that basis, the Guilds deny those allegations. The Guilds deny the remaining allegations in Paragraph 72.

91. The Guilds deny the allegations in Paragraph 73.

92. The Guilds deny WME's characterization of their conduct as a "group boycott." The Guilds admit the remaining allegations in Paragraph 74.

19

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

93.     The Guilds deny WME's characterization of their conduct as an "unlawful group boycott."  The Guilds admit that Exhibit A is the Code of Conduct promulgated by the Guilds on or about April 13, 2019, and that the Code of Conduct contains the quoted statements.  The Guilds deny the remaining allegations in Paragraph 75.

94.     The Guilds deny the allegations in Paragraph 76.

95.     The Guilds deny WME's characterization of their conduct as a "boycott."  The Guilds admit the remaining allegations in Paragraph 77.

96.     The Guilds admit that Working Rule 23 provides that members may only be represented by agents who enter into "an agreement with the Guild covering minimum terms and conditions between agents and their writer clients."  The Guilds further admit that talent agents who do not agree to such an agreement may not represent the Guilds' members with respect to work covered by the MBA. The Guilds deny the remaining allegations in Paragraph 78.

97.     The Guilds admit that Exhibit E to the Complaint is a document prepared and adopted by the Guilds and that the exhibit contains the quoted statements, but deny WME's characterization of that statement.  The Guilds deny the remaining allegations in Paragraph 79.

98.     The Guilds admit that Exhibit E contains the quoted statement, but deny WME's characterization of that statement.  The Guilds further admit that Exhibit G is a document prepared by the Guilds and that the exhibit contains the quoted statement, but deny WME's characterization of that statement.  The Guilds deny the remaining allegations in Paragraph 80.

99.     The Guilds admit that their members are required to comply with certain Working Rules, and that members who fail to comply may be subject to disciplinary action under the Guilds' constitutions.  The Guilds deny the remaining allegations in Paragraph 81.

20

100.   The Guilds admit that their members have a legal right to resign their membership and instead pay a fee to the Guilds to cover the costs of representation.  The Guilds deny the remaining allegations in Paragraph 82.

101.   The Guilds deny WME's characterization of showrunners as "primarily" producers. The Guilds admit that showrunners who are WGA members may set budgets and hire writers, in addition to their writing responsibilities. Paragraph 83 also states legal conclusions to which no response is required.  The Guilds deny the remaining allegations in Paragraph 83.

102.   The Guilds admit that they have taken step to help writers find employment including by creating the Staffing Submission System, and admit that the quoted statements are accurate.  The Guilds deny the remaining allegations in Paragraph 84.

103.   Paragraph 85 states legal conclusions to which no response is required.  The Guilds otherwise deny the allegations in Paragraph 85.

104.   The Guilds deny the allegations in Paragraph 86.

105.   The Guilds admit that talent agencies must agree to follow the Code of Conduct in order to represent writers for work covered by a Guild collective bargaining agreement.  The Guilds further admit that, to date, at least 70 talent agencies have signed the Code of Conduct or franchise agreements containing substantially similar provisions. The Guilds deny the remaining allegations in Paragraph 87.

106.   In response to Paragraph 88, the Guilds admit that talent agencies are horizontal competitors and that they compete to sell their representational services to writers.

107.   The Guilds deny the allegations in Paragraph 89.

108.   The Guilds lack knowledge or information sufficient to respond to the allegations regarding the extent to which "smaller talent agencies" engage in

21

packaging and/or affiliated content production, and on that basis deny those allegations.  The Guilds deny the remaining allegations in Paragraph 90.

109.    The Guilds admit that the MBA does not have an express provision that requires AMPTP members to negotiate only with agents that are designated or franchised by the Guilds, and that the MBA is effective through May 1, 2020.  The Guilds deny the remaining allegations in Paragraph 91.

110.    The Guilds deny that they requested that AMPTP reopen the MBA negotiations.  The Guilds admit the remaining allegations in Paragraph 92.

111.    The Guilds admit that, at the February 9, 2019 meeting with the AMPTP, the Guilds' representatives presented to the AMPTP potential amendments to the MBA set forth in Paragraph 93.  The Guilds deny the remaining allegations in Paragraph 93.

112.    The Guilds deny the allegations in Paragraph 94.

113.    The Guilds deny that they threatened litigation against the AMPTP or any of its members as alleged by WME.  The Guilds further deny that the state court case against WME and other talent agencies referred to in Paragraph 95, n.8, is presently stayed.  That case has been voluntarily dismissed without prejudice. The Guilds admit the remaining allegations in Paragraph 95.

114.    The Guilds deny the allegations in Paragraph 96.

115.    Answering paragraph 97, the Guilds admit that, to date, the AMPTP has not agreed to the proposed amendments to the MBA as requested by the Guilds.  The Guilds further admit that a representative of the AMPTP made the statements quoted on page 29, lines 1 to 3 of the Complaint, but deny the truth of those statements.

116.    The Guilds deny the allegations in Paragraph 98.

117.    Paragraph 99 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 99 is required,

22

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

the Guilds deny those allegations.

118.    The Guilds admit that on or around March 20, 2019, they sent a letter to managers and lawyers who represent the Guilds' members that contained the quoted statements, but deny WME's characterization of those statements.  The Guilds further admit that Exhibit E to the Complaint contains the quoted statement. The Guilds deny the remaining allegations in Paragraph 100.

119.    Paragraph 101 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 101 is required, the Guilds deny those allegations.

120.    The Guilds admit that WGAW Executive Director David Young made the communication quoted in Paragraph 102, but deny WME's characterization of that statement.

121.    The Guilds admit that lawyers or managers representing the Guilds' members in such capacities are not required to sign the Code of Conduct.  The Guilds deny the remaining allegations in Paragraph 103.

122.    In response to the allegations incorporated by reference in Paragraph 104, the Guilds incorporate by reference their responses to those allegations in the preceding paragraphs.  The Guilds deny the remaining allegations in Paragraph 104.

123.    Paragraph 105 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 105 is required, the Guilds deny those allegations.

124.    Paragraph 106 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 106 is required, the Guilds deny those allegations.

125.    Paragraph 107 states legal conclusions to which no response is required. To the extent a response to any allegations in Paragraph 107 is required,

23

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

the Guilds deny those allegations.

126. The Guilds deny the allegations in Paragraph 108.

127. The Guilds deny the allegations in Paragraph 109.

128. The Guilds lack knowledge or information sufficient to respond to the allegation regarding the extent to which WME disputes the legitimacy of certain the Guilds' regulations, and on that basis deny that allegation. The Guilds deny the remaining allegations in Paragraph 110.

129. The Guilds deny the allegations in Paragraph 111.

130. The Guilds admit that their regulation of talent-agent commissions impacts wages and that the AMBA regulated talent-agent commissions. The Guilds deny the remaining allegations in Paragraph 112.

131. The Guilds admit that preventing talent agents from acting against their clients' interests in procuring employment as writers is a proper Guild concern. The Guilds deny the remaining allegations in Paragraph 113.

132. Paragraph 114 states legal conclusions to which no response is required. To the extent a response to any allegations in Paragraph 114 is required, the Guilds deny those allegations.

133. The Guilds deny that their leadership has threatened the Guilds' membership with public shaming, discipline, or the loss of their livelihood. The Guilds deny the remaining allegations Paragraph 115.

134. The Guilds deny the allegations in Paragraph 116.

135. Paragraph 117 states legal conclusions to which no response is required. To the extent a response to any allegations in Paragraph 117 is required, the Guilds deny those allegations.

136. Paragraph 118 states legal conclusions to which no response is required. To the extent a response to any allegations in Paragraph 118 is required, the Guilds deny those allegations.

137.   Paragraph 119 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 119 is required, the Guilds deny those allegations.

138.   The Guilds lack knowledge or information sufficient to respond to the allegation regarding the extent to which certain directors and actors will benefit from agency packaging or the existence of content affiliates, and on that basis deny that allegation.  The remainder of Paragraph 120 states legal conclusions to which no response is required.  To the extent a response to any allegations in the remainder of Paragraph 120 is required, the Guilds deny those allegations.

139.   The Guilds deny the allegations in Paragraph 121.

140.   The Guilds deny the allegations in Paragraph 122.

141.   The Guilds deny the allegations in Paragraph 123.

142.   The Guilds deny the allegations in Paragraph 124.

143.   The Guilds deny the allegations in Paragraph 125.

144.   Paragraph 126 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 126 is required, the Guilds deny those allegations.

145.   The Guilds admit that a majority of the Guilds' members voted to give their leadership the authority to impose a Code of Conduct.  The Guilds deny the remaining allegations in Paragraph 127.

146.   The Guilds admit that certain talent agencies have signed the Code of Conduct.  The Guilds lack knowledge or information sufficient to respond to the allegations regarding the size of those agencies relative to WME and the extent to which those agencies compete with one another and with WME, and on that basis deny those allegations.  The Guilds deny the remaining allegations in Paragraph 128.

147.    The Guilds admit that AMPTP members are horizontal competitors. The Guilds deny the remaining allegations in Paragraph 129.

148.    The Guilds deny the allegations in Paragraph 130.

149.    The Guilds deny the allegations in Paragraph 131.

150.    The Guilds admit that they sent an email on or around April 16, 2019, containing the fragment quoted in Paragraph 132, but deny WME's characterizations of that statement and the context in which that statement was made.

151.    The Guilds deny the allegations in Paragraph 133.

152.    Paragraph 134 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 134 is required, the Guilds deny those allegations.

153.    The Guilds admit that WME and the other talent agencies are competitors.  Paragraph 135 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 135 is required, the Guilds deny those allegations.

154.    Paragraph 136 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 136 is required, the Guilds deny those allegations.

155.    Paragraph 137 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 137 is required, the Guilds deny those allegations.

156.    The Guilds lack knowledge or information sufficient to respond to the allegation regarding the extent to which writers are considered essential components of packages and the extent to which television programming is packaged, and on that basis deny those allegations.  The Guilds deny the remaining allegations in Paragraph 138.

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

157.  The Guilds deny the allegations in Paragraph 139.

158.  The Guilds deny the allegations in Paragraph 140.

159.  The Guilds deny the allegations in Paragraph 141.

160.  Paragraph 142 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 142 is required, the Guilds deny those allegations.

161.  Paragraph 143 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 143 is required, the Guilds deny those allegations.

162.  The Guilds deny the allegations in Paragraph 144 and deny that WME is entitled to any relief.

163.  In response to the Prayer for Relief, the Guilds deny that WME is entitled to any of the relief it seeks, or to any relief whatsoever.

## AFFIRMATIVE DEFENSES

The Guilds assert the following affirmative defenses:

164.  WME's Complaint fails to state a claim on which relief may be granted.

165.  WME's claim for injunctive relief is barred to the extent WME has available an adequate remedy at law and to the extent injunctive relief otherwise is inequitable.

166.  WME's claim for damages is barred because such relief would constitute unjust enrichment.

167.  WME's claims are barred by the statutory and nonstatutory labor exemptions to federal antitrust law.

168.  WME's claims fail because WME has not suffered antitrust injury.

169.  WME's claims are barred because the alleged damages, if any, are speculative and remote.

27

170. WME's claims are barred because the Guilds' conduct does not amount to a *per se* violation of federal antitrust law or involve an unreasonable restraint of trade.

171. WME's claims are barred because the Guilds' conduct was permitted by law.

172. WME's claims are barred, either in whole or in part, by the doctrines of ripeness, mootness, and/or standing.

173. WME has waived or forfeited its right, if any, to pursue the claims in the Complaint, and/or is estopped from doing so, by reason of its own actions and course of conduct.

174. WME's claims are barred by the doctrine of fraud.

175. WME's claims are barred by the doctrine of illegality.

176. WME's claims are barred by the doctrine of unclean hands.

177. WME's claims are barred by the doctrine of laches.

178. The Guilds' conduct is not the proximate cause of any injuries or damages allegedly suffered by WME.

179. The remedies sought by WME are unconstitutional, contrary to public policy, or otherwise not authorized.

180. WME's claims should be dismissed for uncertainty and vagueness and because their claims are ambiguous and/or unintelligible. WME's claims do not describe the events or legal theories with sufficient particularity to permit the Guilds to ascertain which other defenses may exist.

181. The Guilds hereby give notice that they intend to rely upon such other and further defenses as may become available or apparent during pre-trial proceedings in this case, and hereby reserve their rights to amend this Answer and assert such defenses.

## COUNTERCLAIMS

Defendants and Counterclaimants WGAW and WGAE, and Individual Counterclaimant Meredith Stiehm ("Stiehm"), allege as follows:

182. The Guilds re-allege and incorporate by reference the allegations set forth in paragraphs 1-181.

## COUNTERCLAIM PARTIES

183. Defendant and Counterclaimant WGAW is, and at all material times was, a labor union representing approximately 10,000 professional writers who write content for television shows, movies, news programs, documentaries, animation, and new media. WGAW serves as the exclusive collective bargaining representative for writers employed by the more than 2,000 production companies that are signatory to an industrywide collective bargaining agreement negotiated by the Guilds and the AMPTP. WGAW is a California nonprofit corporation headquartered in Los Angeles, California. WGAW members, including Stiehm, have been represented by WME. WGAW brings this action for injunctive and declaratory relief under California's law of fiduciary duty and constructive fraud in its representative capacity on behalf of all writers it represents, and brings this action under the Sherman Act, the Cartwright Act, California's Unfair Competition Law, and the Racketeer Influenced and Corrupt Organizations Act on its own behalf.

184. Defendant and Counterclaimant WGAE is, and at all material times was, a labor union representing over 4,700 professional writers who write content for television shows, movies, news programs, documentaries, animation, and new media. WGAE serves as the exclusive collective bargaining representative for writers employed by the more than 2000 production companies that are signatory to an industrywide collective bargaining agreement negotiated by the Guilds and the AMPTP. WGAE is a nonprofit corporation headquartered in New York, New York. WGAE members have been represented by WME. WGAE brings this action for

29

injunctive and declaratory relief under California's law of fiduciary duty and constructive fraud in its representative capacity on behalf of all writers it represents, and brings this action under the Sherman Act, the Cartwright Act, California's Unfair Competition Law, and the Racketeer Influenced and Corrupt Organizations Act on its own behalf.

185. Counterclaimant Stiehm is a television writer who resides in Santa Monica, California and works in Los Angeles County. Her work as a writer includes writing for *NYPD Blue* and *ER*, creating *Cold Case* and *The Bridge*, and serving as executive producer and writer on *Homeland*. She is a member of WGAW. From approximately 2011 until April 2019, Counterclaim Defendant WME served as her talent agency. Prior to 2011, co-conspirator CAA served as her talent agency. Stiehm has written, created, or served as showrunner for packaged shows, including *Homeland*, *Cold Case*, and *The Bridge*, and was injured by the payment of packaging fees to Agencies on those packaged shows. But for the Agencies' insistence on continuing to engage in unlawful packaging fee practices, Stiehm would currently be represented by her former agents at WME.

186. Plaintiff and Counterclaim Defendant WME is, and at all material times was, a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Los Angeles County, California.

187. WME is a talent agency comprised of numerous individual talent agents, who as partners, principals, or employees of the Agency, render services on behalf of the defendant talent agency. In rendering such services, each individual agent acted on behalf of WME, which at all times remained liable for the acts or omissions of the individual agent.

188. As alleged herein, WME conspired with the other Agencies and other unknown parties, which may include other ATA member agencies, investors in ATA member agencies, and/or owners, executives or employees of ATA member

30

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

agencies that participated in, or had knowledge of, the anticompetitive conduct described herein.  Counterclaimants will be able to identify these co-conspirators through discovery.

## JURISDICTION AND VENUE

189.   This Court has subject matter jurisdiction over the First and Second Claims for Relief pursuant to 28 U.S.C. §§1331 and 1337 and 15 U.S.C. §26; over the Eighth, Ninth, Tenth, and Eleventh Claims for Relief pursuant to 28 U.S.C. §§1331 and 1337 and 18 U.S.C §1964(a) and (c); and over the Twelfth Claim for Relief pursuant to 28 U.S.C. §§1331 and 1337, 15 U.S.C. §26, and 18 U.S.C §1964(a) and (c); and has supplemental jurisdiction over the Third, Fourth, Fifth, Sixth, and Seventh Claims for Relief pursuant to 28 U.S.C. §1367.

190.   Counterclaim Defendant WME, a corporation, has its headquarters within this judicial District (in Beverly Hills, California), is domiciled in this judicial district, has consented to personal jurisdiction in this judicial district by bringing its Complaint in this judicial district, has minimum contacts with this judicial district, and is otherwise subject to the personal jurisdiction of this judicial district.

191.   Venue is proper in this judicial district under 28 U.S.C. §1391(b) and (c), because Counterclaim Defendant WME is subject to this Court's personal jurisdiction with respect to this action, and because a substantial part of the events giving rise to the counterclaims for relief stated herein occurred in this District.

192.   Venue is also proper in this judicial district under 18 U.S.C. §1965(a) because the Counterclaim is an action under §1964(c) against Counterclaim Defendant WME, which resides, is found, has an agent, and transacts its affairs in this judicial district.

193.   Moreover, WME has waived any objection that it could otherwise have asserted to venue in this judicial district by bringing its Complaint in this judicial

31

district.

194.   Finally, venue is proper in this judicial district under the doctrine of pendent venue.

195.   Counterclaimants agree that this action is properly assigned to the Western Division.  Counterclaim Defendant WME and Counterclaimant WGAW both reside in Los Angeles County.

## FACTUAL ALLEGATIONS

### The Guilds and the Role of Talent Agents

196.   Writers are responsible for producing the literary material that forms the basis for thousands of television episodes and films produced every year (many in California), which generate billions of dollars in annual revenue.  The literary material provided by writers includes, among other things, stories, outlines, treatments, screenplays, teleplays, dialogue, scripts, plots, and narrations.  This literary material forms the heart of every television show and film; without it, the shows and films could not be made.

197.   The Guilds and their predecessor organizations have represented writers in the American film and television industries since the 1930s.  The Guilds serve as the exclusive collective bargaining representative for writers in negotiations with film and television producers to protect and promote the rights of screen, television, and new media writers.  The Guilds' long-term efforts on writers' behalf have resulted in a wide range of benefits and protection for writers, including minimum compensation, residuals for reuse of a credited writer's work, pension and health benefits, and protection of writers' creative rights.

198.   The Guilds also administer the process for determining writing credits for feature films, television, and new media programs.

199.   The Guilds sponsor seminars, panel discussions, and special events in order to educate their members about their rights and the steps they can take to

32

protect their own interests.  The Guilds also conduct legislative lobbying and public relations campaigns to promote their members' interests.

200.   The Guilds' members include showrunners.  Showrunners are, at their core, writers.  For example, showrunners typically write the pilot script and continue to, along with staff writers, develop story lines, write scripts, and otherwise control the creative development of the series.  Showrunners who are not writers are not Guild members.

201.   Approximately 2,000 television and film production companies are parties to the industrywide agreement known as the MBA, negotiated between the Guilds and the AMPTP.  The AMPTP serves as the collective bargaining representative of the major studios and production companies, while the Guilds jointly serve as the exclusive representative for all of the writers employed under the MBA.  The MBA establishes minimum terms for the work performed by writers for the MBA-signatory employers, including the minimum compensation that writers must be paid for such work.

202.   The MBA expressly permits writers to negotiate "overscale" employment terms—that is, compensation and other employment terms that exceed the minimums set forth in the MBA.  Although the Guilds are, pursuant to the MBA, the exclusive collective bargaining representatives for writers employed by MBA-signatory companies, the Guilds have chosen to allow writers to negotiate directly with the companies regarding overscale compensation and other terms of employment.  At all times relevant to this action, Article 9 of the MBA has provided:

> The terms of this Basic Agreement are minimum terms; nothing herein contained shall prevent any writer from negotiating and contracting with any Company for better terms for the benefit of such writer than are here provided, excepting only credits for screen authorship, which may be given only pursuant to the terms and in the manner prescribed in Article 8.  The Guild only shall have the right to waive any of the

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

provisions of this Basic Agreement on behalf of or with respect to any individual writer.

203.   The film and television production industry now operates almost entirely on a freelance basis.  Writers are generally hired by production companies to work on individual projects for the duration of those projects, rather than working for the company on a long-term basis across multiple different projects.  In order to find employment, negotiate for overscale employment terms, obtain career guidance, and protect their professional interests, writers have traditionally retained agents (and the agencies with which those agents were associated) to represent them in their dealings with the production companies.  These agents owe fiduciary duties to their writer-clients under California law.

204.   Talent agencies can represent writers only with the consent of the Guilds, which are the writers' exclusive collective bargaining representatives under the MBA.  The Guilds' Working Rule 23 further provides that members may only be represented by agencies that sign an appropriate franchise agreement with the Guilds.

205.   WME and the other Agencies (through the individual agents associated with each of them) provide such representation to their clients.  In doing so, WME and the other Agencies exercise authority delegated to them by the Guilds.

206.   The services that WME and the other Agencies sell to writers and to the production companies are inextricably interrelated.  As described herein, packaging fees are directly deducted from production budgets, thereby reducing writer compensation and employment opportunities.  Further, when WME or one of the other Agencies receives a packaging fee from a production company, the Agency typically foregoes any commissions assessed on its writer-clients included in that package.

34

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

**Agencies' Packaging Fee Practices**

207. Historically, agents retained by writers (and other creative professionals) were compensated for representing their clients by being paid a percentage (generally ten percent) of the amount paid to their clients for work procured while the agent serves as their representative. This traditional arrangement aligned the economic interests of the writers and their agents, because any increase in the compensation received by writers resulted in a corresponding increase in their agents' compensation. The same arrangement persists in film and television industries in other countries, such as Canada, where the system of packaging fees does not exist.

208. Over time, conditions in the television and film industry changed dramatically in a manner that has had significant negative consequences for writers, while drastically increasing the profits of WME and the other Agencies and their agents.

209. First, there has been overwhelming consolidation within the market for talent agents. Because of this consolidation, WME and the three other Agencies now represent the overwhelming majority of writers, actors, directors, and other creative workers involved in the American television and film industries. By virtue of this consolidation, the Agencies exert oligopoly control over access to almost all key talent in the television and film industries.

210. Second, WME and the three other Agencies have moved away from the commission-based model of compensation described above. Instead, WME and the other Agencies have shifted to a "packaging fee" model whereby the Agencies negotiate and collect payments directly from the production companies that employ their writer-clients and that are tied to the revenues and profits of the "packaged" program, rather than receiving a percentage of their clients' compensation. Approximately 90% of all television series are now subject to such packaging fee

35

arrangements; of those, 80% are packaged, at least in part, by just two agencies: WME and CAA.

211. In television, the packaging fee for a particular project normally consists of three components: an upfront fee of $30,000 to $75,000 per episode, an additional $30,000 to $75,000 per episode that is deferred until the show achieves net profits, and a defined percentage of the series' modified adjusted gross profits for the life of the show.

212. Packaging fees are generally based on a "3-3-10" formula, with the upfront fee defined as 3% of the "license fee" paid by the studio for the program, the deferred fee also defined as 3% of the "license fee" paid by the studio for the program, and the profit participation defined as 10% of the program's modified adjusted gross profits. The "license fee" used to determine that portion of the packaging fee is an amount set by the production company or negotiated between the Agency and the production company as part of the packaging fee agreement.

213. Each of the Agencies uses this same, fixed formula as an agreed starting point in negotiations for packages that include writers and other talent it represents.

214. UTA's Company Overview presentation from 2014 concedes that the Agency charges package fees according to the agreed "3-3-10" formula.

215. Although the "3-3-10" formula is established and maintained through collusive agreement as described herein, some elements of a packaging arrangement remain negotiable within the context of that agreement, including the definition or amount of the license fee and the definition of modified adjusted gross profits, which information the Agencies routinely share with one another as well.

**Agencies' Unlawful Benefits from Packaging**

216. Packaging fees generate hundreds of millions of dollars per year in revenue for WME—far more than WME would earn from a traditional 10% commission from its clients. WME has used the income generated through

36

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

packaging to raise private capital, and its business has become so lucrative that WME is now planning to become a publicly held corporation.

217.   The packaging fees paid to WME and the other Agencies often exceed the amount their clients are paid for work on a particular program.  On *Cold Case*, for example, CAA was entitled to a packaging fee of $75,000 per episode, an amount that exceeded Stiehm's per episode pay for at least the first two years of the series.

218.   With almost all television series now being packaged, WME and the other Agencies now earn much of their revenue from representing their own economic interests, rather than from maximizing the earnings of their clients.

219.   WME and the other Agencies do little to justify their enormous packaging fees.

220.   For example, although the core function of an agency is to "procure" employment opportunities for its clients, writers today more often than not find employment from their own network or through sources other than their agency. Nonetheless, even where writers find employment opportunities without their agent, WME and the other Agencies routinely demand to be paid their packaging fees.

221.   Moreover, although the term "packaging" implies that an agency will bring more than one "packageable element" to a project, WME and the other Agencies often demand to be paid a packaging fee for delivering only a single contributor to a project.

222.   Despite their legal obligations as agents, the Agencies are, according to one former CAA agent, "big fans of packaging because packaging [is where] you make all of your money ….  So they hated when you sold a writer to somebody that wasn't a package, even though selling a writer to somebody else might have been better for the client's career and in the long run makes them more of a commodity. Inside CAA it was always about package über alles—that was literally a phrase.

This was [CAA's] philosophy."[4]

223.   Because packaging fees have generated record revenues for the Agencies, private equity has become interested and invested in WME, CAA, ICM, and UTA.

224.   In 2010, CAA, then the largest agency in Hollywood, announced that TPG Capital ("TPG"), a private equity investor, had acquired a 35% stake in the agency.  In 2014, TPG increased its stake by investing another $225 million into the agency.  Today, TPG owns a controlling stake in CAA.

225.   In 2012, WME announced that it had secured a $250 million investment by private equity investor Silver Lake Partners ("Silver Lake").  In 2013, WME acquired IMG for $2.4 billion, thereby surpassing CAA as the largest agency. Following its acquisition of IMG, WME announced that it had secured an additional $500 million investment by Silver Lake.  Silver Lake now owns a controlling stake in WME.  Since that time, WME has sold minority equity stakes in the agency totaling approximately $1.8 billion to various institutional investors.

226.   In 2018, UTA announced that Ivestcorp, a private equity investor, had taken a 40% stake in the agency.

227.   Private equity investors see little to no value in the traditional manner of agency compensation—i.e., commissions received for the procurement of employment opportunities—because the collusively agreed-upon packaging fee model is far more profitable for the Agencies.  Egon Durban of Silver Lake, for example, specifically singled out the attractiveness of packaging fees as key to his firm's investment in WME: "We benefit from package fees from the shows when they get resold and re-syndicated over and over again."[5]

---

[4] James Andrew Miller, *Powerhouse: The Untold Story of Hollywood's Creative Artists Agency* 169 (2016).

[5] Matthew Garrahan, *Silver Lake looks to turn WME into gold*, Financial

38

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

228.   For these reasons, WME and the other Agencies are "less interested in their clients' needs," as one former agent reported.[6]  Industry observers report that "the focus on the bottom line has only intensified, changing ways of doing business that go back decades—and, in some ways, changing the very definition of a talent agency."[7]  A former ICM agent admitted that "[w]hat we're seeing is a fundamental shift in the agency landscape."[8]  Another ICM agent was more blunt:  If a private equity owner is unwilling to invest in the talent representational side of the business, the agency has an irreconcilable "conflict as you're supporting disparate business and financial goals."[9]

229.   TPG and Silver Lake have had multiple opportunities to coordinate with each other on competitive strategies for their Agencies, because TPG and Silver Lake have frequently collaborated on investments.  For example, in 2006, TPG and Silver Lake jointly acquired Sabre Holdings for $5 billion.  In 2007, TPG and Silver Lake jointly acquired Avaya, Inc. for $8.3 billion.  In 2012, between TPG's investment in CAA and Silver Lake's investment in WME, the two private equity firms collaborated again on the acquisition of Radvision, Ltd. through their jointly held portfolio company Avaya.

230.   On May 23, 2019, Endeavor Group Holdings, the parent entity of

---

Times (Nov. 21, 2014), *available at* https://www.silverlake.com/Images/Uploads/docs/Silverlake20111709432928705.pdf.

[6] Gavin Polone, *Why Everyone in Hollywood is Paying More for a Manager*, Vulture (July 11, 2012), https://www.vulture.com/2012/07/polone-why-everyone-pays-more-for-a-manager.html.

[7] Josh Rottenberg, *Wall Street investors to Hollywood talent agencies: "Show us the money*," L.A. Times (July 10, 2015), https://www.latimes.com/entertainment/envelope/cotown/la-et-ct-talent-agencies-private-equity-20150710-story.html.

[8] *Id.*

[9] *Id.*

39

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

WME, filed a Form S-1 with the Securities and Exchange Commission as a first step in its plan to launch an initial public offering ("IPO") later this year. The IPO is intended to allow Silver Lake to cash in at least part of its equity position in WME.

231. Private equity interest in WME, CAA, ICM, and UTA comes at a time when packaging revenues fees have generated record revenues for the Agencies. Indeed, private equity investors are particularly attracted by the fact that WME and the other Agencies have been able to use their packaging revenues to begin their own in-house content production companies (also known as "affiliate content production"). For example, WME began producing scripted film and television content with the formation of Endeavor Content in 2017. Also in 2017, WME acquired a majority stake in Bloom, a film production company and partnered with Chernin Entertainment for the purpose of developing and producing scripted television series. Endeavor Content is slated to produce at least 10 scripted series in 2019.

**Conflict of Interest and Harms Caused by Packaging Fees**

232. The packaging fee model of WME compensation harms writers in multiple respects.

233. Because the first component of any packaging fee is part of a television episode's budget, payment of that amount diverts financial resources away from the clients of WME and the other Agencies and the projects on which they are working, and to WME and the other Agencies themselves. Even where WME and the other Agencies are paid a lower end upfront packaging fee of, for example, $25,000 per episode, that represents the cost of hiring approximately one additional high-level writer or two additional lower-level writers for the program. Where a studio or network insists that the budget for a program be limited or reduced, showrunners cannot reduce the amount paid to WME and the other Agencies as a packaging fee, and must instead cut resources from other portions of the program's budget. WME's

40

and the other Agencies' conduct thus often causes the early cancellation or nonrenewal of their own client's series, thereby artificially limiting employment opportunities for writers.

234.    Likewise, because the third component of the packaging fee is based on defined gross profits, the payment of the packaging fee to WME (or one of the other Agencies) has the effect of reducing the profit participation of the Agency's own clients, including writers, as the writers' share of the profit points is correspondingly reduced.  Worse, WME and the other Agencies in many instances negotiate more favorable profit definitions for themselves than for their own writer-clients.  Stiehm is entitled or would have been entitled but for WME's malfeasance to profit participation for her prior work on packaged shows.  As a result of the fact that packaging fees are frequently paid to WME and the other Agencies before the profits that determine writer's profit are calculated, because of WME's and the other Agencies' higher priority profit definitions, the ongoing amount paid to Stiehm is substantially reduced.

235.    Because WME's and the other Agencies' compensation in a packaging arrangement is tied to the budget for and profits generated by a particular program, rather than to the amount paid to their clients working on that program, WME's and the other Agencies' financial incentive to protect and increase their clients' pay is eliminated.  Agencies receive packaging fees whether their client's pay increases or decreases, and even if their client no longer works on a particular program.  Indeed, WME and the other Agencies actually have a *disincentive* to advocate for greater pay for their clients, because the Agencies' share of profits would be at risk of being reduced.

236.    WME and the other Agencies also have little incentive to protect the pay their clients have already earned.  Because WME's and the other Agencies' earnings now come from packaging fees and not from commission, WME and the

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

other Agencies have no incentive to ensure that their clients receive the pay or profit participation to which the clients are entitled under their contracts with the studios and often refuse to meaningfully assist them in negotiations over missing pay. Indeed, in some instances, Agencies have even pressured their clients to forego pay to which the client would otherwise be entitled in order to obtain a greater packaging fee for themselves.

237.    Because the profits of WME and the other Agencies are generated from packaging fees rather than from commissions on their clients' earnings, WME and the other Agencies are incentivized to protect the studios' interests, not their clients' interests, when they purport to represent those clients.  In order to protect their continuing ability to negotiate new packaging fees from the studios, WME and the other Agencies prioritize their relationships with the studios over the interests of their clients in numerous ways.  For example, WME and the other Agencies fail to negotiate aggressively to ensure their clients will receive the highest possible compensation on a particular program, because doing so could antagonize the studio and potentially lead the studio to refuse to pay a packaging fee.  By failing to negotiate the highest possible compensation for their clients, WME and the other Agencies also help ensure that the studios are willing to continue paying packaging fees on top of the other costs of producing each program, and that paying packaging fees does not become cost-prohibitive.  For writers who are not yet generating new programs on which WME and the other Agencies might be able to seek packaging fees, WME and the other Agencies' interest in preserving the studios' willingness to pay packaging fees substantially outweighs their interest in representing those writers, an imbalance that shapes every aspect of the representation that WME and the other Agencies provide to such writers.

238.    WME, like the other Agencies, recognizes that its interests are no longer aligned with those of the writers it represents, but are instead aligned with the

42

production companies that employ its clients. Indeed, the head of WME has stated publicly that his most important "client" is now a head executive at Warner Brothers.

239. Packaging fees also distort agents' incentives when seeking employment opportunities for their clients.

240. In order to avoid splitting a packaging fee with other agencies, WME, like the other Agencies, pressures its clients to work exclusively on projects where the other key talent is also represented by WME. WME exerts this pressure even where the client and the agent know that the project will be best served by involving someone from another agency. Stiehm has found, for example, that WME presents her with opportunities to work only on projects involving other talent from WME. Her ability to obtain work and compensation commensurate with her experience has been severely hampered by WME's failure to present her with other work opportunities. The same distortion of incentives causes WME and the other Agencies to pressure other writers in the earlier stages of their careers to work only on projects that have been packaged by that particular agency, again depriving them of the ability to advance their careers on projects outside their agency.

241. WME, like the other Agencies, also is incentivized not to sell packaged programs to the production companies willing to pay the most for the programs, or that will be the best creative partner for the programs. Instead, WME chooses to sell packaged programs to the companies willing to negotiate the most profitable packaging deal. Indeed, in many instances, WME and the other Agencies have taken lower offers of compensation for their clients in exchange for a more lucrative package deal.

242. In addition, WME and the other Agencies have routinely refused to close deals until the studio agrees to pay a packaging fee. Indeed, WME and the Agencies have at times even threatened to scuttle deals that the writers have sourced themselves, without their agent's involvement, in order to obtain a packaging fee for

43

themselves.  Even the production companies are unwilling to push back against the Agencies when they demand a packaging fee on deals that they did not close, because of the enormous power the Agencies wield.  As former ICM/UTA agent and current producer Gavin Polone has explained, WME and the other Agencies openly seek packaging fees at their clients' expense:

> I had breakfast with a couple of network executives and pitched them an idea, which they liked.  I told them I wanted to work with a specific writer (with whom I did not discuss this idea before meeting with the executives).  They didn't know him, so I sent them his writing sample, which they enjoyed.  The writer and I then pitched out a complete story.  The executives officially bought the show.  The writer then told his agents of the sale after it was sold. His agents then negotiated with the studio, which was a sister company of the network, and got him a deal with which he was happy.  Then they asked for a package fee.

> I told the network I would not go along with them getting a fee because they had nothing to do with the show.  The writer also told his agents that it didn't make sense for them to receive a package fee.  His agent told him she would not close the deal—despite his direction to do so—without the agency getting its fee. He then asked his lawyer to close the deal and the lawyer also refused, probably not wanting to take on the agents.  I called the network and told the executives just to say it was "take it or leave it" and they'd have to close because the client wanted it closed.  One of the executives told me that I'd have to work it out with the agency myself …. He said the network/studio would rather pay the fee, which could total millions of dollars in success, instead of jeopardizing its relationship with a major agency.  In the end, the agency got its fee.[10]

243.   WME and the other Agencies use popular writers as leverage to secure packaging fees, even where doing so does not serve the economic or creative interests of those writers.  Indeed, the Agencies have at times actively suppressed the wages of their own clients to secure packaging fees; indeed, in one case, WME

---

[10] Polone, *TV's Dirty Secret*, *supra* note 1.

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

expressly offered to secure a writer's work for a studio for $14,000 an episode, instead of the $20,000 he had previously earned.

244. The consequences of packaging, as practiced by all four of the Agencies, have been profound for television writers. Despite growing demand for television series, driven in part by the entry of companies like Netflix, Amazon, Apple, and Facebook into the production and distribution business, and despite the unprecedented profitability of the entertainment industry as a whole, overscale compensation for writers has been stagnant over the last fifteen years. Indeed, when inflation is accounted for, writers are now being paid *less* than they were more than a decade ago. This is true even for top-level writers, show creators, and showrunners.

245. While the practice of packaging has its historical roots in television, WME and the other Agencies now also extract packaging fees on feature film projects, particularly on independent productions not financed or produced by a major studio. On packaged feature projects, WME and the other Agencies are paid a fee from a film's budget or financing, in addition to taking a 10% commission from their clients. WME and the other Agencies also use their leverage to steer film projects to their own clients or affiliated companies to function as financiers or distributors of the finished film, even when doing so harms their clients' interests.

246. While the economics of film packaging differ in some respects from packaging agreements in television, the conflict of interest is the same. WME and the other Agencies leverage their access to high-profile clients for the Agencies' own benefit, and negotiate compensation for themselves, undisclosed to their clients and unrelated to what their clients earn.

247. Feature film packaging fees have a direct detrimental effect on writers. As the feature film business has contracted, increasing pressure on screenwriters, WME and the other Agencies have not advocated against declining screenwriter pay

45

or unpaid work because the Agencies make most of their money on packaging fees paid by production companies for television and film projects, and have little incentive to fight for clients from whom they simply receive a commission.  As in television, the effect of the Agencies' collusive packaging fee practices has been to exert downward pressure on writer compensation.

248.   As in television, feature film front-end and deferred packaging fees are considered overhead and thus charged as production expenses, while back-end packaging fees are an off-the-top expense, meaning that everyone else's profit is reduced proportionally by the agency's payment.  As in television, this leads to writers not only being paid less in wages but also reducing their share of the profits.

249.   Because packaging fees are based in part on gross profit, the payment of the film's packaging fee may, depending on the profit definition, have the effect of reducing the profit participation of the WME's own clients, including writers. And because a portion of the packaging fee comes out of a film's budget, payment of the fee diverts financial resources away from the clients of WME and the other Agencies and the projects on which they are working and to the Agencies themselves.  This not only harms writers by reducing their compensation and denying them additional employment opportunities, but also by placing such a major drain on the production budget on an ongoing basis, harms the quality of the production.

250.   Film packaging fees also distort agents' incentives when seeking employment opportunities for their clients.  In order to avoid splitting a packaging fee with another agency, WME and the other Agencies often pressure their clients to work exclusively on projects where the other key talent is also represented by the client's Agency.  WME and the other Agencies exert this pressure even where the client and the agent know that the project will be best served by involving someone from another Agency.  For the same reasons, WME and the other Agencies also

46

pressure staff writers to work only on films that have been packaged by that particular Agency, depriving them of the opportunity to work on other projects. Accordingly, choice of talent for any project is artificially limited by WME's and the other Agencies' packaging fee practices.

251. WME and the other Agencies also choose not to sell packaged programs to the production companies willing to pay the most for the film, or that will be the best creative partner for the film. Instead, WME and the other Agencies choose to sell packaged films to the companies willing to pay the largest packaging fee.

252. WME and the other Agencies use popular writers as leverage to secure film packaging fees, even where doing so does not serve the economic or creative interests of those writers.

253. Packaging fees have deprived writers of conflict-free and loyal representation in their negotiations with production companies. By depriving writers of conflict-free and loyal representation, packaging fees reduce the compensation paid to writers for their work on particular programs. WME and the other Agencies receiving a packaging fee do not negotiate on their clients' behalf with the same vigor they would if they were being paid a portion of their clients' compensation, and their financial interest in the program creates an incentive for them to hold down or reduce the amount paid to their clients. The Guilds' members, including Stiehm, have seen their writing wages stagnate or decrease over the last decade, particularly on shows packaged by WME and the other Agencies, despite the substantial expansion of the television market in recent years.

254. Polone, a former agent, opines that the Agencies' packaging practices artificially reduce employment opportunities for talent, artificially reduce the quality of audiovisual entertainment, and reduce output: "I have never watched anything I've produced where I didn't think, 'That scene would have been better if we had

47

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

more money for …' a better song, more background actors, better VFX, our first choice of location, an above-scale actor for a small part or many other things that often cost less than $30,000.  Budgets are finite, and if you add a $30,000 cost that doesn't connect to anything that goes onscreen, you necessarily lose something else that would have. So that package fee, which saves the writer his commission on an unprofitable show, might be the exact reason his show was canceled in the first place and never made it to profit; and that is a pretty unequitable exchange."[11]

255.   Because of WME's and the other Agencies' breaches of their fiduciary duties, writers, including Stiehm, have been forced to retain and pay other professionals, including lawyers and/or talent managers, to protect their interests, frequently paying as much as 15% or 20% in additional commissions to these other professionals to secure the services that talent agencies alone once provided. Because writers' agents no longer represent their clients vigorously and without conflicts, many writers rely upon their talent managers to identify employment opportunities and upon their lawyers to negotiate the terms of their contracts with production companies.  These are services that the agents themselves should be providing to the writers they represent.  That writers must pay others for these services further reduces their take-home pay.

256.   Packaging also denies writers employment opportunities.  WME and the other Agencies are resistant to placing their clients with programs or films that are already connected to talent from other Agencies, because doing so will reduce or eliminate any packaging fee they might be paid for the clients' work.  Many potential projects have been delayed or killed solely because of a dispute between WME and a production company over the packaging fee.  Programs are sold to the production companies willing to pay the most lucrative packaging fee, rather than

---

[11] *Id.*

48

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

those willing to provide WME's and the other Agencies' writer-clients with the greatest compensation or those that will serve as the best creative partners for the programs. Likewise, because WME and the other Agencies do not view the potential commissions they would obtain from writers in earlier stages of their careers on outside projects to be sufficiently valuable to be worth pursuing, WME and the other Agencies deny even staff writers the opportunity to work on outside projects, so that those earlier stage writers will be available to work for less compensation and at a lower level on a project packaged by their Agency.

257. WME, like the other Agencies, routinely fails to disclose the conflicts of interest inherent in packaging. The packaging agreement, including the profit definition, is negotiated directly between WME and the production company, with no notice or disclosure of the agreement's terms, or often even of the agreement's existence, to the writer-clients. Indeed, virtually no writer has ever seen a packaging agreement. Stiehm was never provided with the specific details of the packaging agreements applicable to the WME-packaged programs on which she worked while represented by WME, nor was she informed by WME of the existence of the conflict of interest.

258. WME, like the other Agencies, has never obtained its writer-clients' valid, informed consent to WME's flagrant conflicts of interest. Such a valid, informed consent could only be given if WME disclosed not only the existence of the conflict of interest but also all of the specific details of any packaging agreement between WME and the production company. WME, like the other Agencies, however, not only routinely fails, as a matter of policy, to disclose either the existence of the conflict or the material terms of the packaging agreements to its writer-clients, but in many instances actually goes further still and deliberately conceals the existence of the conflict of interest by falsely informing their writer-clients that packaging *benefits* the client because the client will not pay commission,

49

when in fact WME's packaging fees far exceed the 10% commission WME is forgoing and when WME's packaging fees actively suppress the client's earnings.

259.  In fact, WME and the other Agencies in many instances do not even disclose the existence of a packaging fee agreement, depriving their clients of necessary information, in violation of WME's and the other Agencies' fiduciary duties.

260.  The Guilds' members, including Stiehm, have been harmed by WME's and the other Agencies' misleading conduct and their routine failure to disclose not only the existence of the conflict of interest represented by packaging fees but also the specific details of any packaging agreement, which the writers are entitled to know as the principal in the agency relationship.  The Guilds' members, including Stiehm, justifiably expect their agents to represent their interests, in accordance with California agency law principles.  The Guilds' members, including Stiehm, have justifiably relied, to their detriment, on WME's and the other Agencies' misleading concealment of the existence of their conflicts of interest and their misrepresentations that packaging benefits the writer client, when in fact packaging harms WME's and the other Agencies' clients and enriches WME and the other Agencies at the writers' expense.  For example, Stiehm's former agents at WME—Cori Wellins and Matt Solo—never disclosed to Stiehm that they were operating under a conflict of interest in representing Stiehm on packaged shows, nor did they disclose the existence of the packages nor the details of the packaging agreements to Stiehm.

261.  Packaging fees also cause substantial harm to the Guilds.  In order to protect their members' interests, the Guilds have devoted substantial resources to monitoring packaging (to the extent possible given WME's and the other Agencies' failure to provide the Guilds or their writer-clients with clear information about the terms of their packaging arrangements); to educating members about packaging fees,

50

the risks and harms created by agents' conflicted representation, and the steps they can take to protect themselves; to engaging in political advocacy and public outreach to increase awareness of the harms resulting from packaging fees; and to preparing a comprehensive campaign to end packaging fees' harms and abuses.  The Guilds have also incurred additional expenses in enforcing writers' contractual rights because WME and the other Agencies, conflicted by their packaging fee practices, are reluctant or unwilling to defend writers' interests in the face of contract violations.  Finally, packaging fees have reduced the Guilds' revenue from member dues, because dues are dependent in part upon writers' compensation.  WME has engaged in packaging that has caused each of these forms of harm to the Guilds.

262.  Packaging fees have harmed the market for writers' work by draining money from television and film production budgets, and by diverting to WME and the other Agencies funds that could otherwise be used to finance production and the employment of writers.

263.  Because of packaging fees, writers face a less competitive market for their services, with WME and the other Agencies generally attempting to place writers only with projects tied to other clients of the Agency, rather than with all available projects, and failing to negotiate the best possible compensation for their clients. WME's and the other Agencies' collusive packaging fee practices also harm their writer-clients' ability to sell their services because WME and the other Agencies refuse to negotiate employment for their writer-clients unless the Agencies get a packaging fee.  WME and the other Agencies have canceled meetings, held up negotiations, and otherwise stymied their own clients' ability to sell their services over packaging fees.

264.  As *The Hollywood Reporter* recently reported: "Several international sales agents speaking to *THR* on condition of anonymity report cases of talent agents killing projects if they don't land with their in-house production company or

51

threatening to pull a client off a film unless they 'get a piece of the action' on the domestic sale. 'It's a very serious issue—that of the agencies packaging, producing and selling content all under one roof,' notes a veteran sales agent. 'It's further restricting the talent available and making it harder to get films made.'"[12]

265. Likewise, WME and the other Agencies use their control over key talent to pressure writers whose agents are not affiliated with the Agencies to fire those agents and retain WME or one of the other three Agencies in order to have access to employment on the Agency's packages.

266. WME's and the other Agencies' packaging fee practices, individually and collusively, reduce the choice of talent available to work on projects, thus directly impairing a writer's ability to propose scripts in a competitive market, and impairing competition for the budgets for television and film productions. This has a negative direct and proximate effect on writer compensation and reduces writing opportunities for writers.

267. The quality of audiovisual entertainment also suffers as a result of the Agencies' packaging fee practices. For example, budgetary constraints caused by the payment of packaging fees force productions to shoot in less than ideal locations and under questionable conditions, cut special effects, reduce the number of shooting days, and/or hire a smaller crew or fewer writers. In addition to artificially reducing the choice of talent available for a given production, these creative compromises, caused by the charging of packaging fees, directly diminish the quality of the finished product. This also adversely affects the careers of those involved with those projects, including the writers.

---

[12] Tatiana Siegel, *Cannes: Will the Writers Guild Fight Impact Dealmaking at the Festival?* The Hollywood Reporter (May 9, 2019), https://www.hollywoodreporter.com/news/will-writers-guild-fight-impact-dealmaking-at-cannes-festival-1208193.

52

268. WME's and the other Agencies' ongoing intimidation of lawyers, their former clients, and those smaller talent agencies that have signed or are considering signing the Guilds' 2019 Code of Conduct for talent agents (*see infra* paragraphs 312-328) continues this pattern of harm.

269. But for WME's and the other Agencies' illegal agreements regarding packaging, the Guilds and the Guilds' members would not have been so harmed.

270. Finally, packaging fees have harmed the overall market for television and film production by establishing a fixed set of financial terms production companies must pay for each "package" an Agency provides, and by preventing production companies from retaining the best writers and other talent for each project, regardless of agency affiliation.

## Agency Coordination and the ATA

271. The ATA is a trade association headquartered in Los Angeles County, California and comprised of approximately 120 talent agencies across the United States. Those agencies are competing sellers of agency services. When the ATA speaks, it does so on behalf of its members. As stated on the ATA's website: "ATA's collective voice provides strong and effective advocacy for its members in matters relating to the talent-agency business."[13]

272. Prior to the events of April 2019, as described later herein, the ATA member agencies represented the vast majority of the Guilds' members working today.

273. Neither the ATA nor its member agencies enjoy any protections under the antitrust laws other than a derivative labor exemption that may apply under some circumstances based on the ATA's contractual relationship with the Guilds.

---

[13] ATA, *About ATA*, https://www.agentassociation.com/index.php?src=gendocs&ref=about_ata&category=Main.

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

274. Historically, the Agencies competed over the starting point for negotiations on packaging fees. For example, CAA once slashed packaging fees by 40%. Michael Ovitz, CAA's founder, observed: "it increased the volume of our business so we would end up making far more than if we had charged the higher rate."[14] Yet no Agency has challenged the prevailing "3-3-10" formula in decades, because the Big Four have agreed to fix that formula as the default price of agents' services.

275. The "base license fee" (the basis for the first 3%) is an artifact of a prior age, a fiction in today's fragmented television distribution landscape. Accordingly, the Big Four have agreed to a standard range of "base license fees" upon which to calculate the initial 3% fee, taking into account both the number of episodes and the distribution medium (e.g., network television vs. streaming on Netflix).

276. The ATA, writing on behalf of its members, has conceded that "package fees have remained fairly constant in broadcast TV for the past two decades."[15]

277. A former agent conceded in *The Hollywood Reporter* that there is "near uniform price-fixing of package fees on TV shows."[16]

278. As the ATA, writing on behalf of its members, has admitted, agencies "frequently" jointly package television series.[17]

---

[14] Miller, *supra note* 4, at 48.

[15] ATA, *Negotiating a New Artists' Manager Basic Agreement, Frequently Asked Questions* 6 (Feb. 26, 2019), https://www.agentassociation.com/clientuploads/ ATA.General_FAQ.2.26.19.pdf.

[16] Gavin Polone, *Here's the Long-Shot Way Hollywood Writers Can Win the War on Agents*, The Hollywood Reporter (Mar. 26, 2019), https://www.hollywoodreporter.com/news/gavin-polone-heres-how-hollywood-writers-can-win-war-agents-1197093.

[17] ATA, *supra* note 15, at 6.

54

279. When sharing a package, the Agencies exchange competitively sensitive information about their packaging fee practices, including but not limited to adherence to the standard "3-3-10" formula, the amount of the base license fee, and the definition of modified adjusted gross profits (the basis for the last 10%).

280. Joint packaging occurs on a sufficiently frequent basis to allow WME and the other Agencies to reach collusive agreements on their packaging fee practices and to monitor compliance with such practices.

281. WME and the other Agencies also share competitively sensitive information, including through the ATA.

282. For example, on March 17, 2019, the ATA published a study that purports to analyze the economic impact of eliminating front-end packaging fees (the "March 17 Report").

283. Although the ATA claims that the data used to prepare the March 17 Report was made anonymous to protect the disclosure of competitively sensitive information, UTA published its own internal analysis of its data three days later.

284. Competitively sensitive information was also exchanged within the ATA's "Negotiation Committee," which includes employees of all four Agencies.

285. The Agencies are able to coordinate their actions in part because, despite the large number of talent agencies, the agency industry has been described best as "a shrinking oligopoly."[18]

286. There were previously five large talent agencies: William Morris, Endeavor, CAA, ICM, and UTA. In 2009, the "Big Five" became the "Big Four" following William Morris' merger with Endeavor. And until April 2019, three ATA member agencies—WME, CAA, and UTA—represented writers in projects that accounted for approximately 70% of the Guilds' members' earnings.

---

[18] Violaine Roussel, *Representing Talent: Hollywood Agents and the Making of Movies* 49 (2017).

55

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

287.   WME and the other Agencies enforce compliance with their collusive agreements on packaging practices by "blacklisting" any entity or individual who deviates from, or otherwise seeks to frustrate, those agreements.

288.   The fear of being blacklisted by the Agencies is pervasive in Hollywood.  For example, *The Los Angeles Times* reported on the difficulty of getting industry participants to speak publicly about their concerns regarding packaging:

> The combined power of Endeavor and CAA is enormous — together, they represent the bulk of Hollywood's A-list celebrities and the majority of all packaged TV series.  As a result, most people in Hollywood are unwilling to speak about the issue publicly.  …

> "There are a lot of disgruntled people.  But it's whispered about. Everyone on the talent side is afraid to challenge the agencies for fear of being blackballed," said Neville Johnson, a Los Angeles attorney who has represented prominent Hollywood writers and actors in profit disputes.

> The fear is pervasive.  "The studios are afraid of not getting pitches and opportunities if they take a hard line against this," Johnson added.[19]

289.   Even in the context of this dispute, WME and the Agencies, individually or collectively through the ATA, have publicly threatened to retaliate against agencies (and those agencies' clients) that have come to an agreement with the Guilds.

**History of Guild Concern about Packaging Conflicts of Interest**

290.   The Guilds have long had concerns about the conflict of interest inherent in an agency's receipt of compensation directly from its client's employer.

291.   In the 1970s, the Guilds sought to ban the practice of packaging fees in its franchise agreement with thirteen independent talent agencies ("the 1975 Independent Agreement").

_____

[19] Ng, *supra* note 2.

56

292.    Litigation over the Guilds' attempt to bar packaging fees ensued.  A group of independent talent agencies sued the two largest Agencies, William Morris (the predecessor to Counterclaim Defendant WME) and ICM, along with the predecessor entity to the ATA, seeking a declaration that the 1975 Independent Agreement was valid and enforceable.  William Morris counterclaimed, alleging that the 1975 Independent Agreement was an illegal group boycott that violated Section 1 of the Sherman Antitrust Act.

293.    In connection with its counterclaim, William Morris filed a motion for a preliminary injunction, seeking, on antitrust grounds, to prohibit enforcement of the terms of the 1975 Independent Agreement that banned packaging.

294.    On March 24, 1976, Judge Harry Pregerson denied William Morris' motion, finding that William Morris had not demonstrated a reasonable probability that it would prevail on its antitrust counterclaims.  Specifically, Judge Pregerson held that the anti-packaging provisions of the 1975 Independent Agreement were likely protected under both the statutory and non-statutory exemptions to the federal antitrust laws.

295.    Following Judge Pregerson's ruling, the parties settled their dispute and agreed to the 1976 AMBA, which regulated the way agencies represent filmed and television writers.  The Guilds negotiated the 1976 AMBA with the ATA (called at the time the Artists' Managers Guild), which assented to the 1976 AMBA on behalf of its member agencies.  The 1976 AMBA was in effect from 1976 until April 2019.

296.    The Guilds expressly reserved their objections to the practice of agencies accepting packaging fees in the 1976 AMBA.  Paragraph 6(c) of the 1976 AMBA provides: "WGA has asserted that the services of Writers in the fields of radio, television and motion pictures are connected with and affected by the packaging representation of Writers … that the representation of Writers' services and the obtaining of employment for Writers is affected by such packaging

57

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

representation of Writers and others, and that the WGA has a legal right to bargain collectively on such subjects ….." Paragraph 6(c) expressly states that: "The parties hereto agree that nothing in this agreement …. shall be deemed to affect or prejudice the [] positions of WGA …."

297. Moreover, the Agencies have failed to abide by even the limited protections against some of packaging's most extreme abuses that existed in the 1976 AMBA. For example, the 1976 AMBA requires agents to advise their clients "as to the creation and/or development and/or production of the package program." In fact, the Agencies, as a matter of policy, routinely fail to notify writers that their shows are being packaged.

## The Current Dispute

298. This dispute arises in the midst of a new golden era for Hollywood. Eight of the top ten highest grossing films of all time were released this decade; ninety-three of the top 100 highest grossing films of all time were released after 2000. The television industry is experiencing a "second golden age", with approximately 500 scripted series in production today; analysts do not believe that the industry has peaked.

299. WME and the other Agencies have profited massively by extracting packaging fees during this period. For example, in its recently filed S-1, WME boasted that it has delivered "consistent growth and strong financial performance." Since 2015, WME has grown revenue at a rate of 27.1%, generating robust margins of over 15%.

300. Yet while writers lie at the creative heart of the industry, they have been left behind. Their wages have been stagnant over the last two decades, leading to significant declines when adjusted for inflation.

| **Writer-Producer Median Episodic Fee** | | |
|---|---|---|
| Title | 1995-2000 (Adjusted for Inflation) | 2017-18 |
| Co-Producer | $16,400 | $14,000 |
| Producer | $19,500 | $16,000 |
| Supervising Producer | $25,750 | $17,500 |
| Co-Executive Producer | $35,100 | $23,250 |
| Executive Producer | $54,600 | $32,000 |

301.   On April 6, 2018, pursuant to the terms of the 1976 AMBA, the Guilds provided the ATA with a Notice of Election to Terminate the agreement. Contemporaneously, the Guilds published a detailed set of proposals for a new agreement to replace the AMBA, which would, among other things, bar talent agencies from accepting packaging fees.

302.   The Guilds' proposals for a new franchise agreement were modeled in some respects on codes of conduct that are the dominant method of agency regulation in professional sports and have been upheld in the face of antitrust challenge in federal court.

303.   WME and the other three Agencies each were and are members of the ATA's "Negotiation Committee."  The Negotiation Committee (sometimes referred to as the "Strategy Committee") met weekly, and continues to meet, to discuss and agree on common stances to take with respect to the Guilds, the Guilds' members, and the Guilds' internal processes, including but not limited to an agreement not to accede to the Guilds' demand to ban packaging fees.

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

304.    On February 21, 2019, the Guilds wrote to all members of the ATA, including WME and the other three Agencies, enclosing a copy of a written "Code of Conduct" for the representation of the Guilds' members.  In that letter, the Guilds stated that they intended to implement the Code of Conduct on April 7, 2019.  The Guilds further stated that the WGA would "continue[] to have discussion with agencies regarding the Code of Conduct" and that "[a]ny modifications in the Code of Conduct that the [WGA] makes as a result of those discussions will be applied on an equal basis to all agencies."

305.    During that time, the Guilds and the ATA also continued to meet and negotiate for a new agreement to replace the 1976 AMBA.

306.    Among other things, the Code of Conduct made clear the Guilds' continued intention to prohibit packaging fees:  "No Agency shall derive any revenue or other benefit from a Client's involvement in or employment on a motion picture project, other than a percentage commission based on the Client's compensation."

307.    In March 2019, the Guilds' members voted overwhelmingly—95.3% to 4.7%—to authorize the Guilds to implement the Code of Conduct, if and when it becomes advisable to do so, upon expiration of the 1976 AMBA on April 6, 2019.

308.    On April 13, 2019, the Guilds formally implemented the Code of Conduct and, pursuant to Working Rule 23, instructed its members to terminate any agent that had not agreed to its terms.  Subsequently, the vast majority of the Guilds' members terminated their relationship with their agents.

309.    Through the ATA, WME and the other Agencies summarily rejected the Code of Conduct.  The ATA stated that the Code of Conduct was "unacceptable to all agencies," and announced that it was "firmly opposed to the WGA's Code."[20]

---

[20] David Robb, *ATA Says WGA's Code Of Conduct Is "Unacceptable To All Agencies"; No Talks Scheduled Before Deadline*, deadline.com (Apr. 5, 2019),

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

310. The Code of Conduct realigns agents' incentives with their writer-clients and eliminates the conflicts of interest inherent in the Agencies' receipt of packaging fees. Agencies signed to the Code may only represent writers on a commission basis and may not receive packaging fees.

311. Immediately upon implementation, several smaller talent agencies agreed to the Code of Conduct.

312. On or about May 16, 2019, Verve, the largest non-ATA member agency, agreed to the Code of Conduct (as a new franchise agreement). In response, WME and the other Agencies, through the ATA, promised to retaliate against Verve and its clients through an illegal group boycott, and promised similar retaliation against any other agency that broke ranks and dealt with the Guilds individually. ATA executive director Karen Stuart further urged ATA members to "remain strong and united" in their opposition to the Code of Conduct.[21]

313. Stuart, writing collectively on behalf of all ATA member agencies, stated that Verve's decision to agree to the Code of Conduct "will ultimately harm …. the artists that [Verve] represents."[22] This was a not-so veiled threat by ATA member agencies to blacklist and otherwise retaliate against Verve and its clients, which include dozens of the Guilds' members, in the future.

https://deadline.com/2019/04/ata-says-wga-agency-code-unacceptable-to-all-agencies-no-talks-set-1202589594/.

[21] David Robb, *Abrams Artists Agency Chair Adam Bold Says He Won't Sign WGA's Code of Conduct; Urges Both Sides to Resume Talks*, deadline.com (May 17, 2019), https://deadline.com/2019/05/abrams-artists-agency-wont-sing-wga-code-adam-urges-both-sides-to-resume-talks-1202617392/.

[22] David Robb, *Verve Signs WGA's Code of Conduct, A First Crack in Agencies' Solidarity*, deadline.com (May 16, 2019), https://deadline.com/2019/05/verve-wga-code-of-conduct-signs-writers-agencies-fight-1202616769/.

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

314. The ATA's threats were intentionally distributed to the entertainment media and published, in whole, on the *deadline.com* website.

315. Immediately, two members of the ATA's Negotiating Committee announced publicly that they would not deal individually with the Guilds and would not agree to the Code of Conduct. These two agencies promised that Verve's action would not "crack" the agencies' collective refusal to deal with the Guild and that they would work with the ATA and the other Agencies "to bring stability back to the industry."[23]

316. WME and the other Agencies have also retaliated against their former writer-clients who have moved to newly franchised agencies by cancelling meetings and otherwise attempting to sabotage their careers, while at the same time illegally conducting a shadow messaging campaign to interfere with the Guilds' internal elections.

317. Recognizing that further negotiations with the ATA were futile, given the ATA's complete opposition to the Code of Conduct, the Guilds formally withdrew their consent to collective negotiation through the ATA. The Guilds' withdrawal of consent was communicated to the ATA, as well as posted on the Guilds' websites, on June 19, 2019, and widely reported in the media.

318. Despite the Guilds' clear withdrawal of their consent to collective negotiations, WME and the other Agencies continued to meet, discuss and coordinate their negotiation strategy through the ATA with the Guilds, including but not limited to an agreement not to negotiate on the Guilds' Code of Conduct and not to sign a new franchise agreement with the Guilds. Through its Negotiation

---

[23] David Robb, *APA Won't Sign WGA Code of Conduct, Urges Return to Bargaining Table*, deadline.com (May 17, 2019), https://deadline.com/2019/05/apa-wont-sign-wga-code-of-conduct-urges-more-bargaining-talks-1202617538/.

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

Committee, WME and the other Agencies continued to meet, disclose competitively sensitive information regarding their packaging fee practices, and agree on the terms by which agency services would be priced to writers.

319. For example, on June 25, 2019, WGAW Executive Director David Young wrote to each member of the ATA's Negotiation Committee, stating that the Guilds would no longer consent to collective negotiations and offering to meet individually to negotiate the agency's consent to the Guilds' Code of Conduct. However, at the behest of WME and the other Agencies and the ATA, each of the recipient agencies rejected the Guilds' offer, uniformly demanding instead that the Guilds reverse the withdrawal of their consent to collective negotiations. These rejections were coordinated by the ATA.

320. First, Stephen Kravit of The Gersh Agency responded that "under no circumstances will The Gersh Agency meet with you separate from the ATA."

321. Karen Stuart of the ATA then forwarded Kravit's email to the other members of the ATA Negotiation Committee. Each of the other agencies then parroted back the same refusal to deal with the Guilds in short order. For example:

(a) Richard B. Levy of ICM: "we will not [negotiate] individually." Instead, he insisted that any proposal from the Guilds must be to "the entire ATA negotiating committee."

(b) Jay Sures of UTA: "Since you have an official WGA proposal, I think it is best for you to send it to your counterpart at the ATA."

(c) Rick Rosen of WME: "WME believes the path to resolution is through the ATA …. We again invite you to send your proposals to the ATA for consideration by our entire negotiating committee."

322. Despite the fact that talent agencies other than the Big Four derive relatively little revenue from packaging fees, the vast majority of those other agencies have refused to sign the Code of Conduct as a result of WME's and the

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

other Agencies' coordination and threats of retaliation.

323. In light of the Agencies' continued illegal efforts to coordinate both in their individual negotiation strategies with the Guilds and on their continued receipt of packaging fees, on June 28, 2019 the Guilds wrote to WME and the other Agencies and other members of the ATA, demanding that they cease and desist from such illegal conduct.

324. Following receipt of the June 28, 2019 cease and desist letters, WME and the other Agencies have continued to meet and to coordinate their negotiation strategy with the Guilds through the ATA through August 1, 2019, if not beyond.

**Agency Threats to Lawyers**

325. On March 20, 2019, in light of the Agencies' collective refusal to deal with the Guilds, the WGAW, acting within its authority as the exclusive representative of its writer-members, authorized lawyers, pursuant to the various state bar acts of their respective jurisdictions and pursuant to relevant ethics rules, to, among other things, "negotiate overscale terms and conditions of employment for individual Writers in connection with MBA-covered employment and MBA-covered options and purchases of literary material."

326. Employment contracts are, like most contracts, a mix of business (e.g., compensation and benefits) and legal terms (e.g., termination, restrictive covenants, remedies for breach, dispute resolution provisions) and, accordingly, the negotiation of such contracts falls squarely within the practice of law as authorized by the State Bar Act. Moreover, attorneys—and not agents—are responsible for assuring that the language of a final employment agreement fully, accurately, and clearly sets forth essential terms of the arrangement, whether they are "business" or "legal" terms.

327. Immediately after March 20th, however, WME and the other Agencies began threatening lawyers with legal action should they seek to represent writers in

64

negotiating employment contracts with studios. This pattern of intimidation culminated in a letter sent by the ATA's counsel to the Guilds on April 12, 2019 that immediately appeared in the media, ensuring that its contents would be publicly disclosed. Indeed, the April 12 letter was posted in its entirety on the *deadline.com* website within minutes of being sent to the Guilds.

328. In the April 12 letter, the ATA asserted that California's Talent Agency Act, Cal. Labor Code §1700 *et seq.*, would be violated if talent managers or attorneys procured employment or negotiated the terms of that employment for Guild members, and threatened to sue any lawyer who undertook such activities.

## FIRST CLAIM FOR RELIEF

### *Per Se* Price Fixing in Violation of the Sherman Act, 15 U.S.C. §1

### (brought by Meredith Stiehm on her own behalf, and by the Guilds on their own behalf and on behalf of their members, against WME)

329. Counterclaimants re-allege and incorporate by reference the allegations set forth paragraphs 1-328.

330. WME and the other Agencies and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1) by artificially reducing or eliminating competition in the United States.

331. Well before 2015 and continuing through to the present, the exact starting date being unknown to Counterclaimants and exclusively within the knowledge of WME and its unnamed co-conspirators, WME and its co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1) by artificially reducing or eliminating competition in the United States. WME and the other Agencies and their unnamed co-conspirators are engaged in, and their conduct substantially affects, interstate commerce. The production of audiovisual

65

entertainment and scripted entertainment for television and video distribution is in, or affects, interstate commerce and the packaging of talent therefore is in, or affects, such commerce. The procurement of literary talent for such productions is in or affects such commerce.

332. In particular, WME and the other Agencies have combined and conspired to raise, fix, maintain or stabilize the price of agency services and to control access to writers' services. The sale of agency services to studios and writers are inextricably intertwined.

333. As a result of WME's unlawful conduct, prices for agency services were raised, fixed, maintained and stabilized in the United States and the ability of writers to sell their services has been suppressed.

334. The contract, combination, or conspiracy among WME and the other Agencies consisted of a continuing agreement, understanding, and concerted action among WME and the other Agencies and their co-conspirators.

335. For the purpose of formulating and effectuating their contract, combination, or conspiracy, WME and the other Agencies and their co-conspirators did those things they contracted, combined, or conspired to do, including:

(a) exchanging information on the structure and amount of packaging fees;

(b) agreeing to the structure of packaging fees and to negotiate with studios from a common "3-3-10" starting point;

(c) negotiating with studios from a common "3-3-10" starting point;

(d) agreeing to a standard range for the base license fee applicable to the up-front 3% package fee;

(e) utilizing the standard range for the base license fee applicable to up-front 3% package fees charged to studios; and

(f) selling agency services in California and throughout the United States at non-competitive prices.

66

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

336. These contracts, combinations, agreements, or conspiracies substantially affected, and continue to affect, interstate commerce.

337. WME and the other Agencies CAA, UTA, and ICM are direct horizontal competitors. The ATA is a trade association comprised of competing sellers of agency services, including Counterclaim Defendant WME and the three other Agencies.

338. No exemptions apply to the anticompetitive conduct alleged herein.

339. The conduct of the WME and the other Agencies and their co-conspirators was a direct, proximate and substantial factor in causing harm to the Counterclaimants and their members.

340. These contracts, combinations, agreements, or conspiracies have caused substantial anticompetitive effects.

341. Counterclaimants the Guilds and their members, including Stiehm, have suffered antitrust injury due to the illegal conspiracy.

342. Counterclaimants the Guilds and their members, including Stiehm, have suffered and will continue to suffer injury as a direct result of WME and its co-conspirators' illegal conspiracy by way of lower compensation and valuable lost opportunities for their creative television writing services.

343. The alleged contract, combination or conspiracy is a per se violation of the federal antitrust laws.

344. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, Counterclaimant Stiehm, on her own behalf, and Counterclaimants the Guilds, on their own behalf of and on behalf of their members, are entitled to the issuance of an injunction against WME, preventing and restraining the violations alleged herein.

345. Counterclaimants are also entitled to treble damages, as well as their attorney's fees and costs. 15 U.S.C. §§15(a), 26.

**SECOND CLAIM FOR RELIEF**

***Per Se* Group Boycott in Violation of the Sherman Act, 15 U.S.C. §1**

**(brought by Meredith Stiehm on her own behalf, and by the Guilds on their**

**own behalf and on behalf of their members, against WME)**

346.    Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-345.

347.    WME and the other Agencies and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1) by artificially reducing or eliminating competition in the United States.  WME and the other Agencies and their unnamed co-conspirators are engaged in, and their conduct substantially affects, interstate commerce.   The production of audiovisual entertainment and scripted entertainment for television and video distribution is in, or affects, interstate commerce and the packaging of talent therefore is in, or affects, such commerce.  The procurement of literary talent for such productions is in or affects such commerce.

348.    Independent economic actors—including WME and each of the other Agencies CAA, UTA, and ICM—may not collude on the prices they would accept for their services or otherwise engage in concerted anticompetitive action in the marketplace.  *See, e.g.*, *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990).  Specifically, collective bargaining by non-labor organizations over the price of a service is per se illegal under section 1 of the Sherman Act.  *See, e.g.*, *Nat'l Soc'y of Prof'l Engs. v. United States*, 435 U.S. 679, 692–93 (1978).  Likewise, non-labor organizations may not agree to engage in horizontal group boycotts of suppliers, customers, or others.  *See, e.g.*, *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457 (1941).

349.    For the purpose of formulating and effectuating their contract,

68

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

combination, or conspiracy, WME and the other Agencies and their co-conspirators did those things they contracted, combined, or conspired to do, including by:

(a)    Collectively discussing and agreeing on common stances to take with the Guilds after the Guilds had revoked their consent to collective negotiation with the agencies;

(b)    Collectively taking common stances with the Guilds after the Guilds had revoked their consent to collective negotiation with the agencies;

(c)    Collectively refusing to negotiate with the Guilds on an individual rather than collective basis.

(d)    Collectively threatening lawyers with baseless litigation and other retaliatory actions if they represented their former clients in negotiating employment contracts with studios;

(e)    Agreeing to blacklist any agency that agreed to the Guilds' Code of Conduct, thereby harming the Guilds' members who are represented by those agencies.

350.    These contracts, combinations, agreements, or conspiracies substantially affected, and continue to affect, interstate commerce.

351.    Counterclaim Defendant WME and the other Agencies CAA, UTA, and ICM are direct horizontal competitors.  The ATA is a trade association comprised of competing sellers of agency services, including Counterclaim Defendant WME and the other Agencies CAA, UTA, and ICM.

352.    No exemptions apply to the anticompetitive conduct alleged herein.

353.    The conduct of WME and the other Agencies and their co-conspirators was a substantial factor in causing harm to Counterclaimants the Guilds and their members, including Stiehm.

354.    As a direct and proximate result of the Agencies' collusion, the Guilds have been, and continue to be, deprived of competition among individual agencies

69

regarding negotiation of new franchise agreements. Moreover, as a direct and proximate result of the Agencies' collusive scheme not to deal individually with the Guilds and to continue to discuss and agree to common negotiating positions, the Guilds' members have had, and will continue to have, an artificially reduced choice of agents and agencies to represent them.

355. As a direct and proximate result of the Agencies' collusion, the Guilds' members have had, and will continue to have, an artificially reduced choice of legal counsel to represent them in connection with the negotiation of employment contracts.

356. As a direct and proximate result of the Agencies' collusion, the Guilds' members have had, and will continue to have, an artificially reduced choice of employment opportunities.

357. These contracts, combinations, agreements, or conspiracies have caused substantial anticompetitive effects.

358. Counterclaimants the Guilds and their members, including Stiehm, have suffered antitrust injury due to WME's illegal conspiracy.

359. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, Counterclaimant Stiehm, on her own behalf, and Counterclaimants the Guilds, on their own behalf of and on behalf of their members, are entitled to the issuance of an injunction against WME, preventing and restraining the violations alleged herein.

360. Counterclaimants are also entitled to treble damages, as well as their attorney's fees and costs. 15 U.S.C. §§15(a), 26.

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

# THIRD CLAIM FOR RELIEF

## *Per Se* Price-Fixing in Violation of the Cartwright Act,

## Cal. Bus. & Prof. Code §16700 *et seq.*

## (brought by Meredith Stiehm on her own behalf, and by the Guilds on their own behalf and on behalf of their members, against WME)

361.  Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-360.

362.  WME and the other Agencies and their unnamed co-conspirators entered into and engaged in a contract, combination, trust, or conspiracy in unreasonable restraint of trade in violation of the Cartwright Act, California Business and Professions Code §16700 *et seq.*, by artificially reducing or eliminating competition in California and the United States.

363.  WME's and the other Agencies' contract, combination, trust or conspiracy was entered into, carried out, effectuated and perfected mainly within the State of California, and WME's conduct within California injured Counterclaimants the Guilds' members, including Stiehm, within California and throughout the United States.

364.  Well before 2015 and continuing through to the present, the exact starting date being unknown to Counterclaimants and exclusively within the knowledge of WME and its unnamed conspirators, WME and the other Agencies and their co-conspirators entered into a continuing contract, combination trust, or conspiracy to unreasonably restrain trade in violation of the Cartwright Act.  WME has acted in violation of §16700 to fix, raise, stabilize and maintain the prices of agency services and to control access to writers' services.

365.  These violations of the Cartwright Act, without limitation, constitute a continuing unlawful trust and concert of action among WME and the other Agencies and their co-conspirators, the substantial terms of which were to fix, raise, maintain,

71

and stabilize the prices of agency services and to control access to writers' services. The sale of agency services to studios and writers are inextricably intertwined.

366. As a result of WME and the other Agencies and their co-conspirators' unlawful conduct, prices for agency services were raised, fixed, maintained and stabilized in the State of California and the ability of writers to sell their services has been suppressed.

367. For the purpose of formulating and effectuating their contract, combination, or conspiracy, WME and the other Agencies and their co-conspirators did those things they contracted, combined, or conspired to do, including:

(a)    exchanging information on the structure and amount of packaging fees;

(b)    agreeing to the structure of packaging fees and to negotiate with studios from a common "3-3-10" starting point;

(c)    negotiating with studios from a common "3-3-10" starting point;

(d)    agreeing to a standard range for the base license fee applicable to the upfront 3% package fee;

(e)    utilizing the standard range for the base license fee applicable to upfront 3% package fees charged to studios; and

(f)    selling agency services in California and throughout the United States at non-competitive prices.

368. Counterclaim Defendant WME and the three other Agencies CAA, UTA, and ICM are direct horizontal competitors. The ATA is a trade association comprised of competing sellers of agency services, including Counterclaim Defendant WME and the other three Agencies CAA, UTA, and ICM.

369. No exemptions apply to the anticompetitive conduct alleged herein.

370. The conduct of WME and the other Agencies and their co-conspirators was a direct, proximate and substantial factor in causing harm to Counterclaimants.

371. These contracts, combinations, agreements, or conspiracies have

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

caused substantial anticompetitive effects.

372. Counterclaimants have suffered antitrust injury due to the illegal conspiracy.

373. As a result of the WME's unlawful conduct, Counterclaimants the Guilds have been injured in their business and property in that they have received less in dues payments than they otherwise would have received in the absence of WME's unlawful conduct.

374. As a direct and proximate result of the WME's unlawful conduct, Counterclaimants the Guilds' members, including Stiehm, have suffered and will continue to suffer injury as a direct result of the WME's and the other Agencies' and their co-conspirators' illegal conspiracy by way of lower compensation and valuable lost opportunities for their creative television writing services.

375. The alleged contract, combination or conspiracy is a *per se* violation of the Cartwright Act.

376. Counterclaimants are entitled to treble damages and their cost of suit, including reasonable attorneys' fees. Cal. Bus & Prof. Code §16750(a).

377. Counterclaimants the Guilds, on their own behalf and on behalf of their members, and Counterclaimant Stiehm are also entitled to an injunction against WME, preventing and restraining the violations alleged herein. Cal. Bus & Prof. Code §16750(a).

**FOURTH CLAIM FOR RELIEF**

***Per Se* Group Boycott in Violation of the Cartwright Act,**

**Cal. Bus. & Prof. Code §16700 *et seq.***

**(brought by Meredith Stiehm on her own behalf, and by the Guilds on their own behalf and on behalf of their members, against WME)**

378. Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-378.

379. WME and the other Agencies and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of the Cartwright Act, California Business and Professions Code §16700 *et seq.*, by artificially reducing or eliminating competition in California and the United States.

380. WME's and the other Agencies' contract, combination, trust or conspiracy was entered into, carried out, effectuated and perfected mainly within the State of California, and WME's conduct within California injured Counterclaimants the Guilds' members, including Stiehm, within California and throughout the United States.

381. Independent economic actors—including each of WME and the other three Agencies CAA, UTA, and ICM—may not collude on the prices they would accept for their services or otherwise engage in concerted anticompetitive action in the marketplace. *See, e.g.*, *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990). They also may not agree to engage in horizontal group boycotts of suppliers, customers, or others. *See, e.g.*, *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457 (1941). Specifically, collective bargaining by non-labor organizations over the price of a service, and collective refusals to deal with particular suppliers, customers, or others, are per se illegal under California law. *See, e.g.*, *Oakland-Alameda County Builders' Exch. v. F. P. Lathrop Constr. Co.*, 4 Cal.3d 354, 365 (1971).

382. For the purpose of formulating and effectuating their contract, combination, or conspiracy, WME and the other Agencies and their co-conspirators did those things they contracted, combined, or conspired to do, including by:

    (a)    Collectively discussing and agreeing on common stances to take with the Guilds after the Guilds had revoked their consent to collective negotiation with the agencies;

(b)   Collectively taking common stances with the Guilds after the Guilds had revoked their consent to collective negotiation with the agencies;

(c)   Collectively refusing to engage in individual rather than collective negotiations with the Guilds.

(d)   Collectively threatening lawyers with baseless litigation and other retaliatory actions if they represented their former clients in negotiating employment contracts with studios;

(e)   Agreeing to blacklist any agency that agreed to the Guilds' Code of Conduct, thereby harming the Guilds' members who are represented by those agencies.

383.   These contracts, combinations, agreements, or conspiracies substantially affected, and continue to affect, commerce within California and throughout the United States.

384.   WME and the other three Agencies CAA, UTA, and ICM are direct horizontal competitors.  The ATA is a trade association comprised of competing sellers of agency services, including Counterclaim Defendant WME and the other three Agencies CAA, UTA, and ICM.

385.   No exemptions apply to the anticompetitive conduct alleged herein.

386.   The conduct of WME and the other Agencies and their co-conspirators was a substantial factor in causing harm to Counterclaimants the Guilds and their members, including Stiehm.

387.   As a direct and proximate result of the Agencies' collusion, the Guilds have been, and continue to be, deprived of competition among individual agencies regarding negotiation of new franchise agreements.  Moreover, as a direct and proximate result of the Agencies' collusive scheme not to deal individually with the Guilds and to continue to discuss and agree to common negotiating positions, the Guilds' members have had, and will continue to have, an artificially reduced choice

75

of agents and agencies to represent them.

388. As a direct and proximate result of the Agencies' collusion, the Guilds' members have had, and will continue to have, an artificially reduced choice of legal counsel to represent them in connection with the negotiation of employment contracts.

389. As a direct and proximate result of the Agencies' collusion, the Guilds' members have had, and will continue to have, an artificially reduced choice of employment opportunities.

390. These contracts, combinations, agreements, or conspiracies have caused substantial anticompetitive effects.

391. Counterclaimants the Guilds and their members, including Stiehm, have suffered antitrust injury due to the illegal conspiracy.

392. Counterclaimants the Guilds, on their own behalf and on behalf of their members, and Counterclaimant Stiehm are entitled to an injunction against WME, preventing and restraining the violations alleged herein, and an award of attorney's fees and costs. Cal. Bus & Prof. Code §16750(a).

393. Counterclaimants are also entitled to treble damages and an award of attorney's fees and costs. Cal. Bus & Prof. Code §16750(a).

## FIFTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

**(brought by Meredith Stiehm on her own behalf, and by the Guilds on behalf of their members, against Counterclaim Defendant WME)**

394. Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-393.

395. Under California law, an agent owes a fiduciary duty to his or her principal, which includes the duty of loyalty and the duty to avoid conflicts of interest.

76

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

396.    At all times relevant to the Complaint, WME owed fiduciary duties to Stiehm, and to all members of the Guilds represented by WME.

397.    WME willfully breached its fiduciary duty to Meredith Stiehm and other members of the Guilds represented by WME by placing its own interests, including but not limited to its interests in packaging fees, above those of its clients Stiehm and other members of the Guilds, and by increasing its own profits, including but not limited to profits generated by packaging fees, at the expense of Stiehm and other members of the Guilds, which also constituted a breach of the duty of loyalty.

398.    Instances in which WME put its own interests above those of clients to whom it owed a fiduciary duty and a duty of loyalty included, but are not limited to, WME's entrance into packaging fee agreements pursuant to which WME's packaging fee increased with a corresponding reduction in the payment received by its clients and decreased with a corresponding increase in the payment received by its clients; WME's entrance into packaging fee agreements pursuant to which WME's packaging fee necessarily decreased the funding available for its clients to use in producing the programs for which WME received a packaging fee; WME's pursuit of negotiating strategies and entrance into agreements designed to maximize its packaging fee at the expense of its clients' economic and creative interests; WME's negotiation of more favorable profit definitions for itself than for its clients; WME's refusal to approve its clients' agreements with studios to work on particular projects absent a packaging fee agreement that benefitted WME at its clients' expense; WME's steering of its clients to projects in which it could claim a packaging fee, depriving them of employment opportunities and greater compensation; and WME's failure to pursue the highest possible compensation for its clients, or to pursue compensation already owed to its clients, where doing so would compromise WME's own interest in future packaging fees.

399.    WME further willfully breached its fiduciary duty to Stiehm and other

77

members of the Guilds by proceeding with the representation under numerous conflicts of interest without obtaining valid, informed consent to those conflicts of interest from Stiehm or from other members of the Guilds.  In particular, WME failed to disclose the material terms of its packaging fee agreements with particular studios regarding particular programs—including all economic terms of those agreements—before representing its writer clients in connection with those programs, and has deliberately concealed from its clients either the existence of the packaging fee agreement, the terms of the agreement, and/or the conflict of interest created by the agreement.

400.   As a result of WME's willful breaches of its fiduciary duty to Stiehm, she has suffered significant damages, including but not limited to lost wages, lost employment opportunities, and other economic losses.

401.   As a result of WME's willful breaches of its fiduciary duties to the Guilds' members, the Guilds' members suffered significant harm, including but not limited to lost wages, lost employment opportunities, and other economic losses.

402.   Counterclaimants are informed and believe that WME committed the aforementioned acts maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Counterclaimants, from an improper and evil motive amounting to malice, and in conscious disregard of Counterclaimants' rights.  Stiehm is therefore entitled to recover punitive damages from WME in an amount according to proof.

**SIXTH CLAIM FOR RELIEF**

**Constructive Fraud, Cal. Civ. Code §1573**

**(brought by Meredith Stiehm on her own behalf, and by the Guilds on behalf of their members, against Counterclaim Defendant WME)**

403.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-402.

78

404.   Under California law, "[c]onstructive fraud consists … [i]n any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him."  Cal. Civ. Code §1573.  Pursuant to Civil Code §1573, an agent's breach of his or her fiduciary duty to a principal thus constitutes constructive fraud.  Specifically, the failure of a fiduciary to disclose a material fact to his principal that might affect the fiduciary's motives or the principal's decision constitutes constructive fraud, regardless of whether the fiduciary acted with fraudulent intent.

405.   WME, through its agents, committed constructive fraud by breaching its fiduciary duty to Meredith Stiehm and other members of the Guilds represented by WME by placing its own interests above that of its clients Stiehm and other members of the Guilds, and by increasing its own profits at the expense of Stiehm and other members of the Guilds, which constituted a breach of the duty of loyalty. WME, through its agents, committed constructive fraud by breaching its fiduciary duty to Stiehm and other members of the Guilds by proceeding with the representation under numerous conflicts of interest without disclosing either the existence of those conflicts or the material facts concerning those conflicts of interest to Stiehm or other members of the Guilds.  WME, through its agents, committed constructive fraud by failing to disclose to Stiehm and other members of the Guilds material facts known to WME, which material facts might affect WME's motives or, if disclosed to Stiehm and other members of the Guilds, would have affected Stiehm and other members of the Guilds' decisions, including but not limited to the following:

(a)   Concealing the existence of and/or the terms of WME's packaging fee agreements and the fact that packaging fees are an inherent conflict of interest;

(b)   Concealing the fact that packaging fees are paid directly by the

79

production companies from the program's budget or revenues to WME;

(c)     Concealing the fact that WME sought to prevent Stiehm and other members of the Guilds represented by WME from working with talent represented by other Agencies in order to avoid having to split packaging fees with other Agencies;

(d)     Concealing the fact that WME intentionally failed to maximize how much Stiehm and other members of the Guilds represented by WME were or are paid for their work in order to maximize packaging fees for itself;

(e)     Concealing the fact that WME intentionally failed to pitch its clients Stiehm's and other members of the Guilds' work to production companies that would pay the writers the most, and instead, pitched Stiehm's and other members of the Guilds' work to those production companies that WME believed would pay the largest packaging fee;

(f)     Concealing the fact that WME often makes more in packaging fees than Stiehm and other members of the Guilds represented by WME are paid for their work on a particular program;

(g)     Concealing the fact that packaging fees are frequently paid to WME before the profits that determine how Stiehm and other members of the Guilds' profits are calculated, which therefore reduces the overall amount of money paid to Stiehm and other members of the Guilds represented by WME for their work on a particular show;

(h)     Concealing the fact that WME's compensation in a packaging fee arrangement is often tied to the budget of a particular production or program rather than the amount paid to Stiehm and other members of the Guilds represented by WME, and therefore, WME is incentivized to reduce the amount paid to Stiehm and other members of the Guilds represented by WME in order to increase the amount of the budget available to compensate WME;

80

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

(i)    Concealing the fact that WME uses popular writers, including Stiehm and other members of the Guilds represented by WME, as leverage to secure packaging fees even where doing so does not serve the economic and/or creative interests of their writer-clients Stiehm and other members of the Guilds;

(j)    Concealing the fact that WME has, in some instances, intentionally and actively suppressed the wages of their own writer-clients Stiehm and other members of the Guilds represented by WME in order to secure more lucrative "packaging fees" for itself; and

(k)    Concealing the fact that WME's interests in negotiating packaging fees for itself are not aligned with its clients Stiehm and other members of the Guilds, and in fact, are at direct odds with WME's clients.

406.    The Guilds' members, including Stiehm, justifiably expect their agents to loyally represent their interests, in accordance with California agency law principles.    The Guilds' members represented by WME, including Stiehm, have justifiably relied, to their detriment, on WME's misleading concealment of the above facts.

407.    As a result of WME's commissions of constructive fraud under Civil Code §1573, Stiehm suffered significant damages, including but not limited to lost wages, lost employment opportunities, and other economic losses.

408.    As a result of WME's commissions of constructive fraud under Civil Code §1573, the Guilds' members suffered significant harm, including but not limited to lost wages, lost employment opportunities, and other economic losses.

409.    Counterclaimants are informed and believe that WME committed the aforementioned violations of Civil Code §1573 maliciously and oppressively, with the wrongful intention of injuring Counterclaimants, from an improper and evil motive amounting to malice, and in conscious disregard of Counterclaimants' rights. Stiehm is therefore entitled to recover punitive damages from WME in an amount

81

according to proof.

## SEVENTH CLAIM FOR RELIEF

**Unfair Competition, Cal. Bus. & Prof. Code §17200 *et seq.***

**(brought by Meredith Stiehm on her own behalf, and by the Guilds on their own behalf, against WME)**

410.    Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-409.

411.    California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et seq.* ("UCL"), prohibits "unlawful, unfair or fraudulent business act[s]."

412.    The Agencies' packaging fee practices violate the UCL in four respects.

413.    First, packaging fees are an "unlawful" or "unfair" practice because they constitute a breach of the Agencies' fiduciary duty to their clients.

414.    Second, packaging fees are an "unlawful" or "unfair" practice because they constitute constructive fraud under Civil Code §1573.

415.    Third, packaging fees are an "unfair" practice because they deprive writers of loyal, conflict-free representation; divert compensation away from the writers and other creative talent that are responsible for creating valuable television and film properties; and undermine the market for writers' creative endeavors.

416.    Fourth, packaging fees are an "unlawful" or "unfair" practice because they violate Section 302 of the federal Labor-Management Relations Act ("LMRA"), 29 U.S.C. §186, the so-called "anti-kickback" provision of the Taft-Hartley Act.

417.    Subsection (a) of LMRA Section 302 makes it unlawful for "any employer or association of employers … or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value … to *any representative of any of his employees* who are employed in an industry affecting commerce."  29 U.S.C. §186(a) (emphasis added).  The same

82

section makes it unlawful for "any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other things of value prohibited by subsection (a)." *Id.* §186(b).

418.    The television and film industries are industries that affect commerce. Indeed, those industries generate hundreds of millions of dollars of national and international revenue each year.

419.    The production companies that produce the television shows and films on which Stiehm and other Guild-member writers work are employers for the purposes of LMRA Section 302.

420.    WME is a representative of the production companies' employees for the purposes of LMRA Section 302.  Indeed, the very reason WME is retained by writers is to represent those writers in procuring employment opportunities and negotiating wages in excess of the minimums established by the MBA. Any agent representing a writer in negotiations with a production company is exercising authority delegated to the agent by the Guilds under the MBA (which otherwise have the exclusive right pursuant to the MBA to negotiate on behalf of the represented employees).

421.    The key feature of any packaging fee agreement is the payment of a negotiated fee by the employer production company to the employee representative, WME.  Such payments are expressly prohibited by and unlawful under LMRA Section 302, and therefore constitute an unlawful business practice for the purposes of California's UCL.

422.    Stiehm and the Guilds have lost money or property as a result of WME's packaging fee practices.  As noted above, Stiehm has been required to spend money to retain other professionals to provide services her agents should have been providing; has seen her compensation reduced by virtue of packaging fees; and has been denied employment opportunities because of the misalignment of incentives

83

that results from WME's packaging fee practices, as alleged in greater detail above. The Guilds have been required to expend their own resources monitoring WME's packaging fees, educating members about WME's packaging fee abuses, preparing a comprehensive campaign to address those abuses and end packaging fees, and enforcing their members' contractual rights after WME failed to do so. The Guilds have also lost dues revenue due to packaging fees.

423. As a result of WME's unlawful and unfair business practices, Counterclaimants are entitled to injunctive relief and disgorgement of agency profits, and Stiehm is entitled to restitution. Cal. Bus. & Prof. Code §17203.

## EIGHTH CLAIM FOR RELIEF

### Investment of Racketeering Income, 18 U.S.C. §1962(a)

### (brought by Meredith Stiehm on her own behalf, and by the Guilds on their own behalf, against WME)

424. Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-423.

425. The RICO Act, 18 U.S.C. §1962(a), makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … , to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

426. The RICO Act defines "racketeering activity" to include "any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations)." 18 U.S.C. §1961(1)(C). Accordingly, violations of the anti-kickback provisions of the LMRA, i.e. Section 302, 29 U.S.C. §186(a) and (b), constitute racketeering activity under the RICO Act.

427. WME is a "person" within the meaning of the RICO Act. 18 U.S.C.

84

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

§1962(a); *see also id.* §1961(3) ("'person' includes any individual or entity capable of holding a legal or beneficial interest in property").

428.   WME is also an "enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act. 18 U.S.C. §1962(a); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

429.   WME has engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(a)—namely, its repeated violations of LMRA Section 302 in the form of receiving packaging fees from its writer-clients' employers, the production companies.  *See* 29 U.S.C. §186(a), (b).  Every time WME receives any sum of money directly from a production company as part of a package agreement, that payment violates LMRA Section 302.  *See id.*  WME has received multiple unlawful payments from the production companies on each show or film packaged by WME, resulting in hundreds, if not thousands, of separate LMRA Section 302 violations over the last ten years.  *See* 18 U.S.C. §1961(5).  The pattern of racketeering activity directly benefits WME, as the unlawful payments are a major source of WME's income.

430.   WME has invested the income or proceeds of its pattern of racketeering activity—namely, the unlawful packaging fees—back into the operation of WME, in violation of 18 U.S.C. §1962(a).

431.   In the alternative, WME and each of the production companies with which WME deals are groups of persons associated together for the common purpose of engaging in a continuing course of conduct—namely, packaging television and film productions, and paying unlawful packaging fees from the production company to the studio.  The association of WME and each production company is therefore an "enterprise engaged in, or the activities of which affect,

85

interstate or foreign commerce" within the meaning of the RICO Act. 18 U.S.C. §1962(c); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

432. In addition and in the alternative, WME's in-house production companies are "enterprise[s] engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act. 18 U.S.C. §1962(c); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

433. WME has used the income or proceeds of its pattern of racketeering activity—namely, the unlawful packaging fees—in the acquisition of WME's interest in or the establishment or operation of the association-in-fact enterprises described above in paragraph 431, in violation of 18 U.S.C. §1962(a). WME receives substantial income from packaging fees; WME necessarily uses those same resources when coordinating its activities with the production companies, such that WME has either directly or indirectly used the proceeds of its pattern of racketeering activity to obtain an interest in or to establish or operate a RICO enterprise in violation of §1962(a).

434. WME has used the income or proceeds of its pattern of racketeering activity—namely, the unlawful packaging fees—in the acquisition of WME's interest in or in the establishment or operation of the production companies described above in paragraph 432, in violation of 18 U.S.C. §1962(a). WME receives substantial income from packaging fees; WME necessarily uses those same resources in funding its own in-house production company enterprises, such that WME has either directly or indirectly used the proceeds of its pattern of racketeering activity to obtain an interest in or to establish or operate a RICO enterprise in

86

violation of §1962(a).

435.   Each of the above enterprises exists separate and apart from the pattern of racketeering activity alleged herein.

436.   18 U.S.C. § 1964(c) provides a private cause of action to "[a]ny person injured in his business or property by reason of a violation of" the RICO Act.

437.   Under any of the above alternative theories, Stiehm and the Guilds have lost money or property as a result of WME's violations of §1962(a) within the meaning of 18 U.S.C. §1964(c).  WME's pattern of racketeering activity (i.e. its receipt of packaging fees) has allowed it and the other Agencies to dominate the marketplace for agent's services, thereby harming the Guilds' members, including Stiehm, by denying them conflict-free representation and lowering their income.  In addition, as noted above, Stiehm has been required to spend money to retain other professionals to provide services her agents should have been providing; has seen her compensation reduced by virtue of packaging fees; and has been denied employment opportunities because of the misalignment of incentives that results from WME's packaging fee practices, including WME's reinvestment of packaging fees in its operations and/or in its acquisition of an interest in or establishment or operation of any of the above alternative RICO enterprises, as alleged in more detail above.  The Guilds have been required to expend their own resources monitoring WME's packaging fees, educating members about WME's packaging fee abuses, preparing a comprehensive campaign to address those abuses and end packaging fees, and enforcing their members' contractual rights after WME failed to do so. The Guilds have also lost dues revenue due to packaging fees and their reinvestment in WME or in the alternative RICO enterprises, which permits the racketeering activity to continue.

438.   As a result of WME's violations of §1962(a), Counterclaimants are entitled to injunctive relief, including but not limited to an order requiring the

dissolution or reorganization of WME.  18 U.S.C. § 1964(a).

439.   As a result of WME's RICO violations, Counterclaimants are also entitled to treble damages, as well as attorney's fees and costs.  18 U.S.C. § 1964(c).

### NINTH CLAIM FOR RELIEF

**Maintenance of Racketeering Enterprise, 18 U.S.C. §1962(b)**

**(brought by Meredith Stiehm on her own behalf, and by the Guilds on their own behalf, against WME)**

440.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-439.

441.   The RICO Act, 18 U.S.C. §1962(b), makes it "unlawful for any person through a pattern of racketeering activity … to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

442.   The RICO Act defines "racketeering activity" to include "any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations)." 18 U.S.C. §1961(1)(C). Accordingly, violations of the anti-kickback provisions of the LMRA, i.e. Section 302, 29 U.S.C. §186(a) and (b), constitute racketeering activity under the RICO Act.

443.   WME is a "person" within the meaning of the RICO Act.  18 U.S.C. §1962(a); *see also id.* §1961(3) ("'person' includes any individual or entity capable of holding a legal or beneficial interest in property").

444.   WME is an "enterprise which is engaged in, or the activities of which affect, interstate or foreign commeerce" within the meaning of the RICO Act.  18 U.S.C. §1962(b); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

445.   WME has engaged in a pattern of racketeering activity within the

88

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

meaning of 18 U.S.C. §1962(a)—namely, its repeated violations of LMRA Section 302 in the form of receiving packaging fees from its writer-clients' employers, the production companies.  *See* 29 U.S.C. §186(a), (b).  Every time WME receives any sum of money directly from a production company as part of a package agreement, that payment violates LMRA Section 302.  *See id.*  WME has received multiple unlawful payments from the production companies on each show or film packaged by WME, resulting in hundreds, if not thousands, of separate LMRA Section 302 violations over the last ten years.  *See* 18 U.S.C. §1961(5).  The pattern of racketeering activity directly benefits WME, as the unlawful payments are a major source of WME's income.

446.   WME is a "person" that, "through a pattern of racketeering activity"—i.e. through WME's repeated violations of LMRA Section 302—has "acquire[d] or maintain[ed], directly or indirectly, any interest in or control of" WME, in violation of §1962(b).  Specifically, WME's pattern of racketeering activity—i.e. its repeated receipt of packaging fees—is directly linked to its maintenance of control over its business, as packaging fees have indeed become a major part of WME's business model.  WME's packaging fee practices are maintained and directed from the very top of the organization.

447.   In the alternative, WME and each of the production companies with which WME deals are groups of persons associated together for the common purpose of engaging in a continuing course of conduct—namely, packaging television and film productions, and paying unlawful packaging fees from the production company to the studio.  The association of WME and each production company is therefore an "enterprise engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act.  18 U.S.C. §1962(b); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals

89

associated in fact although not a legal entity").

448. In addition and in the alternative, WME's in-house production companies are "enterprise[s] engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act.  18 U.S.C. §1962(b); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

449. Accordingly, WME is a "person" that, "through a pattern of racketeering activity"—i.e. through WME's repeated violations of LMRA Section 302—has "acquire[d] or maintain[ed], directly or indirectly, any interest in or control of" the associated-in-fact enterprises described above in paragraph 447, in violation of §1962(b).  Specifically, WME's pattern of racketeering activity—i.e. its repeated receipt of packaging fees—is directly linked to its interest in or control of the associated-in-fact enterprises, as WME's past packaging fees are used to fund its continued packaging fee practices, and are the very purpose of WME's participation in the associated-in-fact enterprises.

450. In addition, WME is a "person" that, "through a pattern of racketeering activity"—i.e. through WME's repeated violations of LMRA Section 302—has "acquire[d] or maintain[ed], directly or indirectly, any interest in or control of" the in-house production company enterprises described above in paragraph 448, in violation of §1962(b).  Specifically, WME's pattern of racketeering activity—i.e. its repeated receipt of packaging fees—is directly linked to its interest in or control of the in-house production company enterprises, as WME's past packaging fees are used to fund its new forays into production via these enterprises.

451. Each of the above enterprises exists separate and apart from the pattern of racketeering activity alleged herein.

452. 18 U.S.C. § 1964(c) provides a private cause of action to "[a]ny person

90

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

injured in his business or property by reason of a violation of" the RICO Act.

453. Stiehm and the Guilds have lost money or property as a result of WME's violations of §1962(b) within the meaning of 18 U.S.C. §1964(c). WME's pattern of racketeering activity (i.e. its receipt of packaging fees) has allowed it and the other Agencies to dominate the marketplace for agent's services, thereby harming the Guilds' members, including Stiehm, by denying them conflict-free representation and lowering their income. In addition, as noted above, Stiehm has been required to spend money to retain other professionals to provide services her agents should have been providing; has seen her compensation reduced by virtue of packaging fees; and has been denied employment opportunities because of the misalignment of incentives that results from WME's control of its business to continue its unlawful packaging fee practices, as alleged in more detail above. The Guilds have been required to expend their own resources monitoring WME's control of its business to continue its unlawful packaging fee practices, educating members about WME's packaging fee abuses, preparing a comprehensive campaign to address those abuses and end packaging fees, and enforcing their members' contractual rights after WME failed to do so. The Guilds have also lost dues revenue due to WME's control of its business to continue its unlawful practice of receiving packaging fees.

454. As a result of WME's violations of §1962(b), Counterclaimants are entitled to injunctive relief, including but not limited to an order requiring the dissolution or reorganization of WME. 18 U.S.C. § 1964(a).

455. As a result of WME's RICO violations, Counterclaimants are also entitled to treble damages, as well as attorney's fees and costs. 18 U.S.C. § 1964(c).

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

# TENTH CLAIM FOR RELIEF

## Control of Racketeering Enterprise, 18 U.S.C. §1962(c)

## (brought by Meredith Stiehm on her own behalf, and by the Guilds on their own behalf, against WME)

456. Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-455.

457. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

458. WME is a "person" within the meaning of the RICO Act. 18 U.S.C. §1962(a); *see also id.* §1961(3) ("'person' includes any individual or entity capable of holding a legal or beneficial interest in property").

459. WME and each of the production companies with which WME deals are groups of persons associated together for the common purpose of engaging in a continuing course of conduct—namely, packaging television and film productions, and paying unlawful packaging fees from the production company to the studio. The association of WME and each production company is therefore an "enterprise engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act. 18 U.S.C. §1962(c); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

460. In addition, WME's in-house production companies are "enterprise[s] engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act. 18 U.S.C. §1962(b); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other

legal entity, and any union or group of individuals associated in fact although not a legal entity").

461. WME is a "person" that is "associated" with the enterprises described above in paragraphs 459 through 460 and that has "conduct[ed] or participate[d] in the conduct of such enterprise[s]'[] affairs through a pattern of racketeering activity"—i.e. through WME's repeated violations of LMRA Section 302—in violation of §1962(c). Specifically, WME's pattern of racketeering activity—the payment by production companies of packaging fees to WME—is one of the primary purposes of the association in fact between WME and the production companies, i.e. the enterprises described in paragraph 459. Likewise, WME's pattern of racketeering activity—the payment by production companies of packaging fees to WME—funds WME's investments in its own in-house production companies, i.e. the enterprises described in paragraph 460.

462. Each of the above enterprises exists separate and apart from the pattern of racketeering activity alleged herein.

463. 18 U.S.C. § 1964(c) provides a private cause of action to "[a]ny person injured in his business or property by reason of a violation of" the RICO Act.

464. Stiehm and the Guilds have lost money or property as a result of WME's violations of §1962(c) within the meaning of 18 U.S.C. §1964(c). WME's pattern of racketeering activity (i.e. its receipt of packaging fees) has allowed it and the other Agencies to dominate the marketplace for agent's services, thereby harming the Guilds' members, including Stiehm, by denying them conflict-free representation and lowering their income. In addition, as noted above, Stiehm has been required to spend money to retain other professionals to provide services her agents should have been providing; has seen her compensation reduced by virtue of packaging fees; and has been denied employment opportunities because of the misalignment of incentives that results from WME's packaging fee practices, as

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

alleged in more detail above.  The Guilds have been required to expend their own resources monitoring WME's packaging fee practices, educating members about WME's packaging fee abuses, preparing a comprehensive campaign to address those abuses and end packaging fees, and enforcing their members' contractual rights after WME failed to do so.  The Guilds have also lost dues revenue due to WME's control of the above-described enterprises to obtain packaging fees.

465.   As a result of WME's violations of §1962(c), Counterclaimants are entitled to injunctive relief, including but not limited to an order requiring the dissolution or reorganization of WME.  18 U.S.C. § 1964(a).

466.   As a result of WME's RICO violations, Counterclaimants are also entitled to treble damages, as well as attorney's fees and costs.  18 U.S.C. § 1964(c).

## ELEVENTH CLAIM FOR RELIEF

### Racketeering Conspiracy, 18 U.S.C. §1962(d)

### (brought by Meredith Stiehm on her own behalf, and by the Guilds on their own behalf, against WME)

467.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-466.

468.   Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions" of the RICO Act, i.e., 18 U.S.C. §1961(a)-(c).

469.   WME is a "person" within the meaning of the RICO Act.  18 U.S.C. §1962(a); *see also id.* §1961(3) ("'person' includes any individual or entity capable of holding a legal or beneficial interest in property").

470.   WME and its officers conspired to violate 18 U.S.C. §1962(a) by agreeing to reinvest the proceeds of WME's pattern of racketeering activity— namely, the receipt of packaging fees in violation of LMRA Section 302—back into the operation of WME, as described in more detail above, in violation of §1962(d). In the alternative, WME and its officers conspired to violate 18 U.S.C. §1962(a) by

94

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

agreeing to reinvest the proceeds of WME's pattern of racketeering activity—namely, the receipt of packaging fees in violation of LMRA Section 302—into WME's acquisition of an interest in and/or WME's control of the associated-in-fact enterprises described in paragraph 431 above, and/or WME's acquisition of an interest in and/or WME's control of the in-house production company enterprises described in paragraph 432 above,  in violation of §1962(d).

471.   WME and its officers also conspired to violate 18 U.S.C. §1962(b) by agreeing to "acquire or maintain, directly or indirectly, any interest in or control of" WME "through a pattern of racketeering activity"—namely, the receipt of packaging fees in violation of LMRA Section 302—as described in more detail above, in violation of §1962(d).  In the alternative, WME and its officers conspired to violate 18 U.S.C. §1962(b) by agreeing to "acquire or maintain, directly or indirectly, any interest in or control of" the associated-in-fact enterprises described in paragraph 447 above, and/or the in-house production company enterprises described in paragraph 448 above, "through a pattern of racketeering activity"—namely, the receipt of packaging fees in violation of LMRA Section 302— as described in more detail above, in violation of §1962(d).

472.   WME also conspired with its officers and with the production companies to violate §1964(c) by agreeing "to conduct or participate, directly or indirectly, in the conduct of" the RICO enterprises described in paragraphs 459 and 460 "through a pattern of racketeering activity"—namely, the receipt of packaging fees in violation of LMRA Section 302—as described in more detail above, in violation of §1962(d).

473.   18 U.S.C. § 1964(c) provides a private cause of action to "[a]ny person injured in his business or property by reason of a violation of" the RICO Act.

474.   Stiehm and the Guilds have lost money or property as a result of WME's violations of §1962(d) within the meaning of 18 U.S.C. §1964(c).  As noted

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

above, Stiehm has been required to spend money to retain other professionals to provide services her agents should have been providing; has seen her compensation reduced by virtue of packaging fees; and has been denied employment opportunities because of the misalignment of incentives that results from WME's packaging fee practices, as alleged in more detail above. The Guilds have been required to expend their own resources monitoring WME's packaging fee practices, educating members about WME's packaging fee abuses, preparing a comprehensive campaign to address those abuses and end packaging fees, and enforcing their members' contractual rights after WME failed to do so. The Guilds have also lost dues revenue due to WME's conspiracies to violate the RICO Act.

475. As a result of WME's violations of §1962(c), Counterclaimants are entitled to injunctive relief, including but not limited to an order requiring the dissolution or reorganization of WME. 18 U.S.C. § 1964(a).

476. As a result of WME's RICO violations, Counterclaimants are also entitled to treble damages, as well as attorney's fees and costs. 18 U.S.C. § 1964(c).

## TWELFTH CLAIM FOR RELIEF

### Declaratory Relief, 28 U.S.C. §§2201, 2202

**(brought by Meredith Stiehm on her own behalf, and by the Guilds on their own behalf, against Counterclaim Defendant WME)**

477. Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-476.

478. The Declaratory Relief Act, 28 U.S.C. §2201 *et seq.* provides that "[i]n a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id*. §2201(a).

479.  Section 2202 provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

480.  An actual controversy has arisen and now exists between Counterclaimants and WME concerning whether packaging fees constitute a breach of WME's fiduciary duty to its writer-clients, as described in greater detail above in paragraphs 394 through 402.

481.  An actual controversy has arisen and now exists between Counterclaimants and WME concerning whether packaging fees constitute constructive fraud under Civil Code §1573, as described in greater detail above in paragraphs 403 through 409.

482.  An actual controversy has arisen and now exists between Counterclaimants and WME concerning whether packaging fees constitute an unfair and/or unlawful practice under California's UCL because they either breach WME's fiduciary duty to its writer-clients; constitute constructive fraud under Civil Code §1573; violate LMRA Section 302, 29 U.S.C. §186(a) and (b); deprive writers of loyal, conflict-free representation, divert compensation away from the writers and other creative talent that are responsible for creating valuable television and film properties, or undermine the market for writers' creative endeavors; or all of the above, as described in greater detail above in paragraphs 410 through 423.

483.  An actual controversy has arisen and now exists between Counterclaimants and WME concerning whether WME's receipt of packaging fees violates Section 302 of the LMRA, 29 U.S.C. §186(a) and (b), as described in greater detail above in paragraphs 416 through 421.

484.  An actual controversy has arisen and now exists between Counterclaimants and WME concerning whether WME's receipt and use of

97

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

packaging fees violate the RICO Act, 18 U.S.C. §1962(a), (b), (c), and (d), as described in greater detail above in paragraphs 424 through 476.

485. Counterclaimants are entitled to a declaration under §2201 that WME's receipt of packaging fees constitutes a breach of WME's fiduciary duty to its writer-clients, and injunctive relief under §2202 to prevent future violations of the same.

486. Counterclaimants are entitled to a declaration under §2201 that WME's receipt of packaging fees constitutes constructive fraud under Civil Code §1573, and injunctive relief under §2202 to prevent future violations of the same.

487. Counterclaimants are entitled to a declaration under §2201 that packaging fees constitute an unfair and/or unlawful practice under California's UCL because they breach WME's fiduciary duty to its writer-clients; constitute constructive fraud under Civil Code §1573; violate LMRA Section 302, 29 U.S.C. §186(a) and (b); deprive writers of loyal, conflict-free representation, divert compensation away from the writers and other creative talent that are responsible for creating valuable television and film properties, and undermine the market for writers' creative endeavors; and injunctive relief under §2202 to prevent future violations of the same.

488. Counterclaimants are entitled to a declaration under §2201 that WME's receipt of packaging fees violates Section 302 of the LMRA, 29 U.S.C. §186(a) and (b), and injunctive relief under §2202 to prevent future violations of the same.

489. Finally, Counterclaimants are entitled to a declaration under §2201 that WME's receipt of packaging fees violates the RICO Act, 18 U.S.C. §1962(a), (b), (c), and (d), and injunctive relief under §2202 to prevent future violations of the same.

## PRAYER FOR RELIEF

**WHEREFORE,** Counterclaimants respectfully request that the Court:

1. Declare that WME's collusive agreement to a fixed packaging fee

98

model constitutes illegal price-fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

2.     Declare that WME's collusive agreement not to negotiate individually with the Guilds constitutes an illegal group boycott in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

3.     Declare that WME's collusive agreement to blacklist writers and other individuals and entities who object to packaging fees or agree to the Guilds' Code of Conduct constitutes an illegal group boycott in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

4.     Declare that WME's collusive agreement to a fixed packaging fee model constitutes illegal price-fixing in violation of the Cartwright Act, California Business and Professions Code §16700 *et seq.*;

5.     Declare that WME's collusive agreement not to negotiate individually with the Guilds constitutes an illegal group boycott in violation of the Cartwright Act, California Business and Professions Code §16700 *et seq.*;

6.     Declare that WME's collusive agreement to blacklist writers and other individuals and entities who object to packaging fees or agree to the Guild's Code of Conduct constitutes an illegal group boycott in violation of the Cartwright Act, California Business and Professions Code §16700 *et seq.*;

7.     Declare that packaging fees constitute a breach of WME's fiduciary duty to its writer-clients;

8.     Declare that WME's packaging fee practices constitute constructive fraud under Civil Code §1573;

9.     Declare that packaging fees constitute an unfair and/or unlawful practice under California's UCL because they breach WME's fiduciary duty to its writer-clients; constitute constructive fraud under Civil Code §1573; violate LMRA Section 302, 29 U.S.C. §186(a) and (b); and deprive writers of loyal, conflict-free

99

representation, divert compensation away from the writers and other creative talent that are responsible for creating valuable television and film properties, and undermine the market for writers' creative endeavors;

10.    Declare, under 28 U.S.C. §2201, that packaging fees violate Section 302 of the Labor Management Relations Act, 29 U.S.C. §186(a) and (b);

11.    Declare, under 28 U.S.C. §2201 and/or 18 U.S.C. §1964(a), that packaging fees violate the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §1962(a) (b), (c), and (d);

12.    Enjoin WME and its affiliates, successors, transferees, assignees, parents, owners, controlling shareholders, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with it, from entering into new packaging fee agreements in which one or more writer-clients of WME works as a writer, or from receiving any monetary payments or other things of value from any production company that employs any writer client of WME;

13.    Enjoin WME and its affiliates, successors, transferees, assignees, parents, owners, controlling shareholders, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with it, from, in any manner, continuing, maintaining, or renewing the conduct, conspiracy, or combinations alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect, including the following:

(a) Entering negotiations or discussions with one or more other agencies, without the Guilds' authorization, regarding (i) adherence to the Guild' Code of Conduct, (ii) the signing of a franchise agreement with the Guilds, (iii) non-public agreements reached with the Guild during negotiations or

100

discussion regarding the Code of Conduct or a new franchise agreement, or (iv) the status or contents of any such non-public negotiations or discussions;

(b) Agreeing with one or more other agencies on the terms of any proposal, edit, or negotiating position regarding the Guilds' Code of Conduct or franchise agreement without the Guilds' authorization to negotiate collectively, or otherwise collectively refusing to negotiate or discuss the Code of Conduct or a franchise agreement with the Guilds except on the condition that the Guilds include in those discussions one or more other agencies or their representatives;

(c) Agreeing with one or more other agencies on the terms or conditions of any packaging agreement;

(d) Not dealing with, or threatening not to deal with any Guild member, agency or clients of an agency, attorney, manager, production company, studio or any other person who supports a prohibition on packaging, has agreed to adhere to the Code of Conduct, or has otherwise signed a franchise agreement with the Guilds that prohibits packaging; or

(e) Enforcing the terms of any packaging agreement or otherwise directly or indirectly receiving packaging fees from a production company or studio.

14. Enjoin WME and its affiliates, successors, transferees, assignees, parents, owners, controlling shareholders, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with it, from, in any manner, blacklisting any writer, lawyer, agency or other individual or entity that objects to packaging fees, represents writers who have objected to packaging fees including writers who have fired their agents, enters an agency franchise agreement with the Guild, or is represented by such an agency;

101

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

15. Order WME to provide an accounting of all moneys received by WME in connection with projects or programs for which Stiehm or other Guild members were employed as writers;

16. Require WME to pay restitution to Stiehm in an amount equal to the funds that would have been paid to Stiehm in the absence of WME's unlawful and unfair packaging fees;

17. Require WME to disgorge all profits generated from unlawful and unfair packaging fees;

18. Award Stiehm compensatory and punitive damages based on WME's breach of fiduciary duty;

19. Award Counterclaimants treble damages for WME's violations of Section 1 of the Sherman Act, 15 U.S.C. §1;

20. Award Counterclaimants treble damages for WME's RICO violations, 18 U.S.C. §1964(c);

21. Award Counterclaimants their costs and attorneys' fees; and

22. Award such further and additional relief as is just and proper.

DATED: August 19, 2019

Stephen P. Berzon
Stacey Leyton
P. Casey Pitts
Rebecca C. Lee
ALTSHULER BERZON LLP

Anthony R. Segall
Juhyung Harold Lee
ROTHNER, SEGALL & GREENSTONE

W. Stephen Cannon
Ethan E. Litwin
CONSTANTINE CANNON LLP

_____/s/ Stacey Leyton_____
Stacey Leyton

*Attorneys for Defendants and Counterclaimants*

ANSWER AND COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM