Steven A. Marenberg (101033)
Victor Jih (186515)
Stephen M. Payne (310567)
**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276

Adam Levin (156773)
Jeremy Mittman (248854)
Jean Pierre Nogues (84445)
**MITCHELL SILBERBERG & KNUPP LLP**
2049 Century Park E., 18th Floor
Los Angeles, CA 90067

Attorneys for Plaintiff
UNITED TALENT AGENCY, LLC

Richard B. Kendall (90072)
Patrick J. Somers (318766)
Nicholas F. Daum (236155)
**KENDALL BRILL & KELLY LLP**
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Attorneys for Plaintiff
CREATIVE ARTISTS AGENCY, LLC.

Jeffrey L. Kessler (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Isabelle Mercier-Dalphond (*pro hac vice*)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4193

Diana Hughes Leiden (267606)
Shawn R. Obi (288088)
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543

Attorneys for Plaintiff
WILLIAM MORRIS ENDEAVOR
ENTERTAINMENT, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, CREATIVE ARTISTS AGENCY, LLC and UNITED TALENT AGENCY, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> WRITERS GUILD OF AMERICA, WEST, INC. and WRITERS GUILD OF AMERICA, EAST, INC. <br><br> Defendants. | Case No. 2:19-cv-05465-AB (FFMx) <br><br> **FIRST CONSOLIDATED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

In accordance with the Court's Order (ECF No. 40), Plaintiffs William Morris Endeavor Entertainment, LLC ("WME"), Creative Artists Agency, LLC ("CAA") and United Talent Agency, LLC ("UTA," and together with WME and CAA, "Plaintiffs"), hereby file their First Consolidated Complaint.[1]  Each of the Plaintiffs, through its respective undersigned counsel, alleges upon knowledge of its own acts and solely on information and belief as to any act of any other Plaintiff, against Defendants Writers Guild of America, West, Inc. ("WGAW") and Writers Guild of America, East, Inc. ("WGAE") as follows:

## I.    INTRODUCTION

1.    This action concerns defendants WGAW and WGAE's wanton abuse of union authority in violation of antitrust law.

2.    Hollywood talent representation is fiercely competitive.  There are hundreds of agencies and thousands of talent agents competing to represent, among others, writers for television and film productions.  And the writers, in turn, compete to obtain agents' representation services.  Writers are free to choose (and leave) their agents, and writers can (and do) change agencies with regularity.

3.    Defendants WGAW and WGAE (together, "WGA" or the "Guilds") are the two labor unions who represent writers in the entertainment industry.  They serve as the exclusive collective bargaining representatives for writers in that industry. Plaintiffs are three of the largest Hollywood talent agencies that—up until April 12, 2019—had been franchised by WGA to represent its writer-members (and showrunner-members solely in their capacity as writers) in their individual negotiations for employment with television and film studios.

---

[1] Plaintiffs reserve their respective positions that consolidation of their separate actions (Case No. 2:19-cv-05465, Case No. 2:19-cv-05585, and Case No. 2:19-cv-05701) is not appropriate under Federal Rule of Civil Procedure 42 and, furthermore, that they should have been able to preserve their respective complaints. As set forth herein, all Plaintiffs do not join in all claims.

4.     WGA's leadership, however, has orchestrated a series of anticompetitive agreements to prevent Plaintiffs (and other talent agencies) from representing writers unless the agencies (i) abandon their long-accepted, industry-standard practice of bringing together some or all of the key creative talent and intellectual property to sell to studios in exchange for "packaging" fees, and (ii) abandon all affiliations of any kind with companies that produce or distribute content.  Plaintiffs have not agreed to these illegal conditions set forth in WGA's so-called "Code of Conduct" (attached hereto as Exhibit A), and thus WGA has organized an unlawful group boycott to prevent Plaintiffs (and others) from continuing to represent WGA member-writers.  WGA touts that, as a result of its group boycott, more than 7,000 writers (television and film) and showrunners have fired their agents.

5.     Antitrust law's protection of market competition can be in conflict with labor law's protection of collective bargaining.  Balancing the two, Congress and the courts have granted certain union activity a limited statutory or non-statutory labor exemption to the antitrust laws.  When a union crosses the limits of activity protected by the labor exemptions, its conduct becomes fully subject to antitrust scrutiny just like any other organization.  WGA has crossed those limits here by coercing members and non-members alike into a network of anticompetitive agreements that restrain competition in commercial markets over which WGA lacks any legitimate labor law authority or interest.

6.     Specifically, WGA's leadership has orchestrated a group boycott of Plaintiffs and other talent agencies who have refused to agree to WGA's categorical prohibitions of agency packaging and agency affiliation (in any manner) with content companies.  Packaging is an important way that shows and movies get made in the market(s) for TV and film content production, and agency-affiliates who produce shows and movies are important new competitors in these markets.  The group boycott, which stifles this competition, as well as competition in the market to represent writers, is a classic, *per se* violation of the antitrust laws, as WGA itself has conceded.

7.      To effectuate its boycott, WGA leaders have coerced their member-writers into agreeing to refuse to deal with Plaintiffs and other talent agencies who will not agree to stop packaging or affiliating with content companies by threatening these individuals with expulsion and other union discipline that would imperil their ability to work, and threatening their healthcare without a legitimate basis to do so.   Through similar threats, WGA has also coerced certain "showrunners"—*i.e.*, independent contractors, producers of television content, and employers of other employees in the television industry—to refuse to deal with Plaintiffs and other talent agencies, even as to work performed by these showrunners and producers far beyond their employment as writers and far beyond any activity as to which WGA has a legitimate union interest in regulating.  WGA has also coerced certain talent agencies to join its illegal boycott under the threat of losing their writer-representation businesses.  And WGA has tried, and continues to try, to coerce Hollywood studios to refuse to deal with agents who will not sign the Code of Conduct by, among other things, threatening the studios with objectively bad faith litigation.  Finally, WGA is trying to induce certain unlicensed managers and lawyers into joining the conspiracy by telling them that they should perform the work of boycotted talent agents even though it is illegal for them to do so. In particular, California (and New York) statutory law limits unlicensed managers or lawyers—as opposed to *licensed agents*—from procuring film and television employment for writers and other talent.  But WGA has wrongly told unlicensed managers and lawyers that pursuant to a "limited delegation of [WGA's] bargaining authority," they can and should procure employment for writers.

8.      WGA leadership has engaged in an unprecedented abuse of union authority that has pushed their Guilds well beyond the protection of the labor exemptions.  Their tactics are unlawful, and WGA's outright bans on agency packaging and content affiliates do not serve any legitimate union interest.

9.      WGA has a legitimate interest in ensuring that potential conflicts are managed and disclosed, and in protecting its members from the adverse effects of *actual*

conflicts of interest, if and when they arise. WGA's boycott to enforce the Code of Conduct is, however, intended to block agents from competing to sell *any* packages, and to block *any* kind of agency-affiliated content company from facilitating production or distribution of *any* content, regardless of whether there is an actual conflict with, or harm to, WGA members. This distinction is critical because, in reality, agency packaging and agency-affiliated content companies generally provide an economic *benefit* to the writers that the agencies and WGA represent. And the writers who participate in packaging, and seek opportunities from agency-affiliated content companies, do so because of the economic benefits they receive (*e.g.*, obtaining work that might not otherwise be available and retaining 100% of their earnings, instead of paying a 10% commission, on packaged programming).

10. WGA's absolute bans on agency packaging and content affiliates are thus grossly over-restrictive, unnecessary to redress any legitimate union concern, and intrude upon commercial activities in markets that WGA has no authority to regulate. Moreover, WGA's actions will not only harm the economic interests of its own members—including the showrunners who work as producers—they will also harm the economic interests of talent represented by *other* entertainment guilds (*e.g.*, actors and directors) who want to benefit from packaging and agency content affiliates.

11. What WGAW President David Goodman has aptly described as a WGA "power grab" by its leadership to "conquer" the most successful talent agencies like WME, CAA and UTA, is also a whiplash-inducing about-face of seismic proportion. Up until April 12, 2019, WGA had expressly permitted packaging for more than forty years. For a generation, WGA utilized narrowly-tailored agent regulations to prevent any harm to union members from actual—not potential—conflicts of interest.

12. Whatever WGA's leadership might argue about agency packaging or agency-affiliated content companies in the abstract, forming a group boycott to wipe it all out and to restrict competition in commercial markets outside of the union's labor law authority is *per se* illegal. Any legitimate interest that WGA has in protecting its

members from the potential harms of conflicted agents could be accomplished by continuing to implement a rule (like the one that WGA had for more than 40 years) prohibiting agents from acting contrary to the interests of their writer-clients, with a case-by-case determination of any allegation that a writer was in fact harmed by any conflict.

13.   WGA has never offered a cogent explanation for why the agency regulations permitting packaging and content affiliates that served its members so well for more than 40 years would not continue to do so now.  WGA, while refusing to offer such an explanation, has made no bones about their self-proclaimed objective to effectuate a "power grab" and "conquer" the major talent agencies and restrain trade in commercial markets.  That is not a legitimate union interest.  Indeed, being perceived as "powerful" is not a pejorative status for a talent agency—influence and clout with the studios are features and services that writers *want* their agents to have.

14.   The challenged WGA agreements to enforce the Code of Conduct provisions banning agency packaging and agency-affiliated content companies— including the participation of showrunners and other writer-producers, unlicensed managers and attorneys, and other non-labor parties—should be enjoined and declared illegal under Section 1 of the Sherman Act; WGA should be found liable for triple the damages to Plaintiffs' respective writer-representation and packaging businesses that WGA has caused, or will cause, by virtue of its antitrust violation; and WGA should be ordered to pay Plaintiffs' attorney's fees and litigation costs.

15.   Separately, and in the alternative, pursuant to Rule 8(d)(3) of the Federal Rules of Civil Procedure, CAA and UTA allege that WGA is in violation of Section 303 of the Federal Labor-Management Relations Act, 29 U.S.C. § 187, and are entitled to recover damages for WGA's misconduct.

## II.   PARTIES

16.   Plaintiff WME is a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Los Angeles, California.

5

WME's predecessor, the William Morris Agency ("WMA"), was formed in 1898. WMA became WME following its merger with the Endeavor agency in 2009. WME is a talent agency that represents top performing artists, authors and entertainers, including writers for television and film productions and showrunners.

17. Plaintiff CAA is a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Los Angeles, California. CAA is a talent agency that represents some of the world's most successful artists, authors, directors, producers, and entertainers, including writers for television and film productions. CAA's talent agents are licensed under California law (or, as appropriate, other applicable laws).

18. Plaintiff UTA is a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Beverly Hills, California. UTA is a global talent agency representing many talented individuals working in film, television, news, music, sports, theater, fine art, literature, social media, video games, podcasts, and other media, including writers for film and television. UTA employs many of the industry's most experienced talent agents and strives to foster a culture of entrepreneurship, working not only to secure employment for its clients but also to help them launch new TV series and films, sell screenplays, develop companies, find financing, and more.

19. Plaintiffs WME, CAA and UTA are three of the largest talent agencies in Hollywood. Their success is a testament not only to the talent of the writers and other artists they represent, but also to Plaintiffs' singular focus on putting their respective clients first. WGA refers to Plaintiffs, along with International Creative Management Partners, LLC ("ICM"), as the "Big Four" talent agencies.

20. Defendant WGAW is a California non-profit corporation headquartered in Los Angeles, California. WGAW is a labor union representing thousands of writers in the motion picture, television and new media industries.

FIRST CONSOLIDATED COMPLAINT

21.    Defendant WGAE is a New York non-profit corporation headquartered in New York City, New York.  WGAE is a labor union representing thousands of members who write content for motion pictures, television, news and digital media.  Writers who live east of the Mississippi River at the time of their initial membership are enrolled as members of WGAE, whereas those to the west are members of WGAW.

22.    Although WGAW and WGAE are separate entities, they work in tandem to represent their member-writers.  Among other things, WGAW and WGAE negotiated and entered into an industrywide collective bargaining agreement, the "Minimum Basic Agreement" or "MBA" (relevant excerpts are attached hereto as Exhibit B), with the Alliance of Motion Picture and Television Producers, Inc. ("AMPTP").  AMPTP is the multi-employer collective bargaining representative for hundreds of motion picture and television producers who employ writers.

23.    Together, WGAW and WGAE have orchestrated the conspiracy to enforce the Code of Conduct and implement an unlawful group boycott of Plaintiffs and other talent agencies who refuse to sign the Code.

24.    WGA is empowered under federal labor law, as the writers' exclusive collective bargaining representative, to designate (or "franchise") licensed agents to represent union members in individual negotiations for employment to perform writing services with the production studios (*i.e.*, AMPTP members).[2]  But WGA's authority to designate and regulate agents in their representation of writers is limited only to this labor market (individual negotiations for employment) and further by state licensing laws.

25.    From September 22, 1976 through April 12, 2019, WGA regulated talent agents through the Artists' Manager Basic Agreement ("AMBA") between WGA and

---

[2]    Such individual negotiations are subject to the limitations of the MBA, *e.g.*, which sets minimum scales for compensation.

FIRST CONSOLIDATED COMPLAINT

the Association of Talent Agents ("ATA"), attached hereto as Exhibit C.[3] Up until April 12, WGAW and WGAE had designated and authorized Plaintiffs and numerous other talent agencies under the AMBA to represent their members in individual bargaining with AMPTP members; WME, CAA and UTA have now lost their respective designation because of the illegal "power grab" by WGA's leadership.

## III. JURISDICTION AND VENUE

26. This Court has subject-matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, 28 U.S.C. §§ 1331 and 1337, and, in the alternative, 29 U.S.C. § 187.

27. This Court has personal jurisdiction over WGAW under 15 U.S.C. § 15 because it resides in this District. This Court has personal jurisdiction over WGAE because it is a corporation that transacts business in this District under 15 U.S.C. § 22. Indeed, WGAE performs services on behalf of its members in this District; in conjunction with WGAW, WGAE entered into the Minimum Basic Agreement with AMPTP, which is located in this District; and, in conjunction with WGAW, WGAE attempted to negotiate a new AMBA with ATA, which is also located in this District. The Court also has personal jurisdiction over both WGAW and WGAE because they are engaged in a conspiracy to adopt and implement a Code of Conduct that was directed at, and has a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities located in this District, including Plaintiffs. As such, WGAE's activities in this District are continuous and systematic or, at the very least, WGAE purposefully directed its activities toward this District, Plaintiffs' claims arise in significant part out of WGAE's activities in this District, and this Court's exercise of personal jurisdiction would be reasonable.

28. Venue is proper in this District under 15 U.S.C. § 15 and 28 U.S.C. §§ 1391(b), (c) and (d) because WGAW and WGAE are subject to this Court's personal

---

[3] ATA was previously known, at the time the AMBA was signed, as the Artists Managers Guild. *See* Ex. C, AMBA, at 1.

FIRST CONSOLIDATED COMPLAINT

jurisdiction with respect to this action, and a substantial part of the events giving rise to the claims for relief stated herein occurred in this District.  Furthermore, Plaintiffs have suffered and will continue to suffer harm in this District as a result of the conspiracy entered into by WGAW and WGAE averred herein.

29.    This action should be assigned to the Western Division.  Plaintiffs and Defendant WGAW all reside in Los Angeles County.

## IV.    FACTUAL BACKGROUND

30.    WME, CAA and UTA have each earned their place at the vanguard of writer talent representation the way that any agency (or individual agent) succeeds in the market for representing writers:  by making the clients' interests paramount.  Any agency that puts its own interests ahead of a client's would not represent that client for very long.  Accordingly, Plaintiffs have always committed—and continue to commit—to refrain from any and all behavior that would harm the interests of their clients.  Indeed, Plaintiffs (acting both individually and, with WGA's agreement, through a trade organization) made this commitment to WGA through the AMBA for over 40 years.  But Plaintiffs will not capitulate to WGA's total and anticompetitive bans on agency packaging and agency-affiliated content companies because of unsupported and counter-factual allegations of supposed harm to writers from purported conflicts of interest.  The reality is that agency packaging and content affiliates provide significant benefits to writers who (used to be able to) exercise their freedom of choice to take advantage of such practices.  In the words of WGA's leadership, the boycott to enforce their unlawful bans is nothing more than a "power grab" masquerading as a legitimate exercise of union authority.

A.    **Packaging Helps Content Get Produced, Saves Writers' Commissions, and Has Been Expressly Permitted by WGA for More Than 40 Years**

9

FIRST CONSOLIDATED COMPLAINT

31.     Packaging[4] refers to a long-standing practice—dating back to at least the 1950s—through which a talent agency presents to a studio one or more of the key creative elements for a production—such as writers, actors, directors, producers, and/or the intellectual property on which the project is based—in exchange for "packaging fees."  The presentation of a "package" may convince the studio that the project is sufficiently compelling to justify the studio's risk of financing and producing it.  In addition, as production continues over multiple episodes or seasons, the agency ordinarily will help to provide a "pipeline" of additional talent (*e.g.*, staff writers, actors, episodic directors, series regulars, mid- and lower-level employees of different kinds) necessary to support a program's continued production, and provide other ongoing services to aid the success of the program.

32.     Packaging became a responsibility of talent agencies, in part, because studios and other production companies in the television industry did not, unlike the major studios in the film industry, develop and foster new talent.  Talent agents and agencies fulfilled this essential and necessary role for production.  Unlike studios, talent agencies spend substantial time and resources searching for and fostering new talent— and then using the agency's leverage with studios to help its clients penetrate the television-production ecosystem that might otherwise be closed to them.

33.     That the deal is a package can be very significant for facilitating the production of programs.  Since studios want to invest in projects that have the best

---

[4] Unless otherwise specified, the descriptions of "packaging" herein refer to the practice of "packaging" in the television industry, not the feature-length theatrical film industry. In the film business, sometimes certain forms of separately-negotiated agency participation in a film project—for example, the agency serving as an independent film's sales agent, or an agency providing consulting or financing services for a film— are referred to as "packaging."  This "packaging" in the film industry is wholly distinct from "packaging" in the television industry.  It also does not create any kind of inexorable or general conflict of interest with writers.  Among many other problems with WGA's group boycott, WGA fails to distinguish between the differing nature of "packaging" in the television and film industries.

FIRST CONSOLIDATED COMPLAINT

possible mix of talent, and to have a pipeline of talent readily available for a program's continued production, selling packages to studios and other production companies encourages them to invest in, and ultimately produce, television content. Packaging also creates opportunities for writers that they might not receive on their own. A television studio might perceive an unknown writer's brilliant story idea as too risky if she does not yet have a proven record of successful projects—but combine that writer with a well-established producer, well-known director, stellar cast, and pipeline of talent, and the idea becomes much more attractive. Even if the "package" initially consists of just a single person and a great idea (*e.g.*, a very powerful showrunner who might individually warrant a "packaging" deal), the studio may find cause for confidence that the agency will continue to serve the packaged project's creative needs in order to ensure their individual client's continued success.

34. Packaging is particularly important for artists (including writers) in the current media economy, because it helps agencies and their artists secure better deals in an environment in which studios seek relentlessly to reduce the costs of producing television programming, including the amounts paid to talent.

35. Writers—and the rest of the packaged talent—do not pay any commission to their agents (customarily, 10%) in a packaged deal. Instead, the talent agency(ies) service their clients by assembling the creative element(s) so that the television show or film can be staffed and produced. If an individual writer prefers not to be included in a packaged deal, the writer's decision will be respected.

36. The agencies negotiate with studios over the "packaging fees" that studios will pay to the agency(ies) for providing the package; and the agency-clients (writers) who are included in the package do not pay any commission.

37. By putting the creative element(s) together as a "package" to be sold to the studios, agency packaging facilitates the development of television and film projects that might otherwise not get produced. Packaging, therefore, is not the means by which talent agents negotiate the terms and conditions of writers' employment; it is instead a

service that talent agencies provide to their clients to amass the various element(s) of new TV shows and films and facilitate their production.  Packaging creates more opportunities for writers, directors, and actors.

38.     Packaging is an important part of Plaintiffs' businesses because it helps Plaintiffs' clients get their shows and films made and (in the case of shows) picked up, and thereafter helps to ensure that their clients' shows stay on the air.  In television, packaging fees are paid per show, not per artist, and a talent agency typically receives a flat packaging fee regardless of how many of its clients are included in the initial package or are later hired to work on the packaged show.  Hence, when one of the Plaintiffs enters into a packaging deal with a production company for a project, it assumes a large degree of business risk.  For all except the rare successful show that earns significant back-end fees, Plaintiffs' packaging fee is often similar to (and in many cases significantly less than) what Plaintiffs would have earned from charging their clients a commission based on their earnings.

39.     Packaging deals between studios and agencies vary by agency, by studio and by shows.  Specifically, for any given show, each of the Plaintiffs will negotiate directly with the various studios to arrive at a packaging arrangement between the studio and the agency for that show.  The compensation arrangements for writers and other talent are not included in these packaging deals.  Plaintiffs instead separately negotiate client compensation, and such negotiations are completely independent from the packaging deal.  Indeed, except for those clients who are part of the original package, most clients are hired (and their salaries and other terms negotiated) long after the packaging arrangement has been negotiated between a given studio and agency.

40.     As averred above, generally, Plaintiffs' services to their respective clients on a packaged deal do not end with the development of a project.  Each of the Plaintiffs, as part of its services, generally provides from its client rosters a pipeline of actors, writers, episodic directors, series regulars and contributors at middle and minimum-scale levels of compensation that will be necessary over a project's lifespan, particularly

in the television industry. This work can be particularly beneficial for Plaintiffs' clients who are early or mid-career writers. Plaintiffs also generally provide other services that benefit their clients and the overall project. Plaintiffs put together the creative element(s) for a package, then work with the studio to add elements to get the show or film made or to keep the show on the air. Plaintiffs may also provide substantial ongoing services to a packaged television program. Representative examples of the work that Plaintiffs and their agents may perform on packaged shows include: (a) providing lists of available writers to help staff the program; (b) helping to identify opportunities for actors to work on shows and for decision-makers on shows to become aware of available talent that would contribute to the success of the show; (c) helping to find series and episodic directors; (d) helping a studio negotiate a higher license fee with its broadcaster or a higher imputed license fee when a broadcaster and studio are a single company; (e) research and social media support; (f) publicity and marketing assistance; and (g) offering to help a studio or production company with off-network sales. Beyond that, if the television program is cancelled by its initial network, Plaintiffs' agents may assist in helping to set up the project at a new network or platform. Finally, Plaintiffs may assist in the auditing process with respect to "back-end" participation.

41.    Plaintiffs are incentivized to build the best elements into a package so as to maximize the chances that the project will be sold, and that it will be successful and last for as long as possible. Packaging—which can be, and often is, conducted by multiple agencies (who then "share" the packaging fee)—thus puts talent agencies in the business of helping to get their clients' shows and films made, and helping these projects succeed. This of course creates more job opportunities for all writers—whether or not represented by one of the Plaintiffs. Without packaging, some shows and films would never have been produced, and the writing opportunities these productions create would never have existed.

42.     Unsurprisingly, therefore, many writers have hired WME, CAA and/or UTA *because* of their packaging services.  Writers want to benefit from meeting with, and being paired with, in-demand directors and actors.  Plaintiffs' packaging of talent often enhances demand for the writer's script and services and leads to the production of TV shows and movies that would not otherwise get made.

43.     Packaging arrangements are often idiosyncratic and always separately negotiated, but in broad strokes, television packages include a capped upfront fee, in certain circumstances, a capped deferred fee, and a percentage of the back-end proceeds of the series that keys off of revenue definitions that vary widely from package-to-package).  For instance, in the case of WME, the revenue definitions vary from package-to-package and are based upon the most favorable client definition on the show.

44.     Although WGA regularly refers to packages as a 3% (upfront fee)—3% (deferred fee)—10% (back-end fee) formula, this is not an accurate description of how packaging works in general, much less in any particular package.  In fact, WGA has conceded in pleadings in this action that it lacks knowledge and information about packaging terms.

>  a.     The upfront fee is often times not a percentage at all, but a fixed base number that studios will pay per episode.  And when the upfront fee is a percentage, it is capped.  The upfront license fee depends on the distribution channels (*e.g.*, basic versus premium cable versus streaming video on demand) and on the content (*e.g.*, drama versus comedy).
>
>  b.     The deferred fee—sometimes referred to as the "middle 3" in a 3%-3%-10% package—is rarely paid anymore.  In the past 20 years, for example, Plaintiffs believe that just a tiny handful of series earned a "middle 3" deferred fee.  And, again, when the deferred fee is on a percentage basis, it is capped.

c. The back-end fee is also rarely paid for the simple reason that only a small fraction of shows ever generates sufficient revenues to satisfy the contractual conditions (which, again, are defined differently from package-to-package) for the payment of back-end fees or proceeds.  Upon information and belief, over the past 5 years, roughly (and merely) *5* series on the big four broadcast networks (ABC, CBS, FOX, and NBC) have generated back-end fees.[5] Indeed, WGAW President David Goodman recently acknowledged that, more than ever in today's Hollywood of studio "short orders and streaming and vertical integrations," "[w]e have no idea what profits are going to be on future shows."  WGA Agency Campaign Update, attached hereto as Exhibit M, at 5.

45. WGA claims that its about-face in banning talent agency packaging is proper because *all* packages create a harmful conflict of interest.  Specifically, WGA contends that talent agencies like Plaintiffs will always care more about their package fees (which increase when a show or movie generates more revenue) than their clients' compensation, and thus do not work to maximize writers' or showrunners' pay in a packaged production.

46. This contention of harmful conflicts is not only false, but astounding in its implausibility after WGA expressly endorsed agency packaging for more than 40 years.  From September 22, 1976 until April 12, 2019, WGA's agent regulations were set forth in the AMBA, which provided, among other things, that whenever a talent agency took a package fee, it could not additionally commission the writers who were part of the package.  *See* AMBA, § 6(c).  In other words, up until April 12, WGA did not merely

---

[5]   As averred above, talent agency work on a packaged show exists for the life of the series.  To give a few examples, Plaintiffs continue to represent their talent on the show, may need to identify new talent for the show, and may need to find a new network for a cancelled series.

fail to ban packaging as a supposedly invariable harmful conflict to writers' interests, WGA *affirmatively endorsed* packaging for more than 40 years as a practice that benefitted its members by eliminating the 10% commission they would otherwise have to pay, and by facilitating the production of shows and films that might not otherwise get made.

47. The claim by WGA's current leadership that all packaging is uniformly bad for writers is even more implausible given the significant differences between the terms of different packages negotiated by different agencies with different studios under different circumstances for different programming.

48. Furthermore, industry data refutes WGA's claim that writers are worse-off economically by being included in a package rather than paying commissions to their agents. Indeed, Plaintiffs' individual experience is that their packages have been supported by, and economically benefitted, their writer-clients.

49. More than that, WGA's position ignores the overall economics of packaging fees. As noted above, in the overwhelming majority of cases, scripted television programs do not generate back-end fees at all. In these cases, writers are clearly better off under a packaging fee model, in which the writers do not pay a 10% commission on their employment income, than they would be under a commission model, in which they pay 10% commission on all compensation earned.

50. This is so because the upfront fee paid by the studio to an agency is generally a very small percentage of an actual budget for production of an entertainment program (generally on the order of 1% of actual show budgets, and almost always less than 3%), and this fee generally does not increase with the number of agency clients in the "package." That small percentage of the budget devoted to the upfront packaging fee is not, in general, enough to alter or reduce compensation to writers or change production decisions. For instance, a $1 million television episode may have an upfront fee of $15,000, much less than other indirect production costs, such as studio overhead, catering, and facilities that absorb budget but do not directly contribute to the finished

video product. Thus, in the overwhelming majority of cases, there is no basis for WGA's claim that a packaging fee affects the compensation paid by the studio to writers, and, as explained above, the writers take home more compensation in a packaged show because they do not pay the 10% commission for the agency's services. The benefit of not having to pay the 10% commission is stark for staff writers and other lower- or mid-career-level writers (*i.e.*, the overwhelming bulk of WGA's membership) who are brought into a series as part of a "package." Meanwhile, depending on the number of agency clients who are packaged in any particular show, and/or their income levels, agencies may (and often do) earn less from such productions on a packaging-fee model than they would have earned on a more traditional, commission-based model. (Indeed, given this fact, if agencies were solely interested in their own financial interests and not that of their clients they would attempt to staff as few as possible of their own clients on any given packaging deal, to avoid foregoing commission—but, in the real world, Plaintiffs present attractive opportunities on packaging deals to their clients.)

51. As noted, programs that generate back-end fees are the exception rather than the norm. But in those rare instances, it is true that such back-end proceeds can sometimes provide more compensation to Plaintiffs under an agency packaging-fee model than they would have earned under a traditional commission-based model. Significantly, however, the possibility that agencies may earn more in a back-end fee situation does *not* mean (and certainly does not mean in general) that writers earn less. Nor does it mean that the incentives of writers and agents are not aligned.

52. When agencies like Plaintiffs receive back-end proceeds in a packaging deal, so, generally, do showrunners and the top-tier of writers (along with other important talent). When both agents and top-tier writers are participating in the "back-end," then even under WGA's view of the world both agents and writers' incentives are aligned in trying to ensure that the back-end is significant and as large as possible. That the agency earns more does not mean that showrunners and top-tier writers earn less.

53.     The percentage that agencies like Plaintiffs earn from back-end proceeds is generally designed to leave showrunners and top-tier writers who have back-end interests no worse off than they would have been under a traditional commission-based model, even in situations where an agency benefits from back-end fees.  A generalized example (generalized because each deal is independently and separately negotiated) may prove illustrative.  In general, in determining "back-end" participation for both packaging agencies and talent, studios deduct distribution, overhead, and other fees before Modified Adjusted Gross Receipts ("MAGR") are calculated.  Studios then calculate back-end proceeds percentages for both packaging agencies and talent based on the definition of MAGR for that particular show.  An agency may receive as much as 10% of this adjusted number after the (generally sizable) studio deductions.  35% of the remainder is then paid to talent, and 65% retained for the studios.  Therefore, in this hypothetical case, the agents get 10% of the funds that, in the absence of a packaging fee, would otherwise be shared between the studios (65%) and the talent (35%).  Thus, the economic effect is that the packaging fee represents 6.5% of the studio's share of the split, and 3.5% of the talent's share of the split.  In this circumstance, for a show generating high enough revenues to satisfy the condition for the payment of back-end fees, the agents would indeed receive more from a packaging deal than under a 10% commissioning model.  But, critically, the writers would not receive less.  Because the agency receives 10% of the "split," it receives the 6.5% increase from the studio over what it would have received in a traditional commission structure.  But the talent receives the same amount in either case—35% of 90% of MAGR under an agency packaging-fee model (or 31.5% of MAGR), versus, under a traditional commission-based model, 35% of 100% of MAGR, less a 10% agency commission (or 31.5% of MAGR).  Again, in both cases, the interests of agents and talent are aligned.

54.     Beyond that, when a program becomes successful enough to generate back-end proceeds, a writer-client's deal for such a program is often renegotiated by an

FIRST CONSOLIDATED COMPLAINT

agency—often to the agency's own detriment.  This, too, belies WGA's claim of an inexorable conflict of interest between Plaintiffs and their writer-clients.

55.     Nor is it true that agencies like Plaintiffs will generally pitch programs to studios that pay the highest packaging fee, rather than to production companies that will pay the highest compensation to the client.  As discussed above, this is a false assumption and demonstrates a lack of understanding of the industry structure.  First, packaging often allows agencies to pitch groups of talent to studios in circumstances where an individual writer-client may not otherwise have been of interest to a studio.  Second, and importantly, there is no reason to believe, given the economics discussed above, that studios in general trade-off writer compensation for packaging fees, or that agencies could facilitate studios in doing so.  To the contrary, as noted, upfront fees in packaging deals generally do not affect writer compensation at all, because they are such a small percentage of an overall production budget.  In the rare circumstances when back-end compensation is at issue, as noted, top-tier writers who receive back-end compensation and agents generally have a shared incentive to increase the back-end—both initially and through any additional negotiation that the success of an individual show permits.  Third, as a factual matter, it is simply untrue that agents pitch programs for their clients without an eye to their clients' overall compensation or their clients' overall desires.  Each deal is different—separate employment for separate creative clients, negotiated by different, individually-responsible agents with different studios.  Each individual client in each individual deal may have different tradeoffs for salary, creative benefit, creative control, etc.  If agents in fact routinely prioritized packaging fees as opposed to total compensation for their clients, in the fiercely competitive market in which Plaintiffs compete, they would quickly lose their clients.  That is particularly so since Plaintiffs' writer-clients are almost uniformly represented by experienced outside entertainment attorneys, all of whom are familiar with the existence of packaging.

FIRST CONSOLIDATED COMPLAINT

56.     In short, there is no systematic or inevitable conflict of interest between writers and agents concerning packaging fees.  As WGA itself long recognized and authorized, narrowly-tailored rules designed to prevent abuses are amply sufficient to regulate and remedy any issue with packaging fees in the agent-writer relationship.  On these facts, WGA's claimed "conflict of interest" concern cannot be sufficient to justify regulating, through an antitrust-violating group boycott, a significant portion of the entertainment industry beyond the labor market for writers that WGA's group boycott seeks to regulate.

57.     According to WGA itself, packaging has become the industry norm in scripted television.  For example, WGA alleged in a lawsuit it filed (and then voluntarily dismissed) against Plaintiffs and ICM that "[a]pproximately 90% of all television series are now subject to such packaging fee arrangements."  As such, WGA's prohibition on packaging impacts how the vast majority of series are developed and will lead to a reduction in output of television shows.  It will similarly lead to a reduction in the output of feature films.

58.     Further, WGA freely admits that its agency packaging ban will impact not only the writers that it represents, but actors and directors as well as the production businesses of the studios:  "Can't the agencies just get a package fee with actors and directors?  It is possible but very unlikely. . . ." *See* WGA Agency Campaign FAQ, No. 19, attached hereto as Exhibit D.  And, just as with writers, actors and directors benefit from inclusion in a package.

59.     WGA has also structured its group boycott to enforce its packaging ban in a way that requires WGA members to participate in the boycott even when they work as showrunners or producers rather than writers.  *See* Agency Code of Conduct Implementation FAQ, attached hereto as Exhibit E, at 1 ("What if I'm a TV writer/producer? Some unsigned agencies have been telling clients they can still represent them as producers.  This isn't true.  Because your writer and producer functions are inextricably linked, and are deemed covered writing services under the

MBA, you cannot continue to be represented as a producer by an agency not signed to the Code of Conduct."). But WGA itself recognizes that it does not have the authority to do so. *See* Ex. D, WGA Agency Campaign FAQ, No. 48 ("The Guild cannot direct you to leave your agency for non-writing areas of work."). The anticompetitive impact of WGA's packaging ban thus is intended to—and does—extend far beyond the labor market for writers that is WGA's only legitimate union interest. Indeed, one need look no further than WGA's own membership, which includes showrunners who act as producers and hire and supervise writers,[6] and thus are non-labor parties in this capacity.

## B. Agency-Affiliated Content Companies Have Created New Jobs and Enhanced Competition Against Traditional Hollywood Studios

60.    Plaintiffs have, for many years, represented shows and films (*e.g.*, helped promote the sale and distribution of films overseas), and represented clients who are producers and financiers of television and film content without any objection or ban by WGA. As with WGA's erroneous contentions that packaging deals and services are uniform deal-to-deal, WGA is also wrong in its characterizations of Plaintiffs having uniform relationships with production companies.

### i)    Endeavor Content

61.    WME's parent company, Endeavor, sought to expand its content offerings with the formation, in 2017, of Endeavor Content.

62.    Endeavor Content is a separate entity from WME, by corporate structure, and housed in a different building, although the two are affiliated through their common parent company. WME has no ownership interest in Endeavor Content.

63.    WME and Endeavor Content have separate day-to-day management. WME agents do not (and may not) work for Endeavor Content. WME agents do not have any creative control over Endeavor Content projects. WME agents do not hire or

---

[6] WGA has admitted, in this action, that showrunners manage production budgets, and hire and fire writers. WGA Answer and Counterclaims, ECF No. 27 ¶¶ 101, 233.

FIRST CONSOLIDATED COMPLAINT

fire writers (or anyone else) on Endeavor Content projects.  And WME does not share any confidential client information with Endeavor Content.

64.     WME's corporate affiliation with Endeavor Content is known to all of its writer-clients, who often seek opportunities from Endeavor Content specifically because of its affiliation with WME.  And WME requires that WME-represented writers who seek writing opportunities from Endeavor Content be represented by independent counsel in their negotiations with Endeavor Content (and, in some circumstances, WME has even reimbursed the legal fees).

### ii)     Wiip

65.     CAA is a non-governing shareholder in a recently-founded studio/production company known as wiip Productions, LLC ("wiip").  Wiip is a new television studio, founded to create new opportunities for writers and other talent in television production.

66.     CAA owns its interest in wiip indirectly.  Wiip is not operated by CAA, nor does CAA have either voting control or authority over wiip.  Wiip operates out of separate offices and is headed by a long-time television industry veteran, Paul Lee.

67.     CAA agents do not (and may not) work for wiip.  CAA does not (and may not) share confidential client information with wiip.  Every CAA client involved in any deal with wiip is informed of CAA's role as a shareholder in wiip.  CAA clients involved or potentially involved in transactions involving wiip are encouraged to obtain independent counsel to analyze the potential for a conflict of interest with wiip.  No CAA client enters into a transaction with wiip without having (or having the opportunity to have) independent counsel advise as to a potential conflict of interest created by CAA's investment.  To the best of CAA's knowledge, no client has actually entered into a transaction with wiip that created an actual conflict of interest.

### iii)    Civic Center Media

68.     In late 2018, UTA entered into an affiliation with Media Rights Capital ("MRC"), an independent television studio, to increase competition with traditional

22

studios and emerging fully integrated streaming platforms, and provide additional opportunities for UTA's clients and other artists.  Pursuant to UTA's arrangement with MRC, known as Civic Center Media ("Civic Center"), UTA receives a passive, minority financial interest in a portfolio of shows produced and financed by MRC.

69.    Civic Center has an alternative structure from Endeavor Content or wiip. UTA and MRC, who fully operates Civic Center, are separate, and operate independently of each other.  UTA has no role in the management or operations of Civic Center, which is run entirely by MRC executives and maintains separate offices from UTA.  To date, UTA's arrangement with Civic Center has resulted in the production of at least one new television series, and several others have been sold to networks and are currently in development.

70.    Under UTA's arrangement with MRC, UTA is not required to send its clients to Civic Center.  MRC and Civic Center are free to, and do, hire clients of agencies other than UTA and purchase shows not packaged by UTA (or co-packaged by UTA and another agency or agencies).  Similarly, when shows are pitched to Civic Center, or are set up at Civic Center, UTA continues to market such projects and pursue employment for its clients with production entities other than MRC and Civic Center unless the client prefers otherwise.  This is a competitive process and Civic Center obtains business from UTA or its clients only if it makes the best offer, and only if UTA's clients agree to that offer.  No UTA client is pitched to Civic Center without his or her knowledge and consent.  UTA's relationship with Civic Center is always disclosed, as are options for employment with other studios, and UTA encourages its clients to retain independent attorneys to review deals with Civic Center (and, in fact, any other deal for the clients' services).

### iv)    Agency-Affiliated Content Companies Benefit Writers

71.    Endeavor Content, wiip, and Civic Center promote themselves as competitive alternatives to existing studios that empower talent by giving writers and other talent greater creative control and better financial terms than would otherwise be

available.  As such, Endeavor Content, wiip, and Civic Center are alternatives to, and competitors of, the traditional Hollywood studios and emerging vertically integrated streaming platforms that comprise AMPTP's membership.  The additional competition that these new production companies have engendered directly benefits writers, actors and directors, as well as consumers of television and film content.

72.    Endeavor Content, wiip, and Civic Center often pay more for writers' intellectual property than other studios and give writers greater creative control.  WGA itself concedes that talent agency-affiliates may pay writers *more* than traditional studios.  *See* Ex. D, WGA Agency Campaign FAQ, No. 15 (writers "have received beneficial deals with the new producing entities connected to the agencies" because "offering a better deal to some creators is a common approach of new entrants—like Netflix, Amazon, and Apple").

73.    In fact, there have been public reports that WGA Negotiating Committee Co-Chair and former WGA West President Chris Keyser is the executive producer and writer on a new project with Endeavor Content.  Public reports further indicate that Mr. Keyser agreed to a packaging arrangement on the production.  He wrote in response to the public reports that "***Every additional studio that provides work for writers is a good thing.  That includes Endeavor Content, WiiP and [Civic Center].***"  Mr. Keyser is hardly alone.  Beau Willimon—the President of WGA East—also had a show with Endeavor Content.

74.    Indeed, agency-affiliated content production companies create *more* opportunities for writers.  Many writers who have performed work for Endeavor Content, wiip, or Civic Center are not represented by any Plaintiff; many WME, CAA or UTA represented writers have chosen to work with a production affiliate *other than* the production company affiliated with their talent agency; and yet other WME/CAA/UTA-represented writers (or, for that matter, any writer) simply choose not to pursue opportunities with agency-affiliates.  Writers can and do change agencies with regularity; writers can and do choose the content companies with which they want to

FIRST CONSOLIDATED COMPLAINT

work.  And even those writers who prefer not to pursue opportunities from an agency content affiliate benefit from the creation of new writing opportunities by Endeavor Content, wiip, and/or Civic Center because of the net increase in demand for writing work.  No matter what an individual writer prefers about working with an agency-affiliated content company, the emergence of these companies increases output and the opportunities for writers and other talent and is thus undeniably *procompetitive*.

75.     Moreover, any potential for a harmful conflict of interest arising out of a WME, CAA, or UTA writer-client who chooses to pursue an opportunity with Endeavor Content, wiip, or Civic Center, respectively, is eliminated by the series of prophylactic measures described above that Plaintiffs have voluntarily put in place to protect against any such potential harm.

76.     Yet WGA's new regulations flatly bar talent agencies from being "affiliated with[] any entity or individual engaged in the production or distribution of motion pictures."[7]

**C.     Through the AMBA, WGA Permitted Agency Packaging and Agency-Affiliate Content Companies for More Than 40 Years**

77.     In 1976, ATA, of which Plaintiffs are three of the more than 100 members, and WGA entered into an agent-franchise agreement known as the AMBA, *i.e.*, the Artists' Manager Basic Agreement.  Last year, however, WGA decided to exercise its termination right and, as a result, the AMBA expired on April 12, 2019, after it was

---

[7]   "Motion pictures" in WGA's Code of Conduct is defined as works written by writers under the collective bargaining agreement with AMPTP, which refers to motion pictures for exhibition on television and in a theater or similar location in which a fee or admission charge is paid by the viewing audience.  *See* Ex. B, MBA, Art. 1(A)(1)-(2).  What WGA means by "engaged in" production or distribution is less clear, but in any event, WGA has stated that it intends to ban agency affiliation with entities like Endeavor Content through this language.

25

FIRST CONSOLIDATED COMPLAINT

extended from its earlier April 6 termination date. The AMBA was in place for nearly 43 years.

78. As averred above, through the AMBA, WGA designated and authorized (or franchised) agents to represent WGA members in individual contract negotiations with AMPTP members. The AMBA expressly endorsed packaging for all of this time through narrowly-tailored regulations, such as (i) a regulation preventing agents from taking their 10% commissions from writers on projects for which they are receiving a packaging fee (Ex. C, AMBA, § 6(c)) and (ii) a regulation prohibiting agents from conditioning their representation of writers upon the writers' agreement to participate in packages (*see id.*, § 6(c) ¶¶ E, G, H). The AMBA further required talent agencies to fund a WGA Negotiator to be available for writers who wanted assistance negotiating package terms. *See id.*, Exhibit N. And the AMBA did not prohibit franchised agencies from having content affiliates.

79. To the extent that packaging-specific or other WGA regulations were insufficient to protect WGA members from a potentially harmful conflict of interest, WGA additionally included a requirement in the AMBA that an agent "act with reasonable diligence, care and skill at all times in the interest of his Writer-Client and shall not act against his Writer-Client's interest." *Id.*, § 8(e).

80. In the event a writer—or, for that matter, WGA itself—believed that any talent agency had breached its obligations under the AMBA to act in the interests of the writers the agent represented, there were mechanisms for arbitration of the dispute set forth in the AMBA. *See id.*, § 3. Upon information and belief, not one writer has ever filed a claim under the AMBA against any of Plaintiffs based on any claimed failure by any one of them to act in her/his best interests.[8]

---

[8] The AMBA also provided for the appointment of a standing committee to consider and recommend proposed changes to the agreement. Ex. C, AMBA, § 1(d). Such a committee was never appointed.

81.     Although package terms, packaging fees and the ubiquity of packaging have evolved over time, WGA's unsupported claims about why *all* packages supposedly give rise to injurious conflicts of interest would have been as applicable to packaging in 1976 as to packaging in 2019.[9]  For example, WGA currently contends that talent agencies:

    a.    always seek to maximize their packaging fee instead of the writer's compensation;

    b.    always have an incentive to reduce the amount paid to a writer because the packaging fee is tied to a show's revenues and profits;

    c.    always seek to prevent writers from working on projects with talent represented by a competitor agency to avoid splitting the packaging fee; and

    d.    always pitch their writer clients' work to production companies that will pay the highest packaging fee, rather than to production companies that will pay the highest compensation to the client.

While Plaintiffs believe that each of these claims is false, nothing about the fundamentals of packaging has changed in the last 43 years such that WGA could not have made these very same assertions in 1976.  Yet, for 43 years, WGA endorsed talent agency packaging through the AMBA and never took the position that it should be banned because it was harmful to its members.

82.     Also unchanged in 43 years is WGA's labor law duty of fair representation to its members.  If banning all packaging by agents were actually required to protect the interests of WGA members, and a lawful exercise of union authority, then WGA's duty of fair representation would have caused it to implement a packaging ban decades ago.  Instead, however, WGA recognized that packaging benefitted its members, and used

---

[9] That said, the ubiquity of packaging is not a new phenomenon.  As Goodman acknowledged in a recent interview, packaging has "dominated the television business" for "the last 15 [years]."  Goodman Q&A, attached hereto as Exhibit G, at 4.

tailored regulations in the AMBA (to the extent any protections were needed) to ensure that agents acted in the interests of their writer-clients who were included in a packaged project. And, again, the AMBA was silent on agency content affiliates.

83. The sufficiency of the tailored regulations in the AMBA to prevent any harm to WGA members from potential agent conflicts of interests arising from packaging or content affiliates is confirmed by 43 years of history.

84. Not only does WGA's boycott to enforce its Code of Conduct turn this history on its head, as WGA has admitted, its boycott will effectively prohibit actors and directors—who are not represented by WGA—from continuing to benefit from agency packaging and agency content affiliates. It would also prohibit WGA's own members who choose to benefit from these commercial activities from continuing to do so when they work as showrunners or producers.

**D.** **ATA's Negotiations with WGA Over the Code of Conduct Were an Exercise in Futility—WGA's Leadership Was Intent on Implementing its Group Boycott to Effectuate its "Power Grab" and to "Divide and Conquer" the Major Agencies**

85. WGA provided a termination notice under the AMBA in April 2018. As averred below, terminating the AMBA was the first step in what WGAW President David Goodman called the union's "power grab." Specifically, Plaintiffs and ATA learned that one of the main reasons for this termination was WGA leadership's decision to try to ban all agency packaging and agency-affiliate content companies in order to "grab power" from the agencies who engaged in such activities to benefit their clients.

86. Plaintiffs—each independently and through ATA—attempted to engage WGA in negotiations over a new AMBA. ATA offered to answer questions about packaging, Endeavor Content, wiip, and Civic Center, to be transparent, and to engage in a meaningful dialogue about any arguably *bona fide* WGA concerns and to identify any adjustments to the AMBA—short of outright and anticompetitive prohibitions on packaging and content affiliates—that might assuage any legitimate WGA concerns.

87.    WGA, however, would not even meet with ATA's negotiating committee, of which WME, CAA and UTA are members, until February 5, 2019.  In this meeting, the WGA negotiating committee members who attended simply read out loud their Code of Conduct proposals and responded to a few questions from ATA representatives by providing incomplete and elusive answers.  WGA's representatives also refused to provide any context or explanation for its proposals to ban all agency packaging and affiliation with content companies.

88.    ATA met with WGA leadership again on February 19, 2019.  ATA explained packaging and content affiliates in detail, provided an overview of the industry landscape, and answered WGA's questions.  ATA further explained why WGA's proposals would harm—not help—WGA member-writers and other talent.  But it was more of the same from WGA leadership—no meaningful, substantive engagement with the talent agencies who were trying to address WGA's own ostensible concerns.

89.    Subsequently, WGA publicly released a February 13 speech by WGAW's President (Goodman) in which he declared war on Plaintiffs, admitting that the union was "making a power grab" and intended to "divide and conquer" the agency business.  There can be little doubt from statements like this, and WGA's tactics overall, that WGA's leadership has decided to misuse WGA's power as a union to specifically target and cause injury to Plaintiffs, three of the most prominent talent agencies in Hollywood.  Indeed, WGA is seeking to induce, and has induced, a significant number of smaller agencies to join its illegal boycott by devising the Code of Conduct to force the larger agencies out of the writer-representation market based on their participation in the market for content (whether through packaging or content affiliates or both).

90.    On February 21, 2019, WGA circulated its "new set of agency regulations"—which WGA named the "Code of Conduct"—to the then-franchised agencies.  Its key new features were the bans on agency packaging and agency content affiliates.  WGA would also require that the agencies turn over to the unions the

29

confidential employment contracts of the agencies' clients, writers and showrunners alike, without the permission of those clients.

91. Less than two weeks later, on March 4, WGA publicly declared that negotiations with ATA had reached an "impasse." Further efforts by ATA to engage WGA in negotiations about the Code of Conduct led to more meetings, but ultimately proved to be exercises in futility. WGA went so far as to encourage agents at the Big Four largest agencies to quit employment with their agencies and form new companies that would sign the Code of Conduct.

92. On March 12, 2019, ATA responded to each WGA proposal with a specific counter-proposal. Following meetings with hundreds of writer-clients, ATA drafted and presented to WGA the "Statement of Choice" through which the talent agencies were prepared to commit to a series of tailored agent regulations that would have eliminated any plausibly legitimate WGA concern about packaging. At the same meeting, ATA proposed regulations to provide for protection against any claimed adverse effects on writers from agency-affiliate content companies. ATA's proposals were rejected out of hand.

93. On March 14, 2019, WGA proposed a new "WGA Franchise Agreement," as the successor to the AMBA. The WGA Franchise Agreement was essentially the Code of Conduct re-purposed as a draft agreement between WGA and talent agencies. It thus included the complete bans on agency packaging and agency-affiliated content companies that WGA's leadership had been threatening from the outset. WGA leadership further articulated its belief that only the Guilds—not talent agents—are capable of advising writers, and that it had decided that all agency packaging and agency-affiliated content companies must be eliminated. ATA once again explained that it could not agree to these absolute bans—which would hurt not only the agencies, but also writers and showrunners, as well as actors, directors, and consumers—and urged continued negotiations.

30

FIRST CONSOLIDATED COMPLAINT

94.   On March 21, 2019, ATA submitted a new proposal to WGA, which included comprehensive provisions that would preserve the ability of agents to engage in packaging and have a content affiliate, but with tailored regulations and protections to prevent any purported risk of harm to WGA members.  *See* ATA Comprehensive Proposal to WGA, attached hereto as Exhibit F, at 6-9.

95.   All of these proposals were again summarily rejected by WGA's leadership and negotiating committee, which was intent on stopping at nothing short of banning agency packaging and agency-affiliate content companies in order to "grab power" from and "divide and conquer" the largest talent agencies.

96.   From March 27 through March 31, 2019, WGA called for a vote of its members on the following question:  "Do you authorize the Board and Council to implement an Agency Code of Conduct, if and when it becomes advisable to do so, upon expiration of the current Artists' Managers Basic Agreement on April 6, 2019?" On March 31, 2019, WGA announced that a substantial majority of its members had voted "yes" to this question.

97.   Despite the limited nature of the question that was put to a vote— authorizing "a" code of conduct "if and when it becomes advisable to do so"—WGA leadership seized-upon the results as a supposed proxy for it to order the membership to fire their agents and to order a collective agreement to boycott Plaintiffs and any other agents who did not agree to follow whatever Code of Conduct WGA leadership preferred.[10]

98.   On April 6, 2019—the day on which the AMBA was then-scheduled to expire—a small group of representatives from ATA initiated a meeting with WGA,

---

[10] Upon information and belief, fewer than 50% of WGA's members approved the adoption of the Code of Conduct, and even then over half of WGA's members do not even have agents, yet they were permitted to participate in a vote to boycott certain agency practices.  Still further, other WGA members are showrunners—*producers* who hire and fire other writers—yet they too were permitted to participate in the vote.

31

FIRST CONSOLIDATED COMPLAINT

during which WGA agreed not to implement its group boycott and Code of Conduct until the end of the day on Friday, April 12, in order to determine if a new AMBA could be negotiated. WGA then informed its members of the brief extension, but further warned that: "Unless we have an agreed-upon deal, the WGAW Board and WGAE Council have voted that the Code of Conduct will go into effect at 12:01 am on Saturday, April 13th."

99. From April 6 to April 12, 2019, ATA representatives met with WGA and presented further proposals in an effort to address WGA's purported concerns without agreeing to a flat ban on packaging or content affiliates. But WGA was not willing to accept anything short of absolute bans. These negotiations also proved to be futile and the unlawful group boycott directed by WGA's leadership was implemented on April 13.

100. On June 7, Plaintiffs—through ATA—made yet another proposal to WGA, doing what they would never advise a writer-client to do: negotiate against herself or himself. Plaintiffs participated in this effort because, above-all-else, Plaintiffs want to be able to serve their clients, and remain open to agreeing to additional protections for writers against actual, harmful conflicts of interest without banning the packaging or content affiliates that benefit writers and other talent. For its part, WGA did not even bother to show up to the meeting with its full negotiating committee, declined to engage in any meaningful discussion at the meeting, and then never offered any counter-proposal whatsoever to ATA.

101. On June 19, WGA indicated that it would prefer to "negotiate," if at all, with individual talent agencies rather than through ATA.

102. On June 28, WGA sent a "cease-and-desist" letter to Plaintiffs and other ATA members, stating—for the first time—that the Guilds would no longer negotiate collectively with the agencies through ATA.

103. Around the same time, WGA sent a revised version of the Code of Conduct to Plaintiffs, attached hereto as Exhibit H. In this revised Code of Conduct, WGA

continued to insist on a total ban on agency packaging and agency-affiliated production. However, WGA also included two new terms in the revised Code of Conduct. First, the revised Code of Conduct contained a "Most Favored Nations" provision, which provides that "in the event that after the Effective Date, Guild enters into an agreement with any other agency or association representing agencies containing terms or conditions more favorable to the agency than those contained herein, Agency shall have the option of accepting any or all of the more favorable terms." Ex. H at 9. The obvious intent of this anticompetitive provision was to induce smaller talent agencies under pressure from WGA to agree to participate in the group boycott and unlawful restraint of trade.

104. Since that time, at least two more agencies have succumbed to this pressure and agreed to participate in the group boycott and unlawful restraint of trade by signing the Code of Conduct.

105. Second, the revised Code of Conduct contained a "phase-in" provision, which would allow Plaintiffs to continue packaging through June 28, 2020. The presence of this "phase-in" provision utterly belies WGA's position that packaging fees always or inexorably present a harmful conflict of interest for writers. If packaging fees are inexorably harmful to writers (of course, they are not, and actually benefit writers), then WGA could not possibly agree to their existence for another full calendar year. Yet that is precisely what WGA has proposed.

106. As recounted above, the conduct of the WGA leadership has demonstrated that they never intended to negotiate in good faith with ATA or the talent agencies. WGA's prohibitions on agency packaging and agency-affiliate content companies—and its group boycott to enforce them—were a *fait accompli* from the beginning of the negotiations because anything less than these outright bans would not have served WGA leadership's "power grab" and desire to "divide and conquer" the major agencies.

**E.     WGA Enforces the Code of Conduct Against Plaintiffs and Other Talent Agencies Through a Conspiracy to Boycott Non-Compliant Agents**

107.   On April 13, 2019, WGA leadership began to implement its group boycott and Code of Conduct and instructed its members that they were prohibited from being represented by an agent who does not agree to the Code of Conduct: "No Current WGA member can be represented by an agency that is not franchised by the Guild in accordance with Working Rule 23." Ex. E, Agency Code of Conduct Implementation FAQ, at 1.  Working Rule 23, in turn, provides that: "No writer shall enter into a representation agreement whether oral or written, with any agent who has not entered into an agreement with the Guild covering minimum terms and conditions between agents and their writer clients." *Id.*  As WGA explained, "[a]s of April 13, 2019 that agreement is the WGA Agency Code of Conduct." *Id.*

108.   The Code of Conduct includes the same provisions banning all agency packaging and content affiliation that WGA had proposed at the outset of its negotiations with ATA.  Specifically, the following Code of Conduct provisions are now being implemented by WGA through its unlawful group boycott:

a.     No Agent shall have an ownership or other financial interest in, or shall be owned by or affiliated with, any entity or individual engaged in the production or distribution of motion pictures.[11]

b.     No Agent shall have an ownership or other financial interest in, or shall be owned by or affiliated with, any business venture that would create an actual or apparent conflict of interest with Agent's representation of a Writer.

c.     No Agent shall derive any revenue or other benefit from a Writer's involvement in or employment on a motion picture project, other

---

[11]   As averred above, the term "motion pictures" refers to work written by writers under the Minimum Basic Agreement.

than a percentage commission based on the Writer's compensation or fee.

> d.   No Agent shall accept any money or thing of value from the employer of a Writer.

Ex. A, Code of Conduct, at 2.

109.   WGA has engaged in a conspiracy and group boycott to enforce these prohibitions against Plaintiffs and other agencies in a variety of ways with both labor and non-labor parties.

110.   Within less than two weeks of implementing its boycott, WGA publicly declared that over 7,000 of its members—including showrunners and television and feature film writers—had fired their agents.   Plaintiffs are direct victims of this boycott, having been fired—collectively—by thousands of their clients at the behest of WGA leadership.

**F.   WGA Leadership Coerces Most of its Members into a Horizontal Group Boycott Against Plaintiffs and Other Non-Compliant Talent Agents**

111.   WGA Working Rule 23 provides that members can only be represented by agencies that sign a franchise agreement with WGA.  WGA asserts that talent agents who do not sign the Code of Conduct may not represent WGA members with respect to the option and sale of literary material or the rendition of writing services in a field of work covered by the Minimum Basic Agreement (and even for fields of work not covered by the MBA, such as when a writer works as a showrunner or producer).

112.  WGA's Executive Director (David Young) and President (David Goodman) have instructed WGA members that they must join the "collective action by WGA members" to refuse to deal with any agents or agencies who refuse to sign the Code of Conduct.  *See* Ex. E, Agency Code of Conduct Implementation FAQ, at 1 ("If

my agency does not sign the Code of Conduct, do I have to tell them they cannot represent me? Yes, but you will do so as part of a collective action by WGA members.").

113. WGA leadership has also threatened union discipline against any of its members who continue to work with such "non-franchised" agencies and agents. *See id.*, at 3 ("How will Working Rule 23 be enforced? … While individual members have a voice and vote, after the Guild decides on collective action members are obligated to follow Guild rules, which will be enforced. . . . Article X of the WGAW and WGAE Constitutions guides Guild disciplinary procedures."); *see also* Rules for Implementation of the WGA Code of Conduct for Agents, attached hereto as Exhibit I, ¶ 4 ("Members in violation of Working Rule 23 shall be subject to discipline in accordance with Article X of the WGAW Constitution.").

114. Goodman has publicly acknowledged WGA's coercion of its own members, who "are currently, some of them, are having a tough time. Many of our feature writers are struggling without the help of their agents and they want their agents back." Ex. G, Goodman Q&A, at 5.

115. Among other things, Goodman and Young are, on information and belief, attempting to compile a record of which members fire their non-franchised agents, and which members continue to work with their non-franchised agents. The latter group could be subject to discipline by a tribunal of WGA members, and the penalty could be a significant monetary fine or expulsion from WGA. Expulsion from WGA would prohibit AMPTP members (*i.e.*, Hollywood studios) from hiring such writers or showrunners. In other words, WGA members are under threat from WGA leadership that they could become unemployable if they decide against joining WGA's boycott and choose to work with a non-franchised talent agent. WGA leadership could not have made a more coercive threat to union membership.

116. WGA members who want the freedom of working with their preferred talent agent—whether franchised or not—theoretically have the option of turning Financial Core (or "Fi-Core"). This means ceasing to be a WGA member, but paying

a fee to WGA to cover the basic costs of representation by the union. Many WGA members understandably feel conflicted about this option because of the potential stigma of not maintaining a WGA membership. Exploiting this, WGA leadership has threatened to publish the names of members who take Fi-Core status—as WGA has done in the past—and to encourage WGA members not to work with Fi-Core writers. Upon information and belief, no WGA member who has ever taken Fi-Core status has been subsequently accepted back into the union. WGA leadership has thus been able to use coercive threats of public shaming, combined with the pressure to join WGA's boycott, to prevent most members from using Fi-Core to continue working with Plaintiffs and other talent agents who have refused to sign the Code of Conduct.

117. In sum, WGA's leadership has organized a group boycott in which they have banned all agency packaging and content affiliation, and both willing and coerced writers (and showrunners) have agreed to boycott Plaintiffs and other talent agents who will not sign the Code of Conduct.

### G.   WGA Induces Showrunners Acting in Their Capacity as Producers, Not Writers—and Thus as Non-Labor Parties—to Join the Group Boycott

118. In recent years, showrunners have become powerful in the entertainment industry. A showrunner functions as the effective "CEO" of a television series. The showrunner has ultimate power and control over creative, staffing, and production decisions. While showrunners may perform some writing and/or story services for a series, showrunners also perform extensive services as non-unionized producers, acting well outside of their functions as writers, and well outside of any capacity legitimately regulated by WGA.

119. More formally, a showrunner is a person in the television industry entitled to receive an "Executive Producer" credit under the rules of the Producers' Guild (a non-union trade association). Subject only to (a limited, in both formal and practical

FIRST CONSOLIDATED COMPLAINT

terms) veto right of the owner of copyright in a program, the showrunner has final responsibility for all creative and business aspects of producing the series. He or she has direct authority over a majority of the producing functions throughout all phases of the series production, including casting, staffing, budgeting, and marketing.

120. As a practical matter, while showrunners are generally also writers (and, according to WGA, WGA members), the bulk of their responsibility is not in "writing" or in acting as a "writer" as defined by the MBA. By definition, a showrunner must be engaged in an overall supervisory capacity, and undertake significant production responsibilities in addition to his/her writing services and responsibilities. The showrunner must approve the series budget and production schedule. He or she must supervise the production, and approve the final cut of each episode. He or she determines both the creative direction of a program and the personnel who implement that direction.

121. In his or her capacity as a producer, a showrunner is ultimately responsible for the hiring of personnel who work on the production. The showrunner hires, or is ultimately responsible for hiring, a series' writing staff. And the showrunner's hiring responsibilities do not end with writers. The showrunner also has ultimate responsibility for all other critical hiring responsibilities on the series—hiring all series directors, as well as the casting of all series regulars, key members of the producing team, such as the production manager, director of photography, and composer.

122. The vast bulk of a showrunner's compensation derives from producing, not writing, services. Compensation for writing and producing services are often broken out separately, with producing compensation usually more significant. A showrunner's entitlement to a percentage of a program's profits also generally derives primarily from the showrunner's producing, not writing, services.

123. Indeed, showrunners often function not only as managers but as entrepreneurs. Showrunners often own and control their own production companies, which in turn act as independent businesses, with employees, offices, etc. Those

production companies are often used to help produce a television program and ensure its success. And showrunners are generally compensated with a share of a program's profits (which of course are affected by a program's budget, which the showrunners are responsible for helping to create and manage), sometimes even receiving additional compensation if a program comes in under budget. They take risks, they hire, fire, and supervise workers from WGA but also other guilds, they manage against budgets, and run individual television program "businesses" from which they personally profit—the hallmark of an entrepreneur.

124. In fact, WGA encourages showrunners to hire other WGA members: "To ensure that writers seeking employment have a way to get their samples in front of showrunners with jobs to fill, the Guild has created … the Staffing Submission System," which "allow[s] writers and showrunners to connect directly." *See* WGA Resources for Writers Without Agents, attached hereto as Exhibit L, at 5; *see also* C. Lee, VULTURE, How Hollywood Writers Are Finding Jobs After Firing Their Agents (Apr. 23, 2019), attached hereto as Exhibit J, at 1 (WGA's Staffing Submission System "connect[s] Hollywood screenwriters with potential employment opportunities" "within the guild with showrunners").

125. Showrunners function as independent contractors—indeed, they effectively operate their own entrepreneurial businesses and are themselves employers of employees in the television industry.

126. WGA's MBA with AMPTP itself recognizes that when a showrunner is acting in his or her capacity as a producer (but not as a writer), he or she is performing services "in other capacities which are not subject to this Basic Agreement." The MBA does not regulate the compensation showrunners obtain in their capacity as producers for non-writing services. WGA has no legitimate labor interest in regulating wages for producers' non-writing services.

127. Thus, showrunners are plainly "management." They are not "employees" under the National Labor Relations Act ("NLRA"). Their compensation in general, and

FIRST CONSOLIDATED COMPLAINT

particularly as producers for non-writing services, is not a mandatory subject for bargaining under the NLRA.   There is no federal policy requiring an employer to collectively bargain for wages in fields outside the scope of mandatory subjects of bargaining under the NLRA.

128.   Accordingly, in their capacity as management-level producers and entrepreneurs, showrunners are non-labor parties for the purpose of the labor exemption to the antitrust laws.

129.   Additionally, and alternatively, showrunners' compensation for non-writing producer services is beyond the scope of the MBA.   Accordingly, Plaintiffs submit that WGA does not have a legitimate interest in regulating showrunners' compensation for non-writing producer services.

130.   Nonetheless, WGA's group boycott includes showrunners and other WGA members when acting in their capacity as producers.   WGA has specifically instructed its membership that writers who also act as producers must fire their agents for both services, and cannot continue to be represented by an agent for purposes of producing only. *See* Ex. E, Agency Code of Conduct Implementation FAQ, at 1 ("What if I'm a TV writer/producer? Some unsigned agencies have been telling clients they can still represent them as producers.   This isn't true.   Because your writer and producer functions are inextricably linked, and are deemed covered writing services under the MBA, you cannot continue to be represented as a producer by an agency not signed to the Code of Conduct.").

**H.   WGA's Leadership Orchestrates and Coerces Various Smaller Talent Agencies—Plaintiffs' Direct Competitors—into Joining the Group Boycott**

131.   Because WGA requires talent agencies to sign the Code of Conduct in order to represent WGA writers, WGA's Code of Conduct constitutes an agreement among compliant talent agencies to boycott non-signatory talent agencies.   WGA claims

that, to date, "at least 70 talent agencies have signed the Code of Conduct," including, three ATA members—Pantheon, Kaplan Stahler, Buchwald—and other smaller talent agencies.

132. These talent agencies are horizontal competitors who compete with one another, and compete with Plaintiffs, to sell their representation services to writers.

133. WGA has coerced these and other talent agencies in an attempt to force them to join the group boycott by presenting them with a Hobson's choice: either agree to the Code of Conduct, or be prohibited from representing any WGA member-writers.

134. For many smaller talent agencies that are not involved in packaging, or affiliated with content companies, the group boycott through the WGA Code of Conduct provides them with an anticompetitive advantage over non-complying agencies like WME, CAA or UTA. Because the packaging and content bans do not practically affect such agencies, they can sign-on to the anticompetitive Code of Conduct without suffering any harm. At the same time, by participating in and facilitating WGA's group boycott of non-compliant talent agencies, they will inflict anticompetitive injury upon competitors like WME, CAA and UTA.

## I. WGA Leadership's Coercion of AMPTP Members—Non-Labor Parties—to Join the Group Boycott

135. WGA's collective bargaining agreement with AMPTP—the MBA—is effective through May 1, 2020. It does not specifically require AMPTP members to negotiate only with agents that are designated (or "franchised") by WGA.

136. On February 9, 2019, WGA leadership sought to change this by requesting that AMPTP re-open negotiations regarding the MBA in order to add a clause that would prohibit AMPTP members from doing business with any talent agency that fails to agree to WGA's Code of Conduct.

137. Upon information and belief, at the very same meeting, WGA representatives also threatened AMPTP and its members with objectively baseless

FIRST CONSOLIDATED COMPLAINT

litigation regarding their participation in packaging deals, unless they agreed to the following amendment (in bold/underscored text) to the MBA:

### ARTICLE 9 – MINIMUM TERMS (GENERAL)

The terms of this Basic Agreement are minimum terms; nothing herein contained shall prevent any writer from negotiating and contracting with any Company for better terms for the benefit of such writer than are here provided, excepting only credits for screen authorship, which may be given only pursuant to the terms and in the manner prescribed in Article 8. **Unless conducted by an individual writer without assistance of any other person, such negotiations may be conducted or assisted only by agents who, at the time of such negotiations, are bound to an agreement with the Guild concerning the terms of such representation or are otherwise certified by the Guild to assist with or to conduct such negotiations.** The Guild only shall have the right to waive any of the provisions of this Basic Agreement on behalf of or with respect to any individual writer.

### ARTICLE 3 – WORK LISTS, LOAN-OUTS AND RECOGNITION

…

B. RECOGNITION (THEATRICAL)

1. The Company hereby recognizes the Guild as the exclusive representative for the purpose of collective bargaining for all writers in the motion picture industry, **except that an individual writer may designate an agent to negotiate on his or her behalf, or to assist him or her in the negotiation of better terms than are here provided, provided that such agent is, at the time of such negotiations, bound to an agreement with the Guild concerning the terms of such representation or is otherwise certified by the Guild.**

138. Upon information and belief, WGA threatened to sue AMPTP members if they did not agree to the proposed amendments to the MBA, which would prohibit them from continuing to do business with writers' agents who did not sign the Code of Conduct.

139. Upon further information and belief, WGA shared with AMPTP and its members a draft complaint that WGA had prepared against Plaintiffs and ICM based

on their involvement in the packaging business.[12]  This complaint alleged that agency packaging violated Section 302 of the Labor Management Relations Act ("LMRA") because paying packaging fees to talent agencies purportedly constituted *criminal* kickbacks by the studios in violation of the LMRA.  WGA verbally threatened to sue AMPTP and the studios under the same legal theories set forth in the draft complaint— in effect, accusing them of criminal behavior—if they would not acquiesce to the MBA amendment and thus participate in WGA's group boycott.

140.   WGA leadership's threat of filing a civil case alleging that packaging was criminal behavior by the AMPTP members was objectively baseless.  Indeed, because WGA itself has endorsed packaging for more than 40 years in the AMBA, it was frivolous for WGA to assert that such behavior was now suddenly criminal.  This reality, however, did not stop WGA leaders from attempting to extort AMPTP and its members into joining WGA's group boycott to enforce the Code of Conduct.

141.   It is impossible for WGA to reconcile the "phase-in" provision of its latest Code of Conduct—which would permit packaging for another year—with its claim that packaging constitutes a criminal violation of the LMRA's "anti-kickback" provision.  On the contrary, the phase-in provision constitutes further evidence that WGA's litigation threat against the AMPTP was objectively baseless.

142.   On March 25, 2019, AMPTP rejected WGA's invitation to re-open the MBA to include the amendment requiring that AMPTP members refuse to deal with agents who do not sign the Code of Conduct.  AMPTP President Carol Lombardini stated in a publicly reported letter to WGAW Executive Director David Young that such an amendment "would subject [AMPTP], the WGA and individual writers to a

---

[12] As mentioned above, WGA filed such a complaint against Plaintiffs and ICM on April 17, 2019 before the California Superior Court for the County of Los Angeles. However, on August 19, 2019—a few days before WGA was set to oppose the agencies' demurrers to dismiss the complaint—WGA voluntarily dismissed its action.  Goodman has since acknowledged that "the whole point of the lawsuits" against the agencies "was to provide leverage" over them.  Ex. G, Goodman Q&A, at 5.

FIRST CONSOLIDATED COMPLAINT

substantial risk of liability for antitrust violations," and AMPTP members "would also be at risk for violation of federal labor laws as well as state laws."

## J.    WGA Leadership's Inducement of Unlicensed Managers and Lawyers—Non-Labor Parties—to Violate State Law and Participate in the Group Boycott

143.    The group boycott orchestrated by WGA leadership is harming WGA's own members by leaving thousands of them without licensed talent agents to represent them in their individual negotiations with AMPTP producer-members.

144.    WGA leadership has tried to fill this void—which threatens the sustainability of its group boycott—by seeking to induce unlicensed Hollywood managers and lawyers to join the boycott by taking over the representation of WGA writer-members in their negotiations with film and television production companies. Pursuant to California, New York, and certain other state laws, however, unlicensed managers and lawyers are prohibited or limited in their ability to procure employment with the studios. As such, they may not lawfully represent writers in their individual negotiations with the studios absent the involvement of a licensed talent agent.

145.    Specifically, on March 20, 2019, WGA—upon information and belief, at the direction of WGA leadership—sent a letter to managers and lawyers who represent WGA members titled "Limited Delegation of Authority to Negotiate Overscale Terms with Guild-Signatory Companies." The letter asserted that, as the exclusive representative for all writers employed under the MBA, WGA could temporarily authorize unlicensed managers and lawyers "to procure employment and negotiate overscale terms and conditions of employment for individual Writers."[13] WGA's position is wrong. WGA has no legal authority to override state licensing requirements.

---

[13] *See also* Ex. E, Agency Code of Conduct Implementation FAQ, at 2 ("[Q.] The agencies say it is against state laws for managers and lawyers to help writers find work or negotiate without being connected to an agent. [A.] As a matter of practice, managers and sometimes attorneys already get work for clients. In addition, as the exclusive

FIRST CONSOLIDATED COMPLAINT

146. WGA falsely told unlicensed managers and lawyers that, if they agree to this limited delegation, WGA will somehow shield them from the consequences of violating California's Talent Agency Act ("TAA"), which provides that only *licensed agents* may procure employment for writers with television and film producers. Other states, like New York, impose similar legal restrictions on the ability of managers and lawyers to procure employment for a writer without the involvement of a licensed agent. WGA falsely represented that it can protect unlicensed managers and lawyers from liability under these other state laws as well.

147. Continuing to ignore the TAA and other state licensing laws, WGAW Executive Director David Young wrote to members on April 16, 2019 that: "If a talent manager or attorney who provides such procurement services at a writer's direction and in good faith is not otherwise paid for those services because of an alleged violation of the [TAA], the Guild will reimburse the talent manager or attorney in question for those services."

148. In short, as part of its group boycott and in an effort to achieve its "power grab," WGA has combined with certain unlicensed managers and lawyers—*i.e.*, non-labor parties—in violation of various state licensing laws. WGA leadership's actions have the purpose and effect of inducing these non-labor parties to replace Plaintiffs and other non-franchised talent agents, or to force the non-franchised agents to submit to the Code of Conduct. And the leadership's actions also lay bare that their crusade against agency packaging and content affiliates is about "conquer[ing]" the agencies rather than about any supposed conflicts of interest. WGA is *not* requiring lawyers or managers to sign the Code of Conduct in order for WGA members to work with them.

bargaining representative for writers, the Guild has the right under federal law to delegate authority to other representatives, and on a temporary basis has now delegated that authority to managers and attorneys.").

## V.    COUNT ONE:  SECTION 1 OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 1)

149.   Plaintiffs incorporate by reference and re-allege all previous paragraphs as though fully set forth herein.  WGA's Code of Conduct and group boycott are illegal restraints of trade in violation of Section 1 of the Sherman Act.

150.   The Sherman Act prohibits agreements that unreasonably restrict competition; some such agreements—including group boycotts and concerted refusals to deal, like the WGA conspiracy challenged here—are condemned as *per se* illegal.

### A.    <u>The Limited Statutory Labor Exemption to the Antitrust Laws Does Not Shield WGA's Restraint of Trade</u>

151.   Labor law grants unions the exclusive authority to negotiate with employers over the terms and conditions of the union-members' employment.  This labor law authority thus gives unions absolute control—monopoly power—over the labor markets for their members' services.  There is a tension between labor law and the Sherman Act's prohibition against unreasonable restraints on competition because virtually all union activity would constitute an unreasonable restraint of trade if there were not a labor exemption to protect it from the antitrust laws.

152.   Congress, therefore, created the statutory labor exemption to shield from antitrust scrutiny certain union activity that is in pursuit of legitimate labor union goals.  Unions, however, do not have *carte blanche* to restrict competition however they like under the pretext of a labor objective.  Courts have instead strictly limited the scope of the statutory labor exemption to union conduct that is *both* (i) not in conjunction with a non-labor group *and* (ii) in furtherance of a *legitimate* union interest.

153.   Here, WGA may not invoke the protection of the statutory labor exemption for the threshold reason that it has imposed its Code of Conduct in combination with non-labor groups.  Showrunners—who primarily operate as producers—are part of the group boycott.  And, furthermore, WGA leadership has tried to induce (i) AMPTP and its members, *and* (ii) various unlicensed managers and lawyers to participate in WGA's

FIRST CONSOLIDATED COMPLAINT

boycott. Each of these parties—the showrunner-producers, AMPTP and its members, and the unlicensed managers and lawyers—are non-labor groups. Therefore, the statutory labor exemption does not apply to WGA's group boycott on this ground alone because it involves non-labor parties.

154. Even if, however, WGA were not acting in combination with a non-labor group, it still would not be entitled to protection under the statutory labor exemption. A group boycott to enforce prohibitions against agency packaging and agency-affiliate content companies goes beyond any lawful union interest.

155. Plaintiffs do not dispute the legitimacy of WGA seeking regulations tailored to prevent franchised talent agents from acting contrary to the interests of WGA members—just as talent agencies and WGA had agreed to through the AMBA for multiple decades. WGA's boycott, however, oversteps by a country mile any such claimed objective by flatly banning agency packaging and agency-affiliate content companies, without regard to the existence of any *actual* harm to writers resulting from potential conflicts of interest. Such blanket bans on industrywide commercial practices, which extend far beyond the labor market for writer services, do not fall within WGA's labor law authority or legitimate union interests. WGA also does not have any legitimate union interest to deny the benefits of agency packaging and content affiliation to actors and directors—who are not represented by WGA—nor to WGA members when they work as independent contractors, showrunners or producers rather than writers employed by a studio as writers.

156. In fact, WGA's packaging and content bans would hurt WGA's member-writers and other talent while economically shielding *AMPTP members—i.e.*, the non-labor parties that sit *across* the bargaining table from WGA—from both packaging fees and content competition. This is the antithesis of a legitimate union interest that would support application of the statutory labor exemption.

157. Moreover, with regard to many packaging transactions, which occur long before any writers are engaged for the packaged production and include the acquisition

FIRST CONSOLIDATED COMPLAINT

of a script that was authored by a writer acting purely in the capacity of an independent contractor, WGA is not entitled to rely upon the statutory or non-statutory labor exemption at all, because WGA's entitlement to any such exemption rests wholly on its status as the exclusive bargaining representative of the bargaining unit. Prior to a studio's engagement of writers as employees, however, WGA does not stand in the shoes of an exclusive bargaining representative of such writer-employees.

158. Another reason why the boycott orchestrated by WGA leadership to eliminate agency packaging and affiliate content companies does not constitute a legitimate union interest within the meaning of the statutory labor exemption is because the boycott does not concern the terms and conditions of employment for union members. While union regulation of agent commissions indirectly impacts wages, that is not what the challenged provisions of the Code of Conduct do here. On the contrary, the agency packaging ban eliminates *packaging fees* (not commissions) *paid by studios* (not by writers) to agents; and the ban on agency content companies has nothing to do with agency fees or the terms and conditions of writer employment. Both provisions stand in stark contrast to the now-expired AMBA, which regulated agent *commissions* by prohibiting them on projects for which agents were receiving packaging fees. This is all on top of the fact that *showrunners*' terms and conditions of employment for production services are beyond WGA's union authority.

159. Preventing agents from acting against their clients' interests in procuring employment as writers is a proper WGA concern. But that is neither the motivation nor effect of WGA's group boycott. The statutory labor exemption may not be invoked merely by parroting a mantra about purported union concerns about potential conflicts of interest. WGA managed packaging and content affiliates for more than 40 years with tailored regulations, including a specific requirement that agents not act against their writer-clients' interests. WGA leadership's self-proclaimed political agenda to "grab power" from, and to "divide and conquer," large talent agencies by prohibiting long-standing commercial behavior does not further any legitimate union interest.

160. Another factor courts assess in considering the applicability of the statutory labor exemption is whether the challenged behavior resembles traditional union activity. WGA's (i) absolute packaging and content affiliate bans in business markets, (ii) "limited delegation of authority" to unlicensed managers and lawyers in violation of California and other state licensing laws, and (iii) threats to bring an objectively frivolous lawsuit asserting criminal conduct by AMPTP members if they do not join the boycott, do not bear any resemblance to traditional union activity like collective bargaining, calling strikes, picketing, or hand-billing.

161. Nor is there any legitimate union interest in WGA's leadership threatening its own members with public shaming, discipline, and a loss of their livelihood if they continue to be represented by their agents.

162. For all of these reasons, and those averred above, the statutory labor exemption does not apply.

**B.    The Non-Statutory Labor Exemption Also Does Not Apply**

163. Because courts (not Congress) created the second labor law exemption from the antitrust laws, it is known as the non-statutory exemption. The non-statutory exemption also does not shield the Code of Conduct and WGA's group boycott to ban agency packaging and content affiliates from the antitrust laws.

164. The non-statutory labor exemption exists to provide unions and employers with the ability to bargain over wages, hours, and working conditions (the mandatory subjects of collective bargaining). But, as averred above, the provisions at issue in the Code of Conduct do *not* concern wages, hours, working conditions, or even agent commissions.

165. Additional factors that courts consider in determining whether the non-statutory labor exemption applies include: Do the restraints affect parties *other than* parties to the collective bargaining agreement at issue? Do the restraints affect business markets, and if so, directly or indirectly? And could the union's restraints be achieved through less restrictive means? As averred throughout this Complaint, the answer to all

FIRST CONSOLIDATED COMPLAINT

of these questions is a resounding "yes"—thereby establishing that the non-statutory labor exemption does not apply.

166. The purpose and effect of the challenged boycott is to ***directly*** impact the business market for producing and distributing TV shows and movies. Boycotting talent agencies who will not adhere to the Code of Conduct also adversely impacts the markets for the services of, *e.g.*, directors and actors, who WGA has no authority to represent and who will no longer benefit from agency packaging or the existence of content affiliates. Indeed, WGA has affirmatively stated that its packaging ban will impact actors and directors and the businesses of the studios (*see* Ex. D, WGA Agency Campaign FAQ, No. 19), as well as WGA members who work as showrunners or producers (*see* Ex. E, Agency Code of Conduct Implementation FAQ, at 1). The non-statutory labor exemption does not protect anticompetitive WGA activity that directly impacts either business markets *or* labor markets for the services of workers that WGA does not represent.

167. With respect to the availability of less restrictive alternatives, WGA's history demonstrates the availability of much less restrictive ways to address any purported union concerns about the possible harmful effects on writers from conflicts of interest. As for packaging, it would be far less restrictive for WGA to rely upon the AMBA rules that sanctioned packaging but also required that agents refrain from acting against the best interests of their clients. WGA could additionally require that agents make disclosures sufficient to provide writers with the information they need to assess whether participating in a particular package is something they want to do. With respect to affiliated content companies, any WGA concern about potential harmful effects on writers from conflicts of interest could be addressed by regulations requiring firewalls and disclosures like those that WME, CAA and UTA already utilize vis-à-vis Endeavor Content, wiip and Civic Center, respectively, rather than an unduly restrictive, outright ban on all such content affiliates.

168.   The over breadth of WGA's regulations is readily illustrated.  Even WGA has publicly conceded that in many packages, a writer's net compensation will be higher without paying a 10% commission and being part of a package.  Yet, under the Code of Conduct, these writers will always have to pay 10% commissions and be economically worse-off.  Furthermore, when purportedly "delegating" its exclusive bargaining power to "authorize" unlicensed managers and writers to negotiate on behalf of individual writers, WGA did not require them to subscribe to the Code of Conduct.  This hypocrisy further demonstrates that WGA's bans on agency packaging and content affiliates are overly restrictive and just a "power grab" by union leadership.

169.   As another example, many television shows and films would not be produced at all if an agency were not packaging the talent or if there were no agency-affiliate to produce the content.  Under the Code of Conduct, however, these jobs for WGA members will not exist.  In short, the categorical prohibition of output-enhancing commercial behavior presenting only *theoretical* conflicts—rather than the prohibition of *actual* conflicts that harm WGA members—will eradicate agent behavior that *benefits* writers and thus is far more restrictive than necessary.  Indeed, by banning all agency content affiliates, the Code of Conduct would take job opportunities away from writers (and other talent) who are not even represented by the affiliated agency.

170.   For all of the foregoing reasons, the anticompetitive Code of Conduct and group boycott organized by WGA's leadership are not entitled to the protection of the non-statutory labor exemption.

### C.   The Group Boycott is a *Per Se* Violation of Section 1 of the Sherman Act

171.   With WGA unable to invoke the protection of any labor exemption to the antitrust laws, the group boycott and concerted refusal to deal with talent agents who will not sign the Code of Conduct should be condemned as a classic, *per se* violation of Section 1 of the Sherman Act (15. U.S.C. § 1).

172. The first element of a Section 1 claim is the existence of a contract, combination, or conspiracy. Here, WGA has orchestrated a series of such agreements as part of its overall conspiracy.

173. At the inducement of the two WGA unions acting in concert, a majority of WGA writer-members and showrunners—who compete with one another to acquire the services of talent agents—have voted for the Code of Conduct and entered into an unlawful horizontal agreement to boycott and refuse to deal with non-complying agencies. WGA leadership, under the auspices of the union's Working Rules, has threatened members with disciplinary action (including expulsion and an effective blackball from the industry), if they do not agree to boycott non-franchised talent agents. And, as averred above, WGA leadership has also threatened members from taking Fi-Core status and declining to participate in WGA's group boycott with public shaming and threats to their ability to find opportunities as writers. Unlike most alleged antitrust conspiracies where the existence of an agreement is unknown at the pleadings stage, here, the self-proclaimed "collective action" of WGA and its members is out-in-the-open and undeniable.

174. Moreover, at WGA leadership's behest, certain smaller talent agencies—who compete with one another and with Plaintiffs to sell their representation services to writers—have signed WGA's Code of Conduct, which operates as a horizontal agreement to boycott non-complying agencies like WME, CAA and UTA. Once again, there is no uncertainty about the existence of these horizontal agreements orchestrated by WGA—the agreements are affirmatively acknowledged and promoted by WGA itself.

175. WGA leaders have also tried, and continue to try, to induce AMPTP members—who are horizontal competitors in the market(s) for producing television and film content—to join the group boycott against talent agencies who refuse to subscribe to the Code of Conduct.

176.   WGA's leadership has further tried to induce, and continues to induce, unlicensed managers and lawyers into agreeing to participate in the group boycott by, among other things, purporting to provide a "limited delegation" of bargaining authority to procure employment on behalf of individual writers in violation of California and other state licensing laws.

177.   Such contracts, combinations, or conspiracies among various horizontal competitors to refuse to deal with and boycott talent agencies like Plaintiffs who will not agree to the Code of Conduct is the type of pernicious, anticompetitive group boycott agreement that is subject to *per se* condemnation under Section 1 of the Sherman Act.

178.   WGA itself recognized that such agreements are *per se* illegal in an April 16, 2019 email to all its members: "***a combination in restraint of trade in violation of federal antitrust law … would likely constitute a group boycott that is per se unlawful under longstanding Supreme Court precedent***."[14]   In this very action, in asserting counterclaims against Plaintiffs, WGA again alleged that a putative (but non-existent and implausible) "group boycott" over individual negotiations with WGA constitutes "a per se violation of the federal antitrust laws."

**D.     The Group Boycott Would Also Constitute an Unlawful Restraint of Trade Under a "Quick Look" or Full-Blown Rule of Reason Analysis**

179.   Even if the Court were to decline to apply a *per se* test, and to instead evaluate the boycott under either the full-blown rule of reason or a "quick look" mode of analysis, the conduct at issue would still constitute an illegal restraint of trade in violation of Section 1 of the Sherman Act.

180.   Under a full-blown rule of reason analysis, the Court would weigh the anticompetitive harm caused by WGA's restrictions (*e.g.*, the elimination of scores of

---

[14] This statement was made in the context of WGA leadership threatening lawyers and managers who might decline to participate in their boycott conspiracy.

talent agents as competitors to represent writers) against any ostensible procompetitive benefit of those same restrictions.  This inquiry would include defining the relevant economic market(s) in which WGA is restraining competition, assessing WGA's market power in these markets, considering whether WGA could achieve any ostensible procompetitive benefit of its agency packaging and agency-affiliate content bans in a less restrictive manner, and potentially balancing the anti- and procompetitive effects against one another.  As an alternative to a full-blown rule of reason analysis, the Court could also conduct a "quick look" rule of reason review of WGA's conduct to determine whether to summarily condemn it as an unreasonable restraint because of its clear horizontal anticompetitive impact on competition and lack of any plausible justification (*e.g.*, without the need to define the relevant economic markets or assess WGA's market power).  The bottom line, however, is that no matter what antitrust standard is applied, WGA's anticompetitive agreements cannot withstand scrutiny under Section 1 of the Sherman Act.

181.   ***Relevant markets and market power.***  Plaintiffs and other talent agencies compete in a relevant market to sell their representation services to writers negotiating with AMPTP producer-members.  The flip-side of this market is that the writers compete with each other to acquire the representation services of agents.  The geographic scope of this relevant market is the United States. *See, e.g.*, Ex. B, MBA, Art. 5 (application of collective bargaining agreement between WGA and AMPTP focuses on whether writer lives or provides services in the U.S.).  There are no substitutes for the representation services provided in this market and there is no cross-elasticity of demand with unlicensed managers or lawyers or other potential representatives because, under California and a number of other state laws, only licensed talent agents may independently procure employment for writers in their negotiations with studios. WGA has stifled competition in this relevant market through its group boycott to enforce the Code of Conduct.

FIRST CONSOLIDATED COMPLAINT

182. Although WGA itself does not participate in the market for representational services (because it does not seek to acquire agency services on its own behalf), WGA nonetheless has absolute power—indeed, monopoly power—over access to the relevant market for the representation of television and film writers in the United States. This is because of WGA's status as the exclusive collective bargaining representative of all writers for unionized television and film productions. Indeed, the very reason for the creation of the statutory and non-statutory labor exemptions to the antitrust laws is because, without them, virtually all union behavior—including agreements with its members—would constitute an unreasonable restraint of trade given unions' monopoly power over their respective labor markets. This is also the reason why the labor exemptions to the antitrust laws have specific limitations—because, without them, union leaders like WGAW's and WGAE's could abuse their organizations' monopoly power to impose agreements that either unreasonably restrain competition in commercial markets or extend beyond any legitimate union interest.

183. Another relevant market is the market to produce and/or distribute television shows and films.[15] There are no close substitutes or cross-elasticity of demand with producers of other forms of entertainment (*e.g.*, sports or theater or opera) because such organizations do not have the unique experience, talent, reputation or motivation to produce television shows and movies. The geographic scope of this market is the United States—the dominant market for television and film production.

184. WGA's ban on agency packaging has unreasonably restrained competition in the market for producing films and television shows by abusing and leveraging its monopoly power over access to the labor market for writers to eliminate agencies as competitors to sell packages in the relevant market for producing films and television shows. As averred above, writers are typically included in packages, and most

---

[15] Alternatively, the production and distribution of films, and the production and distribution of television shows may either constitute separate relevant markets or sub-markets of the relevant market for film and television production.

television programming is packaged. The anticompetitive effects are thus substantial because many (or all) agents will be driven out of packaging if the conspiracy and group boycott orchestrated by WGA leadership were to succeed.

185. With respect to WGA's agency-affiliate content ban, WGA has unreasonably restrained competition by abusing and leveraging its monopoly power over the labor market for writers to eliminate agency-affiliates as competitors with the established studios in the relevant market for producing and distributing films and television shows. WGA's group boycott to eliminate important new entrants in a market that has seen substantial consolidation and concentration has significant anticompetitive effects. To the extent that studios are participating in this boycott, they directly benefit from the reduction in competition.

186. WGA's group boycott also further unreasonably restrains competition in the relevant market to represent writers by providing an anticompetitive advantage to unlicensed managers and lawyers who WGA's leadership has tried to threaten and coerce into replacing the boycotted agents, such as Plaintiffs, in their representation of writers. These unlicensed managers and lawyers are permitted to participate in packaging and content production without being required to sign the Code of Conduct.

187. ***No procompetitive justifications.*** There is no plausible pro-*competitive* justification for completely banning agency packaging and agency-affiliate content companies. Instead, WGA leadership designed these prohibitions to try to drive the top agencies out of the business of representing writers. This fact alone requires condemnation under either a quick look or full-blown rule of reason analysis.

188. The main questions for purposes of evaluating any claimed procompetitive justification are whether the challenged bans and group boycott enhance or suppress competition, and if so, whether on balance the challenged restraints are more procompetitive than anticompetitive. Here, however, the *only* competitive effect of the challenged restraints is to eliminate Plaintiffs and other agencies who refuse to sign the Code of Conduct as competitors in the relevant markets. These restraints, on their face,

56

FIRST CONSOLIDATED COMPLAINT

thus reduce—not enhance—competition. There is also no plausible procompetitive justification for WGA's boycott to enforce these anticompetitive rules. And even if there were, WGA could achieve any purported procompetitive objective through far less restrictive alternatives that would be virtually as effective as the absolute packaging and content affiliate bans set forth in the Code of Conduct.

189. To the extent the Court were to reach the final step of a full-blown rule of reason inquiry—the balancing step—WGA's group boycott and anticompetitive Code of Conduct would similarly fail. The absolute bans on agency packaging and affiliate-content companies inflict significant anticompetitive effects in the relevant markets with *no* offsetting procompetitive benefits. Indeed, the group boycott to enforce these restraints has significant anticompetitive effects with no offsetting competition-enhancing aspects at all.

190. ***Antitrust injury.*** Finally, Plaintiffs have suffered and will continue to suffer antitrust injury to their business and property as a direct and proximate result of WGA's unlawful conspiracy. Plaintiffs' refusal to agree to the Code of Conduct has subjected their respective writer-representation businesses to a group boycott and refusal to deal. Plaintiffs have and will continue to lose work, lose clients (thousands so far), lose packaging fees, and suffer irreparable harm to its business and property as a result of WGA's unlawful conspiracy. In addition, the ultimate consumers of film and television shows will be injured by the reduction in film and television output caused by WGA's conspiracy. Plaintiffs will prove the amount of damages they have suffered as a result of WGA's antitrust violation at trial and are entitled to both triple damages and attorney's fees.

## VI.   CAA'S AND UTA'S COUNT TWO: IN THE ALTERNATIVE, SECTION 303 OF THE LABOR-MANAGEMENT RELATIONS ACT (29 U.S.C. § 187)

191. Pursuant to Rule 8(3)(d)(2)-(3) of the Federal Rules of Civil Procedure, CAA and UTA plead the following claim for relief in the alternative.

192. CAA and UTA incorporate by reference and re-alleges all previous paragraphs as if fully set forth herein.

193. Section 8(b)(4)(B) of the NLRA prohibits any labor organization, including WGA, from engaging in unfair labor practices, which expressly includes engaging in coercive acts and thereby "forcing or requiring any person . . . to cease doing business with any other person…" 29 U.S.C. § 158(B)(4)(ii)(B). A violation of Section 8(b)(4) gives an aggrieved party a claim for damages in federal court under Section 303 of the LMRA, 29 U.S.C. § 187.

194. This prohibited practice is precisely what WGA has done. WGA has threatened, coerced, and/or restrained CAA and UTA where the object thereof is forcing or requiring CAA and UTA to cease doing business with wiip and Civic Center, respectively, which are companies in interstate commerce that neither CAA nor UTA manage, operate, or control. In particular, WGA has threatened, coerced, and/or restrained CAA and UTA, as alleged above, by forcing WGA members through threats of expulsion and fines to engage in a group boycott of talent agencies who do not sign WGA's Code of Conduct. WGA has engaged in such illegal actions with an object of having CAA and UTA divest themselves of their respective financial interest in wiip and Civic Center. As but one example of WGA's impermissible objective, WGA promulgated the Code of Conduct, which mandates that "no Agent shall have an ownership or other financial interest in, or shall be owned by or affiliated with, any entity or individual engaged in the production or distribution of motions pictures." By threatening, coercing, and/or restraining CAA and UTA with an object of forcing CAA and UTA to cease doing business with wiip and Civic Center, respectively, which are companies engaged in interstate commerce, in an industry affecting commerce, WGA has exceeded the bounds of permissible union activity and violated CAA's and UTA's rights under the LMRA.

195. In addition, WGA has threatened, coerced, and/or restrained its members who are independent contractors, producers of theatrical, television, and other forms of

media motion pictures, such as showrunners, and employers of other employees in the motion picture and television industry, with an object of forcing them to cease doing business with another person. These WGA members are persons engaged in interstate commerce, working in an industry affecting interstate commerce. WGA has mandated that its members must join the "collective action by WGA members" to refuse to deal with any agents or agencies who do not agree to the Code of Conduct. For any member who does not follow this mandate, including those who are independent contractors, producers of theatrical, television, and other forms of media motion pictures, such as showrunners, and employers of other employees in the motion picture and television industry, the consequences are dire. WGA has threatened severe discipline against any member who continues to work with an agency that has not signed the Code of Conduct. Among other threats, WGA told its members that "after the Guild decides on collective action members are obligated to follow Guild rules, which will be enforced [in accordance with] Article X of the WGAW and WGAE Constitutions [which address] Guild disciplinary procedures." WGA's illegal directive to its members to boycott CAA and UTA (and other talent agencies) that do not submit to the Code applies not only to writers, but to any WGA member who acts in a capacity as a producer. WGA has told its members that "producing services are deemed part of writing when performed by writer-producers … [and thus any agency that has not signed the Code of Conduct] cannot represent WGA writers with respect to these hyphenate services, and a member who has historically been employed as a hyphenate cannot avoid the Guild's jurisdiction by re-labeling a contract as a producer-only deal." *See* Working Rule 23 Implementation FAQ, attached hereto as Exhibit K, at 2. This WGA overreach thus applies not only to showrunners (executive producers), but also to the many additional writers who provide producing services.

196.   WGA has violated the LMRA by threatening, coercing, and/or restraining WGA members, including those who are independent contractors, producers of theatrical, television, and other forms of media motion pictures, such as showrunners,

and employers of other employees in the motion picture and television industry, with an object of forcing them to cease doing business with another person. *E.g.*, *Harrah's Club v. N.L.R.B.*, 446 F.2d 471 (9th Cir. 1971).

197. Moreover, WGA has violated the LMRA by inducing and encouraging its members to refuse to perform services for third party studios and production companies that engage in packaging deals with talent agencies. For example, WGA has induced and encouraged writers who are parties to existing "overall deals" with studios not to perform writer or producer services that their employers include in packages with talent agencies that have not signed the Code of Conduct. By doing so, WGA has attempted to force and require third party studios to cease doing business with non-signatory talent agencies, including CAA and UTA.

198. CAA and UTA have been—and continue to be—directly injured by WGA's unlawful conduct described above, including by disrupting and threatening to disrupt CAA's relationship with wiip and UTA's relationship with Civic Center, and by causing CAA and UTA to lose work, clients, commissions, and fees that they would have earned absent WGA's conduct. Damage to CAA and UTA as a result of WGA's illegal activities is ongoing, and CAA and UTA will prove the amount of damages they have suffered as a result of WGA's misconduct at trial.

199. CAA and UTA have standing under Section 303 of the LMRA to assert this claim because Section 303 creates a claim for "whoever shall be injured in his business or property by reason of any violation of subsection (a)." 29 U.S.C. § 187(b).

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs WME, CAA and UTA respectfully request that the Court enter judgment against WGA:

1. Declaring that WGA's bans on agency packaging and content affiliates, and concerted refusal to deal and group boycott to enforce these prohibitions, is an

illegal contract, combination, or conspiracy constituting an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2. Permanently enjoining the challenged conduct;

3. Awarding Plaintiffs treble damages, as well as costs and attorney's fees, in an amount to be proven at trial;

4. Awarding pre-and post-judgment interest at the maximum rate allowable by the law; and

5. Ordering such other relief as the Court may deem just and equitable.

In the alternative, pursuant to Rule 8(d)(2)-(3) of the Federal Rules of Civil Procedure, CAA and UTA respectfully request that the Court enter judgment against WGA as follows with respect to the Second Cause of Action:

1. Declaring that WGA's activities constitute a violation of the Labor-Management Relations Act;

2. Awarding CAA and UTA all proximate damages for the injury caused by WGA, in an amount to be proven at trial;

3. Awarding CAA and UTA their costs, in an amount to be proven at trial;

4. Awarding pre-and post-judgement interest at the maximum rate permitted; and

5. Ordering such other and further relief as the Court may deem just and equitable.

FIRST CONSOLIDATED COMPLAINT

Dated:  September 27, 2019          WINSTON & STRAWN LLP

By:  */s/ Diana Hughes Leiden*
Jeffrey L. Kessler
jkessler@winston.com
David L. Greenspan
dgreenspan@winston.com
Isabelle Mercier-Dalphond
imercier@winston.com
200 Park Avenue
New York, NY 10166-4193
Telephone: 212-294-6700
Facsimile: 212-294-4700

Diana Hughes Leiden (267606)
dhleiden@winston.com
Shawn R. Obi (288088)
sobi@winston.com
333 South Grand Avenue, 38th Floor
Los Angeles, CA  90071-1543
Telephone:    213-615-1700
Facsimile:    213-615-1750

Attorneys for Plaintiff
WILLIAM MORRIS ENDEAVOR
ENTERTAINMENT, LLC

FIRST CONSOLIDATED COMPLAINT

Dated: September 27, 2019

IRELL & MANELLA LLP

MITCHELL SILBERBERG & KNUPP LLP

By:   */s/ Steven A. Marenberg*
Steven A. Marenberg (101033)
smarenberg@irell.com
Victor Jih (186515)
vjih@irell.com
Stephen M. Payne (310567)
spayne@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Adam Levin (156773)
axl@msk.com
Jeremy Mittman (248854)
j2m@msk.com
Jean Pierre Nogues (84445)
jpn@msk.com
2049 Century Park E., 18th Floor
Los Angeles, CA 90067
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Plaintiff
UNITED TALENT AGENCY, LLC

FIRST CONSOLIDATED COMPLAINT

DATED:  September 27, 2019          KENDALL BRILL & KELLY LLP


By:  */s/ Richard B. Kendall*
    Richard B. Kendall (90072)
    rkendall@kbkfirm.com
    Patrick J. Somers (318766)
    psomers@kbkfirm.com
    Nicholas F. Daum (236155)
    ndaum@kbkfirm.com
    Sarah E. Moses (291491)
    smoses@kbkfirm.com
    10100 Santa Monica Blvd., Suite 1725
    Los Angeles, California 90067
    Telephone: 310.556.2700
    Facsimile: 310.556.2705

    Attorneys for Plaintiff
    CREATIVE ARTISTS AGENCY, LLC

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.


Dated:  September 27, 2019                    WINSTON & STRAWN LLP


By:  */s/ Diana Hughes Leiden*
  Jeffrey L. Kessler
  jkessler@winston.com
  David L. Greenspan
  dgreenspan@winston.com
  Isabelle Mercier-Dalphond
  imercier@winston.com
  200 Park Avenue
  New York, NY 10166-4193
  Telephone: 212-294-6700
  Facsimile: 212-294-4700

  Diana Hughes Leiden (267606)
  dhleiden@winston.com
  Shawn R. Obi (288088)
  sobi@winston.com
  333 South Grand Avenue, 38th Floor
  Los Angeles, CA  90071-1543
  Telephone:    213-615-1700
  Facsimile:    213-615-1750

  Attorneys for Plaintiff
  WILLIAM MORRIS ENDEAVOR
  ENTERTAINMENT, LLC

FIRST CONSOLIDATED COMPLAINT

Dated: September 27, 2019

IRELL & MANELLA LLP

MITCHELL SILBERBERG & KNUPP LLP

By:  */s/ Steven A. Marenberg*
    Steven A. Marenberg (101033)
    smarenberg@irell.com
    Victor Jih (186515)
    vjih@irell.com
    Stephen M. Payne (310567)
    spayne@irell.com
    1800 Avenue of the Stars, Suite 900
    Los Angeles, California 90067-4276
    Telephone: (310) 277-1010
    Facsimile: (310) 203-7199

    Adam Levin (156773)
    axl@msk.com
    Jeremy Mittman (248854)
    j2m@msk.com
    Jean Pierre Nogues (84445)
    jpn@msk.com
    2049 Century Park E., 18th Floor
    Los Angeles, CA 90067
    Telephone: (310) 312-2000
    Facsimile: (310) 312-3100

    Attorneys for Plaintiff
    UNITED TALENT, AGENCY, LLC

FIRST CONSOLIDATED COMPLAINT

DATED:  September 27, 2019          KENDALL BRILL & KELLY LLP


By:  */s/ Richard B. Kendall*
     Richard B. Kendall (90072)
     rkendall@kbkfirm.com
     Patrick J. Somers (318766)
     psomers@kbkfirm.com
     Nicholas F. Daum (236155)
     ndaum@kbkfirm.com
     Sarah E. Moses (291491)
     smoses@kbkfirm.com
     10100 Santa Monica Blvd., Suite 1725
     Los Angeles, California 90067
     Telephone: 310.556.2700
     Facsimile: 310.556.2705

     Attorneys for Plaintiff
     CREATIVE ARTISTS AGENCY, LLC

FIRST CONSOLIDATED COMPLAINT