Stephen P. Berzon (SBN 46540)
sberzon@altber.com
Stacey Leyton (SBN 203827)
sleyton@altber.com
P. Casey Pitts (SBN 262463)
cpitts@altber.com
Rebecca C. Lee (SBN 305119)
rlee@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

*Attorneys for Defendants and Counterclaimants*
*(Additional counsel on following page)*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, CREATIVE ARTISTS AGENCY, LLC and UNITED TALENT AGENCY, LLC,<br><br>    Plaintiffs and Counterclaim Defendants,<br><br>    v.<br><br>WRITERS GUILD OF AMERICA, WEST, INC. and WRITERS GUILD OF AMERICA, EAST, INC.,<br><br>    Defendants and Counterclaimants,<br><br>and PATRICIA CARR, ASHLEY GABLE, BARBARA HALL, DERIC A. HUGHES, DEIRDRE MANGAN, DAVID SIMON, and MEREDITH STIEHM,<br><br>    Counterclaimants. | Case No. 2:19-cv-05465-AB-AFM<br><br>**DEFENDANTS' ANSWER TO FIRST CONSOLIDATED COMPLAINT AND DEFENDANTS' AND COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS** |

1

1  Anthony R. Segall (SBN 101340)
   asegall@rsglabor.com
2  Juhyung Harold Lee (SBN 315738)
   hlee@rsglabor.com
3  ROTHNER, SEGALL & GREENSTONE
   510 South Marengo Avenue
4  Pasadena, California 91101
   Telephone: (626) 796-7555
5  Facsimile: (626) 577-0124

6  W. Stephen Cannon (*pro hac vice*)
   scannon@constantinecannon.com
7  CONSTANTINE CANNON LLP
   1001 Pennsylvania Ave, NW, Ste. 1300N
8  Washington, DC 20004
   Telephone: (202) 204-3500
9  Facsimile: (202) 204-3501

10 Ethan E. Litwin (*pro hac vice*)
   elitwin@constantinecannon.com
11 CONSTANTINE CANNON LLP
   335 Madison Avenue, 9th Floor
12 New York, NY 10017
   Telephone: (212) 350-2700
13 Facsimile: (212) 350-2701

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

**INTRODUCTION**

1.     This case arises out of efforts by two labor unions representing writers in the entertainment industry to protect their members against talent agencies' unlawful packaging fee practices, which give rise to inherent conflicts of interest between the agencies and the writers they represent and are the product of the agencies' collusive efforts to maintain the profitability of packaging fees through a series of price-fixing agreements and group boycotts.  The agencies' packaging fee practices have, over time, significantly depressed writers' compensation, employment opportunities, and choice of talent for audiovisual entertainment projects, as well as the quality of those projects, while greatly enriching the talent agencies.

2.     Writers are the creative heart of the television and film businesses. They are responsible for providing the stories, plots, dialogue, and other content of television shows and movies that are enjoyed by audiences around the world and that generate billions of dollars in revenue every year.  Without the work and creative content provided by these writers, the television and film industries could not operate.

3.     The base compensation and benefits paid to writers for their work are governed by a collectively-bargained contract between Writers Guild of America, West, Inc. ("WGAW") and Writers Guild of America, East, Inc. ("WGAE") (collectively "Guilds" or "WGA") and hundreds of production companies ("studios") that employ writers.  Because the entertainment industry is a freelance industry, and because writers may negotiate compensation above the minimum levels established by the Guilds' contract with the studios, the vast majority of working writers have historically procured employment through talent agents they have retained to help them find work and negotiate for the best possible compensation.  These agents owe a fiduciary duty to their clients under California

3

law, and must provide their clients with conflict-free representation.

4.      Talent agencies have represented writers for almost a century.  But what began as a service to writers and other artists in their negotiations with the studios has become an unlawful price-fixing cartel dominated by a few powerful talent agencies that use their control of talent first and foremost to enrich themselves.

5.      The traditional role of a talent agent is to procure employment for their clients in exchange for a commission on the client's earnings.  Among other things, California law requires that a talent agent (1) must deposit client salaries in a trust account, which must be disbursed, less the agent's commission, within 30 days; (2) may not divide fees with an employer, an agent, or other employee of an employer; and (3) may not refer a client to any business in which the talent agency has a financial interest.[1]    These statutory requirements were further enhanced by agreement with the Guilds.

6.      Historically, the agents whom writers retained were compensated by receiving only commissions on any payments made to the writers by studios for work that the agents helped them procure.  By calculating the agents' compensation as a percentage of the writers' compensation, commissions aligned the interests of the agents with the interests of their writer-clients, as required by black letter agency law principles.

7.      Today, however, the three largest talent agencies—Counterclaim Defendants William Morris Endeavor Entertainment ("WME"), Creative Artists Agency ("CAA"), and United Talent Agents ("UTA") (collectively, the "Agencies") —make money not by maximizing their clients' earnings and charging a commission, but by bundling the representational services sold to writers and other talent with services provided to studios and collecting what are known as "packaging

---

[1] Cal. Labor Code, §§17400.25(a), 17400.39, 17400.40(b).

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

fees."   Packaging fee amounts are not directly tied to the Agencies' clients' compensation but instead come directly from television series and film production budgets and profits.

8.     The power exerted by the Agencies in Hollywood is enormous and pervasive.  Even the Hollywood studios—powerful entities in their own right— agree to pay hundreds of millions of dollars in packaging fees annually to the Agencies for what, according to industry insiders, "amounts to extortion,"[2] because they are "afraid of not getting pitches and opportunities if they take a hard line against [packaging fees]."[3]   The studios, like everyone else in Hollywood, "[are] afraid to challenge the agencies for fear of being blackballed."[4]

9.     Near uniform agent compensation via packaging fees among the Agencies is possible because, after substantial consolidation within the industry, the Agencies now control access to the lion's share of the key talent necessary to create a new television show or feature film, including not only writers but also actors and directors.  The Agencies leverage their dominant position in the supply of talent to negotiate packaging fees with television and film studios.  When an agency collects a packaging fee, it bundles its compensation for the representational services provided to talent included in that package as part of the packaging fee.  And where an agency collects a packaging fee, it has historically been contractually precluded from also collecting a commission from its clients, so as to avoid earning "double

---

[2] Gavin Polone, *TV's Dirty Secret: Your Agent Gets Money for Nothing*, The Hollywood Reporter (Mar. 26, 2015), https://www.hollywoodreporter.com/news/gavin-polone-tvs-dirty-secret-783941.

[3] David Ng, *Talent agencies are reshaping their roles in Hollywood.  Not everyone is happy about that*, L.A. Times (Apr. 6, 2018), https://www.latimes.com/business/hollywood/la-fi-ct-talent-agencies-20180406-story.html.

[4] *Id.*

commissions." The Agencies pursue packaging fees "über alles" because the Agencies now make the vast majority of their revenues from packaging fees, which are far more lucrative than simple commissions.[5]

10. Rather than compete with each other, the Agencies and their co-conspirators have instead collusively agreed to propose the same packaging fee terms to studios. Specifically, the Agencies agreed to propose packaging fees pursuant to the so-called "3-3-10" model described herein. The Agencies and their co-conspirators have further agreed to propose the same "base license fees" used to calculate the upfront 3% packaging fee. For years, the fact, scope, and degree of these collusive agreements were successfully kept secret from the Guilds and their members.

11. Packaging fees have created numerous conflicts of interest between writers and the Agencies, wherein the Agencies enrich themselves at their writer-clients' expense, in most cases without those clients' knowledge and in all cases without their valid consent. Unlike in a commission-based system, the economic interests of the agents at CAA, UTA, and WME that represent writers and other creative talent are no longer aligned with those of their writer-clients. Instead of seeking to maximize how much writers are paid for their work, the Agencies are incentivized to maximize the packaging fee they will be paid for a particular project or program. For example, the Agencies have the incentive to, and do, prioritize the studios' interests over those of their clients in order to protect their continuing ability to negotiate new packaging fees from those studios. Moreover, because packaging fees are generally tied to a show's profits, the Agencies have an incentive to *reduce* the amount paid to writers and other talent for their work on a show. Further, each of the Agencies seeks to prevent the writers it represents from working with talent

---

[5] James Andrew Miller, *Powerhouse: The Untold Story of Hollywood's Creative Artists Agency* 169 (2016).

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

represented by other talent agencies in order to avoid having to split the packaging fee with other talent agencies—even where the project would benefit from enabling writer creative choices by not restricting the available talent pool.  The Agencies also pitch writers' work to the studios they believe will agree to the most lucrative packaging fees, rather than to the companies that will pay the most to their writer-clients.  The Agencies have never disclosed to their writer-clients the material facts relevant to these conflicts of interest or the details of their packaging fee agreements.

12.   The Agencies' collusive agreements and their conflicts of interest have resulted in tremendous financial harm to the Guilds and their members, including individual Counterclaimants Patricia ("Patti") Carr, Ashley Gable, Barbara Hall, Deric A. Hughes, Deirdre Mangan, David Simon, and Meredith Stiehm (collectively, the "Individual Counterclaimants"). When talent representational services are paid for as part of a packaging fee, Guild members pay too much for those services.  Packaging fees have depressed Guild members' compensation, as money that would otherwise be paid to writers is instead paid to the Agencies as part of the packaging fee or is left on the table.  Guild members have also lost employment opportunities as a result of agency packaging and, where they are hired, have an artificially reduced universe of talent from which to staff their shows. Packaging fees also reduce, dollar for dollar, the production budget for a project and, accordingly, can and do diminish the quality of the finished product.  Because of the conflicts of interest created by packaging fees, Guild members have also been required to retain other professionals (such as lawyers and personal managers) to monitor their agents, protect the writers' interests, and provide conflict-free services that agents should otherwise provide.

13.   Because the Guilds are the exclusive representatives of writers under federal labor law, talent agents may represent individual writers to negotiate above-scale employment *only* pursuant to the Guilds' delegated authority.  Historically, the

7

Guilds have delegated that authority through a franchise agreement. And as a condition of being franchised, agents are and have been for decades subject to regulations promulgated by the Guilds. Labor law permits the Guilds to dictate in such regulations, among other things, how and how much agents may be paid for the representational services sold to Guild members.

14.     In April 2018, in part in response to the inherent conflicts of interest created by packaging fees, the Guilds served notice on the agencies of their intent to terminate the Artists' Managers Basic Agreement ("AMBA"), the franchise agreement negotiated with the Association of Talent Agents ("ATA") that had historically governed the relationship between writers and their agents. At the same time, the Guilds submitted to the ATA a set of proposals for a new franchise agreement with talent agencies. A critical aspect of these proposals was the Guilds' insistence that franchised agents no longer accept packaging fees from studios on projects where the agency represents a writer-client. The Guilds subsequently formalized these proposals in a new Code of Conduct for franchised agents.

15.     The Agencies collectively responded to the Guilds through the ATA, categorically rejecting the Guilds' demands and questioning the well-established principle that writers may collectively agree "to use only agents who have been 'franchised' by [the Guilds]" and that, "in turn, as a condition of franchising, the [Guilds] may require agents to agree to a code of conduct and restrictions on terms included in agent-[writer] contracts." *Marathon Entm't, Inc. v. Blasi*, 42 Cal.4th 974, 983 (2008).

16.     The ATA categorically refused to negotiate any terms that would end talent agencies' acceptance of packaging fees on projects where their writer-client is employed or any other practices giving rise to similar conflicts of interest. Accordingly, following a June 7, 2019 meeting with the ATA, the Guilds revoked their consent to collective negotiations through the ATA, announcing that they

would only negotiate with individual agencies going forward.  That revocation of consent meant that the ATA and its members, including the Agencies, were no longer covered by federal antitrust law's "labor exemption," which immunizes certain labor union conduct and grants a limited derivative exemption to other entities to negotiate with labor unions.

17.    After the Guilds' revocation of consent to multi-agency negotiations, the Agencies and their co-conspirators unlawfully and collusively circled their wagons inside the ATA—a trade association comprised entirely of competing sellers of talent representational services—and publicly threatened to retaliate against any agency that broke ranks and concluded an individual deal with the Guilds.  Despite the Guilds' revocation of consent, the Agencies and their co-conspirators have continued to collusively discuss and plan their negotiations with the Guilds, and to coordinate with respect to their dealings with the Guilds, through the ATA, in violation of the antitrust laws.

18.    The Agencies have also colluded to blacklist former clients who seek unconflicted representation by agents that have agreed to abide the Guild's Code of Conduct, harming the Guilds and their members, in violation of the antitrust laws.

19.    Counterclaimants bring these counterclaims to end the Agencies' harmful and unlawful packaging fee practices on projects where their writer-client is employed, to end their collusive fixing and preservation of those packaging fees, and to seek compensation for the injuries suffered as a result of these practices.  *First*, as asserted in Counterclaimants' first through fourth claims for relief, the Agencies and their co-conspirators have engaged in unlawful *per se* price fixing and unlawful *per se* group boycotts in violation of the Sherman Act, 15 U.S.C. §1 *et seq.*, and the Cartwright Act, California Business and Professions Code §16700 *et seq.*  *Second*, as asserted in Counterclaimants' fifth claim for relief, the Agencies' packaging fees violate the fiduciary duty that agents owe to their writer-clients and deprive them of

9

the conflict-free representation to which they are entitled. *Third*, as asserted in Counterclaimants' sixth claim for relief, the Agencies' breaches of their fiduciary duty to their writer-clients also constitute constructive fraud under California Civil Code §1573. *Fourth*, as set forth in Counterclaimants' seventh claim for relief, for these reasons, and because the payments made from studios to the Agencies as part of any package constitute unlawful kickbacks from an employer to a "representative of any of his employees" prohibited by Section 302 of the federal Labor-Management Relations Act, 29 U.S.C. §186(a)(1), packaging fees are an unlawful or unfair business practice for the purposes of the California Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et seq.* ("UCL"). *Fifth*, as set forth in Counterclaimants' eighth through eleventh claims for relief, the Agencies' repeated Section 302 violations also constitute an unlawful "pattern of racketeering activity" within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962 *et seq.* ("RICO").

20.     Packaging fees should therefore be declared unlawful and the Agencies should be enjoined from continuing to seek or receive them on projects where their writer-client is employed, Counterclaimants should be awarded disgorgement of unlawful profits, the costs of suit, and reasonable attorneys' fees, and the Individual Counterclaimants should further be awarded restitution and damages. The Agencies should further be enjoined from jointly seeking with each other or with any other talent agency to negotiate, or strategizing with each other or with any other talent agency regarding their individual negotiations, with the Guilds, absent the Guilds' express consent to do so.

## ANSWER TO FIRST CONSOLIDATED COMPLAINT

Defendants and Counterclaimants WGAW and WGAE hereby answer the First Consolidated Complaint ("FCC") of Plaintiffs and Counterclaim Defendants WME, CAA, and UTA as follows:

10

21.   The Guilds admit that the FCC alleges that the Guilds violated antitrust law and that the Agencies do not join in all claims set forth in the FCC. The Guilds deny the remaining allegations in the preamble and Paragraph 1.

22.   The Guilds admit that a variety of talent agencies and talent agents represent writers for work on television and film productions.  The Guilds further admit that certain talent agencies and talent agents compete with one another.  The Guilds also admit that writers may choose and change their agents, and that agents may choose and change the writers they represent.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 2, and on that basis deny the remaining allegations therein.

23.   In response to Paragraph 3, the Guilds admit that WGAW and WGAE are labor unions that serve as the exclusive collective bargaining representatives of certain writers in the entertainment industry, including writer-showrunners. The Guilds further admit that, until on or around April 12, 2019, they previously franchised WME, CAA, and UTA to represent Guild members in individual employment negotiations with television and film studios.

24.   The Guilds admit that they have adopted a "Code of Conduct" for talent agencies that represent writers for work covered by a Guild collective bargaining agreement, and that Exhibit A to the FCC contains this Code of Conduct.  The Guilds affirmatively allege that the text of the Code of Conduct is the best evidence of its contents.  The Guilds also admit that, as a result of the refusal by WME, CAA, UTA, and certain other agencies to sign the Code of Conduct, approximately 7,000 Guild members have chosen to terminate their representation by those agencies with respect to work covered by a Guild collective bargaining agreement.  The Guilds deny the remaining allegations in Paragraph 4.

25.   Paragraph 5 states legal conclusions to which no response is required.

11

To the extent a response to any allegations in Paragraph 5 is required, the Guilds admit that they are entitled to assert a statutory and non-statutory labor exemption to federal antitrust law, and deny the remainder of the allegations in Paragraph 5.

26.     The Guilds admit that certain television shows and movies are packaged by talent agencies.  The Guilds deny the remaining allegations in Paragraph 6.

27.     The Guilds admit that that they granted a limited delegation of their authority to lawyers and managers.  The Guilds deny the remaining allegations in Paragraph 7.

28.     The Guilds deny the allegations in Paragraph 8.

29.     The Guilds admit that they have a legitimate interest in protecting their members from the adverse effects of talent agencies' and talent agents' conflicts of interests, including by ensuring that potential and actual conflicts of interests are disclosed and addressed.  The Guilds lack knowledge or information sufficient to respond to the categorical allegations regarding the motivations of writers who participate in packaging and/or seek opportunities from agency-affiliated content companies, and on that basis deny those allegations.  The Guilds deny the remaining allegations in Paragraph 9.

30.     The Guilds deny the allegations in Paragraph 10.

31.     The Guilds admit that WGAW President David Goodman made the statements quoted in Paragraph 11, but deny the Agencies' characterization of those statements.  The Guilds further admit that they have sought to protect their members from the harm caused by packaging-related conflicts of interest.  The Guilds deny the remaining allegations in Paragraph 11.

32.     The Guilds deny the allegations in Paragraph 12.

33.     The Guilds lack knowledge or information sufficient to respond to the categorical allegation regarding the perception of talent agencies as "powerful,"

12

and on that basis deny that allegation.  The Guilds deny the remaining allegations in Paragraph 13.

34.     The Guilds deny the allegations in Paragraph 14; deny that the Guilds are liable to WME, CAA, or UTA; and deny that WME, CAA, or UTA is entitled to any relief.

35.     The Guilds deny the allegations in Paragraph 15, deny that the Guilds are liable to CAA or UTA, and deny that CAA or UTA is entitled to any relief.

36.     The Guilds admit that WME is a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Los Angeles County, California.  The Guilds further admit that the William Morris Agency ("WMA") is a predecessor of WME, and that WMA and Endeavor merged to form WME in 2009.  The Guilds also admit that WME is a talent agency that represents certain writers for work on television and film productions.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 16, and on that basis deny the remaining allegations therein.

37.     The Guilds admit that CAA is a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Los Angeles County, California.  The Guilds further admit that CAA is a talent agency that represents certain writers for work on television and film productions.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 17, and on that basis deny the remaining allegations therein.

38.     The Guilds admit that UTA is a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Los Angeles County, California.  The Guilds further admit that UTA is a talent agency that represents certain writers for work on television and film productions.  The Guilds also admit that UTA employs talent agents who secure employment and

perform other services for their clients. The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 18, and on that basis deny the remaining allegations therein.

39. The Guilds admit that WME, CAA, and UTA are three of the largest talent agencies in Hollywood. The Guilds further admit that WME, CAA, and UTA represented talented writers, and that the Guilds have referred to WME, CAA, UTA, and ICM as the "Big Four" talent agencies. The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 19, and on that basis deny the remaining allegations therein.

40. The Guilds admit the allegations in Paragraph 20.

41. The Guilds admit the allegations in Paragraph 21.

42. The Guilds deny that they entered into a "collective bargaining agreement" with the Alliance of Motion Picture and Television Producers, Inc. ("AMPTP"). The Guilds admit that Exhibit B to the FCC contains excerpts of the Writers Guild Theatrical and Television Basic Agreement ("MBA") negotiated by the Guilds and the AMPTP. The Guilds admit the remaining allegations in Paragraph 22.

43. The Guilds admit that they have adopted a Code of Conduct for talent agencies that represent writers for work covered by a Guild collective bargaining agreement. The Guilds further admit that WME, CAA, UTA, and certain other agencies have refused to sign the Code of Conduct. The Guilds deny the remaining allegations in Paragraph 23.

44. The Guilds admit that federal labor law empowers them to serve as their members' exclusive collective bargaining representatives and to designate agents who may represent the Guilds' members in individual employment negotiations with production studios. The Guilds further admit that such

negotiations are subject to limitations set forth in the MBA.  The Guilds deny the remaining allegations in Paragraph 24.

45.    The Guilds admit that, during the period from September 22, 1976, through April 12, 2019, they were parties to the AMBA with the ATA, previously known as the Artists' Managers Guild, and that Exhibit C to the FCC contains the AMBA.  The Guilds affirmatively allege that the text of the AMBA is the best evidence of its contents.  The Guilds also admit that, pursuant to the AMBA, the Guilds previously designated WME, CAA, UTA, and certain other talent agencies as authorized to represent the Guilds' members in individual employment negotiations with members of the AMPTP.  The Guilds further admit that, commencing on or around April 13, 2019, the Guilds no longer designate WME, CAA, and UTA as talent agencies that may represent the Guilds' members in individual employment negotiations with members of the AMPTP as to work covered by a Guild collective bargaining agreement.  The Guilds deny the remaining allegations in Paragraph 25.

46.    In response to Paragraph 26, the Guilds admit that this Court has subject-matter jurisdiction over the instant action.

47.    The Guilds admit that WGAW resides in this judicial district and that this Court has personal jurisdiction over WGAW for purposes of the instant action. The Guilds further admit that WGAE is a corporation that transacts business and performs services on behalf of its members in this judicial district; that WGAE worked with WGAW to attempt to negotiate a new franchise agreement with the ATA in this judicial district; and that this Court has personal jurisdiction over WGAE for purposes of the instant action.  The Guilds deny the remaining allegations in Paragraph 27.

48.    The Guilds admit that venue is proper in this judicial district; that the WGAW and WGAE are subject to this Court's personal jurisdiction; and that a

15

substantial part of events described in the FCC occurred in this judicial district. The Guilds deny that the Agencies are entitled to any of the relief they seek in the FCC and deny the remaining allegations in Paragraph 28.

49.     The Guilds admit the allegations in Paragraph 29.

50.     The Guilds lack knowledge or information sufficient to respond to the categorical allegations regarding the standing of WME, CAA, and UTA in the talent-agency industry, and the likelihood of clients remaining with a talent agency that places its own interests before its clients.  On that basis, the Guilds deny those allegations.  The Guilds deny the remaining allegations in Paragraph 30.

51.     In response to Paragraph 31, the Guilds admit that "packaging" refers to a practice by which a talent agency presents one or more elements of a production to a production studio, for which the agency typically receives a "packaging fee" from the studio.  The Guilds further admit that talent agencies may continue to package additional elements of a production and provide other services during the life of the production.  The Guilds deny that packaging is a necessary means of producing television or film projects.  The Guilds further deny that any differences between the nature of packaging fees in the television industry as compared to the film industry are material for purposes of the Guilds' Code of Conduct.  To the extent a response to any remaining allegations in Paragraph 31 is required, the Guilds deny those allegations.

52.     The Guilds admit that talent agencies spend time and resources searching for and fostering new talent, and helping their clients find employment in the television industry.  The Guilds deny that packaging is a necessary means of producing television or film projects.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 32, and on that basis deny the remaining allegations therein.

53.     The Guilds admit that studios may want to invest in projects that have

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

the best possible mix of talent and to have a pipeline of talent readily available for a program's continued production, but deny that packaging is a necessary means of achieving those goals.  The Guilds lack knowledge or information sufficient to respond to the hypothetical allegations regarding "an unknown writer's brilliant story idea," and on that basis deny those allegations.  The Guilds deny the remaining allegations in Paragraph 33.

54.    The Guilds admit that production studios have an interest in reducing the costs of producing television programming.  The Guilds deny the remaining allegations in Paragraph 34.

55.    The Guilds admit that under the now-expired AMBA, writers employed to work on packaged productions could not be required to pay 10% commission to their talent agents.  The Guilds further admit that talent agencies have presented creative elements of television and film projects to production studios.  The Guilds deny the remaining allegations in Paragraph 35.

56.    The Guilds deny that agencies' packaging fees are subject to unlimited, production-by-production negotiation, or that agencies always refrain from charging clients on packaged programs a commission.  The Guilds admit the remaining allegations in Paragraph 36.

57.    The Guilds admit that agency packaging involves putting together one or more elements of a television or film production to be sold to studios.  The Guilds deny the remaining allegations in Paragraph 37.

58.    The Guilds admit that packaging is an important part of the Agencies' businesses, and that an agency's packaging fee may not be directly correlated with how many of the agency's clients are included in the initial package or are later hired to work on the packaged production.  The Guilds further admit that a minority of television shows generate back-end fees.  The Guilds deny that packaging is a necessary means of producing television or film projects and deny

17

that agencies' collection of packaging fees does not affect writers' compensation. The Guilds lack knowledge or information sufficient to respond to the categorical allegation regarding the degree to which agency packaging is a risky business practice, and on that basis deny that allegation. To the extent a response to any remaining allegations in Paragraph 38 is required, the Guilds deny those allegations.

59. The Guilds admit that agencies may not directly negotiate over their clients' compensation as part of their packaging deals, but deny that the agencies' collection of packaging fees does not affect the terms and conditions of their clients' employment. The Guilds further deny that packaging deals between studios and agencies are subject to unlimited, production-by-production negotiation. To the extent a response to any remaining allegations in Paragraph 39 is required, the Guilds deny those allegations.

60. The Guilds admit that the Agencies may provide the services enumerated in Paragraph 40 and that such services may be beneficial to certain writers, but deny that the Agencies may only provide such services on packaged productions and deny that the Agencies' provision of such services is necessary for the production of any television or film project. The Guilds deny the remaining allegations in Paragraph 40.

61. The Guilds admit that agencies engage in joint packaging. The Guilds deny the remaining allegations in Paragraph 41.

62. The Guilds admit that certain writers may want to benefit from meeting with and being paired with in-demand directors and actors, but deny that writers benefit from agencies' receipt of packaging fees for performing these services. The Guilds deny the remaining allegations in Paragraph 42.

63. On information and belief, the Guilds admit that the standard packaging-fee arrangement provides for a license fee, a deferred license fee, and a

percentage of profits.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 43, and on that basis deny the remaining allegations therein.

64.    The Guilds admit that they have previously stated that talent agencies negotiate their packaging fees from a common starting point of a 3% upfront fee, 3% deferred fee, and 10% back-end fee.  The Guilds further admit that Exhibit M to the FCC is a document prepared and adopted by the Guilds, and that the exhibit contains the statements by WGAW President David Goodman quoted in Paragraph 44, but deny the Agencies' characterization of those statements.  The Guilds also admit that a minority of television programs generate back-end fees.  The Guilds lack knowledge and information sufficient to respond to the categorical allegations about packaging terms, and on that basis deny those allegations.  The Guilds deny the remaining allegations in Paragraph 44.

65.    The Guilds admit that they oppose the representation of their members by talent agencies that are compensated for that representation through packaging fees because of the conflicts of interest inherent in the practice.  To the extent a response to any remaining allegations in Paragraph 45 is required, the Guilds deny those allegations.

66.    The Guilds admit that, during the time period from on or around September 22, 1976, until on or around April 12, 2019, the provision of the AMBA cited in Paragraph 46 provided that talent agencies could not collect a commission from writers in addition to collecting a packaging fee.  The Guilds deny the remaining allegations in Paragraph 46.

67.    The Guilds deny the allegations in Paragraph 47.

68.    The Guilds deny the allegations in Paragraph 48.

69.    The Guilds admit that a minority of television programs generate back-end fees.  The Guilds further admit that under a packaging-fee model, writers

19

are not supposed to pay a 10% commission on their employment income, and that under a commission model, they do pay such a commission.  The Guilds deny the remaining allegations in Paragraph 49.

70.     The Guilds admit that an agency's upfront packaging fee is part of a studio's overall expenses on a production  and may not be directly correlated with the number of agency clients in the package.  The Guilds deny that the Agencies' collection of such a fee has no effect on the compensation paid by studios to writers.  The Guilds further deny that writers categorically receive more compensation or otherwise benefit under a packaging-fee model as compared to a traditional-commission model of agency compensation.  The Guilds also deny that agencies prefer a packaging-fee model because it presents more attractive opportunities to their clients than a traditional-commission model.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 50, and on that basis deny the remaining allegations therein.

71.     The Guilds admit that a majority of television programs do not generate back-end fees.  The Guilds further admit that WME, CAA, and UTA may receive more compensation by collecting packaging fees than by collecting a traditional commission.  The Guilds deny the remaining allegations in Paragraph 51.

72.     The Guilds admit that when WME, CAA, and UTA receive back-end proceeds in a packaging deal, writers, including showrunners, may also receive back-end proceeds.  The Guilds deny the remaining allegations in Paragraph 52.

73.     In response to Paragraph 53, the Guilds deny that the Agencies' collection of back-end packaging fees does not affect the compensation received by writers.  To the extent a response to any remaining allegations in Paragraph 53 is required, the Guilds deny those allegations.

74.     The Guilds deny the allegations in Paragraph 54.

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

75.     The Guilds admit that agents may consider, among other factors, their clients' overall compensation or desires when pitching programs to production entities.  The Guilds further admit that the terms and conditions of writers' employment with production entities may vary.  The Guilds also admit that certain writers are represented by entertainment attorneys who are familiar with the existence of packaging.  The Guilds deny the remaining allegations in Paragraph 55.

76.     The Guilds deny the allegations in Paragraph 56.

77.     The Guilds admit that their prohibition on the collection of packaging fees may impact how certain television series are developed, but deny that such prohibition will lead to a reduction in the output of television shows or feature films.  The Guilds admit the remaining allegations in Paragraph 57.

78.     The Guilds admit that Exhibit D to the FCC contains a document prepared and distributed by the Guilds and that the document contains the statement quoted in Paragraph 58.  The Guilds further admit that their prohibition on the collection of packaging fees may impact actors, directors, and the production businesses of studios.  The Guilds deny the remaining allegations in Paragraph 58.

79.     The Guilds admit that Exhibit E to the FCC contains a document prepared and distributed by the Guilds and that Exhibit D and Exhibit E contain the statements quoted in Paragraph 59.  The Guilds further admit that their members, including showrunners, are prohibited from being represented for MBA-covered employment by talent agencies that have not signed the Code of Conduct.  The Guilds deny the remaining allegations in Paragraph 59.

80.     The Guilds admit that the Agencies have represented shows, films, and clients who are producers and financiers of television and film content.  The Guilds deny the remaining allegations in Paragraph 60.

81.     The Guilds admit that WME's parent company, Endeavor, formed Endeavor Content in 2017.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 61, and on that basis deny the remaining allegations therein.

82.     The Guilds admit that WME is affiliated with Endeavor Content.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 62, and on that basis deny the remaining allegations therein.

83.     The Guilds lack knowledge or information sufficient to respond to the allegations in Paragraph 63, and on that basis deny the allegations therein.

84.     The Guilds deny that WME's corporate affiliation with Endeavor Content is known to all of its writer-clients.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 64, and on that basis deny the remaining allegations therein.

85.     The Guilds admit that CAA is a shareholder in a recently founded television studio known as wiip Productions, LLC ("wiip").  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 65, and on that basis deny the remaining allegations therein.

86.     The Guilds admit that CAA owns an interest in wiip and that Paul Lee, a long-time television industry executive, serves in a leadership capacity for wiip.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 66, and on that basis deny the remaining allegations therein.

87.     The Guilds deny that no CAA client has ever entered into a transaction with wiip that has created an actual conflict of interest.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 67, and on that basis deny the remaining allegations therein.

22

88.     The Guilds admit that in or around late 2018, UTA entered into an affiliation with a television studio known as Media Rights Capital ("MRC") and/or Civic Center Media ("Civic Center").  The Guilds further admit that UTA receives a financial interest in a portfolio of shows produced and financed by MRC.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 68, and on that basis deny the remaining allegations therein.

89.     The Guilds admit that Civic Center has an alternative structure from Endeavor Content or wiip and that UTA's arrangement with Civic Center has resulted in the production and/or development of at least one new television series.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 69, and on that basis deny the remaining allegations therein.

90.     The Guilds admit that UTA is not required to send its clients to Civic Center and that MRC and Civic Center may hire clients of agencies other than UTA and purchase shows not packaged or co-packaged by UTA.  The Guilds further admit that UTA may market projects to Civic Center and to other production entities.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 70, and on that basis deny the remaining allegations therein.

91.     The Guilds admit that Endeavor Content, wiip, and Civic Center are alternatives to, and competitors of, each other and other members of the AMPTP.  The Guilds deny that the activities of Endeavor Content, wiip, and Civic Center categorically benefit writers.  The Guilds lack knowledge or information sufficient to respond to the remaining allegations in Paragraph 71, and on that basis deny the remaining allegations therein.

92.     The Guilds admit that the terms and conditions of writers'

23

employment with talent-agency affiliates may differ from other studios.  The Guilds further admit that Exhibit D to the FCC contains the statement quoted in Paragraph 72.  To the extent a response to any remaining allegations in Paragraph 72 is required, the Guilds deny those allegations.

93.    The Guilds admit that "public reports" have indicated that the Guilds Negotiating Committee Co-Chair and former WGAW President Chris Keyser is the executive producer on a packaged project with Endeavor Content.  The Guilds further admit that Keyser made the statement quoted in Paragraph 73.  The Guilds also admit that Endeavor Content has previously produced a project by WGAE President Beau Willimon.  To the extent a response to any remaining allegations in Paragraph 73 is required, the Guilds deny those allegations.

94.    The Guilds admit that certain writers who have performed MBA-covered work for Endeavor Content, wiip, or Civic Center are not represented by WME, CAA, or UTA, respectively; that certain writers have performed work for a production affiliate other than the production company affiliated with their talent agency; and that certain other writers have not performed work for any production affiliates.  The Guilds further admit that certain writers may change the agencies that represent them, and that certain writers may choose the content companies with which they want to work.  The Guilds deny the remaining allegations in Paragraph 74.

95.    The Guilds deny the allegations in Paragraph 75.

96.    The Guilds deny the allegations in Paragraph 76.

97.    The Guilds admit the allegations in Paragraph 77.

98.    The Guilds deny that the AMBA expressly endorsed packaging.  In response to the allegation that the AMBA did not prohibit franchised agencies from having content affiliates, the Guilds admit that the AMBA did not contain an express provision regarding content affiliates.  The Guilds admit the remaining

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

allegations in Paragraph 78.

99.   The Guilds admit that the AMBA contained the language quoted in Paragraph 79.  To the extent a response to any remaining allegations in Paragraph 79 is required, the Guilds deny those allegations.

100.   The Guilds admit that the AMBA provided for the arbitration of certain disputes.  The Guilds further admit that the AMBA provided for the appointment of a standing committee to consider and recommend proposed changes to the agreement, and that such a committee was not appointed.  The Guilds lack knowledge or information sufficient to respond to the allegation regarding claims under the AMBA against the Agencies, and on that basis deny that allegation.  To the extent a response to any remaining allegations in Paragraph 80 is required, the Guilds deny those allegations.

101.   The Guilds admit that package terms, packaging fees, and the extent of packaging have evolved over time.  The Guilds further admit that they oppose the representation of their members by talent agencies that are compensated for that representation through packaging fees because of the conflicts of interest inherent in that practice.  The Guilds also admit that WGAW President David Goodman made the statement quoted in Paragraph 81.  The Guilds deny the remaining allegations in Paragraph 81.

102.   The Guilds admit that they have a duty under federal labor law to represent their members fairly.  The Guilds further admit that the AMBA did not contain an express provision regarding agency content affiliates.  The Guilds deny the remaining allegations in Paragraph 82.

103.   The Guilds deny the allegations in Paragraph 83.

104.   The Guilds admit that the Code of Conduct prohibits the representation of their members by talent agencies that are compensated for that representation through packaging fees.  The Guilds deny the remaining allegations

in Paragraph 84.

105. The Guilds admit that they provided a termination notice under the AMBA in April 2018. The Guilds further admit that WGAW President David Goodman made the statement quoted in Paragraph 85, but deny the Agencies' characterization of that statement. The Guilds also admit that they oppose the representation of their members by talent agencies that are compensated for that representation through packaging fees and/or engaged in affiliated content production because of the conflicts of interest inherent in those practices. The Guilds deny the remaining allegations in Paragraph 85.

106. The Guilds admit that they discussed a successor agreement to the AMBA with the Agencies and the ATA. The Guilds further admit that, as part of these discussions, the Guilds, the Agencies, and the ATA discussed packaging and agency-content affiliates. The Guilds deny the remaining allegations in Paragraph 86.

107. The Guilds admit that their negotiating-committee members met with ATA negotiating-committee members on or around February 5, 2019, and that the ATA negotiating committee included representatives from the Agencies. The Guilds further admit that, during this meeting, the Guilds' negotiating-committee members discussed the Guilds' proposals and answered questions from ATA negotiating-committee members. The Guilds deny the remaining allegations in Paragraph 87.

108. The Guilds admit that the Guilds' negotiating-committee members met with ATA negotiating-committee members on or around February 19, 2019. The Guilds further admit that, at this meeting, members of both negotiating committees discussed packaging and content affiliates. The Guilds deny the remaining allegations in Paragraph 88.

109. The Guilds admit that the cited speech by WGAW President David

26

Goodman is publicly available and that the speech contained the statements in Paragraph 89, but deny the Agencies' characterization of those statements. The Guilds further admit that the Agencies are three of the most prominent talent agencies in Hollywood, and that a significant number of talent agencies have signed the Guilds' Code of Conduct. The Guilds deny the remaining allegations in Paragraph 89.

110. The Guilds admit that on or around February 21, 2019, they circulated a draft version of their Code of Conduct to then-franchised talent agencies, and that this version of the Code of Conduct established certain standards for agencies that represent Guild members for work covered by a Guild collective bargaining agreement. The Guilds further admit that this version of the Code of Conduct established that such agencies could not collect packaging fees in exchange for their representation of writer-clients; could not maintain an ownership stake or affiliation with entities that employ writer-clients; and were required to share certain information with the Guilds regarding their representation of writer-clients. The Guilds also admit that the ATA expressed its opposition to the terms of this version of the Code of Conduct. The Guilds deny the remaining allegations in Paragraph 90.

111. The Guilds admit that, on or around March 4, 2019, they made the statement quoted in Paragraph 91. The Guilds further admit that that they continued to meet with the ATA regarding the Code of Conduct after March 4, 2019, and that the ATA did not sign the Code of Conduct as a result of these meetings. The Guilds deny the remaining allegations in Paragraph 91.

112. The Guilds admit that their negotiating committee did not accept the ATA's March 12, 2019 proposal for a successor agreement to the AMBA, which the ATA referred to as a "Statement of Choice." The Guilds lack knowledge or information sufficient to respond to the allegation that the ATA met with hundreds

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

of writer-clients, and on that basis deny that allegation.  The Guilds deny the remaining allegations in Paragraph 92.

113.   The Guilds admit that on or around March 14, 2019, their negotiating committee proposed a "WGA Franchise Agreement" to replace the AMBA, and that this proposed agreement established certain standards for agencies that represent Guild members for work covered by a Guild collective bargaining agreement.  The Guilds further admit that the proposed WGA Franchise Agreement established that such agencies could not collect packaging fees in exchange for their representation of writer-clients and could not maintain an ownership stake or affiliation with entities that employ writer-clients.  The Guilds also admit that the ATA negotiating committee rejected the proposed WGA Franchise Agreement.  The Guilds deny the remaining allegations in Paragraph 93.

114.   The Guilds admit that, on or around March 21, 2019, the ATA negotiating committee submitted to the Guilds' negotiating committee what the ATA described as a comprehensive proposal for a successor agreement to the AMBA.  The Guilds admit the authenticity of Exhibit F to the Complaint.  The Guilds deny the remaining allegations in Paragraph 94.

115.   The Guilds admit that their negotiating committee did not accept the ATA's March 21, 2019 proposal for a successor agreement to the AMBA.  The Guilds deny the remaining allegations in Paragraph 95.

116.   The Guilds admit the allegations in Paragraph 96.

117.   The Guilds admit that they made the statements quoted in Paragraph 97, but deny the Agencies' characterization of those statements.  The Guilds further admit that some Guild members are or have been showrunners.  The Guilds deny that fewer than 50% of Guild members voted to approve implementation of the Code of Conduct.  The Guilds lack knowledge or information sufficient to respond to the allegation regarding the number of Guild members that had agents

28

1    at the time that the vote took place, and on that basis deny that allegation.  The

2    Guilds deny the remaining allegations in Paragraph 97.

3         118.   The Guilds deny the Agencies' characterization of the Guilds'

4    conduct as a "group boycott."  The Guilds admit the remaining allegations in

5    Paragraph 98.

6         119.   The Guilds admit that ATA and Guild representatives met and

7    discussed proposals for a successor agreement to the AMBA during the period

8    from April 6, 2019 to on or around April 12, 2019, and that the representatives

9    were unable to reach an agreement.  The Guilds deny the remaining allegations in

10   Paragraph 99.

11        120.   The Guilds admit that, on or around June 7, 2019, ATA negotiating-

12   committee members met with and submitted to members of the Guilds' negotiating

13   committee a proposal for a successor agreement to AMBA.  The Guilds further

14   admit that the Guilds later notified their members that they would not offer a

15   counterproposal at that time.  The Guilds lack knowledge and information

16   sufficient to respond to the categorial allegations regarding the advice that the

17   Agencies dispense to their clients, the Agencies' interests in serving their clients,

18   and the extent to which the Agencies are willing to protect writers.  On that basis,

19   the Guilds deny those allegations.  The Guilds deny the remaining allegations in

20   Paragraph 100.

21        121.   The Guilds admit that on or around June 19, 2019, they indicated that

22   they no longer consented to negotiating a new agency agreement with the ATA,

23   and would negotiate only with individual agencies.  To the extent a response to any

24   remaining allegations in Paragraph 101 is required, the Guilds deny those

25   allegations.

26        122.   The Guilds admit that on or around June 28, 2019, they sent a cease-

27   and-desist letter to WME, CAA, UTA, and other ATA members stating that they

28

29

no longer consented to negotiating a new agency agreement with the ATA.  The Guilds deny the remaining allegations in Paragraph 102.

123.    The Guilds admit that on or around June 27, 2019, they sent a revised version of the Code of Conduct to the Agencies, which is attached to the FCC as Exhibit H.  The Guilds affirmatively allege that the text of Exhibit H is the best evidence of its contents.  The Guilds deny the remaining allegations in Paragraph 103.

124.    The Guilds admit that at least two more agencies have agreed to the Code of Conduct since on or around June 27, 2019.  The Guilds deny the remaining allegations in Paragraph 104.

125.    The Guilds admit that the June 27, 2019 version of the Code of Conduct contained a "Phase-In of Packaging Fee Prohibition" provision, and affirmatively allege that the text of that provision is the best evidence of its contents.  The Guilds deny the remaining allegations in Paragraph 105.

126.    The Guilds deny the allegations in Paragraph 106.

127.    The Guilds deny the Agencies' characterization of the Guilds' conduct as a "group boycott."  The Guilds admit the remaining allegations in Paragraph 107.

128.    The Guilds admit that Exhibit A contains the statements quoted in Paragraph 108.  The Guilds further admit that "motion pictures" refers to work written by writers under the MBA.  The Guilds deny the remaining allegations in Paragraph 108.

129.    The Guilds deny the allegations in Paragraph 109.

130.    The Guilds admit that within less than two weeks of implementing their Code of Conduct, they publicly announced that over 7,000 of their members, including showrunners and other writers, had fired their agents.  The Guilds deny the remaining allegations in Paragraph 110.

30

131.   The Guilds admit that Guild Working Rule 23 provides that members may only be represented by agents who enter into "an agreement with the Guild covering minimum terms and conditions between agents and their writer clients." The Guilds further admit that talent agents who do not agree to such an agreement may not represent the Guilds' members with respect to work covered by the MBA. The Guilds deny the remaining allegations in Paragraph 111.

132.   The Guilds admit that Exhibit E contains the statements quoted in Paragraph 112, but deny the Agencies' characterization of those statements.  The Guilds deny the remaining allegations in Paragraph 112.

133.   The Guilds admit that Exhibit E contains the statement quoted in Paragraph 113, but deny the Agencies' characterization of that statement.  The Guilds further admit that Exhibit I to the FCC is a document prepared by the Guilds and that the exhibit contains the statement quoted in Paragraph 113, but deny the Agencies' characterization of that statement.  The Guilds deny the remaining allegations in Paragraph 113.

134.   The Guilds admit that WGAW President David Goodman made the statement quoted in Paragraph 114, but deny the Agencies' characterization of that statement.  To the extent a response to any remaining allegations in Paragraph 114 is required, the Guilds deny those allegations.

135.   The Guilds admit that their members are required to comply with certain working rules, and that members who fail to comply with those working rules may be subject to disciplinary action under the Guilds' constitutions.  The Guilds deny the remaining allegations in Paragraph 115.

136.   The Guilds admit that their members have a legal right to resign their membership and instead pay a fee to the Guilds to cover the costs of representation.  The Guilds deny the remaining allegations in Paragraph 116.

137.   The Guilds admit that they have adopted a Code of Conduct for talent

agencies that represent their members for work covered by a Guild collective bargaining agreement, and that this Code of Conduct establishes that such agencies may not collect packaging fees in exchange for their representation of writer-clients and may not maintain an ownership stake or affiliation with entities that employ writer-clients. The Guilds further admit that their members, including showrunners, have terminated their representation by WME, CAA, UTA, and certain other agencies that have refused to sign the Code of Conduct for work covered by a Guild collective bargaining agreement. The Guilds deny the remaining allegations in Paragraph 117.

138.   The Guilds admit that some Guild members are showrunners who perform writing services for a television series and function as writers on series they work on. The Guilds further admit that some showrunners are involved in creative, staffing, and budgeting decisions, and that some work performed by some showrunners is not governed by the MBA. The Guilds lack knowledge or information sufficient to respond to Paragraph 118's categorical allegations regarding all showrunners, and on that basis deny those allegations. To the extent a response to any remaining allegations in Paragraph 118 is required, the Guilds deny those allegations.

139.   The Guilds admit that some showrunners are involved in "the creative and business aspects of producing [a] series." The Guilds lack knowledge or information sufficient to respond to Paragraph 119's categorical allegations regarding all showrunners, and on that basis deny those allegations. To the extent a response to any remaining allegations in Paragraph 119 is required, the Guilds deny those allegations.

140.   The Guilds admit that some showrunners are writers and Guild members, and that some showrunners have production responsibilities. The Guilds deny that the bulk of showrunners' work is not covered by the MBA. The Guilds

lack knowledge or information sufficient to respond to Paragraph 120's categorical allegations regarding all showrunners, and on that basis deny those allegations. To the extent a response to any remaining allegations in Paragraph 120 is required, the Guilds deny those allegations.

141. The Guilds admit that some showrunners are involved in hiring decisions. The Guilds lack knowledge or information sufficient to respond to Paragraph 121's categorical allegations regarding all showrunners, and on that basis deny those allegations. To the extent a response to any remaining allegations in Paragraph 121 is required, the Guilds deny those allegations.

142. The Guilds admit that in some showrunner contracts, writing and producing services are broken out separately. The Guilds deny the remaining allegations in Paragraph 122.

143. The Guilds admit that some showrunners may own and control their own production companies; be compensated with a share of a program's profits, which may be affected by a program's budget; take risks; and participate in hiring and supervisory decisions regarding Guild members and members of other guilds. The Guilds lack knowledge or information sufficient to respond to Paragraph 123's categorical allegations regarding all showrunners, and on that basis deny those allegations. To the extent a response to any remaining allegations in Paragraph 123 is required, the Guilds deny those allegations.

144. The Guilds admit the allegations in Paragraph 124.

145. Paragraph 125 states legal conclusions to which no response is required. To the extent a response to any allegations in Paragraph 125 is required, the Guilds deny those allegations.

146. The Guilds admit that the MBA contains the statement quoted in Paragraph 126 and that the MBA does not regulate the compensation that showrunners receive for work in non-writing capacities. The Guilds deny the

remaining allegations in Paragraph 126.

147.   Paragraph 127 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 127 is required, the Guilds deny those allegations.

148.   The Guilds deny the allegations in Paragraph 128.

149.   The Guilds admit that the MBA does not regulate the compensation showrunners receive when working in non-writing capacities.  The Guilds deny the remaining allegations in Paragraph 129.

150.   The Guilds admit that Exhibit E contains the statement quoted in Paragraph 130, but deny the Agencies' characterization of that statement.  The Guilds deny the remaining allegations in Paragraph 130.

151.   The Guilds admit that talent agencies must agree to follow the Code of Conduct in order to represent writers for work covered by a Guild collective bargaining agreement.  The Guilds further admit that, to date, at least 70 talent agencies, including the agencies specifically identified in Paragraph 131, have signed the Code of Conduct or franchise agreements containing substantially similar provisions.  The Guilds deny the remaining allegations in Paragraph 131.

152.   In response to Paragraph 132, the Guilds admit that talent agencies are horizontal competitors and that they compete to sell their representational services to writers.  To the extent a response to any remaining allegations in Paragraph 132 is required, the Guilds deny those allegations.

153.   The Guilds deny the allegations in Paragraph 133.

154.   The Guilds deny the allegations in Paragraph 134.

155.   The Guilds admit that the MBA does not contain an express provision requiring AMPTP members to negotiate only with agents that are designated or franchised by the Guilds, and that the MBA is effective through May 1, 2020.  The Guilds deny the remaining allegations in Paragraph 135.

156.   In response to Paragraph 136, the Guilds deny that they requested that the AMPTP reopen the MBA negotiations.  The Guilds admit that on or around February 4, 2019, they presented to the AMPTP a clause that would have prohibited AMPTP members from negotiating with non-franchised agencies regarding MBA-covered work.

157.   The Guilds admit that, at the February 4, 2019 meeting with the AMPTP, the Guilds' representatives presented to the AMPTP potential amendments to the MBA set forth in Paragraph 137.  The Guilds deny the remaining allegations in Paragraph 137.

158.   The Guilds deny the allegations in Paragraph 138.

159.   The Guilds deny that they threatened litigation against the AMPTP or any of its members as alleged in the last sentence of Paragraph 139.  The Guilds admit that Exhibit G contains the statements quoted in Paragraph 139, but deny the Agencies' characterization of those statements.  The Guilds admit the remaining allegations in Paragraph 139.

160.   The Guilds deny the allegations in Paragraph 140.

161.   The Guilds deny the allegations in Paragraph 141.

162.   In response to Paragraph 142, the Guilds admit that, to date, the AMPTP has not agreed to the proposed amendments to the MBA as requested by the Guilds.  The Guilds further admit that a representative of the AMPTP made the statements quoted in Paragraph 142, but deny the truth of those statements.  To the extent a response to any remaining allegations in Paragraph 142 is required, the Guilds deny those allegations.

163.   The Guilds deny the allegations in Paragraph 143.

164.   Paragraph 144 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 144 is required, the Guilds deny those allegations.

165.   The Guilds admit that on or around March 20, 2019, they sent a letter to managers and lawyers who represent the Guilds' members that contained the statements quoted in Paragraph 145, but deny the Agencies' characterization of those statements.  The Guilds further admit that Exhibit E contains the statement quoted in Paragraph 145.  The Guilds deny the remaining allegations in Paragraph 145.

166.   Paragraph 146 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 146 is required, the Guilds deny those allegations.

167.   The Guilds admit that WGAW Executive Director David Young made the communication quoted in Paragraph 147, but deny the Agencies' characterization of that statement.  To the extent a response to any remaining allegations in Paragraph 147 is required, the Guilds deny those allegations.

168.   The Guilds admit that lawyers or managers representing the Guilds' members in such capacities are not required to sign the Code of Conduct.  The Guilds deny the remaining allegations in Paragraph 148.

169.   In response to the allegations incorporated by reference in Paragraph 149, the Guilds incorporate by reference their responses to those allegations in the preceding paragraphs.  The Guilds deny the remaining allegations in Paragraph 149.

170.   Paragraph 150 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 150 is required, the Guilds admit that the Sherman Act prohibits certain agreements that unreasonably restrict competition and that some such agreements are *per se* illegal, and deny the remaining allegations in Paragraph 150.

171.   Paragraph 151 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 151 is required,

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

the Guilds admit the allegations contained in the first two sentences of Paragraph 151 and deny the remaining allegations therein.

172.   Paragraph 152 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 152 is required, the Guilds admit that Congress has created a statutory labor exemption to federal antitrust law and that this exception applies to the pursuit of legitimate labor union goals, and deny  the remaining allegations in Paragraph 152.

173.   The Guilds deny the allegations in Paragraph 153.

174.   The Guilds deny the allegations in Paragraph 154.

175.   The Guilds lack knowledge or information sufficient to respond to the allegation regarding the extent to which the Agencies dispute the legitimacy of certain Guild regulations, and on that basis deny that allegation.  The Guilds deny the remaining allegations in Paragraph 155.

176.   The Guilds deny the allegations in Paragraph 156.

177.   The Guilds admit that some packaging-related transactions may occur before writers are engaged on a packaged production, but deny that any such transactions do not affect the terms and conditions of writers' employment.  The Guilds deny the remaining allegations in Paragraph 157.

178.   The Guilds admit that their regulation of talent-agent commissions impacts wages and that the AMBA regulated talent-agent commissions.  The Guilds further admit that the Code of Conduct establishes that agencies that represent Guild members for work covered by a Guild collective bargaining agreement may not collect packaging fees in exchange for such representation and may not maintain an ownership stake or affiliation with entities that employ writer-clients.  The Guilds also admit that the MBA does not regulate the terms and conditions of work that showrunners perform in non-writing capacities.  The Guilds deny the remaining allegations in Paragraph 158.

179.   The Guilds admit that preventing talent agents from acting against their clients' interests in procuring employment as writers is a proper Guild concern.  The Guilds deny the remaining allegations in Paragraph 159.

180.   Paragraph 160 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 160 is required, the Guilds deny those allegations.

181.   The Guilds deny that their leadership has threatened the Guilds' membership with public shaming, discipline, or the loss of their livelihood.  The Guilds deny the remaining allegations Paragraph 161.

182.   The Guilds deny the allegations in Paragraph 162.

183.   Paragraph 163 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 163 is required, the Guilds admit the existence of a non-statutory labor exemption to federal antitrust law and deny the remaining allegations in Paragraph 163.

184.   Paragraph 164 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 164 is required, the Guilds admit that the non-statutory labor exemption allows unions and employers to bargain over wages, hours, working conditions, and other mandatory subjects of collective bargaining, and deny the remaining allegations in Paragraph 164.

185.   Paragraph 165 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 165 is required, the Guilds deny those allegations.

186.   The Guilds admit that they have stated that their adoption of the Code of Conduct may affect actors, directors, studios, showrunners, and producers.  The Guilds lack knowledge or information sufficient to respond to the categorical allegation regarding the extent to which certain directors and actors have benefited

from agency packaging or the existence of content affiliates, and on that basis deny that allegation.  The Guilds deny the remaining allegations in Paragraph 166.

187.   The Guilds deny the allegations in Paragraph 167.

188.   The Guilds admit that under the Code of Conduct, their members may only be represented by agents who receive a percentage commission for that representation.  The Guilds further admit that they granted a limited delegation of their authority to lawyers and managers, and that such lawyers and managers are not required to sign the Code of Conduct.  The Guilds deny the remaining allegations in Paragraph 168.

189.   The Guilds deny the allegations in Paragraph 169.

190.   The Guilds deny the allegations in Paragraph 170.

191.   The Guilds deny the allegations in Paragraph 171.

192.   Paragraph 172 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 172 is required, the Guilds admit that an element of a claim under Section 1 of the Sherman Act is the existence of a contract, combination, or conspiracy, and deny the remaining allegations in Paragraph 172.

193.   The Guilds admit that a majority of the Guilds' members voted to give their leadership the authority to impose a Code of Conduct.  The Guilds deny the remaining allegations in Paragraph 173.

194.   The Guilds admit that certain talent agencies have signed the Code of Conduct, and that those agencies are horizontal competitors of each other and of the Agencies.  The Guilds deny the remaining allegations in Paragraph 174.

195.   The Guilds admit that certain AMPTP members are horizontal competitors with each other.  The Guilds deny the remaining allegations in Paragraph 175.

196.   The Guilds admit that that they granted a limited delegation of their

39

1   authority to lawyers and managers, but deny the Agencies' characterization of that

2   delegation.  The Guilds deny the remaining allegations in Paragraph 176.

3       197.   The Guilds deny the allegations in Paragraph 177.

4       198.   The Guilds admit that they sent an email on or around April 16, 2019,

5   containing the fragment quoted in Paragraph 178, but deny the Agencies'

6   characterizations of that statement and the context in which that statement was

7   made.  The Guilds deny the remaining allegations in Paragraph 178.

8       199.   The Guilds deny the allegations in Paragraph 179.

9       200.   Paragraph 180 states legal conclusions to which no response is

10  required.  To the extent a response to any allegations in Paragraph 180 is required,

11  the Guilds deny those allegations.

12      201.   The Guilds admit that the Agencies and other talent agencies are

13  competitors, and that the provision of the MBA cited in Paragraph 181 includes

14  mention of the United States.  The remainder of Paragraph 181 states legal

15  conclusions to which no response is required.  To the extent a response to any

16  allegations in Paragraph 181 is required, the Guilds deny those allegations.

17      202.   The Guilds admit that they do not participate in the market for

18  representational services and that they are the exclusive collective bargaining

19  representatives of writers for unionized television and film productions.  The

20  remainder of Paragraph 182 states legal conclusions to which no response is

21  required.  To the extent a response to any of the remaining allegations in Paragraph

22  182 is required, the Guilds deny those allegations.

23      203.   Paragraph 183 states legal conclusions to which no response is

24  required.  To the extent a response to any allegations in Paragraph 183 is required,

25  the Guilds deny those allegations.

26      204.   The Guilds admit that a majority of packages includes writers and that

27  a majority of television programs is packaged.  The Guilds deny the remaining

28

allegations in Paragraph 184.

205.   The Guilds deny the allegations in Paragraph 185.

206.   The Guilds deny the allegations in Paragraph 186.

207.   The Guilds deny the allegations in Paragraph 187.

208.   Paragraph 188 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 188 is required, the Guilds deny those allegations.

209.   The Guilds deny the allegations in Paragraph 189.

210.   The Guilds admit that, as a result of the refusal by WME, CAA, UTA, and certain other agencies to sign the Code of Conduct, approximately 7,000 Guild members have chosen to terminate their representation by those agencies with respect to work covered by a Guild collective bargaining agreement.  The Guilds lack knowledge or information sufficient to respond to the categorical allegations regarding the Agencies' loss of work and packaging fees, and on that basis deny those allegations.  The Guilds deny the remaining allegations in Paragraph 190 and deny that the Agencies are entitled to any relief.

211.   In response to Paragraph 191, the Guilds admit that CAA and UTA seek relief in the alternative under Rule 8(3)(d)(2)-(3) of the Federal Rules of Civil Procedure, but deny that CAA or UTA is entitled to any such relief.

212.   In response to the allegations incorporated by reference in Paragraph 192, the Guilds incorporate by reference their responses to those allegations in the preceding paragraphs.

213.   Paragraph 193 states legal conclusions to which no response is required.  To the extent a response to any allegations in Paragraph 193 is required, the Guilds admit that Section 8(b)(4)(B) of the National Labor Relations Act contains the language quoted in Paragraph 193 and that a violation of Section 8(b)(4)(B) gives rise to a claim under Section 303 of the Labor Management

41

1  Relations Act, but deny that the Guilds violated Section 8(b)(4)(B) and deny that

2  the Agencies are entitled to any relief under Section 303.

3       214.   The Guilds admit that they have promulgated a Code of Conduct for

4  talent agencies that represent writers for work covered by a Guild collective

5  bargaining agreement, and that the Code of Conduct contains the statement quoted

6  in Paragraph 194.  The Guilds further admit that wiip and Civic Center are

7  companies engaged in interstate commerce.  The Guilds deny the remaining

8  allegations in Paragraph 194.

9       215.   The Guilds admit that Guild members work in an industry affecting

10 interstate commerce.  The Guilds further admit that they made the statements

11 quoted in Paragraph 195, but deny the Agencies' characterization of those

12 statements.  The Guilds also admit that Exhibit K is a document prepared and

13 adopted by the Guilds, and that the exhibit contains the statement quoted in

14 Paragraph 195, but deny the Agencies' characterization of that statement.  The

15 Guilds deny the remaining allegations in Paragraph 195.

16      216.   The Guilds deny the allegations in Paragraph 196.

17      217.   The Guilds deny the allegations in Paragraph 197.

18      218.   The Guilds deny the allegations in Paragraph 198.

19      219.   Paragraph 199 states legal conclusions to which no response is

20 required.  To the extent a response to any allegations in Paragraph 199 is required,

21 the Guilds deny those allegations.

22      220.   In response to the Prayer for Relief, the Guilds deny that WME, CAA,

23 and UTA are entitled to any of the relief they seek, or to any relief whatsoever.

24                    **AFFIRMATIVE DEFENSES**

25 The Guilds assert the following affirmative defenses:

26      221.   The FCC fails to state a claim on which relief may be granted.

27      222.   The Agencies' claim for injunctive relief is barred to the extent the

28

42

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

Agencies have available an adequate remedy at law and to the extent injunctive relief otherwise is inequitable.

223.   The Agencies' claim for damages is barred because such relief would constitute unjust enrichment.

224.   The Agencies' claims are barred by the statutory and non-statutory labor exemptions to federal antitrust law.

225.   The Agencies' claims fail because the Agencies have not suffered antitrust injury.

226.   The Agencies' claims are barred because the alleged damages, if any, are speculative and remote.

227.   The Agencies' claims are barred because the Guilds' conduct does not amount to a *per se* violation of federal antitrust law or involve an unreasonable restraint of trade.

228.   The Agencies' claims fail because the Guilds have not coerced any neutral party to stop doing business with another party.

229.   The Agencies' claims are barred because the Guilds' conduct was permitted by law.

230.   The Agencies' claims are barred, either in whole or in part, by the doctrines of ripeness, mootness, and/or standing.

231.   The Agencies have waived or forfeited its right, if any, to pursue the claims in the FCC, and/or are estopped from doing so, by reason of their own actions and courses of conduct.

232.   The Agencies' claims are barred by the doctrine of fraud.

233.   The Agencies' claims are barred by the doctrine of illegality.

234.   The Agencies' claims are barred by the doctrine of unclean hands.

235.   The Agencies' claims are barred by the doctrine of laches.

236.   The Guilds' conduct is not the proximate cause of any injuries or

1   damages allegedly suffered by the Agencies.

2   237.   The remedies sought by the Agencies are unconstitutional, contrary to

3   public policy, or otherwise not authorized.

4   238.   The Agencies' claims should be dismissed for uncertainty and

5   vagueness and because their claims are ambiguous and/or unintelligible.  The

6   Agencies' claims do not describe the events or legal theories with sufficient

7   particularity to permit the Guilds to ascertain which other defenses may exist.

8   239.   The Guilds hereby give notice that they intend to rely upon such other

9   and further defenses as may become available or apparent during pre-trial

10  proceedings in this case, and hereby reserve their rights to amend this Answer and

11  assert such defenses.

12  ## COUNTERCLAIMS

13  Defendants and Counterclaimants WGAW and WGAE, and Individual

14  Counterclaimants Patti Carr ("Carr"), Ashley Gable ("Gable"), Barbara Hall

15  ("Hall"), Deric A. Hughes ("Hughes"), Deirdre Mangan ("Mangan"), David Simon

16  ("Simon"), and Meredith Stiehm ("Stiehm"), allege as follows:

17  240.   The Guilds re-allege and incorporate by reference the allegations set

18  forth in paragraphs 1-239.

19  ## COUNTERCLAIM PARTIES

20  241.   Defendant and Counterclaimant WGAW is, and at all material times

21  was, a labor union representing approximately 10,000 professional writers who write

22  content for television shows, movies, news programs, documentaries, animation,

23  and new media.  WGAW serves as the exclusive collective bargaining representative

24  for writers employed by the more than 2,000 production companies that are

25  signatory to an industrywide collective bargaining agreement negotiated by the

26  Guilds and the AMPTP.   WGAW is a California nonprofit corporation

27  headquartered in Los Angeles, California.  WGAW members, including Individual

28

44

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

Counterclaimants Carr, Gable, Hall, Hughes, Mangan, and Stiehm, have been represented by the Agencies.  WGAW brings this action for injunctive and declaratory relief under the Sherman Act, the Cartwright Act, the Rackateer Influenced and Corrupt Organizations Act, and under California's law of fiduciary duty and constructive fraud in its representative capacity on behalf of all writers it represents, and further brings this action under the Sherman Act, the Cartwright Act, California's Unfair Competition Law, and the Racketeer Influenced and Corrupt Organizations Act on its own behalf.

242.   Defendant and Counterclaimant WGAE is, and at all material times was, a labor union representing over 4,700 professional writers who write content for television shows, movies, news programs, documentaries, animation, and new media.  WGAE serves as the exclusive collective bargaining representative for writers employed by the more than 2,000 production companies that are signatory to an industrywide collective bargaining agreement negotiated by the Guilds and the AMPTP.  WGAE is a nonprofit corporation headquartered in New York, New York.  WGAE members, including Individual Counterclaimant Simon, have been represented by the Agencies.  WGAE brings this action for injunctive and declaratory relief under the Sherman Act, the Cartwright Act, the Racketeer Influenced and Corrupt Organizations Act, and California's law of fiduciary duty and constructive fraud in its representative capacity on behalf of all writers it represents, and further brings this action under the Sherman Act, the Cartwright Act, California's Unfair Competition Law, and the Racketeer Influenced and Corrupt Organizations Act on its own behalf.

243.   Counterclaimant Patti Carr is a television writer who resides in Studio City, California and works in Los Angeles County.  She has written for television shows including *Life Unexpected*, *Mixology*, *Private Practice*, *Reba*, and *'Til Death*, and served as showrunner for *90210*.  She is a member of WGAW.  From January

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

2018 until April 2019, nonparty ICM served as her talent agency. From approximately 2001 to January 2018, Counterclaim Defendant CAA served as her talent agency. Carr has written for packaged shows, including *90210*, *Mixology*, *Private Practice*, and *Reba*, and was injured by the payment of packaging fees to talent agencies on those packaged shows. Carr brings her individual claims against Counterclaim Defendant CAA.

244. Counterclaimant Ashley Gable is a television writer who resides in Los Angeles, California and works in Los Angeles County. She has written for television shows including *Buffy the Vampire Slayer*, *Bull*, *Designated Survivor*, *Magnum PI*, and *The Mentalist*. She is a member of WGAW. From approximately 2006 until April 2019, Counterclaim Defendant CAA served as her talent agency. Gable has written for packaged shows, including *Magnum PI* and *Designated Survivor*, and was injured by the payment of packaging fees to talent agencies on those packaged shows. But for the Agencies' insistence on continuing to engage in unlawful packaging fee practices, Gable would currently be represented by her former agents at CAA. Gable brings her individual claims against Counterclaim Defendant CAA.

245. Counterclaimant Barbara Hall is a television writer who resides in Santa Monica, California and works in Los Angeles County. Her work as a television writer includes serving as the showrunner for *Madam Secretary* for each of its six seasons and creating or developing the television shows *Judging Amy* and *Joan of Arcadia*. She is a member of WGAW. From approximately 2000 until approximately 2012, Counterclaim Defendant CAA served as her talent agency. From approximately 2012 until April 2019, and before 2000, Counterclaim Defendant UTA served as her talent agency. Hall has written, created, developed, and/or served as showrunner for packaged shows, including *Madam Secretary*, *Judging Amy*, and *Joan of Arcadia* and was injured by the payment of packaging fees to talent agencies on those packaged shows. But for the Agencies' insistence

46

on continuing to engage in unlawful packaging fee practices, Hall would currently be represented by her former agents at UTA.   Hall brings her individual claims against Counterclaim Defendant UTA.

246.   Counterclaimant Deric A. Hughes is a television writer who resides in Sherman Oaks, California and works in Sherman Oaks.  He has written for television shows including *Arrow*, *The Flash*, *Beauty and the Beast*, and *Warehouse 13*.  He is a member of WGAW.  From approximately 2009 until April 2019, Counterclaim Defendant CAA served as his talent agency.  Hughes has written for packaged shows, including *Black Samurai* and *Beauty and the Beast*, and was injured by the payment of packaging fees to talent agencies on those packaged shows.  But for the Agencies' insistence on continuing to engage in unlawful packaging fee practices, Hughes would currently be represented by his former agents at CAA.  Hughes brings his individual claims against Counterclaim Defendant CAA.

247.   Counterclaimant Deirdre Mangan is a television writer who lives in Los Angeles, California and works in Los Angeles County.  She has written for television shows including *Midnight Texas*, *The Crossing*, *iZombie*, and *Do No Harm*.  She is a member of WGAW.  From approximately 2012 until March 2019, Counterclaim Defendant UTA served as her talent agency.  Mangan has written for packaged shows, including *iZombie* and *Do No Harm*, and was injured by the payment of packaging fees to Agencies on those packaged shows.  But for the Agencies' insistence on continuing to engage in unlawful packaging fee practices, Mangan would currently be represented by her former agents at UTA.  Mangan brings her individual claims against Counterclaim Defendant UTA.

248.   Counterclaimant David Simon is a television writer who works and resides in Baltimore, Maryland.  His work as a writer includes creating and running the shows *The Wire* and *The Deuce*, as well as writing *Homicide: Life on the Street* (which was based on an earlier book published by Simon), and writing and

producing *The Corner*, *Treme*, *Generation Kill*, and *Show Me A Hero*.  He is a member of WGAE.  From approximately 1992 until April 2019, Counterclaim Defendant CAA served as his talent agency.  Simon has written for a packaged show, *Homicide: Life on the Street*, and was injured by the payment of packaging fees to talent agencies on that packaged show.  Simon brings his individual claims against Counterclaim Defendant CAA.

249.   Counterclaimant Meredith Stiehm is a television writer who resides in Santa Monica, California and works in Los Angeles County.  Her work as a writer includes writing for *NYPD Blue* and *ER*, creating *Cold Case* and *The Bridge*, and serving as executive producer and writer on *Homeland*.  She is a member of WGAW.  From approximately 2011 until April 2019, Counterclaim Defendant WME served as her talent agency.  Prior to 2011, Counterclaim Defendant CAA served as her talent agency.   Stiehm has written, created, and/or served as showrunner for packaged shows, including *Homeland*, *Cold Case*, and *The Bridge*, and was injured by the payment of packaging fees to talent agencies on those packaged shows.  But for the Agencies' insistence on continuing to engage in unlawful packaging fee practices, Stiehm would currently be represented by her former agents at WME.  Stiehm brings her individual claims against Counterclaim Defendants CAA and WME.

250.   Plaintiff and Counterclaim Defendant CAA is, and at all material times was, a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Los Angeles County, California.

251.   Plaintiff and Counterclaim Defendant UTA is, and at all material times was, a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Los Angeles County, California.

252.    Plaintiff and Counterclaim Defendant WME is, and at all material times was, a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Los Angeles County, California.

253.    Each of the Counterclaim Defendants CAA, UTA, and WME is a talent agency comprised of numerous individual talent agents, who as partners, principals, or employees of the Agency, render services on behalf of the defendant talent agency.  In rendering such services, each individual agent acted on behalf of his or her respective Agency, which at all times remained liable for the acts or omissions of the individual agent.

254.    As alleged herein, CAA, UTA, and WME conspired with each other and other individuals and entities, which may include other ATA member agencies, investors in ATA member agencies, and/or owners, executives or employees of ATA member agencies that participated in, or had knowledge of, the anticompetitive conduct described herein.  Counterclaimants will be able to identify these co-conspirators through discovery.

## JURISDICTION AND VENUE

255.    This Court has subject matter jurisdiction over the First and Second Claims for Relief pursuant to 28 U.S.C. §§1331 and 1337 and 15 U.S.C. §26; over the Eighth, Ninth, Tenth, and Eleventh Claims for Relief pursuant to 28 U.S.C. §§1331 and 1337 and 18 U.S.C §1964(a) and (c); and over the Twelfth Claim for Relief pursuant to 28 U.S.C. §§1331 and 1337, 15 U.S.C. §26, and 18 U.S.C §1964(a) and (c); and has supplemental jurisdiction over the Third, Fourth, Fifth, Sixth, Seventh, Thirteenth, and Fourteenth Claims for Relief pursuant to 28 U.S.C. §1367.

256.    Counterclaim Defendant CAA, a corporation, has its headquarters within this judicial District (in Los Angeles, California), is domiciled in this judicial district, has consented to personal jurisdiction in this judicial district by

bringing its Complaint in this judicial district, has minimum contacts with this judicial district, and is otherwise subject to the personal jurisdiction of this judicial district.

257.   Counterclaim Defendant UTA, a corporation, has its headquarters within this judicial District (in Beverly Hills, California), is domiciled in this judicial district, has consented to personal jurisdiction in this judicial district by bringing its Complaint in this judicial district, has minimum contacts with this judicial district, and is otherwise subject to the personal jurisdiction of this judicial district.

258.   Counterclaim Defendant WME, a corporation, has its headquarters within this judicial District (in Beverly Hills, California), is domiciled in this judicial district, has consented to personal jurisdiction in this judicial district by bringing its Complaint in this judicial district, has minimum contacts with this judicial district, and is otherwise subject to the personal jurisdiction of this judicial district.

259.   Venue is proper in this judicial district under 28 U.S.C. §1391(b) and (c) because Counterclaim Defendants CAA, UTA, and WME are subject to this Court's personal jurisdiction with respect to this action, and because a substantial part of the events giving rise to the counterclaims for relief stated herein occurred in this District.

260.   Venue is also proper in this judicial district under 18 U.S.C. §1965(a) because the Counterclaim is an action under §1964(c) against Counterclaim Defendants CAA, UTA, and WME, which reside, are found, have an agent, and transact their affairs in this judicial district.

261.   Moreover, CAA, UTA, and WME have waived any objection that they could otherwise have asserted to venue in this judicial district by bringing their Complaint in this judicial district.

262.   Finally, venue is proper in this judicial district under the doctrine of pendent venue.

263.   Counterclaimants agree that this action is properly assigned to the Western Division.   Counterclaim Defendants CAA, UTA, and WME and Counterclaimant WGAW both reside in Los Angeles County.

## FACTUAL ALLEGATIONS

### The Guilds and the Role of Talent Agents

264.   Writers are responsible for producing the literary material that forms the basis for thousands of television episodes and films produced every year (many in California), which generate billions of dollars in annual revenue.   The literary material provided by writers includes, among other things, stories, outlines, treatments, screenplays, teleplays, dialogue, scripts, plots, and narrations.   This literary material forms the heart of every television show and film; without it, the shows and films could not be made.

265.   The Guilds and their predecessor organizations have represented writers in the American film and television industries since the 1930s.   The Guilds serve as the exclusive collective bargaining representative for writers in negotiations with film and television producers to protect and promote the rights of screen, television, and new media writers.   The Guilds' long-term efforts on writers' behalf have resulted in a wide range of benefits and protection for writers, including minimum compensation, residuals for reuse of a credited writer's work, pension and health benefits, and protection of writers' creative rights.

266.   The Guilds also administer the process for determining writing credits for feature films, television, and new media programs.

267.   The Guilds sponsor seminars, panel discussions, and special events in order to educate their members about their rights and the steps they can take to protect their own interests.   The Guilds also conduct legislative lobbying and public

relations campaigns to promote their members' interests.

268.   The Guilds' members include writer-producers known colloquially as "showrunners."  Guild-member showrunners are, at their core, writers.  For example, showrunners typically write and edit the pilot script and continue to, along with staff writers, develop story lines, write and edit scripts, and otherwise control the creative development of the series; most showrunners are engaged for the primary purpose of performing writing services.  The Guilds' industrywide collective bargaining agreement expressly includes showrunners in the definition of the relevant bargaining unit to the extent they perform writing services.  Showrunners who are not writers and who do not provide writing services to studios (so-called "non-writing producers") are not covered by the Guilds' collective bargaining agreement.

269.   Approximately 2,000 television and film production companies are parties to the industrywide agreement known as the Writers Guild of America Theatrical and Television Basic Agreement ("MBA"), negotiated between the Guilds and the Alliance of Motion Picture and Television Producers, Inc. ("AMPTP").  The AMPTP serves as the collective bargaining representative of the major studios and production companies, while the Guilds jointly serve as the exclusive representative for all of the writers covered by the MBA.  The MBA establishes minimum terms for the work performed by writers for MBA-signatory employers, including the minimum compensation that writers must be paid for such work.  Talent agencies are not parties to the MBA.

270.  The MBA expressly permits writers to negotiate "overscale" employment terms—that is, compensation and other employment terms that exceed the minimums set forth in the MBA.  Although the Guilds are, pursuant to the MBA, the exclusive collective bargaining representatives for writers employed by MBA-signatory companies, they have chosen to allow writers to negotiate directly with the

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

companies regarding overscale compensation and other terms of employment. At all times relevant to this action, Article 9 of the MBA has provided:

> The terms of this Basic Agreement are minimum terms; nothing herein contained shall prevent any writer from negotiating and contracting with any Company for better terms for the benefit of such writer than are here provided, excepting only credits for screen authorship, which may be given only pursuant to the terms and in the manner prescribed in Article 8. The Guild only shall have the right to waive any of the provisions of this Basic Agreement on behalf of or with respect to any individual writer.

271. The film and television production industry now operates almost entirely on a freelance basis. Writers are generally hired by studios to work on individual projects for the duration of those projects, rather than working for the company on a long-term basis across multiple projects. In order to find employment, negotiate for overscale employment terms, obtain career guidance, and protect their professional interests, writers have traditionally retained agents (and the agencies with which those agents were associated) to represent them in their dealings with the studios. These agents owe fiduciary duties to their writer-clients under California law.

272. Talent agencies can represent writers only with the consent of the Guilds, which are the writers' exclusive collective bargaining representatives under federal labor law. The Guilds' Working Rule 23 further provides that members may only be represented by agencies that sign an appropriate franchise agreement with the Guilds.

273. The Agencies (through the individual agents associated with each of them) provide such representation to their clients. In doing so, the Agencies exercise authority delegated to them by the Guilds.

274. In a packaged deal, the representational services provided by an agency to its clients employed on the project are inextricably interrelated with other services

that the agency may sell to a production company.  In exchange for this bundle of services, the agency is paid a single packaging fee and was historically contractually obligated to forego collecting any commissions from its clients.  Specifically, Paragraph 5 of Rider W to the now-terminated 1976 AMBA forbade agents from charging a "*double commission*," *i.e.*, from "charg[ing] or collect[ing] any commission whatsoever on the compensation" of a writer employed on program on which the agent had also been paid for package representation.  Thus, where a project is packaged, the Agencies' compensation for providing representational services to its writer-clients is bundled as part of the packaging fee.

## Agencies' Packaging Fee Practices

275.   Historically, agents retained by writers and other creative professionals were compensated for representing their clients by being paid a percentage (generally ten percent) of the amount paid to their clients for work procured while the agent serves as their representative.  This traditional arrangement aligned the economic interests of the writers and their agents, because any increase in the compensation received by writers resulted in a corresponding increase in their agents' compensation.  The same arrangement persists in film and television industries in other countries, such as Canada, where the system of packaging fees does not exist.

276.   Over time, conditions in the television and film industry changed dramatically in a manner that has had significant negative consequences for writers, while drastically increasing the profits of the Agencies and their agents.

277.   *First*, the talent agent industry has become increasingly consolidated, leading to anticompetitive effects.   As a result of industry consolidation, the Agencies today collectively represent a dominant share of writers, actors, directors, and other creative workers involved in the American television and film industries.

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

In short, the Agencies exert oligopoly control over access to almost all key talent in the television and film industries.

278.   *Second*, the Agencies have moved away from the commission-based model of agent compensation described above.   Instead, the Agencies have increasingly shifted to a "packaging fee" model whereby the Agencies' compensation for their provision of representational services to talent is paid as part of a packaging fee, rather than as a percentage of their clients' compensation. Approximately 90% of all television series are now subject to such packaging fee arrangements; of those, 80% are packaged, at least in part, by just two agencies: WME and CAA.

279.   In television, packaging fees are normally structured around a standard "3-3-10" formula, with the upfront fee defined as 3% of the "license fee" paid by the studio for the program (normally between $30,000 and $75,000 per episode, depending on the type of show and the method of distribution); an additional fee also defined as 3% of the license fee deferred until the show achieves net profits; and a "backend" profit participation defined as 10% of the program's modified adjusted gross receipts.   The "license fee" used to determine the upfront portion of the packaging fee, which was historically negotiated between a studio and a network, is now largely negotiated between the Agency and the studio.   The upfront 3% fee becomes a line item in the studio's production budget and is thus included in the negative cost of the series.   The deferred 3% fee and the 10% backend participation are generally taken "off the top," ensuring not only that the Agencies get paid before any other profit participant, but also that the profits to be shared by other profit participants, including by the Agencies' writer-clients, are reduced proportionally as a result of the payment of the packaging fee.

280.   The Agencies' parallel conduct in the structuring of packaging fees has been well-known in Hollywood for years.   For example, *Variety* reported in 2011

that, "in lieu of taking commissions from clients, agencies collect standard package fees from studios of 3% of the budget or license fee upfront, 3% deferred and 10% of the backend."[6]  *TV Week* similarly noted in 2003 that "[a] standard package commission follows what is known as a "3-3-10" model."[7]

281.   UTA's Company Overview presentation from 2014 conceded that the Agency defines a "full package" as "3% of the license fee (from show budget)," "3% of the license fee is deferred and paid as 'net profits'," and "10% 'defined profit' interest."

282.   Despite the foregoing, the Agencies' illegal agreements remained secret.   Although, as described herein, the Agencies and their co-conspirators secretly agreed to propose the same terms for packaging fees in accordance with the "3-3-10" model, packaging fees remained negotiable within the context of that agreement, including the license fees and the definition of modified adjusted gross profits.  Accordingly, the actual packaging fees paid differed from project to project, further concealing the Agencies' illegal conduct from detection.

### Agencies' Unlawful Benefits from Packaging

283.   Packaging fees generate hundreds of millions of dollars per year in revenue for the Agencies—far more than the Agencies would earn from a traditional 10% commission from their clients.  Indeed, WME has used the income generated through packaging to raise private capital, and its business has become so lucrative that WME has taken steps to become a publicly held corporation.

284.   The packaging fees paid to the Agencies often exceed the amount their clients are paid for work on a particular program.  On *Cold Case*, for example, CAA

---

[6] Ted Johnson, "Creatives sue CAA over packaging," *Variety* (July 12, 2011), https://variety.com/2011/tv/news/creatives-sue-caa-over-packaging-1118039738/.

[7] *TV Week*, "Packaging Prime Time" (July 7, 2003), https://www.tvweek.com/in-depth/2003/07/packaging-prime-time/.

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

was entitled to a packaging fee of $75,000 per episode, an amount that exceeded Stiehm's per episode pay for at least the first two years of the series. The portion of the packaging fee attributable to an Agency's compensation for the talent representational services sold to Guild members likewise typically exceeds the 10% commission that the Agency otherwise would have earned.

285.   With almost all television series now being packaged, the Agencies now earn much of their revenue from representing their own economic interests, rather than from maximizing the earnings of their clients.

286.   The Agencies do little to justify their enormous packaging fees.

287.   For example, although the core function of an agency is to "procure" employment opportunities for its clients, writers today more often than not find employment from their own network or through sources other than their agency. Nonetheless, even where writers find employment opportunities without their agent, the Agencies routinely demand to be paid their packaging fees, which include their compensation for procuring those employment opportunities for their writer-clients.

288.   Moreover, although the term "packaging" implies that an agency will bring more than one "packageable element" to a project, the Agencies often demand to be paid a packaging fee for delivering only a single contributor to a project, who may not be a writer.

289.   Despite their fiduciary obligations as agents, the Agencies are, according to one former CAA agent, "big fans of packaging because packaging [is where] you make all of your money …. So they hated when you sold a writer to somebody that wasn't a package, even though selling a writer to somebody else might have been better for the client's career and in the long run makes them more of a commodity. Inside CAA it was always about package über alles—that was

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

literally a phrase.  This was [CAA's] philosophy."[8]

290.   Because packaging fees have generated record revenues for the Agencies, private equity has become interested and invested in each of the Agencies.

291.   In 2010, CAA, then the largest agency in Hollywood, announced that TPG Capital ("TPG"), a private equity investor, had acquired a 35% stake in the agency.  In 2014, TPG increased its stake by investing another $225 million into the agency.  Today, TPG owns a controlling stake in CAA.

292.   In 2012, WME announced that it had secured a $250 million investment by private equity investor Silver Lake Partners ("Silver Lake").  In 2013, WME acquired IMG for $2.4 billion, thereby surpassing CAA as the largest agency. Following its acquisition of IMG, WME announced that it had secured an additional $500 million investment by Silver Lake.  Silver Lake now owns a controlling stake in WME.  Since that time, WME has sold minority equity stakes in the agency totaling approximately $1.8 billion to various institutional investors.

293.   In 2018, UTA announced that Ivestcorp, a private equity investor, had taken a 40% stake in the agency.

294.   Private equity investors see little to no value in the traditional manner of agency compensation—*i.e.*, commissions received for the procurement of employment opportunities—because the collusively agreed-upon packaging fee model is far more profitable for the Agencies.  Egon Durban of Silver Lake, for example, specifically singled out the attractiveness of packaging fees as key to his firm's investment in WME: "We benefit from package fees from the shows when they get resold and re-syndicated over and over again."[9]

---

[8] Miller, *supra* note 5, at 169.

[9] Matthew Garrahan, *Silver Lake looks to turn WME into gold*, Financial Times (Nov. 21, 2014), *available at* https://www.silverlake.com/Images/Uploads/docs/Silverlake20111709432928705.

295.   For these reasons, the Agencies are "less interested in their clients' needs," as one former agent reported.[10]   Industry observers report that "the focus on the bottom line has only intensified, changing ways of doing business that go back decades—and, in some ways, changing the very definition of a talent agency."[11]   A former ICM agent admitted that "[w]hat we're seeing is a fundamental shift in the agency landscape."[12]   Another ICM agent was more blunt:  If a private equity owner is unwilling to invest in the talent representational side of the business, the agency has an irreconcilable conflict "as you're supporting disparate business and financial goals."[13]

296.   TPG and Silver Lake have had multiple opportunities to coordinate with each other on competitive strategies for their Agencies, because TPG and Silver Lake have frequently collaborated on other investments.  For example, in 2006, TPG and Silver Lake jointly acquired Sabre Holdings for $5 billion.  In 2007, TPG and Silver Lake jointly acquired Avaya, Inc. for $8.3 billion.  In 2012, between TPG's investment in CAA and Silver Lake's investment in WME, the two private equity firms collaborated again on the acquisition of Radvision, Ltd. through their jointly held portfolio company Avaya.

297.   On May 23, 2019, Endeavor Group Holdings, the parent entity of WME, filed a Form S-1 with the Securities and Exchange Commission as a first step

---

pdf.

[10] Gavin Polone, *Why Everyone in Hollywood is Paying More for a Manager*, Vulture (July 11, 2012), https://www.vulture.com/2012/07/polone-why-everyone-pays-more-for-a-manager.html.

[11] Josh Rottenberg, *Wall Street investors to Hollywood talent agencies: "Show us the money*," L.A. Times (July 10, 2015), https://www.latimes.com/entertainment/envelope/cotown/la-et-ct-talent-agencies-private-equity-20150710-story.html.

[12] *Id.*

[13] *Id.*

in its plan to launch an initial public offering ("IPO") in 2019.  The IPO was intended to allow Silver Lake to cash in at least part of its equity position in WME.

298.   Private equity interest in the Agencies comes at a time when packaging fees have generated record revenues for the Agencies.  Indeed, private equity investors are particularly attracted by the fact that WME and CAA have been able to use their packaging revenues to begin their own in-house content production companies (also known as "affiliate content production"), and UTA has been able to use its packaging revenues to invest in a similar content production scheme.  For example, WME began producing scripted film and television content with the formation of Endeavor Content in 2017.  Also in 2017, WME acquired a majority stake in Blumhouse, a film production company, and partnered with Chernin Entertainment for the purpose of developing and producing scripted television series.  Endeavor Content is slated to produce at least 10 scripted series in 2019.  CAA's affiliate content production company, wiip Productions, LLC, has likewise begun producing scripted film and television content.  And UTA has used its packaging fees revenue to finance its affiliation with Media Rights Capital ("MRC"), through which UTA has an indirect financial interest in shows produced by MRC's Civic Center Media.

## Conflict of Interest and Harms Caused by Packaging Fees

299.   The packaging fee model of talent agent compensation used by the Agencies harms writers in multiple respects.

### Harms to Television Writers

300.   The Agencies' packaging practices have harmed the market for writers' work by draining money from television and film production budgets, and by diverting to the Agencies funds that could otherwise be used to finance production and the employment of writers.

301.   Because of the Agencies' desire to pursue packaging fees "über alles," writers face a less competitive market for their services, with the Agencies generally attempting to place writers only with projects tied to other clients of the Agency, rather than with all available projects, and failing to negotiate the best possible compensation for their clients.  The Agencies' collusive packaging fee practices also harm their writer-clients' ability to sell their services because the Agencies refuse to negotiate employment for their writer-clients unless the Agencies get a packaging fee.  The Agencies have canceled meetings, held up negotiations, and otherwise stymied their own clients' ability to sell their services over packaging fees.

302.   As *The Hollywood Reporter* recently reported: "Several international sales agents speaking to *THR* on condition of anonymity report cases of talent agents killing projects if they don't land with their in-house production company or threatening to pull a client off a film unless they 'get a piece of the action' on the domestic sale.  'It's a very serious issue—that of the agencies packaging, producing and selling content all under one roof,' notes a veteran sales agent.  'It's further restricting the talent available and making it harder to get films made.'"[14]

303.   Likewise, the Agencies use their control over key talent to pressure writers whose agents are not affiliated with the Agencies to fire those agents and retain one of the Agencies in order to have access to employment on the Agency's packages.

304.   The Agencies' packaging fee practices reduce the choice of talent available to work on projects, thus directly impairing a writer's ability to propose scripts in a competitive market, and impairing competition for the budgets for

---

[14] Tatiana Siegel, *Cannes: Will the Writers Guild Fight Impact Dealmaking at the Festival?* The Hollywood Reporter (May 9, 2019), https://www.hollywoodreporter.com/news/will-writers-guild-fight-impact-dealmaking-at-cannes-festival-1208193.

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

television and film productions.  This has a negative direct and proximate effect on writer compensation and reduces writing opportunities for writers.

305.   The quality of audiovisual entertainment also suffers as a result of the Agencies' packaging fee practices.  For example, budgetary constraints caused by the payment of packaging fees force productions to shoot in less than ideal locations and under questionable conditions, cut special effects, reduce the number of shooting days, and/or hire a smaller crew or fewer writers.  In addition to artificially reducing the choice of talent available for a given production, these creative compromises, caused by the charging of packaging fees, directly diminish the quality of the finished product.  This also adversely affects the careers of those involved with those projects, including the writers.

306.   The Agencies' ongoing intimidation of lawyers and managers, their former clients, and those smaller talent agencies that have signed or are considering signing the Guilds' 2019 Code of Conduct for talent agents (*see infra* paragraphs 399-404) continues this pattern of harm.

307.   Moreover, because the first component of any packaging fee is paid out of the production budget, payment of that fee diverts financial resources away from that project—which otherwise could be used to pay writers more, or to hire additional writers—to the Agencies.  This inherent conflict of interest between the interests of the Agency and the interests of the writer exists in *every* package agreement.  Even where the Agencies are paid a lower end upfront packaging fee of, for example, $25,000 per episode, that represents the cost of hiring approximately one additional high level writer or two additional lower-level writers for the program.  Likewise, where a studio or network insists that production budgets be reduced, the Agencies' packaging fees cannot be reduced, so writer compensation or other creative elements must be cut instead.  The Agencies' conduct thus often

causes the early cancellation or nonrenewal of their own client's series, thereby artificially limiting employment opportunities for writers.

308.   Likewise, because the third component of the packaging fee is based on defined gross profits, the payment of packaging fees reduces the profit participation of an agency's own clients, including writer-clients.  A direct conflict between the interests of an agency and the interests of a writer-client therefore exists in *every* package agreement where a writer-client receives or would otherwise be entitled to profit participation.   Worse, the Agencies in many instances negotiate more favorable profit definitions for themselves than for their own writer-clients. Individual Counterclaimants Carr, Gable, Hall, Hughes, Simon, and Stiehm were entitled or would have been entitled but for the Agencies' malfeasance to profit participation for their prior work on packaged shows.  Because packaging fees are typically paid to the Agencies before the profits calculation that determines a writer's compensation, thereby affecting that profit calculation, and because of the Agencies' own higher priority profit definitions, the ongoing amount paid to these Individual Counterclaimants is doubly reduced.  This harm to Carr, Gable, Hall, Hughes, Simon, and Stiehm continues to the present day.

309.   For example, even though CAA has not performed *any* work in connection with *Cold Case* since the show was originally purchased by CBS approximately two decades ago, CAA is presently being paid almost exactly the same amount for that successful show that Meredith Stiehm is paid in profit participation for having created the show and having served as showrunner for seven years.  Likewise, although David Simon has never received any profit distributions for *Homicide: Life on the Street* because his agency, CAA, negotiated a profit definition for Simon that was based on net rather than gross profits, on information and belief, CAA to this day continues to receive profit from that show because it secretly negotiated a far more favorable profit definition for itself, without Simon's

knowledge or consent.   Indeed, Simon had strenuously objected to CAA's negotiation of an unfavorable net profit definition for him, and had sought to improve his profit definition in further negotiations; however, when Simon sought to amend his original net profit definition, Simon learned that CAA had represented to the production company that Simon had already agreed to that profit definition and that the production company and NBC had already invested substantial sums in preproduction.   CAA further falsely represented to Simon that his original profit definition was not unfavorable, but also represented to him that if he did not agree to the original net profit definition, he would not only lose the option payments and other monies that were due him under the contract, but would also be liable to the production company and NBC for the preproduction costs.   It was not until many years later that Simon learned not only that CAA had simultaneously represented the director and the head of the production company in the negotiations, but also that all other profit participants in *Homicide*, including CAA and the director, had profit definitions based on gross rather than net profits.

310.   Because the Agencies' packaging fees are calculated based on the budget, revenues, and profits of a particular program, rather than on the amount paid to their clients working on that program, the Agencies' financial incentive to protect and increase their clients' pay is eliminated.   The Agencies receive packaging fees whether their client's pay increases or decreases, and even if their client no longer works on a particular program.   Indeed, the Agencies actually have a *disincentive* to advocate for greater pay for their clients, because the Agencies' share of profits would be accordingly reduced.

311.   For Deirdre Mangan's work on *iZombie*, for example, UTA refused to negotiate a title and compensation commensurate with Mangan's experience, insisting that "studio policy" precluded her from receiving a better title or salary. Mangan subsequently learned that "studio policy" did not in fact preclude other

writers employed by the same studio, on a comparable show, at the same title, from receiving title bumps or salary increases when their agents chose to negotiate them. In order to protect its own profit participation, UTA refused to negotiate a title and compensation commensurate with Mangan's experience.  Mangan's harm suffered from packaging practices as alleged herein is typical of that of writers in the early and mid-stages of their careers.  Indeed, Agencies routinely refuse to negotiate greater salaries for staff writers, instead taking the first offer made by the studio in order to protect the Agencies' packaging fee.

312.   The Agencies also have little incentive to protect the pay their clients have already earned.  Because the Agencies' earnings now come from packaging fees and not from commission, the Agencies have no incentive to ensure that their clients receive the pay or profit participation to which their clients are entitled under their contracts with the studios, and Agencies often refuse to meaningfully assist writer-clients in negotiations over missing pay.  Indeed, in some instances, in order to obtain a greater packaging fee for themselves, Agencies have even pressured their clients to forego pay to which the clients would otherwise be entitled.

313.   Because the profits of the Agencies are generated from packaging fees rather than from commissions on their clients' earnings, the Agencies, while purporting to represent those clients in negotiations with the studios, are incentivized to protect the studios' interests at the expense of their clients.  In order to protect their continuing ability to negotiate new packaging fee agreements with the studios, the Agencies prioritize their relationships with the studios over the interests of their clients in numerous ways.  For example, the Agencies fail to negotiate aggressively to ensure their clients will receive the highest possible compensation on a particular program, because doing so could antagonize the studio and potentially lead the studio to refuse to pay a packaging fee.  By failing to negotiate the highest possible compensation for their clients, the Agencies also help ensure that the studios are

willing to continue paying packaging fees on top of the other costs of producing each program, so that overall cost does not become prohibitive.  For writers who are not yet generating new programs on which the Agencies might be able to seek packaging fees, the Agencies' interest in preserving the studios' willingness to pay packaging fees substantially outweighs their interest in representing those writers, an imbalance that shapes every aspect of the representational services that the Agencies sell to such writers.

314.   The Agencies recognize that their interests are no longer aligned with those of the writers they represent, but are instead aligned with the studios that employ their clients.  Indeed, the head of WME has stated publicly that his most important "client" is now a top executive at Warner Brothers.

315.   The Agencies' desire to earn packaging fees also distorts agents' incentives when seeking employment opportunities for their clients.  In order to avoid splitting a packaging fee with other agencies, the Agencies have an incentive to pressure their clients to work exclusively on projects where the other key talent is also represented by the Agency.  The Agencies exert this pressure even where the client and the agent know that the project will be best served by involving someone from another agency.  Stiehm has found, for example, that WME presents her with opportunities to work only on projects involving other talent from WME.  Likewise, Carr, Gable, and Hughes have found that CAA presents them with opportunities to work only on projects involving other talent from CAA.  And Hall has found that UTA similarly presents her with opportunities to work only on projects involving other talent from UTA.  The Individual Counterclaimants' ability to obtain work and compensation commensurate with their experience has been severely hampered by CAA's, UTA's, and WME's failure to present them with other work opportunities. The same distortion of incentives causes the Agencies to pressure other writers in the earlier stages of their careers to work only on projects that have been packaged

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

by that particular agency, again depriving them of the ability to advance their careers on projects outside their agency.

316.   The Agencies also are incentivized not to sell packaged programs to the studios willing to pay the most for the programs, or that will be the best creative partner for the programs.  Instead, the Agencies choose to sell packaged programs to the companies willing to negotiate the most profitable packaging deal.  Indeed, in many instances, the Agencies have taken lower offers of compensation for their clients in exchange for a more lucrative packaging deal.

317.   In addition, the Agencies have routinely refused to close deals until the studio agrees to pay a packaging fee.  Indeed, the Agencies have at times even threatened to scuttle deals that the writers have set up themselves, without their agents' involvement, in order for the Agencies to obtain a packaging fee for themselves.  As the *L.A. Times* recently reported, the head of WME "refused to split the packaging fee with CAA" for the FX miniseries "The Bastard Executioner," because WME "hadn't received a partial fee on the Fox series '*24*,' and it was time to pay up."[15]  Because of the enormous power the Agencies wield, even the studios are unwilling to push back against the Agencies when they demand a packaging fee on deals that they did not close.  As former UTA agent and current producer Gavin Polone has explained, the Agencies openly seek packaging fees at their clients' expense:

> I had breakfast with a couple of network executives and pitched them an idea, which they liked.  I told them I wanted to work with a specific writer (with whom I did not discuss this idea before meeting with the executives).  They

---

[15] Stacey Perman, "For brash deal-maker Ari Emanuel, IPO collapse is a rare stumble, and his biggest challenge yet," *L.A. Times* (Sept. 30, 2019), https://www.latimes.com/entertainment-arts/business/story/2019-09-29/for-brash-deal-maker-ari-emanuel-ipo-collapse-is-a-rare-stumble-and-his-biggest-challenge-yet.

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

didn't know him, so I sent them his writing sample, which they enjoyed.  The writer and I then pitched out a complete story.  The executives officially bought the show.  The writer then told his agents of the sale after it was sold.  His agents then negotiated with the studio, which was a sister company of the network, and got him a deal with which he was happy.  Then they asked for a package fee.

I told the network I would not go along with them getting a fee because they had nothing to do with the show.  The writer also told his agents that it didn't make sense for them to receive a package fee.  His agent told him she would not close the deal—despite his direction to do so—without the agency getting its fee. He then asked his lawyer to close the deal and the lawyer also refused, probably not wanting to take on the agents.  I called the network and told the executives just to say it was "take it or leave it" and they'd have to close because the client wanted it closed.  One of the executives told me that I'd have to work it out with the agency myself …. He said the network/studio would rather pay the fee, which could total millions of dollars in success, instead of jeopardizing its relationship with a major agency.  In the end, the agency got its fee.[16]

318.   The Agencies use popular writers as leverage to secure packaging fees, even where doing so does not serve the economic or creative interests of those writers.  Indeed, the Agencies have at times actively suppressed the wages of their own clients to secure packaging fees; for example, in one case, WME expressly *offered* to convince a writer to accept $14,000 per episode instead of the $20,000 he had previously earned.

319.   The consequences of packaging, as practiced by each of the Agencies and complained of herein, have been profound for television writers.   Despite growing demand for television series, driven in part by the entry of companies like Netflix, Amazon, Apple, and Facebook into the production and distribution business, and despite the unprecedented profitability of the entertainment industry as a whole, overscale compensation for writers has been stagnant over the last 15 years.  Indeed,

---

[16] Polone, *TV's Dirty Secret*, *supra* note 2.

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

when inflation is accounted for, writers are now being paid *less* than they were more than a decade ago.  This is true even for top-level writers, show creators, and showrunners.

320.  Mr. Polone agrees, observing that the Agencies' packaging fee practices also artificially reduce (1) employment opportunities for talent, (2) the quality of audiovisual entertainment, and (3) the output of audiovisual entertainment:  "I have never watched anything I've produced where I didn't think, 'That scene would have been better if we had more money for …' a better song, more background actors, better VFX, our first choice of location, an above-scale actor for a small part or many other things that often cost less than $30,000.  Budgets are finite, and if you add a $30,000 cost that doesn't connect to anything that goes onscreen, you necessarily lose something else that would have.  So that package fee, which saves the writer his commission on an unprofitable show, might be the exact reason his show was canceled in the first place and never made it to profit; and that is a pretty unequitable exchange."[17]

321.  In sum, packaging fees have deprived television writers of conflict-free and loyal representation in their negotiations with studios.  By depriving writers of conflict-free and loyal representation, packaging fees reduce the compensation paid to writers for their work on particular programs.  The Agencies receiving a packaging fee do not negotiate on their clients' behalf with the same vigor they would if they were being paid a portion of their clients' compensation, and their financial interest in the program creates an incentive for them to hold down or reduce the amount paid to their clients.  Despite the substantial expansion of the television market in recent years, the Guilds' members, including the Individual

---

[17] *Id.*

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

Counterclaimants, have seen their writing wages stagnate or decrease over the last decade, particularly on shows packaged by the Agencies.

*Harms to Film Writers*

322.   While the practice of packaging has its historical roots in television, the Agencies now also extract packaging fees on feature film projects, particularly on independent productions not financed or produced by a major studio.  On packaged feature projects, the Agencies are typically paid a fee from a film's budget or financing, often in addition to taking a 10% commission from their clients.  The Agencies also use their leverage to steer film projects to their own clients or affiliated companies to function as financiers or distributors of the finished film, even when doing so harms their clients' interests.

323.   While the economics of film packaging differ in some respects from packaging agreements in television, the conflict of interest is the same.  The Agencies leverage their access to high-profile clients for the Agencies' own benefit, and negotiate compensation for themselves, undisclosed to their clients and unrelated to what their clients earn.

324.   Feature film packaging fees have a direct detrimental effect on writers. As the feature film business has contracted, increasing pressure on screenwriters, the Agencies have not advocated against declining screenwriter pay or unpaid work because the Agencies make most of their money on packaging fees paid by studios for television and film projects, and have little incentive to fight for clients from whom they simply receive a commission.  As in television, the effect of the Agencies' collusive packaging fee practices has been to exert downward pressure on writer compensation.

325.   As in television, feature film front-end and deferred packaging fees are considered overhead and thus charged as production expenses, while back-end packaging fees are an off-the-top expense, meaning that a writer's profit is reduced

70

proportionally by the agency's payment.  As in television, this leads to writers not only being paid less in wages but also reducing their share of a film's profits.

326.   Because packaging fees are based in part on gross profit, the payment of the film's packaging fee may, depending on the profit definition, have the effect of reducing the profit participation of the Agencies' own clients, including writers. And because the front-end packaging fee comes out of a film's budget, payment of the fee shifts financial resources from the film's creative elements to the Agencies. As with television, this not only harms writers by reducing their compensation and denying them additional employment opportunities, but also, by placing such a major drain on the production budget on an ongoing basis, harms the quality of the production.

327.   Film packaging fees also distort agents' incentives when seeking employment opportunities for their clients.  In order to avoid splitting a packaging fee with another agency, the Agencies often pressure their clients to work exclusively on film projects where the other key talent is also represented by the client's Agency.  The Agencies exert this pressure even where the client and the agent know that the project will be best served by involving someone from another Agency.

328.   The Agencies also choose not to sell packaged programs to the studios willing to pay the most for the film, or that will be the best creative partner for the film.  Instead, the Agencies choose to sell packaged films to the companies willing to pay the largest packaging fee.

329.   The Agencies use popular writers as leverage to secure film packaging fees, even where doing so does not serve the economic or creative interests of those writers.

*Other Harms Experienced by All Writers*

330.   Because of the Agencies' breaches of their fiduciary duties, writers,

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

including the Individual Counterclaimants, have been forced to retain and pay other professionals, including lawyers and/or talent managers, to protect their interests, frequently paying as much as 15% or 20% in additional commissions to these other professionals to secure the services that talent agencies alone once provided. Because writers' agents no longer represent their clients vigorously and without conflicts, many writers rely upon their talent managers to identify employment opportunities and upon their lawyers to negotiate the terms of their contracts with studios. These are services that the agents themselves should be providing to the writers they represent. That writers must pay others for these services further reduces their take-home pay.

331. Barbara Hall's situation is typical in this respect. Although she was represented by UTA until April 2019, to protect her interests, she also had to retain a business manager, talent manager, and a lawyer, who collectively receive a total of 20% of her income. The end result of these additional payments Hall must make is that the per episode packaging fee payment to UTA for *Madam Secretary* is approximately equal to Hall's post-commission payment per episode for her work as showrunner on that program. A second agency, CAA, also receives a separate per episode packaging fee for *Madam Secretary*.

332. Packaging fees also deny writers employment opportunities. The Agencies are resistant to placing their clients with television programs or films that are already connected to talent from other Agencies, because doing so will reduce or eliminate any packaging fee they might be paid for the clients' work. Many potential projects have been delayed or killed solely because of a dispute between one of the Agencies and a studio over the packaging fee. Likewise, because the Agencies do not view the potential commissions they would obtain from writers in earlier stages of their careers on outside projects to be sufficiently valuable to be worth pursuing, the Agencies deny even staff writers the opportunity to work on

outside projects, so that those earlier stage writers will be available to work for less compensation and at a lower level on a project packaged by their Agency.

333.   The Agencies routinely fail to disclose the conflicts of interest inherent in packaging to their clients.   The packaging agreement, including the profit definition, is negotiated directly between an Agency and the studio, with no notice or disclosure of the agreement's terms, or even of the agreement's existence, to the Agency's writer-clients.   Indeed, virtually no writer has ever seen a packaging agreement.   The Individual Counterclaimants have never been provided with the specific details of their Agency's packaging agreements for programs on which they worked while represented by CAA, UTA, or WME, nor were they informed that any conflict of interest existed between them and their agent.

334.   The Agencies have never obtained their writer-clients' valid, informed consent to their flagrant conflicts of interest.   Such valid, informed consent could only be given if the Agency disclosed not only the existence of the conflict of interest but also all of the specific details of any packaging agreement between the Agency and the studio.   The Agencies, however, not only routinely fail, as a matter of policy, to disclose either the existence of the conflict or the material terms of the packaging agreements to their writer-clients, but in many instances actually go further still and deliberately conceal the existence of the conflict of interest by falsely informing their writer-clients that packaging *benefits* the client because the client will not pay commission, when, in fact, (1) the portion of the Agencies' packaging fees attributable to the representational services provided to their writer-client far exceeds the 10% commission the Agencies forgo; and (2) the Agencies' packaging fees directly suppress their writer-client's earnings.   What's more, the Agencies in many instances do not, in fact, refund the commission to their clients on packaged shows, despite their promises to do so.   Barbara Hall, for example, has been paying commission to UTA without receiving the promised refund on her packaged show,

*Madam Secretary*, for over a year.  Indeed, even when Hall has previously received rebates of commission from UTA, those rebates did not represent the full amount of commission UTA charged her.

335.   The Guilds' members, including the Individual Counterclaimants, have been harmed by the Agencies' misleading conduct and their routine failure to disclose not only the existence of the conflict of interest represented by packaging fees, but also the specific details of any packaging agreement, both of which the writers, as the principal in the agency relationship, were entitled to know.   The Guilds' members, including the Individual Counterclaimants, justifiably expect their agents to represent their interests, in accordance with California agency law principles.  The Guilds' members, including the Individual Counterclaimants, have justifiably relied, to their detriment, on the Agencies' individual and collective misleading statements and concealment of the existence of their conflicts of interest. They have similarly relied on Agencies' individual and collective misrepresentations that the payment of packaging fees benefits the writer-client, when in fact the payment of packaging fees harms the Agencies' clients and enriches the Agencies at writers' expense.

336.   For example, Stiehm's former agents at WME—Cori Wellins and Matt Solo—never disclosed to Stiehm that they were operating under a conflict of interest in representing Stiehm on packaged shows, nor did they disclose to Stiehm the existence of the packages nor the details of the packaging fees earned by WME. Likewise, Carr's former agents at CAA—Tracy Murray, Kathy White, and Nancy Jones—never disclosed to Carr that they were operating under a conflict of interest in representing Carr on packaged shows, nor did they disclose the existence of the packages nor the details of the packaging fees earned by CAA to Carr.  Hall's former agent at CAA—Chris Harbert—never disclosed to Hall that he was operating under a conflict of interest in representing Hall on packaged shows, nor did he disclose the

74

details of the packaging fees earned by CAA to Hall.  The same is true of Gable's former CAA agent, Nancy Etz; Hughes' former CAA agents; Stiehm's former CAA agents, Jeff Jacobs and Tanya Rosenfeld; and Simon's former CAA agent, Matthew Snyder.  Hall's former agent at UTA—Peter Benedict—never disclosed to Hall that he was operating under a conflict of interest in representing Hall on packaged shows, nor did he disclose the existence of the packages nor the details of the packaging fees earned by UTA to Hall.  And Mangan's former agent at UTA—Dan Erlij—never disclosed to Mangan that he was operating under a conflict of interest in representing Mangan on packaged shows, nor did he disclose to Mangan the existence of the packages nor the details of the packaging fees earned by UTA.

*Harms to the Guilds*

337.   The Agencies' packaging practices, including but not limited to their collusive agreements among themselves and their co-conspirators, also cause substantial harm to the Guilds.  In order to protect their members' interests, the Guilds have devoted substantial resources to monitoring packaging (to the extent possible given the Agencies' failure to provide the Guilds or their writer-clients with clear information about the terms of their packaging arrangements); to educating members about packaging fees, the risks and harms created by agents' conflicted representation, and the steps they can take to protect themselves; to engaging in political advocacy and public outreach to increase awareness of the harms resulting from packaging fees; and to preparing a comprehensive campaign to end packaging fees' harms and abuses.

338.   The Guilds have also incurred additional expenses in enforcing writers' contractual rights because the Agencies, conflicted by their packaging fee practices, are reluctant or unwilling to defend writers' interests in the face of contract violations.  A notable example of this is the Guilds' ongoing effort to address the "late pay" problem:  the chronic problem of writers not being paid on time by the

studios.  While the MBA imposes strict time limits on the employers' payment of compensation to writers, the information regarding when payment is due is frequently in the hands of the writers' agents, not the Guild.  The Guilds have repeatedly proposed to the Agencies (both directly and through the ATA) a program by which the Agencies would systematically provide the Guilds with information necessary to enforce the late pay provisions of the MBA.  The Agencies have resisted these proposals, a reluctance that stems in part from the fact that, on packaged shows, the payment of the writer-client is de-linked from the payment of the packaging fee to the Agency, making the timing of the payment to the writer of less interest to the Agencies.  In the absence of Agency cooperation in combating the problem of late pay, the Guilds have had to divert resources that they would otherwise have used on other initiatives to develop alternative means of data collection relevant to late pay, including WGAW's creation of an online portal known as the "start button" that allows writers to provide late pay documentation directly to WGAW.

339.   The Guilds have also been forced to negotiate provisions with the AMPTP that would previously have been part of contractual agreements negotiated by individual agents.  Because the Guilds' leverage is limited, this required the Guilds to divert their bargaining power to negotiate these provisions instead of pursuing other objectives in negotiation.  Examples of this diversion of the Guilds' resources have occurred in each of the last two MBA negotiations.

340.   In the 2014 MBA negotiations, the Guilds negotiated a new provision —Article 67, entitled *Options and Exclusivity (Television)*—placing a limit on the length of time a writer could be held under option or subject to exclusivity outside of a period of active employment.  Prior to 2014, such contractual provisions had always been left to overscale negotiations conducted on an individual basis by the writer's agent.  The Agencies' persistent failure to protect their writer-clients from onerous provisions in this area was reflected in repeated member surveys conducted

by the Guilds as a means of determining bargaining priorities.  The pressure from members to collectively bargain protections in the area culminated in the 2014 negotiations and led the Guilds to designate limits on options and exclusivity as one of its bargaining priorities.

341.  Similarly, in the 2017 MBA negotiations, the Guilds proposed and obtained another new provision addressing an issue previously left to individual overscale negotiations conducted by talent agents.  This provision—Article 14.K.2, commonly know as the "span" provision—regulates the length of time a writer hired on a per-episode basis can be required to work.  Traditionally, television writers had been expected to work for two weeks per episode.  In recent years, however, the Guilds' research disclosed that writers were being expected to work for longer and longer periods for the same per-episode fee.  While the Agencies could have negotiated limits on the number of weeks per episode, they frequently lacked incentive to do so because, under the packaging fee system, the Agencies' compensation was unaffected by the number of weeks a writer-client actually worked.  The failure of the Agencies effectively to represent their writer-clients with respect to the issue of span caused the Guilds to step into the breach in the 2017 negotiations, proposing and winning a new contract provision limiting span in most instances to a maximum of 2.4 weeks per episode.  The need for the Guilds to regulate in this area had a direct effect on the Guilds' conduct of the negotiations, and entailed a significant expenditure of staff resources and bargaining capital to secure the new contract provision.

342.  Finally, packaging fees have reduced the Guilds' revenue from member dues, because, except for a small fixed base amount, dues are calculated as a fixed percentage of writers' compensation.

343.  The Agencies individually and collectively have engaged in packaging that has caused each of these forms of harm to the Guilds.

344.   But for the Agencies' illegal agreements regarding packaging, the Guilds and the Guilds' members would not have been so harmed.

### Agency Collusion and the ATA Trade Association

345.   The ATA is a trade association headquartered in Los Angeles County, California and comprised of approximately 120 talent agencies across the United States.   ATA member agencies are competing sellers of talent representational services.   When the ATA speaks, it does so on behalf of its members.   As stated on the ATA's website: "ATA's collective voice provides strong and effective advocacy for its members in matters relating to the talent-agency business."[18]

346.   Prior to the events of April 2019, as described later herein, the ATA member agencies represented the vast majority of the Guilds' members working today.

347.   Neither the ATA nor its member agencies enjoy any protections under the antitrust laws other than a derivative labor exemption that may apply under some circumstances based on the ATA's prior contractual relationship with the Guilds.

348.   Historically, the Agencies competed over the starting point for negotiations on packaging fees.   For example, when CAA was formed in 1975, CAA undercut prevailing packaging fees by more than 40% by offering studios packaging fees based on a "3-3-10" model as opposed to the prevailing "5-5-15" model. Michael Ovitz, CAA's founder, observed: "it increased the volume of our business so we would end up making far more than if we had charged the higher rate."[19]   No agency has challenged the prevailing "3-3-10" model in decades, because the Agencies, which control the vast majority of packages, have agreed to propose the

[18] ATA, *About ATA*, https://www.agentassociation.com/index.php?src=gendocs&ref=about_ata&category=Main.
[19] Miller, *supra note* 5, at 48.

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

same "3-3-10" package fee terms to studios.

349.   The Agencies' collusive conduct was revealed to the Guilds recently when a former ICM agent and UTA partner admitted in *The Hollywood Reporter* that there is "near *uniform price-fixing of package fees* on TV shows."[20]   The Agencies, through the ATA, further conceded : "*package fees have remained fairly constant in broadcast TV for the past two decades*."[21]

350.   The Guilds learned more from a second Agency source about the substance of the price fixing conspiracy first reported by Mr. Palone in *The Hollywood Reporter*.  In the 1990s, the studios had engaged in a concerted effort to eliminate packaging fees.  As this second former senior Agency executive admitted, *in response to the studios' efforts and for the purpose of preserving their ability to earn packaging fees, several agencies, including William Morris, Endeavor and CAA, agreed to offer the same packaging fee terms to studios*.  This former Agency senior executive directly participated in discussions with, among others, Lee Gabler of CAA and Ari Emanuel (then of Endeavor and now of WME), during which these illegal agreements were reached.  These illegal price fixing agreements, which were kept secret by the Agencies for more than 20 years, endure to this day.

351.   In addition to agreeing on the "3-3-10" model, the Agencies have also agreed to propose to studios the same "base license fee," which is the basis for the upfront 3% part of a 3-3-10 packaging fee.  License fees are largely an artifact of a prior age, a fiction in today's television distribution landscape where vertically

---

[20] Gavin Polone, *Here's the Long-Shot Way Hollywood Writers Can Win the War on Agents*, The Hollywood Reporter (Mar. 26, 2019), https://www.hollywoodreporter.com/news/gavin-polone-heres-how-hollywood-writers-can-win-war-agents-1197093.

[21] ATA, *Negotiating a New Artists' Manager Basic Agreement, Frequently Asked Questions* 6 (Feb. 26, 2019), https://www.agentassociation.com/clientuploads/ ATA.General_FAQ.2.26.19.pdf.

integrated studios and streaming companies both produce and distribute audiovisual entertainment.  Accordingly, where vertical integration or streaming has eliminated the payment of a license fee by a network to a studio, the Agencies have agreed to each propose the same "base license fees" upon which to calculate the initial 3% fee. The "base license fee" applicable to a given project varies by type of show (*e.g.*, hour-long drama, half-hour sitcom), number of episodes, and distribution method (*e.g.*, network television, cable, streaming).

352.   The Agencies are able to coordinate their packaging practices because, despite the large number of talent agencies, the agency industry is "a shrinking oligopoly."[22]   There were previously five large talent agencies: William Morris, Endeavor, CAA, ICM, and UTA.  In 2009, the "Big Five" became the "Big Four" following William Morris' merger with Endeavor.  Two Agencies (WME and CAA) control more than 80% of all television packages (representing more than 70% of all television series).  And until April 2019, three ATA member agencies—UTA, CAA, and WME—represented writers in projects that accounted for approximately 70% of the Guilds' members' earnings.

353.   In addition to the high concentration in the agency industry, the Agencies' packaging practices facilitate the creation and monitoring of collusive agreements on packaging fees.  For example, as the ATA, writing on behalf of its members, has admitted, the Agencies "frequently" jointly package television series.[23]   When sharing a package, the Agencies exchange competitively sensitive information about their packaging fee practices, including but not limited to adherence to the agreed "3-3-10" model, the amount of the base license fee, and the definition of modified adjusted gross profits (the basis for the last 10%).

---

[22] Violaine Roussel, *Representing Talent: Hollywood Agents and the Making of Movies* 49 (2017).

[23] ATA, *supra* note 21, at 6.

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

354.   Joint packaging occurs on a sufficiently frequent basis to allow the Agencies to reach collusive agreements on their packaging fee practices and to monitor compliance with such practices.  Indeed, a former senior Agency executive who participated directly in the relevant inter-agency discussions admitted that joint packaging was developed and expanded during the 1990s as part of the Agencies' conspiracy to resist the studios' efforts to eliminate packaging fees.

355.   The Agencies also share competitively sensitive information, including through the ATA.

356.   For example, on March 17, 2019, the ATA published a study that purports to analyze the economic impact of eliminating front-end packaging fees (the "March 17 Report").

357.   Although the ATA claims that the data used to prepare the March 17 Report was made anonymous to protect the disclosure of competitively sensitive information, UTA published its own analysis three days later.

358.   Competitively sensitive information was also exchanged within the ATA's "Negotiation Committee," which includes employees of each of the Agencies.

359.   The Agencies enforce compliance with their collusive agreements on packaging practices by "blacklisting" any entity or individual who deviates from, or otherwise seeks to frustrate, those agreements.

360.   The fear of being blacklisted by the Agencies is pervasive in Hollywood.  For example, *The Los Angeles Times* reported on the difficulty of getting industry participants to speak publicly about their concerns regarding packaging:

> The combined power of Endeavor and CAA is enormous — together, they represent the bulk of Hollywood's A-list celebrities and the majority of all packaged TV series.  As a result, most people in Hollywood are unwilling to

speak about the issue publicly…

"There are a lot of disgruntled people.  But it's whispered about.  *Everyone on the talent side is afraid to challenge the agencies for fear of being blackballed*," said Neville Johnson, a Los Angeles attorney who has represented prominent Hollywood writers and actors in profit disputes.

*The fear is pervasive.*  "The studios are afraid of not getting pitches and opportunities if they take a hard line against this," Johnson added.[24]

361.   Even in the context of this dispute, the Agencies, individually or collectively through the ATA, have publicly threatened to retaliate against agencies (and those agencies' clients) that have come to an agreement with the Guilds.

## **History of Guild Concern about Packaging Conflicts of Interest**

362.   The Guilds have long had concerns about the conflict of interest inherent in an agency's receipt of compensation directly from its client's employer.

363.   In the 1970s, the Guilds sought to ban the practice of packaging fees in their franchise agreement with thirteen independent talent agencies ("the 1975 Independent Agreement").

364.   Litigation over the Guilds' attempt to bar talent agencies from receiving packaging fees based on their representation of their writer-clients ensued.  A group of independent talent agencies sued the two largest Agencies, William Morris (the predecessor to Counterclaim Defendant WME) and ICM, along with the predecessor entity to the ATA, seeking a declaration that the 1975 Independent Agreement was valid and enforceable.  William Morris counterclaimed, alleging that the 1975 Independent Agreement was an illegal group boycott that violated Section 1 of the Sherman Antitrust Act.

365.   In connection with its counterclaim, William Morris filed a motion for a preliminary injunction, seeking, on antitrust grounds, to prohibit enforcement of

---

[24] Ng, *supra* note 3 (emphases added).

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

the terms of the 1975 Independent Agreement that banned packaging.

366.   On March 24, 1976, Judge Harry Pregerson denied William Morris' motion, finding that William Morris had not demonstrated a reasonable probability that it would prevail on its antitrust counterclaims.  Specifically, Judge Pregerson held that the anti-packaging provisions of the 1975 Independent Agreement were likely protected under both the statutory and non-statutory exemptions to the federal antitrust laws.

367.   Following Judge Pregerson's ruling, the parties settled their dispute and agreed to the 1976 AMBA, which regulated the way agencies represent writers.  The Guilds negotiated the 1976 AMBA with the ATA (at the time called the Artists' Managers Guild), which assented to the 1976 AMBA on behalf of its member agencies.  The 1976 AMBA was in effect from 1976 until April 2019.

368.   The Guilds expressly reserved their objections to the practice of agencies accepting packaging fees in the 1976 AMBA.  Paragraph 6(c) of the 1976 AMBA provides: "WGA has asserted that the services of Writers in the fields of radio, television and motion pictures are connected with and affected by the packaging representation of Writers … that the representation of Writers' services and the obtaining of employment for Writers is affected by such packaging representation of Writers and others, and that the WGA has a legal right to bargain collectively on such subjects …."  Paragraph 6(c) expressly states: "The parties hereto agree that nothing in this agreement …  shall be deemed to affect or prejudice the [] positions of WGA …."

369.   Moreover, the Agencies have failed to abide by even the limited protections contained in the 1976 AMBA.  For example, the 1976 AMBA requires agents to advise their clients "as to the creation and/or development and/or production of the package program."  In fact, the Agencies, as a matter of policy, routinely fail to notify writers that their shows are being packaged.

**The Current Dispute**

370.   This dispute arises in the midst of a new golden era for Hollywood. Eight of the top ten highest grossing films of all time were released this decade; ninety-three of the top 100 highest grossing films of all time were released after 2000.   The television industry is experiencing a "second golden age," with approximately 500 scripted series in production today; analysts do not believe that the industry has peaked.

371.   The Agencies have profited massively by extracting packaging fees during this period.   For example, in its recently filed S-1, WME boasted that it has delivered "consistent growth and strong financial performance."   Since 2015, WME has grown revenue at a rate of 27.1%, generating robust margins of over 15%.

372.   Yet while writers lie at the creative heart of the industry, they have been left behind.   Their wages have been stagnant over the last two decades, leading to significant declines when adjusted for inflation.

| Writer-Producer Median Episodic Fee | | |
| --- | --- | --- |
| **Writer's Title** | **1995-2000 (Adjusted for Inflation)** | **2017-18** |
| Co-Producer | $16,400 | $14,000 |
| Producer | $19,500 | $16,000 |
| Supervising Producer | $25,750 | $17,500 |
| Co-Executive Producer | $35,100 | $23,250 |
| Executive Producer | $54,600 | $32,000 |

373.   On April 6, 2018, pursuant to the terms of the 1976 AMBA, the Guilds provided the ATA with a Notice of Election to Terminate the agreement. Contemporaneously, the Guilds published a detailed set of proposals for a new agreement to replace the AMBA, which would, among other things, bar talent agencies from accepting packaging fees on any project on which their writer-client is employed.

374.   The Guilds' proposals for a new franchise agreement were modeled in some respects on codes of conduct that are the dominant method of agency regulation in professional sports and have been upheld in the face of antitrust challenge in federal court.

375.   The Agencies were and are members of the ATA's "Negotiation Committee."  The Negotiation Committee (sometimes referred to as the "Strategy Committee") met weekly, and continues to meet, to discuss and agree on common stances to take with respect to the Guilds, the Guilds' members, and the Guilds' internal processes, including but not limited to an agreement not to accede to the Guilds' demand to ban agencies from accepting packaging fees on projects where their writer-client is employed.

376.   On February 21, 2019, the Guilds wrote to all members of the ATA, including the Agencies, enclosing a copy of a written "Code of Conduct" for the representation of the Guilds' members.  In that letter, the Guilds stated that they intended to implement the Code of Conduct on April 7, 2019.  The Guilds further stated that the WGA would "continue[] to have discussion with agencies regarding the Code of Conduct" and that "[a]ny modifications in the Code of Conduct that the [WGA] makes as a result of those discussions will be applied on an equal basis to all agencies."

377.   During that time, the Guilds and the ATA also continued to meet and negotiate for a new agreement to replace the 1976 AMBA.  In the context of those

85

negotations, the ATA proposed, among other things, to strengthen the various prophylactic protections set forth in the AMBA to deal with what the ATA conceded were legitimate concerns about conflicts of interest.  The prophylactic protections in the AMBA were, however, proven to be illusory and ineffective, as Guild members believe that the Agencies would retaliate against them if they challenged an Agency's receipt of a packaging fee on any given project.  Indeed, agents have repeatedly threatened to kill projects unless they were paid a packaging fee.  Moreover, agents have threatened to blacklist uncooperative clients from future projects.  The ATA's proposals, like the AMBA's illusory protections, would merely allow the Agencies to continue to extract unwarranted profits from audiovisual projects at their clients' expense.

378.   For these reasons and others, the Code of Conduct made clear the Guilds' continued intention to prohibit agencies from collecting packaging fees on any project on which their writer-client is employed:  "No Agency shall derive any revenue or other benefit from a Client's involvement in or employment on a motion picture project, other than a percentage commission based on the Client's compensation."

379.   Notably, although the Code of Conduct prohibits franchised agencies that represent Guild members on a project from earning a packaging fee on that project, the Code permits *both* (a) franchised agencies to earn a packaging fee on a project where they are not representing a writer-client, *and* (b) franchised agents to package talent, including writer-clients, as long as they are not paid a packaging fee.  Indeed, the Code expressly permits "[a]n Agent's concurrent representation on a commission basis of multiple clients employed or submitted for employment on the same Motion Picture project."

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

380.  In March 2019, the Guilds' members voted overwhelmingly—95.3% to 4.7%—to authorize the Guilds to implement the Code of Conduct, if and when it became advisable to do so, upon expiration of the 1976 AMBA on April 6, 2019.

381.  On April 13, 2019, the Guilds formally implemented the Code of Conduct and, pursuant to Working Rule 23, instructed its members to terminate any agent that had not agreed to its terms.  Subsequently, the vast majority of the Guilds' members terminated their relationship with their agents.

382.  Through the ATA, the Agencies summarily rejected the Code of Conduct.  The ATA stated that the Code of Conduct was "unacceptable to all agencies," and announced that it was "firmly opposed to the WGA's Code."[25]

383.  The Code of Conduct realigns agents' incentives with their writer-clients and eliminates the conflicts of interest inherent in the Agencies' receipt of packaging fees.  Agencies signed to the Code may only represent writers on a commission basis and may not receive packaging fees on projects where their writer-client is employed.

384.  Immediately upon implementation, several smaller talent agencies agreed to the Code of Conduct.

385.  On or about May 16, 2019, Verve, the largest non-ATA member agency, agreed to the Code of Conduct (in the form of a new franchise agreement).  In response, the Agencies and their co-conspirators, through the ATA, promised to retaliate against Verve and its clients through an illegal group boycott, and promised similar retaliation against any other agency that broke ranks and dealt with the Guilds

---

[25] David Robb, *ATA Says WGA's Code of Conduct Is "Unacceptable To All Agencies"; No Talks Scheduled Before Deadline*, deadline.com (Apr. 5, 2019), https://deadline.com/2019/04/ata-says-wga-agency-code-unacceptable-to-all-agencies-no-talks-set-1202589594/.

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

individually.  ATA executive director Karen Stuart further urged ATA members to "remain strong and united" in their opposition to the Code of Conduct.[26]

386.   Stuart, writing collectively on behalf of all ATA member agencies, stated that Verve's decision to agree to the Code of Conduct "will ultimately harm [Verve's] business and the artists that [Verve] represents."[27]  This was a not-so veiled threat by ATA member agencies to blacklist and otherwise retaliate against Verve and its clients, which include dozens of the Guilds' members, in the future.

387.   The ATA's threats were intentionally distributed to the entertainment media and published, in whole, on the *deadline.com* website.

388.   Immediately thereafter, two members of the ATA's Negotiating Committee announced publicly that they would not deal individually with the Guilds and would not agree to the Code of Conduct.  These two agencies promised that Verve's action would not "crack" the Agencies' and their co-conspirators' collective refusal to deal with the Guilds and that they would work with the ATA and other ATA member agencies "*to bring stability back to the industry*."[28]

389.   The Agencies have also retaliated against their former writer-clients who have moved to newly franchised agencies by cancelling meetings and otherwise

---

[26] David Robb, *Abrams Artists Agency Chair Adam Bold Says He Won't Sign WGA's Code of Conduct; Urges Both Sides to Resume Talks*, deadline.com (May 17, 2019), https://deadline.com/2019/05/abrams-artists-agency-wont-sing-wga-code-adam-urges-both-sides-to-resume-talks-1202617392/.

[27] David Robb, *Verve Signs WGA's Code of Conduct, A First Crack in Agencies' Solidarity*, deadline.com (May 16, 2019), https://deadline.com/2019/05/verve-wga-code-of-conduct-signs-writers-agencies-fight-1202616769/.

[28] David Robb, *APA Won't Sign WGA Code of Conduct, Urges Return to Bargaining Table*, deadline.com (May 17, 2019), https://deadline.com/2019/05/apa-wont-sign-wga-code-of-conduct-urges-more-bargaining-talks-1202617538/.

attempting to sabotage their careers, while at the same time illegally conducting a shadow messaging campaign to interfere with the Guilds' internal elections.

390.   Recognizing that further negotiations with the ATA were futile, given the ATA's complete opposition to the Code of Conduct, the Guilds formally withdrew their consent to collective negotiation through the ATA.  The Guilds' withdrawal of consent was communicated to the ATA, as well as posted on the Guilds' websites, on June 19, 2019, and was widely reported in the media.

391.   Despite the Guilds' clear withdrawal of their consent to collective negotiations, the Agencies and their co-conspirators continued to meet, discuss, and coordinate their negotiation strategy through the ATA, including but not limited to an agreement not to negotiate on, or agree to, the Guilds' Code of Conduct.  Through its Negotiation Committee, the Agencies and their co-conspirators continued to meet, disclose competitively sensitive information regarding their packaging fee practices, and agree on the terms by which talent representational services would be priced to writers.

392.   For example, on June 25, 2019, WGAW Executive Director David Young wrote to each member of the ATA's Negotiation Committee, stating that the Guilds would no longer consent to collective negotiations and offering to meet individually to negotiate each agency's consent to the Guilds' Code of Conduct. Each of the recipient agencies rejected the Guilds' offer, uniformly demanding instead that the Guilds reverse the withdrawal of their consent to collective negotiations. These rejections were illegally coordinated by the ATA.

393.   First, Stephen Kravit of The Gersh Agency responded that "under no circumstances will The Gersh Agency meet with you separate from the ATA."

394.   Karen Stuart of the ATA replied ("Can I share with group?") and forwarded Kravit's email to the other members of the ATA Negotiation Committee.

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

1    Each of the other recipient agencies then parroted back the same refusal to deal with
2    the Guilds in short order.  For example:

3        (a)    Richard B. Levy of ICM: "we will not [negotiate] individually."
4               Instead, he insisted that any proposal from the Guilds must be to "the
5               entire ATA negotiating committee."

6        (b)    Jay Sures of UTA: "Since you have an official WGA proposal, I think
7               it is best for you to send it to your counterpart at the ATA."

8        (c)    Rick Rosen of WME: "WME believes the path to resolution is through
9               the ATA .... We again invite you to send your proposals to the ATA
10              for consideration by our entire negotiating committee."

11   395.   Despite the fact that talent agencies other than the Agencies derive
12   relatively little revenue from packaging fees, the majority of those other agencies
13   have refused to sign the Code of Conduct as a result of the Agencies' coordination
14   and threats of retaliation.

15   396.   In light of the Agencies' continued illegal efforts to coordinate both in
16   their individual negotiation strategies with the Guilds and on their continued receipt
17   of packaging fees, on June 28, 2019, the Guilds wrote to the Agencies and other
18   members of the ATA, demanding that they cease and desist from such illegal
19   conduct.

20   397.   Following receipt of the June 28, 2019 cease and desist letters, the
21   Agencies continued to meet and to coordinate their negotiation strategy with the
22   Guilds through the ATA.

23   398.   As a result of the Agencies' illegal joint refusal to deal with the Guilds
24   and of their insistence on continuing to receive packaging fees, the Guilds have
25   expended considerable time and money creating alternative staffing systems to
26   replace the representational services previously provided by the Agencies to Guild
27   members.  In the first 26 days of its operation alone, Guild members made 2,135

28

90

submissions by 1,048 writers to 92 shows. To date, Guild members have logged into the Guilds' system more than 20,000 times and have made over 9,000 submissions.

### Agency Threats to Lawyers and Managers

399.   On March 20, 2019, in light of the Agencies' collective refusal to deal with the Guilds, the WGAW, acting within its authority under the National Labor Relations Act as the exclusive representative of its writer-members, authorized lawyers and talent managers to, among other things, "negotiate overscale terms and conditions of employment for individual Writers in connection with MBA-covered employment and MBA-covered options and purchases of literary material."

400.   Immediately after March 20th, however, the Agencies began threatening lawyers with legal action should they seek to represent writers in negotiating employment contracts with studios.   This pattern of intimidation culminated in a letter sent by the ATA's counsel to the Guilds on April 12, 2019 that immediately appeared in the media, ensuring that its contents would be publicly disclosed.   Indeed, the April 12 letter was posted in its entirety on the *deadline.com* website within minutes of being sent to the Guilds.

401.   In the April 12 letter, the ATA asserted that California's Talent Agency Act, Cal. Labor Code §1700 *et seq.*, would be violated if talent managers or attorneys procured employment or negotiated the terms of that employment for Guild members, and threatened to sue any talent manager or lawyer who undertook such activities.

402.   The Agencies' threats were repeated in an April 18, 2019 letter from the ATA, which also appeared on the *deadline.com* website immediately after being sent to the ATA's members.   In that letter, the ATA, on behalf of the Agencies and their co-conspirators, threatened to, among other things, bring legal action against lawyers who negotiated employment contracts on behalf of the lawyers' writer-clients.

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

403.   The Agencies' threatened litigation is meritless and has deprived Guild members of legal counsel.  Employment contracts, like most contracts, include a mix of business (*e.g.*, compensation and benefits) and legal (*e.g.*, termination, restrictive covenants, remedies for breach, dispute resolution provisions) terms and, accordingly, the negotiation of such contracts falls squarely within the practice of law as authorized by the California State Bar Act, Cal. Bus. & Prof. Code §6000 *et seq*.  Moreover, attorneys—and not agents—are responsible for assuring that the language of a final employment agreement fully, accurately, and clearly sets forth essential terms of the arrangement, whether they are "business" or "legal" terms.

404.   The Agencies' threats to talent managers also harmed Guild members by depriving them of employment representation by talent managers.

## FIRST CLAIM FOR RELIEF

### *Per Se* Price Fixing in Violation of the Sherman Act, 15 U.S.C. §1
### (brought by the Individual Counterclaimants on their own behalf, and by the Guilds on their own behalf and on behalf of their members)

405.   Counterclaimants re-allege and incorporate by reference the allegations set forth paragraphs 1-404.

406.    The Agencies and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1) by artificially reducing or eliminating competition in the United States.

407.   As described above at Paragraph 350, in or around 1995-1996, and continuing through to the present, the exact starting date being unknown to Counterclaimants and exclusively within the knowledge of the Agencies and their co-conspirators, the Agencies and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1) by artificially reducing or eliminating

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

competition in the United States.  The details and extent of the Agencies' conspiracy was kept secret and was not discovered by the Guilds or the Individual Counterclaimants before 2016.

408.   The Agencies and their co-conspirators are engaged in, and their conduct substantially affects, interstate commerce.   The provision of representational services to talent is in, or affects, interstate commerce.   The production of audiovisual entertainment and scripted entertainment for television, feature films and video distribution is in, or affects, interstate commerce. The procurement of writer services for such productions is in, or affects, such interstate commerce.

409.   In particular, the Agencies and their co-conspirators have combined and conspired to raise, fix, maintain or stabilize the price of talent representational services and to control access to the writing services offered by Guild members to studios.  Guild members are direct purchasers of representational services from the Agencies.   The studios are direct purchasers of writing services from Guild members.  As packaging fees, including the portion of such fees that represent Agency compensation for the representational services purchased by Guild members regarding the writing services sold to the studios, are directly paid out of production budgets and "off the top" on the back-end, the injury to Guild members is inextricably intertwined with any injury suffered by studios.

410.   As a result of the Agencies' and their co-conspirators' unlawful conduct, prices for talent representational services provided to Guild members were raised, fixed, maintained and stabilized in the United States; the ability of Guild members to sell their writing services to studios and production companies has been suppressed; and the quality of the talent representation available to Guild members has been substantially reduced.

411.   The contract, combination, or conspiracy among the Agencies and their

co-conspirators consisted of a continuing agreement, understanding, and concerted action among the Agencies and their co-conspirators.

412.   The talent agency industry is highly concentrated.  For example, as a result of numerous mergers and acquisitions (as well as the poaching of agents from smaller agencies), until April 2019, the three Counterclaim Defendants—CAA, UTA, and WME—represented writers in projects that accounted for approximately 70% of Guild members' earnings.

413.   For the purpose of formulating and effectuating their contract, combination, or conspiracy, the Agencies and their co-conspirators did those things they contracted, combined, or conspired to do, including:

(a)   exchanging information regarding the pricing and terms of packaging fees;

(b)   agreeing to propose the same "3-3-10" packaging fee to studios;

(c)   proposing and negotiating with studios from a common "3-3-10" starting point;

(d)   agreeing to propose the same terms regarding base license fees to studios based on factors such as type of show, number of episodes, and method of distribution;

(e)   making offers to studios that reflected the price-fixed base license fee; and

(f)   selling talent representation services in California and throughout the United States at non-competitive prices.

414.   Moreover, since June 20, 2019, the Agencies and their co-conspirators have collectively agreed to continue to adhere to the "3-3-10" model in any negotiations with the Guilds and have, further, collectively refused to agree to the Guilds' Code of Conduct.  These unlawful agreements have further unreasonably

restrained price competition among competing sellers of talent representational services.

415.   Many of the Agencies' co-conspirators have acted in conformity with these illegal agreements despite generating little to no revenues from packaging fees.

416.   These contracts, combinations, agreements, or conspiracies substantially affected, and continue to affect, interstate commerce.

417.   Counterclaim Defendants CAA, UTA, and WME, and their co-conspirators are direct horizontal competitors.

418.   The ATA is a trade association comprised of competing sellers of talent representational services, including Counterclaim Defendants CAA, UTA, WME, and their co-conspirators.  The Agencies' participation in the ATA faciliated the Agencies' and their co-conspirators' ability to reach these illegal agreements and to monitor compliance with them.

419.   ATA committees, including the Negotiation/Strategy Committee, are staffed by senior executives of the Agencies and their co-conspirators.  These executives regularly communicate with each other, including regarding negotiations with the Guilds.

420.   The Agencies jointly package audiovisual entertainment projects, which require the Agencies to disclose competitively sensitive information to each other regarding the terms of each Agency's packaging fees for such project.  Joint packaging therefore further faciliates the Agencies' ability to monitor compliance with the illegal agreements described herein.

421.   No exemptions apply to the anticompetitive conduct alleged herein.

422.   The conduct of the Agencies and their co-conspirators was a direct, proximate and substantial factor in causing harm to the Counterclaimants and their members.

423.   These contracts, combinations, agreements, or conspiracies have caused substantial anticompetitive effects.

424.   Counterclaimants the Guilds and their members, including the Individual Counterclaimants, have suffered antitrust injury due to the illegal conspiracy because Guild members purchased talent representational services at artificially inflated prices and the quality of the talent representation available to Guild members has been substantially reduced.

425.   The Guilds have suffered antitrust injuries because they have had to divert their resources to, among other things, (1) monitor the Agencies' packaging practices, (2) educate Guild members about the Agencies' conflicts of interest, (3) enforce Guild members' rights, including through contract enforcement actions under the MBA, and (4) negotiate additional protections for writers in their MBA that would otherwise have been provided by their talent agents, as described in greater detail above in Paragraphs 337-44.   The Guilds have also received lower dues payments as a direct result of the inflated price of talent representation services and the reduced member compensation caused by the Agencies' price fixing of packaging fees.

426.   The Guilds' members, including the Individual Counterclaimants, have suffered and will continue to suffer antitrust injuries as a direct result of the Agencies' and their co-conspirators' illegal conspiracy by way of lower compensation and lost opportunities for their creative writing services, as well as because the quality of the talent representation available to Guild members has been substantially reduced.

427.   One of the objectives of the Agencies' conspiracy is to frustrate the mission of the Guilds to ensure fair wages for their members.

428.   The alleged contract, combination or conspiracy is a *per se* violation of the federal antitrust laws.

96

429.   Pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, the Individual Counterclaimants, on their own behalf, and Counterclaimants the Guilds, on their own behalf and on behalf of their members, are entitled to the issuance of an injunction against the Agencies, preventing and restraining the violations alleged herein.

430.   The Individual Counterclaimants are also entitled to treble damages.  15 U.S.C. §15(a).

431.   Counterclaimants are also entitled to their attorneys' fees and costs.  15 U.S.C. §§15(a) and 26.

## SECOND CLAIM FOR RELIEF

**_Per Se_ Group Boycott in Violation of the Sherman Act, 15 U.S.C. §1 (brought by the Individual Counterclaimants on their own behalf, and by the Guilds on their own behalf and on behalf of their members, against Counterclaim Defendants CAA, UTA, and WME)**

432.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-431.

433.   The Agencies and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1) by artificially reducing or eliminating competition in the United States.   The Agencies and their co-conspirators are engaged in, and their conduct substantially affects, interstate commerce.   The production of audiovisual entertainment and scripted entertainment for television and video distribution is in, or affects, interstate commerce and the packaging of talent therefore is in, or affects, such commerce.   The procurement of literary talent for such productions is in or affects such commerce.

434.   Independent economic actors—including Counterclaim Defendants CAA, UTA, WME, and their co-conspirators—may not collude on the prices they

would accept for their services or otherwise engage in concerted anticompetitive action in the marketplace.  *See, e.g.*, *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990).  Specifically, collective bargaining by non-labor organizations over the price of a service is per se illegal under Section 1 of the Sherman Act.  *See, e.g.*, *Nat'l Soc'y of Prof'l Engs. v. United States*, 435 U.S. 679, 692–93 (1978).  Likewise, non-labor organizations may not agree to engage in horizontal group boycotts of suppliers, customers, or others.  *See, e.g.*, *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457 (1941).

435.   The Agencies possess a dominant market position.  Due to the operation of the laws of California and other states, talent agencies possess a statutory monopoly over the procurement of employment opportunities for talent.  Within this statutory monopoly, the Agencies possess a dominant share even among other talent agencies in the sale of talent representational services.  For example, until April 2019, the three Counterclaim Defendants—CAA, UTA, and WME—represented writers in projects that accounted for approximately 70% of Guild members' earnings.  The Agencies are also dominant in the procurement of employment opportunities for Guild members.  For example, two Agencies (WME and CAA) control more than 80% of all television packages (representing more than 70% of all television series).

436.  For the purpose of formulating and effectuating their contract, combination, or conspiracy, the Agencies and their co-conspirators did those things they contracted, combined, or conspired to do, including by:

(a)   Collectively discussing and agreeing on common stances to take with the Guilds after the Guilds had revoked their consent to collective negotiation with the agencies;

(b)   Collectively taking common stances with the Guilds after the Guilds had revoked their consent to collective negotiation with the agencies;

(c)    Collectively refusing to negotiate with the Guilds on an individual rather than collective basis;

(d)    Collectively threatening lawyers and talent managers with baseless litigation and other retaliatory actions if they represented their former clients in negotiating employment contracts with studios;

(e)    Agreeing to blacklist any agency that agreed to the Guilds' Code of Conduct, thereby harming the Guilds' members who are represented by those agencies.

437.   These contracts, combinations, agreements, or conspiracies substantially affected, and continue to affect, interstate commerce.

438.   Counterclaim Defendants CAA, UTA, WME, and their co-conspirators are direct horizontal competitors. The Agencies' co-conspirators have acted in conformity with these illegal agreements despite generating little to no revenues from packaging fees.

439.   The ATA is a trade association comprised of competing sellers of talent representational services, including Counterclaim Defendants CAA, UTA, WME, and their co-conspirators. The Agencies' participation in the ATA faciliated the Agencies' and their co-conspirators' ability to reach these illegal agreements and to monitor compliance with them.

440.   ATA committees, including the Negotiation/Strategy Committee, are staffed by senior executives of the Agencies and their co-conspirators. These executives regularly communicate with each other, including regarding negotiations with the Guilds.

441.   No exemptions apply to the anticompetitive conduct alleged herein.

442.   The conduct of the Agencies and their co-conspirators was a substantial factor in causing harm to Counterclaimants the Guilds and their members, including the Individual Counterclaimants.

443.   As a direct and proximate result of the Agencies' collusion, the Guilds have been, and continue to be, deprived of competition among individual agencies regarding negotiation of new franchise agreements.

444.   As a direct and proximate result of the Agencies' and their co-conspirators' collusion, the Guilds' members have had, and will continue to have, an artificially reduced choice of legal counsel and talent managers to represent them in connection with the negotiation of employment contracts, as well as an artificially reduced number of employment opportunities.

445.   These contracts, combinations, agreements, or conspiracies have caused substantial anticompetitive effects.

446.   The Guilds' members, including the Individual Counterclaimants, have suffered antitrust injury due to the Agencies' illegal conspiracy.

447.   The Guilds have also suffered antitrust injuries due to the Agencies' and their co-conspirators' illegal combination.  For example, the Guilds have had to divert their resources by spending significant time and money in building and expanding their alternative staffing systems described at Paragraph 398.

448.   One of the objectives of the Agencies' group boycott is to frustrate the mission of the Guilds to ensure fair wages for their members.

449.   The alleged group boycott is a *per se* violation of the federal antitrust laws.

450.   Pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, the Individual Counterclaimants, on their own behalf, and Counterclaimants the Guilds, on their own behalf of and on behalf of their members, are entitled to the issuance of an injunction against CAA, UTA, and WME, preventing and restraining the violations alleged herein, along with their attorneys' fees and costs.

451.   The Individual Counterclaimants are also entitled to treble damages.  15 U.S.C. §15(a).

**THIRD CLAIM FOR RELIEF**

*Per Se* **Price-Fixing in Violation of the Cartwright Act,**

**Cal. Bus. & Prof. Code §16700 *et seq.***

**(brought by the Individual Counterclaimants on their own behalf, and by the**

**Guilds on their own behalf and on behalf of their members, against**

**Counterclaim Defendants CAA, UTA, and WME)**

452.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-20, 241-305, and 307-398.

453.   The Agencies and their co-conspirators entered into and engaged in a contract, combination, trust, or conspiracy in unreasonable restraint of trade in violation of the Cartwright Act, California Business and Professions Code §16700 *et seq.*, by artificially reducing or eliminating competition in California and the United States.

454.   The Agencies' and their co-conspirators' contract, combination, trust or conspiracy was entered into, carried out, effectuated and perfected mainly within the State of California, and the Agencies' conduct within California injured Counterclaimants the Guilds' members, including the Individual Counterclaimants, within California and throughout the United States.

455.   As described above at Paragraph 350, in or around 1995-1996, and continuing through to the present, the exact starting date being unknown to Counterclaimants and exclusively within the knowledge of the Agencies and their conspirators, the Agencies and their co-conspirators entered into a continuing contract, combination, trust, or conspiracy to unreasonably restrain trade in violation of the Cartwright Act.   The Agencies and their co-conspirators have acted in violation of §16700 to fix, raise, stabilize, and maintain the prices of talent representational services and to control access to writers' services.   The details and extent of the Agencies' conspiracy was kept secret and was not discovered by the

Guilds or the Individual Counterclaimants before 2016.

456.   These violations of the Cartwright Act, without limitation, constitute a continuing unlawful trust and concert of action among the Agencies and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of talent representational services and to control access to writers' services.   The sale of talent representational services to studios and writers are inextricably intertwined.

457. As a result of the Agencies' and their co-conspirators' unlawful conduct, prices for talent representational services provided to Guild members were raised, fixed, maintained, and stabilized in the State of California; the ability of Guild members to sell their writing services to studios and production companies has been suppressed; and the quality of the talent representation available to Guild members has been substantially reduced.

458.   The talent agency industry is highly concentrated.  For example, as a result of numerous mergers and acquisitions (as well as the poaching of agents from smaller agencies), until April 2019, the three Counterclaim Defendants—CAA, UTA, and WME—represented writers in projects that accounted for approximately 70% of Guild members' earnings.

459. For the purpose of formulating and effectuating their contract, combination, or conspiracy, the Agencies and their co-conspirators did those things they contracted, combined, or conspired to do, including:

(a)   exchanging information regarding the pricing and terms of packaging fees;

(b)   agreeing to propose the same "3-3-10" packaging fee to studios;

(c)   proposing and negotiating with studios from a common "3-3-10" starting point;

(d)    agreeing to propose the same terms regarding base license fees to studios based on factors such as type of show, number of episodes, and method of distribution;

(e)    making proposals to studios that reflected the price-fixed base license fee; and

(f)    selling talent representation services in California and throughout the United States at non-competitive prices.

460.   Moreover, since June 20, 2019, the Agencies and their co-conspirators have collectively agreed to continue to adhere to the "3-3-10" model in any negotiations with the Guilds and have, further, collectively refused to agree to the Guilds' Code of Conduct.  These unlawful agreements have further unreasonably restrained price competition among competing sellers of talent representational services.

461.   Many of the Agencies' co-conspirators have acted in conformity with these illegal agreements despite generating little to no revenues from packaging fees.

462.   Counterclaim Defendants CAA, UTA, WME, and their co-conspirators are direct horizontal competitors.  The Agencies' co-conspirators have acted in conformity with these illegal agreements despite generating little to no revenues from packaging fees.

463.   The ATA is a trade association comprised of competing sellers of talent representational services, including Counterclaim Defendants CAA, UTA, WME, and their co-conspirators.  The Agencies' participation in the ATA faciliated the Agencies' and their co-conspirators' ability to reach these illegal agreements and to monitor compliance with them.

464.   The Agencies' participation in the ATA helped to enable the Agencies and their co-conspirators to reach these illegal agreements and to monitor compliance with them.

465.   ATA committees, including the Negotiation/Strategy Committee, are staffed by senior executives of the Agencies and their co-conspirators.   These executives regularly communicated with each other, including regarding negotiations with the Guilds.

466.   The Agencies jointly package audiovisual entertainment projects, which require the Agencies to disclose competitively sensitive information to each other regarding the terms of each Agency's packaging fees for such project.  Joint packaging therefore further faciliates the Agencies' ability to monitor compliance with the illegal agreements described herein.

467.   No exemptions apply to the anticompetitive conduct alleged herein.

468.   The conduct of the Agencies and their co-conspirators was a direct, proximate and substantial factor in causing harm to Counterclaimants.

469.   These contracts, combinations, agreements, or conspiracies have caused substantial anticompetitive effects.

470.   Counterclaimants the Guilds and their members, including the Individual Counterclaimants, have suffered antitrust injury due to the illegal conspiracy because Guild members purchased talent representational services at artificially inflated prices and the quality of the talent representation available to Guild members has been substantially reduced.

471.   The Guilds have suffered antitrust injuries because they have had to divert their resources to, among other things, (1) monitor the Agencies' packaging practices, (2) educate Guild members about the Agencies' conflicts of interest, (3) enforce Guild members' rights, including through contract enforcement actions under the MBA and (4) negotiate additional protections for writers in the MBA  that would otherwise have been negotiated by writers' talent agents, as described in greater detail above in Paragraphs 337-44.  The Guilds have also received lower dues payments as a direct result of the inflated price of talent representation services and

the reduced member compensation caused by the Agencies' price fixing of packaging fees.

472.   The Guilds' members, including the Individual Counterclaimants, have suffered and will continue to suffer antitrust injuries as a direct result of the Agencies' and their co-conspirators' illegal conspiracy by way of lower compensation and lost opportunities for their creative television writing services, as well as because the quality of the talent representation available to Guild members has been substantially reduced.

473.   One of the objectives of the Agencies' conspiracy is to frustrate the mission of the Guilds to ensure fair wages for their members.

474.   The alleged contract, combination or conspiracy is a *per se* violation of the Cartwright Act.

475.   The Individual Counterclaimants are entitled to treble damages, and Counterclaimants are also entitled to their costs of suit, including reasonable attorneys' fees.  Cal. Bus & Prof. Code §16750(a).

476.   Counterclaimants the Guilds, on their own behalf and on behalf of their members, and the Individual Counterclaimants are also entitled to an injunction against CAA, UTA, and WME, preventing and restraining the violations alleged herein.  Cal. Bus & Prof. Code §16750(a).

## **FOURTH CLAIM FOR RELIEF**

### ***Per Se* Group Boycott in Violation of the Cartwright Act,**
### **Cal. Bus. & Prof. Code §16700 *et seq.***
### **(brought by the Individual Counterclaimants on their own behalf, and by the**
### **Guilds on their own behalf and on behalf of their members, against**
### **Counterclaim Defendants CAA, UTA, and WME)**

477.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-20, 241-305, and 307-398.

478.   The Agencies and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of the Cartwright Act, California Business and Professions Code §16700 *et seq.*, by artificially reducing or eliminating competition in California and the United States.

479.   The Agencies' and their co-conspirators' contract, combination, trust or conspiracy was entered into, carried out, effectuated, and perfected mainly within the State of California, and the Agencies' conduct within California injured Counterclaimants the Guilds' members, including the Individual Counterclaimants, within California and throughout the United States.

480.   Independent economic actors—including Counterclaim Defendants CAA, UTA, WME, and their co-conspirators—may not collude on the prices they would accept for their services or otherwise engage in concerted anticompetitive action in the marketplace. *See, e.g.*, *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990).  They also may not agree to engage in horizontal group boycotts of suppliers, customers, or others. *See, e.g.*, *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457 (1941).   Specifically, collective bargaining by non-labor organizations over the price of a service, and collective refusals to deal with particular suppliers, customers, or others, are per se illegal under California law. *See, e.g.*, *Oakland-Alameda County Builders' Exch. v. F. P. Lathrop Constr. Co.*, 4 Cal.3d 354, 365 (1971).

481.   The Agencies possess a dominant market position.  Due to the operation of the laws of California and other states, talent agencies possess a statutory monopoly over the procurement of employment opportunities for talent.  Within this statutory monopoly, the Agencies possess a dominant share even among other talent agencies in the sale of talent representational services.  For example, until April 2019, the Counterclaim Defendants—CAA, UTA, and WME—represented writers in projects that accounted for approximately 70% of Guild members' earnings.  The

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

Agencies are also dominant in the procurement of employment opportunities for Guild members.  For example, two Agencies (WME and CAA) control more than 80% of all television packages (representing more than 70% of all television series).

482.  For the purpose of formulating and effectuating their contract, combination, or conspiracy, the Agencies and their co-conspirators did those things they contracted, combined, or conspired to do, including by:

(a)  Collectively discussing and agreeing on common stances to take with the Guilds after the Guilds had revoked their consent to collective negotiation with the agencies;

(b)  Collectively taking common stances with the Guilds after the Guilds had revoked their consent to collective negotiation with the agencies;

(c)  Collectively refusing to engage in individual rather than collective negotiations with the Guilds;

(d)  Agreeing to blacklist any agency that agreed to the Guilds' Code of Conduct, thereby harming the Guilds' members who are represented by those agencies.

483.  These contracts, combinations, agreements, or conspiracies substantially affected, and continue to affect, commerce within California and throughout the United States.

484.  Counterclaim Defendants CAA, UTA, WME, and their co-conspirators are direct horizontal competitors.

485.   The Agencies' participation in the ATA helped to enable the Agencies and their co-conspirators to reach these illegal agreements and to monitor compliance with them.

486.  ATA committees, including the Negotiation/Strategy Committee, are staffed by senior executives of the Agencies and their co-conspirators.  These

executives regularly communicated with each other, including regarding negotiations with the Guilds.

487.    The ATA is a trade association comprised of competing sellers of talent representational services, including Counterclaim Defendants CAA, UTA, WME, and their co-conspirators.  The Agencies' participation in the ATA faciliated the Agencies' and their co-conspirators' ability to reach these illegal agreements and to monitor compliance with them.

488.    No exemptions apply to the anticompetitive conduct alleged herein.

489.    The conduct of the Agencies and their co-conspirators was a substantial factor in causing harm to Counterclaimants the Guilds and their members, including the Individual Counterclaimants.

490.    As a direct and proximate result of the Agencies' collusion, the Guilds have been, and continue to be, deprived of competition among individual agencies regarding negotiation of new franchise agreements.

491.    As a direct and proximate result of the Agencies' and their co-conspirators' collusion, the Guilds' members have had, and will continue to have, an artificially reduced choice of employment opportunities.

492.    These contracts, combinations, agreements, or conspiracies have caused substantial anticompetitive effects.

493.    The Guilds' members, including the Individual Counterclaimants, have suffered antitrust injury due to the illegal conspiracy.

494.    The Guilds have also suffered antitrust injuries due to the Agencies' illegal conspiracy.  For example, the Guilds have had to divert their resources by spending significant time and money in building and expanding their alternative staffing systems described at Paragraph 398.

495.    One of the objectives of the Agencies' group boycott is to frustrate the mission of the Guilds to ensure fair wages for their members.

496.   The alleged group boycott is a *per se* violation of the federal antitrust laws.

497.   The Individual Counterclaimants are entitled to treble damages.  Cal. Bus & Prof. Code §16750(a).

498.   Counterclaimants the Guilds, on their own behalf and on behalf of their members, and the Individual Counterclaimants are also entitled to an injunction against CAA, UTA, and WME, preventing and restraining the violations alleged herein, and an award of attorneys' fees and costs.  Cal. Bus & Prof. Code §16750(a).

## FIFTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (brought by the Individual Counterclaimants on their own behalf,

### and by the Guilds on behalf of their members, against

### Counterclaim Defendants CAA, UTA, and WME)

499.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-20, 241-305, and 307-398.

500.   Under California law, an agent owes a fiduciary duty to his or her principal, which includes the duty of loyalty and the duty to avoid conflicts of interest.

501.   At all times relevant to the Complaint, each of the Agencies owed fiduciary duties to the Individual Counterclaimants and to all Guild members represented by the Agencies.

502.   The Agencies each willfully breached their fiduciary duties to the Individual Counterclaimants and other Guild members represented by the Agencies by placing their own interests, including but not limited to their interests in packaging fees, above those of their clients, the Individual Counterclaimants and other Guild members, and by increasing their own profits, including but not limited to profits generated by packaging fees, at the expense of the Individual

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

Counterclaimants and other Guild members, which also constituted a breach of the duty of loyalty.

503.   Instances in which the Agencies put their own interests above those of their clients to whom they owed fiduciary duties and a duty of loyalty included, but are not limited to, the Agencies' entrance into packaging fee agreements pursuant to which the Agencies' packaging fees increased with a corresponding reduction in the payments received by their clients and decreased with a corresponding increase in the payments received by their clients; the Agencies' entrance into packaging fee agreements pursuant to which the Agencies' packaging fee necessarily decreased the funding available for their clients to use in producing the programs for which the Agencies received  packaging fees; the Agencies' pursuit of negotiating strategies and entrance into agreements designed to maximize their packaging fees at the expense of their clients' economic and creative interests; the Agencies' negotiation of more favorable profit definitions for themselves than for their clients; the Agencies' refusal to approve their clients' agreements with studios to work on particular projects absent a packaging fee agreement that benefitted the Agencies at their clients' expense; the Agencies' steering of their clients to projects in which they could claim packaging fees, depriving them of employment opportunities and greater compensation; and the Agencies' failure to pursue the highest possible compensation for their clients, or to pursue compensation already owed to their clients, when doing so would compromise the Agencies' own interests in future packaging fees.

504.   The Agencies each further willfully breached their fiduciary duty to the Individual Counterclaimants and other Guild members by proceeding with the representation of their clients under numerous conflicts of interest without obtaining valid, informed consent to those conflicts of interest from the Individual Counterclaimants or from other Guild members.  In particular, the Agencies failed

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

to disclose the material terms of their packaging fee agreements with particular studios regarding particular programs—including all economic terms of those agreements—before representing their writer-clients in connection with those programs, and have deliberately concealed from their clients either the existence of packaging fee agreements, the terms of the agreements, and/or the conflicts of interest created by the agreements.

505.   As a result of the Agencies' willful breaches of their fiduciary duties to the Individual Counterclaimants, they have suffered significant damages, including but not limited to lost wages, lost employment opportunities, and other economic losses.

506.   As a result of the Agencies' willful breaches of their fiduciary duties to the Guilds' members, the Guilds' members have suffered significant harm, including but not limited to lost wages, lost employment opportunities, and other economic losses.

507.   Counterclaimants are informed and believe that the Agencies committed the aforementioned acts maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Counterclaimants, from an improper and evil motive amounting to malice, and in conscious disregard of Counterclaimants' rights. The Individual Counterclaimants are therefore entitled to recover punitive damages from the Agencies in an amount according to proof.

## SIXTH CLAIM FOR RELIEF

### Constructive Fraud, Cal. Civ. Code §1573

### (brought by the Individual Counterclaimants on their own behalf, and by the Guilds on behalf of their members, against Counterclaim Defendants CAA, UTA, and WME)

508.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-20, 241-305, and 307-398.

509.    Under California law, "[c]onstructive fraud consists … [i]n any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him."  Cal. Civ. Code §1573.  Pursuant to Civil Code §1573, an agent's breach of his or her fiduciary duty to a principal thus constitutes constructive fraud.  Specifically, the failure of a fiduciary to disclose a material fact to his principal that might affect the fiduciary's motives or the principal's decision constitutes constructive fraud, regardless of whether the fiduciary acted with fraudulent intent.

510.    The Agencies, through their agents, each committed constructive fraud by breaching their fiduciary duties to the Individual Counterclaimants and to other Guild members represented by the Agencies by placing their own interests above that of their clients, the Individual Counterclaimants and other Guild members, and by increasing their own profits at the expense of the Individual Counterclaimants and other Guild members, which constituted a breach of the duty of loyalty.  The Agencies, through their agents, committed constructive fraud by breaching their fiduciary duties to the Individual Counterclaimants and other Guild members by proceeding with the representation under numerous conflicts of interest without disclosing either the existence of those conflicts or the material facts concerning those conflicts of interest to the Individual Counterclaimants or other Guild members.  The Agencies, through their agents, committed constructive fraud by failing to disclose to the Individual Counterclaimants and other Guild members material facts known to the Agencies, which material facts might affect the Agencies' motives or, if disclosed to the Individual Counterclaimants and other Guild members, would have affected the Individual Counterclaimants' and other Gild members' decisions, including but not limited to the following:

(a)     Concealing the existence of and/or the terms of the Agencies' packaging fee agreements and the fact that packaging fees are an inherent conflict of interest;

(b)     Concealing the fact that packaging fees are paid directly by the studios from the program's budget or revenues to the Agencies;

(c)     Concealing the fact that the Agencies sought to prevent the Individual Counterclaimants and other Guild members represented by the Agencies from working with talent represented by other talent agencies in order to avoid having to split packaging fees with other talent agencies;

(d)     Concealing the fact that the Agencies intentionally failed to maximize how much the Individual Counterclaimants and other Guild members represented by the Agencies were or are paid for their work in order to maximize packaging fees for themselves;

(e)     Concealing the fact that the Agencies intentionally failed to pitch their clients the Individual Counterclaimants' and other Guild members' work to studios that would pay the writers the most, and instead, pitched  the Individual Counterclaimants' and other Guild members' work to those studios that the Agencies believed would pay the largest packaging fee;

(f)     Concealing the fact that the Agencies often make more in packaging fees than the Individual Counterclaimants and other Guild members represented by the Agencies are paid for their work on a particular program;

(g)     Concealing the fact that packaging fees are frequently paid to the Agencies before the profits that determine how the Individual Counterclaimants' and other members of the Guilds' profits are calculated, which therefore reduces the overall amount of money paid to the Individual Counterclaimants and other Guild members represented by the Agencies for their work on a particular show;

(h)    Concealing the fact that the Agencies' compensation in a packaging fee arrangement is often tied to the budget of a particular production or program rather than the amount paid to the Individual Counterclaimants and other Guild members represented by the Agencies, and therefore, the Agencies are incentivized to reduce the amount paid to the Individual Counterclaimants and other Guild members represented by the Agencies in order to increase the amount of the budget available to compensate the Agencies;

(i)    Concealing the fact that the Agencies use popular writers, including the Individual Counterclaimants and other Guild members represented by the Agencies, as leverage to secure packaging fees even where doing so does not serve the economic and/or creative interests of their writer-clients the Individual Counterclaimants and other Guild members;

(j)    Concealing the fact that the Agencies have, in some instances, intentionally and actively suppressed the wages of their own writer-clients the Individual Counterclaimants and other Guild members represented by the Agencies in order to secure more lucrative "packaging fees" for themselves; and

(k)    Concealing the fact that the Agencies' interests in negotiating packaging fees for themselves are not aligned with their clients the Individual Counterclaimants and other Guild members, and in fact, are at direct odds with the Agencies' clients.

511.   The Guilds' members, including the Individual Counterclaimants, justifiably expect their agents to loyally represent their interests, in accordance with California agency law principles.   The Guilds' members represented or formerly represented by the Agencies, including the Individual Counterclaimants, have justifiably relied, to their detriment, on the Agencies' misleading concealment of the above facts.

512.   As a result of the Agencies' commission of constructive fraud under

114

Civil Code §1573, the Individual Counterclaimants suffered significant damages, including but not limited to lost wages, lost employment opportunities, and other economic losses.

513.   As a result of CAA's, UTA's, and WME's commission of constructive fraud under Civil Code §1573, the Guilds' members suffered significant harm, including but not limited to lost wages, lost employment opportunities, and other economic losses.

514.   Counterclaimants are informed and believe that the Agencies committed the aforementioned violations of Civil Code §1573 maliciously and oppressively, with the wrongful intention of injuring Counterclaimants, from an improper and evil motive amounting to malice, and in conscious disregard of Counterclaimants' rights.  The Individual Counterclaimants are therefore entitled to recover punitive damages from the Agencies in an amount according to proof.

## SEVENTH CLAIM FOR RELIEF

**Unfair Competition, Cal. Bus. & Prof. Code §17200 *et seq.***

**(brought by the Individual Counterclaimants on their own behalf,**

**and by the Guilds on their own behalf, against**

**Counterclaim Defendants CAA, UTA, and WME)**

515.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-20, 241-305, and 307-398.

516.   California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et seq.* ("UCL"), prohibits "unlawful, unfair or fraudulent business act[s]."

517.   The Agencies' packaging fee practices violate the UCL in four respects.

518.   First, packaging fees are an "unlawful" or "unfair" practice because they constitute a breach of the Agencies' fiduciary duties to their clients.

519.   Second, packaging fees are an "unlawful" or "unfair" practice because they constitute constructive fraud under Civil Code §1573.

520.   Third, packaging fees are an "unfair" practice because they deprive writers of loyal, conflict-free representation; divert compensation away from the writers and other creative talent that are responsible for creating valuable television and film properties; and undermine the market for writers' creative endeavors.  The enormous harms caused by the Agencies' receipt of packaging fees far outweigh the benefit, if any, to their writer-clients.  Because of the Agencies' threats of blacklisting described above, the Individual Counterclaimants and other Guild members cannot reasonably avoid the Agencies' unfair packaging fee practices.  The Agencies' conduct also offends several established California and federal public policies, including but not limited to the public policies expressed in Civil Code §§1573, 2232(c), and 29 U.S.C. §186.  The Agencies' receipt of packaging fees is further immoral, unethical, oppressive, unscrupulous, and substantially injurious to the Agencies' writer-clients, who are the consumers of their representational services.

521.   Fourth, packaging fees are an "unlawful" or "unfair" practice because they violate Section 302 of the federal Labor-Management Relations Act ("LMRA"), 29 U.S.C. §186, the so-called "anti-kickback" provision of the Taft-Hartley Act.

522.   Subsection (a) of LMRA Section 302 makes it unlawful for "any employer or association of employers … or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value … to *any representative of any of his employees* who are employed in an industry affecting commerce."  29 U.S.C. §186(a) (emphasis added).  The same section makes it unlawful for "any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other things of value prohibited by subsection (a)."  *Id.* §186(b).

523.   The television and film industries are industries that affect commerce.

116

Indeed, those industries generate hundreds of millions of dollars of national and international revenue each year.

524.   The studios that produce the television shows and films on which the Individual Counterclaimants and other Guild-member writers work are employers for the purposes of LMRA Section 302.

525.   CAA, UTA, and WME are each representatives of the studios' employees for the purposes of LMRA Section 302.  Indeed, the very reason CAA, UTA, or WME is retained by writers is to represent those writers in procuring employment opportunities and negotiating wages in excess of the minimums established by the MBA.  Any agent representing a writer in negotiations with a studio is exercising authority delegated to the agent by the Guilds (which otherwise have the exclusive right to negotiate on behalf of the represented employees).

526.   The key feature of any packaging fee agreement is the payment of a negotiated fee by the employer studio to the employee representative, i.e. to CAA, UTA, or WME.  Such payments are expressly prohibited by and unlawful under LMRA Section 302, and therefore constitute an unlawful business practice for the purposes of California's UCL.

527.   The Individual Counterclaimants and the Guilds have lost money or property as a result of the Agencies' packaging fee practices.  As noted above, the Individual Counterclaimants have been required to spend money to retain other professionals to provide services their agents should have been providing; have seen their compensation reduced by virtue of packaging fees; and have been denied employment opportunities because of the misalignment of incentives that results from the Agencies' packaging fee practices, as alleged in greater detail above.  The Guilds have been required to divert their resources to create new staffing systems, negotiate new protections for their members with the AMPTP, monitor the Agencies' packaging fees, educate members about the Agencies' packaging fee

abuses, prepare a comprehensive campaign to address those abuses and end packaging fees, and enforce their members' contractual rights after the Agencies failed to do so.  The Guilds have also lost dues revenue due to packaging fees.

528.   As a result of the Agencies' unlawful and unfair business practices, Counterclaimants are entitled to injunctive relief and disgorgement of agency profits, and the Individual Counterclaimants are entitled to restitution.  Cal. Bus. & Prof. Code §17203.

## EIGHTH CLAIM FOR RELIEF

### Investment of Racketeering Income, 18 U.S.C. §1962(a)

### (brought by the Individual Counterclaimants on their own behalf, and by the Guilds on their own behalf and on behalf of their members, against Counterclaim Defendants CAA, UTA, and WME)

529.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-528.

530.   The RICO Act, 18 U.S.C. §1962(a), makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … , to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

531.   The RICO Act defines "racketeering activity" to include "any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations)." 18 U.S.C. §1961(1)(C). Accordingly, violations of the anti-kickback provisions of the LMRA, i.e. Section 302, 29 U.S.C. §186(a) and (b), constitute racketeering activity under the RICO Act.

532.   Each of the Agencies is a "person" within the meaning of the RICO Act.  18 U.S.C. §1962(a); *see also id.* §1961(3) ("'person' includes any individual

118

1   or entity capable of holding a legal or beneficial interest in property").

2   533.   Each of the Agencies is also an "enterprise which is engaged in, or the

3   activities of which affect, interstate or foreign commerce" within the meaning of the

4   RICO Act.  18 U.S.C. §1962(a); *see also id.* §1961(4) ("'enterprise' includes any

5   individual, partnership, corporation, association, or other legal entity, and any union

6   or group of individuals associated in fact although not a legal entity").

7   534.   Each of the Agencies has engaged in a pattern of racketeering activity

8   within the meaning of 18 U.S.C. §1962(a)—namely, each Agency's repeated

9   violations of LMRA Section 302 in the form of receiving packaging fees from their

10  writer-clients' employers, the studios.  *See* 29 U.S.C. §186(a), (b).  Every time one

11  of the Agencies receives any sum of money directly from a studio as part of a

12  package agreement, that payment violates LMRA Section 302.  *See id.*  The

13  Agencies have each received multiple unlawful payments from the studios on each

14  show or film packaged by each Agency, resulting in hundreds, if not thousands, of

15  separate LMRA Section 302 violations over the last ten years.  *See* 18 U.S.C.

16  §1961(5).  This pattern of racketeering activity directly benefits the Agencies, as the

17  unlawful payments are a major source of the Agencies' income.

18  535.   The Agencies have each invested the income or proceeds of their

19  pattern of racketeering activity—namely, the unlawful packaging fees—back into

20  the operation of each Agency, in violation of 18 U.S.C. §1962(a).

21  536.   In the alternative, the Agencies and each of the studios with which the

22  Agencies deal are groups of persons associated together for the common purpose of

23  engaging in a continuing course of conduct—namely, packaging television and film

24  productions, and paying unlawful packaging fees from the studio to the Agency.  The

25  association of an Agency and each studio is therefore an "enterprise engaged in, or

26  the activities of which affect, interstate or foreign commerce" within the meaning of

27  the RICO Act.  18 U.S.C. §1962(c); *see also id.* §1961(4) ("'enterprise' includes any

28

119

individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

537.   The Agencies have each used the income or proceeds of their pattern of racketeering activity—namely, the unlawful packaging fees—in the acquisition of their interests in or the establishment or operation of the association-in-fact enterprises described in the previous paragraph, in violation of 18 U.S.C. §1962(a). The Agencies receive substantial income from packaging fees; the Agencies necessarily use those same resources when coordinating their activities with the studios, such that the Agencies have either directly or indirectly used the proceeds of their patterns of racketeering activity to obtain an interest in or to establish or operate a RICO enterprise in violation of §1962(a).

538.   In addition and in the alternative, the Agencies' affiliate production companies are "enterprise[s] engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act.  18 U.S.C. §1962(c); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

539.   The Agencies have used the income or proceeds of their pattern of racketeering activity—namely, the unlawful packaging fees—in the acquisition of the Agencies' interest in or in the establishment or operation of the affiliate production companies described in the previous paragraph, in violation of 18 U.S.C. §1962(a).   The Agencies receive substantial income from packaging fees; the Agencies necessarily use those same resources in funding their affiliate production company enterprises, such that the Agencies have each either directly or indirectly used the proceeds of their pattern of racketeering activity to obtain an interest in or to establish or operate a RICO enterprise in violation of §1962(a).

540.   Each of the above enterprises exists separate and apart from the pattern

1   of racketeering activity alleged herein.

2   541.   18 U.S.C. §1964(c) provides a private cause of action to "[a]ny person

3   injured in his business or property by reason of a violation of" the RICO Act.

4   542.   Under any of the above alternative theories, the Individual

5   Counterclaimants and the Guilds have lost money or property as a result of the

6   Agencies' violations of §1962(a) within the meaning of 18 U.S.C. §1964(c).  The

7   Agencies' pattern of racketeering activity (i.e. their receipt of packaging fees) has

8   allowed them to dominate the marketplace for talent representational services,

9   thereby harming the Guilds' members, including the Individual Counterclaimants,

10  by denying them conflict-free representation, lowering their income, requiring them

11  to pay artificially inflated prices for talent representational services, and reducing

12  the quality of talent representational services available to them.  In addition, as noted

13  above, the Individual Counterclaimants have been required to spend money to retain

14  other professionals to provide services their agents should have been providing; have

15  seen their compensation reduced by virtue of packaging fees; and have been denied

16  employment opportunities because of the misalignment of incentives that results

17  from the Agencies' packaging fee practices, including the Agencies' reinvestment

18  of packaging fees in their operations and/or in their acquisition of an interest in or

19  establishment or operation of any of the above alternative RICO enterprises, as

20  alleged in more detail above.  The Guilds have been required to divert their resources

21  to create new staffing systems, negotiate new protections for their members with the

22  AMPTP, monitor the Agencies' packaging fees, educate members about the

23  Agencies' packaging fee abuses, prepare a comprehensive campaign to address

24  those abuses and end packaging fees, and enforce their members' contractual rights

25  after the Agencies failed to do so.  The Guilds have also lost dues revenue due to

26  packaging fees and their reinvestment in the Agencies or in the alternative RICO

27  enterprises, which permits the racketeering activity to continue.

28

543.   As a result of each of the Agencies' violations of §1962(a), Counterclaimants are entitled to injunctive relief, including but not limited to an order requiring the dissolution or reorganization of each of the Agencies.  18 U.S.C. §1964(a).

544.   As a result of each of the Agencies' RICO violations, the Individual Counterclaimants and the Guilds on their on behalf are also entitled to treble damages, as well as attorneys' fees and costs.  18 U.S.C. §1964(c).

### NINTH CLAIM FOR RELIEF

**Maintenance of Racketeering Enterprise, 18 U.S.C. §1962(b)**

**(brought by the Individual Counterclaimants on their own behalf,**

**and by the Guilds on their own behalf and on behalf of their members,**

**against Counterclaim Defendants CAA, UTA, and WME)**

545.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-544.

546.   The RICO Act, 18 U.S.C. §1962(b), makes it "unlawful for any person through a pattern of racketeering activity … to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

547.   The RICO Act defines "racketeering activity" to include "any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations)."  18 U.S.C. §1961(1)(C). Accordingly, violations of the anti-kickback provisions of the LMRA, i.e. Section 302, 29 U.S.C. §186(a) and (b), constitute racketeering activity under the RICO Act.

548.   Each of the Agencies is a "person" within the meaning of the RICO Act.  18 U.S.C. §1962(a); *see also id.* §1961(3) ("'person' includes any individual or entity capable of holding a legal or beneficial interest in property").

549.   Each of the Agencies is an "enterprise which is engaged in, or the

activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act. 18 U.S.C. §1962(b); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

550. The Agencies have engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(a)—namely, their repeated violations of LMRA Section 302 in the form of receiving packaging fees from their writer-clients' employers, the studios. *See* 29 U.S.C. §186(a), (b). Every time one of the Agencies receives any sum of money directly from a studio as part of a package agreement, that payment violates LMRA Section 302. *See id.* The Agencies have each received multiple unlawful payments from the studios on each show or film packaged by each Agency, resulting in hundreds, if not thousands, of separate LMRA Section 302 violations over the last ten years. *See* 18 U.S.C. §1961(5). This pattern of racketeering activity directly benefits the Agencies, as the unlawful payments are a major source of the Agencies' income.

551. Each of the Agencies is a "person" that, "through a pattern of racketeering activity"—i.e. through the Agencies' repeated violations of LMRA Section 302—has "acquire[d] or maintain[ed], directly or indirectly, any interest in or control of" each Agency, in violation of §1962(b). Specifically, the Agencies' pattern of racketeering activity—i.e. their repeated receipt of packaging fees—is directly linked to their maintenance of an interest in and control over each Agency's business, as packaging fees have indeed become a major part of each Agency's business model. The Agencies' packaging fee practices are maintained and directed from the very top of each organization.

552. In the alternative, each Agency and each of the studios with which each Agency deals are groups of persons associated together for the common purpose of engaging in a continuing course of conduct—namely, packaging television and film

productions, and paying unlawful packaging fees from the studio to the Agency. The association of each Agency and each studio is therefore an "enterprise engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act. 18 U.S.C. §1962(b); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

553.   Accordingly, each Agency is a "person" that, "through a pattern of racketeering activity"—i.e. through the Agencies' repeated violations of LMRA Section 302—have "acquire[d] or maintain[ed], directly or indirectly, any interest in or control of" the association-in-fact enterprises described in the previous paragraph, in violation of §1962(b). Specifically, the Agencies' pattern of racketeering activity—i.e. their repeated receipt of packaging fees—is directly linked to their interest in or control of the association-in-fact enterprises, as the Agencies' past packaging fees are used to fund their continued packaging fee practices, and are the very purpose of the Agencies' participation in the association-in-fact enterprises.

554.   In addition and in the alternative, the Agencies' affiliate production companies are "enterprise[s] engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act. 18 U.S.C. §1962(b); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

555.   Accordingly, each Agency is a "person" that, "through a pattern of racketeering activity"—i.e. through the Agencies' repeated violations of LMRA Section 302—have "acquire[d] or maintain[ed], directly or indirectly, any interest in or control of" the affiliate production company enterprises described in the previous paragraph, in violation of §1962(b). Specifically, the Agencies' pattern of racketeering activity—i.e. their repeated receipt of packaging fees—is directly

124

linked to their interest in or control of the affiliate production company enterprises, as the Agencies' past packaging fees are used to fund their new forays into production via these enterprises.

556.   Each of the above enterprises exists separate and apart from the pattern of racketeering activity alleged herein.

557.   18 U.S.C. §1964(c) provides a private cause of action to "[a]ny person injured in his business or property by reason of a violation of" the RICO Act.

558.   The Individual Counterclaimants and the Guilds have lost money or property as a result of the Agencies' violations of §1962(b) within the meaning of 18 U.S.C. §1964(c).  The Agencies' pattern of racketeering activity (i.e. their receipt of packaging fees) has allowed them to dominate the marketplace for talent agents' representational services, thereby harming the Guilds' members, including the Individual Counterclaimants, by denying them conflict-free representation, lowering their income, requiring them to pay artificially inflated prices for talent representational services, and reducing the quality of talent representational services available to them.  In addition, as noted above, the Individual Counterclaimants have been required to spend money to retain other professionals to provide services their agents should have been providing; have seen their compensation reduced by virtue of packaging fees; and have been denied employment opportunities because of the misalignment of incentives that results from the Agencies' control of their business to continue their unlawful packaging fee practices, as alleged in more detail above. The Guilds have been required to divert their resources to create a new staffing system, negotiate new protections for their members with the AMPTP, monitor the Agencies' control of their business to continue their unlawful packaging fee practices, educate members about the Agencies' packaging fee abuses, prepare a comprehensive campaign to address those abuses and end packaging fees, and enforce their members' contractual rights after the Agencies failed to do so.  The

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

Guilds have also lost dues revenue due to the Agencies' control of their business to continue their unlawful practice of receiving packaging fees.

559.   As a result of the Agencies' violations of §1962(b), Counterclaimants are entitled to injunctive relief, including but not limited to an order requiring the dissolution or reorganization of each Agency.  18 U.S.C. §1964(a).

560.   As a result of the Agencies' RICO violations, the Individual Counterclaimants and the Guilds on their own behalf are also entitled to treble damages, as well as attorneys' fees and costs.  18 U.S.C. §1964(c).

## <u>TENTH CLAIM FOR RELIEF</u>

**Control of Racketeering Enterprise, 18 U.S.C. §1962(c)**

**(brought by the Individual Counterclaimants on their own behalf, and by the Guilds on their own behalf and on behalf of their members, against Counterclaim Defendants CAA, UTA, and WME)**

561.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-560.

562.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

563.   Each Agency is a "person" within the meaning of the RICO Act.  18 U.S.C. §1962(a); *see also id.* §1961(3) ("'person' includes any individual or entity capable of holding a legal or beneficial interest in property").

564.   The Agencies and each of the studios with which each Agency deals are groups of persons associated together for the common purpose of engaging in a continuing course of conduct—namely, packaging television and film productions, and paying unlawful packaging fees from the studio to the Agency.  The association of each Agency and each studio is therefore an "enterprise engaged in, or the

126

activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act.  18 U.S.C. §1962(c); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

565.  In addition, the Agencies' affiliate production companies are "enterprise[s] engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act.  18 U.S.C. §1962(b); *see also id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

566.  Each Agency is a "person" that is "associated" with the enterprises described above in the previous two paragraphs and that has "conduct[ed] or participate[d] in the conduct of such enterprise[s]'[] affairs through a pattern of racketeering activity"—i.e. through the Agencies' repeated violations of LMRA Section 302—in violation of §1962(c).  Specifically, the Agencies' pattern of racketeering activity—the payment by studios of packaging fees to the Agencies—is among the primary purposes of the association in fact between the Agencies and the studios, i.e. the enterprises described in paragraph 564.  Likewise, the Agencies' pattern of racketeering activity—the payment by studios of packaging fees to the Agencies—funds the Agencies' investments in their affiliate production companies, i.e. the enterprises described in paragraph 565.

567.  Each of the above enterprises exists separate and apart from the pattern of racketeering activity alleged herein.

568.  18 U.S.C. §1964(c) provides a private cause of action to "[a]ny person injured in his business or property by reason of a violation of" the RICO Act.

569.  The Individual Counterclaimants and the Guilds have lost money or property as a result of the Agencies' violations of §1962(c) within the meaning of

127

18 U.S.C. §1964(c).  The Agencies' pattern of racketeering activity (i.e. their receipt of packaging fees) has allowed the Agencies  to dominate the marketplace for talent agents' representational services, thereby harming the Guilds' members, including the Individual Counterclaimants, by denying them conflict-free representation, lowering their income, requiring them to pay artificially inflated prices for talent representational services, and reducing the quality of talent representational services available to them.  In addition, as noted above, the Individual Counterclaimants have been required to spend money to retain other professionals to provide services their agents should have been providing; have seen their compensation reduced by virtue of packaging fees; and have been denied employment opportunities because of the misalignment of incentives that results from the Agencies' packaging fee practices, as alleged in more detail above.  The Guilds have been required to divert their resources to create new staffing systems, negotiate new protections for their members with the AMPTP, monitor the Agencies' packaging fee practices, educate members about the Agencies' packaging fee abuses, prepare a comprehensive campaign to address those abuses and end packaging fees, and enforce their members' contractual rights after the Agencies failed to do so.  The Guilds have also lost dues revenue due to the Agencies' control of the above-described enterprises to obtain packaging fees.

570.    As a result of the Agencies' violations of §1962(c), Counterclaimants are entitled to injunctive relief, including but not limited to an order requiring the dissolution or reorganization of each Agency.  18 U.S.C. §1964(a).

571.    As a result of the Agencies' RICO violations, the Individual Counterclaimants and the Guilds on their own behalf are also entitled to treble damages, as well as attorneys' fees and costs.  18 U.S.C. §1964(c).

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

## ELEVENTH CLAIM FOR RELIEF

### Racketeering Conspiracy, 18 U.S.C. §1962(d)

**(brought by the Individual Counterclaimants on their own behalf, and by the Guilds on their own behalf and on behalf of their members, against Counterclaim Defendants CAA, UTA, and WME)**

572.   Counterclaimants re-allege and incorporate by reference the allegations set forth in paragraphs 1-571.

573.   Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions" of the RICO Act, i.e., 18 U.S.C. §1961(a)-(c).

574.   Each Agency is a "person" within the meaning of the RICO Act.  18 U.S.C. §1962(a); *see also id.* §1961(3) ("'person' includes any individual or entity capable of holding a legal or beneficial interest in property").

575.   The Agencies and their officers conspired to violate 18 U.S.C. §1962(a) by agreeing to reinvest the proceeds of the Agencies' pattern of racketeering activity—namely, the receipt of packaging fees in violation of LMRA Section 302— back into the operation of each Agency, as described in more detail above, in violation of §1962(d).  In the alternative, The Agencies and their officers conspired to violate 18 U.S.C. §1962(a) by agreeing to reinvest the proceeds of their pattern of racketeering activity—namely, the receipt of packaging fees in violation of LMRA Section 302—into the Agencies' acquisition of an interest in and/or their control of the association-in-fact enterprises described in paragraph 536 above, and/or the Agencies' acquisition of an interest in and/or the Agencies' control of the affiliate production company enterprise described in paragraph 538 above, in violation of §1962(d).

576.   The Agencies and their officers also conspired to violate 18 U.S.C. §1962(b) by agreeing to "acquire or maintain, directly or indirectly, any interest in or control of" each Agency "through a pattern of racketeering activity"—namely,

the receipt of packaging fees in violation of LMRA Section 302—as described in more detail above, in violation of §1962(d).  In the alternative, the Agencies and their officers conspired to violate 18 U.S.C. §1962(b) by agreeing to "acquire or maintain, directly or indirectly, any interest in or control of" the association-in-fact enterprises described in paragraph 552 above, and/or the affiliate production company enterprises described in paragraph 554 above, "through a pattern of racketeering activity"—namely, the receipt of packaging fees in violation of LMRA Section 302— as described in more detail above, in violation of §1962(d).

577.   The Agencies also conspired with their officers and with the studios to violate §1964(c) by agreeing "to conduct or participate, directly or indirectly, in the conduct of" the RICO enterprises described in paragraphs 564 and 565 "through a pattern of racketeering activity"—namely, the receipt of packaging fees in violation of LMRA Section 302—as described in more detail above, in violation of §1962(d).

578.   18 U.S.C. §1964(c) provides a private cause of action to "[a]ny person injured in his business or property by reason of a violation of" the RICO Act.

579.   The Individual Counterclaimants and the Guilds have lost money or property as a result of WME's violations of §1962(d) within the meaning of 18 U.S.C. §1964(c).  The Agencies' pattern of racketeering activity (i.e. their receipt of packaging fees) has allowed them to dominate the marketplace for talent agents' representational services, thereby harming the Guilds' members, including the Individual Counterclaimants, by denying them conflict-free representation, lowering their income, requiring them to pay artificially inflated prices for talent representational services, and reducing the quality of talent representational services available to them.  As noted above, the Individual Counterclaimants have also been required to spend money to retain other professionals to provide services their agents should have been providing; have seen their compensation reduced by virtue of packaging fees; and have been denied employment opportunities because of the

misalignment of incentives that results from the Agencies' packaging fee practices, as alleged in more detail above.  The Guilds have been required to divert their resources to create new staffing systems, negotiate new protections for their members with the AMPTP, monitor the Agencies' packaging fee practices, educate members about the Agencies' packaging fee abuses, prepare a comprehensive campaign to address those abuses and end packaging fees, and enforce their members' contractual rights after the Agencies failed to do so.  The Guilds have also lost dues revenue due to the Agencies' conspiracies to violate the RICO Act.

580.   As a result of the Agencies' violations of §1962(c), Counterclaimants are entitled to injunctive relief, including but not limited to an order requiring the dissolution or reorganization of WME.  18 U.S.C. §1964(a).

581.   As a result of the Agencies' RICO violations, the Individual Counterclaimants and the Guilds on their own behalf are also entitled to treble damages, as well as attorneys' fees and costs.  18 U.S.C. §1964(c).

## TWELFTH CLAIM FOR RELIEF

### Declaratory Relief, 28 U.S.C. §§2201, 2202

**(brought by the Individual Counterclaimants on their own behalf, and by the Guilds on their own behalf and on behalf of their members, against Counterclaim Defendants CAA, UTA, and WME)**

582.   The Declaratory Relief Act, 28 U.S.C. §2201 *et seq.* provides that "[i]n a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id*. §2201(a).

583.   Section 2202 provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and

hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. §2201.

584. An actual controversy has arisen and now exists between Counterclaimants and the Agencies concerning whether packaging fees constitute a breach of the Agencies' fiduciary duties to their writer-clients, as described in greater detail above in paragraphs 499 through 507.

585. An actual controversy has arisen and now exists between Counterclaimants and the Agencies concerning whether packaging fees constitute constructive fraud under Civil Code §1573, as described in greater detail above in paragraphs 508 through 514.

586. An actual controversy has arisen and now exists between Counterclaimants and the Agencies concerning whether packaging fees constitute an unfair and/or unlawful practice under California's UCL because they either breach the Agencies' fiduciary duties to their writer-clients; constitute constructive fraud under Civil Code §1573; violate LMRA Section 302, 29 U.S.C. §186(a) and (b); deprive writers of loyal, conflict-free representation, divert compensation away from the writers and other creative talent that are responsible for creating valuable television and film properties, or undermine the market for writers' creative endeavors; or all of the above, as described in greater detail above in paragraphs 515 through 528.

587. An actual controversy has arisen and now exists between Counterclaimants and the Agencies concerning whether the Agencies' receipt of packaging fees violates Section 302 of the LMRA, 29 U.S.C. §186(a) and (b), as described in greater detail above in paragraphs 521 through 526.

588. An actual controversy has arisen and now exists between Counterclaimants and the Agencies concerning whether the Agencies' receipt and use of packaging fees violate the RICO Act, 18 U.S.C. §1962(a), (b), (c), and (d), as

described in greater detail above in paragraphs 529 through 581.

589.   Counterclaimants are entitled to a declaration under §2201 that the Agencies' receipt of packaging fees constitutes a breach of CAA's, UTA's, and WME's fiduciary duty to their writer-clients, and injunctive relief under §2202 to prevent future violations of the same.

590.   Counterclaimants are entitled to a declaration under §2201 that the Agencies' receipt of packaging fees constitutes constructive fraud under Civil Code §1573, and injunctive relief under §2202 to prevent future violations of the same.

591.   Counterclaimants are entitled to a declaration under §2201 that packaging fees constitute an unfair and/or unlawful practice under California's UCL because they breach the Agencies' fiduciary duties to their writer-clients; constitute constructive fraud under Civil Code §1573; violate LMRA Section 302, 29 U.S.C. §186(a) and (b); deprive writers of loyal, conflict-free representation, divert compensation away from the writers and other creative talent that are responsible for creating valuable television and film properties, and undermine the market for writers' creative endeavors; and injunctive relief under §2202 to prevent future violations of the same.

592.   Counterclaimants are entitled to a declaration under §2201 that the Agencies' receipt of packaging fees violates Section 302 of the LMRA, 29 U.S.C. §186(a) and (b), and injunctive relief under §2202 to prevent future violations of the same.

593.   Finally, Counterclaimants are entitled to a declaration under §2201 that the Agencies' receipt of packaging fees violates the RICO Act, 18 U.S.C. §1962(a), (b), (c), and (d), and injunctive relief under §2202 to prevent future violations of the same.

## THIRTEENTH CLAIM FOR RELIEF

**Breach of Contract**

**(brought by Barbara Hall on her own behalf,**

**against Counterclaim Defendant  UTA)**

594.   Counterclaimant Barbara Hall re-alleges and incorporates by reference the allegations set forth in paragraphs 1-20, 241-305, and 307-398.

595.   In approximately 2012 or 2013, UTA orally agreed to refund in full to Hall all commissions UTA charged Hall for her work on *Madam Secretary* in exchange for UTA's ability to continue to represent Hall as her talent agency.

596.   Hall fully performed under the contract by allowing UTA to serve as her talent agency from 2012 to April 2019.

597.   UTA breached the contract by failing to refund in full to Hall all commissions UTA charged Hall for her work on *Madam Secretary*.  UTA has never refunded to Hall the full amount of commission UTA charged her for each episode of work on *Madam Secretary*; UTA has only ever given Hall partial refunds of the commission.   Moreover, UTA has not refunded any commission to Hall since Episode 13 of Season 4 of *Madam Secretary*, in December 2017.  *Madam Secretary* is currently airing its sixth season.

598.  As a result of UTA's breach, Hall suffered damages, including but not limited to the unrefunded amounts of commission.

## FOURTEENTH CLAIM FOR RELIEF

**Promissory Estoppel**

**(brought by Barbara Hall on her own behalf,**

**against Counterclaim Defendant  UTA)**

599.   Counterclaimant Barbara Hall re-alleges and incorporates by reference the allegations set forth in paragraphs 1-20, 241-305, 307-398, and 592-96.

600.   In approximately 2012 or 2013, UTA clearly and unambiguously promised to refund in full to Hall all commissions UTA charged Hall for her work on *Madam Secretary* in exchange for UTA's ability to continue to represent Hall as her talent agency.

601.   Hall reasonably and foreseeably relied to her detriment on UTA's promise by continuing to allow UTA, rather than another talent agency, to serve as her talent agency from 2012 to April 2019.

602.   UTA failed to refund in full to Hall all commissions UTA charged Hall for her work on *Madam Secretary*.  UTA has never refunded to Hall the full amount of commission UTA charged her for each episode of work on *Madam Secretary*; UTA has only ever given Hall partial refunds of the commission.  Moreover, UTA has not refunded any commission to Hall since Episode 13 of Season 4 of *Madam Secretary*, in December 2017.  *Madam Secretary* is currently airing its sixth season.

603.   As a result of UTA's breach of its promise and her reasonable and foreseeable detrimental reliance, Hall suffered damages, including but not limited to the unrefunded amounts of commission.

## PRAYER FOR RELIEF

**WHEREFORE,** Counterclaimants respectfully request that the Court:

1.   Declare that the Agencies' and their co-conspirators' collusive agreements regarding packaging fees constitute illegal price-fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

2.   Declare that the Agencies' and their co-conspirators' collusive agreement not to negotiate individually with the Guilds constitutes an illegal group boycott in violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

3.   Declare that the Agencies' and their co-conspirators' collusive agreement to blacklist writers and other individuals and entities who object to packaging fees or agree to the Guilds' Code of Conduct constitutes an illegal group

1  boycott in violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

2      4.    Declare that the Agencies' and their co-conspirators' collusive

3  agreements regarding packaging fees constitute illegal price-fixing in violation of

4  the Cartwright Act, California Business and Professions Code §16700 *et seq.*;

5      5.    Declare that the Agencies' and their co-conspirators' collusive

6  agreement not to negotiate individually with the Guilds constitutes an illegal group

7  boycott in violation of the Cartwright Act, California Business and Professions Code

8  §16700 *et seq.*;

9      6.    Declare that the Agencies' and their co-conspirators' collusive

10 agreement to blacklist writers and other individuals and entities who object to

11 packaging fee practices or agree to the Guild's Code of Conduct constitutes an illegal

12 group boycott in violation of the Cartwright Act, California Business and

13 Professions Code §16700 *et seq.*;

14     7.    Declare that packaging fees constitute a breach of the Agencies'

15 fiduciary duties to their writer-clients;

16     8.    Declare that the Agencies' packaging fee practices constitute

17 constructive fraud under Civil Code §1573;

18     9.    Declare that packaging fees constitute an unfair and/or unlawful

19 practice under California's UCL because they breach the Agencies' fiduciary duties

20 to their writer-clients; constitute constructive fraud under Civil Code §1573; violate

21 LMRA Section 302, 29 U.S.C. §186(a) and (b); and deprive writers of loyal,

22 conflict-free representation, divert compensation away from the writers and other

23 creative talent that are responsible for creating valuable television and film

24 properties, and undermine the market for writers' creative endeavors;

25     10.   Declare, under 28 U.S.C. §2201, that packaging fees violate Section

26 302 of the Labor Management Relations Act, 29 U.S.C. §186(a) and (b);

27     11.   Declare, under 28 U.S.C. §2201 and/or 18 U.S.C. §1964(a), that

28

136

packaging fees violate the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §1962(a) (b), (c), and (d);

12. Enjoin each Agency and its affiliates, successors, transferees, assignees, parents, owners, controlling shareholders, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with it, from collecting a packaging fee on any project on which one or more of its writer-clients works as a writer, or from receiving any monetary payments or other things of value from any production company that employs any of its writer-clients;

13. Enjoin the Agencies and their affiliates, successors, transferees, assignees, parents, owners, controlling shareholders, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from, in any manner, continuing, maintaining, or renewing the conduct, conspiracy, or combinations alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect, including the following:

(a) Entering negotiations or discussions with one or more other agencies, without the Guilds' authorization, regarding (i) adherence to the Guild' Code of Conduct, (ii) the signing of a franchise agreement with the Guilds, (iii) non-public agreements reached with the Guilds during negotiations or discussion regarding the Code of Conduct or a new franchise agreement, or (iv) the status or contents of any such non-public negotiations or discussions;

(b) Agreeing with one or more other agencies on the terms of any proposal, edit, or negotiating position regarding the Guilds' Code of Conduct or franchise agreement without the Guilds' authorization to negotiate

137

collectively, or otherwise collectively refusing to negotiate or discuss the Code of Conduct or a franchise agreement with the Guilds except on the condition that the Guilds include in those discussions one or more other agencies or their representatives;

(c) Agreeing with one or more other agencies on the terms or conditions of any packaging agreement;

(d) Not dealing with, or threatening not to deal with, any Guild member, agency, or clients of an agency, attorney, manager, production company, studio, or any other person who supports the Guilds' positions concerning packaging fees, has agreed to adhere to the Code of Conduct, or has otherwise signed a franchise agreement with the Guilds that prohibits packaging; or

(e) Enforcing the terms of any packaging agreement or otherwise directly or indirectly receiving packaging fees from a production company or studio on any project on which their writer-client is employed.

14.   Enjoin the Agencies and their affiliates, successors, transferees, assignees, parents, owners, controlling shareholders, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from, in any manner, blacklisting any writer, lawyer, agency, or other individual or entity that objects to packaging fee practices, represents writers who have objected to packaging fee practices including writers who have fired their agents, enters an agency franchise agreement with the Guild, or is represented by such an agency;

15.   Order the Agencies to provide an accounting of all moneys received by the Agencies in connection with projects or programs for which the Individual Counterclaimants or other Guild members were employed as writers;

16.   Require the Agencies to pay restitution to the Individual

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

1   Counterclaimants in an amount equal to the funds that would have been paid to the

2   Individual Counterclaimants in the absence of the Agencies' unlawful and unfair

3   packaging fees;

4        17.   Require the Agencies to disgorge all profits generated from unlawful

5   and unfair packaging fees;

6        18.   Award the Individual Counterclaimants compensatory and punitive

7   damages based on the Agencies' breaches of fiduciary duty and/or constructive

8   frauds;

9        19.   Award the Individual Counterclaimants treble damages for the

10  Agencies' violations of Section 1 of the Sherman Act, 15 U.S.C. §1;

11       20.   Award the Individual Counterclaimants treble damages for the

12  Agencies' violations of the Cartwright Act, Cal. Bus & Prof. Code §16700;

13       21.   Award the Individual Counterclaimants and the Guilds on their own

14  behalf treble damages for CAA's, UTA's, and WME's RICO violations, 18 U.S.C.

15  §1964(c);

16       22.   Award Individual Counterclaimant Barbara Hall damages for UTA's

17  breach of contract and/or for promissory estoppel;

18       23.   Award Counterclaimants their costs and attorneys' fees; and

19       24.   Award such further and additional relief as is just and proper.

20  DATED: October 18, 2019          Stephen P. Berzon

21                                        Stacey Leyton

22                                        P. Casey Pitts

23                                        Rebecca C. Lee
                                          ALTSHULER BERZON LLP

24

25                                        Anthony R. Segall

26                                        Juhyung Harold Lee
                                          ROTHNER, SEGALL & GREENSTONE

27

28

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM

1
2

W. Stephen Cannon
Ethan E. Litwin
CONSTANTINE CANNON LLP

3
4

_____/s/ Stacey Leyton_____
Stacey Leyton

5
6

*Attorneys for Defendants and Counterclaimants*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANSWER TO FIRST CONSOLIDATED COMPLAINT AND CONSOLIDATED COUNTERCLAIMS
Case No. 2:19-cv-05465-AB-AFM