Steven A. Marenberg (101033)
Victor Jih (186515)
Stephen M. Payne (310567)
**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276

Jeffrey L. Kessler (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Isabelle Mercier-Dalphond (*pro hac vice*)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4193

Adam Levin (156773)
Jeremy Mittman (248854)
Jean Pierre Nogues (84445)
**MITCHELL SILBERBERG & KNUPP LLP**
2049 Century Park E., 18th Floor
Los Angeles, CA 90067

Diana Hughes Leiden (267606)
Shawn R. Obi (288088)
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA  90071-1543

*Attorneys for Plaintiff*
*WILLIAM MORRIS ENDEAVOR*
*ENTERTAINMENT, LLC*

*Attorneys for Plaintiff*
*UNITED TALENT AGENCY, LLC*

Richard B. Kendall (90072)
Patrick J. Somers (318766)
Nicholas F. Daum (236155)
**KENDALL BRILL & KELLY LLP**
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

*Attorneys for Plaintiff*
*CREATIVE ARTISTS AGENCY, LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, CREATIVE ARTISTS AGENCY, LLC and UNITED TALENT AGENCY, LLC,<br><br>        Plaintiffs,<br><br>    v.<br><br>WRITERS GUILD OF AMERICA, WEST, INC. and WRITERS GUILD OF AMERICA, EAST, INC.,<br><br>        Defendants. | Case No. 2:19-cv-05465-AB (FFMx)<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNT I OF THE CONSOLIDATED COMPLAINT, OR IN THE ALTERNATIVE FOR JUDGMENT ON THE PLEADINGS**<br><br>Hearing Date:  December 6, 2019<br>Time:           10:00 a.m.<br>Courtroom:    7B<br>Judge:         Hon. André Birotte Jr. |

# **TABLE OF CONTENTS**

**Page(s)**

I. PRELIMINARY STATEMENT ...........................................................................1

II. COUNTER-STATEMENT OF FACTUAL ALLEGATIONS ..............................3

III. THE AGENCIES HAVE PLAUSIBLY ALLEGED THAT THE GUILDS ARE NOT PROTECTED BY EITHER LABOR EXEMPTION ....................................5

    A. The Agencies Have Plausibly Alleged Facts Showing That the Statutory Labor Exemption Does Not Apply....................................................................6

       1. The Agencies Have Plausibly Alleged Facts of Illegitimate Union Objectives and Tactics ................................................................................6

       2. The Agencies Have Plausibly Alleged Facts that the Guilds Are Acting in Concert with Non-Labor Parties ...............................................11

    B. The Non-Statutory Labor Exemption Also Does Not Apply........................14

IV. THE AGENCIES HAVE PLEADED FAR MORE THAN PLAUSIBLE FACTS TO STATE A SHERMAN ACT VIOLATION ........................................17

    A. The Agencies Have Unquestionably Pleaded an "Agreement, Conspiracy, or Combination" in Restraint of Trade .....................................17

    B. The Agencies Did Not Need To—But Nonetheless Did—Plead Sufficient Facts of the Guilds' Market Power in a Relevant Market............................20

    C. The Agencies Have Plausibly Pleaded Antitrust Injury...............................22

    D. The Agencies Are Not Asserting Claims on Behalf of Affiliates.................25

V. CONCLUSION ...................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962)................................................................20

*A&D Supermarkets, Inc. v. United Food and Commercial Workers. Local Union 880,*
732 F. Supp. 770 (N.D. Ohio 1989) .......................................16

*Adams, Ray & Rosenberg v. William Morris Agency, Inc.,*
411 F. Supp. 403 (C.D. Cal. 1976)...................................*passim*

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.,*
141 F.3d 947 (9th Cir. 1988) ..................................................20

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
486 U.S. 492 (1988)................................................................19

*Am. Fed'n of Musicians v. Carroll,*
391 U.S. 99 (1968)............................................................8, 13

*American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.,*
456 U.S. 556 (1982)................................................................19

*Apple Inc. v. Samsung Electronics Co., Ltd.,*
2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) ........................18

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)..................................................................3

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
182 F.3d 1096 (9th Cir. 1999) ................................................23

*Bodine Produce, Inc. v. United Farm Workers Organizing Committee,*
494 F.2d 541 (1974) ...............................................................10

*Choi v. 8th Bridge Capital, Inc.,*
2019 WL 4956147 (C.D. Cal. Oct. 7, 2019) ............................3

*Connell Const. Co. v. Plumbers & Steamfitters Local Union No. 100,*
421 U.S. 616 (1975)...............................................14, 15, 17

ii

*Dang v. San Francisco Forty Niners*,
   964 F. Supp. 2d 1097 (N.D. Cal. 2013)...................................................20, 21

*DM Research, Inc. v. Coll. of Am. Pathologists*,
   170 F.3d 53 (1st Cir. 1999)...........................................................................18

*E.W. French & Sons, Inc. v. General Portland Inc.*,
   885 F.2d 1392 (9th Cir. 1989) ......................................................................23

*FTC v. Superior Court Trial Lawyers Ass'n*,
   493 U.S. 411 (1990).......................................................................................19

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
   343 F.3d 1000 (9th Cir. 2003) ......................................................................23

*Glynn-Brunswick Hosp. Auth. v. Becton*,
   159 F. Supp. 3d 1361 (S.D. Ga. 2016) .........................................................22

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
   547 F.3d 266 (5th Cir. 2008) ........................................................................18

*Grp. Life & Health Ins. Co. v. Royal Drug Co.*,
   440 U.S. 205 (1979).........................................................................................6

*H.A. Artists & Assocs. v. Actors' Equity Ass'n*,
   451 U.S. 704 (1981)................................................................................7, 8, 12

*Home Box Office, Inc. v. Directors Guild of Am., Inc.*,
   531 F. Supp. 578 (S.D.N.Y. 1982), *aff'd*, 708 F.2d 95 (2d Cir. 1983) ...........13, 14

*Image Tech. Servs. v. Eastman Kodak*,
   125 F.3d 1195 (9th Cir. 1997) ......................................................................21

*Int'l Boxing Club of N.Y., Inc. v. United States*,
   358 U.S. 242 (1959).......................................................................................21

*Kissing Camels Surg. Ctr., LLC v. Centura Health Corp.*,
   2015 WL 5081608 (D. Colo. Aug. 28, 2015).............................................23

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959).................................................................................17, 19

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
   884 F.2d 504 (9th Cir. 1989) ........................................................................23

*Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of*
  *N. Am. v. Jewel Tea Co.*,
  381 U.S. 676 (1965) ................................................................................ 16

*Lockheed Martin Corp. v. Boeing Co.*,
  314 F. Supp. 2d 1198 (M.D. Fla. 2004) ................................................ 22

*Movie 1 & 2 v. United Artists Communications*,
  909 F.2d 1245 (9th Cir. 1990) .............................................................. 19

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
  468 U.S. 85 (1984) ................................................................................ 20

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) ......................................................... 22, 24

*Newcal Indus., Inc. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008) .............................................................. 21

*Northern Cal. Minimally Invasive Cardiovascular Surg., Inc. v. Northbay*
  *Healthcare Corp. et al.*,
  2016 WL 1570015 (N.D. Cal. Apr. 19, 2016) ....................................... 23

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985) .............................................................................. 19

*Oltz v. St. Peter's Cmty. Hosp.*,
  861 F.2d 1440 (9th Cir. 1988) ......................................................... 20, 23

*Pan Alaska Trucking v. Int'l Bhd. of Teamster*s,
  621 F. Supp. 800 (D. Alaska 1985) ........................................................ 6

*Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n*,
  81 F.3d 858 (9th Cir. 1996) ............................................................. 14, 16

*Power Analytics Corp. v. Operation Tech.*,
  2017 WL 5479638 (C.D. Cal. May 10, 2017) ....................................... 22

*PowerTV Media, LLC v. Street Racing DigNight, LLC*,
  2017 WL 5665013 (C.D. Cal. Mar. 10, 2017) ....................................... 17

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
  890 F.2d 139 (9th Cir. 1989) ................................................................ 20

iv

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ............................................................................. 14

*St. Paul Fire & Marine Ins. Co. v. Barry*,
   438 U.S. 531 (1978)........................................................................................... 19

*Sun-Land Nurseries, Inc. v. S. California Dist. Council of Laborers*,
   793 F.2d 1110 (9th Cir. 1986) ......................................................................... 16

*T. Harris Young &Assocs. v. Marquette Elecs., Inc.*,
   931 F.2d 816 (11th Cir. 1991) ......................................................................... 22

*Talent Representatives, Inc. v. Am. Fed'n of Television & Radio Artists*,
   593 F. Supp. 576 (S.D.N.Y. 1984) ................................................................... 6

*Trendsettah USA, Inc. v. Swisher Int'l Inc.*,
   2016 WL 6822191 (C.D. Cal. Jan. 21, 2016)................................................... 24

*United Mine Workers of America v. Pennington*,
   381 U.S. 657 (1965)........................................................................................... 15

*United States v. First Nat'l Pictures, Inc.*,
   282 U.S. 44 (1930)................................................................................. 15, 19, 22

*United States v. Gen. Motors Corp.*,
   384 U.S. 127 (1966)..................................................................................... 22, 24

*United States v. Hutcheson*,
   312 U.S. 219 (1941)........................................................................................... 6

*USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Const. Trades Council,*
   *AFL-CIO*,
   31 F.3d 800 (9th Cir. 1994) .....................................................................*passim*

*Wi-LAN Inc. v. LG Elecs., Inc.*,
   382 F. Supp. 3d 1012 (S.D. Cal. 2019) ............................................................ 25

**Statutes**

California's Talent Agency Act ...................................................................... 12

Clayton Act ................................................................................................... 23

Labor Management Relations Act ................................................................... 1

Sherman Act............................................................................... 17, 19, 23, 25

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNT I OF THE CONSOLIDATED
COMPLAINT, OR IN THE ALTERNATIVE FOR JUDGMENT ON THE PLEADINGS

# I.   PRELIMINARY STATEMENT[1]

The Agencies have alleged that the Guilds violate federal antitrust law by acting in conjunction with writers, producers, lawyers, and managers to boycott the Agencies and other talent agents who have refused to sign the Guilds' new Code of Conduct.  The Code bans long-settled, commercial business practices—packaging and agency affiliations—and seeks to upend an industry.  In the words of the Guilds' leadership, the objective of their group boycott is to "grab power" from and "conquer" the major talent agencies.  FCC ¶¶ 11, 13, 30, 85, 89, 159.  The Agencies have further alleged that the Guilds, to effectuate their illegitimate objectives, have threatened members with discipline, induced lawyers and managers to violate California and other state laws, and engaged in other non-traditional union tactics.  *Id.* ¶¶ 111-117, 143-148.  Such conduct enjoys no protection from antitrust scrutiny.

The Guilds now seek to dismiss Count I of the FCC, raising the labor exemptions and a panoply of other purported antitrust defects.  But each of the Guilds' arguments is based either upon factual disputes which may not be resolved on a 12(b)(6) or 12(c) motion, or upon fundamental mischaracterizations of the law.  In fact, sticking to their practice of profoundly misstating the FCC's allegations, the Guilds spill much ink attacking positions the Agencies do not assert.

For example, contrary to the premise of the Guilds' labor exemption defense, the FCC does *not* challenge the Guilds' labor law authority to require talent agents to be "franchised" before representing a member in procuring employment governed by the Guilds' collective bargaining agreement.  Instead, the Agencies challenge the Guilds

---

[1] Plaintiffs William Morris Endeavor Entertainment, LLC ("WME"), Creative Artists Agency, LLC ("CAA") and United Talent Agency, LLC ("UTA," and together with WME and CAA, "Plaintiffs" or the "Agencies") hereby oppose Defendants Writers Guild of America, West, Inc. and Writers Guild of America, East, Inc.'s (together, the "Guilds" or "WGA") motion to dismiss (ECF No. 43) Count I of the First Consolidated Complaint ("FCC") (ECF No. 42), or in the alternative for judgment on the pleadings (ECF No. 47) ("Motion").  CAA and UTA's joint opposition to the Guilds' Motion regarding their claims brought under Section 303 of the Labor Management Relations Act (Count II of the FCC) is filed separately and the arguments supporting their opposition are not reiterated here.

implementing a group boycott to achieve *illegitimate ends* (*e.g.*, to "grab power" from and "conquer" the Agencies), through *illegitimate* and *non-traditional union tactics* (*e.g.*, threatening their own members and banning industry-standard commercial practices), *in combination with non-labor parties* (managers, lawyers, and producers). *E.g.*, *id.* ¶¶ 7-13.  These well-pleaded factual allegations—which are largely ignored by the Guilds—take the Agencies' antitrust claims well-outside the boundaries of both the statutory and non-statutory labor exemptions.  And, as a court in this District previously held when confronted with the question of whether either labor exemption immunized the Guilds' conduct from antitrust review, the application of the labor exemptions presents "numerous factual issues which must be resolved at trial."  *Adams, Ray & Rosenberg v. William Morris Agency, Inc.*, 411 F. Supp. 403, 411 (C.D. Cal. 1976).

Likewise, the Agencies' antitrust claims are not "based on [their] disapproval of the unions' good faith judgment about how to protect their members."  Mot. at 1.  It is not the "wisdom" of the Guilds' Code of Conduct that the Agencies challenge (although, to be sure, it is unwise), but rather the fact that the Code and the Guilds' attempt to impose it exceed the boundaries of any labor exemption because it: (i) attempts to *directly regulate commercial practices* (*e.g.*, banning packaging and content affiliates instead of simply prohibiting agents from "act[ing] against [their] Writer-Client's interest" like the Guilds did for 43 years through the Artists' Manager Basic Agreement of 1976 ("AMBA")); (ii) *is not limited to regulating the terms and conditions of employment*; and (iii) *restrains trade in commercial markets that the Guilds do not have authority to regulate*.

The Guilds' grab-bag of remaining, cursorily-asserted arguments against the merits of the Agencies' antitrust claim fare no better.  Again, the Guilds either improperly seek to adjudicate factual disputes or profoundly misstate the law.  Simply put, without protection from the labor exemptions (which do not apply), there is no colorable justification for the Guilds using their monopoly power over the writers they control to implement a horizontal, *per se* unlawful boycott to coerce the Agencies into

2

accepting the terms of the Code of Conduct.  The Agencies are the direct victims of this conspiracy—7,000 writers have fired their agents—and plainly have antitrust standing.

For all of these reasons, the Court should deny the Guilds' motion to dismiss the Agencies' antitrust claim, which rests upon comprehensive and detailed factual allegations that may not be challenged on the pleadings.

## II.    COUNTER-STATEMENT OF FACTUAL ALLEGATIONS

On a motion to dismiss, Plaintiffs' well-pleaded, non-conclusory (*i.e.*, "plausible") facts must be taken as true.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).[2]  The Guilds' Motion simply ignores this rule.

The Guilds admit in their Answer that they ordered their members to fire any talent agent who (like Plaintiffs) has not agreed to the Guilds' unilaterally-promulgated Code of Conduct (Answer ¶¶ 130-131), and that, consequently, more than 7,000 competing writers have effectuated the Guilds' boycott by firing their agents.  *Id.*; FCC ¶¶ 4, 110.  There is also no dispute that, through the Code, the Guilds seek (i) to ban the industry-standard practice of agencies "packaging" talent for television and film productions, and (ii) to abolish content companies that are affiliated with talent agencies and compete against traditional studios.  FCC ¶¶ 85-148.  Instead, the factual disputes in this litigation center on whether the Guilds' objectives and means for effectuating the boycott deprive them of the statutory and non-statutory labor exemption defenses.

While not disputing their organization of a group boycott against the Agencies who will not agree to the Code of Conduct, the Guilds' Motion denies or mischaracterizes many other critical allegations of the FCC, thus raising numerous factual disputes that may not be resolved on the pleadings.  For example, the Guilds assert that "[h]istorically, agents have been compensated for representing writers

---

[2] *See also Choi v. 8th Bridge Capital, Inc.*, No. 217CV8958CASAFMX, 2019 WL 4956147, at *2 (C.D. Cal. Oct. 7, 2019) (under both Rules 12(b)(6) and 12(c), "a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy") (quoting *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012)).

through commissions." Mot. at 3. Not so. As the Agencies allege, writers are not commissioned on packages, and packaging has existed for decades; in fact, the Guilds *affirmatively and explicitly agreed to* packaging for 43 years in the AMBA. FCC ¶¶ 77, 81-83. The Guilds also assert that packaging "reduce[s] writer compensation" (Mot. at 4), but the Agencies allege the opposite: *to wit*, that packaging increases writing opportunities, enhances the longevity of the work, and eliminates commissions without reducing writer compensation. FCC ¶¶ 31-59. And notwithstanding the Guilds' bald factual contention that *all* packaging is harmful to *all* writers—despite approving the practice for over 40 years—they may not dispute on this Motion the Agencies' contrary allegations that packaging benefits writers and that, despite easy access to a Guild arbitration panel for members to bring grievances, "not one writer has ever filed a claim under the AMBA against any of Plaintiffs based on any claimed failure by any one of them to act in her/his best interests." *Id.* ¶ 80; *see also id.* ¶¶ 31-59 (describing the benefits of packaging to writers).

The Guilds' factual assertion that content affiliates harm writers (Mot. at 4) is likewise at odds with the FCC allegations. Content affiliates create more writing work and enhance competition that benefits all writers regardless of whether an individual writer chooses to pursue work with an agency's content affiliate. FCC ¶¶ 30, 35, 37, 41. Indeed, the Guilds' own leadership has *accepted work from content affiliates* and publicly admitted that "*[e]very additional studio that provides work for writers is a good thing. That includes Endeavor Content, WiiP, and [Civic Center]*." *Id.* ¶ 73. The Guilds also argue that the "procedures" put in place by the Agencies to ensure that clients are not harmed by their (varied) affiliations with content companies are "ineffective." Mot. at 4. But this is yet another contradiction with the FCC's well-pled allegations. FCC ¶¶ 63-70, 75, 167.

The Guilds have also tried to minimize the far-reaching impact of their packaging and content affiliate bans by arguing that the Code of Conduct "applies *only* to franchised agents' representation of Guild members only in connection with writing

4

work covered by the MBA." Mot. at 4, 13. As the FCC alleges, however, the Guilds have publicly boasted that their packaging ban makes it "unlikely" that directors or actors could be included in packages, even though the Guilds have no legal right to regulate talent besides writers. FCC ¶¶ 10, 58, 71, 84, 93, 155, 166. The FCC further alleges that the Guilds have sought to regulate "showrunners" who are executive producers in connection with their non-writing work. *Id.* ¶¶ 59, 84, 93, 118-130. And, of course, banning content affiliates deprives all of Hollywood of the work that these companies create. *Id.* ¶¶ 60-76.

Most significantly, the Guilds' proclamations about their benevolent "purpose," and their denials that the boycott includes non-labor parties, once again fly in the face of the substantial factual allegations showing that the Guilds' boycott has been implemented for the illegitimate purpose of "conquering" the Agencies and restricting competition in commercial markets beyond the Guilds' labor law jurisdiction. Similarly, the Court must now accept as true the Agencies' allegations that the Guilds have coerced non-labor party attorneys and managers to participate in their boycott, and that the showrunners who joined in the boycott and fired their agents are, in reality, executive producers who are also non-labor parties.

Accepting these FCC allegations as true, the Guilds' Motion must be denied.

## III. THE AGENCIES HAVE PLAUSIBLY ALLEGED THAT THE GUILDS ARE NOT PROTECTED BY EITHER LABOR EXEMPTION

As the Ninth Circuit and this court have previously recognized, the application of both the statutory and non-statutory labor exemptions is an inherently fact-dependent inquiry and thus usually not susceptible to resolution on the pleadings. *See*, *e.g.*, *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 809-10 (9th Cir. 1994) (holding that plaintiff was "entitled to try to raise a triable issue of fact on [whether union acted in its self-interest for purposes of the statutory labor exemption] by gathering evidence in support of its allegations"); *Adams*, 411 F. Supp. at 411 (agency's preliminary injunction motion against the Guilds "raises

5

numerous factual issues" about whether the labor exemptions apply "which must be resolved at trial").[3]   The conclusion in *Adams* that the application of the labor exemptions to the Guilds' conduct turns on disputed issues of fact applies with even greater force here based upon the litany of additional facts pleaded in the FCC as to why no labor exemption applies.

## A.   The Agencies Have Plausibly Alleged Facts Showing That the Statutory Labor Exemption Does Not Apply

The statutory labor exemption only applies if the union **both** (1) acted in its legitimate self-interest, *and* (2) not in conjunction with a non-labor party.  *United States v. Hutcheson*, 312 U.S. 219, 232 (1941); *USS-POSCO*, 31 F.3d at 805-10.  Exemptions from the antitrust laws must be narrowly construed.  *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979).

### 1.   The Agencies Have Plausibly Alleged Facts of Illegitimate Union Objectives and Tactics

As alleged in the FCC, the **objective** of the Guilds' boycott is anything but legitimate.  "Whether the interest in question is legitimate depends on whether the ends to be achieved are among the **traditional objectives** of labor organizations." *USS-POSCO*, 31 F.3d at 808 (emphasis added).  Here, the Guilds' leadership has proclaimed that the objective of their boycott is "to effectuate a 'power grab' and 'conquer' the major talent agencies" (FCC ¶ 13)—hardly a traditional (or appropriate) union objective to further members' interests in collective bargaining with employers.  Crediting these allegations, the Guilds' statutory exemption defense fails at the start.

The Guilds, however, assert that anything a union claims to be in its "self-interest" is completely immunized from the antitrust laws because courts "must not

---

[3] *See also Pan Alaska Trucking v. Int'l Bhd. of Teamster*s, 621 F. Supp. 800, 803-04 (D. Alaska 1985) (rejecting labor exemption defense on motion to dismiss); *Talent Representatives, Inc. v. Am. Fed'n of Television & Radio Artists*, 593 F. Supp. 576, 579 (S.D.N.Y. 1984) (holding that issues of fact were raised as to "intent or purpose" and "effect" of union conduct, precluding summary judgment on labor exemption defense).

second guess" "the wisdom or unwisdom . . . of the end of which the particular union activities are the means."  Mot. at 5-6.  This astonishing position is contrary to black-letter law: "Whether the interest in question is legitimate depends on whether the ends to be achieved are among the ***traditional objectives*** of labor organizations."  *USS-POSCO*, 31 F.3d at 808 (emphasis added); *see also H.A. Artists & Assocs. v. Actors' Equity Ass'n*, 451 U.S. 704, 721-22 (1981).

The Guilds' selective citation of authority attempts to obscure this point.  For example, the Guilds' description of *H.A. Artists* focuses on the non-controversial proposition that unions may "franchise" agents, while ignoring the Supreme Court's holding in that same case that the statutory exemption does not insulate a union from the antitrust laws for charging agents franchise fees.  *H.A. Artists*, 451 U.S. at 722.  Even though the union there had argued "that the fees [we]re somehow related to the basic purposes of its [agent] regulations," including the "elimination of wage competition," the Court concluded that charging franchise fees was not a protected union activity.  *Id.*  *H.A. Artists* thus closed the door 40 years ago on the Guilds' contention that the statutory labor exemption protects any "purpose" a union self-labels to be "legitimate."

Here, the FCC is replete with factual allegations of the Guilds pursuing ***non-traditional objectives*** that are unrelated to any *bona fide* union interest in regulating the labor market for their members' work.   The FCC's allegations, taken as true, demonstrate that the Guilds' statutory exemption defense fails because it is motivated by the illegitimate intentions of seizing power in Hollywood far beyond the employment market for writers, at the expense of the union's own membership.  *Cf. USS-POSCO*, 31 F.3d at 808-09 (union self-dealing is not a legitimate purpose).

Further, the Guilds also ignore that, in this Circuit, when a plaintiff alleges that the union used ***non-traditional means*** to achieve even legitimate goals, the court "***place[s] a substantial burden on the union***" to prove that the "non-traditional means were ***appropriate***."  *USS-POSCO*, 31 F.3d at 809 (citing *H.A. Artists*, 451 U.S. at 722) (emphases added).  To do so, the union must show that "the non-traditional means were

7

not only lawful, but **necessary** because the goals could not be achieved through traditional tactics." *Id.* (emphasis added); *see also H.A. Artists*, 451 U.S. at 722 (holding that union's "justification" for non-traditional union activity of extracting franchise fees from agents was "inadequate"); *Am. Fed'n of Musicians v. Carroll*, 391 U.S. 99, 112 (1968) (price-list requirement imposed by union must be "necessary" to accomplish union's legitimate objective).

The FCC painstakingly details how the **means** that the Guilds have used are "non-traditional" (and not "necessary").  For example, the FCC alleges the Guilds have:

- threatened their own members with expulsion, discipline, loss of healthcare, and public shaming if they do not boycott agents—not *employers*—who will not agree to the Code of Conduct (FCC ¶¶ 7, 113-116, 161, 173, 195-196);

- solicited lawyers and managers to fill the void of boycotted talent agents in procuring employment for writers despite the fact that these lawyers and managers are unlicensed under state laws to do so (*id.* ¶¶ 144-146); and then promised to indemnify the lawyers and managers for the legal risk of violating state law (*id.* ¶¶ 146-147);[4]

- banned a commercial practice—packaging—that *the Guilds* sanctioned for over 40 years, that represents the way that 90% of television shows get made, and that facilitates employment opportunities not only for writers but actors and directors (*id.* ¶¶ 57, 77-84);

- banned content affiliates from competing in commercial markets even though the Guilds' own leaders work with and have praised the writing opportunities created by such affiliates (*id.* ¶¶ 60-76);

- negotiated in bad faith with talent agencies over a new franchise agreement (*id.* ¶¶ 85-106); and

- threatened the studios' collective bargaining representative—the Alliance of Motion Picture and Television Producers, Inc. ("AMPTP")—with objectively baseless litigation if it does not help the Guilds' boycott by

---

[4] The Guilds' claim that federal labor law gives them the power to, in effect, override state talent agency licensing laws is frivolous.  Mot. at 13-14.  The Guilds may not negate state licensing requirements for talent agents any more than a union of health professionals could authorize unlicensed doctors to perform surgery or prescribe drugs.

amending their collective bargaining agreement to effectuate the boycott (*id.* ¶¶ 137-142).

These detailed factual allegations establish that the Guilds are imposing their boycott through non-traditional means and thus, under *USS-POSCO*, the Guilds bear the "substantial burden" to prove that their conduct was "necessary" and could not have been achieved through "traditional tactics" such as "picketing" and "handbilling." *USS-POSCO*, 31 F.3d at 809 (holding that "pursuing legitimate labor goals through" non-traditional activity, "such as pressing frivolous lawsuits . . . to make an example of [plaintiff]," is not "per se exempted from the antitrust laws"). While it is "traditional" for a union to organize its members to boycott their *employers* to try to extract concessions in collective bargaining concerning terms and conditions of employment, it is unprecedented for the Guilds here to have ordered members to boycott their own agents to "conquer" the Agencies and ban commercial practices long-condoned by the Guilds.

The Agencies have also plausibly alleged facts demonstrating that the Guilds cannot meet their substantial burden to prove that their non-traditional tactics are necessary. As recounted above, the FCC alleges that packaging and content affiliates *benefit*—not harm—writers by, among other things, facilitating and creating job opportunities that would not otherwise exist for Guild members (and, in the case of packaging, eliminating commissions). It thus cannot be "necessary" to categorically ban these long-standing commercial practices. Further, the *Guilds' own conduct* for 43 years through the AMBA makes plain that the unions could have continued to employ a "traditional tactic" to prevent any possible harmful conflicts of interest from packaging or content affiliates: requiring, as a condition of being franchised, that each talent agent commit to "act with reasonable diligence, care and skill at all times in the interest of his Writer-Client and . . . not act against his Writer-Client's interest." FCC ¶ 79 (quoting the AMBA). This traditional franchise rule, along with an arbitration system to enforce it, has vindicated Guild interests in prohibiting any harmful conflicts

9

for decades—demonstrating that the Guilds will not be able to prove that their radical and unprecedented ban of packaging and content affiliates is "necessary."

The Guilds' Motion does not address any of these legal standards for invoking the statutory exemption; nor does it even acknowledge the FCC's allegations about illegitimate motives and non-traditional tactics. Instead, the Motion waxes on about how unions have the labor law authority to franchise agents and a legitimate interest in preventing agent conflicts of interest. Mot. at 6-7. But the Agencies do not challenge either of these principles. FCC ¶ 9. What the Agencies challenge, and what takes the Guilds' actions outside of any labor exemption, are the illegitimate motives and non-traditional and unnecessary tactics (in tandem with non-labor parties) that the Guilds are using to ban well-established, industry-wide, commercial practices.[5]

The Guilds ignore these important limitations on the scope of the statutory exemption and instead imply that so long as their regulations are "intimately bound up with the subject of wages," the statutory exemption affords them *carte blanche* immunity. Mot. at 7, 12, 15 (citing *Carroll*, 391 U.S. at 113). This too is incorrect. As shown above, the case law is clear that a union's objectives and means limit the application of the statutory exemption. Moreover, the Agencies' factual allegations demonstrate that the Guilds' ban on content affiliates has *nothing* to do with the "subject of wages" (FCC ¶ 158), and neither does the packaging ban (apart from the fact that it eliminates any commission on writers' wages). *E.g., id.* ¶¶ 35-37. Here, as in *Adams*,

---

[5] *Bodine Produce, Inc. v. United Farm Workers Organizing Committee*, 494 F.2d 541, 557 (1974) does not stand for the proposition, as the Guilds suggest (Mot. at 12), that a claimed legitimate union purpose automatically triggers the statutory labor exemption, regardless of the non-traditional means used to achieve that claimed purpose. *Bodine* holds that, when a union engages in traditional union activities normally associated with labor disputes, *i.e.,* activities which are "intimately related to wages, hours, and working conditions," the activity is more likely to be protected by the statutory labor exemption. *Id.* at 557. But *Bodine* is inapposite here because Plaintiffs have alleged facts that show the Guilds have used non-traditional means to accomplish an illegitimate purpose that does *not* "intimately relate to wages, hours and working conditions." FCC ¶¶ 5-13, 30, 85-106, 118-130, 151-162.

1  "[t]he impact of package commissions on the terms and conditions of employment of

2  members of the Guild is a question to be resolved at trial." *Adams*, 411 F. Supp. at 410.[6]

3  Finally, there is no merit to the Guilds' argument that "in prohibiting talent agents

4  from accepting payments from or affiliating with Guild members' employers . . . the

5  Guilds merely require that agents who exercise Guild-delegated authority comply with

6  the same traditional prohibitions that would apply were the Guilds exercising that

7  authority directly." Mot. at 13. As alleged in the FCC, the "traditional prohibition" on

8  agents' delegated Guild-authority to negotiate individual writer contracts with

9  studios—as established by 43 years of history under the AMBA—is a prohibition on

10 actual, harmful conflicts of interest and an arbitration system to redress any alleged

11 breach of this prohibition. There simply is no "tradition" of the Guilds prohibiting the

12 long-standing commercial practices of packaging and content affiliates by franchised

13 agents. FCC ¶¶ 78-80.

14        **2.     The Agencies Have Plausibly Alleged Facts that the Guilds Are
              Acting in Concert with Non-Labor Parties**
15

16        The Guilds may not claim the protections of the statutory exemption for the

17 *independent* reason that the Guilds are implementing their group boycott in concert with

18 non-labor parties. *USS-POSCO*, 31 F.3d at 805-10.

19        ***Lawyers and managers.*** The Agencies have alleged more than sufficient facts

20 to plausibly allege agreements by the Guilds with lawyers and managers to effectuate

21 the boycott. The FCC alleges that the Guilds have sought "to induce unlicensed

22 ───────────────
[6] Notably, contrary to the Guilds' contention, there is no "holding" in *Adams* that the
23 Guilds' packaging ban furthers the "Guilds' legitimate self-interest." Mot. at 12.
   Rather, in *Adams*, a predecessor to WME sought a preliminary injunction against the
24 Guilds enforcing "Provision 9," which limited—*but did not attempt to ban*—talent
   agencies' receipt of "package commissions" under certain circumstances. 411 F. Supp.
25 at 406. Although the court declined to grant a preliminary injunction because of the
   myriad triable issues of fact, it clearly did not "hold" that the statutory labor exemption
26 would apply. And, even so, *Adams* was a far cry from this case, where the Agencies
   have plausibly alleged an illegitimate union motive to "conquer" the Agencies through
27 a complete ban on commercial packaging practices that the Guilds sanctioned for 43
   years, as well as a ban on content affiliates.

28

───────────────
11

Hollywood managers and lawyers to join the boycott by taking over the representation of WGA writer-members" in order "to replace Plaintiffs and other non-franchised talent agents." FCC ¶¶ 144-148.  Because lawyers and managers are not licensed to procure employment under California's Talent Agency Act ("TAA") (and similar state laws), the Guilds promised to "shield them from the consequences of violating" these laws and to indemnify them for services unpaid "because of an alleged violation of the [TAA or other state laws]." *Id.* ¶¶ 146-147.  The Guilds were so desperate for the participation of lawyers and managers in their conspiracy that they even went so far as threatening them with an antitrust claim if they did not join. *Id.* ¶ 178 & n.14.  It is correct that the Agencies have not *named* in the FCC the specific lawyers and managers who succumbed to the Guilds' pressure tactics and agreed to support the boycott.  But that does not undermine the plausibility of the allegations—supported by the Guilds' public statements—that lawyers and managers have, in fact, accepted the Guilds' invitation to aid the boycott by representing writers in violation of state law. *Id.* ¶ 147.

Further, while the Guilds apparently dispute that the lawyers and managers they enlisted are "non-labor parties," this is another question of fact that cannot be resolved at this stage.  In *H.A. Artists*, the Supreme Court held that "*[b]ecause franchised agents were exercising delegated authority from the union, they were 'considered a labor group' for statutory exemption purposes.*"  Mot. at 10 (quoting *H.A. Artists*, 451 U.S. at 721) (emphasis added).  From there, the Guilds offer the non-sequitur that "[t]his holding applies to . . . managers, or lawyers who represent Guild members." *Id.*  But lawyers and managers have never been franchised by the Guilds and are not licensed under state law to procure employment on behalf of writers with studios.  FCC ¶ 144-148.  They are thus no more a labor party than stockbrokers or real estate agents "who represent Guild members" for purposes other than procuring work. *See H.A. Artists*, 451 U.S. 704, 719-22 (examining fact record to determine existence of an agreement with non-labor group).

***Showrunners.***   The Guilds have additionally and independently included non-labor parties in their group boycott through the participation of showrunners—*i.e.*, Guild members who are executive producers of programming, performing management functions, and who at most nominally perform work as writers.  FCC ¶¶ 118-130. Unlike with the lawyers and managers, the Guilds do not deny that showrunners are parties to the group boycott.  Mot. at 7-9.  Rather, the Guilds contend that showrunners do not qualify as a "non-labor group" and that "[t]his issue was squarely addressed in *Carroll*."  *Id.* at 8-9.  But the test developed in *Carroll*—which concerned orchestra leaders, not showrunners—is inherently fact-specific.  391 U.S. at 106-13.  There, the Supreme Court affirmed the district court's conclusion that there was "substantial . . . evidence" presented *at trial* establishing that the orchestra leaders, who were employers and independent contractors, were in "job and wage competition" with the union-member musicians in "the club date and hotel steady engagement fields" and, as such, orchestra leaders "comprise[d] a labor group in these fields."  *Id.* at 106 & n.9.  Here, by contrast, the Agencies have alleged that showrunners are "producers of television content, and employers of other employees in the television industry" and that the Guilds have coerced them to join the boycott "even when they work as showrunners or producers rather than writers."  FCC ¶¶ 7, 59.[7]  Unlike the orchestra leaders and musicians in *Carroll*, the FCC plausibly alleges that showrunners are not in job or wage competition with other union writers when they work as producers.  Indeed, the work showrunners perform regularly and substantively differs from that of "ordinary" writer-members of the Guilds and, as such, showrunners constitute a non-labor group.  *See Home Box Office, Inc. v. Directors Guild of Am., Inc.*, 531 F. Supp. 578, 600 (S.D.N.Y. 1982), *aff'd*, 708 F.2d 95 (2d Cir. 1983) (noting that if Plaintiffs had identified at trial a

---

[7] The Guilds have admitted in their Answer that showrunners are involved in "creative, staffing, and budgeting decisions" and "hiring and supervisory decisions regarding" other Guild members; that "showrunners have production responsibilities," may "own and control their own production companies, [and] be compensated with a share of a program's profits;" and that "some work performed by" showrunners is "not governed by the" Guilds' collective bargaining agreement.  ECF No. 44 ¶¶ 138-149.

13

class of "producer-directors whose work regularly and substantively differ[ed] from that of ordinary directors," they would constitute a non-labor group); *id.* at 600-03 (concluding, after trial, that "director-packagers," who produce and market TV shows, are a "labor group" only "insofar as they work as directors").  The Agencies have thus plausibly alleged triable fact issues with respect to their claim in the FCC that showrunners participating in the Guilds' boycott are non-labor parties, so that the statutory exemption cannot apply.  *Adams*, 411 F. Supp. at 409; *Home Box Office*, 531 F. Supp. at 589-90.[8]

## B.     The Non-Statutory Labor Exemption Also Does Not Apply

The Guilds also erroneously contend that the non-statutory labor exemption protects them.  Mot. at 14-16.  But the Agencies have plausibly alleged numerous facts that render the non-statutory exemption inapplicable.  FCC ¶¶ 163-170.  Indeed, the test is just as fact-intensive as the statutory exemption, yet even more difficult for the Guilds to satisfy.  *Connell*, 421 U.S. at 622-23.  Perhaps that is why the Guilds neglect to so much as *mention* the required elements for invoking the non-statutory exemption in this Circuit:

> [T]he parties to an agreement restraining trade are exempt from antitrust liability only if (1) the restraint primarily affects the parties to the agreement and no one else, (2) the agreement concerns wages, hours, or conditions of employment that are mandatory subjects of collective bargaining, and (3) the agreement is produced from *bona fide*, arm's-length collective bargaining.

*Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n*, 81 F.3d 858, 861 (9th Cir. 1996) (citing *Mackey, v. Nat'l Football League*, 543 F.2d 606, 614 (8th Cir. 1976)).  The FCC

---

[8] The Guilds correctly note that, at this time, the Agencies are not alleging an "agreement" between the AMPTP and the Guilds.  Mot. at 9.  The FCC nevertheless presents another fact issue regarding the application of the statutory labor exemption due to the Guilds' illegitimate tactic of threatening the AMPTP "with objectively baseless litigation" based on the Guilds' frivolous argument that packaging fees "constitute[] *criminal* kickbacks" under federal labor law.  FCC ¶¶ 137-41.  The *Noerr-Pennington* doctrine does not exempt the Guilds from antitrust liability for making such sham litigation threats.  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006).

14

allegations show that the Guilds will be unable to satisfy any—much less all—of these three requirements.

**First,** the Agencies have alleged—based on the Guilds' own proclamations—that the Guilds' ban on agency packaging through their unlawful boycott will impact not only the writers they represent, but also talent (*e.g.*, directors and actors) represented by *other* unions.  FCC ¶¶ 10, 58, 84, 93, 166.  The ban will further impact studios who seek to buy packages of talent, and harm consumers to the extent that the packaging ban frustrates the production of content.  *Id.* ¶¶ 31-59, 169.  The same is true of the ban on content affiliates: it deprives *all* talent (not just writers) in the entertainment industry of work, *reduces* competition against traditional studios, and *reduces* the output of television and film production.  *Id.* ¶¶ 60-76.  The Agencies have thus plausibly alleged that the Guilds' conduct substantially impacts numerous parties besides the writers and agents, rendering the non-statutory labor exemption inapplicable.

**Second,** as previously discussed, the Agencies have alleged that (i) the packaging ban at most tangentially concerns "wages," and (ii) the content affiliate ban has *nothing* to do with "wages, hours, or conditions of employment."  *Supra* § 3(a)(1); FAC ¶ 158.  Indeed, packaging and content affiliate bans for the agents are not mandatory subjects of collective bargaining with the writers' employers and the Code of Conduct is not contained in a collective bargaining agreement with employers of WGA members.  However, even if the Code's prohibitions *did* relate to mandatory subjects of bargaining, the non-statutory labor exemption still would not apply because the Agencies have alleged facts showing that the bans have the "potential for restraining competition in the business market in ways that would not follow naturally from elimination of competition over wages and working conditions."  *Connell*, 421 U.S. at 625 (holding that non-statutory labor exemption did not shield a collective bargaining agreement because it contained a "direct restraint on the business market" that had "substantial anticompetitive effects, both actual and potential"); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 663 (1965) ("restraint on the product market [that] is direct

and immediate" is not subject to the exemption).[9]   Indeed, the AMPTP rejected the Guilds' demand that the AMPTP help effectuate the group boycott by including the ban on non-complying agents in the CBA with the Guilds because it "would subject [AMPTP], the WGA and individual writers to a substantial risk of liability for antitrust violations."  FCC ¶ 142.

Further, the FCC plausibly alleges facts that show the Guilds fail to satisfy the second prong of the non-statutory exemption test for an additional reason: they could achieve any legitimate union objectives through less restrictive means.  *See Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of N. Am. v. Jewel Tea Co.*, 381 U.S. 676, 692-93 (1965); *A&D Supermarkets, Inc. v. United Food and Commercial Workers. Local Union 880*, 732 F. Supp. 770, 776 (N.D. Ohio 1989) (denying motion to dismiss because complaint raised issues of fact concerning whether union's method "is the least restrictive as to the product market as required by *Jewel Tea*").   The AMBA's 43-year prohibition on agents acting contrary to their writer-clients' interests demonstrates one such (far) less restrictive means for achieving any legitimate union objective.  *E.g.*, FCC ¶¶ 167-169.

***Third,*** the Guilds' agreement to engage in a boycott to coerce agency acquiescence to the Code of Conduct was not "produced from *bona fide*, arm's-length collective bargaining."  *Phoenix Elec.*, 81 F.3d at 861.  The FCC is replete with detailed allegations about how neither the Code nor the boycott to impose it were the result of good faith negotiations with the Agencies, much less any collective bargaining.  FCC ¶¶ 85-148.  Once again, therefore, the factual averments of the FCC present numerous

---

[9] The Guilds' argument that "[t]he non-statutory exemption applies despite any alleged effect on other markets" (Mot. at 16 n.14) thus flies in the face of Supreme Court precedent.   In fact, in *Sun-Land Nurseries, Inc. v. S. California Dist. Council of Laborers*, 793 F.2d 1110, 1116-17 (9th Cir. 1986), the case that the Guilds misquote, the court noted that *Jewel Tea*—another Supreme Court authority—does *not* stand for the proposition that "collective bargaining activity concerning mandatory subjects of bargaining could never be subjected to antitrust scrutiny."

issues of fact precluding the Guilds from invoking any labor exemption defense at this stage of the case.

## IV.   THE AGENCIES HAVE PLEADED FAR MORE THAN PLAUSIBLE FACTS TO STATE A SHERMAN ACT VIOLATION

The Agencies' Sherman Act claim will eventually be decided based upon whether the Guilds can prove that their group boycott is exempt from antitrust scrutiny under either labor exemption.  Because unions necessarily eliminate competition among their members, most union conduct would violate the Sherman Act absent an applicable labor exemption.  *Connell Const. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 622 (1975) ("Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws.").  Here, the Guild members' (admitted) boycott of any talent agent who will not agree to the Code of Conduct's packaging and content affiliate bans constitutes a classic, *per se* illegal group boycott by horizontal competitors (the competing writers) in violation of Section 1 of the Sherman Act.  *E.g.*, *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212-13 (1959); *PowerTV Media, LLC v. Street Racing DigNight, LLC*, 2017 WL 5665013, at *8 (C.D. Cal. Mar. 10, 2017) (horizontal boycotts are per se illegal).

While the Guilds make several cursory arguments against the merits of the Agencies' Sherman Act claim should the labor exemptions not apply, none of them provides so much as a colorable basis for dismissal.  Mot. at 16-20.

### A.   The Agencies Have Unquestionably Pleaded an "Agreement, Conspiracy, or Combination" in Restraint of Trade

Notwithstanding the headline to their argument, the Guilds do not actually contend—nor could they—that the Agencies have failed plausibly to allege the concerted action required to plead a Section 1 agreement.  Mot. at 16-17.  The fact of the agreement among the thousands of writers who constitute the Guilds' members and

17

who compete with one another to obtain agency representational services is out in the open for anyone to see.  FCC ¶¶ 110-130.  Nor do the Guilds contend that there is anything competition-enhancing about an organized refusal to deal with talent agencies unless they accept the Guilds' take-it-or-leave-it Code of Conduct banning long-standing commercial practices and restricting output.

Instead, the Guilds cynically compare themselves to industry standard-setting organizations that "may promulgate limiting rules even if they incidentally restrain trade."  Mot. at 17.  But the Guilds do not remotely resemble an industry standard-setting organization—and the only case they cite for "support" (Mot. at 17-18) stands for the unremarkable proposition that "it is commonplace, and often very useful, for organizations to recommend quality standards […] or adopt them as part of a certification process." *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 57 (1st Cir. 1999).  An example of a *bona fide* standard-setting organization would be a group of mobile-phone manufacturers and patent holders devising industry-standard technology so that all phones may work on the same network.  *See Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 273 (5th Cir. 2008) (standard setting enables "the numerous necessary components of cellular communications to operate compatibly" and discussing that "[p]otential procompetitive benefits of standards promoting technological compatibility include facilitating economies of scale in the market for complementary goods, reducing consumer search costs, and increasing economic efficiency").[10]  The Guilds' claim that they resemble such standard-setting associations is implausible on its face and, at best, a factual dispute not susceptible to resolution on the pleadings.

---

[10] *See also Apple Inc. v. Samsung Electronics Co., Ltd.*, 2011 WL 4948567, at *1 (N.D. Cal. Oct. 18, 2011) ("Standards setting organizations . . . play an important role in the wireless communications industry."); Holmes and Mangiaracina, Antitrust Law Handbook § 2:22 (standard-setting organization "can serve highly desirable competitive objectives, as, for example, by facilitating research or product development that might not otherwise occur or by achieving better product performance and compatibility through industry standards").

The FCC allegations establish that the Guilds' boycott serves no procompetitive objective.  Specifically, the alleged intent and effect of the boycott is to force the Agencies to acquiesce to the Code of Conduct and to eliminate large swaths of competitors in the market for agency services.  FCC ¶¶ 11, 13, 25, 30, 85, 89, 95, 106, 148, 159, 168.  The seminal Supreme Court cases on standard-setting organizations in the antitrust context, *American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 572-74 (1982) and *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 506-07 (1988), confirm that even legitimate industry standard-setting organizations commit a Sherman Act, Section 1 violation if, as here, competitors engage in a group boycott to coerce parties to succumb to anticompetitive terms.  Indeed, such an agreement by competing purchasers of agency services is a classic example of a *per se* illegal horizontal group boycott.  *See, e.g.*, *Klor's,* 359 U.S. at 210 (concerted refusal by traders to deal with plaintiff retailer was the "type of trade restraint" that "the Sherman Act forbids"); *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 422-28, 433-36 (1990) (applying *per se* rule to a group boycott designed to force higher wages); *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 290 (1985) ("Concerted refusals to deal . . . are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* [illegal]"); *United States v. First Nat'l Pictures, Inc.*, 282 U.S. 44, 54-55 (1930) (group boycott by film distributors not to deal with exhibitors who refused particular contractual terms was *per se* illegal); *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 543-44 (1978) (unlawful to engage in "concerted refusals to deal" with a customer who refuses to accede to particular contractual terms); *Movie 1 & 2 v. United Artists Communications*, 909 F.2d 1245, 1253 (9th Cir. 1990) (agreement between movie exhibitors splitting the market for movie licenses among themselves and refusing to deal with other exhibitors was *per se* illegal).

**B.     The Agencies Did Not Need To—But Nonetheless Did—Plead Sufficient Facts of the Guilds' Market Power in a Relevant Market**

The Guilds' argument that the Agencies were required and failed to plead a "market" and "market power" (Mot. at 18-19) misstates both the law and the FCC's allegations.  Where, as here, Plaintiffs allege a *per se* illegal group boycott, they need not allege that Defendants have market power in a relevant market.  *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 109-10 & n. 42 (1984) ("[we] have never required proof of market power in such a case").[11]  Indeed, even under a "quick look" (rather than *per se*) analysis, "proof of market power is not required."  *Id.* at 109.  In a full rule of reason case, unlike here, plaintiffs must plead a relevant market and market power to demonstrate that the challenged restraint harms competition.  *Id.* at 110 n.42.  But such allegations are unnecessary for the types of horizontal restraints—including group boycotts—that courts have found to be so pernicious that they are *per se* illegal or can be condemned with a "quick look."  *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988).[12]

That said, the Agencies *did* plead a relevant market *and* the Guilds' market (indeed, monopoly) power over it.  FCC ¶¶ 181-186.  Relevant markets "typically" present "a factual inquiry" and are sufficiently pled when a plaintiff plausibly alleges a "separate and distinct" market for goods or services with "uniquely attractive" characteristics (*Dang*) and no reasonably interchangeable substitutes or "cross-elasticity of demand" (*Brown Shoe*).  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962);

---

[11] *See also R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 164 (9th Cir. 1989) ("proof of market power [is] not required to condemn the agreement at issue because a horizontal agreement not to offer a particular service [is], in and of itself, 'a naked restriction on price or output'") (quoting *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986)).

[12] The case the Guild cites for the proposition that "market power" pleadings are required in a *per se* case holds no such thing.  In *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 949-950 (9th Cir. 1988), the Ninth Circuit held that there was no *per se* violation pled at all, not that market power must be pleaded to support a *per se* violation.  FCC ¶¶ 22, 24-25.

20

*Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1107-08 (N.D. Cal. 2013). "Ultimately what constitutes a relevant market is a factual determination for the jury." *Image Tech. Servs. v. Eastman Kodak*, 125 F.3d 1195, 1203 (9th Cir. 1997). Antitrust complaints "survive[] a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect," such as failing to even attempt to explain why a market should be limited in a particular way. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).

Here, the Agencies have alleged a relevant market for talent agencies to sell representation services to writers negotiating with producers of films and television shows. FCC ¶¶ 181-182. Further, the Agencies allege there are no substitutes for writer-talent agents because, among other things, such agents must be franchised by the Guilds and licensed under state law. *Id.* ¶ 181.[13] And, the FCC alleges facts that show that the Guilds have monopsony power over the relevant market because they represent *all* buyers of talent agency services in that market (*i.e.*, the writers), and control access to the market by virtue of requiring writer-talent agents to have a Guild franchise. *Id.* ¶¶ 181-182.

The Guilds' retort to these allegations—that a market for representing writers is too narrow (Mot. at 18)—just presents another factual dispute. The Agencies' allegations of the Guilds' monopsony power over a distinct market for providing representational services to writers are more than sufficient because the Agencies have alleged facts plausibly identifying the contours of this market. FCC ¶¶ 181-82; *e.g.*, *Dang*, 964 F. Supp. 2d. at 1106-07 (denying motion to dismiss where plaintiff alleged that a market for NFL-branded apparel was plausibly distinct from other sporting apparel); *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 252 (1959)

---

[13] Moreover, only writers, and no one else, are capable of providing film and television writing services—an actor, producer, or director cannot, by definition, provide writing services, and the talent agency service of representing writers cannot be substituted by the service of representing non-writers. FCC ¶¶ 22, 24-25.

(holding—after trial—a market for *championship* boxing events to be distinct from the market for *non*-championship boxing).[14]

## C.     The Agencies Have Plausibly Pleaded Antitrust Injury

To establish antitrust injury, a plaintiff must plead facts to show (1) injury to competition of the type the antitrust law was intended to prevent, and (2) that the plaintiff was directly harmed by the injury to competition.  *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1153-55 (9th Cir. 2019) ("*NFL Sunday Ticket*").  The Guilds acknowledge that the Agencies have alleged direct harm in the form of lost clients and revenue stemming from the group boycott.  Mot. at 19. They contend, however, that the Agencies have failed to alleged facts to show that the Guilds' boycott injures competition apart from the damage to the Agencies themselves. *Id.*  The Guilds are wrong three times over.

***First***, the Agencies allege that the Guilds' boycott has stifled competition in the market for writer-representation services by excluding *all* talent agencies (not just Plaintiffs) who have declined to agree to the Code of Conduct.  FCC ¶¶ 6, 131-134, 181-182, 186, 188.  "Exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free-market principles" that it is a *per se* violation of the antitrust laws.  *United States v. Gen. Motors Corp.*, 384 U.S. 127, 146–47 (1966).

---

[14] Each case cited by the Guilds (Mot. at 18-19) involved a situation where the plaintiff had pled an antitrust claim governed by the rule of reason and failed to plausibly allege any distinct market—neither of which is true here.  *Power Analytics Corp. v. Operation Tech.*, 2017 WL 5479638 at *13-*14 (C.D. Cal. May 10, 2017) (in rule of reason case, a proposed market of sales of power-grid management products to "HR Data Centers" was insufficiently narrow because plaintiff could sell identical products interchangeably to a range of customers); *T. Harris Young &Assocs. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823-25 (11th Cir. 1991) (in rule of reason case, rejecting proposed market of sale of recording paper to "200 [plus] bed hospitals" because plaintiff could sell identical paper in a much broader market); *Lockheed Martin Corp. v. Boeing Co.*, 314 F. Supp. 2d 1198, 1226-29 (M.D. Fla. 2004) (in rule of reason case, sales to federal government alone could not constitute a relevant market when the identical product could be sold elsewhere); *Glynn-Brunswick Hosp. Auth. v. Becton*, 159 F. Supp. 3d 1361, 1380-81 (S.D. Ga. 2016) (in rule of reason case, a "market" consisting of only a few customers for a medical device was insufficiently distinct to plead monopolization, when the identical medical devices could be sold to many other customers).

1   While the Guilds argue that removing one or more competitors from the market

2   does not always equate with injury to competition (Mot. at 19), that rare case has no

3   application here.  Even focusing only on the elimination of the three Agencies, they

4   were by far the largest providers of representation services to writers.  *See* FCC ¶¶ 3,

5   19; Answer, ECF No. 44 ¶ 352 (Guilds alleging the Agencies account for 70% of

6   writers' earnings).[15]

7   Further, individual talent agents have unique experiences and relationships with

8   their clients, and the Guilds' boycott further harms competition by depriving writers of

9   the option to work with the agents of their choice.  *Glen Holly Entm't, Inc. v. Tektronix*

10  *Inc.*, 343 F.3d 1000, 1011 (9th Cir. 2003) ("One form of antitrust injury is '[c]oercive

11  activity that prevents its victims from making free choices between market

12  alternatives.'") (citation omitted).[16]  The Guilds' citation to *Les Shockley Racing, Inc.*

13  *v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989) is not to the contrary.  In that

14  case, the court found that the ban on competing in certain drag races did not harm

15  competition because there were many other equivalent racers of jet-powered vehicles;

16  and there was no claim that the number of drag races was reduced.  *Id.* at 508-09.  Here,

17  by contrast, the Agencies have plausibly alleged that driving them (and other agents)

18  out of the market has significantly reduced competition.[17]

19

---

20  [15] *Kissing Camels Surg. Ctr., LLC v. Centura Health Corp.*, 2015 WL 5081608, at *7 (D. Colo. Aug. 28, 2015) (finding antitrust injury where "elimination of any of the

21  Plaintiffs as competitors would have a substantial negative impact on competition"); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 (9th Cir. 1999)

22  (finding antitrust injury where group boycott restricted access to customers); *E.W. French & Sons, Inc. v. General Portland Inc.*, 885 F.2d 1392, 1401 (9th Cir. 1989) ("the elimination of a single competitor may violate section 1 if it harms competition").

23  [16] *See also Oltz*, 861 F.2d at 1448 (finding antitrust injury where restraint hindered

24  patients and surgeons from obtaining services of "preferred" anesthetists); *Northern Cal. Minimally Invasive Cardiovascular Surg., Inc. v. Northbay Healthcare Corp. et*

25  *al.*, 2016 WL 1570015, at *5-*6 (N.D. Cal. Apr. 19, 2016) (finding antitrust injury where exclusion of cardiologists from market "gave consumers fewer choices" and "substantially reduced total competition in the market") (citation omitted).

26

27  [17] The *Brantley* and *Cascade* cases cited by the Guilds (Mot. at 19) are inapposite because they address antitrust claims for product "tying"—a unique antitrust claim

28  under Section 3 of the Clayton Act, subject to a specific body of case law, that has nothing to do with a group boycott.

***Second***, the Agencies have alleged that the Guilds' ban on packaging has also harmed competition in the market for the production of television shows and films by eliminating the Agencies as providers of packaging, thereby reducing the output of new shows and films.  FCC ¶¶ 57, 169, 184.  Output restrictions are a classic form of injury to competition.  *See, e.g.*, *NFL Sunday Ticket*, 933 F.3d at 1156-58 (alleged reduction in output of televised NFL games satisfied antitrust injury requirement); *Trendsettah USA, Inc. v. Swisher Int'l Inc.*, 2016 WL 6822191, at *8 (C.D. Cal. Jan. 21, 2016) ("harm to competition resulting from restricted output constitutes a viable antitrust injury").

The Guilds concede that the Agencies have alleged reduction in output, but assert that the Agencies' allegations are "conclusory and concern markets in which the Agencies do not participate."  Mot. at 20.  Not so.  The FCC specifies in great detail how the Agencies' packaging facilitates the production of new shows and films and how the Agencies sell packages to studios in that production market.  FCC ¶¶ 31-42.[18]

***Third***, contrary to the Guilds' claim that the FCC allegations about the harm to competition from eliminating content production affiliates are conclusory, the FCC details how banning content affiliates will reduce the output of new shows and films by decreasing both the number of production companies and the resources available for production.  FCC ¶¶ 60-70, 169, 185.  Further, the Agencies have alleged that eliminating the presence of the content production affiliates who strive to offer better terms to talent will reduce competition for such talent with traditional studios.  FCC ¶¶ 71-74; *see*, *e.g.*, *Gen. Motors*, 384 U.S. at 145 ("Elimination, by joint collaborative action, of discounters from access to the market is a per se violation of the [Sherman]

---

[18] For example, the Agencies allege that they "service their clients by assembling the creative element(s)" of new TV shows and films and sell such packages to studios, thereby "facilitat[ing] the development of television and film projects that might otherwise not get produced."  FCC ¶¶ 35-37.  In addition, the Agencies allege that packaging is an efficiency-enhancing practice that makes production easier for studios and encourages investment by pairing known stars with up-and-coming talent.  *Id.* ¶¶ 31-33.

Act"); *Wi-LAN Inc. v. LG Elecs., Inc.*, 382 F. Supp. 3d 1012, 1024 (S.D. Cal. 2019) (allegation that firm's exclusion from market eliminated innovative products established antitrust injury).

### D.     The Agencies Are Not Asserting Claims on Behalf of Affiliates

Finally, the Guilds' argument that the Agencies lack standing to bring antitrust claims for injury to their content-affiliates is a red herring because the Agencies do not assert any such claims.  The Agencies assert claims, and seek relief, for the ***direct antitrust*** injury to their own businesses caused by the Guilds' group boycott.  FCC ¶ 190.

## V.     CONCLUSION

For all the foregoing reasons, the motion to dismiss the Agencies' Sherman Act claim against the Guilds' unlawful group boycott (Count I of the FCC), or in the alternative for judgment on the pleadings, at best raises issues of fact for trial and therefore must be denied.

| | |
|---|---|
| 1 | Dated:  November 6, 2019 |

WINSTON & STRAWN LLP

By:  */s/ Diana Hughes Leiden*
Jeffrey L. Kessler
jkessler@winston.com
David L. Greenspan
dgreenspan@winston.com
Isabelle Mercier-Dalphond
imercier@winston.com
200 Park Avenue
New York, NY 10166-4193
Telephone: 212-294-6700
Facsimile: 212-294-4700
Diana Hughes Leiden (267606)
dhleiden@winston.com
Shawn R. Obi (288088)
sobi@winston.com
333 South Grand Avenue, 38th Floor
Los Angeles, CA  90071-1543
Telephone:    213-615-1700
Facsimile:    213-615-1750

*Attorneys for Plaintiff*
*WILLIAM MORRIS ENDEAVOR*
*ENTERTAINMENT, LLC*

Dated: November 6, 2019

IRELL & MANELLA LLP
MITCHELL SILBERBERG & KNUPP LLP

By:  */s/ Steven A. Marenberg*
Steven A. Marenberg (101033)
smarenberg@irell.com
Victor Jih (186515)
vjih@irell.com
Stephen M. Payne (310567)
spayne@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Adam Levin (156773)
axl@msk.com
Jeremy Mittman (248854)
j2m@msk.com
Jean Pierre Nogues (84445)
jpn@msk.com
2049 Century Park E., 18th Floor
Los Angeles, CA 90067
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

*Attorneys for Plaintiff*
*UNITED TALENT AGENCY, LLC*

DATED:  November 6, 2019

KENDALL BRILL & KELLY LLP

By: /s/ *Richard B. Kendall*
    Richard B. Kendall (90072)
    rkendall@kbkfirm.com
    Patrick J. Somers (318766)
    psomers@kbkfirm.com
    Nicholas F. Daum (236155)
    ndaum@kbkfirm.com
    Sarah E. Moses (291491)
    smoses@kbkfirm.com
    10100 Santa Monica Blvd., Suite 1725
    Los Angeles, California 90067
    Telephone: 310.556.2700
    Facsimile: 310.556.2705

*Attorneys for Plaintiff*
*CREATIVE ARTISTS AGENCY, LLC*

## ATTESTATION

Pursuant to Local Rule 5-4.3.4(a)(2)(i), I, Diana Hughes Leiden, attest that the other signatories listed, and on whose behalf this filing is submitted, concur in the filing content and has authorized this filing.

*/s/ Diana Hughes Leiden*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNT I OF THE CONSOLIDATED
COMPLAINT, OR IN THE ALTERNATIVE FOR JUDGMENT ON THE PLEADINGS