Steven A. Marenberg (101033)
Victor Jih (186515)
Stephen M. Payne (310567)
**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276

Adam Levin (156773)
Jeremy Mittman (248854)
Jean Pierre Nogues (84445)
**MITCHELL SILBERBERG & KNUPP LLP**
2049 Century Park E., 18th Floor
Los Angeles, CA 90067

Attorneys for Plaintiff/Counterclaim-Defendant
UNITED TALENT AGENCY, LLC

Jeffrey L. Kessler (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Isabelle Mercier-Dalphond (*pro hac vice*)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4193

Diana Hughes Leiden (267606)
Shawn Obi (288088)
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA  90071-1543

Attorneys for Plaintiff/Counterclaim-Defendant
WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC

Richard B. Kendall (90072)
Patrick J. Somers (318766)
Nicholas F. Daum (236155)
**KENDALL BRILL & KELLY LLP**
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Attorneys for Plaintiff/Counterclaim-Defendant
CREATIVE ARTISTS AGENCY, LLC.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, CREATIVE ARTISTS AGENCY, LLC and UNITED TALENT AGENCY, LLC,<br><br>Plaintiffs and Counterclaim-Defendants,<br><br>v.<br><br>WRITERS GUILD OF AMERICA, WEST, INC. and WRITERS GUILD OF AMERICA, EAST, INC.,<br><br>Defendants and Counterclaimants,<br><br>and PATRICIA CARR, ASHLEY GABLE, BARBARA HALL, DERIC A. HUGHES, DEIRDRE MANGAN, DAVID SIMON, and MEREDITH STIEHM,<br><br>Counterclaimants. | Case No. 2:19-cv-05465-AB-AFM (FFMx)<br><br>**PLAINTIFFS AND COUNTERCLAIM-DEFENDANTS WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC'S, CREATIVE ARTISTS AGENCY, LLC'S, AND UNITED TALENT AGENCY, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  January 17, 2020<br>Time: 10:00 a.m.<br>Courtroom: 7B |

## NOTICE OF MOTION AND MOTION

TO DEFENDANTS AND COUNTERCLAIMANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 17, 2020 at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 7B of this Court, located at 350 W. 1st Street, Los Angeles, California 90012, Plaintiffs and Counterclaim-Defendants William Morris Endeavor Entertainment, LLC ("WME"), Creative Artists Agency, LLC ("CAA") and United Talent Agency, LLC ("UTA") (collectively, "Plaintiffs," "Counterclaim Defendants," or "the Agencies") will and hereby do move this Court for an order dismissing the Counterclaims (ECF No. 44) filed by Defendants and Counterclaimants Writers Guild of America, West, Inc. ("WGAW") and Writers Guild of America, East, Inc. ("WGAE," collectively with WGAW, the "Guilds" or "WGA") and Counterclaimants Meredith Stiehm, Patricia Carr, Ashley Gable, Barbara Hall, Deric A. Hughes, Deirdre Mangan, and David Simon ("Individual Counterclaimants") (collectively with the Guilds, "Counterclaimants").

Plaintiffs move on the grounds that, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), Counterclaimants fail to state any claim upon which relief can be granted and the Court lacks subject matter jurisdiction over the Guilds' counterclaims.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities in support of the Motion filed concurrently herewith, the record in this action, and any evidence and argument that may be presented at or before the hearing.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place on November 1, 2019.

1    Dated:   November 15, 2019        WINSTON & STRAWN LLP

2                                      By:  */s/ Jeffrey L. Kessler*
3                                          Jeffrey L. Kessler
                                           jkessler@winston.com
                                           David L. Greenspan
4                                          dgreenspan@winston.com
                                           Isabelle Mercier-Dalphond
5                                          imercier@winston.com
                                           200 Park Avenue
6                                          New York, NY 10166-4193
                                           Telephone: 212-294-6700
7                                          Facsimile: 212-294-4700

8                                          Diana Hughes Leiden (267606)
                                           dhleiden@winston.com
9                                          Shawn R. Obi (288088)
                                           sobi@winston.com
10                                         333 South Grand Avenue, 38th Floor
                                           Los Angeles, CA  90071-1543
11                                         Telephone:    213-615-1700
                                           Facsimile:    213-615-1750
12
                                           Attorneys for Plaintiff/Counterclaim-
13                                         Defendant
                                           WILLIAM MORRIS ENDEAVOR
14                                         ENTERTAINMENT, LLC

15
16   Dated: November 15, 2019         IRELL & MANELLA LLP
                                      MITCHELL SILBERBERG & KNUPP LLP
17
18                                    By:  */s/ Steven A. Marenberg*
                                           Steven A. Marenberg (101033)
19                                         smarenberg@irell.com
                                           Victor Jih (186515)
20                                         vjih@irell.com
                                           Stephen M. Payne (310567)
21                                         spayne@irell.com
                                           1800 Avenue of the Stars, Suite 900
22                                         Los Angeles, California 90067-4276
                                           Telephone: (310) 277-1010
23                                         Facsimile: (310) 203-7199

24                                         Adam Levin (156773)
                                           axl@msk.com
25                                         Jeremy Mittman (248854)
                                           j2m@msk.com
26                                         Jean Pierre Nogues (84445)
                                           jpn@msk.com
27                                         2049 Century Park E., 18th Floor
                                           Los Angeles, CA 90067
28                                         Telephone: (310) 312-2000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Facsimile: (310) 312-3100

Attorneys for Plaintiff/Counterclaim-
Defendant
UNITED TALENT AGENCY, LLC

DATED:  November 15, 2019      KENDALL BRILL & KELLY LLP

By: /s/ Richard B. Kendall
    Richard B. Kendall (90072)
    rkendall@kbkfirm.com
    Patrick J. Somers (318766)
    psomers@kbkfirm.com
    Nicholas F. Daum (236155)
    ndaum@kbkfirm.com
    Sarah E. Moses (291491)
    smoses@kbkfirm.com
    10100 Santa Monica Blvd., Suite 1725
    Los Angeles, California 90067
    Telephone: 310.556.2700
    Facsimile: 310.556.2705

Attorneys for Plaintiff /Counterclaim-
Defendant
CREATIVE ARTISTS AGENCY, LLC

3

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

# **TABLE OF CONTENTS**

**Page(s)**

NOTICE OF MOTION AND MOTION ..................................................................... 1

I.     INTRODUCTION ................................................................................................ 1

I.     SUMMARY OF COUNTERCLAIM ALLEGATIONS ..................................... 3

II.    ARGUMENT ........................................................................................................ 5

    A.    The Federal and State Antitrust Claims Should Be Dismissed ................. 5

        1.    Counterclaimants Lack Antitrust Standing .................................. 5

            (a)   Counterclaimants Lack Antitrust Standing to Sue Over the Alleged Price-Fixing of Packages That They Do Not Buy or Sell ................................................................................... 6

            (b)   Counterclaimants Lack Antitrust Standing to Sue Over an Alleged Group Boycott That is Not Causally Connected to Their Claimed Injuries .................................................... 9

        2.    Counterclaimants Have Failed to Plausibly Allege Any Conspiratorial Agreement ......................................................... 11

            (a)   Counterclaimants Have Not Pleaded the Facts Required to State a Price-Fixing Agreement .......................................... 11

            (b)   Counterclaimants Also Have Not Pleaded Facts to Plausibly State a Group Boycott Conspiracy ....................................... 13

        3.    The Cartwright Act Claims Fall with the Sherman Act Claims .... 14

    B.    Counterclaimants' RICO Claims Should Also Be Dismissed ................. 15

        1.    Counterclaimants Do Not Have Standing, And Have Not Pleaded Proximate Causation, To State Any RICO Claim ............................ 15

        2.    Counterclaimants Fail to Allege any Predicate Racketeering Act Because Packaging Does Not Violate the LMRA ......................... 16

        3.    Counterclaimants' RICO Claims Also Fail for a Host of Additional Reasons ..................................................................... 19

    C.    Counterclaimants' State Law Claims Are Each Legally Defective ......... 20

        1.    The Guilds Lack Standing to Assert Each State Law Claim ......... 21

            (a)   The Guilds Have No Associational Standing to Assert Breach of Fiduciary Duty (Claim Five) or Constructive Fraud (Claim Six) on Behalf of Their Members ................. 21

        2.    The Individual Counterclaimants' Claims for Breach of Fiduciary Duty, Constructive Fraud, and Breach of Contract/Promissory Estoppel Fail on Numerous Grounds ............................................. 24

        3.    All of the Counterclaimants Fail to State the Required Elements of a UCL Cause of Action ................................................................ 27

            (a)   Counterclaimants Have Not Pled Facts to Satisfy the "Unlawfulness" UCL Prong ....................................... 28

            (b)   Counterclaimants have Not Pled Facts to Satisfy the "Unfairness" UCL Prong ................................................ 29

    D.    The Declaratory Relief Claim Should Also Be Dismissed ..................... 30

i

1

III.    CONCLUSION ................................................................................................30

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acri v. Varian Assoc., Inc.*,
114 F.3d 999 (9th Cir. 1997) (*en banc*) .................................................. 20

*AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*,
181 F.3d 216 (2d Cir. 1999) ................................................................. 12

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ................................................................ 8

*Am. Dental Ass'n v. Cigna Corp.*,
605 F.3d 1283 (11th Cir. 2010) ............................................................ 12

*Amalgamated Transit Union, Local 1756, AFL-CIO v. Super. Ct.*,
46 Cal. 4th 993 (2009) ........................................................................ 23

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ............................................................................ 16

*Arroyo v. United States*,
359 U.S. 419 (1959) ............................................................................ 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................. 5

*Assoc. of Wash. Pub. Hosp. Dist. v. Philip Morris, Inc.*,
241 F.3d 696 (9th Cir. 2001) .......................................................... 6, 15

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) ..................................................................... *passim*

*Bates v. Suntrust Mortg., Inc.*,
2013 WL 6491528 (E.D. Cal. Dec. 10, 2013) ...................................... 30

*Bell Atl. v. Twombly*,
550 U.S. 544 (2007) .................................................................. 5, 11, 12

*Berryman v. Merit Prop. Mgmt., Inc.*,
152 Cal. App. 4th 1544 (2007) ...................................................... 23, 27

iii

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

*Bhan v. NME Hosp., Inc.*,
   772 F.2d 1467 (9th Cir. 1985) ................................................................ 6

*Branch v. Tunnell*,
   14 F.3d 449 (9th Cir. 1994) .................................................................. 5

*Brown v. Cal. Pension Adm'rs & Consultants, Inc.*,
   45 Cal. App. 4th 333 (1996) ................................................................ 24

*Caltex Plastics, Inc. v. Lockheed Martin Corp.*,
   824 F.3d 1156 (9th Cir. 2016) ............................................................ 23

*Canyon Cty. v. Syngenta Seeds, Inc.*,
   519 F.3d 969 (9th Cir. 2008) .............................................................. 15

*Chaset v. Fleer/Skybox Int'l, LP*,
   300 F.3d 1083 (9th Cir. 2002) ............................................................ 16

*In re Citric Acid Litigation*,
   191 F.3d 1090 (9th Cir. 1999) ............................................................ 12

*City & Cty. of San. Fran. v. Spencer*,
   2003 WL 23119283 (N.D. Cal. Dec. 29, 2003) .................................. 19

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013).............................................................................. 10

*Conditioned Air & Refrigeration Co. v. Plumbing & Pipe Fitting Labor
   Mgmt. Relations Trust*,
   159 F. Supp. 887 (S.D. Cal. 1956) ...................................................... 18

*Cong. of Cal. Seniors v. Catholic Healthcare W.*,
   87 Cal. App. 4th 491 (2001) ................................................................ 28

*Consol. Metal Prod., Inc. v. Am. Petroleum Inst.*,
   846 F.2d 284 (5th Cir. 1988) .............................................................. 12

*Cooper v. Pickett*,
   137 F.3d 616 (9th Cir. 1997) .............................................................. 24

*Davis v. HSBC Bank Nevada, N.A.*,
   691 F.3d 1152 (9th Cir. 2012) ............................................................ 29

*People ex rel. Dept. of Transp. v. Naegele Outdoor Advert. Co.*,
    38 Cal. 3d 509 (1985) ......................................................................... 28

*Dunkel v. eBay Inc.*,
    2013 WL 415584 (N.D. Cal. Jan. 31, 2013) ........................................ 23

*Eagle v. Star-Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987) ........................................................ *passim*

*Fireman's Fund Ins. Co. v. Stites*,
    258 F.3d 1016 (9th Cir. 2001) ............................................................ 16

*Galindo v. Ocwen Loan Servicing, LLC*,
    282 F. Supp. 3d 1193 (N.D. Cal. 2017) .............................................. 23

*Gen. Foods Corp.*,
    231 NLRB 1232 (1977) ...................................................................... 18

*Hanson v. Shell Oil Co.*,
    541 F.2d 1352 (9th Cir. 1976) ............................................................ 13

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ............................................................................ 21

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) .............................................................................. 7

*Int'l Assoc. of Machinists Dist. Ten & Local Lodge 873 v. Allen*,
    904 F.3d 490 (7th Cir. 2018) .............................................................. 28

*Int'l Union of Operating Eng'rs Local 399 v. Vill. of Lincolnshire*,
    905 F.3d 995 (7th Cir. 2018), *cert. granted, judgment vacated as moot*
    139 S. Ct. 2692 (2019) ........................................................................ 28

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*
    *v. Brock*,
    477 U.S. 274 (1986) ............................................................................ 22

*Jean-Louis v. J.P. Morgan Chase Bank, N.A.*,
    2014 WL 12696911 (C.D. Cal. Sept. 16, 2014) .................................. 16

*Keel v. Schwarzenegger*,
    2009 WL 1444644 (C.D. Cal. May 19, 2009) ..................................... 16

v

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ....................................................................... 11, 12, 13

*Lake Mohave Boat Owners Ass'n v. Nat. Park Svc.*,
   78 F.3d 1360 (9th Cir. 1995) ................................................................................... 21

*Lenhoff Enterp., Inc. v. United Talent Agency, Inc.*,
   729 F. App'x 528 (9th Cir. 2018) .................................................................... *passim*

*Local No. 2 of Operative Plasterers & Cement Masons Int'l Ass'n v.*
   *Paramount Plastering, Inc.*,
   310 F.2d 179 (9th Cir. 1962) ................................................................................... 18

*Lozano v. AT&T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) ................................................................................... 29

*Lucas Auto. Eng., Inc. v. Bridgestone/Firestone, Inc.*,
   140 F.3d 1228 (9th Cir. 1998) ................................................................................... 6

*Martinez v. Welk Grp., Inc.*,
   907 F. Supp. 2d 1123 (S.D. Cal. 2012) ................................................................... 29

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ................................................................................... 2

*Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*,
   176 F.R.D. 329 (C.D. Cal. 1997) ............................................................................ 21

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
   696 F.3d 849 (9th Cir. 2012) (Pro, J., concurring) ................................................. 23

*Neibel v. Trans World Assurance Co.*,
   108 F.3d 1123 (9th Cir. 1997), *overruled on other grds* ....................................... 20

*NorthBay Healthcare Grp.-Hosp. Div. v. Blue Shield of Cal. Life &*
   *Health Ins.*,
   342 F. Supp. 3d 980 (N.D. Cal. 2018) .................................................................... 28

*Odom v. Microsoft Corp.*,
   486 F.3d 541 (9th Cir. 2007) ................................................................................... 20

*Orcilla v. Big Sur, Inc.*,
   244 Cal. App. 4th 982 (2016) ................................................................................. 27

*Oregon Laborers-Emp. Health & Welfare Tr. Fund v. Philip Morris Inc.*,
  185 F.3d 957 (9th Cir. 1999) ...................................................................... 8, 15

*Oregon Teamster Emp. Trust v. Hillsboro Garbage Disposal, Inc.*,
  800 F. 3d 1151 (9th Cir. 2015) ...................................................................... 17

*Pillsbury, Madison & Sutro v. Lerner*,
  31 F.3d 924 (9th Cir. 1994) ............................................................................ 15

*Portney v. CIBA Vision Corp.*,
  2009 WL 305488 (C.D. Cal. Feb. 6, 2009) .................................................... 27

*Prakashpalan v. Engstrom, Lipscomb & Lack*,
  223 Cal. App. 4th 1105 (2014) ....................................................................... 24

*Rest. Law Ctr. v. City of New York*,
  360 F. Supp. 3d 192 (S.D.N.Y. 2019) ............................................................ 18

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) ........................................................................................ 20

*Salinas v. United States*,
  522 U.S. 52 (1997) .......................................................................................... 20

*Scheidler v. Nat'l Org. for Women, Inc.*,
  537 U.S. 393 (2003) ........................................................................................ 16

*Schultz v. N.L.R.B.*,
  284 F.2d 254 (D.C. Cir. 1960) ........................................................................ 18

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985) ........................................................................................ 20

*Simon v. Value Behavioral Health, Inc.*,
  208 F.3d 1073 (9th Cir. 2000), *overruled on other grds* ............................... 20

*Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*,
  634 F. Supp. 2d 1009 (N.D. Cal. 2007) .......................................................... 24

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016), *as revised* (May 24, 2016) ...................................... 23

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ............................................................................ 5

vii

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

*Stelmachers v. Verifone Sys.*,
   2016 WL 6835084 (N.D. Cal. Dec. 17, 2015) ........................................................ 23

*Sybersound Records, Inc. v. UAV Corp.*,
   517 F.3d 1137 (9th Cir. 2008) .............................................................. 19, 23

*Tietsworth v. Sears*,
   720 F. Supp. 2d 1123 (N.D. Cal. 2010) .......................................................... 29

*Tostevin v. Douglas*,
   160 Cal. App. 2d 321 (1958) .................................................................. 27

*In re Toyota Motor Corp. UA Mktg. Litig.*,
   785 F. Supp. 2d 883 (C.D. Cal. 2011) .......................................................... 19

*Tribeca Cos. v. First Am. Title Ins. Co.*,
   239 Cal. App. 4th 1088 (2015) ......................................................... *passim*

*Turner v. Local Union No. 302*,
   604 F. 2d 1219 (9th Cir. 1979) .............................................................. 17

*U.S. v. Camez*,
   839 F.3d 871 (9th Cir. 2016) ................................................................ 16

*United States v. Fernandez*,
   388 F.3d 1199 (9th Cir. 2004) .............................................................. 20

*United States v. McGowan*,
   58 F.3d 8 (2d Cir. 1995) ..................................................................... 18

*United States v. Ryan*,
   350 U.S. 299 (1956) ......................................................................... 18

*United Union of Roofers v. Ins. Corp. of Am.*,
   919 F.2d 1398 (9th Cir. 1990) .............................................................. 21

*Wagh v. Metris Direct, Inc.*,
   363 F.3d 821 (9th Cir. 2003) ................................................................ 19

*Younan v. Equifax Inc.*,
   111 Cal. App. 3d 498 (1980) ................................................................ 24

viii

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

**Statutes**

28 U.S.C. § 1367 ........................................................................... 20

Cal. Civ. Code § 1573 ................................................................... 24

Cal. Civ. Code § 1624 ................................................................... 27

Cal. Civ. Proc. Code § 339 ........................................................... 27

California's Unfair Competition Law ............................................. 1

Cartwright Act .............................................................................. 14

Clayton Act .................................................................................. 15

National Labor Relations Act ....................................................... 18

Labor Management Relations Act ............................................. 17-18

RICO Act ............................................................................... *passim*

Sherman Act .......................................................... 6, 11, 12, 13, 14

ix

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION[1]

This case concerns the entertainment industry's common business practice of "packaging"—the process by which a talent agency assembles a package of writers, actors, directors and others to create a television show or film, and then sells that package to a production studio.  When an agency sells a package, it negotiates and collects a fee from the studio instead of charging any of its clients in the show or movie a commission (typically, 10%) on their compensation.  Packaging is ubiquitous; Counterclaimants allege, for example, that 90% of television series are the result of packaging.  The widespread adoption of packaging has been endorsed by the Guilds and their writer-members for over forty years.  Specifically, in 1976, the Guilds entered into a franchise agreement with the Agencies—the "AMBA"—in which the Guilds, on behalf of their members, expressly sanctioned packaging.

In April of 2019, the Guilds made a complete about-face.  In a move they publicly declared to be a "power grab" to "conquer" the major talent agencies, the Guilds terminated the AMBA and unilaterally imposed a new Code of Conduct that, among other things, seeks to ban packaging from the marketplace.  The Guilds subsequently forced their members to fire any talent agency—including CAA, UTA, WME, and upwards of 7,000 agents in total—that would not submit to the draconian Code of Conduct.  The Agencies initiated this action to end the unlawful group boycott.

Now, in their Answer and Counterclaims, ECF No. 44 ("A&C"), Counterclaimants assert, without even a hint of irony, that the very practice they endorsed for more than forty years constitutes an antitrust violation by the Agencies, a criminal violation of federal RICO and labor laws, a violation of California's Unfair Competition Law ("UCL"), a breach of fiduciary duty, and a constructive fraud.  In advancing these wholly meritless claims, the Guilds have channeled the creative talents

---

[1] The parties are defined in the Notice of Motion and Motion.

1  of the Hollywood writers they represent and cut from whole cloth a dizzying array of
2  causes of action that do not come close to meeting the plausibility test.

3      ***Antitrust***:  Counterclaimants' antitrust claims are fatally defective for several
4  reasons.  First, Counterclaimants each lack antitrust standing, because they do not (and
5  cannot) allege any facts plausibly showing that the Agencies' purported price-fixing of
6  packaging fees caused them antitrust injury.  To the contrary, Counterclaimants'
7  allegations establish that any theoretical price-fixing of packaging fees would cause
8  antitrust injury *to the Hollywood production studios that pay the fees*—not the Guilds
9  or any writer.  Indeed, in two precedents directly apposite here, the Supreme Court and
10  the Ninth Circuit have squarely rejected both a union's and its members' antitrust
11  standing to assert such remote and derivative injuries arising from alleged restraints in
12  markets in which they do not participate.  *Associated Gen. Contractors of Cal. v. Cal.*
13  *State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"); *Eagle v. Star-Kist Foods,*
14  *Inc.*, 812 F.2d 538 (9th Cir. 1987).  Additionally, and independently, the Ninth Circuit
15  recently rejected the plausibility of the very claim that Counterclaimants recycle here
16  about the Agencies conspiring to price-fix package fees.  *Lenhoff Enterp., Inc. v. United*
17  *Talent Agency, Inc.*, 729 F. App'x 528 (9th Cir. 2018) ("*Lenhoff*").  Counterclaimants'
18  secondary antitrust claim—that the Agencies are engaged in a group boycott to refuse
19  to individually bargain with the Guilds over a new franchise agreement—also fails the
20  antitrust standing test and is just as bereft of the factual allegations needed to cross the
21  line from conceivable to plausible.

22      ***RICO***:  Counterclaimants' RICO claims likewise fail as a matter of law for
23  several independent reasons.  First, Counterclaimants again lack standing because
24  RICO applies the same test that dooms their antitrust claims.  Second, Counterclaimants
25  have failed plausibly to allege a viable predicate criminal or "racketeering" act.
26  Counterclaimants' contention that the Agencies' receipt of packaging fees as part of a
27  commercial transaction constitutes a criminal union "kickback" under the Labor
28  Management Relations Act ("LMRA") is breathtakingly in error.  In the seventy-plus

2

years that the LMRA has been on the books, the Agencies do not know of a single prosecutor or private litigant who has ever contended that the long-standing, industry-wide practice of packaging is a criminal violation of labor law.  Nor could it be.  As the factual allegations of the Counterclaims make clear, packaging fees are *individually negotiated* fees for a commercial transaction that has nothing to do with the *collective bargaining process* that the LMRA serves to protect by banning corrupt kickbacks to unions.  Counterclaimants' attempt to transmute their desire to ban packaging into a RICO claim fails at every level of statutory analysis.

*State Law Claims*:  If the Court decides to exercise its supplemental jurisdiction to consider them, Counterclaimants' UCL and common-law law tort claims should also be dismissed, with prejudice, for failing to state a viable cause of action.  As an initial matter, the Guilds have no associational standing to assert highly-individualized damages claims on behalf of their 14,700 member-writers.   And the Individual Counterclaimants simply allege no plausible *facts* to show how any Agency packaging transaction breached any tort duty or proximately caused them any harm.  Instead, the legally absurd and implausible premise of their claims is that the Agencies *automatically* perpetrated a tort every time they engaged in any packaging deal for any writer-client.  But Counterclaimants' own allegations reflect that packaging offers many benefits to writers, which is why the Guilds endorsed packaging for more than forty years.  No court has ever held that such a long-standing, commercially-accepted practice could morph overnight into *per se* violations of tort duties and the UCL simply because two unions have decided they want the practice to end.

## I.    SUMMARY OF COUNTERCLAIM ALLEGATIONS

The two Guilds—WGAE and WGAW—are the labor unions that represent television and motion picture writers in *collective* bargaining with the multi-employer bargaining representative of television and film studios.  A&C ¶¶ 241-242.

CAA, UTA, and WME are talent agencies that, until April 2019, had been franchised by the Guilds to represent *individual* writers in their *individual* negotiations with studios. *Id*. ¶¶ 27, 250-53.

The seven individual Counterclaimants are writer-showrunners and/or writer-producers who are members of WGAW or WGAE and who were previously represented by one or more of the Agencies. *Id.* ¶¶ 243-49.  In April 2019, the Guilds instructed these individuals to—and they did—fire their respective Agencies.  *Id.* ¶¶ 210, 243-49, 381.  As "showrunners" and "producers," the Individual Counterclaimants act in executive capacities—managing production budgets and hiring and firing writers. *Id.* ¶¶ 243-249, 268.

All of the Counterclaims concern "packaging," a "practice by which a talent agency presents one or more elements of a production to a production studio, for which the agency typically receives a 'packaging fee' from the studio." *Id.* ¶ 51.  Packaging allows writers to save paying their agencies the standard 10% (or any) commission.  As Counterclaimants admit, packaging benefits many writers in this, and other ways.[2]

In a packaging transaction, talent agencies service their clients by assembling the "writers and other artists" into a package so that the television show or film can be staffed and produced; the agencies negotiate with *studios* over the "packaging fees" that the *studios* will pay to the agency (or agencies) for selling the package; and the agency-clients (writers) who are included in the package do not pay their agencies any commission on their compensation.  *Id.* ¶¶ 26, 51, 55, 58, 278.  As such, if talent agencies were conspiring to inflate packaging fees, it would be the studios—not the Guilds or the writers—who would be paying any claimed "overcharge" for the package.

---

[2] *See, e.g.*, A&C ¶ 322 (agencies forego 10% commissions in packaging arrangements and "use their leverage to steer film projects to their own clients"); ¶ 60 (admitting that the Agencies' services to their respective clients on a packaged deal "may be beneficial to certain writers [. . .]"); ¶ 62 (admitting "that certain writers may want to benefit from meeting with and being paired with in-demand directors and actors [. . .]").

Packaging has become a standard industry practice—"[a]pproximately 90% of all television series are now subject to such packaging fee arrangements." *Id.* ¶ 278. It became ubiquitous because, for approximately 43 years, *the Guilds contractually agreed* that the (formerly) franchised agencies (including CAA, UTA, and WME) could include their member-writers in packages pursuant to the AMBA—the Artists' Manager Basic Agreement of 1976—which was entered into between the Guilds and the agencies' trade association (the Association of Talent Agencies, or "ATA"). *Id.* ¶¶ 45, 366-68; ECF No. 42-3, AMBA, § 6(c), Rider W.[3]   At all relevant times through April of 2019, the practice of packaging was something to which Counterclaimants had expressly consented.   And what Counterclaimants now depict as grievous—even criminal—misconduct was, in fact, a well-known business practice agreed to and encouraged by the Guilds and their members for more than 43 years.

## II.   ARGUMENT

A cause of action cannot survive a Rule 12(b)(6) motion without "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007).   Allegations must contain "more than labels and conclusions" (*id.* at 555), and a court should not accept "unreasonable inferences" or "unwarranted deductions of fact." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

### A.   <u>The Federal and State Antitrust Claims Should Be Dismissed</u>

#### 1.   Counterclaimants Lack Antitrust Standing

To state an antitrust claim, Counterclaimants must satisfy the "demanding" test for pleading antitrust standing—a far more stringent hurdle than Article III standing. *Eagle*, 812 F.2d at 540.   In the Supreme Court's seminal case on antitrust standing— *AGC*—it observed that, "a union, in its capacity as bargaining representative, will

---

[3] The Court may consider the terms of the AMBA because it is both incorporated-by-reference by Counterclaimants (A&C ¶¶ 274, 367-69, 373, 377, 380) and attached to the Consolidated Complaint (ECF No. 42-3). *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).

5

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

frequently not be part of the class the Sherman Act was designed to protect."  459 U.S. at 540.  Applying the *AGC* test in the Ninth Circuit requires consideration of: (1) the nature of the plaintiff's alleged injury, *i.e.*, whether the claim is for an "antitrust injury" of the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.  *Eagle*, 812 F.2d at 540; *Lucas Auto. Eng., Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998).    Neither Counterclaimants' price-fixing nor group boycott claim can survive the application of the antitrust standing test, or the controlling force of *Eagle*, a case addressing (and rejecting) purported injuries remarkably similar to what Counterclaimants aver here.

        **(a)**    **Counterclaimants Lack Antitrust Standing to Sue Over the Alleged Price-Fixing of Packages That They Do Not Buy or Sell**

The first and most critical factor in the antitrust standing analysis is "antitrust injury."  *Bhan v. NME Hosp., Inc.*, 772 F.2d 1467, 1470 n.3 (9th Cir. 1985).  To have suffered antitrust injury, "the injured party [must] be a participant in the same market as the alleged malefactors."  *Id.* at 1470; *see also Assoc. of Wash. Pub. Hosp. Dist. v. Philip Morris, Inc.*, 241 F.3d 696, 704 (9th Cir. 2001).  Typically, this requirement means that "the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market."  *Eagle*, 812 F.2d at 540.  Here, Counterclaimants do not buy packages from Agencies, do not sell packages to studios, and do not otherwise participate in any market in which packages are bought or sold.  A&C ¶¶ 271, 278, 334.  Under the *AGC* standing requirements, therefore, Counterclaimants lack antitrust standing to sue over allegedly price-fixed packaging fees that are paid by the studios.

The Ninth Circuit's application of *AGC* in *Eagle* is dispositive.  There, the plaintiff-union argued that certain tuna "canneries conspired to set tuna prices at artificially low levels resulting in a reduction of the wages paid to [union] crewmembers and a loss of employment opportunities," which in turn "reduced the dues paid to the

union." *Id.* at 539.  The Ninth Circuit affirmed dismissal because plaintiffs—both the union and its members—were not "buyers or sellers of raw tuna" and any claimed injuries were "merely derivative" of those suffered by the *direct victims* of the putative conspiracy, *i.e.*, the vessel owners who were forced to sell tuna to the canneries at artificially depressed prices.  *Id* at 540-41.  Likewise here, because neither the Guilds nor the Individual Counterclaimants buy or sell packages *or* compete with the Agencies, any injuries Counterclaimants endured from this alleged conduct would necessarily be "merely derivative" of any overcharges paid by the studios for the packages.  Just as "[t]he crewmembers [in *Eagle*] did not negotiate the prices with the canneries, the vessel owners did" (*id.* at 541), here, neither the Individual Counterclaimants nor the Guilds negotiated packaging fees with the Agencies—the studios did.  A&C ¶¶ 271, 278, 334.

  *Eagle* also disposes of Counterclaimants' allegation that because studios allegedly overpaid for packages, the studios had less work and wages left for writers.  *Id.* ¶¶ 300, 304.  As the Ninth Circuit held concerning the same claim: "[w]hen the employer"—*e.g.*, a studio—"reacts to a loss by terminating employees, or when employees receive diminished salary or commissions, as a result of the employers' weakened market position, these employees suffer *derivative* injury only."  *Eagle*, 812 F.2d at 541-42.  Such derivative injuries by non-market participants do not confer antitrust standing under either the principles of *AGC* (459 U.S. at 544), or the bar on indirect purchaser price-fixing claims set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 747 (1977).

  Additional requisites for antitrust standing identified in *AGC* and *Eagle* also serve to bar Counterclaimants' price-fixing claim.  Counterclaimants' assertions of derivative injury create the same dangers of impermissible multiple recoveries, and insurmountable problems of apportionment, that the Supreme Court warned of in *AGC*.  For example, even if it were true that the Agencies had conspired to artificially inflate packaging fees, the Court would have to answer virtually impossible questions about how much of the overcharge was absorbed by the studios, and how much was passed

on to any single person employed by or paid by the studios. The price-fixing Counterclaim here "would transform [antitrust] actions into massive efforts to apportion the recovery among all potential plaintiffs . . . and [would] seriously undermine their effectiveness." *AGC*, 459 U.S. at 544.[4]

Nor can Counterclaimants establish antitrust injury with their conclusory and speculative allegations that, as a result of the alleged packaging fee price-fixing conspiracy, "Guild members purchased talent representational services at artificially inflated prices and the quality of the talent representation available to Guild members has been substantially reduced." A&C ¶¶ 424, 470. First, it is implausible to allege that such a conspiracy would cause Guild members to pay "inflated" prices for representation when they pay no "price" (*e.g.*, commission) at all to be represented on a packaged show. Second, if the "quality of the talent representation . . . has been substantially reduced," it is only because the Guilds, by their own admission, instructed their members to fire their agents who refused to agree to the Code of Conduct.

The Guilds' allegations about two more sources of injuries fare no better. First, the Guilds' claim of injury due to receiving lower dues payments (A&C ¶ 472) is the exact injury that both *AGC* and *Eagle* held to be too remote to confer antitrust standing. *AGC*, 459 U.S. at 541 n.46 (a reduction in union dues payments because members lost jobs or wages is "even more indirect than the already indirect injury to its members"); *Eagle*, 812 F.2d at 542-43 ("lost union dues" were a derivative injury and thus not a basis for antitrust standing). Second, the Guilds' allegations of injury caused by the need to devote resources to "monitoring" packaging (A&C ¶ 337) are even more remote than that. Further, because the Guilds allege that they would have to monitor packaging

---

[4] Counterclaimants' "simple invocation of [the phrase 'inextricably intertwined'] will not allow [them] to avoid the fundamental requirement for antitrust standing [. . .]." *Oregon Laborers-Emp. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 967 (9th Cir. 1999). Whether an alleged antitrust injury is "inextricably intertwined" concerns a "narrow exception to the market participant requirement" that is inapplicable when a plaintiff is neither the direct victim of the alleged conspiracy nor the actual means for carrying out the alleged conspiracy. *See Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057, n.5 (9th Cir. 1999) (citations omitted).

8

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

*whether the fees were price-fixed or not*, there is no causal connection between the alleged antitrust violation and the claimed harm.

> **(b)** **Counterclaimants Lack Antitrust Standing to Sue Over an Alleged Group Boycott That is Not Causally Connected to Their Claimed Injuries**

Counterclaimants' secondary antitrust claim is that the Agencies have engaged in a group boycott to counter the Guilds' stated desire to negotiate new franchise agreements (which would ban packaging) with talent agencies on an individual basis. A&C ¶¶ 432-451, 477-498 (Claims Two and Four). But the Counterclaimants once again lack antitrust standing to assert this claim. Counterclaimants assert that the purported boycott "deprived [the Guilds] of competition among individual agencies" and "artificially reduced choice of legal counsel and talent managers to represent" the Guilds' *members*. A&C ¶¶ 443-44, 490-91. But the *Guilds* do not seek representation from talent agents and thus are not "consumer[s] of the alleged violator's goods or services." *Eagle*, 812 F.2d at 540. In the same vein, the Guilds cannot claim antitrust standing for injuries allegedly suffered by some writers, but not suffered by the Guilds themselves. *Id*. at 540-41.[5]

Moreover, neither the Guilds nor their writer-members may claim any antitrust injury from the alleged reduction in the number of franchised agents, because it is the Guilds—not the Agencies—that have barred their writers from using non-franchised agents. A&C ¶¶ 130, 210, 381. Indeed, there is no allegation of a plausible causal connection between the Guilds' decision to instruct their members to fire their non-franchised agents and any alleged group boycott by the Agencies. To the contrary, the Guilds assert that they instructed their members to fire their agents who would not agree to the Guilds' Code of Conduct banning packaging months *before* the Guilds allege that the Agencies' group boycott of individual negotiations with the Guilds began. *Compare*

---

[5] In addition to lacking antitrust standing to pursue their own group boycott claims, the Guilds may not assert associational standing to assert individualized-damages claims on behalf of their members. *Infra*, § III.C.1(a).

A&C ¶ 381 ("On April 13, 2019, the Guilds . . . instructed [their] members to terminate any agent that had not agreed to [the Code of Conduct]"), *with* ¶ 390-391 (alleging that the purported boycott by the Agencies of individual negotiations with the Guilds for a new franchise agreement began in June 2019).  There is thus *no* causal connection—much less a "direct" and "immediate" connection (*Eagle*, 812 F.2d at 541)—between the Agencies' alleged group boycott and the Guilds' decision months earlier to shrink the pool of franchised agents to those who would agree to the Code.

The Individual Counterclaimants' group boycott claim fails the *AGC* antitrust standing test on other grounds as well.  The only way these writer Counterclaimants could have been injured under their theory about having a reduced choice of agents is if, *but for* the putative group boycott, the Agencies would have individually reached new franchise agreements with the Guilds, *and* each of the Individual Counterclaimants would then have retained one of those previously-boycotted agents.  But this attenuated chain of events not only impermissibly rests on rank speculation, it is flatly contradicted by Counterclaimants' own allegations that *each individual* Agency has always opposed the very packaging ban that the Guilds insist upon to reach a new franchise agreement. *E.g.*, A&C ¶ 309.  It is thus implausible that any Agency would have agreed to the Code of Conduct in any individual negotiation with the Guilds.

In addition, because it was the Individual Counterclaimants who fired the Agencies at the Guilds' direction, any resulting injury was self-inflicted.  *Id.* ¶¶ 243-249, 381.  As noted, even under the less rigorous requirements of Article III standing, "self-inflicted injuries . . . do[] not give rise to standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).

Finally, as with Counterclaimants' price-fixing claims, they lack antitrust standing because their group boycott theory presents impossible "problems of identifying damages and apportioning them among [direct victims] . . . and indirectly affected employees and union entities." *AGC*, 459 U.S. at 545.  How the Court or a jury would identify and apportion damages under a theory that the alleged boycott

1    created a smaller pool of agents which somehow caused economic harm to writers is an

2    imponderable question, and alone defeats antitrust standing under *AGC*.  *Id*.

3    **2.    Counterclaimants Have Failed to Plausibly Allege Any**
        **Conspiratorial Agreement**
4

5        Independently, Counterclaimants have failed plausibly to allege the most

6    fundamental element of an antitrust conspiracy:  an agreement.  As *Twombly* instructs:

7        [t]he crucial question is whether the challenged anticompetitive
8        conduct stem[s] from independent decision or from an agreement, tacit
         or express. While a showing of parallel business behavior is admissible
9        circumstantial evidence from which the fact finder may infer
         agreement, it falls short of conclusively establish[ing] agreement or ...
10       itself constitut[ing] a Sherman Act offense.    Even conscious
         parallelism, a common reaction of firms in a concentrated market [that]
11       recogniz[e] their shared economic interests and their interdependence
12       with respect to price and output decisions is not in itself unlawful.
13

14   550 U.S. at 553-54 (internal quotations and citations omitted).  *Twombly* is right on

15   point here, where Counterclaimants rely on alleged parallelism and mere opportunities

16   to conspire, rather than plausible facts of a conspiratorial agreement.

17       **(a)    Counterclaimants Have Not Pleaded the Facts Required**
             **to State a Price-Fixing Agreement**
18

19       Counterclaimants aver that the Agencies have "conspired to raise . . . the price of

20   talent representational services" by "agreeing to propose the same '3-3-10' packaging

21   fee to studios," "proposing and negotiating with studios from a common '3-3-10'

22   starting point," and "making offers to studios that reflected the price-fixed base license

23   fee." A&C ¶¶ 409, 413.  These conclusory allegations are inadequate to state a Sherman

24   Act, Section 1 violation.  They do "not answer the basic questions:  who, did what, to

25   whom (or with whom), where, and when?"  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042,

26   1048 (9th Cir. 2008).

27

28

The Ninth Circuit in *Lenhoff* dismissed a complaint alleging a virtually identical packaging price-fixing conspiracy by the Agencies resting on virtually identical allegations of (i) parallel packaging fees and (ii) communications through the Agencies' trade association (*i.e.*, the ATA).  There, the plaintiff also alleged that CAA, UTA, WME and a fourth agency "conspired to fix a '3-3-10 packaging fee.'"  729 F. App'x at 530.  The Ninth Circuit affirmed dismissal, holding that this contention was "a bare, conclusory allegation of parallel conduct."  *Id*.[6]  The *Lenhoff* plaintiff also alleged that the ATA's Strategic Planning Committee (the "who") met in the ATA's offices (the "where") from 1999 forward (the "when") to reach this purported agreement.  *Id.*  The Ninth Circuit also rejected these allegations as insufficient because they "amount to nothing more than an allegation that defendants participated in a lawful trade organization, and 'mere participation in trade-organization meetings . . . does not suggest an illegal agreement.'"  *Id.* (citing *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015)).[7]

*Lenhoff* controls.  Here, as in *Lenhoff*, the price-fixing Counterclaims set forth only conclusory allegations that the Agencies have "exchanged competitively sensitive information" through the ATA and "agree[d] on the "3-3-10" model . . . [and] to propose to studios the same 'base license fee,' which is the basis for the upfront 3% part of a 3-3-10 packaging fee."  A&C ¶¶ 351-55.  Counterclaimants' only concrete allegation is that "on March 17, 2019, the ATA published a study that purports to analyze the economic impact of eliminating front-end packaging fees," and "the data used to prepare the March 17 Report was made anonymous to protect the disclosure of competitively sensitive information."  *Id.* ¶¶ 356-57.  On its face, this allegation suggests nothing about a price-fixing conspiracy, let alone "nudges their claims across

---

[6] *See also Kendall*, 518 F.3d at 1048 (dismissing Sherman Act conspiracy claim that banks "merely charg[ed], adopt[ed] or follow[ed] the fees set by a Consortium").

[7] *See also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) ("[P]articipation in trade organizations provides no indication of conspiracy."); *AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 234 (2d Cir. 1999); *Consol. Metal Prod., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293-94 (5th Cir. 1988).

the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.[8]  And, because Counterclaimants allege that the price-fixing conspiracy began "in the 1990s" (A&C ¶ 350), their one specific allegation about anonymized data sharing in March 2019 (*id.* 356-57) is irrelevant to pleading a more than two decades-old conspiracy claim.

In a desperate effort to address this fatal defect, Counterclaimants make a new, fantastical allegation that they have uncovered details about "illegal price-fixing agreements" supposedly reached by principals of William Morris, Endeavor and CAA *over 20 years ago*.[9]  *Id.* ¶¶ 349, 350.  But Counterclaimants have not pleaded any facts about the subsequent twenty years that would indicate anything more than the same type of parallel conduct and trade association meetings that were held to be legally insufficient in *Lenhoff*.  "Similarity of prices . . . will not alone make out a prima facie case of collusive price fixing in violation of the Sherman Act." *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976).

### (b)  Counterclaimants Also Have Not Pleaded Facts to Plausibly State a Group Boycott Conspiracy

Counterclaimants rely upon three categories of allegations to try to state a group boycott claim—but none satisfies the requirement to plausibly plead "who, did what, to whom (or with whom), where, and when." *Kendall*, 518 F.3d at 1048.  *First*, Counterclaimants offer allegations about the myriad opportunities the Agencies had to conspire through the ATA.  *E.g.*, A&C ¶ 375.  But, as discussed immediately above, alleging mere opportunities to conspire at a trade association is legally insufficient to support a conspiracy claim.  *Second*, Counterclaimants offer a series of alleged

---

[8] *See also In re Citric Acid Litigation*, 191 F.3d 1090, 1098 (9th Cir. 1999) ("Gathering information about pricing and competition in the industry is standard fare for trade associations.  If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action.").

[9] Counterclaimants' allegations about twenty-year old discussions do not even mention UTA, and thus cannot show UTA's involvement in any such conspiratorial agreement and provide a basis for a claim against UTA.

statements (A&C ¶394) by UTA and WME employees and the ATA Executive Director *individually* expressing variations of the opinion that it would be "best" for the Guilds to continue negotiating through the ATA rather than one-by-one with hundreds of talent agencies.  Such an expression of individual opinions that it would be beneficial for the Guilds to continue their 43-year history of negotiating a franchise agreement with the ATA on behalf of its members is, at most, parallel conduct incapable of establishing a conspiracy.  *Third,* while Counterclaimants conclusorily allege that the Agencies made unspecified "threats of retaliation" against other talent agencies that might sign the Code of Conduct (*id.* ¶¶ 385, 395), Counterclaimants do not allege a *single* retaliatory *act* taken by CAA, UTA, *or* WME against any *one* of the "70 talent agencies . . . [that] have signed the Code of Conduct."  *Id*. ¶ 151.

In any event, Counterclaimants' own allegations preclude the possibility of any illegal group boycott until *after* June 19, 2019, the date that Counterclaimants allege "the Guilds formally withdrew their consent to collective negotiation through the ATA."  *Id.* ¶ 390-91.[10]  But Counterclaimants allege virtually no facts-of-conspiracy after the June 19 date on or after which the group boycott supposedly began.  The lone allegations post-dating June 19 concern a handful of agencies independently objecting to the Guilds' withdrawal from negotiations with the ATA.  *Id.* ¶¶ 392, 396-97.  As shown above, however, allegations of scattered, parallel behavior are insufficient to state a group boycott claim for any time period.

**3.   The Cartwright Act Claims Fall with the Sherman Act Claims**

Counterclaimants' Cartwright Act claims merely parrot their federal price-fixing and group boycott claims.   A&C ¶¶ 452-476, 477-498 (Claims Three and Four).

---

[10] Counterclaimants allege that their "revocation of consent" on June 19 "meant that the ATA and its members, including the Agencies, were *no longer* covered by federal antitrust law's 'labor exemption,' which immunizes certain labor union conduct and grants a limited derivative exemption to other entities to negotiate with labor unions." A&C ¶ 16 (emphasis added); *id.* ¶ 436(a) (alleging unlawful group boycott only "after the Guilds had revoked their consent to collective negotiations").

Alleged behavior that does not violate the Sherman Act "necessarily implies that the conduct is not unlawful under the Cartwright Act." *Lenhoff*, 729 App'x at 531.

### B. Counterclaimants' RICO Claims Should Also Be Dismissed

Counterclaimants allege a panoply of claims under the federal RICO statute, rooted in the preposterous theory that each time the Agencies were paid packaging fees, that commercial transaction constituted a RICO predicate act as a criminal "kickback" to a union representative in violation of Section 302 of the LMRA, 29 U.S.C. § 186. These allegations fail both for lack of RICO standing and because packaging does not constitute a predicate racketeering act, much less one that has plausibly been alleged to proximately harm Counterclaimants within the meaning and text of the RICO statute.

### 1. Counterclaimants Do Not Have Standing, And Have Not Pleaded Proximate Causation, To State Any RICO Claim

Counterclaimants' RICO claims, like their antitrust claims, are based upon the studios' payment of fees to the agencies for packages that neither the Guilds nor the Individual Counterclaimants buy or sell. A&C ¶¶ 529-581. RICO requires far more for a party to plead standing and causation.

*First*, as the Supreme Court explained in *Holmes v. Securities Investor Protection Corp.*, "Congress modeled § 1964(c) [the RICO private action] on . . . § 4 of the Clayton Act" and therefore the standing requirements of *AGC* were found to be applicable to that RICO case. 503 U.S. 258, 267-68 (1992). As the Ninth Circuit has stated: "[t]he requirements for standing to maintain a civil action under RICO and the antitrust laws are similar," and both require that the plaintiff's harm be tied directly to the defendant's wrongful conduct. *Oregon Laborers-Emp. Health & Welfare Tr. Fund*, 185 F.3d at 963.[11] As shown above, *AGC* and *Eagle* make it clear that the attenuated causal chain

---

[11] *See also Ass'n of Wash. Pub. Hosp. Districts v. Philip Morris Inc.*, 241 F.3d 696, 701–03 (9th Cir. 2001) (applying the *AGC* test to determine RICO standing); *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 929 (9th Cir. 1994) (applying antitrust standing principles to determine that the plaintiff had no RICO standing).

1  of injury from packaging fees alleged by Counterclaimants fails to meet the *AGC* test,

2  which applies with equal force to RICO.

3      *Second*, Counterclaimants have not and cannot plausibly allege that any injury

4  they claim to have suffered was proximately caused by a RICO violation. "Proximate

5  causation requires 'some direct relation between the injury asserted and the injurious

6  conduct alleged.'" *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 981 (9th Cir.

7  2008) (citations omitted). But there is no "direct relation" between a packaging fee paid

8  to the Agencies by a production studio in purported violation of labor law and any

9  claimed injury to the Individual Counterclaimants (much less to their unions). Courts

10  routinely dismiss RICO claims alleging such remote and attenuated causal chains.[12]

11      *Third*, "[t]o demonstrate injury for RICO purposes, plaintiffs must show proof of

12  concrete financial loss, and not mere injury to a valuable intangible property interest."

13  *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1086–87 (9th Cir. 2002); *Fireman's*

14  *Fund Ins. Co. v. Stites*, 258 F.3d 1016, 1021 (9th Cir. 2001). The amorphous damages

15  alleged here—unidentified "lost opportunities" and "lost wages" for the Individual

16  Counterclaimants, and "lost dues" and "monitoring" costs for the Guilds—do not

17  qualify as a "concrete financial loss" under RICO.[13]

18
19          **2.**    **Counterclaimants Fail to Allege any Predicate Racketeering**
             **Act Because Packaging Does Not Violate the LMRA**

20      Another foundational problem with Counterclaimants' RICO claims is that they

21  do not plausibly allege a "pattern of racketeering activity." 18 U.S.C. §§ 1961(5),

22

23  [12] *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457-60 (2006) (plaintiff failed to

24  allege proximate cause because its loss of sales revenue was attenuated from defendants' alleged RICO violation of defrauding the New York tax authority and using

25  the proceeds to undercut competitors like the plaintiff); *Holmes*, 503 U.S. at 265-66 (financial injuries asserted by a corporation with responsibility to reimburse customers of broker-dealers who could not meet their financial obligations were not proximately

26  caused by a RICO conspiracy to manipulate stock prices).

27  [13] *Keel v. Schwarzenegger*, 2009 WL 1444644, at *6 (C.D. Cal. May 19, 2009) (no RICO injury where plaintiff failed to allege that he "actually lost employment or

28  employment opportunities" because "prospective damages . . . are not compensable, absent concrete financial loss").

1962(a)-(d); *U.S. v. Camez*, 839 F.3d 871, 873 (9th Cir. 2016).  Counterclaimants' entire RICO theory is premised on the claim that, for more than forty years, packaging has constituted a criminal violation of Section 302, *i.e.*, the LMRA's "anti-kickback" provision for unions.  If there is no Section 302 violation, then there is no predicate racketeering activity, and *all* of the RICO claims must fail.  *See, e.g.*, *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 411 (2003); *Jean-Louis v. J.P. Morgan Chase Bank, N.A.*, 2014 WL 12696911, at *5 (C.D. Cal. Sept. 16, 2014).  And fail they do.

Section 302 is a criminal statute—intended to prevent union corruption in collective bargaining—and thus must be interpreted narrowly.  *Arroyo v. United States*, 359 U.S. 419, 424 (1959) (narrowly construing section 302 and explaining that "[i]t is the legislature, not the Court, which is to define a crime, and ordain its punishment.") (citations omitted).  Section 302 makes it a criminal offense for any "employer or association of employers" to "pay, lend, or deliver, or agree to pay, lend or deliver, any money or other thing of value" to "any representative of any of his employees who are employed in an industry affecting commerce."  29 U.S.C. § 186(a).

As the Ninth Circuit recently explained, Section 302 "target[s] practices harmful to the *collective bargaining process*, including bribery by employers during collective bargaining, extortion by employee representatives, and abuse of power by union officers who have sole control over welfare funds."  *Oregon Teamster Emp. Trust v. Hillsboro Garbage Disposal, Inc.*, 800 F. 3d 1151, 1157 (9th Cir. 2015) (emphasis added; quotations omitted).  "The dominant purpose of [§] 302 is to prevent employers from tampering with the loyalty of union officials and to prevent union officials from extorting tribute from employers."  *Turner v. Local Union No. 302*, 604 F. 2d 1219, 1227 (9th Cir. 1979).  But—as Counterclaimants plead—talent agents do not participate in and thus are powerless to corrupt the collective bargaining process.  A&C ¶¶ 241-42.

When strictly construing Section 302 because it is a criminal statute—or, for that matter, when construing Section 302 in any reasonable fashion—it becomes evident that talent agents are not "representatives" of the "employees" for purposes of *collective*

17

*bargaining* with an employer within the scope of the statute.  The text of Section 302 thus underscores the Ninth Circuit's holding that the statutory intent is to address union collective-bargaining activities, as opposed to the individual, client-by-client negotiations handled by the Agencies.  By its terms, Section 302 applies only to payments by an employer to a "*representative* of any of his employees."  29 U.S.C. § 186(a)(1) (emphasis added).  Federal labor law in turn defines "representative" as an "individual or labor organization."  29 U.S.C. § 152(4).  The Agencies are neither.[14]

Indeed, although the LMRA has been on the books for over 70 years, the Agencies have been unable to identify a single case applying Section 302 to anyone other than union leaders or union-managed retirement funds (and employers who pay bribes to such persons).[15]  In other words, we are aware of *no* case where the alleged criminal "kickback" was not *directly linked* to a labor organization involved in collective bargaining activities.[16]

---

[14] "Individual" means a natural person, "mortal [and] subject to illness and disability"—not corporations like the Agencies.  *Schultz v. N.L.R.B.*, 284 F.2d 254, 257 (D.C. Cir. 1960); *Rest. Law Ctr. v. City of New York*, 360 F. Supp. 3d 192, 235 (S.D.N.Y. 2019).  And a "labor organization" is defined to mean only organizations "in which employees [1] participate and which exist[] for the purpose . . . of [2] dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."  29 U.S.C. § 152(5).  This definition has no application to the Agencies.  *Schultz*, 284 F.2d at 256.  Further, Agencies do not "deal with" the studios in federal labor-law parlance, which means *collective* bargaining with studios.  *See Gen. Foods Corp.*, 231 NLRB 1232, 1234-35 (1977).

[15] *See, e.g.*, *Local No. 2 of Operative Plasterers & Cement Masons Int'l Ass'n v. Paramount Plastering, Inc.*, 310 F.2d 179, 182 (9th Cir. 1962) (trust funds and non-profit corporation established by agreement between union and employers' association, were "representatives" within the meaning of the LMRA); *Conditioned Air & Refrigeration Co. v. Plumbing & Pipe Fitting Labor Mgmt. Relations Trust*, 159 F. Supp. 887, 894 (S.D. Cal. 1956) (trust administered by a board of trustees composed equally of members representing the unions and the employers); *United States v. Ryan*, 350 U.S. 299, 301-02 (1956) (union president and principal negotiator); *United States v. McGowan*, 58 F.3d 8, 15 (2d Cir. 1995) (union member involved in union dealings).

[16] Counterclaimants' Section 302 theory also fails because they have not pled any facts to show that the "prevailing market price" exception to Section 302 does not apply to packaging fees for commercial transactions.  "[T]he sale or purchase" by a union representative "of an article or commodity at the prevailing market price in the regular course of business" does not violate Section 302.  29 U.S.C. § 186(c)(3).  But Counterclaimants do not allege any facts that any particular packaging fee negotiated by an Agency was not "at the prevailing market price" (*id.*)—indeed, Counterclaimants allege hardly any facts at all about particular packages.

---

18

### 3. Counterclaimants' RICO Claims Also Fail for a Host of Additional Reasons

Counterclaimants have asserted RICO claims under each subsection of the statute: (1) "investment of racketeering income" (§1962(a)); (2) "maintenance of a racketeering enterprise" through a "pattern of racketeering activity" (§ 1962(b)); (3) "control of a racketeering enterprise" through a 'pattern of racketeering activity" (§ 1962(c)); and (4) "conspir[acy] to violate" RICO (§ 1962(d)).   In addition to the foundational defects above, these claims fail for reasons particular to each subsection of the statute.

*Section 1962(a)* requires allegations of "an investment injury separate and distinct from the injury flowing from the predicate act," *i.e.*, separate and distinct from the Agencies' receipt of packaging fees. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1149 (9th Cir. 2008).   Allegations of reinvestment of funds into a RICO enterprise, "standing alone, are insufficient to demonstrate investment injury[.]" *City & Cty. of San. Fran. v. Spencer*, 2003 WL 23119283, at *2 (N.D. Cal. Dec. 29, 2003). Here, Counterclaimants allege that the Agencies reinvest packaging fees "back into the operation of each Agency" (A&C ¶ 535), but Counterclaimants do not link these reinvestment allegations to any injury.   Mere "[r]einvestment of proceeds . . . back into the enterprise to continue its racketeering activity is insufficient" to state a RICO claim. *Sybersound*, 517 F.3d at 1149; *Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 829 (9th Cir. 2003).

*Section 1962(b)* similarly requires a RICO plaintiff to "allege an 'injury from the defendant's acquisition or control of an interest in a RICO enterprise' *separate from an injury flowing from the racketeering activity itself.*"   *In re Toyota Motor Corp. UA Mktg. Litig.*, 785 F. Supp. 2d 883, 921 (C.D. Cal. 2011) (emphasis added).   There are no such allegations here.   Instead, Counterclaimants assert that it is the "pattern of racketeering activity (i.e. [Agencies'] receipt of packaging fees)" that "harm[s] the Guild's

members," rather than explaining how acquiring control of any alleged enterprise does so. A&C ¶ 558. Counterclaimants also have not alleged—as required by Section 1962(b)—that the Agencies' predicate acts led to their acquisition or maintenance of an interest in or control of the RICO enterprise." *Toyota*, 785 F. Supp. 2d at 921.

**Section 1962(c)** prohibits a "person" from "conduct[ing] or participat[ing]" in a racketeering "enterprise's affairs through a pattern of racketeering activity." Setting aside whether Counterclaimants have sufficiently alleged a plausible "enterprise," they have at most alleged the "mere commission of the predicate offenses." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). They never allege facts—as Section 1962(c) requires—to demonstrate how the Agencies' receipt of supposed packaging fee "kickbacks" functions as a means of "participat[ing] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 186 (1993).

Finally, **Section 1962(d)** requires that the "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of" another provision of Section 1962. *Salinas v. United States*, 522 U.S. 52, 65 (1997). Because Counterclaimants fail to state claims under any provisions of Section 1962, that "implicitly means that [claimants] cannot plead a conspiracy claim" under 1962(d).[17]

### C.   Counterclaimants' State Law Claims Are Each Legally Defective

Counterclaimants recycle three state law claims from their abandoned state court pleadings: breach of fiduciary duty, constructive fraud, and violation of the UCL. At the threshold, if the Court dismisses the federal claims, it should then decline to exercise supplemental jurisdiction and remand the state law claims to the state court where they originated. 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to

---

[17] *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1084 (9th Cir. 2000), *overruled on other grds.*; *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007); *Neibel v. Trans World Assurance Co.*, 108 F.3d 1123, 1127 (9th Cir. 1997) (similar), *overruled on other grds.*; *United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004).

exercise jurisdiction over the remaining state-law claims." *Acri v. Varian Assoc., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (*en banc*) (quotation omitted).  If the Court were, however, to adjudicate the state law claims, they should be dismissed.

### 1.   The Guilds Lack Standing to Assert Each State Law Claim

#### (a)   The Guilds Have No Associational Standing to Assert Breach of Fiduciary Duty (Claim Five) or Constructive Fraud (Claim Six) on Behalf of Their Members

The Guilds try to assert breach of fiduciary duty and constructive fraud claims "on behalf of their members."  But an organization has associational standing to sue for its members only if, among other things, "neither the ***claim asserted*** nor ***the relief requested*** requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (emphases added).  Here, on both the "relief requested" and the "claims asserted," the factual inquiries are highly individualized.

*First*, with respect to the "relief requested," the Guilds seek myriad forms of damages for many thousands of writers.  A&C ¶¶ 505-06, 512-13.  "It is generally accepted," however, "that associational standing is precluded where the organization seeks to obtain damages on behalf of its members."  *Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 344 (C.D. Cal. 1997) (citing *United Food & Comm. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553–54 (1996)).  This "generally accepted" principle applies with particular force to the fiduciary duty and constructive fraud claims asserted here (as well as the federal and state antitrust claims) because it is difficult to conceive of more individualized damages claims than, *e.g.*, "lost wages," "lost employment opportunities," and being "required to spend money to retain other professionals to provide services their agents should have been providing."  A&C ¶ 506 (fiduciary duty), ¶ 513 (constructive fraud), and ¶¶ 426, 472 (antitrust).  Such relief would necessarily require "individual Union members . . . to participate at the proof of damages stage," thus precluding the Guilds' associational standing.  *United Union of Roofers v. Ins. Corp. of Am.*, 919 F.2d 1398, 1400 (9th Cir.

21

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

1990); *Lake Mohave Boat Owners Ass'n v. Nat. Park Svc.*, 78 F.3d 1360, 1367 (9th Cir. 1995).

*Second*, as to the "claim[s] asserted" (*Hunt*, 432 U.S. at 343), the Guilds' own allegations about packaging make it clear that whether packaging violated a duty to a particular writer must be determined on a case-by-case basis (*i.e.*, package-by-package and writer-by-writer) because of the admitted *benefits* of packaging to many writers. A&C ¶ 60 (packaging "may be beneficial to certain writers [. . .]"); ¶ 62 ("certain writers may want to benefit from meeting with and being paired with in-demand directors and actors [. . .]".). Likewise, Counterclaimants' attacks on packaging—*i.e.*, that "at times" it is detrimental to writers (*id.* ¶ 318) and may "often" cause injury (*id.* ¶ 284)—underscore the fact that each writer's claims must be separately adjudicated.

For example, under both the fiduciary duty and constructive fraud Counterclaims, any fact-finder would have to make such individualized determinations as: who among the Guilds' 14,700 members was represented by one of the Agencies, when they were represented by that Agency, if they were ever included in a package by the Agency, the details of the package, whether they objected to the arrangement, and if there was any net injury (*e.g.*, if a writer saving a 10% commission or getting to work on a show that would not otherwise exist offsets any purported injury from being part of a package). Indeed, it is implausible that *all* packaging transactions harm writers; if this were true, Counterclaimants would not have approved packaging for 43 years under the AMBA. To offer a concrete illustration, *showrunners* like Carr, Hall, and Stiehm—who *manage production budgets*—would not be able to deny knowledge about "the material terms of [] packaging fee agreements" for the very shows *they* managed. *Compare* A&C ¶ 504 *with* ¶¶ 138-142, 268.

Each and every one of the foregoing factual determinations—multiplied by 14,700 Guild members—"would require individualized proof," *i.e.*, mini-trials. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287 (1986). This defeats the Guilds' assertion of associational standing.

22

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

**(b)   The Guilds Also Lack Standing to Assert a UCL Claim on Their Own Behalf**

The Guilds purport to state a UCL claim "on their own behalf." But they plead no facts to establish standing for such a claim. *First,* the UCL claims are merely copycats of the fiduciary duty and constructive fraud claims asserted by the Individual Counterclaimants. But the Guilds do not allege—nor could they—that the Agencies owe *the Guilds* any fiduciary duties (as opposed to the Agencies owing duties to their writer-clients). This is dispositive.[18]

*Second*, the Guilds may not prosecute a UCL cause of action in their own name by claiming harm (*e.g.*, increased monitoring costs) from practices that are not allegedly directed at the Guilds. *See* A&C ¶¶ 518-20 (claiming breaches of duties supposedly owed to the Guilds' members, not to the Guilds). A UCL plaintiff may not bring a claim derived from purported violations aimed at someone else.[19] Rather, "all unfair competition law actions seeking relief on behalf of others, including those brought by representative or associational plaintiffs, *must be brought as class actions.*" *Amalgamated Transit Union, Local 1756, AFL-CIO v. Super. Ct.*, 46 Cal. 4th 993, 1005 (2009) (emphasis added). No putative class action is asserted here.

*Third*, the Guilds do not plead facts even to establish Article III standing for their UCL claim. Article III requires a plaintiff to "clearly" allege an "injury in fact" that is "fairly traceable to the challenged conduct of the defendant[.]" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (citation omitted). When a claimant's alleged injury requires that "a litany of speculative events come about," the harm "is too attenuated to constitute a qualifying injury in fact for standing."

---

[18] *Dunkel v. eBay Inc.*, 2013 WL 415584, at *10 (N.D. Cal. Jan. 31, 2013); *Galindo v. Ocwen Loan Servicing, LLC,* 282 F. Supp. 3d 1193, 1201 (N.D. Cal. 2017).

[19] *See Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1161 (9th Cir. 2016); *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1555 (2007); *Sybersound Records, Inc.*, 517 F.3d at 1152 ("Furthermore, allowing [a plaintiff seller] to bring suit to essentially vindicate the rights of the [other] copyright holders and the Customers would pose significant problems . . . under the UCL.").

23

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

*Stelmachers v. Verifone Sys.*, 2016 WL 6835084, at *3-4 (N.D. Cal. Dec. 17, 2015). The Guilds' speculative allegations of increases in union administrative expenses and lost dues (A&C ¶¶ 338, 342), due to claimed injuries to Guild *members*, do not establish the concrete causal chain necessary for Article III standing. *See Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867-69 (9th Cir. 2012) (Pro, J., concurring).

### 2. The Individual Counterclaimants' Claims for Breach of Fiduciary Duty, Constructive Fraud, and Breach of Contract/Promissory Estoppel Fail on Numerous Grounds

***Pleading Standards.*** To state a claim for breach of fiduciary duty, each Individual Counterclaimant must plausibly allege facts sufficient to establish (1) the existence of a fiduciary duty; (2) a breach of the duty; and (3) damages proximately caused by the breach. *Tribeca Cos. v. First Am. Title Ins. Co.*, 239 Cal. App. 4th 1088, 1114 (2015). As a matter of law, this is an individualized, fact-specific determination. *See Brown v. Cal. Pension Adm'rs & Consultants, Inc.,* 45 Cal. App. 4th 333, 347-48 (1996). Moreover, Counterclaimants' own allegations establish that whether packaging benefits or allegedly harms a particular writer, on a particular packaging transaction, may only be determined on a case-by-case basis, and the Individual Counterclaimants fail to allege nearly any such individualized facts.[20]

Counterclaimants' constructive fraud claims are largely identical to their breach of fiduciary duty claims and therefore fail for the same reasons, *Younan v. Equifax Inc*., 111 Cal. App. 3d 498, 516 n.14 (1980); Cal. Civ. Code § 1573, but also fail to satisfy the heightened pleading requirements of Rule 9(b). *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1021 (N.D. Cal. 2007). Rule 9(b) requires Counterclaimants to plead the "who, what, when, where, and how" of the misconduct charged. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). They fail to do so.

---

[20] In addition, each of the Individual Counterclaimants must allege facts showing that the supposed breach of fiduciary duty was the legal cause of their alleged harm. *See Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1128-29 (2014). A failure to allege sufficient facts to show causation is fatal. *Id.*

***Specific Pleading Defects***.  As an initial matter, it is obviously not plausible that *every* packaging arrangement for every writer for four decades amounted to a breach of fiduciary duty and constructive fraud, or else the Guilds would not have authorized packaging through the AMBA for this entire time.  Indeed, as chronicled above, Counterclaimants admit in their pleading that, in many cases, packaging advantages individual writers.  Accordingly, without specific allegations about *how* an *Individual* Counterclaimant was supposedly harmed on a *particular* packaging transaction, Individual Counterclaimants cannot plausibly state a claim.

Yet all they have done is parrot one another's conclusory allegations and generalities.  For instance, each Individual Counterclaimant makes the non-specific allegation that his/her agents did not disclose the existence or details of the package or a general "conflict of interest."  A&C ¶ 336.  But the Guilds in the AMBA ***expressly permitted*** each Agency to engage in packaging and accept packaging fees.  There cannot, therefore, have been a requirement to disclose, in general, the mere existence of packaging fees or a generalized (and non-existent) conflict of interest.  And even if the Individual Counterclaimants had alleged that they did not know about the existence or details of a ***particular*** packaging transaction, such a purported lack of information would still fall short of pleading that the writer was somehow ***proximately caused harm*** from an ***actual breach*** of duty by virtue of his/her inclusion in the package (especially as to the Individual Counterclaimant-showrunners who were the executive producers of their own packaged television shows).  *Tribeca Cos.*, 239 Cal. App. 4th at 1114.

As another example, some Individual Counterclaimants make the conclusory allegation that they were or "would have been" entitled to profit participation on packaged shows, and that but for agency packaging, they would have earned more in profit participation.[21]  A&C ¶ 308.  But there is no ***factual*** allegation to support this

---

[21]  On November 14, 2019, counsel for David Simon informed counsel for Counterclaim-Defendants that Simon intends to voluntarily dismiss Claims 5 through 11.

1  bald assertion of lost profits—*e.g.*, allegations that, in the absence of packaging, a
2  particular show still would have been made, would have generated profits, and would
3  have had similar deal terms.

4      Some Individual Counterclaimants also allege that they have "found" that their
5  agents present them "with opportunities to work only on projects involving other talent
6  from" their respective agencies.  *Id.* ¶ 315.  But they do not allege what other
7  "opportunities" were actually available, or that they were actually harmed by working
8  on projects with talent represented by their same Agency.

9      Further, each Individual Counterclaimant makes the identical, conclusory
10  assertion that he or she has been "forced to retain and pay other professionals, including
11  lawyers and/or talent managers, to protect their interests."  A&C ¶ 330.  But ***none*** of
12  the Individual Counterclaimants alleges that, in the absence of packaging, they would
13  not have retained a business manager, talent manager, or lawyer (or how packaging that
14  they supposedly did not know about *caused* them to retain these professionals).

15      In addition, each Individual Counterclaimant claims damages—such as
16  unspecified "lost wages" and "lost employment opportunities" (*id.* ¶ 505)—that leave
17  one to guess what, if anything, comprises these harms or how any Agency supposedly
18  caused them.  Such boilerplate recitations of damages do not satisfy the bare notice
19  pleading requirements of Rule 8.

20      ***Additional Individual Pleading Failures***.  Finally, some of the Individual
21  Counterclaimants also have more specific problems.

22      <u>Meredith Stiehm</u>:  The generalized allegations of Stiehm (a client of both WME
23  and CAA) do not provide even the most basic *notice* of her claims, let alone *plausibly*
24  establish a breach of any duty or proximate harm.  For example, it is not clear in
25  Paragraph 308 of the A&C whether Stiehm alleges that WME or CAA negotiated a sub-
26  standard profit definition, let alone on what program, or how.  Further, Stiehm alleges
27  that she "served as a showrunner for packaged shows" (A&C ¶ 249), and it is
28

implausible to profess ignorance about the "existence" or "details" of packaging on programs where Stiehm was the *de facto* CEO.[22]

Barbara Hall:  Hall's allegation that UTA breached a supposed duty to "disclose the existence of the packages" (A&C ¶ 336) is particularly implausible, not only because she is a "showrunner" (*id.* ¶ 245), but also because she alleges that she *knew* UTA engaged in the practice of packaging—indeed, she alleges that UTA supposedly promised her a "refund on her packaged show" *Madam Secretary*. *Id.* ¶ 334.

Hall also has unique claims for breach of oral contract (Thirteenth Claim) and (inconsistently) for promissory estoppel (Fourteenth Claim).  Both claims are barred by the statute of frauds.  Hall alleges an oral agreement (A&C ¶ 595) that by its terms was not to be performed within a year from the making thereof.  Cal. Civ. Code § 1624(a); *see Tostevin v. Douglas*, 160 Cal. App. 2d 321, 327–328 (1958) (oral contract for payment of services for a television show was subject to the statute of frauds).[23]

Hall's promissory estoppel claim also fails because she does not adequately allege the necessary element of detrimental reliance on the purported promise.  She merely alleges that she "continu[ed] to allow UTA . . . to serve as her talent agency from 2012 to April 2019."   A&C ¶ 601.  She does not allege how this constituted *detrimental* reliance, as she does not identify any damages caused by her decision to "allow" UTA to represent her rather than a different agency.  *Id.*; *see Orcilla v. Big Sur, Inc.*, 244 Cal. App. 4th 982, 1007 (2016) (dismissing promissory estoppel claim where plaintiff "fail[ed] to allege injury caused by any reliance on the promise").  Purported lost refunds cannot satisfy this element either, because Hall never alleges how such lost refunds constitute "harm" **caused** by any reliance **on the purported promise**.

### 3.    All of the Counterclaimants Fail to State the Required Elements of a UCL Cause of Action

---

[22] Stiehm is the only Individual Counterclaimant who asserts a claim against WME, and paragraphs 249, 308, 315, and 336 are her only substantive allegations against WME.
[23] The Thirteenth and Fourteenth Claims for Relief are also barred by the two-year statute of limitations that applies to these claims.  Cal. Civ. Proc. Code § 339(1).

27

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

### (a)   Counterclaimants Have Not Pled Facts to Satisfy the "Unlawfulness" UCL Prong

Because "a violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong[,]" *Berryman v. Merit Property Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007), "[i]f the borrowed violations of law or predicate claims lack merit, then the [UCL] claim necessarily fails." *Portney v. CIBA Vision Corp.*, 2009 WL 305488, at *7 (C.D. Cal. Feb. 6, 2009).  As shown above, all of Counterclaimants' UCL predicates—fiduciary duty, constructive fraud, antitrust, RICO, and LMRA Section 302—are all legally defective.  The UCL "unlawfulness" claim thus fails too.

Separately, Counterclaimants' UCL claim based on LMRA Section 302 fails for the additional reason that it is preempted by federal labor law.  A UCL claim is preempted when, as here, Congress has demonstrated an intent to occupy the field governing the allegedly illegal underlying act.[24]  Congress intended to occupy the field in the area of payments from employers to union representatives, and Section 302 "represents a careful balancing of interests [that] *leaves no room for regulation— complementary or otherwise—by subnational units of government*."  *Int'l Union of Operating Eng'rs Local 399 v. Vill. of Lincolnshire,* 905 F.3d 995, 1002 (7th Cir. 2018) (emphasis added), *cert. granted, judgment vacated as moot* 139 S. Ct. 2692 (2019). Congress entrusted Section 302's enforcement to the United States Attorney General, complete with escalating penalties up to imprisonment, and "[t]he fact that some violations . . . may be felonies . . . reflects the depth of Congress's commitment to these policy choices."  *Int'l Assoc. of Machinists Dist. Ten & Local Lodge 873 v. Allen*, 904 F.3d 490, 505 (7th Cir. 2018).[25]

---

[24] *See Cong. of Cal. Seniors v. Catholic Healthcare W.*, 87 Cal. App. 4th 491, 508–09 (2001) (dismissing union's UCL claim invoking Medicare's complex regime of regulations, which left "no room for state involvement."); *People ex rel. Dept. of Transp. v. Naegele Outdoor Advert. Co.*, 38 Cal. 3d 509, 522-23 (1985) (similar, in context of highway billboard regulations).

[25] Congressional intent to occupy the field is further evident in the fact that Congress provided no private right of action in Section 302.

28

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

### (b)   Counterclaimants have Not Pled Facts to Satisfy the "Unfairness" UCL Prong

Re-labeling the same alleged misconduct as "unfair" cannot salvage the UCL claims.  At the threshold, a "claim under the 'unfair' prong [that] overlaps entirely with the 'unlawful' prong . . . cannot survive if . . . the unlawful prong does not survive." *NorthBay Healthcare Grp.-Hosp. Div. v. Blue Shield of Cal. Life & Health Ins.*, 342 F. Supp. 3d 980, 989 (N.D. Cal. 2018).  This should be the beginning-and-end of the analysis under the unfairness prong.  Nonetheless, even if Counterclaimants had pleaded a separate "unfairness" claim, not dependent on unlawfulness, the claim would fare no better under any of the potentially applicable "unfairness" tests:

*Balancing test.*  Some courts apply a balancing test which requires "weigh[ing] the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (internal quotes omitted).  But conclusory allegations about "[t]he enormous harms caused by the Agencies' receipt of packaging fees" (A&C ¶ 520)—without regard to any particular packaging transaction—fail to plausibly aver that such unspecified harm outweighs the conceded benefits of packaging (*e.g.*, saving 10% commissions and obtaining work that might not otherwise exist).

*Public policy test.*  Other courts have held that "unfairness must be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition."  *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735 (9th Cir. 2007) (internal quotes omitted).  However, where, as here, "the Court has already found that Plaintiff's alleged violations under the unlawful prong fails, Plaintiff cannot properly tether his 'unfair' allegations to an applicable statutory violation."  *Martinez v. Welk Grp., Inc.*, 907 F. Supp. 2d 1123, 1142 (S.D. Cal. 2012).

*FTC test.*  If the Court were to apply what is called the "FTC test," the UCL claim would still fail for want of factual averments establishing that any "consumer injury is

29

COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMANTS' CONSOLIDATED COUNTERCLAIMS
CASE NO. 2:19-CV-05465-AB-AFM (FFMx)

substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1137 (N.D. Cal. 2010) (quotation omitted).[26]  Indeed, other than boilerplate, Counterclaimants do not allege consumer injury at all.

### D.   The Declaratory Relief Claim Should Also Be Dismissed

Finally, "[a] declaratory relief cause of action cannot survive a motion to dismiss when the substantive claims on which it is based are dismissed." *Bates v. Suntrust Mortg., Inc.*, 2013 WL 6491528, at *2 (E.D. Cal. Dec. 10, 2013).

## III.   CONCLUSION

Each Counterclaim should be dismissed with prejudice.  The pervasive standing defects are incurable, the LMRA Section 302 theory is legally baseless, and Counterclaimants have already failed four times to allege viable state law claims, both here and in Superior Court.

Dated:   November 15, 2019          WINSTON & STRAWN LLP

By:  */s/ Jeffrey L. Kessler*
     Jeffrey L. Kessler
     jkessler@winston.com
     David L. Greenspan
     dgreenspan@winston.com
     Isabelle Mercier-Dalphond
     imercier@winston.com
     200 Park Avenue
     New York, NY 10166-4193
     Telephone: 212-294-6700
     Facsimile: 212-294-4700

     Diana Hughes Leiden (267606)
     dhleiden@winston.com
     Shawn R. Obi (288088)
     sobi@winston.com

---

[26] Counterclaimants' allegation that they could not "reasonably [have] avoid[ed]" their alleged injury (A&C ¶ 520) has nothing to do with consumers (indeed, there is no allegation that consumers are harmed by packaging), and, regardless, Counterclaimants can—and always could—decline to be included in packages and/or to work with talent agents who engage in packaging.

30

333 South Grand Avenue, 38th Floor
Los Angeles, CA  90071-1543
Telephone:     213-615-1700
Facsimile:     213-615-1750

Attorneys for Plaintiff/Counterclaim-
Defendant
WILLIAM MORRIS ENDEAVOR
ENTERTAINMENT, LLC

Dated: November 15, 2019

IRELL & MANELLA LLP
MITCHELL SILBERBERG & KNUPP LLP

By:  */s/ Steven A. Marenberg*
Steven A. Marenberg (101033)
smarenberg@irell.com
Victor Jih (186515)
vjih@irell.com
Stephen M. Payne (310567)
spayne@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Adam Levin (156773)
axl@msk.com
Jeremy Mittman (248854)
j2m@msk.com
Jean Pierre Nogues (84445)
jpn@msk.com
2049 Century Park E., 18th Floor
Los Angeles, CA 90067
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Plaintiff/Counterclaim
Defendant
UNITED TALENT AGENCY, LLC

DATED:  November 15, 2019

KENDALL BRILL & KELLY LLP

By: /s/ Richard B. Kendall
Richard B. Kendall (90072)
rkendall@kbkfirm.com
Patrick J. Somers (318766)
psomers@kbkfirm.com
Nicholas F. Daum (236155)
ndaum@kbkfirm.com
Sarah E. Moses (291491)
smoses@kbkfirm.com

31

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

Attorneys for Plaintiff/Counterclaim-Defendant
CREATIVE ARTISTS AGENCY, LLC

1

**ATTESTATION**

2  Pursuant to Local Rule 5-4.3.4(a)(2)(i), I, Diana Hughes Leiden, attest that the other

3  signatories listed, and on whose behalf this filing is submitted, concur in the filing

4  content and has authorized this filing.

5

6                                                    By: /s/ *Diana Hughes Leiden*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28