MAKAN DELRAHIM
Assistant Attorney General, Antitrust Division

NICOLA T. HANNA
United States Attorney

MICHAEL F. MURRAY
Deputy Assistant Attorney General, Antitrust Division

DANIEL E. HAAR
NICKOLAI G. LEVIN (DCBN 490881)
Attorneys, Antitrust Division
U.S. Department of Justice
950 Pennsylvania Ave. NW #3224
Washington, DC 20530
Telephone: (202) 514-2886
Facsimile: (202) 514-0536
E-mail: nickolai.levin@usdoj.gov

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, *et al.*, <br><br>       Plaintiffs-Counterdefendants, <br><br>   v. <br><br> WRITERS GUILD OF AMERICA, WEST, INC., *et al.*, <br><br>       Defendants-Counterplaintiffs. | No. 2:19-cv-05465-AB (AFMx) <br> **STATEMENT OF INTEREST OF THE UNITED STATES** <br><br> Date: December 6, 2019 <br> Time: 10:00 AM <br> Courtroom: 7B <br> United States Courthouse <br> 350 West First Street <br> Los Angeles, CA 90012 <br><br> Honorable Andre Birotte Jr. <br> United States District Judge |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF THE UNITED STATES ................................................ 1

BACKGROUND ............................................................................... 1

DISCUSSION ................................................................................... 8

    I.      Statutory Labor Exemption ................................................ 9

          a.   Combination with Non-Labor Groups ............................. 10

          b.   Actions in the Union's Legitimate Self-Interest .............. 13

    II.    Nonstatutory Labor Exemption ............................................ 17

# TABLE OF AUTHORITIES

**Cases**

*Adams, Ray & Rosenberg v. William Morris Agency, Inc.*,
  411 F. Supp. 403 (C.D. Cal. 1976) ................................................................ 15, 17

*Allen Bradley Co. v. Electrical Workers*, 325 U.S. 797 (1939)...............................10

*American Federations of Musicians in U.S. & Canada v. Carroll*,
  391 U.S. 99 (1968).........................................................................................12

*American Steel Erectors, Inc. v. Local Union No. 7, International Association*
  *of Bridge, Structural, Ornamental & Reinforcing Iron Workers*,
  536 F.3d 68 (1st Cir. 2008) ...........................................................................18

*Apex Hosiery Co. v. Leader*, 310 U.S. 469 (1940) ...............................................2

*Bodine Produce, Inc. v. United Farm Workers Organizing Committee*,
  494 F.2d 541 (9th Cir. 1974)..........................................................................2

*Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996) ......................................... 2, 3, 8, 17

*California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118 (9th Cir. 2011)... 2, 18, 19

*Clarett v. NFL*, 369 F.3d 124 (2d Cir. 2004).................................................... 17, 18

*Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*,
  421 U.S. 616 (1975) .................................................................................. 3, 18

*Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades*
  *District Council, Metal Trades Department, AFL-CIO*,
  817 F.2d 1391 (9th Cir. 1987)........................................................................19

*Group Life & Health Inc. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979).................8

*H.A. Artists & Associates, Inc. v. Actors' Equity Association*,
  451 U.S. 704 (1981) ................................................................................ passim

*Independent Sports & Entertainment, LLC v. Fegan*,
  2017 WL 2598550 (C.D. Cal. May 30, 2017) ................................................6

*Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen*
  *of North America, AFL-CIO v. Jewel Tea Co.*, 381 U.S. 676 (1965)..................20

*Mackey v. NFL*, 543 F.2d 606 (8th Cir. 1976).......................................................19

*North Carolina State Board Of Dental Examiners v. FTC*,

   135 S. Ct. 1101 (2015) ....................................................................... 8, 9, 17

*Phoenix Electric Co. v. National Electric Contractors Association*,

   81 F.3d 858 (9th Cir. 1996)........................................................... 18, 19

*United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965)...................2

*United States v. First City National Bank of Houston*, 386 U.S. 361 (1967)..........10

*United States v. Hutcheson*, 312 U.S. 219 (1941) ...................................... 7, 8, 9, 10

*United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) .................................9

*USS-POSCO Industries v. Contra Costa County Building. & Construction*

   *Trades Council, AFL-CIO*, 31 F.3d 800 (9th Cir. 1994).............................. passim

**Statutes**

12 U.S.C. § 1828(c)(5)(B) ..............................................................................10

15 U.S.C. § 1 ................................................................................ 1, 2, 6, 9

15 U.S.C. § 17 ...........................................................................................1, 9

28 U.S.C. § 517 ...............................................................................................1

29 U.S.C. § 52 ...........................................................................................1, 9

29 U.S.C. § 104 .........................................................................................1, 9

29 U.S.C. § 105 .........................................................................................1, 9

29 U.S.C. § 113 .........................................................................................1, 9

**Other Authorities**

Antitrust Modernization Commission, Report and Recommendation (2007).........18

1B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*,

   (4th ed. 2013) .................................................................... 14, 15, 18, 20

## INTEREST OF THE UNITED STATES

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in a federal court.  The United States enforces the federal antitrust laws and has a strong interest in addressing the proper application of the labor exemptions from the antitrust laws.

The United States has filed numerous Statements of Interest addressing the application of various antitrust exemptions.  *See, e.g.*, *Seaman v. Duke Univ.*, No. 1:15-cv-462, Doc. 325 (M.D.N.C. Mar. 7, 2019) (state action).  The United States urges this Court to reject defendants' argument that it can apply the labor exemptions from the antitrust laws in this case on the pleadings.  Development of a factual record is necessary to ensure that both the federal antitrust laws and the labor exemptions from the antitrust laws are given their proper scope, and that the fundamental national values protecting competition embodied in the federal antitrust laws are not displaced improperly.  The United States takes no position on the merits of this case.

## BACKGROUND

This case involves an antitrust suit between talent agencies and two screenwriters' unions over restrictions on the fees that agents may receive when representing writers, as well as on the agencies' ability to affiliate with companies engaged in the production or distribution of TV shows or movies.  It raises important questions about the "statutory" and "nonstatutory" labor exemptions from the federal antitrust laws.

1. Section 1 of the Sherman Act declares a "contract, combination . . . or conspiracy[] in restraint of trade or commerce among the several States" to be "illegal."  15 U.S.C. § 1.  The "statutory" labor exemption, rooted in Sections 6 and 20 of the Clayton Act and Sections 4, 5, and 13 of the Norris-LaGuardia Act,

"establishes that labor unions are not combinations or conspiracies in restraint of trade and exempts certain union activities from scrutiny under the antitrust laws" even though they may eliminate or restrict competition in a labor market. *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1124 (9th Cir. 2011) (*en banc*); *H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 706 n.2, 713-16 (1981); *accord United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 666 (1965); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 503 (1940).

The statutory labor exemption, however, does not apply merely because a union is involved in a case. The statutory labor exemption does "not exempt concerted action or agreements between unions and nonlabor parties," *Safeway*, 651 F.3d at 1125, or activities that are not in pursuit of the union's "*legitimate* self-interest," *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 808 (9th Cir. 1994). "Whether the interest in question is legitimate depends on whether the ends to be achieved are among the traditional objectives of labor organizations." *Id.* For example, it is not in a union's legitimate self-interest "to enable[] one or more employers to obtain control of the supply and price of a certain product in a particular market, or to make possible the elimination of troublesome competition" outside the labor market, such as in a business market. *Bodine Produce, Inc. v. United Farm Workers Organizing Comm.*, 494 F.2d 541, 551 (9th Cir. 1974).

The "nonstatutory" labor exemption, by contrast, has been inferred by courts from federal labor statutes that "set forth a national labor policy favoring free and private collective bargaining," "require good-faith bargaining over wages, hours, and working conditions," and "delegate related rulemaking and interpretive authority to the National Labor Relations Board [NLRB]." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 236 (1996). This implied exemption interprets the labor statutes as "limiting an antitrust court's authority to determine . . . what is or is not a 'reasonable' practice" in the area of collective bargaining and related industrial

conflict, and "substitutes legislative and administrative labor-related determinations for judicial antitrust-related determinations" in that area. *Id.* at 236-37.  Unlike the statutory labor exemption, which just protects labor groups, the nonstatutory labor exemption can include nonlabor groups. *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 622 (1975).  Yet, the nonstatutory labor exemption does not apply "when a union and a nonlabor party agree to restrain competition in a business market." *Id.* at 622-23.  Such a "direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions." *Id.* at 625.

2.  The dispute in this case is between "three of the largest talent agencies in Hollywood"—William Morris Endeavor Entertainment, LLC, Creative Artists Agency, LLC, and United Talent Agency, LLC (collectively, the Agencies)—and "the two labor unions who represent writers in the entertainment industry"—Writers Guild of America, West, Inc. and Writers Guild of America, East, Inc. (collectively, Writers Guild or Guild).  First Consolidated Complaint (FCC), Doc. 42, ¶ 3.[1]  The Writers Guild is "the exclusive collective bargaining representative for writers in that industry," *id.*, and has reached a collective bargaining agreement with the Alliance of Motion Picture and Television Producers, Inc. (AMPTP)—the "Minimum Basic Agreement" (MBA)—effective through May 1, 2020. *Id.* ¶¶ 22, 135.  The MBA sets forth "minimum terms" for producers to hire writers, but allows for individual negotiation beyond those terms. *Id.* ¶ 137.

Under a separate "agent-franchise agreement known as" the Artists' Manager Basic Agreement of 1976 (AMBA) between the Writers Guild and the Artists Managers Guild (AMG)—which later became the Association of Talent Agents (ATA)—the Agencies "had been franchised by [the Writers Guild] to represent its writer-members . . . in their individual negotiations for employment

---

[1] The facts in this Statement are taken from the pleadings in this case.

with television and film studies." FCC ¶¶ 3, 25.[2]  The AMBA set forth "agent regulations" including permissible forms of compensation.  *Id.* ¶¶ 46, 77-80; Ex. C, Doc. 42-3 (a copy of the AMBA).

"[C]ustomarily," a writer would pay an agent a commission of 10% for representing the writer when seeking employment with television and film studios. FCC ¶ 35.  The AMBA, however, also allowed for alternative forms of compensation.  In particular, the AMBA recognized that "the services of Writers in the fields of radio, television and motion pictures are connected with and affected by the packaging representation of Writers and others" by agents (*i.e.*, representing a writer along with an actor, director, etc.).  *Id.* Ex. C § 6(c)(A) (Package Representation).  The AMBA allowed agents to engage in packaged representation for "Writer-members of the [Guild] in their writing capacities," *id.*, and to receive a "package commission" for such representation from the studios (*i.e.*, a fee paid directly by studios to the agents), *id.* Ex. C § 6(c)(C); FCC ¶¶ 36, 39.[3]  The AMBA further provided that "[n]othing herein contained shall limit or affect, directly or indirectly, the amount of such 'package commission,'" which can vary by agency, by studio, and by show.  *Id.*  If receiving a package commission in relation to the work of a Writer-client, however, an agent "shall not be entitled to and shall not

[2] The AMBA also allowed agents to represent "showrunner-members" of the Guild "solely in their capacity as writers." FCC ¶¶ 3, 25.  Showrunners' roles can vary by show, and are discussed below at pp. 11-12 & n.7.

[3] According to the Agencies:  "Representative examples of the work that Plaintiffs and their agents may perform on packaged shows include: (a) providing lists of available writers to help staff the program; (b) helping to identify opportunities for actors to work on shows and for decision-makers on shows to become aware of available talent that would contribute to the success of the show; (c) helping to find series and episodic directors; (d) helping a studio negotiate a higher license fee with its broadcaster or a higher imputed license fee when a broadcaster and studio are a single company; (e) research and social media support; (f) publicity and marketing assistance; and (g) offering to help a studio or production company with off-network sales." FCC ¶ 40.

receive any [other] commission from a Writer-client." *Id.* Ex. C § 6(c)(G). Moreover, while an agent could "request[] a Writer to sign a package representation agreement," an agent could not "require any Writer to sign a package representation agreement as a condition of representing said Writer for writing services or materials." *Id.* Ex. C § 6(c)(E).

Since the parties signed the AMBA in 1976, "package terms, packaging fees and the ubiquity of packaging have evolved over time," and the Writers Guild "provided a termination notice under the AMBA in April 2018." FCC ¶¶ 81, 85. The Writers Guild expressed concerns that packaging fees gave rise to "inherent" conflicts of interest between writers and agents, especially in light of how the Agencies had expanded their operations into content-production through "agency-affiliate content companies." FCC ¶¶ 81, 85; Answer to First Consolidated Complaint and Consolidated Counterclaims (A&C), Doc. 44, ¶ 1.

The Writers Guild attempted to negotiate a new AMBA with the Agencies "independently and through ATA." FCC ¶ 86. The parties, however, were unable to reach a new agreement, and the AMBA terminated on April 12, 2019. *Id.* ¶¶ 3, 86-99.

On April 13, 2019, the Writers Guild "instructed its members that they were prohibited from being represented by an agent who does not agree to [its] Code of Conduct." FCC ¶ 107. That Code of Conduct, as amended, provided that:

a. No Agent shall have an ownership or other financial interest in, or shall be owned by or affiliated with, any entity or individual engaged in the production or distribution of motion pictures.

b. No Agent shall have an ownership or other financial interest in, or shall be owned by or affiliated with, any business venture that would create an actual or apparent conflict of interest with Agent's representation of a Writer.

c. No Agent shall derive any revenue or other benefit from a Writer's involvement in or employment on a motion picture project, other than a percentage commission based on the Writer's compensation or fee.

d. No Agent shall accept any money or thing of value from the employer of a Writer.

*Id.* ¶ 108; Ex. A., Doc. 42-1, at 2 (Writers Guild Code of Conduct as of April 13, 2019). Within two weeks, over 7,000 Guild members had fired their agents. FCC ¶ 110.

The Agencies sued the Writers Guild, alleging that it engaged in a group boycott in violation of Section 1 of the Sherman Act. *Id.* ¶¶ 149-190.[4] The Guild moved to dismiss the complaint on the ground that the alleged boycott was exempt from antitrust liability under the statutory labor exemption or, if that did not apply, under the nonstatutory labor exemption. Dfs. Mem. of P. & A. in Supp. of Mot. to Dismiss Consolidated Compl. (MTD), Doc. 43-1, at 5-16.[5] In the alternative, the Writers Guild moved for judgment on the pleadings. Doc. 47.

The Writers Guild argued that "[i]t is black letter labor law that the National Labor Relations Act ('NLRA') gives the Guilds the exclusive right to represent their members in contract negotiations, and that if the Guilds choose to delegate any of that statutory authority, they may adopt standards (including conflict of interest prohibitions) that agents must meet." MTD 1 (citing *H.A. Artists*, 451 U.S. at 721-22, and *Indep. Sports & Entm't, LLC v. Fegan*, 2017 WL 2598550, *5 (C.D. Cal. May 30, 2017)). The Writers Guild further argued that, while the Agencies disagreed as to the necessity of the Code restrictions, "courts must not use antitrust law to second-guess a union's 'judgment regarding the wisdom or unwisdom, the

---

[4] Two of the Agencies also brought a claim under the Labor-Management Relations Act (which is not discussed here).

[5] The WGA also moved to dismiss the complaint on other grounds, and brought antitrust counterclaims against the Agencies, which are not addressed by this Statement.

rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.'"  *Id.* at 2, 11 (quoting *United States v. Hutcheson*, 312 U.S. 219, 232 (1941)).  In the Guild's view, the "Agencies' allegations that the Guilds and Guild members have agreed to refuse representation by any talent agency that has not agreed to the Guilds' conflict of interest prohibitions, FCC ¶171, describe quintessential labor union activity that falls squarely within the statutory labor exemption."  MTD 6.  Moreover, the agent regulations are "intimately bound with the subject of wages," so the nonstatutory labor exemption would apply even if the statutory exemption did not.  *Id.* at 15 (citation omitted).

The Agencies' opposition to the motion argued that "each of the Guilds' arguments is based either upon factual disputes which may not be resolved on a 12(b)(6) or 12(c) motion, or upon fundamental mischaracterizations of the law."  Pfs. Opp. to Defs. Mot. to Dismiss Count I of the Consolidated Compl., or in the Alternative for J. on the Pleadings (Agencies BIO), Doc. 50, at 1.  The Agencies argued that their "well-pleaded factual allegations . . . take [their] antitrust claims well-outside the boundaries of both the statutory and non-statutory labor exemptions," because they establish that the Guild used various "illegitimate and non-traditional union tactics" "in combination with non-labor parties" to "achieve illegitimate ends," and the Guild "directly regulate[d] commercial practices" to "restrain[] trade in commercial markets that the [Guild does] not have authority to regulate."  *Id.* at 2.  They claimed that their "comprehensive and detailed factual allegations" regarding the Guild's "objectives and means for effectuating the boycott," and its effect on competition outside of the labor market, "may not be challenged on the pleadings."  *Id.* at 3-17.

The Writers Guild argued in reply that the various factual disputes identified by the Agencies are irrelevant because the complaint "*affirmatively demonstrates* that the labor exemptions foreclose the Agencies' antitrust claim."  Reply in Supp.

of Defs. Mot. to Dismiss Consolidated Compl. or for J. on the Pleadings (Guild Reply), Doc. 57, at 1.

## DISCUSSION

As the Supreme Court has explained: "Labor unions are lawful combinations that serve the collective interests of workers, but they also possess the power to control the character of competition in an industry. Accordingly, there is an inherent tension between national antitrust policy, which seeks to maximize competition, and national labor policy, which encourages cooperation among workers to improve the conditions of employment." *H.A. Artists*, 451 U.S. at 713. The statutory labor exemption and the judicially implied nonstatutory labor exemption attempt to minimize that tension by exempting certain labor-related activities from the reach of the federal antitrust laws. *See id.* at 715-16 & n.19.

Yet like all "implicit" and "express statutory exemptions" from the antitrust laws, the statutory and nonstatutory labor exemptions are "narrowly construed." *Grp. Life & Health Inc. Co. v. Royal Drug Co.*, 440 U.S.205, 231 (1979) (citing *Connell* and other cases); *cf. N.C. State Bd. Of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1110 (2015) (*N.C. Dental*) ("Although state-action immunity exists to avoid conflicts between state sovereignty and the Nation's commitment to a policy of robust competition, [state-action] immunity is not unbounded. [G]iven the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, state-action immunity is disfavored, much as are repeals by implication.") (citations and internal quotation marks omitted). Courts, however, should still give them "hospitable scope" in light of "Congressional purpose" supporting federal labor policy. *Hutcheson*, 312 U.S. at 235 (statutory labor exemption) (citation omitted); *see also Brown*, 518 U.S. at 237 (discussing the nonstatutory labor exemption).

The Writers Guild's motion to dismiss is premised on the notion that as a legitimate union its judgment about what is best for its members cannot be

"second-guess[ed]" by this Court.  MTD 2, 11.  Application of the labor exemptions here, however, is not so facile.  The pleadings in this case raise several factual disputes that this Court must resolve before holding either the statutory or nonstatutory labor exemption applicable here to ensure that federal antitrust law is not discarded inappropriately.  Otherwise, the Court may disrupt the proper balance between federal labor law and federal antitrust law and undermine the fundamental protections for competition and consumers embodied in the federal antitrust laws.  *Cf. N.C. Dental*, 135 S. Ct. at 1109 ("Federal antitrust law is a central safeguard for the Nation's free market structures.  In this regard it is 'as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms.'") (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972)).  While any construction of the labor exemptions must allow unions to restrict competition in labor markets in pursuit of legitimate labor law goals, courts must also be careful to circumscribe the application of these exemptions lest unions be "giv[en] free rein to extend their substantial economic power into markets for goods and services other than labor."  *USS-POSCO*, 51 F.3d at 806.

Part I of this Statement addresses the statutory labor exemption.  Part II of this Statement addresses the nonstatutory labor exemption.  The United States takes no position on the merits of the Agencies' Section 1 group boycott claim.

## I.    Statutory Labor Exemption

The statutory labor exemption derives from the "interlacing" of the Sherman Act with Sections 6 and 20 of the Clayton Act and the Norris-LaGuardia Act.  *Hutcheson*, 312 U.S. at 231-32.  "So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit . . . are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular

union activities are the means." *Id.* at 232; *see also H. A. Artists*, 451 U.S. at 721 (discussing "the union's legitimate self-interest").

The Ninth Circuit has read these precedents "as establishing a two-prong test for the statutory labor exemption:  (1)  Did the union combine with a non-labor group?  (2)  Did the union act in its legitimate self-interest?" *USS-POSCO*, 31 F.3d at 805.  The Agencies have detailed plausible allegations that raise questions of law and fact as to both prongs.[6]

### a.  Combination with Non-Labor Groups

The statutory labor exemption applies only to unilateral conduct by unions and other "bona fide labor organization[s]." *H.A. Artists*, 451 U.S. at 717 & n.20. "Accordingly, antitrust immunity is forfeited when a union combines with one or more employers [or other non-labor groups] in an effort to restrain trade." *Id.* at 715.  "Congress 'intended to outlaw business monopolies.  A business monopoly is no less such because a union participates, and such participation is a violation of the [Sherman] Act.'" *Id.* at 716 (quoting *Allen Bradley Co. v. Electrical Workers*, 325 U.S. 797, 811 (1939)).

"What constitutes a non-labor group for purposes of the antitrust laws has never been very clearly defined." *USS-POSCO*, 31 F.3d at 805.  In "most statutory labor exemption cases, the focus has been on whether the union combined with a competitor of the targeted employer." *Id.* at 806.  "To allow unions breathing

---

[6] Under *USS-POSCO*, "the statutory exemption is not an affirmative defense; it's an element of any claim that unions violated the antitrust laws." 31 F.3d at 805 n.3.  Thus, "Plaintiff bears the burden of proof." *Id.*  This is a departure from the general principle that "defendants normally bear the burden of proving exceptions to the antitrust laws." *Id.*  This Statement takes no position on whether the statutory labor exemption is best considered an element of a claim or an affirmative defense, like other exemptions from the antitrust laws.  *See, e.g.*, *United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 363 (1967) (holding that statutory exemption from the antitrust laws found in 12 U.S.C. § 1828(c)(5)(B) of the Bank Merger Act is an affirmative defense).

space in carrying out their legitimate functions without giving them free rein to extend their substantial economic power into markets for goods and services other than labor," the Ninth Circuit has concluded that "the definition of non-labor group must not stray too far from the paradigm of the union combining with the employer's competitors" and that, to constitute "a non-labor group for purposes of the statutory labor exemption, therefore, the entity in question must operate in the same market as the plaintiff to a sufficient degree that it would be capable of committing an antitrust violation against the plaintiff, quite independent of the union's involvement."  *Id.*

The Agencies have pleaded that the statutory labor exemption is inapplicable here because the alleged group boycott includes (among others): (i) showrunners acting as producers and (ii) and non-franchised lawyers and managers that compete with the Agencies in representing writers.  FCC ¶ 153; Agencies BIO 12-13.  It is an issue of fact whether these entities are part of the group boycott and, if so, in what capacity.  Only after resolving these factual issues can this Court address the legal question of whether the alleged boycott falls outside the statutory labor exemption because it includes a non-labor group.

For instance, the role of a showrunner can vary significantly between different shows.  The Agencies plead that a "showrunner functions as the effective 'CEO' of a television series.  The showrunner has ultimate power and control over creative, staffing, and production decisions."  FCC ¶ 118.  "While showrunners may perform some writing and/or story services for a series, showrunners also perform extensive services" in a production capacity, including "manage production budgets," and "hire and fire writers."  FCC ¶¶ 59 & n.6, 118-123.  The Agencies thus argue that showrunners are more like "management" than employees.  *Id.* ¶ 127.

The Writers Guild, however, argues that any showrunners participating in the agreement qualify as a labor group because they are similar to the orchestra

leaders found to be a "labor group" in *American Federations of Musicians in U.S. & Canada v. Carroll*, even though the orchestra leaders were "employers" of musician union members and "independent contractors," because of their "economic inter-relationship" with union members.  391 U.S. 99, 106 (1968).  *See* MTD 8-9.  Yet that is not the sort of comparison that can be made without factual development.  *Carroll*, for example, was not decided until after trial concluded.  *Id.* at 102.  Before this Court can assess the degree of similarity between this case and *Carroll* as a matter of law, it first must determine, as a matter of fact, what the various relationships between different showrunners and different screenwriters participating in the alleged agreement entail.  *Cf.* Agencies BIO 13 (arguing that showrunners should be treated as a non-labor group because "the FCC plausibly alleges that showrunners are not in job or wage competition with other union writers when they work as producers" and that "the work showrunners perform regularly and substantively differs from that of 'ordinary' writer-members of the Guilds").[7]

The Writers Guild's argument that non-franchised lawyers and managers must be treated as a labor group is likewise premature.  The Guild correctly notes that *H.A. Artists* held that franchised lawyers and agents are a "labor group" for purposes of the exemption because they "perform a function—the representation of

---

[7] The Writers Guild argues that the complaint "conclusively establish[es]" that showrunners have job and wage competition with writers "by alleging that showrunners *write* for series that they also supervise."  Guild Reply 3.  The complaint, however, alleges that "showrunners are *generally* also writers"—not that they write for every show—and that, when they are writers, "the bulk of their responsibility is not in 'writing' or in acting as a 'writer' as defined by the MBA." FCC ¶ 120 (emphasis added); *see also id.* ¶ 122 (alleging that the "vast bulk of a showrunner's compensation" and the "showrunner's entitlement to a percentage of a program's profits" derives from "producing, not writing, services").  Without a factual record, the Court cannot reasonably compare the nature and amount of any wage and job competition between showrunners and writers with that of the orchestra leaders and members in *Carroll*.

union members in the sale of their labor—that in most nonentertainment industries is performed exclusively by unions."  MTD 10 (quoting 451 U.S. at 721).  Here, however, the group boycott allegedly includes non-franchised lawyers and managers, who are competitors of the Agencies in representing writers (though not licensed under state law for that purpose).  FCC ¶¶ 144-148.  Whether the Court could treat franchised and non-franchised lawyers and managers similarly for labor exemption purposes raises various factual questions—including the nature of services rendered by non-franchised lawyers and managers and whether they "would be capable of committing an antitrust violation against the plaintiff, quite independent of the union's involvement," *USS-POSCO*, 31 F.3d at 806—that cannot be resolved on the pleadings in this case.  *Compare* Agencies BIO 12 (arguing this distinction is important), *with* Guild Reply 4 & n.4 (arguing this distinction is insignificant).

### b.  Actions in the Union's Legitimate Self-Interest

If a union does not combine with a non-labor group, its actions are protected by the statutory labor exemption only when they are in the union's "legitimate self-interest."  *USS-POSCO*, 31 F.3d at 805.  This requirement ensures that, in displacing the application of the antitrust laws to the challenged conduct, the "ends to be achieved are among the traditional objectives of labor organizations."  *Id.* at 808.  Thus, for instance, "if a union forces employers to funnel money into a commercial enterprise from which the union derives profits; or if it forces the employer to hire the union president's spouse; or if a union is involved in illegal activities unrelated to its mission, such as dealing drugs or gambling, those would not be objectives falling within the union's legitimate interest."  *Id.*  Where a plaintiff sufficiently alleges that a union is advancing an illegitimate goal, the union cannot defeat this allegation merely by asserting that its conduct advances a legitimate labor goal; the conduct must be "sufficiently related" to the legitimate goal.  *Id.* at 809.

One way that courts ensure such a sufficient relationship—and that the union is not invoking a legitimate goal pretextually to advance illegitimate objectives—is by evaluating the connection between the means chosen and the end invoked. *Id.* at 808.  Under *USS-POSCO*, the "means employed by the union bear on the degree of scrutiny [the Court] cast[s] on the legitimacy of the union's interest." *Id.* (emphasis omitted).  "[W]here a union engages in activities normally associated with labor disputes, these will be presumed to be in pursuit of the union's legitimate interest absent a very strong showing to the contrary." *Id.* (citation omitted).  On the other hand, "[w]here the union's activities are farther afield, the scrutiny is more searching." *Id.* at 808-09.  Where the challenged conduct is "not a traditional union activity," there is a "substantial burden on the union to prove why [it] was not merely convenient but necessary." *Id.* at 809.  For instance, in *H.A. Artists*, the Supreme Court declined to apply the statutory exemption to the union's "extraction of franchise fees from agents" because the union "suggest[ed], only in the most general terms, that the fees are somehow related to the basic purposes of its regulations: elimination of wage competition, upholding of the union wage scale, and promotion of fair access to jobs" and thus did not adequately show that its legitimate interests were affected by the imposition of the franchise fees.  451 U.S. at 722.

In evaluating the connection between the challenged restraint and the legitimate labor objective, courts must make a "judgment" about "the closeness or 'intimacy' of that connection relative to competition policy."  1B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 255e3, at 100 (4th ed. 2013).  "An alternative way of looking at the intimacy issue is to ask whether there is a 'less restrictive way' of achieving the union's legitimate objective or whether the restraint chosen is the minimum restraint necessary for that objective." *Id.*[8]  While

---

[8] Areeda and Hovenkamp "emphasize" that "the necessary judgments about intimacy, breadth, or less restrictive alternatives must always be rather gross.  A court that tries to appraise those matters in too refined a way may find itself

a union may lawfully restrict competition in labor markets, it is not a legitimate interest of the union to restrict competition in "markets for goods and services other than labor," such as downstream product markets. *USS-POSCO*, 51 F.3d at 806, 809.

*H.A. Artists* held that there was a sufficient connection between legitimate labor objectives and a stage actors' union's regulations of franchised agents designed to "avoid[] conflicts of interest," including the union's ban on excessive commissions. 451 U.S. at 719-21. Because a commission is paid as a percentage of a member's wage, the Court explained, too high a commission could bring the effective wage of a member below the union's bargained-for wage floor. *Id.* at 720-21. "The agent stands directly between union members and jobs, and is in a powerful position to evade the union's negotiated wage structure." *Id.* at 720.

Here, the Writers Guild asserts that the challenged restraints serve the same objective of "prevent[ing] financial conflicts of interest among agents authorized to represent Guild members," which has previously been recognized to be a legitimate labor goal by this Court. MTD 11-12; *Adams, Ray & Rosenberg v. William Morris Agency, Inc.*, 411 F. Supp. 403, 410 (C.D. Cal. 1976) (stating that regulations that "eliminate[] the conflict of interest that exists when an artists' manager represents both a package owner and a writer hired by the package owner" would further Guild's legitimate self-interest). The Writers Guild further argues that "a union's refusal to deal with agents who do not agree to the union's representation rules is very traditional union activity." MTD 13.

The Agencies "do not dispute the legitimacy of [the Guild] seeking regulations tailored to prevent franchised talent agents from acting contrary to the interests of [Guild] members," FCC ¶ 155, but contend that the alleged boycott "oversteps by a country mile any such claimed objective [in avoiding conflicts of

---

intruding to the point where its reasoning can offer no more logical or equitable solution than the one chosen by the parties themselves." *Id.*

interests] by flatly banning agency packaging and agency-affiliate content companies, without regard to the existence of any actual harm to writers resulting from potential conflicts of interest." *Id.*   The Agencies contend that these "blanket bans on industrywide commercial practices . . . extend far beyond the labor market for writer services" by affecting numerous non-union members (such as actors and directors) and by harming competition in business markets such as content production, *id.* ¶¶ 155-56, and that the Guild "managed packaging and content affiliates for more than 40 years with tailored regulations," *id.* ¶ 159.  The Agencies also argue that much of the Guild's conduct, such as "threatening [union members'] healthcare" and "threats to bring an objectively frivolous lawsuit alleging criminal conduct by AMPTP members," does not "bear any resemblance to traditional union activity like collective bargaining, calling strikes, picketing, or hand-billing." *Id.* ¶¶ 7, 160.

Thus, the Agencies regard the Writers Guild as exercising a "power grab" by using its monopsony power (that is, monopoly power on the buyer side) over agents to reduce the compensation that agents otherwise would receive.  FCC ¶¶ 13, 182, 190.  While unions can restrict agent compensation when pursuing a legitimate union goal such as avoiding conflicts of interest, *see H.A. Artists*, 451 U.S. at 721, it is not a legitimate goal for a union to exert monopsony power over agents simply to extract additional rents, *see id.* at 722 (collection of franchise fees from agents was not protected by statutory exemption); *USS-POSCO*, 31 F.3d at 809 ("it looked like the union [in *H.A. Artists*] may have been using its bargaining power with theatrical agents to generate a collateral source of revenue").

On reply, the Writers Guild argues that this "power grab" was legitimate, because "'[s]eizing power' to protect their members' interests is what unions do." Guild Reply 5.  The Guild contends that, "[w]hat matters for purposes of the statutory labor exemption" is not that it is seizing power, but *why* it has done so. *Id*.  The Guild further argues that it only had the legitimate goal of preventing

agent conflicts of interest and that "the supposed non-traditional means the Agencies identify, Opp. at 8-9, are all either long-recognized as *traditional* union activity or irrelevant." Guild Reply 6. The Guild further disputes that it engaged in some of the alleged conduct. *See id.* at 7 n.6.

The Guild's arguments for dismissal thus depend not only on a different view of the law of the statutory labor exemption than the Agencies, but also on its view of the facts. The pleadings raise many factual disputes regarding the scope of the restraints and their purposes, the connection between the means chosen and the end to be achieved, and their effect on competition in non-labor business markets, including: (i) whether the Guild used nontraditional means in adopting the restraints; (ii) whether the restraints serve only legitimate labor law objectives or also further any illegitimate goals such as abusing monopsony power over agents or eliminating competition in a business market; and (iii) whether the restraints are overbroad in relation to the Guild's legitimate labor objective of preventing agent conflicts of interest. Resolving these disputes requires discovery and development of a factual record. Indeed, this Court previously recognized that such a dispute regarding the legitimacy of the Guild's interest in regulating packaging fees "raises numerous factual issues which must be resolved at trial." *Adams, Ray & Rosenberg*, 411 F. Supp. at 411.

## II. Nonstatutory Labor Exemption

Courts have inferred the "nonstatutory" labor exemption "from federal labor statutes" in order to "accommodate the collective bargaining process" and "to prevent the courts from usurping the NLRB's function of determin[ing], in the area of industrial conflict, what is or is not a reasonable practice." *Clarett v. NFL,* 369 F.3d 124, 130-31 (2d Cir. 2004) (quoting *Brown*, 518 U.S. at 236-37) (internal quotation marks omitted).[9] "The Supreme Court has never delineated the precise

---

[9] The Supreme Court recently emphasized that "repeals [of the antitrust laws] by implication" are generally "disfavored." *N.C. Dental*, 135 S. Ct. at 1110. This is consistent with the unanimous bipartisan recommendation of the Antitrust

boundaries of the [nonstatutory labor] exemption, and what guidance it has given as to its application has come mostly in cases in which agreements between an employer and a labor union were alleged to have injured or eliminated a competitor in the employer's business or product market." *Id.* at 131.[10]

Courts have recognized that the "case for the applicability of the non-statutory exemption is strongest where the alleged restraint operates primarily in the labor market and has only tangential effects on the business market." *Safeway*, 651 F.3d at 1130 (quoting *Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 79 (1st Cir. 2008); and *Clarett*, 369 F.3d at 134 n. 14). The "business market" may lawfully be restrained only to the extent that the restraints "follow naturally from the elimination of competition over wages and working conditions." *Connell*, 421 U.S. at 625. In addition, courts frequently consider whether the challenged agreement "concerns wages, hours, or conditions of employment that are mandatory subjects of collective bargaining," and "was produced from bona fide, arm's-length collective bargaining." *Phoenix Elec. Co. v. Nat'l Elec. Contractors*

---

Modernization Commission that exemptions from the antitrust laws "should be granted rarely, and only where, and for so long as, a clear case has been made that the conduct in question would subject the actors to antitrust liability *and* is necessary to satisfy a specific societal goal that trumps the benefit of a free market to consumers and the U.S. economy in general." Antitrust Modernization Commission, Report and Recommendation 335-36 (2007), *available at* https://govinfo.library.unt.edu/amc/report_recommendation/amc_final_report.pdf.

[10] The "most common case implicating the nonstatutory [labor] exemption involves a completed collective bargaining agreement actually in effect that (a) limits the employer's ability to select freely among other firms, such as subcontractors, with whom it might deal; or (b) requires an employer to use only union suppliers of a given input; (c) attempts to regulate the wages or other inputs of employers who are not parties to the collective bargaining agreement, perhaps for the purpose of destroying them; or (d) imposes restraints in the product market." 1B Areeda & Hovenkamp, *Antitrust Law*, *supra*, ¶256c, at 108.

1   *Ass'n*, 81 F.3d 858, 861-62 (9th Cir. 1996); *Cont'l Mar. of S.F., Inc. v. Pac. Coast*

2   *Metal Trades Dist. Council, Metal Trades Dep't, AFL-CIO*, 817 F.2d 1391 (9th

3   Cir. 1987), *Mackey v. NFL*, 543 F.2d 606, 614 (8th Cir. 1976).[11]

4           This case is far from the heartland of the nonstatutory labor exemption.  The

5   Agencies are not challenging a term in the collective bargaining agreement

6   between the Writers Guild and the producers—the MBA.  Nor are they challenging

7   the wages paid by employers, hours, or other conditions of employment for the

8   union members.

9           Nevertheless, in *H.A. Artists*, the Supreme Court kept open the possibility

10  that the nonstatutory labor exemption could apply to agent regulations preventing

11  conflicts of interest.  The court of appeals had stated "that even if there had been an

12  agreement between Equity and a 'non-labor group,' the agreement might still have

13  been protected from the antitrust laws under the 'non-statutory' exemption.  451

14  U.S. at 712 & n.11.  The Supreme Court recognized that possibility, *id.* at 716

15  n.19, but importantly saw no need to address this issue since the Court agreed with

16  the court of appeals that the statutory labor exemption applied.

17          Relying on *H.A. Artists*, the Writers Guild argues that the court should apply

18  the nonstatutory labor exemption here because the boycott claim is sufficiently

19  connected to a mandatory subject of collective bargaining since "requiring agents

20

21  _____

    [11] The Agencies argue these factors are "required elements for invoking the non-
22  statutory exemption in this Circuit."  Agencies BIO 14.  The Guild disputes that
    assertion, arguing that under the Ninth Circuit's *en banc* opinion in *Safeway*, they
23  "are simply different factors to consider" as part of the totality of circumstances.
    Guild Reply 9-10.  The Guild recognizes that "Ninth Circuit panels have applied
24  *Phoenix Electric* after [*Safeway*]," but distinguishes those cases on the ground that
    they involved collective bargaining agreements.  Guild Reply 10 n.13.  This
25  Statement takes no position on this dispute and assumes *arguendo* that these are
    merely factors courts should consider.  Nevertheless, the United States disagrees
26  with the Guild's suggestion that the nonstatutory exemption should be easier to
    satisfy because this case does not involve a challenge to a collective bargaining
27  agreement.

28

1    to 'honor their fiduciary obligations by avoiding conflicts of interest' serve[s] a

2    union's interest in preventing evasion of 'the union's negotiated wage structure.'"

3    MTD 15 (quoting *H.A. Artists*, 451 U.S. at 719-20).  In the Guild's view "[t]he

4    crucial determinant [for purposes of the nonstatutory labor exemption] is not the

5    form of the agreement—e.g., prices or wages—but its relative impact on the

6    product market and the interests of union members."  *Id.* (quoting *Local Union No.*

7    *189, Amalgamated Meat Cutters & Butcher Workmen of N. Am., AFL-CIO v. Jewel*

8    *Tea Co.*, 381 U.S. 676, 690 n.5 (1965)).

9        The Agencies dispute that argument and contend that the nonstatutory labor

10   exemption should not apply here because the challenged "restraints affect parties

11   *other than* parties to the collective bargaining agreement at issue," "directly" affect

12   "business markets," and because the "union's restraints [could] be achieved

13   through less restrictive means."  FCC ¶ 165.  These allegations are supported by

14   detailed allegations of fact.  *See id.* ¶¶ 165-169.

15        This Court cannot properly resolve this dispute without development of a

16   factual record.  As the Writers Guild implicitly admits, this Court would need to

17   inquire into the factual connection between the challenged restraints and wages

18   (and other conditions of employment), as well as their "relative impact" on labor

19   and business markets.  MTD 15.  The Court also would need to inquire into

20   whether there were any less restrictive alternatives that did not hinder competition

21   in business markets.  *See* 1B Areeda & Hovenkamp, *Antitrust Law*, *supra*, ¶ 255e3,

22   *discussed* at pp. 14-15 & n.8, *supra*.  Such factual analysis regarding the nature of

23   the restraints and their effect on competition in business markets is required to

24   ensure that antitrust law is not being displaced improperly.

25

26

27

28

Dated:  November 26, 2019        Respectfully submitted,

MAKAN DELRAHIM
Assistant Attorney General

NICOLA T. HANNA
United States Attorney

MICHAEL F. MURRAY
Deputy Assistant Attorney General

DANIEL E. HAAR
NICKOLAI G. LEVIN
Attorneys, Appellate Section

Attorneys for the United States of America

/s/ Nickolai G. Levin
NICKOLAI G. LEVIN