Stephen P. Berzon (SBN 46540)
sberzon@altber.com
Stacey Leyton (SBN 203827)
sleyton@altber.com
P. Casey Pitts (SBN 262463)
cpitts@altber.com
Rebecca C. Lee (SBN 305119)
rlee@altber.com
Andrew Kushner (SBN 316035)
akushner@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

Anthony R. Segall (SBN 101340)
asegall@rsglabor.com
Juhyung Harold Lee (SBN 315738)
hlee@rsglabor.com
ROTHNER, SEGALL &
 GREENSTONE
510 South Marengo Avenue
Pasadena, California 91101
Telephone: (626) 796-7555
Facsimile: (626) 577-0124

W. Stephen Cannon (*pro hac vice*)
scannon@constantinecannon.com
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave, NW, Ste. 1300N
Washington, DC 20004
Telephone: (202) 204-3500
Facsimile: (202) 204-3501

Ethan E. Litwin (*pro hac vice*)
elitwin@constantinecannon.com
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701

*Attorneys for Defendants and Counterclaimants*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, *et al.*, <br><br>  Plaintiffs and Counterclaim Defendants, <br><br>  v. <br><br> WRITERS GUILD OF AMERICA, WEST, INC., *et al.*, <br><br>  Defendants and Counterclaimants, <br><br> and PATRICIA CARR, *et al.* <br><br>  Counterclaimants. | Case No.   2:19-cv-05465-AB-AFM <br><br> **OPPOSITION TO MOTION TO DISMISS COUNTERCLAIMS** <br><br> Hearing Date:  Jan. 17, 2020 <br> Time:        10:00am <br> Courtroom:    7B <br> Judge:       Hon. André Birotte Jr. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

LEGAL STANDARD ............................................................................................. 1

ARGUMENT .......................................................................................................... 2

I.  The Guilds have associational standing to seek declaratory and injunctive relief for breach of fiduciary duty (Claim Five) and constructive fraud (Claim Six) on behalf of their members ........................... 2

    A.  The Guilds seek equitable relief, not money damages, on behalf of their members .................................................................................. 2

    B.  The Guilds' claims do not require individual participation ................. 2

II.  The Guilds have standing to bring a UCL claim on their own behalf ........... 5

III.  Counterclaimants adequately plead state law claims ..................................... 7

    A.  Individual Counterclaimants adequately allege breach of fiduciary duty and constructive fraud ................................................ 7

    B.  The AMBA does not preclude the state law claims ............................ 9

    C.  Stiehm and Hall sufficiently plead their state law claims .................... 9

    D.  Counterclaimants state a claim under the UCL ................................ 11

        1.  Counterclaimants adequately allege unlawfulness ................... 11

        2.  Counterclaimants' UCL claim is not preempted ...................... 14

        3.  Counterclaimants adequately allege that the Agencies' conduct is unfair ................................................................... 15

IV.  Counterclaimants state a claim under RICO ............................................... 16

    A.  Counterclaimants adequately allege RICO standing .......................... 16

    B.  The Agencies' other challenges to the RICO claims fail .................. 19

V.  Counterclaimants plead plausible antitrust claims ....................................... 20

    A.  Counterclaimants plausibly allege that the Agencies have violated the antitrust laws .................................................................. 20

    B.  Counterclaimants have antitrust standing ......................................... 23

    C.  Counterclaimants plead a viable Cartwright Act claim ..................... 29

CONCLUSION ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Amalgamated Transit Union, Local 1756 v. Superior Court*,
  46 Cal.4th 993 (2009)...........................................................................7

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,
  190 F.3d 1051 (9th Cir. 1999)............................................................29

*Anderson News, LLC v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)................................................................21

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ...........................................................................18

*Arroyo v. United States*,
  359 U.S. 419 (1959) ...........................................................................18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................1

*Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris, Inc.*,
  241 F.3d 696 (9th Cir. 2001)..............................................................17

*Barthelemy v. ALPA*,
  897 F.2d 999 (9th Cir. 1990)..............................................................12

*Batson v. Strehlow*,
  68 Cal.2d 662 (1968)..................................................................5, 9, 10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................................21

*Berryman v. Merit Prop. Mgmt., Inc.*,
  152 Cal.App.4th 1544 (2007)................................................................7

*Blue Shield of Virginia v. McCready*,
  457 U.S. 465 (1982) ...........................................................24, 25, 28, 29

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017)..................................................29

*Brown v. California Pension Administrators, Inc.*,
  45 Cal.App.4th 333 (1996)....................................................................8

*Caltex Plastics, Inc. v. Lockheed Martin Corp.*,
  824 F.3d 1156 (9th Cir. 2016)..............................................................7

*Candelore v. Tinder, Inc.*,
  19 Cal.App.5th 1138 (2018).........................................................15, 16

ii

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986) ........................................................... 17, 23, 29

*Chamber of Commerce v. City of Seattle*,
    274 F. Supp. 3d 1140 (W.D. Wash. 2017) ...................................... 27

*Congress of Cal. Seniors v. Catholic Healthcare*,
    87 Cal.App.4th 491 (2001) .......................................................... 14

*Constr. Indus. Ass'n of Sonoma Cty. v. City of Petaluma*,
    522 F.2d 897 (9th Cir. 1975) ......................................................... 6

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) .......................................................... 2

*Daro v. Superior Court*,
    151 Cal.App.4th 1079 (2007) ........................................................ 6

*Dep't of Transp. v. Naegele Outdoor Advert. Co.*,
    38 Cal.3d 509 (1985) ................................................................... 14

*Diaz v. Gates*,
    420 F.3d 897 (9th Cir. 2005) (en banc) .......................................... 16

*Dunkel v. eBay Inc.*,
    2013 WL 415584 (N.D. Cal. Jan. 31 2013) ...................................... 7

*Eagle v. Star-Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987) .................................................... 27, 28

*Earhart v. William Low Co.*,
    25 Cal.3d 503 (1979) ............................................................. 10, 11

*In re Elec. Books Antitrust Litig.*,
    859 F. Supp.2d 671 (S.D.N.Y. 2012) ............................................. 22

*Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
    612 F.Supp.2d 330 (S.D.N.Y. 2009) .............................................. 28

*Galindo v. Ocwen Loan Serv., LLC*,
    282 F.Supp.3d 1193 (N.D. Cal. 2017) .............................................. 7

*Gregory v. Albertson's Inc.*,
    104 Cal.App.4th 845 (2002) .......................................................... 6

*Estate of Gump*,
    1 Cal.App.4th 582 (1991) .......................................................... 9, 10

*H.A. Artists & Assoc. v. Actors' Equity Ass'n*,
    451 U.S. 704 (1981) ................................................................ 12, 13

iii

*Holmes v. Sec. Inv'r Prot. Corp.*,
   503 U.S. 258 (1992) ................................................................................ 18

*Hosp. Council of W. Pa. v. City of Pittsburgh*,
   949 F.2d 83 (3d Cir. 1991) ...................................................................... 4

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ............................................................................ 3, 5

*Indep. Sports & Entm't, LLC v. Fegan*,
   2017 WL 2598550 (C.D. Cal. May 30, 2017)................................. 13, 19

*Int'l Assoc. of Machinists Local 873 v. Allen*,
   904 F.3d 490 (7th Cir. 2018).................................................................. 14

*Int'l Union of Operating Eng'rs Local 399 v. Vill. of Lincolnshire*,
   905 F.3d 995 (7th Cir. 2018).................................................................. 14

*JTC Petrol. Co. v. Piasa Motor Fuels, Inc.*,
   190 F.3d 775 (7th Cir. 1999).................................................................. 22

*Keel v. Schwarzenegger*,
   2009 WL 1444644 (C.D. Cal. 2009)...................................................... 17

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008)............................................................... 21

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000).................................................................. 29

*Knutson v. Foster*,
   25 Cal.App.5th 1075, 1094-95 (2018), *review denied* (Nov. 20,
   2018)................................................................................................ 8, 10

*Korholz v. United States*,
   269 F.2d 897 (10th Cir. 1959)............................................................... 12

*In re Lazar*,
   237 F.3d 967 (9th Cir. 2001).................................................................. 30

*Lenhoff Enters. v. United Talent Agency, Inc.*,
   729 F.App'x. 528 (9th Cir. 2018)........................................................... 23

*Lenhoff Enters. v. United Talent Agency, Inc.*,
   2015 WL 7008185 (C.D. Cal. Sept. 18, 2015)...................................... 23

*Lorenzo v. Qualcomm*,
   603 F.Supp.2d 1291 (S.D. Cal. 2009) ................................................... 23

*Lozano v. AT&T Wireless Servs.*,
   504 F.3d 718 (9th Cir. 2007).................................................................. 16

*Marquez v. Screen Actors Guild*,
   525 U.S. 33 (1998) ........................................................................ 18

*In re Marriage of Benson*,
   36 Cal.4th 1096 (2005).................................................................. 10

*Mendoza v. Zirkle Fruit Co.*,
   301 F.3d 1163 (9th Cir. 2002)....................................................... 18

*Michel v. Moore & Assocs., Inc.*,
   156 Cal.App.4th 756 (2007).................................................... 4, 8, 9

*Miller v. Lakeside Vill. Condo. Assn.*,
   1 Cal.App.4th 1611 (1991)............................................................ 5, 8

*Mkt. Lofts Cmty. Assn. v. 9th St. Mkt. Lofts, LLC*,
   222 Cal.App.4th 924 (2014).............................................................. 4

*N.J. Prot. & Advocacy, Inc. v. N.J. Dep't of Educ.*,
   563 F.Supp.2d 474 (D.N.J. 2008)...................................................... 4

*NLRB v. United Bhd. of Carpenters*,
   531 F.2 424 (9th Cir. 1976)............................................................ 17

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996)..................................................... 28

*Nat'l Mar. Union of Am. v. Commander, Military Sealift Command*,
   824 F.2d 1228 (D.C. Cir. 1987) ........................................................ 3

*Olagues v. Russoniello*,
   770 F.2d 791 (9th Cir. 1985).......................................................... 2, 5

*Oncale v. Sundowner Offshore Servs.*,
   523 U.S. 75 (1998) ........................................................................ 12

*Or. Teamsters Emps. Trust v. Hillsboro Garbage Disposal, Inc.*,
   800 F.3d 1151 (9th Cir. 2015)....................................................... 17

*Pa. Psych. Soc. v. Green Spring Health Servs.*,
   280 F.3d 278 (3d Cir. 2002) ............................................................ 4

*Painters & Allied Trades Dist. Council 82 Health Care Fund v.
   Takeda Pharm. Co.*,
   2019 WL 6484263 (9th Cir. 2019)................................................. 17

*Pharm. Care Mgmt. Ass'n v. Rowe*,
   429 F.3d 294 (1st Cir. 2005) ............................................................ 4

*Rebel Oil Co. v. Atlantic Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995).......................................................... 26

*Rest. Law Ctr. v. City of N.Y.*,
    360 F.Supp.3d 192 (S.D.N.Y. 2019) ................................................................. 13

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ....................................................................... 19, 20

*Roberts v. Lomanto*,
    112 Cal.App.4th 1553 (2003) ............................................................................ 9

*Robinson v. U-Haul Co.*,
    4 Cal.App.5th 304 (2016) ................................................................................. 6

*Rodriguez v. City of San Jose*,
    930 F.3d 1123 (9th Cir. 2019) ......................................................................... 6

*Rodriguez v. Holder*,
    619 F.3d 1077 (9th Cir. 2010) ....................................................................... 12

*Rose v. Bank of Am.*,
    57 Cal.4th 390 (2013) ..................................................................................... 14

*Schreiber Dist. Co. v. Serv-Well Furniture Co.*,
    806 F.2d 1393 (9th Cir. 1986) ....................................................................... 19

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ......................................................................... 21

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) ....................................................................................... 20

*Spokeo, Inc. v. Robins*,
    136 S.Ct. 1540 (2016) ....................................................................................... 5

*St. Paul Fire & Marine Ins. v. Barry*,
    436 U.S. 531 (1978) ....................................................................................... 27

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ...................................................................... 6, 7

*In re Toyota Motor Corp. UA Mktg. Litig.*,
    785 F.Supp.2d 883 (C.D. Cal. 2011) ............................................................. 19

*United States v. Borland*,
    311 F.Supp. 622 (D. Del. 1970) ..................................................................... 14

*United States v. Gruttadauro*,
    1986 WL 167 (N.D. Ill. Mar. 11, 1986) ........................................................ 14

*United States v. Lanni*,
    466 F.2d 1102 (3d. Cir. 1972) ....................................................................... 13

vi

*United States v. Mabry*,
   518 F.3d 442 (6th Cir. 2008) ............................................................... 14

*United States v. Ryan*,
   350 U.S. 299 (1956) ............................................................... 12, 13

*Vess v. Ciba-Geigy Corp.*,
   317 F.3d 1097 (9th Cir. 2003) ............................................................... 8

*In re Warfarin Sodium Antitrust Litig.*,
   214 F.3d 395 (3d Cir. 2000) ............................................................... 29

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................... 2, 3, 5

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
   865 F.Supp.2d 1002 (C.D. Cal. 2011) ............................................................... 16

*Werschkull v. United Cal. Bank*,
   85 Cal.App.3d 981 (1978) ............................................................... 5

*Wyatt v. Union Mortg.*,
   24 Cal.3d 773 (1979) ............................................................... 3

**Statutes**

29 U.S.C. §152(4) ............................................................... 13

29 U.S.C. §186(a) ............................................................... 11, 12, 18

29 U.S.C. §186(b) ............................................................... 11

29 U.S.C. §186(c)(3) ............................................................... 13

Cal. Bus. & Prof. Code §16750(a) ............................................................... 29

Cal. Bus. & Prof. Code §17204 ............................................................... 6

Cal. Civ. Code §1573 ............................................................... 3, 4

**Rules & Regulations**

9th Cir. Rule 36-3(a) ............................................................... 23

**Other Authorities**

Philip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN
   ANALYSIS OF ANTITRUST PRINCIPLES & THEIR APPLICATION (4th ed.
   2018) ............................................................... 26

Restatement (Third) Agency § 8.03. ............................................................... 5, 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTRODUCTION

This case challenges Hollywood talent agencies' unlawful pursuit of profits above their clients' interests in violation of their fiduciary duties and numerous other state and federal laws.  The Consolidated Counterclaims, Dkt. #44 ("A&C"), allege that William Morris Endeavor Entertainment ("WME"), Creative Artists Agency ("CAA"), and United Talent Agency ("UTA") (collectively, "the Agencies") are paid compensation for representing writers by the studios that employ those writers through collusively determined and imposed "packaging fees" instead of a commission on writer compensation.  This packaging fee model creates a direct conflict between the Agencies' financial interests and those of the writers they represent.  Yet the Agencies fail to disclose to their writer-clients either the existence of these conflicts of interest or the material terms of their packaging fee agreements.  Further, the Agencies have colluded to maintain the profitability of their packaging fees through a series of price-fixing agreements and group boycotts.  This conduct has significantly depressed writers' compensation and employment opportunities, while greatly enriching the Agencies.[1]

Counterclaimants' allegations state claims for breach of fiduciary duty, constructive fraud, unfair competition, racketeering, and unlawful price-fixing and boycott activity prohibited by federal and state antitrust laws.  The Agencies' motion to dismiss, which largely ignores the detailed facts pleaded in support of these causes of action, should be denied.

# LEGAL STANDARD

In deciding a motion to dismiss, courts must accept as true all "well-pleaded factual allegations," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all

---

[1] The Agencies contend that their packaging practices provide certain benefits to writer-clients (e.g. increased access to job opportunities), but those benefits do not depend upon the Agencies' receipt of packaging *fees*—which is all that is at issue here.  Any such benefits remain available when agents earn conflict-free commissions for putting together a package of writers and other talent.

reasonable inferences in favor of the non-moving party, *see Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

## ARGUMENT

**I.  The Guilds have associational standing to seek declaratory and injunctive relief for breach of fiduciary duty (Claim Five) and constructive fraud (Claim Six) on behalf of their members.**

**A.  The Guilds seek equitable relief, not money damages, on behalf of their members.**

The Agencies' argument that the Guilds lack associational standing to assert claims for breach of fiduciary duty (Claim Five) and constructive fraud (Claim Six) on behalf of their members, Motion to Dismiss ("MTD"), Dkt. #54 at 21-22, is premised on a fundamental misapprehension of the Guilds' counterclaims.[2]  The Guilds are *not* seeking money "damages" on behalf of their members.  *Id.* at 21.  Rather, as outlined in the Prayer for Relief, the Guilds seek only *equitable* declaratory and injunctive relief on behalf of their members for the Agencies' breaches of fiduciary duty and constructive fraud.  A&C Prayer ¶¶7, 8, 12, 15, 16.  Claims for equitable relief can be pursued on an associational basis, because when an "association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."  *Warth v. Seldin*, 422 U.S. 490, 515 (1975).  Indeed, "such equitable relief is *particularly* suited for group representation."  *Olagues v. Russoniello*, 770 F.2d 791, 799 (9th Cir. 1985) (emphasis added).

**B.  The Guilds' claims do not require individual participation.**

There is no merit to the Agencies' alternative argument that the Guilds' *claims* for breach of fiduciary duty and constructive fraud require the participation of each of the Guilds' individual members in separate "mini-trials."  MTD at 22.

---

[2] With respect to Claims Five and Six, the Agencies challenge only the Guilds' standing; they do not contend that the claims are otherwise inadequately pleaded.

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Agencies contend that only the third prong is not satisfied here. But the Agencies would have to show that "the nature of the claim ... make[s] the individual participation of each injured party *indispensable* to proper resolution of the cause." *Warth*, 422 U.S. at 511 (emphasis added). Such cases are rare, and arise only "where quite particularized information [is] required" to resolve the claim. *Nat'l Mar. Union of Am. v. Commander, Military Sealift Command*, 824 F.2d 1228, 1232 n.7 (D.C. Cir. 1987).

Contrary to the Agencies' argument, the Guilds' equitable challenges to the Agencies' systemic violations of California agency law and California Civil Code §1573 are amenable to group treatment under *Hunt*. Counterclaimants allege that the Agencies routinely breach their duty of loyalty to their writer-clients by negotiating lucrative packaging fees for themselves that directly suppress their writer-clients' income, thereby enriching themselves at their clients' expense.[3]

---

[3] For example, Counterclaimants allege, that an "inherent conflict of interest between the interests of the Agency and the interests of the writer exists in *every* package agreement," because payment of a packaging fee "diverts financial resources away from [the] project—which otherwise could be used to pay writers more," A&C ¶307 (emphasis in original); "[a] direct conflict … exists in *every* package agreement where a writer-client receives or would otherwise be entitled to profit participation" because "the payment of packaging fees reduces the profit participation of an agency's own clients, including writer-clients," *id.*¶308 (emphasis in original); and, to protect their packaging fees, the Agencies deliberately negotiate less than the maximum available compensation for their clients, causing writers' wages to stagnate or decrease despite the expansion of the market and the Agencies' own record profits in the same period. *Id.* ¶¶284-85, 311, 313, 319, 321, 370-72, 502-03. These allegations state violations of the Agencies' duty of loyalty, pursuant to which an agent "not only … [has] the duty of acting in the highest good faith toward his principal but [also is] preclude[d] … from obtaining *any* advantage over the principal in any transaction had by virtue of

Counterclaimants further allege that the Agencies breach their fiduciary duties (and also commit constructive fraud) by deliberately concealing from their clients not only that their receipt of packaging fees gives rise to conflicts of interest, but the material terms of their packaging fee arrangements, which the Agencies, as fiduciaries, are required to disclose.[4]  And although establishing a principal's consent to a conflict of interest is the *agent's* burden, Counterclaimants allege that "[t]he Agencies have never obtained their writer-clients' valid, informed consent."  A&C ¶334.  In addition to this deprivation of loyal representation and of information they are entitled to know, Counterclaimants allege that the Agencies' pervasive conflicts of interest and routine concealment thereof cause their members substantial harm, including but not limited to lost income and job opportunities, the added expense of hiring others to provide services agents should be providing, and other losses.  *Id.* ¶¶11-12, 284-85, 299-336, 372, 506, 511, 513.

These are precisely the kinds of allegations of "systemic" violations that are suitable for group treatment, because they may be "established with sample testimony" and remedied with equitable relief that inures to the benefit of all Guild members who are harmed by these practices.  *Pa. Psych. Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 286 (3d Cir. 2002).[5]  Indeed, the California Courts of Appeal have expressly held that a "cause[] of action for breach of fiduciary duty" may be pursued on a representational basis.  *Mkt. Lofts Cmty. Ass'n. v. 9th St. Mkt.*

---

his agency."  *Wyatt v. Union Mortg.*, 24 Cal.3d 773, 782 (1979) (emphasis added) (quotation omitted).

[4] *See* A&C ¶¶11, 333-336, 504, 510; *see also, e.g.*, *Michel v. Moore & Assocs., Inc.*, 156 Cal.App.4th 756, 762 (2007) ("fiduciary *must* tell its principal of *all* information it possesses that is material to the principal's interests"; failure to disclose is also constructive fraud (emphasis added) (citing Cal. Civ. Code §1573)).

[5] *See also, e.g.*, *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 307 (1st Cir. 2005); *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 89-90 (3d Cir. 1991); *N.J. Prot. & Advocacy, Inc. v. N.J. Dep't of Educ.*, 563 F.Supp.2d 474, 483-84 (D.N.J. 2008).

*Lofts, LLC*, 222 Cal.App.4th 924, 932 (2014).

    As in numerous other cases involving challenges to systemic violations brought on an associational basis, the Guilds' claims can be established through representative testimony, and "it can reasonably be supposed that the [prospective] remedy" sought by the Guilds "will inure to the benefit of *those members of the association actually injured*" by the challenged conduct.  *Hunt*, 432 U.S. at 343 (emphasis added).  Thus, there is no need to show that *all* of members *were* in fact so injured through individual mini-trials for each of 14,700 members (though the Guilds do allege that all members the Agencies represented were harmed).[6]

## II.     The Guilds have standing to bring a UCL claim on their own behalf.

    "An associational plaintiff has standing to seek redress of direct injury to the organization itself."  *Olagues*, 770 F.2d at 797; *see also Warth*, 422 U.S. at 511.  The Guilds allege injuries that are fairly traceable to the Agencies' conduct and likely to be redressed by the requested declaratory and injunctive relief.  *See, e.g.*, *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016); A&C Prayer ¶¶12, 15, 17; *cf.* MTD at 23-24.  The Guilds specifically allege that the Agencies' packaging fee

---

[6] The Agencies misrepresent the elements of the Guilds' claims in contending that mini-trials are required.  MTD at 22.  The Agencies violate their fiduciary obligations by failing to disclose the existence of their conflicts of interest or the material terms of their packaging fees agreements, regardless of whether their clients would "deny knowledge" of their receipt of packaging fees *generally*.  *See, e.g.*, *Batson v. Strehlow*, 68 Cal.2d 662, 675-76 (1968); Restatement (Third) Agency §8.03 cmt. b.  Likewise, the Guilds need not prove that each writer-client suffered "net [economic] injury."  MTD at 22.  It is well established that "[t]he *extent* of damage is not an element of a cause of action in tort"; instead, "the general rule" is that, to plead the element of "damage" in a tort simply requires alleging some "actual and appreciable harm."  *Miller v. Lakeside Vill. Condo. Assn.*, 1 Cal.App.4th 1611, 1623 (1991) (quotation omitted; emphasis added); *cf. Werschkull v. United Cal. Bank*, 85 Cal.App.3d 981, 1003 (1978).  It is thus irrelevant that the Agencies provide certain services that "may be beneficial to certain writers."  MTD at 22.   Any such services could be provided without packaging fees (A&C ¶60; *supra* n. 1), and any benefit to some writers does not negate allegations that the Agencies' conflicts cause concrete harm to members.  A&C ¶¶11-12, 299-336, 372, 506, 513.

practices have injured the Guilds by requiring them to expend significant resources to combat the resultant harms by, among other things, enforcing members' contractual rights when their agents refused to do so, negotiating new provisions with the AMPTP that would not have been necessary if the Agencies complied with their fiduciary duties, monitoring packaging and educating members, and creating new staffing systems.  A&C ¶¶337-41, 542, 558, 569, 579.  The Guilds also allege that "packaging fees have reduced the Guilds' revenue from member dues."  *Id.* ¶342.  These injuries are not "speculative" or "attenuated."  MTD at 23-24.

The Guilds' allegations thus establish Article III injury: "(1) frustration of [the Guilds'] organizational mission; and (2) diversion of [their] resources to combat the particular [injurious behavior] in question."  *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019) (quotation omitted).  Likewise, allegations that the Guilds have suffered "lost [dues] revenues" "easily satisfy the 'injury in fact' … requirement."  *Constr. Indus. Ass'n of Sonoma Cty. v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975).

The Guilds need not allege that "the Agencies owe *the Guilds* … fiduciary duties" under the UCL, MTD at 23 (emphasis in original), which grants standing to "*any* 'person who has suffered injury in fact and has lost money or property as a result of the unfair competition.'"  *Robinson v. U-Haul Co.*, 4 Cal.App.5th 304, 317 (2016) (emphasis added) (quoting Cal. Bus. & Prof. Code §17204).  The Guilds need only allege "a causal connection between the harm suffered [by the Guilds] and the [Agencies'] unlawful business activity."  *Daro v. Superior Court*, 151 Cal.App.4th 1079, 1099 (2007).  Indeed, the Agencies' own authority recognizes that "the sweeping standing provisions of California's UCL … do[] not require that a plaintiff prove that he or she was directly injured by the unfair practice.'"  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir.

2008) (quoting *Gregory v. Albertson's, Inc.*, 104 Cal.App.4th 845, 851 (2002)).[7]

The Agencies' other authorities are inapposite. *Amalgamated Transit Union, Local 1756 v. Superior Court*, 46 Cal.4th 993 (2009), held that a union could not bring a *representative* UCL action, *id.* at 1005, but as the Agencies admit, the Guilds sue under the UCL solely "on their own behalf," MTD at 23; *see also* A&C ¶¶241-42, 527. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1161 (9th Cir. 2016), cites *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal.App.4th 1544, 1553 (2007), for the rule that third-party beneficiaries cannot "bootstrap" a UCL claim to evade the rule forbidding third party beneficiaries from suing for breach of contract. The Agencies identify no such rule barring third parties harmed by breach of fiduciary duty or constructive fraud—which arise in tort, not contract—from suing under the UCL.[8]

## III. Counterclaimants adequately plead state law claims.

### A. Individual Counterclaimants adequately allege breach of fiduciary duty and constructive fraud.

Individual Counterclaimants allege that their Agencies owed them fiduciary duties. A&C ¶¶19, 271, 289, 500-01. They allege many ways that the Agencies breached those duties—by enriching themselves at Individual Counterclaimants' expense, placing their own interests above Individual Counterclaimants', and failing to disclose both that packaging fees create inherent conflicts of interest and the material facts concerning the packaging fees they earn at their clients' expense.

---

[7] *Sybersound* concluded that the relief requested there would place the court "in the awkward situation of enforcing private contracts among sophisticated parties who are not all parties to this lawsuit," which could interfere with those parties' business judgment. 517 F.3d at 1152-53. No such concerns arise from the Guilds' requested relief barring the Agencies' tortious receipt of unlawful packaging fees for representation of individual writer-clients. *See id.*

[8] *Dunkel v. eBay Inc.*, 2013 WL 415584 (N.D. Cal. Jan. 31 2013), and *Galindo v. Ocwen Loan Serv., LLC*, 282 F.Supp.3d 1193 (N.D. Cal. 2017), dismissed UCL claims premised on breach of fiduciary duty for failure to adequately plead the underlying breach, not because the claims were pursued by third parties.

*Id.* ¶¶299-21, 330-36.  And several Individual Counterclaimants specifically allege that they lost profits due to the Agencies' breaches of fiduciary duty.  *Id.* ¶308.  All allege that they "suffered significant damages, including but not limited to lost wages, lost employment opportunities, and other economic losses," and they explain how their Agency's packaging fees caused those specific harms to them. *Id.* ¶505; *see also id.* ¶¶299-321, 330-36.  These allegations plead the required elements: existence of a duty, breach of that duty, and resulting harm.

The Agencies' authorities do not require more "individualized" allegations. MTD at 24.  *Brown v. California Pension Administrators, Inc.*, 45 Cal.App.4th 333 (1996), held that a breach of fiduciary duty claim was not pleaded because the plaintiffs had not established a fiduciary relationship.  *Id.* at 347-48.  Here, the Agencies indisputably owe fiduciary duties to Individual Counterclaimants.  Nor is there any merit to the suggestion that breach of fiduciary duty requires weighing the supposed "benefits" of packaging fees against the harms caused by the Agencies' conflicts and concealment; Counterclaimants allege that they were harmed, which is all that is required.  *See, e.g.*, *Miller*, 1 Cal.App.4th at 1623. Individual Counterclaimants also sufficiently allege that the Agencies' fiduciary duty breaches and constructive fraud were a "substantial factor" in causing them harm, which, in a claim alleging a fiduciary's failure to avoid a conflict of interest, is satisfied by the conflict itself.  *Knutson v. Foster*, 25 Cal.App.5th 1075, 1094-95 (2018), *review denied* (Nov. 20, 2018).  The same is true of failure to disclose material information, which itself constitutes harm.  *Id.*; *cf.* MTD n.20.

Nor are the Agencies correct that Rule 9(b) applies to the constructive fraud claims.  Under California law, constructive fraud is "a term of art obviating actual fraudulent intent" and is established by an agent's failure to disclose material information *regardless* of whether the agent intended to deceive.  *Michel*, 156 Cal.App.4th at 762-63.  Rule 9(b) "does not require that allegations supporting a claim be stated with particularity when," as here, "fraud is not an essential element

of the claim." *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1104-05 (9th Cir. 2003).

In any event, even if Rule 9(b) did apply, Individual Counterclaimants plead their constructive fraud claims with particularity. Individual Counterclaimants specifically plead that their former agents disclosed neither that they were operating under conflicts of interest nor the material details of their packaging fee agreements. A&C ¶336; *see also id.* ¶510. Individual Counterclaimants also specifically plead that they relied to their detriment on their agents' misrepresentations in continuing to accept their undisclosed conflicted representation. *Id.* ¶¶335, 511. In any event, California law "presume[s] reasonable reliance upon the misrepresentation or nondisclosure." *Estate of Gump*, 1 Cal.App.4th 582, 601 (1991).

## B.     The AMBA does not preclude the state law claims.

The now-expired Guild franchise agreement ("AMBA") did not obviate the Agencies' disclosure obligations. MTD at 25. It expressly stated that "nothing in [it] shall be deemed to affect or prejudice the respective positions of" the parties regarding packaging fees. AMBA §6(c), Dkt. #42-3 at 8. These provisions were a "voluntary accommodation" in light of each party's "practical needs" in 1976. *Id.* Further, nothing in the AMBA disclosed *the details of each packaging fee arrangement*, as would be required to satisfy the Agencies' fiduciary obligation to disclose, much less establish the principal's consent. Under state law, an agent "violate[s] his fiduciary duties" and commits constructive fraud "by failing to fully disclose all of the material facts of the transaction" in which the agent stands personally to gain at the principal's expense. *Batson*, 68 Cal.2d at 676; *Michel*, 156 Cal.App.4th at 762. An agent cannot benefit at a principal's expense "unless the agent *fully* discloses the nature *and amount* of the benefit"—which bear on the overall desirability of the transaction—*and* "receives the approval of the principal." *Roberts v. Lomanto*, 112 Cal.App.4th 1553, 1563 (2003) (emphasis in original).

### C.     Stiehm and Hall sufficiently plead their state law claims.

The Agencies' alternative suggestion that Barbara Hall and Meredith Stiehm, as writer "showrunner[s]," must "profess ignorance" about their Agencies' package deals is a red herring.  MTD at 26-27.  "A principal's knowledge that an agent deals as or on behalf of an adverse party does not relieve the agent of duties to the principal in connection with that transaction," including the duties of loyalty and disclosure.  Restatement (Third) Agency §8.03 cmt. b; *Batson*, 68 Cal.2d at 676 (same).  Hall and Stiehm allege that their agents never informed them that they were operating under conflicts of interest nor disclosed the material terms of their packaging fee agreements.  A&C ¶¶333, 335-36.  That Hall or Stiehm may have learned that their Agencies were receiving packaging fees does not cure the Agencies' flagrant violation of their duty to inform Hall and Stiehm of all facts material to their conflicts and not to enrich themselves at their clients' expense.

The same is true of their claims for constructive fraud.  They need only allege that their agents concealed material information from them, which they have done.  *Id.* ¶¶334, 336, 510; *see Estate of Gump*, 1 Cal.App.4th at 601.[9]

Nor does the statute of frauds bar Hall's alternative contract or promissory estoppel claims for UTA's failure to refund its commissions (enriching itself at Hall's expense not only by accepting packaging fees that depressed her income but also taking money from her pay).  A&C ¶¶594-603; MTD at 27.  It is axiomatic that "'part performance'" by one party takes an oral contract out of the statute of frauds.  *Earhart v. William Low Co.*, 25 Cal.3d 503, 514 (1979).  "Such conduct

---

[9] Stiehm further alleges that each of her Agencies, CAA and WME, breached their fiduciary duties to her and caused her substantial harm, including by negotiating substandard profit definitions for her on the shows from which she was or would have been entitled to profit.  *Compare* MTD at 26 *with* A&C ¶308.  Those allegations, which must be taken as true, state a claim against both CAA and WME for breach of the duty of loyalty.  *See, e.g.*, *Knutson*, 25 Cal.App.5th at 1094-95 (agent's "fail[ure] to employ all negotiation strategies beneficial to" principal was breach of fiduciary duty of loyalty).

satisfies the evidentiary function of the statute of frauds by confirming that a
bargain was in fact reached." *In re Marriage of Benson*, 36 Cal.4th 1096, 1109
(2005). Hall alleges that she fully performed her end of the bargain, and that UTA
partly performed by making partial refunds until December 2017. A&C ¶¶596-97.
Further, "reliance by one party on an oral contract may 'estop' the other from
setting up a defense based upon the statute of frauds." *Earhart*, 25 Cal.3d at 514.
Promissory estoppel doctrine similarly "bind[s] a promisor when he should
reasonably expect a substantial change of position, either by act or forbearance, in
reliance on his promise." *Id.* at 515 (quotation omitted). Hall plausibly alleges
that she detrimentally relied on UTA's promise by not seeking representation by an
agency that would not collect a double commission. A&C ¶601. And Hall's
allegation that UTA ceased refunding commissions in December 2017, *id.* ¶¶334,
597, pleads injury within the two-year limitations period. *Cf.* MTD at 27 n.23.

### D. Counterclaimants state a claim under the UCL.

#### 1. Counterclaimants adequately allege unlawfulness.

Counterclaimants' allegations of breach of fiduciary duty and constructive
fraud also establish the Agencies' unlawful conduct for UCL purposes. *See supra*
at 3-5, 7-9. In addition, Counterclaimants allege violations of the Labor
Management Relations Act ("LMRA"). LMRA Section 302(a)(1) prohibits
employer payments of "any money or other things of value [] to any representative
or any of his employees who are employed in an industry affecting commerce[.]"
29 U.S.C. §186(a)(1). Section 302(b) reciprocally makes it unlawful "to request,
demand, receive, or accept" any such payment. 29 U.S.C. §186(b). The Agencies'
receipt of packaging fees violates this prohibition: The Agencies represent
employees of the studios and production companies, and packaging fees are
"money" paid to them by those employers.

The Agencies' argument that LMRA Section 302 does not apply to agents
because it prohibits payment only to individuals and entities that represent

employees *collectively*—labor unions and their officers and employees—is contrary to the statute's plain language, legislative history, and longstanding precedent.  Section 302 applies to a representative of "*any* of [an employer's] employees," not merely those who represent multiple employees collectively.  As the Tenth Circuit explained long ago, the "representative[s]" covered by Section 302 include "any person who is empowered or authorized in any way to represent *an employee or employees* in dealing with the employer in matters relating to wages, hours, or working conditions[.]"  *Korholz v. United States*, 269 F.2d 897, 902 (10th Cir. 1959) (emphasis added).  Indeed, when Congress enacted Section 302, it *rejected* language limiting its reach to those representing two or more employees.  *See United States v. Ryan*, 350 U.S. 299, 306 & n.6 (1956).[10]

The Agencies urge this Court to ignore Section 302's plain language because its primary purpose was to protect the collective bargaining process and prevent unions from extorting employers.  But Congress did not limit Section 302(a)(1) to those circumstances.  Rather, it prohibited all employer payments "to *any* [employee] representative" (emphasis added).[11]  "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."  *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998); *see also Barthelemy v. ALPA*, 897 F.2d 999, 1010 (9th Cir. 1990) (applying language of comparable provision of Railway Labor Act even though conduct did not implicate union corruption concerns underlying provision).[12]

---

[10] In any event, the Agencies fall within Section 302 even under their own incorrect construction of the statute: They represent thousands of writers, and often represent multiple writers (and other talent) employed by the same studio on the same show.  As such, they negotiate on behalf of all of their clients on such shows collectively—especially where a show is packaged by that Agency.

[11] Two other *separate* provisions of Section 302 specifically address payments by employers to unions and their officers or employees.  29 U.S.C. §186(a)(2), (4).

[12] The rule of lenity does not apply when statutory language is unambiguous.

12

Moreover, the Agencies are wrong in contending that their conduct as employee representatives is unrelated to collective bargaining or the concerns that animated Congress' enactment of Section 302. The Agencies "perform a function—the representation of union members in the sale of their labor—that in most nonentertainment industries is performed exclusively by unions." *H.A. Artists & Assocs. v. Actors' Equity Ass'n*, 451 U.S. 704, 721 (1981). Because the Agencies "stand[] directly between union members and jobs," they are "in a powerful position to evade the union's negotiated wage structure." *Id.* at 720; *see also Indep. Sports & Entm't, LLC v. Fegan*, 2017 WL 2598550, at *5 (C.D. Cal. May 30, 2017). Applying Section 302(a)(1) to the payments agents receive from employers—i.e., applying the same rule to agents exercising Guild-delegated authority that would apply if the Guilds exercised that authority directly—is thus entirely consistent with the statute's purpose to ensure conflict-free representation.

The Agencies argue they are not subject to Section 302 because the NLRA defines "representatives" as "any individual or labor organization," 29 U.S.C. §152(4), and they are neither. MTD at 18. But the Supreme Court has *rejected* the argument that LMRA Section 302's use of the term "representative" is limited by the NLRA's definition of "representatives." *Ryan*, 350 U.S. at 307. And even if the NLRA's definition *did* apply, the *agents* who make up the Agencies are "individuals." Employer payments to employee representatives cannot be made lawful under Section 302 by funneling them through corporate "middlem[e]n." *See Rest. Law Ctr. v. City of N.Y.*, 360 F.Supp.3d 192, 229 (S.D.N.Y. 2019) (quoting *United States v. Lanni*, 466 F.2d 1102, 1108 (3d. Cir. 1972)).[13]

---

*See, e.g.*, *Rodriguez v. Holder*, 619 F.3d 1077, 1080 n.3 (9th Cir. 2010).

[13] Counterclaimants need not plead that the Agencies' receipt of packaging fees falls outside the statute's safe harbor for "the sale or purchase of an article or commodity at the prevailing market price in the regular course of business," 29 U.S.C. §186(c)(3). MTD at 18 n.16. Section 302's "exceptions are distinct from and in no sense form an integral part of the offenses enumerated in [Section 302(a) and (b)]," so that the Agencies bear the burden of establishing that the safe harbor

13

### 2.   Counterclaimants' UCL claim is not preempted.

While a UCL claim based on a violation of federal law may be preempted where Congress *precluded* private enforcement, it is not preempted merely because Congress failed to provide a cause of action.  *See, e.g.*, *Rose v. Bank of Am.*, 57 Cal.4th 390, 398 (2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct.  To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.") (quotations omitted); *cf.* MTD at 28.  Here, there is no evidence of Congressional intent to "bar" private enforcement of Section 302; to the contrary, RICO expressly *permits* private parties to enforce that prohibition, showing Congress's intent to *permit* such enforcement.  There is no reason to believe Congress intended to bar similar state law causes of action.

The Section 302 cases the Agencies cite (MTD at 28:13-23) establish no such intent.  Neither addresses private enforcement of Section 302 or the Section 302 provision that bars employer payments to employee representatives.  They address state and local legislation that conflicted with an exemption to Section 302 liability for employer transfers of union dues deducted from employee wages.  *See Int'l Union of Operating Eng'rs Local 399 v. Vill. of Lincolnshire*, 905 F.3d 995, 1002 (7th Cir. 2018); *Int'l Ass'n of Machinists Local 873 v. Allen*, 904 F.3d 490, 505 (7th Cir. 2018).  Section 302 allows such agreements to be irrevocable for up to one year, while the laws held preempted imposed a *different* standard that conflicted with "careful balancing of interests" Congress struck in adopting this

---

applies to the employer payments at issue.  *United States v. Borland*, 311 F.Supp. 622, 624 (D. Del. 1970); *see also United States v. Gruttadauro*, 1986 WL 167, at *1 (N.D. Ill. Mar. 11, 1986) (collecting cases); *United States v. Mabry*, 518 F.3d 442, 446 (6th Cir. 2008) (Section 302(c) "provides nine exceptions which serve as affirmative defenses to liability").  Moreover, even assuming that *services* could be deemed an "article" or commodity, agents do not "sell" writing services.  Regardless of how they are compensated, agents represent *clients* in the sale of *their* talent services to studios.

exemption.  *Lincolnshire*, 905 F.3d at 1002; *Allen*, 904 F.3d at 492-93 (state statute "shorten[ed] this maximum period to thirty days").[14]

### 3.  Counterclaimants adequately allege that the Agencies' conduct is unfair.

Counterclaimants' UCL unfairness theory does not "overlap[] entirely" with their unlawful theory.  MTD at 29.  The Consolidated Counterclaims enumerate additional ways that the Agencies' conduct harms competition, and harms both their writer-clients and the Guilds.  *See generally* A&C ¶¶11-12, 299-344, 520, 527.

The California Courts of Appeal have explained that the so-called balancing and public policy tests' standards are "intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud.… [T]he court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim … [A]n 'unfair' business practice occurs when that practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Candelore v. Tinder, Inc.*, 19 Cal.App.5th 1138, 1155-56 (2018) (quotation omitted).

Counterclaimants' allegations more than satisfy this "intentionally broad" standard and establish that the Agencies' conduct "offends [multiple] established public polic[ies]," including federal and state antitrust laws, which are not alleged as unlawfulness predicates.  *Id.*  Counterclaimants also allege, among other things, that the Agencies blacklist or threaten to blacklist anyone that challenges their

---

[14] The other UCL cases the Agencies cite (MTD at 28 n. 24) address different federal laws that demonstrated Congress's intent to foreclose enforcement other than as specifically provided under federal law.  *See Dep't of Transp. v. Naegele Outdoor Advert. Co.*, 38 Cal.3d 509, 522 (1985) (Congress "reserved to federal authorities the responsibility for enforcing the act's provisions"); *Cong. of Cal. Seniors v. Catholic Healthcare*, 87 Cal.App.4th 491, 509-10 (2001) (plaintiff's UCL theory required court to determine whether particular Medicare cost is reasonable, a determination Congress assigned to a federal agency's complex administrative review scheme).

packaging fee practices.  A&C ¶¶18, 359-61, 377, 386.  This conduct is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," i.e. to writers who pay for agents' services.  *Candelore*, 19 Cal.App.5th at 1156 (quotations omitted).  To the extent the Agencies' misconduct could "benefit" anyone, Counterclaimants plausibly allege under the balancing test that that any such hypothetical benefit is substantially outweighed by the extraordinary harms the Agencies' conduct causes to their own clients.  *See id.* ¶¶301-36, 520, 527.

There is no merit to the Agencies' assertion that the "FTC test" should apply here.  The Ninth Circuit has expressly "decline[d] to apply the FTC standard in the absence of a clear holding from the California Supreme Court" that such standards should apply to UCL claims by consumers, as opposed to by direct competitors. *Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 736 (9th Cir. 2007).  In any event, Counterclaimants easily satisfy that test.  Counterclaimants allege that the harm the Agencies' packaging fee practices cause to them as "consumers of [the Agencies'] representational services" is substantial, A&C ¶¶520, 301-36; that the benefit, if any, of this conduct is substantially outweighed by their injury, *id*. ¶520; and that they could not reasonably have avoided the injury, given the Agencies' threats of blacklisting, *id*. ¶¶18, 359-61, 377, 386.

**IV.   Counterclaimants state a claim under RICO.**

**A.   Counterclaimants adequately allege RICO standing.**

Individual Counterclaimants allege that the Agencies' receipt of packaging fees has caused them lost employment opportunities, A&C ¶¶542, 558, 569, 579; caused "writing wages" to "stagnate or decrease," *id*. ¶¶321, 542; and forced writers "to retain and pay other professionals" to negotiate on their behalf, *id*. ¶¶330, 542.  This demonstrates injury to Individual Counterclaimants' "business or property" for RICO standing purposes.  *See Diaz v. Gates*, 420 F.3d 897, 898, 900 (9th Cir. 2005) (en banc) (allegation of plaintiff's "lost employment, employment opportunities, and the wages and other compensation associated with said business,

16

employment and opportunities" sufficed to plead "injury to business or property").

Likewise, the Guilds "have been required to divert their resources to create new staffing systems, negotiate new protections for their members … , monitor the Agencies' packaging fees, educate members about the Agencies' packaging fee abuses," and enforce members' rights.  A&C ¶¶542, 558, 569, 579; *see also id.* ¶¶337-41.  These injuries establish the Guilds' RICO standing.  *See In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F.Supp.2d 1002, 1023 n.6 (C.D. Cal. 2011) (association's allegation of "direct injury to their business in the form of increased counseling expenses" to protect members from insurer's practices established RICO standing).

The Agencies' authority is not to the contrary.  MTD at 16 n.13.  In *Keel v. Schwarzenegger*, 2009 WL 1444644 (C.D. Cal. 2009), a pro se prisoner argued that denial of a resentencing hearing resulted in lost employment opportunities, which the court dismissed as "speculative."  *Id.* at *6.  Here, Individual Counterclaimants offer detailed allegations regarding concrete injuries to their employment prospects and compensation.  A&C ¶¶300-05, 307-13, 315-21, 330-36.

The Agencies argue that Counterclaimants do not allege the required RICO "proximate causation."  MTD at 15-16.  But proximate cause is relevant only to RICO claims for retrospective damages, not to claims for equitable relief.  *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986) (in analogous antitrust context, certain proximate cause factors are not relevant to injunctive relief claim, because "raises no threat of multiple lawsuits or duplicative recoveries").  Further, because Counterclaimants are *direct* victims of the Agencies' unlawful conduct, proximate cause is present.  *See Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris, Inc.*, 241 F.3d 696, 701 (9th Cir. 2001) (setting forth three factors).

Guild members, including Individual Counterclaimants, "are the most direct

17

victims" of the Agencies' RICO violations.  *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co.*, 2019 WL 6484263, at *6 (9th Cir. 2019).  The Agencies' acceptance of payments prohibited by LMRA Section 302 (the predicate act on which Counterclaimants' RICO claims are premised) deprives them of unconflicted representation.  Among Section 302's purposes is "forestalling … bribery of employee representatives by employers."  *NLRB v. United Bhd. of Carpenters*, 531 F.2d 424, 427 (9th Cir. 1976); *see also Or. Teamsters Emps. Trust v. Hillsboro Garbage Disposal, Inc.*, 800 F.3d 1151, 1157 (9th Cir. 2015) ("dominant purpose" of §302 "is to prevent employers from tampering with the loyalty of" employee representatives) (quotations omitted).  And while the Agencies suggest that the studios that pay packaging fees are the only direct victims of the Agencies' RICO violations, those studios are in fact *co-perpetrators* with respect to the Section 302 violations.  *See* 29 U.S.C. §186(a)(1) (making it unlawful for "any employer … to pay … any money or other thing of value … to any representative of any of his employees"); *see also Arroyo v. United States*, 359 U.S. 419, 423 (1959) (noting "reciprocal" nature of §302(a) and §302(b)).[15]

    Individual Counterclaimants also satisfy the other proximate cause factors. For the second, they need only allege that the Agencies *caused* their injury.  *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002) (distinguishing "between uncertainty" regarding "fact of" and "amount of damage").  The allegations that "receipt of packaging fees … has allowed [Agencies] to dominate the marketplace for talent [agent's] services, thereby harming the Guilds' members

---

[15] The Agencies' cases are distinguishable.  MTD at 16 n.12.  The most direct victim in *Anza v. Ideal Steel Supply Corp.*, was New York State (which was defrauded out of tax revenue), not the plaintiff competitor that was undersold because of the defendant's tax savings.  547 U.S. 451, 458 (2006).  Similarly, in *Holmes v. Sec. Inv'r Prot. Corp.*, the direct victims were broker-dealers who went bankrupt as a result of the defendants' actions, not the plaintiff association that had to step in to cover the broker-dealers' liabilities.  503 U.S. 258, 262-63 (1992).

… by denying them conflict-free representation [and] lowering their income"
suffices.  A&C ¶¶542, 558, 569, 579; *Mendoza*, 301 F.3d at 1171 (allegation of
"market power" sufficient, as it rules out "factors other than the scheme" as basis
for damage).  The third factor is also satisfied because Guild members are direct
victims of the Section 302 violations.  *Mendoza*, 301 F.3d at 1171-72.[16]

The Guilds are also direct victims of the Section 302 violations.  The Guilds
are the exclusive representative of Guild members and have a duty of fair
representation to them.  *See Marquez v. Screen Actors Guild*, 525 U.S. 33, 44
(1998).  As is typical in sports and entertainment industries, the Guilds delegate
part of that authority to authorized agents.  *See, e.g.*, *Indep. Sports & Entm't*, 2017
WL 2598550, at *5.  The duty of fair representation requires that the Guilds ensure
that such agents are fairly representing Guild members, and the Guilds' ability to
fulfill that obligation is directly impaired by Agencies' receipt of packaging fees.

**B. The Agencies' other challenges to the RICO claims fail.**

Contrary to the Agencies' allegations, MTD at 19-20, Counterclaimants *do*
allege separate and distinct injuries resulting from the Agencies' investment of
packaging fees in (§1962(a)), and use of such fees to "maintain … any interest in
or control of" (§1962(b)), an enterprise.[17]  Counterclaimants allege that the
Agencies' conduct has allowed them "to dominate the marketplace for [agents']
services, thereby harming the Guilds' members, including by … requiring them to
pay artificially inflated prices for talent representational services, and reducing the
quality of talent representational services available to them."  A&C ¶¶542, 558.[18]

---

[16] Any damages for other plaintiffs would compensate them for different
injuries, so there is no risk of double recovery.  *Mendoza*, 301 F.3d at 1171.

[17] The Agencies identify no similar requirement for the Section 1962(c) claim.

[18] The "person" engaged in racketeering can also be the RICO "enterprise."
*Schreiber Dist. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1397-98 (9th Cir.
1986) ("where a corporation engages in racketeering activities and is the direct or
indirect beneficiary of the pattern of racketeering activity, it can be both the
'person' and the 'enterprise' under" both §§1962(a) and (b)).

These market-domination injuries are distinct from packaging-fees injuries.[19]

Finally, the Agencies are wrong that Counterclaimants' §1962(c) claim must explain how packaging fees "function[]" as "'participat[ion]'" in the RICO enterprise. MTD at 20 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 186 (1993)). *Reves* imposes no such requirement. It holds only that a RICO defendant must "*participate* in the operation or management of the enterprise itself," not that there is any need to explain how the defendant's predicate act "functions" as participation in that enterprise. 507 U.S. at 185 (emphasis added).[20]

Because Counterclaimants adequately allege §1962(a)-(c) claims, the Agencies' challenge to their §1962(d) claim also fails. *See* MTD at 20 & n.17.

## V.     Counterclaimants plead plausible antitrust claims.

Counterclaimants' antitrust claims arise out of the sale of Guild members' writing services, through their talent agents, to Hollywood studios. A&C ¶¶264, 273-74. In exchange for providing writing services, writers are paid a wage and their agents earn either a commission or a packaging fee for procuring their writer-clients' employment.[21] A&C ¶274. Counterclaimants allege that the Agencies'

---

[19] The Agencies are wrong that Counterclaimants fail to allege that the predicate acts "'led to'" Agencies' "'maintenance of an interest in or control of the RICO enterprise.'" MTD at 20 (quoting *In re Toyota Motor Corp. UA Mktg. Litig.*, 785 F.Supp.2d 883, 921 (C.D. Cal. 2011)). *See* A&C ¶551 (re-investment of packaging fees is "directly linked to … maintenance of an interest in and control over each Agency's business," as fees are "a major part of each Agency's business").

[20] *Sedima, S.P.R.L. v. Imrex Co.* is the same, and in fact explains that §1962(c) imposes no requirement "to allege … an injury separate from the financial loss stemming from" the predicate acts. 473 U.S. 479, 522 (1985). In any case, Counterclaimants allege that receipt of packaging fees "is among the primary purposes of the association in fact between the Agencies and the studios" and "funds the Agencies' investments in their affiliate production companies" (an alternative enterprise alleged in the Counterclaims). A&C ¶566.

[21] Packaged deals are not inherently different from commissioned deals in that receipt of a packaging fee does not obligate an agency to perform additional or different services. *See* First Consolidated Complaint ("FCC"), Dkt. 42 ¶40 (identifying ancillary services Agencies "may also provide"); A&C ¶¶286-87. Just as packaging fees may be earned on projects where an agency represents only a single client (A&C ¶288; FCC ¶31), commissions may be earned on projects where

20

coordination on packaging fees, including their collective refusal to deal with the Guilds, has and will continue to economically harm the Guilds and their members.

### A. Counterclaimants plausibly allege that the Agencies have violated the antitrust laws.

Counterclaimants plausibly allege that the Agencies have violated the antitrust laws by pleading direct evidence sufficient to satisfy the Ninth Circuit's requirement to allege the who, what, when, and why of an antitrust violation. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).[22]

**Who:** Participants in the initial meetings where the alleged price-fixing agreement was formed included Lee Gabler, then-managing partner of CAA, Ari Emanuel, founding partner of Endeavor (now WME), and others. A&C ¶350. Details and the ongoing nature of this pact, which the Agencies had kept secret, were recently confirmed by former UTA partner Gavin Polone. *Id.* ¶349. And a UTA 2014 presentation admitted that it charged packaging fees according to the 3-3-10 formula. *Id.* ¶281. The alleged group boycott was coordinated by and through members of ATA's Negotiation Committee. *Id.* ¶¶375, 391-94.

**What:** In response to studio efforts to eliminate packaging fees, the Agencies met and agreed to offer the same packaging fee terms. *Id.* ¶350. The Agencies agreed (1) to the "3-3-10" packaging fee structure; (2) that negotiations with studios would start at 3-3-10; and (3) to a standard range of base license fees

---

an agency represents multiple clients (FCC, Ex. A, Dkt. #42-1, at 2, §3.B.5). Packaging fees differ from commissions in that they are nearly uniformly earned by large agencies, are far more lucrative than straight commissions, and present conflicts of interest with the agencies' clients. A&C ¶¶278, 283, 289, 290.

[22] As courts have observed, a "conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with … precision." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (quotation omitted); *see also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 n.2 (4th Cir. 2015) (direct "smoking gun" evidence of conspiracy is "extremely rare in antitrust cases"). Counterclaimants need only provide "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

which comprise the up-front 3% packaging fee. *Id.* ¶459. Over time, the Agencies' collusion has resulted in 90% of all scripted TV series being packaged. *Id.* ¶278. To maintain this price-fixing agreement after the Guilds revoked their consent to collective negotiation, the Agencies continued to coordinate their negotiation strategy, including their refusal to agree to the Code, *id.* ¶391, and to retaliate against anyone who works with the Guilds, *id.* ¶¶8, 18, 360, 377, 386.

**When:** The initial price-fixing agreement was reached in the 1990s, when the aforementioned agency executives were speaking daily to coordinate their efforts. *Id.* ¶350. Following the revocation of the Guilds' consent to collective negotiation in June 2019, the Agencies improperly continued to collectively strategize and coordinate their response to the Guilds' efforts to negotiate individually with them. *Id.* ¶¶392-94.[23]

**Why**: The Agencies have a strong profit motive to resist all efforts to eliminate packaging fees. *Id.* ¶¶283-84, 332, 363-367, 371. They are "big fans of packaging because packaging [is where] you make all of your money … it was always about package über alles—that was literally a phrase" at CAA. *Id.* ¶289.

When read in context with the alleged direct evidence of the Agencies' agreement, Counterclaimants' factual allegations further demonstrate the plausibility of Counterclaimants' price-fixing and group boycott claims. Those allegations include: (1) the talent agency industry is susceptible to coordination because it is highly concentrated and agents provide "rather standardized services"

---

[23] On June 25, 2019, ATA Executive Director Karen Stuart coordinated responses by each ATA Negotiation Committee member to the Guilds' invitation to commence individual negotiations on the Code. A&C ¶394. Each member declined the invitation and specifically suggested that the Guilds recommence collective negotiations with the ATA. *Id.* These emails are direct evidence of the Agencies' concerted refusal to negotiate with the Guilds, a *per se* violation of the antitrust laws. *See In re Elec. Books Antitrust Litig.*, 859 F. Supp.2d 671, 682-83 (S.D.N.Y. 2012) (allegations of publishers' agreement to make identical demands in negotiations plausibly stated *per se* antitrust claim).

1    to talent;[24] and (2) the Agencies have the ability to (a) monitor compliance with

2    their illegal agreement[25] and (b) punish cheaters.[26]  *See JTC Petrol. Co. v. Piasa*

3    *Motor Fuels, Inc.*, 190 F.3d 775, 777 (7th Cir. 1999) (conditions "ripe for effective

4    collusion" where market is highly concentrated, services are "rather standardized,"

5    and means exist to monitor compliance with agreement and punish cheaters).

6            Ignoring these detailed allegations supporting Counterclaimants' antitrust

7    claims, the Agencies contend that the Ninth Circuit's *unpublished* decision in

8    *Lenhoff Enterprises v. United Talent Agency, Inc.*, 729 F.App'x. 528 (9th Cir.

9    2018), forecloses Counterclaimants' antitrust claims.  But an unpublished

10   memorandum disposition is never "control[ling]" on this Court, MTD at 12.  9th

11   Cir. Rule 36-3(a).  Moreover, *Lenhoff* was decided on a different set of pleadings

12   involving an entirely different claim:  Lenhoff, an agent, accused UTA and another

13   agency of conducting a group boycott to exclude him from representing talent on

14   television productions, and of using their control over packaging to poach his

15   clients.  *Lenhoff Enters. v. United Talent Agency, Inc.*, 2015 WL 7008185 at *1-2

16

17   ────────────
     [24] The Agencies' share of the representational market exceeds 70%.  A&C ¶352.
     They admit that "writers can (and do) change agencies with regularity."  FCC ¶2.

18   [25] The Agencies have numerous opportunities to learn about their competitors'
     packaging fee practices because they routinely share this competitively sensitive

19   information with each other.  They each belong to the ATA's Negotiation
     Committee, where packaging fee practices are discussed.  A&C ¶358.  The ATA

20   coordinates studies of packaging fees.  *Id.* ¶¶355-357.  The Agencies also share
     packaging fee information when they jointly package a project.  *Id.* ¶¶353-354.

21

22   [26] The Agencies also have the ability to enforce the terms of their agreements on
     packaging fees and not to agree to the Code by blacklisting any agency, studio, or

23   other party that challenges their packaging practices.  A&C ¶¶18, 359-61, 377,
     386, 436(e).  For example, the Agencies can exclude non-conforming agencies

24   from joint packages, denying them access to the vast majority of TV series.
     Indeed, the Agencies have obliquely threatened to do so regarding at least one

25   franchised agency.  *Id.* ¶386.  The Agencies have also threatened to blacklist
     lawyers who negotiate employment contracts for Guild members with MBA-

26   member studios.  *Id.* ¶¶399-404, 436(d).  Regarding its group boycott claims,
     Counterclaimants allege that the Agencies, through the ATA, have threatened to

27   blacklist and otherwise retaliate against any agency (and its clients) that agrees to
     the Code.  *Id.* ¶386.

28

(C.D. Cal. Sept. 18, 2015).  The operative Complaint contained only a bare allegation that UTA and its co-conspirators had set the price of packaging fees, and this allegation was not material to his actual claims.  The Ninth Circuit did not have before it *any* of the specific facts and circumstances alleged here.

## B. Counterclaimants have antitrust standing.

To seek injunctive relief under the Clayton Act, Counterclaimants must simply allege that they have suffered "loss or damage of the type that the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful."  *Cargill*, 479 U.S. at 113 (quotations omitted); *see also Lorenzo v. Qualcomm*, 603 F.Supp.2d 1291, 1300 (S.D. Cal. 2009).  Counterclaimants plead antitrust claims that center upon how the Agencies are compensated for representing Individual Counterclaimants and other Guild members, and thus have standing to challenge collusive efforts to fix the price for that representation.

Counterclaimants allege that they directly sell their writing services to studios and directly purchase representational services from talent agents in a single transaction.  A&C ¶409.  In many deals, including *all* packaging fee deals, the studio pays for the representational services of the agent hired by the writer.[27]  By agreeing to the AMBA, which prohibited as a "double commission" the payment of a 10% fee from a writer in addition to the payment of a packaging fee from a studio, the Agencies expressly recognized that this studio payment to the agent was actually made at the direct expense of the writer.[28]  Counterclaimants allege that by *colluding* with respect to these fees, the Agencies thus artificially increased their own compensation at the direct expense of their writer

---

[27] Absent their role in "procuring" employment and negotiating compensation for talent, the Agencies would have no role in any "packaged" transaction.  The Agencies' compensation, whether by commission or packaging fee, is thus derivative of and entirely dependent on their efforts to procure and negotiate employment for their clients.

[28] A&C ¶274; *see also* AMBA, Rider W ¶5, Dkt. #42-3 at 25-26  (prohibiting collection of "double commissions").

24

clients.  Counterclaimants further allege that packaging fees are generally paid first, *i.e.*, "off the top," of a fixed production budget and thus reduce it dollar for dollar.  A&C ¶¶7, 12, 279.  On those deals, studios are uninjured, and the economic impact of the Agencies' scheme instead falls entirely on Guild members and other talent.  *Id.* ¶300.  Indeed, Counterclaimants allege that studios have reduced writer wages and/or eliminated writing jobs as a means of paying the Agencies their artificially inflated packaging fees from a fixed budget.  *Id.* ¶307.

The interrelationship between the writers, agents, and studios at issue here recalls the intertwined relationships in the seminal antitrust standing decision *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982).  The *McCready* plaintiff alleged that her employer-provided health insurer had conspired with an organization of psychiatrists to exclude psychological services from coverage under its insurance plans.  *Id.* at 469–70.  McCready alleged injury as a result of Blue Shield's denial of insurance reimbursement for a psychologist's treatment.  *Id.* at 467–69.  As McCready thus had not directly paid for her insurance policy and was not the target of the alleged conspiracy, the defendant argued that her claims were too "incidental" and "remote" to have antitrust standing.  *Id.* at 478.  Although the Court noted that McCready's psychologist would have had a viable antitrust claim if the alleged boycott had resulted in lost income from patients who declined to pay for his services out of pocket, McCready's claims were on behalf of patients who continued to see their psychologists and were refused reimbursement.  *Id.* at 483.  The Court therefore concluded that the conspiracy directly caused two distinct injuries, and that McCready had antitrust standing because her injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market."  *Id.* at 484.

Here, the relationships between Guild members, their agents, and the studios are even more "inextricably intertwined" than in *McCready*.  Just as McCready's employer purchased an insurance policy for her benefit, Guild members'

employers, *i.e.* the studios, paid for the representational services provided to Guild members with packaging fees.  Like the *McCready* conspirators, the Agencies' conduct caused two sets of injuries.  Studios were harmed if they increased production budgets to pay packaging fees, but where, as Counterclaimants allege, those fees were paid first, i.e., "off the top" of a fixed production budget, the entire economic impact of the Agencies' price-fixing scheme falls squarely on Guild members and other talent.  A&C ¶279.

Counterclaimants also allege that the Agencies reduced the quality of the representational services bought by Guild members by agreeing to (1) move the industry to a packaging model, (2) resist studio and other efforts to eliminate packaging, and (3) offer the same packaging fees, *see, e.g.*, *id.* ¶¶11, 305, 320, 326, 410, 426, and that by eliminating Guild members' ability to procure conflict-free representation, writers have earned lower wages, lost employment opportunities, and have had to retain other professionals to monitor their conflicted agents.  *See, e.g.*, *id.* ¶¶12, 424-26.  Such collusive agreements not to provide conflict-free representation violate the antitrust laws.  *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995); *see also, e.g.*, Philip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES & THEIR APPLICATION ¶ 1901d, at 246 (4th ed. 2018) (noting that while output reduction may be estimated based on "number of units sold," it may also be estimated by *quality* of units sold; thus, agreements to sell services of "inferior quality would count as the output reduction").[29]  The victims of that conduct—here, Guild members—have standing to challenge it.

Counterclaimants also have antitrust standing to pursue their group boycott claims.  The Agencies claim that talent agents alone are authorized under

---

[29] Contrary to the Agencies' argument, MTD at 8, the reduction in quality of representation does not result from the Guilds' decision to impose the Code of Conduct, but from the fact that packaging fees reduce or eliminate incentives to promote and protect writer-clients' interests.  A&C ¶¶1, 12, 305, 320, 326.

26

California law to procure employment for Guild members.  FCC ¶181.  Because the Agencies control over 70% of the market, A&C ¶352, Guild members must have access to their representational services to effectively procure studio employment.  As Counterclaimants allege, instead of negotiating freely and individually with the Guilds after the Guilds revoked consent to collective negotiations, *id.* ¶390, the Agencies continued to jointly strategize about negotiations, and explicitly coordinated their refusal to enter into individual negotiations with the Guilds, *id*. ¶¶391-95.  And through their continued participation in ATA Negotiation Committee meetings, they agreed to continue to resist the Guilds' efforts to prohibit packaging fees and affiliated production for Guild member representation.  *Id*. ¶¶396-97.

The Agencies' agreement on these competitive business issues restrained competition in a market where they are dominant, depriving Guild members of competition among individual agencies regarding the negotiation of new franchise agreements.  *See St. Paul Fire & Marine Ins. v. Barry*, 436 U.S. 531, 543-45 (1978) (agreement among four medical malpractice insurers on prescribed non-price terms stated antitrust claim).  As in *St. Paul*, the Agencies, given their dominance, have effectively barred Guild members from procuring alternative representational services or negotiating more favorable terms elsewhere in the market.  *Id.*  Guild members have been "deprived of competition among individual agencies regarding negotiation of new franchise agreements."  A&C ¶443.[30]  The Agencies argue that it is "implausible that any Agency would have agreed to the Code of Conduct in any individual negotiation with the Guilds," MTD at 10, but

---

[30] To the extent the Agencies challenge the Guilds' associational standing to assert antitrust claims on behalf of their members, they are wrong for the reasons set forth *supra* at 2-5.  The Guilds have associational standing to challenge the Agencies' collective refusal to sign the Code, negotiate individually with the Guilds, or otherwise jointly strategize concerning their negotiations.  There are no special rules for associational standing regarding antitrust claims.  S*ee Chamber of Commerce v. City of Seattle*, 274 F. Supp. 3d 1140, 1146 (W.D. Wash. 2017).

that opinion is contrary to Counterclaimants' allegations, A&C ¶392, 395, 436, 438, 460-61, 482, 484, and merely raises an issue of fact to be explored in discovery.  Indeed, it ignores that several Agency competitors have agreed to the Code.  *Id.* ¶¶384-85.

In challenging antitrust standing, the Agencies rely primarily upon *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541 (9th Cir. 1987), which is easily distinguished.  *Eagle* concerned claims by fishing vessel crew members against defendant canneries for fixing the purchase price of fresh tuna.  The crew members, whose pay included a percentage of revenues from the sale of the fish, claimed the conspiracy had reduced their earnings.  Because their injuries were "merely derivative of" the injuries suffered by the "immediate victims," namely the third-party vessel owners, they lacked standing.  *Id.* at 541.  As the crew admitted, they were classic "*indirect sellers*" whose claims were derivative of their employers'.  *Id.* (quotations omitted; emphasis added).

Here, however, Guild members *dealt directly with both the studios and the Agencies on the same transaction*:  Guild members simultaneously sold writing services to the studios and purchased representational services from the Agencies to facilitate those same sales.  A&C ¶409.[31]  Unlike the *Eagle* crew, which had no direct dealings with the canneries, Guild members have the strongest economic incentive to enforce the antitrust laws in the context of packaging fees.  *Compare*

---

[31] The Agencies also argue that Counterclaimants lack antitrust standing to bring these claims because writers do not "buy packages from Agencies, … sell packages to studios, … [or] otherwise participate in any market in which packages are bought or sold."  MTD at 6.  But "packaging fees" are not a market—they are a means of paying for the representational services of the agent hired by the talent included in the package.  A&C ¶9.  Even if studios encourage packaging, that fact does not establish a market: "The existence of one-stop shopping, and a group of customers with a preference or even demand for it, is insufficient to define a relevant market."  *Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F.Supp.2d 330, 352-55 (S.D.N.Y. 2009).  Agents do not "sell" packages.  Agents, regardless of how they are compensated, represent *clients* who are selling their talent services to studios.

*Eagle*, 812 F.2d at 541-42, *with McCready*, 457 U.S. at 483-84 (McCready's claims were "inextricably intertwined" with harm to her fully paid psychologist stemming from his partial exclusion from market).[32]  As alleged in the Counterclaims, where production budgets do not change to account for packaging fees, studios pay the same aggregate amount for the intertwined sale of writing services and representational services regardless of whether agents are compensated by commission or packaging fee.  A&C ¶¶7, 12, 279.  The economic consequences of the Agencies' antitrust violations thus fall squarely on Guild members.[33]  Thus, contrary to the Agencies' arguments, MTD at 7, the studios' "market position" is unaffected and the only economic harm consists of diminished writer wages and employment opportunities.  *See McCready*, 457 U.S. at 483 (antitrust injury borne directly by the psychologists' patients who choose to pay

---

[32] The Agencies' argument that Counterclaimants lack antitrust standing because packaging fees were negotiated between studios and the Agencies is meritless: *Guild members hire agents to negotiate on their behalf with the studios.*  Had the *Eagle* vessel owners been crew members' agents, the plaintiffs would have had standing.  *See In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 505 (S.D.N.Y. 1996) (plaintiffs had antitrust standing even though they traded with defendants through unaffiliated brokers).  As *NASDAQ* observed, agents are not distinct economic entities for purposes of antitrust standing, since they facilitate a transaction rather than constitute a separate step in the distribution chain.

[33] The Agencies' arguments regarding speculative and duplicative damages are irrelevant to the Guilds' claims for injunctive relief.  *See Cargill*, 479 U.S. at 111 n.6 (Section 16 "raises no threat of multiple lawsuits or duplicative recoveries"); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 813 (N.D. Ill. 2017) (holding "the factors [*AGC*] identified that relate to damages are not relevant to standing to seek injunctive relief").  Likewise, their claims for injunctive relief would be viable even if they had been indirect purchasers of the Agencies' services.  *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000).  Finally, Individual Counterclaimants' injuries are not duplicative of others' in a manner that precludes finding they have antitrust standing to pursue individual damages.  Any harms studios have suffered due to the Agencies' anticompetitive conduct are distinct from the lower wages earned by Individual Counterclaimants.  *Cf. Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1059 (9th Cir. 1999) (finding that "the damages suffered by the ASRs and the advertisers are distinct despite their resulting from the same anticompetitive conduct").

out of pocket).

### C.     Counterclaimants plead a viable Cartwright Act claim.

The Agencies contend that the above arguments also require dismissal of the California Cartwright Act claims.  MTD at 14-15.  But Counterclaimants plead facts plausibly establishing the Agencies' illegal and collusive conduct, and the Agencies' antitrust standing arguments are inapplicable to the Cartwright Act. "[T]he more restrictive definition of antitrust injury under federal law does not apply to the Cartwright Act."  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 991 (9th Cir. 2000) (quotation omitted); *see also* Cal. Bus. & Prof. Code §16750(a) (authorizing private actions "by any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt directly or indirectly with the defendant").[34]

### CONCLUSION

For the foregoing reasons, the Agencies' Motion to Dismiss should be denied in its entirety.

DATED: December 11, 2019             Stephen P. Berzon
                                     Stacey Leyton
                                     P. Casey Pitts
                                     Rebecca Lee
                                     ALTSHULER BERZON LLP

                                     Anthony R. Segall
                                     Juhyung Harold Lee
                                     ROTHNER, SEGALL & GREENSTONE

---

[34] Even if this Court were to dismiss Counterclaimants' federal claims (which it should not do), the Court would still be required to exercise supplemental jurisdiction over these state law claims if the Agencies' federal claims remain before the Court, because these state law claims arise out of the same "aggregate set of operative facts."  *In re Lazar*, 237 F.3d 967, 979 (9th Cir. 2001).  And even if all federal claims were dismissed, the Court should retain jurisdiction over the remaining claims to avoid any further delays in the resolution of this dispute. Through the course of briefing and argument of the state law merits issues, this Court has expended resources familiarizing itself with the pertinent issues.

30

W. Stephen Cannon
Robert S. Schwartz
Ethan E. Litwin
CONSTANTINE CANNON LLP


_____/s/ P. Casey Pitts_____
P. Casey Pitts

*Attorneys for Defendants and Counterclaimants*