UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, CREATIVE ARTISTS AGENCY, LLC, and UNITED TALENT AGENCY, LLC,

Plaintiffs,

v.

WRITERS GUILD OF AMERICA, WEST, INC. and WRITERS GUILD OF AMERICA, EAST, INC.,

Defendants.

Case No. 2:19-cv-05465-AB-FFMx

**AMENDED ORDER DENYING DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR JUDGMENT ON THE PLEADINGS**

## I. INTRODUCTION

Before the Court is Defendants Writers Guild of America, West, Inc. and Writers Guild of America, East, Inc.'s ("Defendants") motion to dismiss Plaintiffs William Morris Endeavor Entertainment, LLC, Creative Artists Agency, LLC, and United Talent Agency, LLC's ("Plaintiffs") First Consolidated Complaint, or, in the alternative, motion for judgment on the pleadings. (Dkt. Nos. 43, 47.) Plaintiffs oppose Defendants' motion. (Dkt. Nos. 50, 51.) The Court heard oral argument regarding Defendants' motion on December 6, 2019. For the reasons stated below, the Court

**DENIES** Defendants' motion to dismiss or, in the alternative, motion for judgment on the pleadings.

## II. BACKGROUND

This case concerns an antitrust dispute between "three of the largest Hollywood talent agencies" and "two labor unions who represent writers in the entertainment industry." (Dkt. No. 42, "FCC" ¶ 3.) Plaintiffs, the Hollywood talent agencies, allege as follows:

Until April 12, 2019, Defendants expressly permitted a practice known as "packaging," which refers to a "long-standing practice . . . through which a talent agency presents to a studio one or more of the key creative elements for a production—such as writers, actors, directors, producers, and/or the intellectual property on which the project is based—in exchange for 'packaging fees.'" *Id.* ¶¶ 11, 31. Packaging presents numerous benefits because, in part, "[t]he presentation of a 'package' may convince the studio that the project is sufficiently compelling to justify the studio's risk of financing and producing it." *Id.* ¶ 31. "Packaging also creates opportunities for writers that they might not receive on their own," because packages of key creative elements can make it more likely that a writer's work product is put into production. *Id.* ¶ 33. In a packaged deal, "[w]riters—and the rest of the packaged talent—do not pay any commission to their agents (customarily 10%)." *Id.* ¶ 35.

Although the agencies' clients (in this case writers) who are included in the packaged deal do not pay any commission, "[t]he agencies negotiate with studios over the 'packaging fees' that studios will pay to the agency(ies) for providing the package." *Id.* ¶ 36. For any given show, "Plaintiffs will negotiate directly with the various studios to arrive at a packaging arrangement between the studio and the agency for that show." *Id.* ¶ 39. However, "[t]he compensation arrangements for writers and other talent are not included in these packaging deals." *Id.* Rather, Plaintiffs "separately negotiate client compensation, and such negotiations are completely independent from the packaging deal." *Id.*

Despite the fact that compensation arrangements for writers are negotiated separately from the packaging deal, Defendants sought to prohibit packaging fee arrangements "because all packages create a harmful conflict of interest." *Id.* ¶ 45. In particular, Defendants "contend[] that talent agencies like Plaintiffs will always care more about their package fees . . . than their clients' compensation, and thus do not work to maximize writers' or showrunners' pay in a packaged production." *Id.*

Plaintiffs contend that this change by Defendants upended a longstanding industry practice of allowing packaging fees. In particular, from September 22, 1976 to April 12, 2019, Defendants regulated talent agents through the Artists' Manager Basic Agreement ("AMBA"). *Id.* ¶ 25. The AMBA specifically endorsed packaging as a permissible practice for talent agencies, and provided, among other things, "that whenever a talent agency took a package fee, it could not additionally commission the writers who were part of the package." *Id*. ¶ 46 .

In April 2018, however, Defendants "provided a termination notice under the AMBA." *Id.* ¶ 85. From approximately April 2018 to March 2019, Plaintiffs—independently and through the Association of Talent Agents ("ATA")—attempted to negotiate a new AMBA with Defendants. *Id.* ¶¶ 85–95. None of these negotiations proved successful. *Id.* On April 6, 2019, the day on which the AMBA was then-scheduled to expire, representatives from the ATA met with Defendants, during which meeting Defendants agreed to not implement their new Code of Conduct until April 12, 2019, to determine if a new AMBA could be negotiated. *Id.* ¶ 98. Negotiations between the ATA and Defendants from April 6, 2019 and April 12, 2019 again proved futile. *Id.* ¶ 99.

On April 13, 2019, Defendants implemented their new Code of Conduct after receiving authorization from their members through a vote in March 2019. *Id.* ¶¶ 96, 107. The Code of Conduct prohibits Defendants' members from being represented by an agency that is not franchised by Defendants in accordance with Working Rule 23. *Id.* ¶ 107. Working Rule 23, in turn, provides that "No writer shall enter into a

representation agreement whether oral or written, with any agent who has not entered into an agreement with [Defendants] covering minimum terms and conditions between agents and their writer clients." *Id.* The Code of Conduct further provides:

1. No Agent shall have an ownership or other financial interest in, or shall be owned by or affiliated with, any entity or individual engaged in the production or distribution of motion pictures.
2. No Agent shall have an ownership or other financial interest in, or shall be owned by or affiliated with, any business venture that would create an actual or apparent conflict of interest with Agent's representation of a Writer.
3. No Agent shall derive any revenue of other benefit from a Writer's involvement in or employment on a motion picture project, other than a percentage commission based on the Writer's compensation or fee
4. No Agent shall accept any money or thing of value from the employer of a Writer.

*Id.* ¶ 108. In sum, this new Code of Conduct prohibits Defendants' members from being represented by any agent or agencies that (1) receive(s) packaging fees or (2) has (have) an ownership or other financial interest in the production companies. Defendants threatened their members with severe discipline for violating the new Code of Conduct, including threats of expelling them from the union, imposing significant monetary fines, and taking away their healthcare. *Id.* ¶¶ 7, 115. Within less than two weeks of implementing its new Code of Conduct, Defendants "publicly declared that over 7,000 of its members—including showrunners and television and feature film writers—had fired their agents." *Id.* ¶ 110. Defendants additionally stated that "at least 70 talent agencies have signed the Code of Conduct." *Id.* ¶ 131.

The Code of Conduct, by its own terms, limits its application "to the Agent's representation of Writers with respect to the option and sale of literary material or the rendition of writing services in a field of work covered by [Defendant's Collective Bargaining Agreement]." (Dkt. No. 42-1 "Ex. A" at 2.) Defendant's Collective Bargaining Agreement, the Theatrical and Television Basic Agreement ("MBA"),

effective from May 2, 2017 through May 1, 2020, states that it does not cover "the employment of Producers, Directors, Story Supervisors, Composers, Lyricists, or other persons employed in a *bona fide* non-writing capacity[.]" (Dkt. No. 43-2 at 21.)

Despite this limited application of the Code of Conduct, Plaintiffs allege that Defendants have coerced or attempted to coerce non-labor parties to join their "boycott" of talent agencies that do not comply with the Code of Conduct. FCC ¶¶ 118–30, 135–48. In addition to the 70 talent agencies that have already signed the Code of Conduct, *Id*. ¶ 131, Defendants have instructed showrunners to fire their agents, even when an agent represents a showrunner for the purposes of producing only. *Id.* ¶ 130. According to Plaintiffs, showrunners function as "the effective 'CEO' of a television series." *Id*. ¶ 118. Showrunners' job duties may include "some writing and/or story services for a series," but showrunners "also perform extensive services as non-unionized producers." *Id.* The MBA recognizes "that when a showrunner is acting in his or her capacity as a producer (but not as a writer), he or she is performing services 'in other capacities which are not subject to the [MBA].'" *Id.* ¶ 126. Despite this recognition, Defendants prohibit showrunners from hiring agents that have not signed the Code of Conduct "[b]ecause [their] writer and producer functions are inextricably linked." *Id.* ¶ 130.

In addition to requiring showrunners to fire their agents who have not signed the Code of Conduct, Defendants also threatened the Alliance of Motion Picture and Television Producers, Inc. ("AMPTP") and its members with litigation if AMPTP did not agree to modify the MBA. *Id*. ¶ 136. Defendants sought to add a clause to the MBA "that would prohibit AMPTP members from doing business with any talent agency that fails to agree to [Defendants'] Code of Conduct." *Id.* Defendants threatened AMPTP and its members that it would bring a lawsuit alleging that packaging was criminal behavior if AMPTP did not agree to modify the MBA. *Id.* ¶ 140. AMPTB rejected Defendants' request to modify the MBA on March 25, 2019. *Id.* ¶ 142.

Plaintiffs further allege that Defendants have "[sought] to induce unlicensed Hollywood managers and lawyers to join the boycott by taking over representation of

[Defendant's] writer-members in their negotiations." *Id.* ¶ 144. In particular, on March 20, 2019, Defendants sent a letter to managers and lawyers who represent Defendants' members, asserting that Defendants "could temporarily authorize unlicensed managers and lawyers" to act as agents on Defendants' members behalf. *Id.* ¶ 145. Defendants also told these unlicensed managers and lawyers that Defendants can protect them from liability under state law licensing requirements. *Id.* ¶ 146. Defendant Writers Guild of America, West, Inc.'s Executive Director David Young wrote to Defendants' members on April 16, 2019, and stated that Defendants will reimburse unlicensed managers or attorneys for their services as agents, if those managers or attorneys are denied compensation for violating California's Talent Agency Act. *Id.* ¶ 147.

Plaintiffs allege that Defendants' intent in enforcing its Code of Conduct is to harm Plaintiffs, not to protect Defendants' members from conflicts of interest. Defendants' "self-proclaimed objective" is "to effectuate a 'power grab' and 'conquer' the major talent agencies and restrain trade in commercial markets.'" *Id.* ¶¶ 13, 148.

Based on the above allegations, Plaintiffs each bring a cause of action for unlawful restraint of trade under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. *Id.* ¶¶ 149–90.

Plaintiffs Creative Artists Agency, LLC and United Talent Agency, LLC ("LMRA Plaintiffs") bring a cause of action in the alternative for violation of Section 303 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 187. *Id.* ¶¶ 191–99. The LMRA Plaintiffs allege that Defendants have violated Section 303 by (1) promulgating the Code of Conduct, (2) threatening Defendants' members with severe discipline for failing to follow the Code of Conduct, and (3) inducing its members, through enforcement of the Code of Conduct, to not do business with studios or production companies that receive packaging fees. *Id.* ¶¶ 194–97. These actions have caused the LMRA Plaintiffs injury by disrupting their business relationships with content companies, and causing them to lose work, clients, commissions, and fees. *Id.* ¶ 198.

## III. LEGAL STANDARDS

### 1. Motion to dismiss standard

Federal Rule of Civil Procedure 8 requires a plaintiff to present a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

To defeat a Rule 12(b)(6) motion to dismiss, the complaint must provide enough factual detail to "give the defendant fair notice of what the. . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must also be "plausible on its face," that is, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Labels, conclusions, and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed under Rule 12(b)(6) for the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (internal quotation marks omitted).

The court generally may not consider materials other than facts alleged in the complaint and documents that are made a part of the complaint. *Anderson v. Angelone*,

86 F.3d 932, 934 (9th Cir. 1996). However, a court may consider materials if (1) the authenticity of the materials is not disputed and (2) the plaintiff has alleged the existence of the materials in the complaint or the complaint "necessarily relies" on the materials. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted). The court may also take judicial notice of matters of public record outside the pleadings and consider them for purposes of the motion to dismiss. *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Lee*, 250 F.3d at 689-90.

**2. Motion for judgment on the pleadings standard**

"After the pleadings are closed – but early enough to not delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. Proc. 12(c). The standard for assessing a Rule 12(c) motion for judgment on the pleadings is the same as the standard for a Rule 12(b)(6) motion to dismiss. *Enron Oil Trading & Trans. Co. v. Walbrook Ins. Co., Ltd.*, 132 F.3d 526, 529 (9th Cir. 1997). To decide a motion for judgment on the pleadings, a court must accept as true all material allegations in the complaint and must construe those allegations in the light most favorable to the plaintiff. *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 928 (9th Cir. 1994). A court should grant a motion for judgment on the pleadings only when the moving party is entitled to judgment as a matter of law. *Fajardo v. Cty. of Los Angeles*, 179 F.3d 698, 699 (9th Cir. 1999).

## IV. DISCUSSION

**1. Plaintiffs' cause of action under Section 1 of the Sherman Act survives**

Plaintiffs' first cause of action is for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants move to dismiss this cause of action of five grounds: (1) Plaintiffs' cause of action is barred by the statutory labor exemption, (2) Plaintiffs' cause of action is barred by the non-statutory labor exemption, (3) Plaintiffs have failed to allege that Defendants agreed to unreasonably restrain trade, (4) Plaintiffs have failed to allege that Defendants have a dominant market position, and (5) Plaintiffs have failed

to allege that they suffered an antitrust injury. (Dkt. No. 43-1 at 5–20.)

**a. Plaintiffs have pleaded sufficient factual allegations to meet their burden of showing that the statutory labor exemption does not apply**

First, Defendants argue that Plaintiffs' first cause of action is barred by the statutory labor exemption. *Id.* at 5–14. The statutory labor exemption to antitrust laws is an element of a Section 1 Sherman Act claim, the non-applicability of which must be shown by Plaintiff. *See USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 805 n.3 (9th Cir. 1994). To establish the non-applicability of the statutory labor exemption, Plaintiffs must show *either* (1) that Defendants combined with a non-labor group, *or* (2) that Defendants did not act in their legitimate self-interest. *Id.* at 805, 810. "To constitute a non-labor group for purposes of the statutory labor exemption . . . the entity in question must operate in the same market as the plaintiff to a sufficient degree that it would be capable of committing an antitrust violation against the plaintiff, quite independent of the union's involvement." *Id.* at 806. "[A] competitor of the plaintiff clearly falls within [the definition of a non-labor group], as would a supplier or purchaser of the plaintiff's goods or services." *Id.* "Other entities, though more remote, may nevertheless stand in such a relationship to the plaintiff that they are deemed to be operating in the same market." *Id.* at 807.

Plaintiffs allege that Defendants have combined with several purported non-labor groups, including (1) other talent agencies, (2) showrunners acting in a producer-only capacity who are thus exempt from the MBA, and (3) unlicensed lawyers and managers. FCC ¶ 153. In particular, with respect to showrunners, Plaintiffs allege that Defendants have coerced showrunners into abiding by the Code of Conduct, prohibiting them from employing agents or agencies that receive packaging fees, even when the showrunners seek employment in their producing capacity only. *Id.* ¶ 130. Plaintiffs also plead sufficient factual allegations to raise a plausible inference that when showrunners seek employment in their producing capacity only, their employment does not have a direct or substantial effect on Defendants members' wages. *Id.* ¶¶118–25. Plaintiffs allege that

showrunners function as "CEOs" of television series, *id*. ¶ 118, that showrunners are responsible for hiring writing staff and all other critical personnel, *id.* ¶ 121, that the "vast bulk" of showrunners' compensation derives from producing, not writing, services, *id.* ¶ 122, and that showrunners function as independent contractors operating their own businesses, *id.* ¶ 125. Plaintiffs further allege that when showrunners seek employment in their producing capacity only, they are not covered by Defendants' MBA, and that showrunners are purchasers of Plaintiffs' talent agency services. *Id.* ¶¶ 60, 110, 126, 130. Construing these factual allegations in the light most favorable to Plaintiffs, as required by both Rule 12(b)(6) and Rule 12(c), these allegations raise a plausible inference that Defendants have combined with a non-labor group in enforcing the Code of Conduct. *See USS-POSCO*, 31 F.3d at 806 (holding that a purchaser of the plaintiff's services "clearly falls within" the definition of a non-labor group); *see also Adams, Ray and Rosenberg v. William Morris Agency*, 411 F. Supp. 403, 409 (C.D. Cal. 1976) (noting that the criterion applied in determining whether a group constitutes a labor group is the presence of job or wage competition or some other economic inter-relationship affecting legitimate union interests.) (citing *Am. Fed. of Musicians v. Carroll*, 391 U.S. 99, 105–06 (1968)).

Defendants raise several points in opposition to this conclusion, none of which the Court finds availing at this juncture. First, Defendants argue that *Carroll* is dispositive in concluding that showrunners are labor groups, because the evidence in *Carroll* showed that orchestra leaders who perform displace other musicians, thus creating job or wage competition or some other form of economic independence between the two groups. (Dkt. No. 43-1 at 8–9) (citing *Carroll*, 391 U.S. at 105–06, 111, n.11). However, Plaintiffs' pleadings raise a plausible inference that showrunners acting in solely producer capacities do not displace writers, and that showrunners' compensation for producing services is separate from compensation for writing services. FCC ¶¶ 120–25. Moreover, Defendants argue that the Code of Conduct regulates showrunners only when they are performing writing work governed by the

MBA. (Dkt. No. 43-1 at 8 n.1.) However, Plaintiffs' allegations, which the Court must accept as true at the motion to dismiss stage, show that the Code of Conduct regulates showrunners even when they seek employment as producers, not writers. FCC ¶¶ 126, 130.

Because Plaintiffs' factual allegations raise a plausible inference that Defendants have combined with a nonlabor group in enforcing the Code of Conduct, the Court concludes that Plaintiffs have met their burden of pleading facts showing that the statutory labor exemption does not apply to Plaintiffs' claims.

**b. Plaintiffs have pleaded sufficient factual allegations to show that the non-statutory labor exemption does not apply**

Defendants' second ground for dismissing Plaintiffs' Section 1 Sherman Act claim is that Plaintiffs have failed to show that the non-statutory labor exemption applies. Under one test adopted by the Ninth Circuit,

> the parties to an agreement restraining trade are exempt from antitrust liability only if (1) the restraint primarily affects the parties to the agreement and no one else, (2) the agreement concerns wages, hours, or conditions of employment that are mandatory subjects of collective bargaining and (3) the agreement is produced from bona fide, arm's-length collective bargaining.

*Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n*, 81 F.3d 858, 861 (9th Cir. 1996). As a preliminary matter, Defendants argue that this test is no longer the law of the Ninth Circuit, relying on *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1129 (9th Cir. 2011) (en banc), which applied a totality-of-the-circumstances approach. (Dkt. No. 57 at 9.) However, the Court need not—and does not—resolve the issue of whether *Harris* overruled the standard set forth in *Phoenix Electric*, as Defendants have shown that the non-statutory labor exemption does not apply under either case's approach.

First, with respect to the approach adopted in *Phoenix Electric*, Plaintiffs plead sufficient factual allegations to show that the Code of Conduct does not primarily affect the parties to the Code of Conduct and no one else. In particular, Plaintiffs allege that

the Code of Conduct's packaging restrictions prohibit actors and directors, who are not Defendants' members, from benefiting from packaging as well. FCC ¶¶ 10, 58, 84, 166. Plaintiffs further allege that the Code of Conduct's packaging restrictions will reduce the amount of content created overall, resulting in harm to media consumers. *Id.* ¶¶ 169, 190. Because Plaintiffs' factual allegations show that the Code of Conduct does not primarily affect parties to the agreement and no one else, the non-statutory labor exemption as delineated in *Phoenix Electric* does not bar Plaintiffs' Section 1 Sherman Act claim.

Second, under the totality-of-the-circumstances approach employed in *Harris*, the Ninth Circuit considered, *inter alia*, (1) whether the practice under examination is an extensively regulated and carefully circumscribed practice in labor negotiations, (2) whether the practice relates to any core subject matter of collective bargaining, such as wages, hours, or working conditions, and (3) whether the practice operates primarily in the labor market with only tangential effects on the business market. 651 F.3d at 1129–31. Here, Plaintiffs' factual allegations show that packaging has been affirmatively endorsed by Defendants for more than forty years, and that Defendants have not previously banned packaging fees in their franchising of agents. FCC ¶¶ 45, 46. Plaintiffs further allege that Defendants' packaging fee ban prohibits all forms of packaging by agents, despite the fact that packaging arrangements are often idiosyncratic in their terms and fees. *Id.* ¶¶ 43–45, 49–56. And, as noted above, Plaintiffs allege that Defendants' prohibition of packaging fees has substantial effects on the larger media market, reducing employment for directors and actors, and reducing the overall amount of media content produced. *Id.* ¶¶ 10, 58, 84, 166, 169, 190. Construing these factual allegations in the light most favorable to Plaintiffs, the pleadings are sufficient to show that (1) the practice of banning packaging fees is not an extensively regulated or carefully circumscribed practice in labor negotiations, and (2) the practice does not operate primarily in the labor market with only tangential effects on the business market. Because the totality of the circumstances does not show

that Defendants' Code of Conduct fits within the non-statutory labor exemption, that exemption as delineated in *Harris* similarly does not bar Plaintiffs'' Section 1 Sherman Act claim.

In sum, Plaintiffs' First Consolidated Complaint pleads sufficient factual allegations to show that neither the statutory labor exemption nor the non-statutory labor exemption bars Plaintiffs' Section 1 Sherman Act claim.

**c. Plaintiffs allege that Defendants agreed to unreasonably restrain trade**

Defendants argue "separately and independently" that Plaintiffs' Section 1 Sherman Act claim should be denied for failure to state a valid antitrust claim. (Dkt. No. 43-1 at 16–20.) Defendants' first argument in this respect is that Plaintiffs have not plausibly alleged an agreement, conspiracy, or combination between multiple entities that unreasonably restrains trade. *Id.* at 16–18. Defendants further argue that the Code of Conduct is an associational standard that, at best, incidentally restrains trade. *Id.* at 17.

First, "[t]he Supreme Court generally has treated as per se illegal joint efforts by firms to disadvantage a competitor by persuading customers to deny that competitor relationships the competitor needs in the competitive struggle." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1154–55 (9th Cir. 2003) (collecting authorities). In these cases, however, "the practices generally were not justified by plausible arguments that the practices enhanced overall efficiency and made markets more competitive." *Id.* at 1155. Here, accepting Plaintiffs' allegations as true, Plaintiffs have shown that the Code of Conduct does not enhance overall efficiency or make markets more competitive. In particular, Plaintiffs allege that packaging presents numerous economic benefits to writers and other members of the entertainment industry by encouraging greater content production. FCC ¶¶ 31, 33–35. Plaintiffs further allege that packaging leads to greater employment opportunities for writers, directors, and actors who otherwise would not be employed by studios or production companies. *Id.* ¶ 41, 166, 169. And, with respect to Defendants' argument that prohibiting packaging fees

reduces conflicts of interest, Plaintiffs allege that packaging fees are negotiated independently from writers' compensation, that packaging eliminates the commissions paid by writers to agents, and that Defendants endorsed packaging as an industry practice for the past forty years. *Id.* ¶¶ 39, 46, 49. Because, accepting Plaintiffs' allegations as true, Defendants have not provided a plausible argument that prohibiting packaging enhances overall efficiency and makes markets more competitive, the Court concludes that Plaintiffs have adequately alleged a joint effort to disadvantage Plaintiffs by persuading writers to deny Plaintiffs relationships the Plaintiffs need in a competitive struggle.

Second, the Court finds unavailing Defendants' argument that the Code of Conduct is an associational standard that cannot be considered an unreasonable restraint on trade. Assuming for the sake of argument that the Code of Conduct is an organizational quality standard, cases that condemn these standards as unreasonable under the Sherman Act have as a "principal concern . . . the use of standards setting as a predatory device by some competitors to injure others." *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 57 (1st Cir. 1999). Here, Plaintiffs have alleged that Defendants' intent in adopting the Code of Conduct was to specifically harm Plaintiffs—to "conquer" or "grab power" from them—rather than to protect its members from conflicts of interest. FCC ¶¶ 11, 13, 25, 89. Plaintiffs have further alleged that packaging presents numerous economic benefits to Defendants' members, such that a restriction on packaging ultimately harms, rather than benefits, the members in question by reducing their opportunities for employment. *Id.* ¶¶ 33–34, 37, 42. These allegations, again construed in the light most favorable to Plaintiffs, raise a plausible inference that the Code of Conduct was a predatory device used by Defendants to injure Plaintiffs.

Because Plaintiffs' factual allegations show that Defendants entered a joint effort to disadvantage Plaintiffs by persuading Defendants' members to deny Plaintiffs business relationships, and that Defendants' intent was to injure Plaintiffs, Plaintiffs

have adequately pleaded an agreement, conspiracy, or combination in restraint of trade.

**d. Plaintiffs need not plead facts showing that Defendants possess a dominant market position**

Defendants' next ground for dismissing Plaintiffs' Section 1 Sherman Act claim is that Plaintiffs fail to plead facts showing that Defendants possess a dominant market position. However, as Plaintiffs correctly state, "[a]s a matter of law, the absence of proof of market power does not justify a naked restriction on price or output. To the contrary, when there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'" *Nat'l Coll. Athletic Ass'n v. Bd. of Regents Univ. of Okla.*, 468 U.S. 85, 109 (1984) (citing *Nat'l Soc. of Prof'l. Eng'rs. v. United States*, 435 U.S. 679, 692 (1978)). Although proof of a dominant market position is indicative of a per se illegal boycott, *Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.*, 141 F.3d 947, 950 (9th Cir. 1998), Defendants have failed to show that it a necessary element of pleading a Section 1 Sherman Act claim in this case.

**e. Plaintiffs have adequately pleaded sufficient facts showing an antitrust injury**

Defendants' next ground for dismissing Plaintiffs' Section 1 Sherman Act claim is that Plaintiffs have failed to plead sufficient facts to raise a plausible inference of antitrust injury. "Antitrust injury is made up of four elements: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1008 (9th Cir. 2003) (internal quotation marks omitted). "In addition, we impose a fifth requirement, that the injured party be a participant in the same market as the alleged malefactors." *Id.* (internal quotation marks omitted). Defendants argue that Plaintiffs have failed to plead an antitrust injury because they do not plead an injury to competition beyond the impact on Plaintiffs themselves. However, as Plaintiffs correctly state in opposition, their First

Consolidated Complaint alleges that the Code of Conduct stifles competition in the market for writer-representation services by excluding all talent agencies that decline to agree to the Code of Conduct, not just Plaintiffs. FCC ¶¶ 6, 131–34, 181–82, 186, 188. Because Plaintiffs' allegations show that their injuries stem from the competition-reducing aspects of Defendants' Code of Conduct (*i.e.*, they are injured because Defendants' Code of Conduct prohibits them and other non-compliant talent agencies from representing guild writers in the entertainment industry), the Court finds Defendants' argument with respect to antitrust injury unavailing.[1]

For the reasons stated above, Defendants' motion to dismiss or, in the alternative, motion for judgment on the pleadings as to Plaintiffs' Section 1 Sherman Act claim is **DENIED**.

**2. The LMRA Plaintiffs' cause of action under Section 303 of the Labor-Management Relations Act survives**

Defendants also seek to dismiss the LMRA Plaintiffs' second cause of action in the alternative: violation of Section 303 of the LMRA.

Section 303 of the LMRA provides a private right of action for any violation of 29 U.S.C. 158(b)(4). 29 U.S.C. § 187. Section 158(b)(4) provides that it shall be an unfair labor practice for a labor organization or its agents "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an objected thereof is . . . forcing or requiring any person to cease . . . doing business with any other person." 29 U.S.C. § 158(b)(4)(B). Defendants allege that the LMRA Plaintiffs' Section 303 claim fails because (1) the LMRA Plaintiffs have not alleged any coercive action against neutral secondary parties and (2) Defendants have not sought to coerce its members or talent agencies from doing business with anyone else. (Dkt.

[1] Finally, the Court finds unavailing Defendants' argument that Plaintiffs lack standing to bring antitrust claims because they assert claims as indirect purchasers. Rather, the FCC clearly shows that Plaintiffs assert claims as direct sellers of writer-representation services, and that Plaintiffs allege injury to their own business because of the Code of Conduct.

No.43-1 at 21–25.)

First, Plaintiffs are correct that the FCC establishes coercive action against neutral third parties. In particular, the FCC establishes that the Code of Conduct is enforced against showrunners who, although Defendants' members, seek employment as independent contractors for the purposes of producing only, and employ Defendants' members. FCC ¶¶ 118–30. The FCC further establishes that when showrunners seek employment for the purposes of producing only, they are not subject to Plaintiffs' MBA. *Id.* ¶ 129. Plaintiffs are correct to argue that where an individual "is both a union member and an employing contractor," Section 158(b)(4) prohibits the union from threatening, coercing, or restraining the union members by means of intra-union disciplinary procedures. *See Tennessee Glass Co.*, 164 NLRB 116, 118–19 (1967). Defendants' argument that Plaintiffs have failed to allege coercive action against a neutral third party is therefore unavailing.

Second, Defendants' argument that because they have the right to prohibit anyone from representing their members, their enforcement of the Code of Conduct cannot be construed as coercion under Section 158(b)(4) is equally unavailing. Plaintiffs are correct to argue that "[a]ssuming there is a conflict between [the objectives of Section 158(b)(4)] and the right of a union to prescribe its own rules with respect to the acquisition and retention of members, this right must yield to the paramount objectives of the secondary boycott provisions of the Act." *East Bay Ctys. Dry Cleaners Ass'n*, 167 NLRB 45, 51–52 (1967). Succinctly put, "[t]he Union's attempt to enforce its governing rules should not 'insulate' it from liability for violation of the applicable section of the Act." *Id.* at 52.

Because Defendants' arguments as to the insufficiency of the LMRA Plaintiffs' cause of action under Section 303 of the LMRA fail, Defendants' motion to dismiss the LMRA Plaintiffs' second cause of action is **DENIED**.

//

//

## V. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss or, in the alternative, motion for judgment on the pleadings is **DENIED**.

**IT IS SO ORDERED.**

Dated: January 8, 2020

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE