1  Steven A. Marenberg (101033)
2  **PAUL HASTINGS LLP**
   1999 Avenue of the Stars, 27th Floor
3  Los Angeles, California 90067

4  D. Scott Carlton (239151)
   **PAUL HASTINGS LLP**
5  515 South Flower Street, 25th Floor
   Los Angeles, California 90071
6
   Adam Levin (156773)
7  Jeremy Mittman (248854)
   **MITCHELL SILBERBERG & KNUPP**
8  **LLP**
   2049 Century Park E., 18th Floor
9  Los Angeles, CA 90067

10 Attorneys for Plaintiff/Counterclaim-
   Defendant
11 UNITED TALENT AGENCY, LLC

12 Jeffrey L. Kessler (*pro hac vice*)
   David L. Greenspan (*pro hac vice*)
13 **WINSTON & STRAWN LLP**
   200 Park Avenue
14 New York, NY 10166-4193

Diana Hughes Leiden (267606)
Shawn Obi (288088)
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543

Attorneys for Plaintiff/Counterclaim-
Defendant
WILLIAM MORRIS ENDEAVOR
ENTERTAINMENT, LLC

Richard B. Kendall (90072)
Patrick J. Somers (318766)
Nicholas F. Daum (236155)
**KENDALL BRILL & KELLY LLP**
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Attorneys for Plaintiff/Counterclaim-
Defendant
CREATIVE ARTISTS AGENCY, LLC.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, CREATIVE ARTISTS AGENCY, LLC and UNITED TALENT AGENCY, LLC, <br><br> Plaintiffs and Counterclaim-Defendants, <br><br> v. <br><br> WRITERS GUILD OF AMERICA, WEST, INC. and WRITERS GUILD OF AMERICA, EAST, INC., <br><br> Defendants and Counterclaimants, <br><br> and PATRICIA CARR, *et al.*, <br><br> Counterclaimants. | Case No. 2:19-cv-05465-AB-AFM <br><br> **DECLARATION OF DAVID L. GREENSPAN IN SUPPORT OF PLAINTIFFS' MOTION FOR LIMITED STAY OF DISCOVERY PENDING RESOLUTION OF PLAINTIFFS' AND COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS THE COUNTERCLAIMS** <br><br> Date:      May 8, 2020 <br> Time:      10:00 a.m. <br> Courtroom: 7B |

## DECLARATION OF DAVID L. GREENSPAN

1.    I, David L. Greenspan, declare under penalty of perjury that the following is true and correct:

2.    I am a partner in the law firm of Winston & Strawn LLP, counsel for Plaintiff and Counterclaim-Defendant William Morris Endeavor Entertainment, LLC ("WME").  I am a member of the bar of the State of New York and am admitted to practice before this Court in this matter *pro hac vice*.  I submit this declaration in support of Plaintiffs' Motion for Limited Stay of Discovery Pending Resolution of Plaintiffs' and Counterclaim-Defendants' Motion to Dismiss the Counterclaims.

3.    On December 20, 2019, Defendants and Counterclaimants Writers Guild of America, West, Inc. ("WGAW") and Writers Guild of America, East, Inc. ("WGAE," collectively with WGAW, the "Guilds" or "WGA") and Counterclaimants Patricia Carr, Ashley Gable, Barbara Hall, Deric A. Hughes, Deirdre Mangan, David Simon and Meredith Stiehm (collectively with WGA, "Counterclaimants") served approximately 80 discovery requests on Plaintiffs and Counterclaim-Defendants William Morris Endeavor Entertainment, LLC ("WME"), Creative Artists Agency, LLC ("CAA") and United Talent Agency, LLC ("UTA") (collectively, the "Agencies").

4.    Attached hereto as **Exhibit A** is a true and correct copy of Counterclaimants' Requests for Production served on WME.

5.    Attached hereto as **Exhibit B** is a true and correct copy of Counterclaimants' Requests for Production served on CAA.

6.    Attached hereto as **Exhibit C** is a true and correct copy of Counterclaimants' Requests for Production served on UTA.

7.    Attached hereto as **Exhibit D** is a true and correct copy of excerpts of the transcript of the January 24, 2020 hearing before the Honorable André Birotte, Jr on Plaintiffs' and Counterclaim-Defendants' Motion to Dismiss the Counterclaims.

8.    Attached hereto as **Exhibit E** is a true and correct copy of an email sent from P. Casey Pitts to me, dated February 25, 2020.

9.     The parties have, for weeks, been engaged in extensive meet-and-confers concerning their respective document requests.

10.     The Agencies proposed that the parties agree to defer the document requests that relate solely to the Counterclaims while the parties await the Court's decision on whether those claims will proceed.  The parties disagreed as to which of Counterclaimants' 80 document requests fall into this category, but as a compromise, agreed on February 24, 2020 to defer 16 requests until March 20, 2020, with both sides reserving their rights about how to proceed with those requests in the event that the Court still had not decided the Agencies' Motion to Dismiss as of March 20.

11.     The list of document requests that the parties previously agreed to stay is Counterclaimants' Requests for Production Nos. 5, 10, 16, 17, 18, 36, 37, 38, 39, 40, 45, 46, 47, 48, 51 and 52 directed to WME, CAA, and UTA.

12.     The Agencies specifically reserved the right "to seek a stay" after the parties' agreement expired.

13.     On March 25, 2020, Counterclaimants indicated their intention "to move forward with those RFPs immediately."

14.     The Agencies responded that they continued to believe it would be wasteful to work on the requests at issue before the Court rules, that the Agencies had already compromised by agreeing to continue working on many additional document requests that the Agencies believe relate principally or exclusively to the Counterclaims, and that the Agencies would therefore seek a temporary and limited discovery stay.

15.     Counterclaimants responded by taking the position that the Agencies "must procure a protective order from the Court" rather than seeking a temporary and limited discovery stay.


I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

1    Executed on April 1, 2020, in New York City, New York.

2

3                                    /s/ *David L. Greenspan*
                                     David L. Greenspan
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Stephen P. Berzon (SBN 46540)
sberzon@altber.com
Stacey Leyton (SBN 203827)
sleyton@altber.com
P. Casey Pitts (SBN 262463)
cpitts@altber.com
Rebecca C. Lee (SBN 305119)
rlee@altber.com
Andrew Kushner (SBN 316035)
akushner@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

Anthony R. Segall (SBN 101340)
asegall@rsglabor.com
Juhyung Harold Lee (SBN 315738)
hlee@rsglabor.com
ROTHNER, SEGALL &
  GREENSTONE
510 South Marengo Avenue
Pasadena, California 91101
Telephone: (626) 796-7555
Facsimile: (626) 577-0124

W. Stephen Cannon (*pro hac vice*)
scannon@constantinecannon.com
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave, NW, Ste. 1300N
Washington, DC 20004
Telephone: (202) 204-3500
Facsimile: (202) 204-3501

Ethan E. Litwin (*pro hac vice*)
elitwin@constantinecannon.com
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701

*Attorneys for Defendants and Counterclaimants*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, *et al.*,<br><br>    Plaintiffs and Counterclaim<br>    Defendants,<br><br>    v.<br><br>WRITERS GUILD OF AMERICA, WEST, INC., *et al.*,<br><br>    Defendants and Counterclaimants,<br><br>and PATRICIA CARR, *et al.*<br><br>    Counterclaimants. | Case No. 2:19-cv-05465-AB-AFM<br><br>**DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF/COUNTERCLAIM DEFENDANT WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC** |

**PROPOUNDING PARTIES:  DEFENDANTS/COUNTERCLAIMANTS AND INDIVIDUAL COUNTERCLAIMANT MEREDITH STIEHM**

**RESPONDING PARTY:  PLAINTIFF AND COUNTERCLAIM DEFENDANT WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC**

**SET NUMBER:  ONE**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendants and Counterclaimants **Writers Guild of America, West**, **Writers Guild of America, East, and Individual Counterclaimant Meredith Stiehm** propound the following Requests for Production ("Requests") on Plaintiff and Counterclaim Defendant William Morris Endeavor Entertainment, LLC, to be answered in writing in compliance with Rule 34 of the Federal Rules of Civil Procedure, within 30 days from the date of service.  In answering and responding to these requests for production of documents WME shall identify and produce all requested documents within the actual or constructive possession, custody, or control of WME, or WME's officers, employees, agents, representatives or attorneys.

Defendants and Counterclaimants request that such production be made in accordance with the "DEFINITIONS" and "INSTRUCTIONS" set forth below.

## DEFINITIONS

1.     The following rules of construction should apply to all discovery requests:

   a.  "All" should be construed to include the collective as well as the singular and shall mean "each," "any," and "every."  The terms "any," "all," "each," and "every" should be understood in either their most or least inclusive sense as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of the scope.

b. "And" and "or" should be construed so as to require the broadest possible response. If, for example, a request calls for information about "A or B" or "A and B," WME should produce all information about A and all information about B, as well as all information about A and B collectively. In other words, "or" and "and" should be read as "and/or."

c. "Any" shall be construed to mean "any and all."

d. "Including" shall be construed to mean "without limitation." "Including" is used to emphasize certain types of documents requested and should not be construed as limiting the request in any way.

e. The use of the singular form of any word includes the plural and vice versa.

2.    "Document" or "Documents" has the broadest meaning possible, including all Communications.    "Document" or "Documents" includes all "writings," "recordings," or "photographs" as those terms are defined in Federal Rule of Civil Procedure 34 and Rule 1001 of the Federal Rules of Evidence. Without limiting the generality of the foregoing, the term "Documents" includes both hard copy documents as well as electronically stored data files.  Regarding hard copy documents, the term "Documents" includes all written or printed matter of any kind, including the originals and all non-identical copies thereof (whether different from the originals by reason of any interlineation, receipt stamp, indication of copies sent or received, or other notation made on such copies or otherwise), including memoranda, notes, opinions, compilations, chronicles, minutes, agenda, notations of any sort of conversations, contracts, agreements, reports, summaries, teletypes, telefax, thermafax, confirmations, inter-office and intra-office Communications, printed e-mail, printed text messages, printed instant messages, all written or graphic records of representations of any kind, and all records of representations of any kind. Regarding electronically stored data files, the term "Documents" includes

3

correspondence, memoranda, legal pleadings, calendars, diaries, travel records, summaries, records of telephone conversations, telegrams, teletypes, telefax, thermafax, confirmations, notes, reports, compilations, notebooks, work papers, graphs, charts, blueprints, books, pamphlets, brochures, circulars, manuals, instructions, ledgers, drawings, sketches, photographs, videotapes, audiotapes, film and sound reproductions, e-mails, instant messages, text messages, collaboration software tools (including Slack), internal or external web sites, audio or video discs, data on magnetic or optical storage media (*e.g.*, servers, storage area networks, hard drives, backup tapes, CDs, DVDs, Bluray, DVD-HD thumb flash drives, floppy disks or any other type of portable storage device, etc.) stored as an "active" or backup file, in its native format, computer files, discs and drives, sales, advertising and promotional literature, agreements, stored recordings, minutes or other records of meetings, computer data (including information or programs stored in a computer, whether or not ever printed out or displayed) and all drafts, alterations, modifications, changes, and amendments of any of the foregoing, all written or graphic records of representations of any kind, and all mechanical or electronic data, records of representations of any kind, including photographs, microfiche, microfilm, videotape, records and motion pictures, and electronic, mechanical, or electric records or representations, tapes, cassettes, discs, magnetic cards, recordings, and cloud storage services.

3.     "Electronically Stored Information," abbreviated as "ESI" has the same meaning and scope as it has in the Federal Rules of Civil Procedure and includes the following:

      a.  structured and unstructured data, as those terms are defined in The Sedona Conference Glossary, available at www.thesedonaconference.org/publications;

      b.  activity listings of electronic mail receipts or transmittals;

c.  output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, text messages (SMS, MMS, or TMS), instant messages (such as iMessage, WhatsApp, WeChat, Google Hangout, or similar program) or bulletin board programs, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, a deleted file, or file fragment;

d.  any and all items stored on computer memories, hard disks, floppy disks, CD discs, DVD discs, flash drives, thumb drives, memory cards, magnetic tape, microfiche, or in any other vehicle for digital data storage or transmittal, such as a personal digital assistant (e.g., iPhone, Android, Blackberry, Smart Phone or similar device) and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all documents requested herein;

e.  any and all items stored on voice-mail systems, websites, company intranet sites, chat rooms, and social networking websites (e.g., Facebook, Twitter, LinkedIn, and other social websites listed at http://en.wikipedia.org/wiki/List of social networking websites); and any and all data, data compilations, and data analyses.

4.  "Person" or "Persons" includes individuals, corporations, partnerships, limited partnerships, unincorporated associations, and all other governmental and non-governmental entities.

5.  "You" or "Yours" or "WME" refers to Plaintiff and Counterclaim Defendant William Morris Endeavor Entertainment, LLC and: (a) all of its officers,

5

directors, members, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction; and (b) any entity that exercises control over, or provides strategic direction or recommendations to, WME, all of its officers, directors/members, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf.

6.  "Communication" or "Communications" means the oral or written transmittal of information of any kind (in the form of facts, ideas, inquiries, or otherwise) by any means, including any face to face, telephonic, video or other virtual meeting, conversation, discussion, conference, correspondence, message, or other written, electronic, or oral transmission, exchange, or transfer of information in any form between two or more persons, including in person or by telephone, facsimile, telegraph, telex, e-mail, text message, instant message, collaboration software tools such as Slack, or other medium.  The phrase "communication between" is defined to include instances where one party communicates with another party but that other party does not necessarily respond.

7.  Each of the words "concerning," "reflecting," "relating," "supporting," "negating," "evidencing," and "referring" shall be defined to include the common meanings of all those terms, and shall include indirect as well as direct references to the subject matter set forth in the Request.

8.  "Abrams Artists Agency" means Abrams Artists Agency LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

9.  "ATA" means the Association of Talent Agents, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions,

6

predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.  This includes members of the ATA's Negotiating Committee, the Strategy Committee, the Board of Directors, and any other formal or informal committee or group that the ATA has convened, organized, sponsored or facilitated.

10.    "Buchwald" means Don Buchwald & Assocs., Inc., a/k/a The Buchwald Agency, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

11.    "CAA" means Creative Artists Agency LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

12.    "ICM" means International Creative Management Partners, LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

13.    "Kaplan Stahler" means The Kaplan-Stahler Agency, Inc., and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

14.    "Pantheon" means Pantheon Talent Group LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

15.    "RBEL" means Rothman Brecher Ehrich Livingston, Inc., and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries,

7

divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

16.    "Silver Lake" means Silver Lake Management LLC, a/k/a Silver Lake Partners, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, funds (including Silver Lake Partners IV, L.P.), predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

17.    "TPG" means Tarrant Capital IP LLC, a/k/a TPG Capital, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, funds (including TPG Partners VI, L.P.), predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

18.    "UTA" means United Talent Agency LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

19.    "Verve" means Verve Talent & Literary Agency, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

20.    "Affiliation" means any ownership or other financial interest or similar association between entities, including but not limited to the relationship between WME and Endeavor Content.

21.    "Talent Agency" means any entity registered under the California Talent Agencies Act ("TAA"), Article 11 of the New York General Business Law, Article 37 of the New York Arts and Cultural Affairs Law ("Article 37"), or any other similar law.

8

22.    "Talent Agency Services" includes all aspects of the representation of Talent including but not limited to (i) procuring, offering, promising, or attempting to procure employment or engagements for Talent, and (ii) any other service provided by a Talent Agency as set forth in Paragraph 40 of Plaintiffs' First Consolidated Complaint.  For the purposes of the RFPs, "Talent Agency Services" also includes any services provided by a Talent Agency to a Studio, including services provided for an individual Project, across multiple Projects, or generally, and any other business interaction involving a Talent Agency and a Studio.

23.    The "Guilds" or "WGA" refers collectively to the Writers Guild of America, West, and the Writers Guild of America, East.

24.    "Writer" refers to any writer who provides writing services or sells or options literary material pursuant to the terms of the MBA, as defined at Paragraph 269 of the Answer and Counterclaims, as well as any entity created or existing for the purpose of lending or otherwise providing the writing services of, or selling or optioning the literary material of, any Writer.

25.    "Talent" includes, individually and collectively, Writers, directors, actors, producers and other above and below-the-line creative elements that are employed by a Studio on a Project.

26.    "Studio" refers to any member of the Alliance of Motion Picture and Television Producers or other entity, including any production company, studio, network, or other financier, that directly or indirectly employs, or purchases or utilizes the services of, Writers, as set forth at Paragraph 269 of the Answer and Counterclaims.

27.    "AMBA" refers to the Artists' Manager Basic Agreement between the Guilds and the ATA in effect during the period from September 22, 1976 to on or around April 12, 2019.

9

28.   "Code of Conduct" refers to, individually and collectively, (i) the documents dated on or about February 21, 2019 that the Guilds provided to ATA members, including WME, concerning the relationship among the WGA, Talent Agencies, and Writers, including all subsequent drafts thereto; (ii) the documents dated on or about April 13, 2019 that the Guilds implemented that govern the relationship among the WGA, Talent Agencies, and Writers, including all subsequent drafts thereto; and (iii) the documents (including Codes of Conduct or franchise agreements) postdating April 13, 2019 that the Guilds implemented that govern the relationship among the WGA, Talent Agencies, and Writers, including all subsequent drafts thereto and including all such agreements with Abrams Artists Agency, Buchwald, Kaplan Stahler Agency, Pantheon, RBEL, and Verve.

29.   "Project" refers to an audiovisual entertainment project, such as a television series or a feature film.

30.   "Commissions" refers to the method of compensating Talent Agencies for procuring employment for their clients, as described at Paragraphs 5, 6, and 275 of the Answer and Counterclaims.

31.   "Packaging" refers to any practice by which Talent Agencies represent one or more Talent elements of a Project, including as described at Paragraphs 275-282 of the Answer and Counterclaims.

32.   "Packaging Fees" refers to any price, payment, emolument, stipend, cost, or rate, including any component or portion thereof, paid by or on behalf of a Studio to a Talent Agency in connection with its representation of one or more Talent elements of a Project, including as described at Paragraph 279 of the Answer and Counterclaim.

33.   "3-3-10" refers to the standard Packaging Fee, ordinarily defined to be comprised of a 3% "Upfront License Fee," a 3% "Deferred License Fee," and a 10% "Back-end Fee," as described at Paragraph 279 of the Answer and Counterclaims.

34.     "Base License Fee" refers to the dollar amount that a network actually remits, or is deemed to hypothetically remit, to a Studio for delivered creative content, as described at Paragraph 279 of the Answer and Counterclaims.

35.     "Joint Packaging" or "Shared Packaging" refers to any practice by which more than one Talent Agency share a Packaging Fee paid for a single Project.

36.     "Competitively Sensitive Information" refers to any company strategies, plans, policies, procedures, trade secrets, trade craft, price information, rate information, cost information, product or service information, supplier information, customer information, employee information, or expansion or contraction plans.

## **INSTRUCTIONS**

1.     Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these Requests for Production shall be deemed to be continuing in nature so that, if WME subsequently discovers or obtains possession, custody, or control of any Document or ESI previously requested or required to be produced, WME shall make such Documents or ESI available within 7 days of discovery or possession. These Requests call for the production of all responsive documents within the actual or constructive possession, custody or control of WME.

2.     Except as to Documents and things as to which WME asserts a claim of privilege or other exemption from disclosure, furnish all Documents or things in WME's actual or constructive possession, custody, or control, or known or available to WME, regardless of the physical location of the Documents, or whether such Documents or things are possessed directly by WME or by WME's employees, agents, representatives, affiliates, subsidiaries, accountants, attorneys, investigators, or consultants.

3.     If any Document covered by these requests is withheld by reason of a claim of attorney-client privilege, attorney work product protection, or any other privilege or protection, please furnish a log providing the following information with respect to each such withheld document: date, author, recipients, general subject matter sufficient to make a prima facie determination whether the asserted privilege has been properly invoked, and legal basis upon which the Document has been withheld.

4.     In producing Documents, WME is requested to produce the original of each Document requested, together with all non-identical copies and drafts of such Document. If the original of any Document cannot be located, a copy shall be produced in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

5.      If any requested Document cannot be produced in full, WME is to produce it to the extent possible, indicating which Document, or portion of such Document, is being withheld, and the reason that it is being withheld.

6.      If production of any portion of a Document is required pursuant to these Requests, produce the entirety of that Document.

7.      Documents not otherwise responsive to these Requests shall be produced if such Documents mention, discuss, refer to, or explain the Documents that are called for by these Requests, or if such Documents are attached to Documents called for by these Requests and constitute routing slips, transmittal memoranda, letters, cover sheets, comments, evaluation, or similar materials.

8.      All Documents shall be produced in the same order as they are kept or maintained by WME in the ordinary course of WME's business. If any Documents have been removed from the files in which they were found for purposes of producing them in response to these Requests, indicate for each Document the file(s) from which the Document(s) was (or were) originally located.

9.      If a Document once existed and has subsequently been lost, destroyed, or is otherwise missing, please provide sufficient information to identify the Document and state the details concerning its loss.

10.     With respect to any Document maintained or stored electronically, please harvest it in a manner that maintains the integrity and readability of all data, including all metadata.

11.     Unless otherwise agreed, all ESI should be produced in native format on compact disc(s), DVD disc(s), or zip drives in the original electronic file format(s) of the Documents.   Specifically, and in no way limiting the generality of the foregoing, presentations, such as PowerPoint presentations, and data compilations, such as Excel spreadsheets, shall be produced in native format.

12.     Data called for by this Request must be submitted electronically in a reasonably usable compilation that will allow the Guilds to access the information it contains. For the Guilds to be able to access and interpret data, the WME must respond to RFP No. 26 including, for each database, a Data Dictionary that includes, for each table in the database:

  a. the name of the table;

  b. a general description of the information contained;

  c. the size in both number of records and megabytes;

  d. a list of fields;

  e. the format, including variable type and length, of each field;

  f. a definition for each field as it is used by WME, including the meanings of all codes that can appear as field values;

  g. the fields that are primary keys for the purpose of identifying a unique observation;

  h. the fields that are foreign keys for the purpose of joining tables; and

  i. an indication of which fields are populated.

13.     Please produce all Documents maintained or stored electronically in native, electronic format with all relevant metadata intact. Encrypted or password-protected Documents should be produced in a form permitting them to be reviewed. Defendants-Counterclaimants also request WME to immediately meet and confer regarding the manner in which WME shall produce Documents in order for the parties to try and reach agreement in this regard and avoid any unnecessary expense.

14.     Please organize electronic Documents produced for inspection in the same manner that WME stores them (*e.g.*, if maintained by a custodian, such as e-mail residing on an e-mail server, please organize Documents for production by custodian; if maintained as a subfolder of "My Documents" on a custodian's hard

drive, please organize Documents for production by custodian with path information preserved, etc.).

15.     Documents attached to each other should not be separated, including hard-copy versions of Documents attached to hard-copy printouts of e-mails produced pursuant to these Requests.

16.     At WME's election, Documents maintained or stored in paper, hard-copy form can be produced as searchable .PDF (*i.e.*, portable Document format files with embedded text) and in an appropriate and usable manner (*e.g.*, by copying such data onto an external hard drive).

17.     These requests require production of paper documents in the same form and same order as they are kept in the usual course of business or organized and labeled to correspond with the requests set forth below. If WME chooses the former method, the Documents are to be produced in the boxes, file folders, binders and other containers in which the Documents are found. The titles, labels, or other descriptions on the boxes, file folders, binders, or other containers are to be left intact.

18.     Documents stored as electronic data on magnetic, optical, or other storage media as "active" or "backup" files shall be produced in their native formats with any associated metadata.

19.     To the extent responsive Documents reside on databases and other such systems and files, WME is requested to produce the relevant database in useable form or permit access for inspection, review, and extraction of responsive information.

20.     Each document request, and each subpart thereof, shall be separately set forth and accorded a separate answer. Each response shall first set forth verbatim the document request to which it is responsive, followed by WME's response.

21.     No part of a document request shall be left unanswered merely because an objection was interposed to another part of the document request.

22.     If WME objects to any document request or subpart thereof, the objection shall state with specificity all grounds. Any ground not stated shall be waived.

23.     Failure to provide information in response to these document requests will be deemed a waiver of WME's right to produce such evidence at trial. Defendants-Counterclaimants reserve the right to move to preclude the introduction of any evidence not produced in response to this Request.

24.     Documents should be produced in the same order as they are kept or maintained in the ordinary course of business, or the Documents should be organized and labeled to correspond to the categories of the Documents requested below.

25.     Unless otherwise noted in a specific Request, the relevant time period of these document requests is **April 6, 2015 through the present** (the "Relevant Time Period"). These document requests seek all responsive Documents created or generated during the Relevant Time Period, as well as responsive Documents created or generated outside of the Relevant Time Period, but which contain information concerning the Relevant Time Period.

# REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1.**

Documents, including organizational charts, sufficient to show WME's company structure and the organization of each division, department, unit or subdivision, parent, controlling shareholder(s), subsidiary, joint venture, or affiliate of WME.  This request includes Documents sufficient to show the percentage of any stock or other interests owned by each entity in WME's company structure, and Documents sufficient to show each employee or executive with managerial responsibilities for the provision of Talent Agency Services, including those of a parent or other controlling entity providing strategic direction, control, or advice regarding Talent Agency Services.

**REQUEST FOR PRODUCTION NO. 2.**

Documents sufficient to identify all WME executives, employees, or other personnel who have represented WME at the ATA or on ATA-related committees (including but not limited to the ATA's Negotiation or Strategy Committees), or otherwise have served on or participated in, or supported the work of such committees.

**REQUEST FOR PRODUCTION NO. 3.**

Documents, including directories and organizational charts, sufficient to identify all persons in WME who had any responsibility with respect to the provision of Talent Agency Services.

**REQUEST FOR PRODUCTION NO. 4.**

All Documents sufficient to identify all officers, directors, members, and beneficial owners, and changes in beneficial ownership of WME, including of WME's agents, subsidiaries, or other affiliated or related entities that provide, purchase, or financially benefit from the provision of Talent Agency Services.

**REQUEST FOR PRODUCTION NO. 5.**

For the period January 1, 1999 to the present, Documents sufficient to identify all contemplated, planned, pending, or executed purchases, sales, acquisitions, mergers, joint ventures, divestitures, transfers, spinoffs, or any other change in ownership of any subsidiaries, affiliates, departments, business units, or other subdivisions of WME.

**REQUEST FOR PRODUCTION NO. 6.**

For the period January 1, 2014 to the present, all Documents discussing, concerning, or regarding competition for the provision of Talent Agency Services to or concerning any Writer(s), including but not limited to Documents disclosing, discussing, analyzing, reporting, or otherwise concerning the market share of any Talent Agency.

**REQUEST FOR PRODUCTION NO. 7.**

For the period January 1, 1999 to the present, all agreements and contracts between WME and any Studio, including but not limited to all agreements and contracts regarding the provision of any Talent Agency Services, whether for an individual Project, across multiple Projects, or otherwise.

**REQUEST FOR PRODUCTION NO. 8.**

For the period January 1, 2014 to the present, all Documents constituting, discussing, reflecting, or relating to (i) any complaint, question, or comment from a Studio or a Writer regarding Packaging Fees, (ii) any request by a Studio or a Writer to waive or reduce Packaging Fees, or (iii) the discussion, proposal, offer, or negotiation of a Joint Packaging arrangement for any Project.

**REQUEST FOR PRODUCTION NO. 9.**

All Documents relating to (i) any ATA meeting, briefing, or other communication (including, but not limited to, meetings of the ATA Board of

Directors, the ATA Negotiation Committee, and the ATA Strategy Committee) that discuss, reflect discussions, or concern Packaging, Packaging Fees, Joint Packaging, this lawsuit, the Code of Conduct, the Guilds, or actions between the Guilds and any Talent Agencies; or (ii) discussions of such meetings, including agendas, meeting minutes, notes, attendance lists, expense reports, handouts, memoranda, reports, data, or correspondence.

**REQUEST FOR PRODUCTION NO. 10.**

All Documents that reflect Communications with any other Talent Agency or the ATA discussing, concerning, regarding, or calculating (a) Base License Fee(s) or (b) Upfront License Fee(s).

**REQUEST FOR PRODUCTION NO. 11.**

All Documents constituting, discussing, reflecting, or relating to Communications between any employee, officer, director, or member of WME, on the one hand, and the ATA, Karen Stuart, or any Person claiming to represent the ATA, on the other hand, discussing, concerning, or regarding Packaging, Packaging Fees, Joint Packaging, the Code of Conduct, this litigation, or the Guilds.

**REQUEST FOR PRODUCTION NO. 12.**

All Documents concerning, referencing, or regarding Packaging, or Joint Packaging, or Packaging Fees, including actual, proposed, or offered terms of any Packaging or Joint Packaging agreement and all Communications relating to or reflecting the amount, rate, or calculation of any Packaging Fee.

**REQUEST FOR PRODUCTION NO. 13.**

All Documents referring or relating to any of the following with respect to the provision of Talent Agency Services:

    a)    Any rate or price quotation issued by WME or any other Talent Agency regarding any Talent Agency Service;

b)    Any rate or price change issued by WME or any other Talent Agency regarding any Talent Agency Service;

c)    Any of WME's actual, proposed, or prospective rates or prices, rate or price setting practices, rate or price setting policies, or rate or price setting strategies regarding any Talent Agency Service.

**REQUEST FOR PRODUCTION NO. 14.**

For the provision of Talent Agency Services, WME's business or strategic plans, and Documents relating to:

a)    WME's plans, policies, methods, formulas, guidelines, or factors used to determine, compute, or quote rates or prices regarding any Talent Agency Service; or

b)    WME's contracts, offers, agreements, or proposals for the provision of any Talent Agency Service.

**REQUEST FOR PRODUCTION NO. 15.**

All Documents prepared by, submitted to, or received from any consulting firm, investment bank, or other financial services firm, relating to the provision of any Talent Agency Service.

**REQUEST FOR PRODUCTION NO. 16.**

All Documents discussing, describing, referring to, relating to, reflecting, or concerning any meeting or Communications between any employee, officer, or director/member of WME, on the one hand, and any other Talent Agency or any Person claiming to represent any other Talent Agency, on the other hand, regarding Packaging, Packaging Fees, Joint Packaging, the Code of Conduct, or the Guilds.

**REQUEST FOR PRODUCTION NO. 17.**

All notes, memoranda, email, or any other Documents that concern or reflect

meetings, discussions or communications between WME and any other Talent Agency regarding Packaging, Packaging Fees, Joint Packaging, the Code of Conduct, or the Guilds.

**REQUEST FOR PRODUCTION NO. 18.**

From April 1, 1999 to the present, all Documents constituting, discussing, concerning, or reflecting any agreement or understanding between WME and any other Talent Agency regarding (i) 3-3-10; (ii) the calculation or setting of Packaging Fees; or (iii) the calculation or setting of Base License Fee(s).  Included in this Request are any Documents that discuss, refer to, reference or otherwise concern or are related to discussions among (i) Sam Haskell, former Executive Vice President and Worldwide Head of Television for the William Morris Agency, (ii) Nancy Josephson, former co-President of ICM, (iii) Lee Gabler, former co-Chairman of CAA, (iv) Sam Gores, Chairman of Paradigm Talent Agency, (v) Ari Emanuel, former CEO of Endeavor Talent Agency and current co-CEO of WME, or (vi) representatives of other Talent Agencies, concerning (a) Studio efforts to eliminate or substantially reduce Packaging Fees, (b) Joint Packaging, (c) any agreement or understanding concerning the structure, rate, price, amount, or calculation of Packaging Fees, or (d) any agreement or understanding that certain Talent Agencies would offer Studios the same or substantially similar terms in packaged deals.

**REQUEST FOR PRODUCTION NO. 19.**

For the period January 1, 2014 to the present, all Documents constituting, discussing, concerning, or reflecting (i) any offer, negotiation, or concluded agreement regarding the provision of writing services or sale or option of literary material by any Writer represented by WME to a Studio, relating to a Project or Projects in connection with which the Studio paid a Packaging Fee; or (ii) any offer, negotiation, or concluded agreement between WME and a Studio regarding

---

21

1 | Packaging Fees.

2 | **REQUEST FOR PRODUCTION NO. 20.**

3 | For the period January 1, 2014 to the present, all Documents discussing,

4 | concerning, or reflecting any Project for which WME earned a Packaging Fee where

5 | WME represented only one packaged element on the Project.

6 | **REQUEST FOR PRODUCTION NO. 21.**

7 | For the period January 1, 2014 to the present, all Documents discussing,

8 | concerning, or reflecting any situation in which a Project was delayed, canceled, or

9 | prevented from using Talent due to a disagreement or dispute between WME and

10 | any other Person regarding Packaging, Packaging Fees, or Joint Packaging,

11 | including all policies and practices related thereto and all Communications with any

12 | Writer or any other Person relating thereto.

13 | **REQUEST FOR PRODUCTION NO. 22.**

14 | For the period January 1, 2009 to the present, all Documents discussing,

15 | concerning, or reflecting any complaint received by WME from any of WME's

16 | clients regarding allegations of sexual harassment or sexual assault by any employee

17 | or executive of a Studio.

18 | **REQUEST FOR PRODUCTION NO. 23.**

19 | Data sufficient to show all earnings from Talent Agency Services relating to

20 | a Project that WME has received since January 1, 1999 where WME represented a

21 | Writer on the Project, including (i) a unique identifier or title for each Project; (ii)

22 | the production and initial broadcast date(s) of the Project; (iii) the WME agents or

23 | other employees involved in the Project; (iv) the identity of all Talent WME brought

24 | to the Project; (v) the identity of all Talent other Talent Agencies brought to the

25 | Project, identifying for each individual Talent, the responsible Talent Agency; (vi)

26 | whether the Project was subject to Joint Packaging; (vii) the Studio involved in the

27 |

28 |

Project; (viii) the structure or formula of any Packaging Fees earned; (ix) the combined total of any WME earnings from the Project; (x) a breakdown of any WME earnings from the Project that identifies (1) any Packaging Fees earned (separately for upfront, deferred, and back-end fees), (2) any Commissions earned, and (3) any other WME earnings from the Project; and (xi) for each item in (x), the identity of the entity that paid the earnings.

**REQUEST FOR PRODUCTION NO. 24.**

For each Person identified in response to RFP No. 23, data sufficient to show all earnings of all Talent employed on the Project. To respond to this RFP, produce earnings information separately for each Talent represented by WME.

**REQUEST FOR PRODUCTION NO. 25.**

Data sufficient to show all Commission revenues received by WME for each of the last 20 years from Writers for the provision of writing services or the sale or option of any literary material on any Project.

**REQUEST FOR PRODUCTION NO. 26.**

Documents sufficient to identify each database or data set used or maintained by WME relating to the provision of Talent Agency Services at any time after January 1, 1999 that contains information relating to WME's:

    a.  agents;

    b.  Talent represented;

    c.  Talent compensation;

    d.  Projects;

    e.  Studios for whom any Writer represented by WME performed writing services or sold or optioned literary material;

    f.  Studios owned, in whole or in part, whether by Affiliation or otherwise;

    g.  bids, estimates, quotes, proposals, or responses to requests for information;

h.  prices, costs, or margins;

i.  fees earned, including commissions, Packaging Fees, or any licensing fees (e.g., upfront, deferred, back-end);

j.  earnings or profit and loss reports;

k.  win/loss reports;

l.  research and development projects;

m. marketing, promotions, or advertising; or

n.  competitors.

**REQUEST FOR PRODUCTION NO. 27.**

For each database or data set identified in RFP No. 26, documents sufficient to describe each database or data set, which includes: (1) its software platform; (2) its type (e.g., flat, relational, or enterprise); (3) the sources (e.g., other databases or individuals) used to populate the database; (4) a Data Dictionary; (5) for relational or enterprise databases, documents specifying the relationships among tables (e.g., an entity relationship diagram); (6) any query forms; and (7) any regularly prepared reports produced from that database.

**REQUEST FOR PRODUCTION NO. 28.**

For each of 2015, 2016, 2017, 2018, and 2019, data sufficient to identify Writers in that year who (a) were represented by WME, (b) terminated WME, or (c) signed with WME, and for each Writer, data sufficient to identify the Writer's former Talent Agency or new Talent Agency, as the case may be.

**REQUEST FOR PRODUCTION NO. 29.**

All Documents or data relating to Studio revenue and budgets for any Project.

**REQUEST FOR PRODUCTION NO. 30.**

All Documents or data relating to Writer compensation for any Project.

**REQUEST FOR PRODUCTION NO. 31.**

24

All Documents analyzing, discussing, or relating to the financial impact Packaging has on WME, Talent Agencies, Studios, Writers, or the Guilds and any underlying data used to conduct the analysis or that otherwise is referenced in the Document.

**REQUEST FOR PRODUCTION NO. 32.**

All Documents prepared by WME or any of its financial or consulting advisors that analyzes WME's Packaging practices, Packaging Fees, or the future of Packaging.

**REQUEST FOR PRODUCTION NO. 33.**

All Documents prepared in connection with WME's efforts to launch an initial public offering in 2019 that analyze, discuss, or reference Packaging or Packaging Fees.

**REQUEST FOR PRODUCTION NO. 34.**

All Documents analyzing, discussing, or relating to the effect Packaging Fees have on the output or quality of the film and television industries, as alleged at Paragraph 57 of the First Consolidated Complaint, and any underlying data that supports WME's allegations as to output as alleged at Paragraph 57 of the First Consolidated Complaint.

**REQUEST FOR PRODUCTION NO. 35.**

All Documents reflecting Communications between WME and any other Talent Agency or between WME and ATA concerning the response of such Talent Agency or ATA, or between or among any member of ATA, whether or not WME was an immediate party to such Communication, relating to actions or positions to be taken by one or more Talent Agencies in response to the following: (a) the Guilds' February 21, 2019 Communication transmitting a Copy of a proposed Code of Conduct, including development of ATA bargaining positions in response thereto;

(b) the June 19, 2019 Communication from the Guilds to withdraw consent to ATA and is members engaging in collective negotiations regarding a successor to the AMBA; (c) Communications from WGAW Executive Director David Young to each member of the ATA Negotiating Committee to negotiate individually with each member Agency regarding its individual agreement to the Code of Conduct; and (d) Communications among ATA members relating to positions to be taken is further discussion with the Guilds created or forwarded after a June 28, 2019 letter from the Guilds' counsel to ATA Negotiating Committee members advising them to cease and desist from collective discussions.

**REQUEST FOR PRODUCTION NO. 36.**

All Documents reflecting Communications between WME and any other Talent Agency or between WME and ATA concerning the response of such Talent Agency or ATA , or between or among any member of ATA, whether or not WME was an immediate party to such Communication, concerning actions or positions to be taken by one or more Talent Agencies in response to the following: (a) the action by Verve, on or about May 16, 2019, to sign a franchise agreement with the Guilds, (b) the action taken by Kaplan Stahler, on or about June 22, 2019, to sign a franchise agreement with the Guilds, (c) the action taken by Buchwald, on or about July 25, 2019, to sign a franchise agreement with the Guilds, (d) the action taken by Abrams Artists Agency, on or about November 13, 2019, to sign a franchise agreement with the Guilds, (e) the action taken by RBEL, on or about November 18, 2019, to sign a franchise agreement with the Guilds, or (f) the action taken by Pantheon, on or about March 15, 2019, to sign a franchise agreement with the Guilds.  For the avoidance of doubt, this Request should be deemed to include all Documents that reference or refer to a Talent Agency's determination, intention, or plan not to work with, or otherwise not deal with, Abrams Artists Agency, Buchwald, Kaplan Stahler Agency,

Pantheon, RBEL, or Verve (or any their clients), in any capacity whatsoever.

**REQUEST FOR PRODUCTION NO. 37.**

All Documents reflecting Communications between WME and any other Talent Agency, or between WME and ATA concerning the response of such Talent Agency or ATA, or between or among any member of ATA, whether or not WME was an immediate party to such Communication, concerning actions or positions to be taken by one or more Talent Agencies in response to the to the WGAW's March 20, 2019 authorization to lawyers to "negotiate overscale terms and conditions of employment for individual Writers" as described in Answer and Counterclaim Paragraph 399, and Communications by WME with attorneys that were potentially covered by the WGA's authorization.

**REQUEST FOR PRODUCTION NO. 38.**

All Documents, including policies, standards, guidelines, or warnings, concerning WME's compliance with U.S. federal and state antitrust laws.

**REQUEST FOR PRODUCTION NO. 39.**

All Documents, including policies, standards, guidelines, or warnings, concerning the ATA's compliance with U.S. federal and state antitrust laws.

**REQUEST FOR PRODUCTION NO. 40.**

All Documents discussing, concerning, or reflecting the exchange of Competitively Sensitive Information among Talent Agencies, whether between individual Talent Agencies or by way of a third-party intermediary such as the ATA.

**REQUEST FOR PRODUCTION NO. 41.**

All Documents reflecting, concerning, or relating to the impact of Packaging, Packaging Fees, the present disputes with the Guilds, the Code of Conduct, or the termination of the AMBA on investments by shareholders of Talent Agencies.

**REQUEST FOR PRODUCTION NO. 42.**

DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
Case No. 2:19-cv-05465-AB-AFM

All Documents reflecting, concerning, or relating to WME's policies and practices regarding the retention, destruction, disposal or preservation of Documents and ESI and, if such policies or practices have been different with respect to any category of Documents over different time periods, Documents sufficient to (a) identify each such category and time period and (b) describe WME's retention policy or practice with respect to each such category and time period.

**REQUEST FOR PRODUCTION NO. 43.**

All Documents referring or relating to written policies, procedures, and guidelines related to WME's computers, computer systems, electronic data, or electronic media, including, by way of example and not limitation: (i) backup tape rotation schedules; (ii) electronic data retention, preservation, and destruction schedules; (iii) employee usage policies for company computers, telephones, and other technology; (iv) company-wide monitoring software; (v) electronic media deployment, allocation, and maintenance procedures for new employees, current employees, or departed employees; and (vi) personal or home computer usage policies for work-related activities.

**REQUEST FOR PRODUCTION NO. 44.**

All Documents and Communications constituting, discussing, reflecting, concerning, or relating to information shared either (a) between or among WME and one or more private equity firms or funds, or (b) between or among any private equity firms or funds (including Silver Lake and TPG), regarding the business of Talent Agencies, including Packaging, WME's ability to obtain Packaging Fees, the Talent Agencies' expansion into content production and ownership, WME's ability to restrict access to Talent that it represents, or the present disputes with the Guilds.

**REQUEST FOR PRODUCTION NO. 45.**

All Documents between or among Talent Agencies, either directly or by way

of a third-party such as the ATA, reflecting, concerning, or relating to WME's decision (including the concealment thereof) to assemble a Package or Joint Package based on the amount of Packaging Fees that WME would earn, rather than the fee that the Writer would earn.

**REQUEST FOR PRODUCTION NO. 46.**

All Documents between or among Talent Agencies, either directly or by way of a third-party such as the ATA, reflecting, concerning, or relating to promises, threats, or future plans by a Talent Agency to not do business with any other Talent Agency (including Abrams Artists Agency, Buchwald, Kaplan Stahler Agency, Pantheon, RBEL, or Verve), any other Talent Agency's clients, or any Writer(s).

**REQUEST FOR PRODUCTION NO. 47.**

All ATA Board of Director and Board committee minutes, pre-meeting Board packets, presentations and any other such Documents relating to, regarding, or referencing:

    (1)    any proposed or actual agreement or understanding between or among Talent Agencies, including any Plaintiff and Counter-Defendant, concerning the provision of Talent Agency Services;

    (2)    any investigations by any Person into the legality of such agreements or understandings;

    (3)    any findings from such investigations; or

    (4)    any resolutions or other Board or committee decisions arrived at after consideration of the results of any such investigations.

**REQUEST FOR PRODUCTION NO. 48.**

All Documents relating to the voluntary or involuntary termination, retirement, resignation, discipline, discharge, reassignment, transfer, or suspension of any employee who was terminated, disciplined, discharged, or suspended, or who

retired or resigned as a result of his or her alleged participation in, involvement in, or knowledge of any agreement, understanding, plan, contract, combination, or conspiracy, express or implied, regarding the provision of Talent Agency Services between WME and any other Talent Agency.

**REQUEST FOR PRODUCTION NO. 49.**

All Documents relating to the voluntary or involuntary termination, retirement, resignation, discipline, discharge, reassignment, transfer, or suspension of any employee who was terminated, disciplined, discharged, or suspended, or who retired or resigned as a result of his or her alleged participation in, involvement in, or knowledge of any potential or actual conflict of interest related to WME's provision of Talent Agency Services.

**REQUEST FOR PRODUCTION NO. 50.**

All Communications and filings, made at any time, with the U.S. Department of Justice or the Federal Trade Commission, including all filings and submissions made pursuant to the Hart-Scott-Rodino Act, with respect to the merger of William Morris and Endeavor.

**REQUEST FOR PRODUCTION NO. 51.**

Produce the following Documents for each officer of WME and for each of WME's employees, agents or contractors who either (1) has or had any direct or indirect responsibility for or participated in setting, recommending, preparing, reviewing, approving, adjusting, evaluating, or disclosing rates, prices, or any other terms or conditions for the provision of Talent Agency Services; (2) attended any meetings of the ATA; (3) had any meeting or Communication relating to Packaging with any present or former officer, director, employee, or agent of another Talent Agency; or (4) was voluntarily or involuntarily terminated, or was disciplined, discharged, reassigned, transferred, or suspended, as a result of his or her alleged

participation in, involvement in, or knowledge of any agreement, understanding, plan or contract, combination, or conspiracy, express or implied, relating to the Provision of Talent Agency Services between WME and any other Talent Agency:

(a) The personal and company copy of all electronic or manual diaries, calendars, pocket calendars, calendar pads, appointment books, or appointment notes;

(b) Voice mail, answering machine messages, e-mail, text messages, or other correspondence to and from each such person relating to any communication between Talent Agencies regarding Packaging;

(c) The personal and company copy of all trip and travel logs, records, and supporting Documents;

(d) The personal and company copy of all expense reimbursement or entertainment records and supporting Documents;

(e) The personal and company copy of all telephone number logs, telephone message logs, directories, notebooks, card files (such as Rolodex cards) or memoranda;

(f) All long distance or cellular telephone bills, statements and records and supporting Documents recording or relating to long distance or cellular telephone calls by such officers, employees, agents, or contractors; and

(g) The personal and company copies of all Documents relating to actual or proposed participation or membership in the ATA or any committee or subcommittee thereof relating to Packaging, including meeting minutes, agendas, attendance lists, handouts, notes, and publications.

**REQUEST FOR PRODUCTION NO. 52.**

All Documents distributed at, prepared in connection with, taken to, received at, or creating during any meeting attended by WME and any other Talent Agency

DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
Case No. 2:19-cv-05465-AB-AFM

at which there was a discussion, presentation, or Communication regarding Packaging.

**REQUEST FOR PRODUCTION NO. 53.**

All Documents discussing or reflecting (prospectively or retrospectively) WME's Communications with the trade press, including *Deadline*, *Variety* and *The Hollywood Reporter*, regarding (a) Packaging, (b) Packaging Fees, (c) this lawsuit, (d) the Code of Conduct, or (e) the Guilds.

**REQUEST FOR PRODUCTION NO. 54.**

All Documents concerning or reflecting WME's Communications with any Writer regarding (a) Packaging, (b) Packaging Fees, (c) this lawsuit, (d) the Code of Conduct, or (e) the Guilds.

**REQUEST FOR PRODUCTION NO. 55.**

All Documents concerning or reflecting WME's Communications with any Studio regarding (a) Packaging, (b) Packaging Fees, (c) this lawsuit, (d) the Code of Conduct, or (e) the Guilds, or (f) the Guilds' efforts to require Studios to deal only with franchised Talent Agencies.

**REQUEST FOR PRODUCTION NO. 56.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to (a) WME's fiduciary duties to its clients, or (b) any potential or actual conflict of interest arising from WME's provision of Talent Agency Services, including all Documents constituting, reflecting, concerning, or relating to WME's policies and practices regarding topics (a) and (b), and all Communications with any Writer or any other Person regarding topics (a) and (b).

**REQUEST FOR PRODUCTION NO. 57.**

For the period January 1, 2014 to the present, all Documents constituting,

analyzing, discussing, or relating to WME's disclosure of information concerning any potential or actual conflict of interest arising from WME's provision of Talent Agency Services, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 58.**

For the period January 1, 2014 to the present, all Documents constituting, analyzing, discussing, or relating to WME's disclosure of information regarding Packaging or Packaging Fees to WME's clients, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 59.**

For the period January 1, 2014 to the present, all Documents constituting, reflecting, concerning, analyzing, discussing, or relating to any WME client's waiver of or consent to any actual or potential conflict of interest relating to Packaging or Packaging Fees.

**REQUEST FOR PRODUCTION NO. 60.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to WME's negotiation of any profit definition for any Writer, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 61.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to WME's collection or non-collection of "double commission," as defined in the AMBA, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 62.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to WME's refund of any commission to any Writer as a result of Packaging in a Project, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 63.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to WME's negotiation of Packaging Fees on any Project on which WME procured or sought to procure the employment of a single Talent element, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 64.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, or relating to any offer by WME to procure the employment of any Writer by a Studio for less compensation than that Writer had previously earned on any other Project.

**REQUEST FOR PRODUCTION NO. 65.**

All Documents from any time reflecting, concerning, analyzing, discussing, or relating to WME's provision of Talent Agency Services to Counterclaimant Meredith Stiehm.

**REQUEST FOR PRODUCTION NO. 66.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to (a) WME's preference or decision not to procure or attempt to procure employment for any client of WME on any Project on which WME was not receiving a Packaging Fee, or (b) any attempt by

34

WME to prevent, objection by WME to, or comment or question by WME concerning the employment of any Talent not represented by WME on any Project on which WME sought to receive or did receive a Packaging Fee, or (c) WME's preference or decision to procure or attempt to procure employment for any client of WME on those Projects on which WME was receiving Packaging Fees, including all policies and practices regarding topics (a), (b), or (c) and all Communications with any Writer or any other Person regarding topics (a), (b), or (c).

**REQUEST FOR PRODUCTION NO. 67.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to WME's attempt to procure employment for any client of WME at any Studio with which WME has any Affiliation, including all policies and practices relating thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 68.**

From the period of January 1, 1999 to the present, all agreements and contracts between WME and any Studio concerning any Affiliation between said Studio and WME.

**REQUEST FOR PRODUCTION NO. 69.**

All documents supporting WME's contention in the First Consolidated Complaint that WME's receipt of Packaging Fees benefits Writers represented by WME.

**REQUEST FOR PRODUCTION NO. 70.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to the market valuation of Packaging, including all policies and practices relating thereto and all Communications with any Person relating thereto.

**REQUEST FOR PRODUCTION NO. 71.**

All Documents that concern, discuss, or refer to a Writer's Communication of his or her preference not to be employed on a Project on which any Talent Agency was receiving Packaging Fees or of his or her preference for any Talent Agency not to receive Packaging Fees on any Project on which the Writer was employed, or any Communication constituting or reflecting any question from any Writer concerning his or her employment on a Project on which any Talent Agency was receiving Packaging Fees or concerning the payment of Packaging Fees on such a Project, as well as WME's response to any such Communication, as alleged in Paragraph 35 of the First Consolidated Complaint.

**REQUEST FOR PRODUCTION NO. 72.**

All Documents that support WME's allegation that it "often . . . earns less from such productions on a packaging-fee model than [it] would have earned on a more traditional commission-based model", as alleged at Paragraph 50 of the First Consolidated Complaint.

**REQUEST FOR PRODUCTION NO. 73.**

All Documents that concern, discuss, relate to, or refer any Communication by any employee, executive, officer, director, or manager of WME to either (a) a Studio, (b) a producer, (c) a Writer, (d) a lawyer, or (e) a Talent manager in which such employee, executive, officer, director, or manager of WME stated any intention, on behalf of himself, herself, or WME (alone or in conjunction with any other Talent Agencies), not to do business with, not to deal with, not to allow Talent represented by WME to do business with, not to allow Talent represented by WME to deal with, "blacklist," "blackball," or put in the "penalty box" the recipient or the recipient's employer.

**REQUEST FOR PRODUCTION NO. 74.**

All Documents that concern, discuss, relate to or refer to any "blacklist" or any similar list of (i) individuals, including Writers, lawyers, or managers, or (ii) entities, such as Studios, whom WME (alone or in conjunction with any other Talent Agencies) has refused to do business with, to deal with, to allow Talent represented by WME to do business with, to allow Talent represented by WME to deal with, or whom WME has otherwise "blackballed" or put in the "penalty box" as those terms are commonly understood in the industry.

**REQUEST FOR PRODUCTION NO. 75.**

All Documents that concern, discuss, analyze, relate to, or refer to a Writer's invocation, or intention to invoke, any of the "narrowly-tailored regulations" provided for in the 1976 AMBA that are alleged at Paragraphs 78 and 79 of the First Consolidated Complaint.

**REQUEST FOR PRODUCTION NO. 76.**

All Documents in which any director, officer, manager, executive or employee of WME refers to any Studio or Studios as a "client" or "clients" of theirs or of WME's.

**REQUEST FOR PRODUCTION NO. 77.**

Documents sufficient to show the existence, terms, and signatories to any joint defense agreement or common interest agreement entered into among the Agencies and any other Persons.

**REQUEST FOR PRODUCTION NO. 78.**

All Documents that discuss or otherwise concern any offer or proposal made to the ATA or any Agency regarding either (a) the Code of Conduct, or (b) a franchise agreement.

**REQUEST FOR PRODUCTION NO. 79.**

All WME balance sheets, financial statements, monthly income statements,

DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
Case No. 2:19-cv-05465-AB-AFM

1    monthly cash flow statements, and general ledgers.

2    **REQUEST FOR PRODUCTION NO. 80.**

3         Documents concerning any injury to WME, as alleged at Paragraph 190 of the

4    First Consolidated Complaint.

5    DATED: December 20, 2019        ALTSHULER BERZON LLP

6

7                              /s/ Stacey Leyton

8                              Stacey Leyton

9               Stephen P. Berzon

10              sberzon@altber.com
                Stacey Leyton

11              sleyton@altber.com
                P. Casey Pitts

12              cpitts@altber.com
                Rebecca C. Lee

13              rlee@altber.com
                Andrew Kushner

14              akushner@altber.com

15              177 Post Street, Suite 300
                San Francisco, California 94108

16              Telephone: (415) 421-7151
                Facsimile: (415) 362-8064

17

18              Anthony R. Segall
                asegall@rsglabor.com

19              Juhyung Harold Lee
                hlee@rsglabor.com

20              ROTHNER, SEGALL & GREENSTONE
                510 South Marengo Avenue

21              Pasadena, California 91101
                Telephone: (626) 796-7555

22              Facsimile: (626) 577-0124

23              W. Stephen Cannon

24              scannon@constantinecannon.com
                CONSTANTINE CANNON LLP

25              1001 Pennsylvania Ave, NW, Ste. 1300N
                Washington, DC 20004

26              Telephone: (202) 204-3500
                Facsimile: (202) 204-3501

27

                                  38

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ethan E. Litwin (*pro hac vice* pending)
elitwin@constantinecannon.com
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701

*Attorneys for Defendants and Counterclaimants*

DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
Case No. 2:19-cv-05465-AB-AFM

# EXHIBIT B

Stephen P. Berzon (SBN 46540)
sberzon@altber.com
Stacey Leyton (SBN 203827)
sleyton@altber.com
P. Casey Pitts (SBN 262463)
cpitts@altber.com
Rebecca C. Lee (SBN 305119)
rlee@altber.com
Andrew Kushner (SBN 316035)
akushner@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

Anthony R. Segall (SBN 101340)
asegall@rsglabor.com
Juhyung Harold Lee (SBN 315738)
hlee@rsglabor.com
ROTHNER, SEGALL &
 GREENSTONE
510 South Marengo Avenue
Pasadena, California 91101
Telephone: (626) 796-7555
Facsimile: (626) 577-0124

W. Stephen Cannon (*pro hac vice*)
scannon@constantinecannon.com
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave, NW, Ste. 1300N
Washington, DC 20004
Telephone: (202) 204-3500
Facsimile: (202) 204-3501

Ethan E. Litwin (*pro hac vice*)
elitwin@constantinecannon.com
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701

*Attorneys for Defendants and Counterclaimants*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, *et al.*,<br><br>    Plaintiffs and Counterclaim Defendants,<br><br>    v.<br><br>WRITERS GUILD OF AMERICA, WEST, INC., *et al.*,<br><br>    Defendants and Counterclaimants,<br><br>and PATRICIA CARR, *et al.*<br><br>    Counterclaimants. | Case No. 2:19-cv-05465-AB-AFM<br><br>**DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF/COUNTERCLAIM DEFENDANT CREATIVE ARTISTS AGENCY, LLC** |

**PROPOUNDING PARTIES:  DEFENDANTS/COUNTERCLAIMANTS AND INDIVIDUAL COUNTERCLAIMANTS PATRICIA CARR, ASHLEY GABLE, DERIC A. HUGHES, DAVID SIMON, AND MEREDITH STIEHM**

**RESPONDING PARTY:  PLAINTIFF AND COUNTERCLAIM DEFENDANT CREATIVE ARTISTS AGENCY, LLC**

**SET NUMBER:  ONE**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendants and Counterclaimants **Writers Guild of America, West**, **Writers Guild of America, East, and Individual Counterclaimants Patricia Carr, Ashley Gable, Deric A. Hughes, David Simon, and Meredith Stiehm** propound the following Requests for Production ("Requests") on Plaintiff and Counterclaim Defendant Creative Artists Agency, LLC, to be answered in writing in compliance with Rule 34 of the Federal Rules of Civil Procedure, within 30 days from the date of service.   In answering and responding to these requests for production of documents CAA shall identify and produce all requested documents within the actual or constructive possession, custody, or control of CAA, or CAA's officers, employees, agents, representatives or attorneys.

Defendants and Counterclaimants request that such production be made in accordance with the "DEFINITIONS" and "INSTRUCTIONS" set forth below.

### DEFINITIONS

1.     The following rules of construction should apply to all discovery requests:

    a.  "All" should be construed to include the collective as well as the singular and shall mean "each," "any," and "every."  The terms "any," "all," "each," and "every" should be understood in either their most or least inclusive sense as necessary to bring within the scope of the

Request all responses that might otherwise be construed to be outside of the scope.

b. "And" and "or" should be construed so as to require the broadest possible response. If, for example, a request calls for information about "A or B" or "A and B," CAA should produce all information about A and all information about B, as well as all information about A and B collectively. In other words, "or" and "and" should be read as "and/or."

c. "Any" shall be construed to mean "any and all."

d. "Including" shall be construed to mean "without limitation." "Including" is used to emphasize certain types of documents requested and should not be construed as limiting the request in any way.

e. The use of the singular form of any word includes the plural and vice versa.

2. "Document" or "Documents" has the broadest meaning possible, including all Communications. "Document" or "Documents" includes all "writings," "recordings," or "photographs" as those terms are defined in Federal Rule of Civil Procedure 34 and Rule 1001 of the Federal Rules of Evidence. Without limiting the generality of the foregoing, the term "Documents" includes both hard copy documents as well as electronically stored data files. Regarding hard copy documents, the term "Documents" includes all written or printed matter of any kind, including the originals and all non-identical copies thereof (whether different from the originals by reason of any interlineation, receipt stamp, indication of copies sent or received, or other notation made on such copies or otherwise), including memoranda, notes, opinions, compilations, chronicles, minutes, agenda, notations of any sort of conversations, contracts, agreements, reports, summaries, teletypes, telefax, thermafax, confirmations, inter-office and intra-office Communications, printed e-mail, printed text messages, printed instant messages, all written or graphic

3

records of representations of any kind, and all records of representations of any kind. Regarding electronically stored data files, the term "Documents" includes correspondence, memoranda, legal pleadings, calendars, diaries, travel records, summaries, records of telephone conversations, telegrams, teletypes, telefax, thermafax, confirmations, notes, reports, compilations, notebooks, work papers, graphs, charts, blueprints, books, pamphlets, brochures, circulars, manuals, instructions, ledgers, drawings, sketches, photographs, videotapes, audiotapes, film and sound reproductions, e-mails, instant messages, text messages, collaboration software tools (including Slack), internal or external web sites, audio or video discs, data on magnetic or optical storage media (*e.g.*, servers, storage area networks, hard drives, backup tapes, CDs, DVDs, Bluray, DVD-HD thumb flash drives, floppy disks or any other type of portable storage device, etc.) stored as an "active" or backup file, in its native format, computer files, discs and drives, sales, advertising and promotional literature, agreements, stored recordings, minutes or other records of meetings, computer data (including information or programs stored in a computer, whether or not ever printed out or displayed) and all drafts, alterations, modifications, changes, and amendments of any of the foregoing, all written or graphic records of representations of any kind, and all mechanical or electronic data, records of representations of any kind, including photographs, microfiche, microfilm, videotape, records and motion pictures, and electronic, mechanical, or electric records or representations, tapes, cassettes, discs, magnetic cards, recordings, and cloud storage services.

3.     "Electronically Stored Information," abbreviated as "ESI" has the same meaning and scope as it has in the Federal Rules of Civil Procedure and includes the following:

a. structured and unstructured data, as those terms are defined in The Sedona Conference Glossary, available at www.thesedonaconference.org/publications;

b. activity listings of electronic mail receipts or transmittals;

c. output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, text messages (SMS, MMS, or TMS), instant messages (such as iMessage, WhatsApp, WeChat, Google Hangout, or similar program) or bulletin board programs, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, a deleted file, or file fragment;

d. any and all items stored on computer memories, hard disks, floppy disks, CD discs, DVD discs, flash drives, thumb drives, memory cards, magnetic tape, microfiche, or in any other vehicle for digital data storage or transmittal, such as a personal digital assistant (e.g., iPhone, Android, Blackberry, Smart Phone or similar device) and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all documents requested herein;

e. any and all items stored on voice-mail systems, websites, company intranet sites, chat rooms, and social networking websites (e.g., Facebook, Twitter, LinkedIn, and other social websites listed at http://en.wikipedia.org/wiki/List of social networking websites); and any and all data, data compilations, and data analyses.

DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
Case No. 2:19-cv-05465-AB-AFM

4. "Person" or "Persons" includes individuals, corporations, partnerships, limited partnerships, unincorporated associations, and all other governmental and non-governmental entities.

5. "You" or "Yours" or "CAA" refers to Plaintiff and Counterclaim Defendant Creative Artists Agency, LLC and: (a) all of its officers, directors, members, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction; and (b) any entity that exercises control over, or provides strategic direction or recommendations to, CAA, all of its officers, directors/members, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf.

6. "Communication" or "Communications" means the oral or written transmittal of information of any kind (in the form of facts, ideas, inquiries, or otherwise) by any means, including any face to face, telephonic, video or other virtual meeting, conversation, discussion, conference, correspondence, message, or other written, electronic, or oral transmission, exchange, or transfer of information in any form between two or more persons, including in person or by telephone, facsimile, telegraph, telex, e-mail, text message, instant message, collaboration software tools such as Slack, or other medium. The phrase "communication between" is defined to include instances where one party communicates with another party but that other party does not necessarily respond.

7. Each of the words "concerning," "reflecting," "relating," "supporting," "negating," "evidencing," and "referring" shall be defined to include the common meanings of all those terms, and shall include indirect as well as direct references to the subject matter set forth in the Request.

8.     "Abrams Artists Agency" means Abrams Artists Agency LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

9.     "ATA" means the Association of Talent Agents, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.  This includes members of the ATA's Negotiating Committee, the Strategy Committee, the Board of Directors, and any other formal or informal committee or group that the ATA has convened, organized, sponsored or facilitated.

10.     "Buchwald" means Don Buchwald & Assocs., Inc., a/k/a The Buchwald Agency, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

11.     "UTA" means United Talent Agency LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

12.     "ICM" means International Creative Management Partners, LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

13.     "Kaplan Stahler" means The Kaplan-Stahler Agency, Inc., and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

14.   "Pantheon" means Pantheon Talent Group LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

15.   "RBEL" means Rothman Brecher Ehrich Livingston, Inc., and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

16.   "Silver Lake" means Silver Lake Management LLC, a/k/a Silver Lake Partners, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, funds (including Silver Lake Partners IV, L.P.), predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

17.   "TPG" means Tarrant Capital IP LLC, a/k/a TPG Capital, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, funds (including TPG Partners VI, L.P.), predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

18.   "WME" means William Morris Endeavor Entertainment, LLC and: (a) all of its officers, directors, members, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction; and (b) any entity that exercises control over, or provides strategic direction or recommendations to, WME, all of its officers, directors/members, employees, affiliates, associates, agents, attorneys, subsidiaries,  divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf.

8

19.   "Verve" means Verve Talent & Literary Agency, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

20.   "Affiliation" means any ownership or other financial interest or similar association between entities, including but not limited to the relationship between CAA and wiip Productions LLC.

21.   "Talent Agency" means any entity registered under the California Talent Agencies Act ("TAA"), Article 11 of the New York General Business Law, Article 37 of the New York Arts and Cultural Affairs Law ("Article 37"), or any other similar law.

22.   "Talent Agency Services" includes all aspects of the representation of Talent including but not limited to (i) procuring, offering, promising, or attempting to procure employment or engagements for Talent, and (ii) any other service provided by a Talent Agency as set forth in Paragraph 40 of Plaintiffs' First Consolidated Complaint.  For the purposes of the RFPs, "Talent Agency Services" also includes any services provided by a Talent Agency to a Studio, including services provided for an individual Project, across multiple Projects, or generally, and any other business interaction involving a Talent Agency and a Studio.

23.   The "Guilds" or "WGA" refers collectively to the Writers Guild of America, West, and the Writers Guild of America, East.

24.   "Writer" refers to any writer who provides writing services or sells or options literary material pursuant to the terms of the MBA, as defined at Paragraph 269 of the Answer and Counterclaims, as well as any entity created or existing for the purpose of lending or otherwise providing the writing services of, or selling or optioning the literary material of, any Writer.

25.   "Talent" includes, individually and collectively, Writers, directors, actors, producers and other above and below-the-line creative elements that are employed by a Studio on a Project.

26.   "Studio" refers to any member of the Alliance of Motion Picture and Television Producers or other entity, including any production company, studio, network, or other financier, that directly or indirectly employs, or purchases or utilizes the services of, Writers, as set forth at Paragraph 269 of the Answer and Counterclaims.

27.   "AMBA" refers to the Artists' Manager Basic Agreement between the Guilds and the ATA in effect during the period from September 22, 1976 to on or around April 12, 2019.

28.   "Code of Conduct" refers to, individually and collectively, (i) the documents dated on or about February 21, 2019 that the Guilds provided to ATA members, including CAA, concerning the relationship among the WGA, Talent Agencies, and Writers, including all subsequent drafts thereto; (ii) the documents dated on or about April 13, 2019 that the Guilds implemented that govern the relationship among the WGA, Talent Agencies, and Writers, including all subsequent drafts thereto; and (iii) the documents (including Codes of Conduct or franchise agreements) postdating April 13, 2019 that the Guilds implemented that govern the relationship among the WGA, Talent Agencies, and Writers, including all subsequent drafts thereto and including all such agreements with Abrams Artists Agency, Buchwald, Kaplan Stahler Agency, Pantheon, RBEL, and Verve.

29.   "Project" refers to an audiovisual entertainment project, such as a television series or a feature film.

30.   "Commissions" refers to the method of compensating Talent Agencies for procuring employment for their clients, as described at Paragraphs 5, 6, and 275 of the Answer and Counterclaims.

10

31.   "Packaging" refers to any practice by which Talent Agencies represent one or more Talent elements of a Project, including as described at Paragraphs 275-282 of the Answer and Counterclaim.

32.   "Packaging Fees" refers to any price, payment, emolument, stipend, cost, or rate, including any component or portion thereof, paid by or on behalf of a Studio to a Talent Agency in connection with its representation of one or more Talent elements of a Project, including as described at Paragraph 279 of the Answer and Counterclaims.

33.   "3-3-10" refers to the standard Packaging Fee, ordinarily defined to be comprised of a 3% "Upfront License Fee," a 3% "Deferred License Fee," and a 10% "Back-end Fee," as described at Paragraph 279 of the Answer and Counterclaims.

34.   "Base License Fee" refers to the dollar amount that a network actually remits, or is deemed to hypothetically remit, to a Studio for delivered creative content, as described at Paragraph 279 of the Answer and Counterclaims.

35.   "Joint Packaging" or "Shared Packaging" refers to any practice by which more than one Talent Agency share a Packaging Fee paid for a single Project.

36.   "Competitively Sensitive Information" refers to any company strategies, plans, policies, procedures, trade secrets, trade craft, price information, rate information, cost information, product or service information, supplier information, customer information, employee information, or expansion or contraction plans.

## **INSTRUCTIONS**

1.      Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these Requests for Production shall be deemed to be continuing in nature so that, if CAA subsequently discovers or obtains possession, custody, or control of any Document or ESI previously requested or required to be produced, CAA shall make such Documents or ESI available within 7 days of discovery or possession. These Requests call for the production of all responsive documents within the actual or constructive possession, custody or control of CAA.

2.      Except as to Documents and things as to which CAA asserts a claim of privilege or other exemption from disclosure, furnish all Documents or things in CAA's actual or constructive possession, custody, or control, or known or available to CAA, regardless of the physical location of the Documents, or whether such Documents or things are possessed directly by CAA or by CAA's employees, agents, representatives, affiliates, subsidiaries, accountants, attorneys, investigators, or consultants.

3.      If any Document covered by these requests is withheld by reason of a claim of attorney-client privilege, attorney work product protection, or any other privilege or protection, please furnish a log providing the following information with respect to each such withheld document: date, author, recipients, general subject matter sufficient to make a prima facie determination whether the asserted privilege has been properly invoked, and legal basis upon which the Document has been withheld.

4.      In producing Documents, CAA is requested to produce the original of each Document requested, together with all non-identical copies and drafts of such Document. If the original of any Document cannot be located, a copy shall be produced in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

5.      If any requested Document cannot be produced in full, CAA is to produce it to the extent possible, indicating which Document, or portion of such Document, is being withheld, and the reason that it is being withheld.

6.      If production of any portion of a Document is required pursuant to these Requests, produce the entirety of that Document.

7.      Documents not otherwise responsive to these Requests shall be produced if such Documents mention, discuss, refer to, or explain the Documents that are called for by these Requests, or if such Documents are attached to Documents called for by these Requests and constitute routing slips, transmittal memoranda, letters, cover sheets, comments, evaluation, or similar materials.

8.      All Documents shall be produced in the same order as they are kept or maintained by CAA in the ordinary course of CAA's business. If any Documents have been removed from the files in which they were found for purposes of producing them in response to these Requests, indicate for each Document the file(s) from which the Document(s) was (or were) originally located.

9.      If a Document once existed and has subsequently been lost, destroyed, or is otherwise missing, please provide sufficient information to identify the Document and state the details concerning its loss.

10.     With respect to any Document maintained or stored electronically, please harvest it in a manner that maintains the integrity and readability of all data, including all metadata.

11.     Unless otherwise agreed, all ESI should be produced in native format on compact disc(s), DVD disc(s), or zip drives in the original electronic file format(s) of the Documents.   Specifically, and in no way limiting the generality of the foregoing, presentations, such as PowerPoint presentations, and data compilations, such as Excel spreadsheets, shall be produced in native format.

12.     Data called for by this Request must be submitted electronically in a reasonably usable compilation that will allow the Guilds to access the information it contains. For the Guilds to be able to access and interpret data, the CAA must respond to RFP No. 26 including, for each database, a Data Dictionary that includes, for each table in the database:

     a.  the name of the table;

     b.  a general description of the information contained;

     c.  the size in both number of records and megabytes;

     d.  a list of fields;

     e.  the format, including variable type and length, of each field;

     f.  a definition for each field as it is used by CAA, including the meanings of all codes that can appear as field values;

     g.  the fields that are primary keys for the purpose of identifying a unique observation;

     h.  the fields that are foreign keys for the purpose of joining tables; and

     i.  an indication of which fields are populated.

13.     Please produce all Documents maintained or stored electronically in native, electronic format with all relevant metadata intact. Encrypted or password-protected Documents should be produced in a form permitting them to be reviewed. Defendants-Counterclaimants also request CAA to immediately meet and confer regarding the manner in which CAA shall produce Documents in order for the parties to try and reach agreement in this regard and avoid any unnecessary expense.

14.     Please organize electronic Documents produced for inspection in the same manner that CAA stores them (*e.g.*, if maintained by a custodian, such as e-mail residing on an e-mail server, please organize Documents for production by custodian; if maintained as a subfolder of "My Documents" on a custodian's hard

drive, please organize Documents for production by custodian with path information preserved, etc.).

15.     Documents attached to each other should not be separated, including hard-copy versions of Documents attached to hard-copy printouts of e-mails produced pursuant to these Requests.

16.     At CAA's election, Documents maintained or stored in paper, hard-copy form can be produced as searchable .PDF (*i.e.*, portable Document format files with embedded text) and in an appropriate and usable manner (*e.g.*, by copying such data onto an external hard drive).

17.     These requests require production of paper documents in the same form and same order as they are kept in the usual course of business or organized and labeled to correspond with the requests set forth below. If CAA chooses the former method, the Documents are to be produced in the boxes, file folders, binders, and other containers in which the Documents are found. The titles, labels, or other descriptions on the boxes, file folders, binders or other containers are to be left intact.

18.     Documents stored as electronic data on magnetic, optical, or other storage media as "active" or "backup" files shall be produced in their native formats with any associated metadata.

19.     To the extent responsive Documents reside on databases and other such systems and files, CAA is requested to produce the relevant database in useable form or permit access for inspection, review, and extraction of responsive information.

20.     Each document request, and each subpart thereof, shall be separately set forth and accorded a separate answer. Each response shall first set forth verbatim the document request to which it is responsive, followed by CAA's response.

21.     No part of a document request shall be left unanswered merely because an objection was interposed to another part of the document request.

22.     If CAA objects to any document request or subpart thereof, the objection shall state with specificity all grounds. Any ground not stated shall be waived.

23.     Failure to provide information in response to these document requests will be deemed a waiver of CAA's right to produce such evidence at trial. Defendants-Counterclaimants reserve the right to move to preclude the introduction of any evidence not produced in response to this Request.

24.     Documents should be produced in the same order as they are kept or maintained in the ordinary course of business, or the Documents should be organized and labeled to correspond to the categories of the Documents requested below.

25.     Unless otherwise noted in a specific Request, the relevant time period of these document requests is **April 6, 2015 through the present** (the "Relevant Time Period").  These document requests seek all responsive Documents created or generated during the Relevant Time Period, as well as responsive Documents created or generated outside of the Relevant Time Period, but which contain information concerning the Relevant Time Period.

DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
Case No. 2:19-cv-05465-AB-AFM

# REQUESTS FOR PRODUCTION

## REQUEST FOR PRODUCTION NO. 1.

Documents, including organizational charts, sufficient to show CAA's company structure and the organization of each division, department, unit or subdivision, parent, controlling shareholder(s), subsidiary, joint venture, or affiliate of CAA.  This request includes Documents sufficient to show the percentage of any stock or other interests owned by each entity in CAA's company structure, and Documents sufficient to show each employee or executive with managerial responsibilities for the provision of Talent Agency Services, including those of a parent or other controlling entity providing strategic direction, control, or advice regarding Talent Agency Services.

## REQUEST FOR PRODUCTION NO. 2.

Documents sufficient to identify all CAA executives, employees, or other personnel who have represented CAA at the ATA or on ATA-related committees (including but not limited to the ATA's Negotiation or Strategy Committees), or otherwise have served on or participated in, or supported the work of such committees.

## REQUEST FOR PRODUCTION NO. 3.

Documents, including directories and organizational charts, sufficient to identify all persons in CAA who had any responsibility with respect to the provision of Talent Agency Services.

## REQUEST FOR PRODUCTION NO. 4.

All Documents sufficient to identify all officers, directors, members, and beneficial owners, and changes in beneficial ownership of CAA, including of CAA's agents, subsidiaries, or other affiliated or related entities that provide, purchase, or financially benefit from the provision of Talent Agency Services.

**REQUEST FOR PRODUCTION NO. 5.**

For the period January 1, 1999 to the present, Documents sufficient to identify all contemplated, planned, pending, or executed purchases, sales, acquisitions, mergers, joint ventures, divestitures, transfers, spinoffs, or any other change in ownership of any subsidiaries, affiliates, departments, business units, or other subdivisions of CAA.

**REQUEST FOR PRODUCTION NO. 6.**

For the period January 1, 2014 to the present, all Documents discussing, concerning, or regarding competition for the provision of Talent Agency Services to or concerning any Writer(s), including but not limited to Documents disclosing, discussing, analyzing, reporting, or otherwise concerning the market share of any Talent Agency.

**REQUEST FOR PRODUCTION NO. 7.**

For the period January 1, 1999 to the present, all agreements and contracts between CAA and any Studio, including but not limited to all agreements and contracts regarding the provision of any Talent Agency Services, whether for an individual Project, across multiple Projects, or otherwise.

**REQUEST FOR PRODUCTION NO. 8.**

For the period January 1, 2014 to the present, all Documents constituting, discussing, reflecting, or relating to (i) any complaint, question, or comment from a Studio or a Writer regarding Packaging Fees, (ii) any request by a Studio or a Writer to waive or reduce Packaging Fees, or (iii) the discussion, proposal, offer, or negotiation of a Joint Packaging arrangement for any Project.

**REQUEST FOR PRODUCTION NO. 9.**

All Documents relating to (i) any ATA meeting, briefing, or other communication (including, but not limited to, meetings of the ATA Board of

Directors, the ATA Negotiation Committee, and the ATA Strategy Committee) that discuss, reflect discussions, or concern Packaging, Packaging Fees, Joint Packaging, this lawsuit, the Code of Conduct, the Guilds, or actions between the Guilds and any Talent Agencies; or (ii) discussions of such meetings, including agendas, meeting minutes, notes, attendance lists, expense reports, handouts, memoranda, reports, data, or correspondence.

**REQUEST FOR PRODUCTION NO. 10.**

All Documents that reflect Communications with any other Talent Agency or the ATA discussing, concerning, regarding, or calculating (a) Base License Fee(s) or (b) Upfront License Fee(s).

**REQUEST FOR PRODUCTION NO. 11.**

All Documents constituting, discussing, reflecting, or relating to Communications between any employee, officer, director, or member of CAA, on the one hand, and the ATA, Karen Stuart, or any Person claiming to represent the ATA, on the other hand, discussing, concerning, or regarding Packaging, Packaging Fees, Joint Packaging, the Code of Conduct, this litigation, or the Guilds.

**REQUEST FOR PRODUCTION NO. 12.**

All Documents concerning, referencing, or regarding Packaging, or Joint Packaging, or Packaging Fees, including actual, proposed, or offered terms of any Packaging or Joint Packaging agreement and all Communications relating to or reflecting the amount, rate, or calculation of any Packaging Fee.

**REQUEST FOR PRODUCTION NO. 13.**

All Documents referring or relating to any of the following with respect to the provision of Talent Agency Services:

a) Any rate or price quotation issued by CAA or any other Talent Agency regarding any Talent Agency Service;

b)      Any rate or price change issued by CAA or any other Talent Agency regarding any Talent Agency Service;

c)      Any of CAA's actual, proposed, or prospective rates or prices, rate or price setting practices, rate or price setting policies, or rate or price setting strategies regarding any Talent Agency Service.

**REQUEST FOR PRODUCTION NO. 14.**

For the provision of Talent Agency Services, CAA's business or strategic plans, and Documents relating to:

a)      CAA's plans, policies, methods, formulas, guidelines, or factors used to determine, compute, or quote rates or prices regarding any Talent Agency Service; or

b)      CAA's contracts, offers, agreements, or proposals for the provision of any Talent Agency Service.

**REQUEST FOR PRODUCTION NO. 15.**

All Documents prepared by, submitted to, or received from any consulting firm, investment bank, or other financial services firm, relating to the provision of any Talent Agency Service.

**REQUEST FOR PRODUCTION NO. 16.**

All Documents discussing, describing, referring to, relating to, reflecting, or concerning any meeting or Communications between any employee, officer, or director/member of CAA, on the one hand, and any other Talent Agency or any Person claiming to represent any other Talent Agency, on the other hand, regarding Packaging, Packaging Fees, Joint Packaging, the Code of Conduct, or the Guilds.

**REQUEST FOR PRODUCTION NO. 17.**

All notes, memoranda, email, or any other Documents that concern or reflect

meetings, discussions or communications between CAA and any other Talent Agency regarding Packaging, Packaging Fees, Joint Packaging, the Code of Conduct, or the Guilds.

**REQUEST FOR PRODUCTION NO. 18.**

From April 1, 1999 to the present, all Documents constituting, discussing, concerning, or reflecting any agreement or understanding between CAA and any other Talent Agency regarding (i) 3-3-10; (ii) the calculation or setting of Packaging Fees; or (iii) the calculation or setting of Base License Fee(s).  Included in this Request are any Documents that discuss, refer to, reference or otherwise concern or are related to discussions among (i) Sam Haskell, former Executive Vice President and Worldwide Head of Television for the William Morris Agency, (ii) Nancy Josephson, former co-President of ICM, (iii) Lee Gabler, former co-Chairman of CAA, (iv) Sam Gores, Chairman of Paradigm Talent Agency, (v) Ari Emanuel, former CEO of Endeavor Talent Agency and current co-CEO of WME, or (vi) representatives of other Talent Agencies, concerning (a) Studio efforts to eliminate or substantially reduce Packaging Fees, (b) Joint Packaging, (c) any agreement or understanding concerning the structure, rate, price, amount, or calculation of Packaging Fees, or (d) any agreement or understanding that certain Talent Agencies would offer Studios the same or substantially similar terms in packaged deals.

**REQUEST FOR PRODUCTION NO. 19.**

For the period January 1, 2014 to the present, all Documents constituting, discussing, concerning, or reflecting (i) any offer, negotiation, or concluded agreement regarding the provision of writing services or sale or option of literary material by any Writer represented by CAA to a Studio, relating to a Project or Projects in connection with which the Studio paid a Packaging Fee; or (ii) any offer, negotiation, or concluded agreement between CAA and a Studio regarding

Packaging Fees.

**REQUEST FOR PRODUCTION NO. 20.**

For the period January 1, 2014 to the present, all Documents discussing, concerning, or reflecting any Project for which CAA earned a Packaging Fee where CAA represented only one packaged element on the Project.

**REQUEST FOR PRODUCTION NO. 21.**

For the period January 1, 2014 to the present, all Documents discussing, concerning, or reflecting any situation in which a Project was delayed, canceled, or prevented from using Talent due to a disagreement or dispute between CAA and any other Person regarding Packaging, Packaging Fees, or Joint Packaging, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 22.**

For the period January 1, 2009 to the present, all Documents discussing, concerning, or reflecting any complaint received by CAA from any of CAA's clients regarding allegations of sexual harassment or sexual assault by any employee or executive of a Studio.

**REQUEST FOR PRODUCTION NO. 23.**

Data sufficient to show all earnings from Talent Agency Services relating to a Project that CAA has received since January 1, 1999 where CAA represented a Writer on the Project, including (i) a unique identifier or title for each Project; (ii) the production and initial broadcast date(s) of the Project; (iii) the CAA agents or other employees involved in the Project; (iv) the identity of all Talent CAA brought to the Project; (v) the identity of all Talent other Talent Agencies brought to the Project, identifying for each individual Talent, the responsible Talent Agency; (vi) whether the Project was subject to Joint Packaging; (vii) the Studio involved in the

Project; (viii) the structure or formula of any Packaging Fees earned; (ix) the combined total of any CAA earnings from the Project; (x) a breakdown of any CAA earnings from the Project that identifies (1) any Packaging Fees earned (separately for upfront, deferred, and back-end fees), (2) any Commissions earned, and (3) any other CAA earnings from the Project; and (xi) for each item in (x), the identity of the entity that paid the earnings.

**REQUEST FOR PRODUCTION NO. 24.**

For each Person identified in response to RFP No. 23, data sufficient to show all earnings of all Talent employed on the Project. To respond to this RFP, produce earnings information separately for each Talent represented by CAA.

**REQUEST FOR PRODUCTION NO. 25.**

Data sufficient to show all Commission revenues received by CAA for each of the last 20 years from Writers for the provision of writing services or the sale or option of any literary material on any Project.

**REQUEST FOR PRODUCTION NO. 26.**

Documents sufficient to identify each database or data set used or maintained by CAA relating to the provision of Talent Agency Services at any time after January 1, 1999 that contains information relating to CAA's:

    a.  agents;

    b.  Talent represented;

    c.  Talent compensation;

    d.  Projects;

    e.  Studios for whom any Writer represented by CAA performed writing services or sold or optioned literary material;

    f.  Studios owned, in whole or in part, whether by Affiliation or otherwise;

    g.  bids, estimates, quotes, proposals, or responses to requests for information;

h.  prices, costs, or margins;

i.  fees earned, including commissions, Packaging Fees, or any licensing fees (e.g., upfront, deferred, back-end);

j.  earnings or profit and loss reports;

k.  win/loss reports;

l.  research and development projects;

m. marketing, promotions, or advertising; or

n.  competitors.

**REQUEST FOR PRODUCTION NO. 27.**

For each database or data set identified in RFP No. 26, documents sufficient to describe each database or data set, which includes: (1) its software platform; (2) its type (e.g., flat, relational, or enterprise); (3) the sources (e.g., other databases or individuals) used to populate the database; (4) a Data Dictionary; (5) for relational or enterprise databases, documents specifying the relationships among tables (e.g., an entity relationship diagram); (6) any query forms; and (7) any regularly prepared reports produced from that database.

**REQUEST FOR PRODUCTION NO. 28.**

For each of 2015, 2016, 2017, 2018, and 2019, data sufficient to identify Writers in that year who (a) were represented by CAA, (b) terminated CAA, or (c) signed with CAA, and for each Writer, data sufficient to identify the Writer's former Talent Agency or new Talent Agency, as the case may be.

**REQUEST FOR PRODUCTION NO. 29.**

All Documents or data relating to Studio revenue and budgets for any Project.

**REQUEST FOR PRODUCTION NO. 30.**

All Documents or data relating to Writer compensation for any Project.

**REQUEST FOR PRODUCTION NO. 31.**

24

All Documents analyzing, discussing, or relating to the financial impact Packaging has on CAA, Talent Agencies, Studios, Writers, or the Guilds and any underlying data used to conduct the analysis or that otherwise is referenced in the Document.

**REQUEST FOR PRODUCTION NO. 32.**

All Documents prepared by CAA or any of its financial or consulting advisors that analyzes CAA's Packaging practices, Packaging Fees, or the future of Packaging.

**REQUEST FOR PRODUCTION NO. 33.**

All Documents prepared in connection with WME's efforts to launch an initial public offering in 2019 that analyze, discuss, or reference Packaging or Packaging Fees.

**REQUEST FOR PRODUCTION NO. 34.**

All Documents analyzing, discussing, or relating to the effect Packaging Fees have on the output or quality of the film and television industries, as alleged at Paragraph 57 of the First Consolidated Complaint, and any underlying data that supports CAA's allegations as to output as alleged at Paragraph 57 of the First Consolidated Complaint.

**REQUEST FOR PRODUCTION NO. 35.**

All Documents reflecting Communications between CAA and any other Talent Agency or between CAA and ATA concerning the response of such Talent Agency or ATA, or between or among any member of ATA, whether or not CAA was an immediate party to such Communication, relating to actions or positions to be taken by one or more Talent Agencies in response to the following: (a) the Guilds' February 21, 2019 Communication transmitting a Copy of a proposed Code of Conduct, including development of ATA bargaining positions in response thereto;

(b) the June 19, 2019 Communication from the Guilds to withdraw consent to ATA and is members engaging in collective negotiations regarding a successor to the AMBA; (c) Communications from WGAW Executive Director David Young to each member of the ATA Negotiating Committee to negotiate individually with each member Agency regarding its individual agreement to the Code of Conduct; and (d) Communications among ATA members relating to positions to be taken is further discussion with the Guilds created or forwarded after a June 28, 2019 letter from the Guilds' counsel to ATA Negotiating Committee members advising them to cease and desist from collective discussions.

**REQUEST FOR PRODUCTION NO. 36.**

All Documents reflecting Communications between CAA and any other Talent Agency or between CAA and ATA concerning the response of such Talent Agency or ATA , or between or among any member of ATA, whether or not CAA was an immediate party to such Communication, concerning actions or positions to be taken by one or more Talent Agencies in response to the following:  (a) the action by Verve, on or about May 16, 2019, to sign a franchise agreement with the Guilds, (b) the action taken by Kaplan Stahler, on or about June 22, 2019, to sign a franchise agreement with the Guilds, (c) the action taken by Buchwald, on or about July 25, 2019, to sign a franchise agreement with the Guilds, (d) the action taken by Abrams Artists Agency, on or about November 13, 2019, to sign a franchise agreement with the Guilds, (e) the action taken by RBEL, on or about November 18, 2019, to sign a franchise agreement with the Guilds, or (f) the action taken by Pantheon, on or about March 15, 2019, to sign a franchise agreement with the Guilds.  For the avoidance of doubt, this Request should be deemed to include all Documents that reference or refer to a Talent Agency's determination, intention, or plan not to work with, or otherwise not deal with, Abrams Artists Agency, Buchwald, Kaplan Stahler Agency,

Pantheon, RBEL, or Verve (or any their clients), in any capacity whatsoever.

**REQUEST FOR PRODUCTION NO. 37.**

All Documents reflecting Communications between CAA and any other Talent Agency, or between CAA and ATA concerning the response of such Talent Agency or ATA, or between or among any member of ATA, whether or not CAA was an immediate party to such Communication, concerning actions or positions to be taken by one or more Talent Agencies in response to the to the WGAW's March 20, 2019 authorization to lawyers to "negotiate overscale terms and conditions of employment for individual Writers" as described in Answer and Counterclaim Paragraph 399, and Communications by CAA with attorneys that were potentially covered by the WGA's authorization.

**REQUEST FOR PRODUCTION NO. 38.**

All Documents, including policies, standards, guidelines, or warnings, concerning CAA's compliance with U.S. federal and state antitrust laws.

**REQUEST FOR PRODUCTION NO. 39.**

All Documents, including policies, standards, guidelines, or warnings, concerning the ATA's compliance with U.S. federal and state antitrust laws.

**REQUEST FOR PRODUCTION NO. 40.**

All Documents discussing, concerning, or reflecting the exchange of Competitively Sensitive Information among Talent Agencies, whether between individual Talent Agencies or by way of a third-party intermediary such as the ATA.

**REQUEST FOR PRODUCTION NO. 41.**

All Documents reflecting, concerning, or relating to the impact of Packaging, Packaging Fees, the present disputes with the Guilds, the Code of Conduct, or the termination of the AMBA on investments by shareholders of Talent Agencies.

**REQUEST FOR PRODUCTION NO. 42.**

DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
Case No. 2:19-cv-05465-AB-AFM

All Documents reflecting, concerning, or relating to CAA's policies and practices regarding the retention, destruction, disposal, or preservation of Documents and ESI and, if such policies or practices have been different with respect to any category of Documents over different time periods, Documents sufficient to (a) identify each such category and time period and (b) describe CAA's retention policy or practice with respect to each such category and time period.

**REQUEST FOR PRODUCTION NO. 43.**

All Documents referring or relating to written policies, procedures, and guidelines related to CAA's computers, computer systems, electronic data, or electronic media, including, by way of example and not limitation: (i) backup tape rotation schedules; (ii) electronic data retention, preservation, and destruction schedules; (iii) employee usage policies for company computers, telephones, and other technology; (iv) company-wide monitoring software; (v) electronic media deployment, allocation, and maintenance procedures for new employees, current employees, or departed employees; and (vi) personal or home computer usage policies for work-related activities.

**REQUEST FOR PRODUCTION NO. 44.**

All Documents and Communications constituting, discussing, reflecting, concerning, or relating to information shared either (a) between or among CAA and one or more private equity firms or funds, or (b) between or among any private equity firms or funds (including Silver Lake and TPG), regarding the business of Talent Agencies, including Packaging, CAA's ability to obtain Packaging Fees, the Talent Agencies' expansion into content production and ownership, CAA's ability to restrict access to Talent that it represents, or the present disputes with the Guilds.

**REQUEST FOR PRODUCTION NO. 45.**

All Documents between or among Talent Agencies, either directly or by way

28

of a third-party such as the ATA, reflecting, concerning, or relating to CAA's decision (including the concealment thereof) to assemble a Package or Joint Package based on the amount of Packaging Fees that CAA would earn, rather than the fee that the Writer would earn.

**REQUEST FOR PRODUCTION NO. 46.**

All Documents between or among Talent Agencies, either directly or by way of a third-party such as the ATA, reflecting, concerning, or relating to promises, threats, or future plans by a Talent Agency to not do business with any other Talent Agency (including Abrams Artists Agency, Buchwald, Kaplan Stahler Agency, Pantheon, RBEL, or Verve), any other Talent Agency's clients, or any Writer(s).

**REQUEST FOR PRODUCTION NO. 47.**

All ATA Board of Director and Board committee minutes, pre-meeting Board packets, presentations and any other such Documents relating to, regarding, or referencing:

(1)   any proposed or actual agreement or understanding between or among Talent Agencies, including any Plaintiff and Counter-Defendant, concerning the provision of Talent Agency Services;

(2)   any investigations by any Person into the legality of such agreements or understandings;

(3)   any findings from such investigations; or

(4)   any resolutions or other Board or committee decisions arrived at after consideration of the results of any such investigations.

**REQUEST FOR PRODUCTION NO. 48.**

All Documents relating to the voluntary or involuntary termination, retirement, resignation, discipline, discharge, reassignment, transfer, or suspension of any employee who was terminated, disciplined, discharged, or suspended, or who

retired or resigned as a result of his or her alleged participation in, involvement in, or knowledge of any agreement, understanding, plan, contract, combination, or conspiracy, express or implied, regarding the provision of Talent Agency Services between CAA and any other Talent Agency.

**REQUEST FOR PRODUCTION NO. 49.**

All Documents relating to the voluntary or involuntary termination, retirement, resignation, discipline, discharge, reassignment, transfer, or suspension of any employee who was terminated, disciplined, discharged, or suspended, or who retired or resigned as a result of his or her alleged participation in, involvement in, or knowledge of any potential or actual conflict of interest related to CAA's provision of Talent Agency Services.

**REQUEST FOR PRODUCTION NO. 50.**

All Communications and filings, made at any time, with the U.S. Department of Justice or the Federal Trade Commission, including all filings and submissions made pursuant to the Hart-Scott-Rodino Act.

**REQUEST FOR PRODUCTION NO. 51.**

Produce the following Documents for each officer of CAA and for each of CAA's employees, agents or contractors who either (1) has or had any direct or indirect responsibility for or participated in setting, recommending, preparing, reviewing, approving, adjusting, evaluating, or disclosing rates, prices, or any other terms or conditions for the provision of Talent Agency Services; (2) attended any meetings of the ATA; (3) had any meeting or Communication relating to Packaging with any present or former officer, director, employee, or agent of another Talent Agency; or (4) was voluntarily or involuntarily terminated, or was disciplined, discharged, reassigned, transferred, or suspended, as a result of his or her alleged participation in, involvement in, or knowledge of any agreement, understanding,

30

plan or contract, combination, or conspiracy, express or implied, relating to the Provision of Talent Agency Services between CAA and any other Talent Agency:

    (a)    The personal and company copy of all electronic or manual diaries, calendars, pocket calendars, calendar pads, appointment books, or appointment notes;

    (b)    Voice mail, answering machine messages, e-mail, text messages, or other correspondence to and from each such person relating to any communication between Talent Agencies regarding Packaging;

    (c)    The personal and company copy of all trip and travel logs, records, and supporting Documents;

    (d)    The personal and company copy of all expense reimbursement or entertainment records and supporting Documents;

    (e)    The personal and company copy of all telephone number logs, telephone message logs, directories, notebooks, card files (such as Rolodex cards) or memoranda;

    (f)    All long distance or cellular telephone bills, statements and records and supporting Documents recording or relating to long distance or cellular telephone calls by such officers, employees, agents, or contractors; and

    (g)    The personal and company copies of all Documents relating to actual or proposed participation or membership in the ATA or any committee or subcommittee thereof relating to Packaging, including meeting minutes, agendas, attendance lists, handouts, notes, and publications.

**REQUEST FOR PRODUCTION NO. 52.**

All Documents distributed at, prepared in connection with, taken to, received at, or creating during any meeting attended by CAA and any other Talent Agency at which there was a discussion, presentation, or Communication regarding Packaging.

**REQUEST FOR PRODUCTION NO. 53.**

All Documents discussing or reflecting (prospectively or retrospectively) CAA's Communications with the trade press, including *Deadline*, *Variety* and *The Hollywood Reporter*, regarding (a) Packaging, (b) Packaging Fees, (c) this lawsuit, (d) the Code of Conduct, or (e) the Guilds.

**REQUEST FOR PRODUCTION NO. 54.**

All Documents concerning or reflecting CAA's Communications with any Writer regarding (a) Packaging, (b) Packaging Fees, (c) this lawsuit, (d) the Code of Conduct, or (e) the Guilds.

**REQUEST FOR PRODUCTION NO. 55.**

All Documents concerning or reflecting CAA's Communications with any Studio regarding (a) Packaging, (b) Packaging Fees, (c) this lawsuit, (d) the Code of Conduct, or (e) the Guilds, or (f) the Guilds' efforts to require Studios to deal only with franchised Talent Agencies.

**REQUEST FOR PRODUCTION NO. 56.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to (a) CAA's fiduciary duties to its clients, or (b) any potential or actual conflict of interest arising from CAA's provision of Talent Agency Services, including all Documents constituting, reflecting, concerning, or relating to CAA's policies and practices regarding topics (a) and (b), and all Communications with any Writer or any other Person regarding topics (a) and (b).

**REQUEST FOR PRODUCTION NO. 57.**

For the period January 1, 2014 to the present, all Documents constituting, analyzing, discussing, or relating to CAA's disclosure of information concerning any potential or actual conflict of interest arising from CAA's provision of Talent

Agency Services, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 58.**

For the period January 1, 2014 to the present, all Documents constituting, analyzing, discussing, or relating to CAA's disclosure of information regarding Packaging or Packaging Fees to CAA's clients, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 59.**

For the period January 1, 2014 to the present, all Documents constituting, reflecting, concerning, analyzing, discussing, or relating to any CAA client's waiver of or consent to any actual or potential conflict of interest relating to Packaging or Packaging Fees.

**REQUEST FOR PRODUCTION NO. 60.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to CAA's negotiation of any profit definition for any Writer, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 61.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to CAA's collection or non-collection of "double commission," as defined in the AMBA, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 62.**

For the period January 1, 2014 to the present, all Documents reflecting,

concerning, analyzing, discussing, or relating to CAA's refund of any commission to any Writer as a result of Packaging in a Project, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 63.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to CAA's negotiation of Packaging Fees on any Project on which CAA procured or sought to procure the employment of a single Talent element, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 64.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, or relating to any offer by CAA to procure the employment of any Writer by a Studio for less compensation than that Writer had previously earned on any other Project.

**REQUEST FOR PRODUCTION NO. 65.**

All Documents from any time reflecting, concerning, analyzing, discussing, or relating to CAA's provision of Talent Agency Services to Counterclaimant Patricia Carr.

**REQUEST FOR PRODUCTION NO. 66.**

All Documents from any time reflecting, concerning, analyzing, discussing, or relating to CAA's provision of Talent Agency Services to Counterclaimant Ashley Gable.

**REQUEST FOR PRODUCTION NO. 67.**

All Documents from any time reflecting, concerning, analyzing, discussing, or relating to CAA's provision of Talent Agency Services to Counterclaimant

1  Barbara Hall.

2  **REQUEST FOR PRODUCTION NO. 68.**

3      All Documents from any time reflecting, concerning, analyzing, discussing,

4  or relating to CAA's provision of Talent Agency Services to Counterclaimant Deric

5  A. Hughes.

6  **REQUEST FOR PRODUCTION NO. 69.**

7      All Documents from any time reflecting, concerning, analyzing, discussing,

8  or relating to CAA's provision of Talent Agency Services to Counterclaimant David

9  Simon.

10  **REQUEST FOR PRODUCTION NO. 70.**

11      All Documents from any time reflecting, concerning, analyzing, discussing,

12  or relating to CAA's provision of Talent Agency Services to Counterclaimant

13  Meredith Stiehm.

14  **REQUEST FOR PRODUCTION NO. 71.**

15      For the period January 1, 2014 to the present, all Documents reflecting,

16  concerning, analyzing, discussing, or relating to (a) CAA's preference or decision

17  not to procure or attempt to procure employment for any client of CAA on any

18  Project on which CAA was not receiving a Packaging Fee, or (b) any attempt by

19  CAA to prevent, objection by CAA to, or comment or question by CAA concerning

20  the employment of any Talent not represented by CAA on any Project on which

21  CAA sought to receive or did receive a Packaging Fee, or (c) CAA's preference or

22  decision to procure or attempt to procure employment for any client of CAA on those

23  Projects on which CAA was receiving Packaging Fees, including all policies and

24  practices regarding topics (a), (b), or (c) and all Communications with any Writer or

25  any other Person regarding topics (a), (b), or (c).

26  **REQUEST FOR PRODUCTION NO. 72.**

27

28

35

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to CAA's attempt to procure employment for any client of CAA at any Studio with which CAA has any Affiliation, including all policies and practices relating thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 73.**

From the period of January 1, 1999 to the present, all agreements and contracts between CAA and any Studio concerning any Affiliation between said Studio and CAA.

**REQUEST FOR PRODUCTION NO. 74.**

All documents supporting CAA's contention in the First Consolidated Complaint that CAA's receipt of Packaging Fees benefits Writers represented by CAA.

**REQUEST FOR PRODUCTION NO. 75.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to the market valuation of Packaging, including all policies and practices relating thereto and all Communications with any Person relating thereto.

**REQUEST FOR PRODUCTION NO. 76.**

All Documents that concern, discuss, or refer to a Writer's Communication of his or her preference not to be employed on a Project on which any Talent Agency was receiving Packaging Fees or of his or her preference for any Talent Agency not to receive Packaging Fees on any Project on which the Writer was employed, or any Communication constituting or reflecting any question from any Writer concerning his or her employment on a Project on which any Talent Agency was receiving Packaging Fees or concerning the payment of Packaging Fees on such a Project, as

well as CAA's response to any such Communication, as alleged in Paragraph 35 of the First Consolidated Complaint.

**REQUEST FOR PRODUCTION NO. 77.**

All Documents that support CAA's allegation that it "often . . . earns less from such productions on a packaging-fee model than [it] would have earned on a more traditional commission-based model", as alleged at Paragraph 50 of the First Consolidated Complaint.

**REQUEST FOR PRODUCTION NO. 78.**

All Documents that concern, discuss, relate to, or refer any Communication by any employee, executive, officer, director, or manager of CAA to either (a) a Studio, (b) a producer, (c) a Writer, (d) a lawyer, or (e) a Talent manager in which such employee, executive, officer, director, or manager of CAA stated any intention, on behalf of himself, herself, or CAA (alone or in conjunction with any other Talent Agencies), not to do business with, not to deal with, not to allow Talent represented by CAA to do business with, not to allow Talent represented by CAA to deal with, "blacklist," "blackball," or put in the "penalty box" the recipient or the recipient's employer.

**REQUEST FOR PRODUCTION NO. 79.**

All Documents that concern, discuss, relate to or refer to any "blacklist" or any similar list of (i) individuals, including Writers, lawyers, or managers, or (ii) entities, such as Studios, whom CAA (alone or in conjunction with any other Talent Agencies) has refused to do business with, to deal with, to allow Talent represented by CAA to do business with, to allow Talent represented by CAA to deal with, or whom CAA has otherwise "blackballed" or put in the "penalty box" as those terms are commonly understood in the industry.

**REQUEST FOR PRODUCTION NO. 80.**

All Documents that concern, discuss, analyze, relate to, or refer to a Writer's invocation, or intention to invoke, any of the "narrowly-tailored regulations" provided for in the 1976 AMBA that are alleged at Paragraphs 78 and 79 of the First Consolidated Complaint.

**REQUEST FOR PRODUCTION NO. 81.**

All Documents in which any director, officer, manager, executive or employee of CAA refers to any Studio or Studios as a "client" or "clients" of theirs or of CAA's.

**REQUEST FOR PRODUCTION NO. 82.**

Documents sufficient to show the existence, terms, and signatories to any joint defense agreement or common interest agreement entered into among the Agencies and any other Persons.

**REQUEST FOR PRODUCTION NO. 83.**

All Documents that discuss or otherwise concern any offer or proposal made to the ATA or any Agency regarding either (a) the Code of Conduct, or (b) a franchise agreement.

**REQUEST FOR PRODUCTION NO. 84.**

All CAA balance sheets, financial statements, monthly income statements, monthly cash flow statements, and general ledgers.

**REQUEST FOR PRODUCTION NO. 85.**

Documents concerning any injury to CAA, as alleged at Paragraph 190 of the First Consolidated Complaint.

DATED: December 20, 2019                    ALTSHULER BERZON LLP


                                                /s/ Stacey Leyton
                                                  Stacey Leyton


                                            Stephen P. Berzon
                                            sberzon@altber.com
                                            Stacey Leyton
                                            sleyton@altber.com
                                            P. Casey Pitts
                                            cpitts@altber.com
                                            Rebecca C. Lee
                                            rlee@altber.com
                                            Andrew Kushner
                                            akushner@altber.com

                                            177 Post Street, Suite 300
                                            San Francisco, California 94108
                                            Telephone: (415) 421-7151
                                            Facsimile: (415) 362-8064


                                            Anthony R. Segall
                                            asegall@rsglabor.com
                                            Juhyung Harold Lee
                                            hlee@rsglabor.com
                                            ROTHNER, SEGALL & GREENSTONE
                                            510 South Marengo Avenue
                                            Pasadena, California 91101
                                            Telephone: (626) 796-7555
                                            Facsimile: (626) 577-0124


                                            W. Stephen Cannon
                                            scannon@constantinecannon.com
                                            CONSTANTINE CANNON LLP
                                            1001 Pennsylvania Ave, NW, Ste. 1300N
                                            Washington, DC 20004
                                            Telephone: (202) 204-3500
                                            Facsimile: (202) 204-3501


                                            Ethan E. Litwin (*pro hac vice* pending)
                                            elitwin@constantinecannon.com
                                            CONSTANTINE CANNON LLP
                                            335 Madison Avenue, 9th Floor
                                            New York, NY 10017
                                            Telephone: (212) 350-2700
                                            Facsimile: (212) 350-2701

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Defendants and Counterclaimants*

DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
Case No. 2:19-cv-05465-AB-AFM

# EXHIBIT C

Stephen P. Berzon (SBN 46540)
sberzon@altber.com
Stacey Leyton (SBN 203827)
sleyton@altber.com
P. Casey Pitts (SBN 262463)
cpitts@altber.com
Rebecca C. Lee (SBN 305119)
rlee@altber.com
Andrew Kushner (SBN 316035)
akushner@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

Anthony R. Segall (SBN 101340)
asegall@rsglabor.com
Juhyung Harold Lee (SBN 315738)
hlee@rsglabor.com
ROTHNER, SEGALL &
 GREENSTONE
510 South Marengo Avenue
Pasadena, California 91101
Telephone: (626) 796-7555
Facsimile: (626) 577-0124

W. Stephen Cannon (*pro hac vice*)
scannon@constantinecannon.com
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave, NW, Ste. 1300N
Washington, DC 20004
Telephone: (202) 204-3500
Facsimile: (202) 204-3501

Ethan E. Litwin (*pro hac vice*)
elitwin@constantinecannon.com
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701

*Attorneys for Defendants and Counterclaimants*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, *et al.*, | Case No. 2:19-cv-05465-AB-AFM |
| Plaintiffs and Counterclaim Defendants, | **DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF/COUNTERCLAIM DEFENDANT UNITED TALENT AGENCY, LLC** |
| v. | |
| WRITERS GUILD OF AMERICA, WEST, INC., *et al.*, | |
| Defendants and Counterclaimants, | |
| and PATRICIA CARR, *et al.* | |
| Counterclaimants. | |

1

**PROPOUNDING PARTIES:  DEFENDANTS/COUNTERCLAIMANTS AND INDIVIDUAL COUNTERCLAIMANTS BARBARA HALL AND DEIRDRE MANGAN**

**RESPONDING PARTY:  PLAINTIFF AND COUNTERCLAIM DEFENDANT UNITED TALENT AGENCY, LLC**

**SET NUMBER:  ONE**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendants and Counterclaimants **Writers Guild of America, West**, **Writers Guild of America, East, and Individual Counterclaimants Barbara Hall and Deirdre Mangan** propound the following Requests for Production ("Requests") on Plaintiff and Counterclaim Defendant United Talent Agency, LLC, to be answered in writing in compliance with Rule 34 of the Federal Rules of Civil Procedure, within 30 days from the date of service.  In answering and responding to these requests for production of documents UTA shall identify and produce all requested documents within the actual or constructive possession, custody, or control of UTA, or UTA's officers, employees, agents, representatives or attorneys.

Defendants and Counterclaimants request that such production be made in accordance with the "DEFINITIONS" and "INSTRUCTIONS" set forth below.

## DEFINITIONS

1.      The following rules of construction should apply to all discovery requests:

a.  "All" should be construed to include the collective as well as the singular and shall mean "each," "any," and "every."  The terms "any," "all," "each," and "every" should be understood in either their most or least inclusive sense as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of the scope.

b. "And" and "or" should be construed so as to require the broadest possible response. If, for example, a request calls for information about "A or B" or "A and B," UTA should produce all information about A and all information about B, as well as all information about A and B collectively. In other words, "or" and "and" should be read as "and/or."

c. "Any" shall be construed to mean "any and all."

d. "Including" shall be construed to mean "without limitation." "Including" is used to emphasize certain types of documents requested and should not be construed as limiting the request in any way.

e. The use of the singular form of any word includes the plural and vice versa.

2. "Document" or "Documents" has the broadest meaning possible, including all Communications. "Document" or "Documents" includes all "writings," "recordings," or "photographs" as those terms are defined in Federal Rule of Civil Procedure 34 and Rule 1001 of the Federal Rules of Evidence. Without limiting the generality of the foregoing, the term "Documents" includes both hard copy documents as well as electronically stored data files. Regarding hard copy documents, the term "Documents" includes all written or printed matter of any kind, including the originals and all non-identical copies thereof (whether different from the originals by reason of any interlineation, receipt stamp, indication of copies sent or received, or other notation made on such copies or otherwise), including memoranda, notes, opinions, compilations, chronicles, minutes, agenda, notations of any sort of conversations, contracts, agreements, reports, summaries, teletypes, telefax, thermafax, confirmations, inter-office and intra-office Communications, printed e-mail, printed text messages, printed instant messages, all written or graphic records of representations of any kind, and all records of representations of any kind. Regarding electronically stored data files, the term "Documents" includes

3

correspondence, memoranda, legal pleadings, calendars, diaries, travel records, summaries, records of telephone conversations, telegrams, teletypes, telefax, thermafax, confirmations, notes, reports, compilations, notebooks, work papers, graphs, charts, blueprints, books, pamphlets, brochures, circulars, manuals, instructions, ledgers, drawings, sketches, photographs, videotapes, audiotapes, film and sound reproductions, e-mails, instant messages, text messages, collaboration software tools (including Slack), internal or external web sites, audio or video discs, data on magnetic or optical storage media (*e.g.*, servers, storage area networks, hard drives, backup tapes, CDs, DVDs, Bluray, DVD-HD thumb flash drives, floppy disks or any other type of portable storage device, etc.) stored as an "active" or backup file, in its native format, computer files, discs and drives, sales, advertising and promotional literature, agreements, stored recordings, minutes or other records of meetings, computer data (including information or programs stored in a computer, whether or not ever printed out or displayed) and all drafts, alterations, modifications, changes, and amendments of any of the foregoing, all written or graphic records of representations of any kind, and all mechanical or electronic data, records of representations of any kind, including photographs, microfiche, microfilm, videotape, records and motion pictures, and electronic, mechanical, or electric records or representations, tapes, cassettes, discs, magnetic cards, recordings, and cloud storage services.

3.   "Electronically Stored Information," abbreviated as "ESI" has the same meaning and scope as it has in the Federal Rules of Civil Procedure and includes the following:

    a.   structured and unstructured data, as those terms are defined in The Sedona Conference Glossary, available at www.thesedonaconference.org/publications;

    b.   activity listings of electronic mail receipts or transmittals;

DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
Case No. 2:19-cv-05465-AB-AFM

c. output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, text messages (SMS, MMS, or TMS), instant messages (such as iMessage, WhatsApp, WeChat, Google Hangout, or similar program) or bulletin board programs, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, a deleted file, or file fragment;

d. any and all items stored on computer memories, hard disks, floppy disks, CD discs, DVD discs, flash drives, thumb drives, memory cards, magnetic tape, microfiche, or in any other vehicle for digital data storage or transmittal, such as a personal digital assistant (e.g., iPhone, Android, Blackberry, Smart Phone or similar device) and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all documents requested herein;

e. any and all items stored on voice-mail systems, websites, company intranet sites, chat rooms, and social networking websites (e.g., Facebook, Twitter, LinkedIn, and other social websites listed at http://en.wikipedia.org/wiki/List of social networking websites); and any and all data, data compilations, and data analyses.

4. "Person" or "Persons" includes individuals, corporations, partnerships, limited partnerships, unincorporated associations, and all other governmental and non-governmental entities.

5. "You" or "Yours" or "UTA" refers to Plaintiff and Counterclaim Defendant United Talent Agency, LLC and: (a) all of its officers, directors,

5

members, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction; and (b) any entity that exercises control over, or provides strategic direction or recommendations to, UTA, all of its officers, directors/members, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf.

6. "Communication" or "Communications" means the oral or written transmittal of information of any kind (in the form of facts, ideas, inquiries, or otherwise) by any means, including any face to face, telephonic, video or other virtual meeting, conversation, discussion, conference, correspondence, message, or other written, electronic, or oral transmission, exchange, or transfer of information in any form between two or more persons, including in person or by telephone, facsimile, telegraph, telex, e-mail, text message, instant message, collaboration software tools such as Slack, or other medium.  The phrase "communication between" is defined to include instances where one party communicates with another party but that other party does not necessarily respond.

7. Each of the words "concerning," "reflecting," "relating," "supporting," "negating," "evidencing," and "referring" shall be defined to include the common meanings of all those terms, and shall include indirect as well as direct references to the subject matter set forth in the Request.

8. "Abrams Artists Agency" means Abrams Artists Agency LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

9. "ATA" means the Association of Talent Agents, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions,

predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.  This includes members of the ATA's Negotiating Committee, the Strategy Committee, the Board of Directors, and any other formal or informal committee or group that the ATA has convened, organized, sponsored or facilitated.

10.    "Buchwald" means Don Buchwald & Assocs., Inc., a/k/a The Buchwald Agency, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

11.    "CAA" means Creative Artists Agency LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

12.    "ICM" means International Creative Management Partners, LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

13.    "Kaplan Stahler" means The Kaplan-Stahler Agency, Inc., and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

14.    "Pantheon" means Pantheon Talent Group LLC, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

15.    "RBEL" means Rothman Brecher Ehrich Livingston, Inc., and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries,

divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

16. "Silver Lake" means Silver Lake Management LLC, a/k/a Silver Lake Partners, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, funds (including Silver Lake Partners IV, L.P.), predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

17. "TPG" means Tarrant Capital IP LLC, a/k/a TPG Capital, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, funds (including TPG Partners VI, L.P.), predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

18. "WME" means William Morris Endeavor Entertainment, LLC and: (a) all of its officers, directors, members, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction; and (b) any entity that exercises control over, or provides strategic direction or recommendations to, WME, all of its officers, directors/members, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf.

19. "Verve" means Verve Talent & Literary Agency, and its officers, directors, employees, affiliates, associates, agents, attorneys, subsidiaries, divisions, predecessors, successors, committees, and all other persons or entities acting or purporting to act on its behalf or direction.

20.    "Affiliation" means any ownership or other financial interest or similar association between entities, including but not limited to the relationship between UTA and Media Rights Capital.

21.    "Talent Agency" means any entity registered under the California Talent Agencies Act ("TAA"), Article 11 of the New York General Business Law, Article 37 of the New York Arts and Cultural Affairs Law ("Article 37"), or any other similar law.

22.    "Talent Agency Services" includes all aspects of the representation of Talent including but not limited to (i) procuring, offering, promising, or attempting to procure employment or engagements for Talent, and (ii) any other service provided by a Talent Agency as set forth in Paragraph 40 of Plaintiffs' First Consolidated Complaint.  For the purposes of the RFPs, "Talent Agency Services" also includes any services provided by a Talent Agency to a Studio, including services provided for an individual Project, across multiple Projects, or generally, and any other business interaction involving a Talent Agency and a Studio.

23.    The "Guilds" or "WGA" refers collectively to the Writers Guild of America, West, and the Writers Guild of America, East.

24.    "Writer" refers to any writer who provides writing services or sells or options literary material pursuant to the terms of the MBA, as defined at Paragraph 269 of the Answer and Counterclaims, as well as any entity created or existing for the purpose of lending or otherwise providing the writing services of, or selling or optioning the literary material of, any Writer.

25.    "Talent" includes, individually and collectively, Writers, directors, actors, producers and other above and below-the-line creative elements that are employed by a Studio on a Project.

26.    "Studio" refers to any member of the Alliance of Motion Picture and Television Producers or other entity, including any production company, studio,

network, or other financier, that directly or indirectly employs, or purchases or utilizes the services of, Writers, as set forth at Paragraph 269 of the Answer and Counterclaims.

27.    "AMBA" refers to the Artists' Manager Basic Agreement between the Guilds and the ATA in effect during the period from September 22, 1976 to on or around April 12, 2019.

28.    "Code of Conduct" refers to, individually and collectively, (i) the documents dated on or about February 21, 2019 that the Guilds provided to ATA members, including UTA, concerning the relationship among the WGA, Talent Agencies, and Writers, including all subsequent drafts thereto; (ii) the documents dated on or about April 13, 2019 that the Guilds implemented that govern the relationship among the WGA, Talent Agencies, and Writers, including all subsequent drafts thereto; and (iii) the documents (including Codes of Conduct or franchise agreements) postdating April 13, 2019 that the Guilds implemented that govern the relationship among the WGA, Talent Agencies, and Writers, including all subsequent drafts thereto and including all such agreements with Abrams Artists Agency, Buchwald, Kaplan Stahler Agency, Pantheon, RBEL, and Verve.

29.    "Project" refers to an audiovisual entertainment project, such as a television series or a feature film.

30.    "Commissions" refers to the method of compensating Talent Agencies for procuring employment for their clients, as described at Paragraphs 5, 6, and 275 of the Answer and Counterclaims.

31.    "Packaging" refers to any practice by which Talent Agencies represent one or more Talent elements of a Project, including as described at Paragraphs 275-282 of the Answer and Counterclaims.

32.    "Packaging Fees" refers to any price, payment, emolument, stipend, cost, or rate, including any component or portion thereof, paid by or on behalf of a

10

Studio to a Talent Agency in connection with its representation of one or more Talent elements of a Project, including as described at Paragraph 279 of the Answer and Counterclaim.

33.    "3-3-10" refers to the standard Packaging Fee, ordinarily defined to be comprised of a 3% "Upfront License Fee," a 3% "Deferred License Fee," and a 10% "Back-end Fee," as described at Paragraph 279 of the Answer and Counterclaims.

34.    "Base License Fee" refers to the dollar amount that a network actually remits, or is deemed to hypothetically remit, to a Studio for delivered creative content, as described at Paragraph 279 of the Answer and Counterclaims.

35.    "Joint Packaging" or "Shared Packaging" refers to any practice by which more than one Talent Agency share a Packaging Fee paid for a single Project.

36.    "Competitively Sensitive Information" refers to any company strategies, plans, policies, procedures, trade secrets, trade craft, price information, rate information, cost information, product or service information, supplier information, customer information, employee information, or expansion or contraction plans.

## **INSTRUCTIONS**

1.     Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these Requests for Production shall be deemed to be continuing in nature so that, if UTA subsequently discovers or obtains possession, custody, or control of any Document or ESI previously requested or required to be produced, UTA shall make such Documents or ESI available within 7 days of discovery or possession. These Requests call for the production of all responsive documents within the actual or constructive possession, custody or control of UTA.

2.     Except as to Documents and things as to which UTA asserts a claim of privilege or other exemption from disclosure, furnish all Documents or things in UTA's actual or constructive possession, custody, or control, or known or available to UTA, regardless of the physical location of the Documents, or whether such Documents or things are possessed directly by UTA or by UTA's employees, agents, representatives, affiliates, subsidiaries, accountants, attorneys, investigators, or consultants.

3.     If any Document covered by these requests is withheld by reason of a claim of attorney-client privilege, attorney work product protection, or any other privilege or protection, please furnish a log providing the following information with respect to each such withheld document: date, author, recipients, general subject matter sufficient to make a prima facie determination whether the asserted privilege has been properly invoked, and legal basis upon which the Document has been withheld.

4.     In producing Documents, UTA is requested to produce the original of each Document requested, together with all non-identical copies and drafts of such Document. If the original of any Document cannot be located, a copy shall be produced in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

12

5.      If any requested Document cannot be produced in full, UTA is to produce it to the extent possible, indicating which Document, or portion of such Document, is being withheld, and the reason that it is being withheld.

6.      If production of any portion of a Document is required pursuant to these Requests, produce the entirety of that Document.

7.      Documents not otherwise responsive to these Requests shall be produced if such Documents mention, discuss, refer to, or explain the Documents that are called for by these Requests, or if such Documents are attached to Documents called for by these Requests and constitute routing slips, transmittal memoranda, letters, cover sheets, comments, evaluation, or similar materials.

8.      All Documents shall be produced in the same order as they are kept or maintained by UTA in the ordinary course of UTA's business. If any Documents have been removed from the files in which they were found for purposes of producing them in response to these Requests, indicate for each Document the file(s) from which the Document(s) was (or were) originally located.

9.      If a Document once existed and has subsequently been lost, destroyed, or is otherwise missing, please provide sufficient information to identify the Document and state the details concerning its loss.

10.     With respect to any Document maintained or stored electronically, please harvest it in a manner that maintains the integrity and readability of all data, including all metadata.

11.     Unless otherwise agreed, all ESI should be produced in native format on compact disc(s), DVD disc(s), or zip drives in the original electronic file format(s) of the Documents.  Specifically, and in no way limiting the generality of the foregoing, presentations, such as PowerPoint presentations, and data compilations, such as Excel spreadsheets, shall be produced in native format.

12.     Data called for by this Request must be submitted electronically in a reasonably usable compilation that will allow the Guilds to access the information it contains. For the Guilds to be able to access and interpret data, the UTA must respond to RFP No. 26 including, for each database, a Data Dictionary that includes, for each table in the database:

        a.  the name of the table;

        b.  a general description of the information contained;

        c.  the size in both number of records and megabytes;

        d.  a list of fields;

        e.  the format, including variable type and length, of each field;

        f.  a definition for each field as it is used by UTA, including the meanings of all codes that can appear as field values;

        g.  the fields that are primary keys for the purpose of identifying a unique observation;

        h.  the fields that are foreign keys for the purpose of joining tables; and

        i.  an indication of which fields are populated.

13.     Please produce all Documents maintained or stored electronically in native, electronic format with all relevant metadata intact. Encrypted or password-protected Documents should be produced in a form permitting them to be reviewed. Defendants-Counterclaimants also request UTA to immediately meet and confer regarding the manner in which UTA shall produce Documents in order for the parties to try and reach agreement in this regard and avoid any unnecessary expense.

14.     Please organize electronic Documents produced for inspection in the same manner that UTA stores them (*e.g.*, if maintained by a custodian, such as e-mail residing on an e-mail server, please organize Documents for production by custodian; if maintained as a subfolder of "My Documents" on a custodian's hard

drive, please organize Documents for production by custodian with path information preserved, etc.).

15.   Documents attached to each other should not be separated, including hard-copy versions of Documents attached to hard-copy printouts of e-mails produced pursuant to these Requests.

16.   At UTA's election, Documents maintained or stored in paper, hard-copy form can be produced as searchable .PDF (*i.e.*, portable Document format files with embedded text) and in an appropriate and usable manner (*e.g.*, by copying such data onto an external hard drive).

17.   These requests require production of paper documents in the same form and same order as they are kept in the usual course of business or organized and labeled to correspond with the requests set forth below. If UTA chooses the former method, the Documents are to be produced in the boxes, file folders, binders, and other containers in which the Documents are found. The titles, labels, or other descriptions on the boxes, file folders, binders or other containers are to be left intact.

18.   Documents stored as electronic data on magnetic, optical, or other storage media as "active" or "backup" files shall be produced in their native formats with any associated metadata.

19.   To the extent responsive Documents reside on databases and other such systems and files, UTA is requested to produce the relevant database in useable form or permit access for inspection, review, and extraction of responsive information.

20.   Each document request, and each subpart thereof, shall be separately set forth and accorded a separate answer. Each response shall first set forth verbatim the document request to which it is responsive, followed by UTA's response.

21.   No part of a document request shall be left unanswered merely because an objection was interposed to another part of the document request.

22.   If UTA objects to any document request or subpart thereof, the objection shall state with specificity all grounds. Any ground not stated shall be waived.

23.   Failure to provide information in response to these document requests will be deemed a waiver of UTA's right to produce such evidence at trial. Defendants-Counterclaimants reserve the right to move to preclude the introduction of any evidence not produced in response to this Request.

24.   Documents should be produced in the same order as they are kept or maintained in the ordinary course of business, or the Documents should be organized and labeled to correspond to the categories of the Documents requested below.

25.   Unless otherwise noted in a specific Request, the relevant time period of these document requests is **April 6, 2015 through the present** (the "Relevant Time Period").  These document requests seek all responsive Documents created or generated during the Relevant Time Period, as well as responsive Documents created or generated outside of the Relevant Time Period, but which contain information concerning the Relevant Time Period.

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1.**

Documents, including organizational charts, sufficient to show UTA's company structure and the organization of each division, department, unit or subdivision, parent, controlling shareholder(s), subsidiary, joint venture, or affiliate of UTA. This request includes Documents sufficient to show the percentage of any stock or other interests owned by each entity in UTA's company structure, and Documents sufficient to show each employee or executive with managerial responsibilities for the provision of Talent Agency Services, including those of a parent or other controlling entity providing strategic direction, control, or advice regarding Talent Agency Services.

**REQUEST FOR PRODUCTION NO. 2.**

Documents sufficient to identify all UTA executives, employees, or other personnel who have represented UTA at the ATA or on ATA-related committees (including but not limited to the ATA's Negotiation or Strategy Committees), or otherwise have served on or participated in, or supported the work of such committees.

**REQUEST FOR PRODUCTION NO. 3.**

Documents, including directories and organizational charts, sufficient to identify all persons in UTA who had any responsibility with respect to the provision of Talent Agency Services.

**REQUEST FOR PRODUCTION NO. 4.**

All Documents sufficient to identify all officers, directors, members, and beneficial owners, and changes in beneficial ownership of UTA, including of UTA's agents, subsidiaries, or other affiliated or related entities that provide, purchase, or financially benefit from the provision of Talent Agency Services.

**REQUEST FOR PRODUCTION NO. 5.**

For the period January 1, 1999 to the present, Documents sufficient to identify all contemplated, planned, pending, or executed purchases, sales, acquisitions, mergers, joint ventures, divestitures, transfers, spinoffs, or any other change in ownership of any subsidiaries, affiliates, departments, business units, or other subdivisions of UTA.

**REQUEST FOR PRODUCTION NO. 6.**

For the period January 1, 2014 to the present, all Documents discussing, concerning, or regarding competition for the provision of Talent Agency Services to or concerning any Writer(s), including but not limited to Documents disclosing, discussing, analyzing, reporting, or otherwise concerning the market share of any Talent Agency.

**REQUEST FOR PRODUCTION NO. 7.**

For the period January 1, 1999 to the present, all agreements and contracts between UTA and any Studio, including but not limited to all agreements and contracts regarding the provision of any Talent Agency Services, whether for an individual Project, across multiple Projects, or otherwise.

**REQUEST FOR PRODUCTION NO. 8.**

For the period January 1, 2014 to the present, all Documents constituting, discussing, reflecting, or relating to (i) any complaint, question, or comment from a Studio or a Writer regarding Packaging Fees, (ii) any request by a Studio or a Writer to waive or reduce Packaging Fees, or (iii) the discussion, proposal, offer, or negotiation of a Joint Packaging arrangement for any Project.

**REQUEST FOR PRODUCTION NO. 9.**

All Documents relating to (i) any ATA meeting, briefing, or other communication (including, but not limited to, meetings of the ATA Board of

Directors, the ATA Negotiation Committee, and the ATA Strategy Committee) that discuss, reflect discussions, or concern Packaging, Packaging Fees, Joint Packaging, this lawsuit, the Code of Conduct, the Guilds, or actions between the Guilds and any Talent Agencies; or (ii) discussions of such meetings, including agendas, meeting minutes, notes, attendance lists, expense reports, handouts, memoranda, reports, data, or correspondence.

**REQUEST FOR PRODUCTION NO. 10.**

All Documents that reflect Communications with any other Talent Agency or the ATA discussing, concerning, regarding, or calculating (a) Base License Fee(s) or (b) Upfront License Fee(s).

**REQUEST FOR PRODUCTION NO. 11.**

All Documents constituting, discussing, reflecting, or relating to Communications between any employee, officer, director, or member of UTA, on the one hand, and the ATA, Karen Stuart, or any Person claiming to represent the ATA, on the other hand, discussing, concerning, or regarding Packaging, Packaging Fees, Joint Packaging, the Code of Conduct, this litigation, or the Guilds.

**REQUEST FOR PRODUCTION NO. 12.**

All Documents concerning, referencing, or regarding Packaging, or Joint Packaging, or Packaging Fees, including actual, proposed, or offered terms of any Packaging or Joint Packaging agreement and all Communications relating to or reflecting the amount, rate, or calculation of any Packaging Fee.

**REQUEST FOR PRODUCTION NO. 13.**

All Documents referring or relating to any of the following with respect to the provision of Talent Agency Services:

a)   Any rate or price quotation issued by UTA or any other Talent Agency regarding any Talent Agency Service;

b)     Any rate or price change issued by UTA or any other Talent Agency regarding any Talent Agency Service;

c)     Any of UTA's actual, proposed, or prospective rates or prices, rate or price setting practices, rate or price setting policies, or rate or price setting strategies regarding any Talent Agency Service.

**REQUEST FOR PRODUCTION NO. 14.**

For the provision of Talent Agency Services, UTA's business or strategic plans, and Documents relating to:

a)     UTA's plans, policies, methods, formulas, guidelines, or factors used to determine, compute, or quote rates or prices regarding any Talent Agency Service; or

b)     UTA's contracts, offers, agreements, or proposals for the provision of any Talent Agency Service.

**REQUEST FOR PRODUCTION NO. 15.**

All Documents prepared by, submitted to, or received from any consulting firm, investment bank, or other financial services firm, relating to the provision of any Talent Agency Service.

**REQUEST FOR PRODUCTION NO. 16.**

All Documents discussing, describing, referring to, relating to, reflecting, or concerning any meeting or Communications between any employee, officer, or director/member of UTA, on the one hand, and any other Talent Agency or any Person claiming to represent any other Talent Agency, on the other hand, regarding Packaging, Packaging Fees, Joint Packaging, the Code of Conduct, or the Guilds.

**REQUEST FOR PRODUCTION NO. 17.**

All notes, memoranda, email, or any other Documents that concern or reflect

20

meetings, discussions or communications between UTA and any other Talent Agency regarding Packaging, Packaging Fees, Joint Packaging, the Code of Conduct, or the Guilds.

**REQUEST FOR PRODUCTION NO. 18.**

From April 1, 1999 to the present, all Documents constituting, discussing, concerning, or reflecting any agreement or understanding between UTA and any other Talent Agency regarding (i) 3-3-10; (ii) the calculation or setting of Packaging Fees; or (iii) the calculation or setting of Base License Fee(s).  Included in this Request are any Documents that discuss, refer to, reference or otherwise concern or are related to discussions among (i) Sam Haskell, former Executive Vice President and Worldwide Head of Television for the William Morris Agency, (ii) Nancy Josephson, former co-President of ICM, (iii) Lee Gabler, former co-Chairman of CAA, (iv) Sam Gores, Chairman of Paradigm Talent Agency, (v) Ari Emanuel, former CEO of Endeavor Talent Agency and current co-CEO of WME, or (vi) representatives of other Talent Agencies, concerning (a) Studio efforts to eliminate or substantially reduce Packaging Fees, (b) Joint Packaging, (c) any agreement or understanding concerning the structure, rate, price, amount, or calculation of Packaging Fees, or (d) any agreement or understanding that certain Talent Agencies would offer Studios the same or substantially similar terms in packaged deals.

**REQUEST FOR PRODUCTION NO. 19.**

For the period January 1, 2014 to the present, all Documents constituting, discussing, concerning, or reflecting (i) any offer, negotiation, or concluded agreement regarding the provision of writing services or sale or option of literary material by any Writer represented by UTA to a Studio, relating to a Project or Projects in connection with which the Studio paid a Packaging Fee; or (ii) any offer, negotiation, or concluded agreement between UTA and a Studio regarding

Packaging Fees.

**REQUEST FOR PRODUCTION NO. 20.**

For the period January 1, 2014 to the present, all Documents discussing, concerning, or reflecting any Project for which UTA earned a Packaging Fee where UTA represented only one packaged element on the Project.

**REQUEST FOR PRODUCTION NO. 21.**

For the period January 1, 2014 to the present, all Documents discussing, concerning, or reflecting any situation in which a Project was delayed, canceled, or prevented from using Talent due to a disagreement or dispute between UTA and any other Person regarding Packaging, Packaging Fees, or Joint Packaging, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 22.**

For the period January 1, 2009 to the present, all Documents discussing, concerning, or reflecting any complaint received by UTA from any of UTA's clients regarding allegations of sexual harassment or sexual assault by any employee or executive of a Studio.

**REQUEST FOR PRODUCTION NO. 23.**

Data sufficient to show all earnings from Talent Agency Services relating to a Project that UTA has received since January 1, 1999 where UTA represented a Writer on the Project, including (i) a unique identifier or title for each Project; (ii) the production and initial broadcast date(s) of the Project; (iii) the UTA agents or other employees involved in the Project; (iv) the identity of all Talent UTA brought to the Project; (v) the identity of all Talent other Talent Agencies brought to the Project, identifying for each individual Talent, the responsible Talent Agency; (vi) whether the Project was subject to Joint Packaging; (vii) the Studio involved in the

Project; (viii) the structure or formula of any Packaging Fees earned; (ix) the combined total of any UTA earnings from the Project; (x) a breakdown of any UTA earnings from the Project that identifies (1) any Packaging Fees earned (separately for upfront, deferred, and back-end fees), (2) any Commissions earned, and (3) any other UTA earnings from the Project; and (xi) for each item in (x), the identity of the entity that paid the earnings.

**REQUEST FOR PRODUCTION NO. 24.**

For each Person identified in response to RFP No. 23, data sufficient to show all earnings of all Talent employed on the Project. To respond to this RFP, produce earnings information separately for each Talent represented by UTA.

**REQUEST FOR PRODUCTION NO. 25.**

Data sufficient to show all Commission revenues received by UTA for each of the last 20 years from Writers for the provision of writing services or the sale or option of any literary material on any Project.

**REQUEST FOR PRODUCTION NO. 26.**

Documents sufficient to identify each database or data set used or maintained by UTA relating to the provision of Talent Agency Services at any time after January 1, 1999 that contains information relating to UTA's:

    a.  agents;

    b.  Talent represented;

    c.  Talent compensation;

    d.  Projects;

    e.  Studios for whom any Writer represented by UTA performed writing services or sold or optioned literary material;

    f.  Studios owned, in whole or in part, whether by Affiliation or otherwise;

    g.  bids, estimates, quotes, proposals, or responses to requests for information;

h.  prices, costs, or margins;

i.  fees earned, including commissions, Packaging Fees, or any licensing fees (e.g., upfront, deferred, back-end);

j.  earnings or profit and loss reports;

k.  win/loss reports;

l.  research and development projects;

m. marketing, promotions, or advertising; or

n.  competitors.

**REQUEST FOR PRODUCTION NO. 27.**

For each database or data set identified in RFP No. 26, documents sufficient to describe each database or data set, which includes: (1) its software platform; (2) its type (e.g., flat, relational, or enterprise); (3) the sources (e.g., other databases or individuals) used to populate the database; (4) a Data Dictionary; (5) for relational or enterprise databases, documents specifying the relationships among tables (e.g., an entity relationship diagram); (6) any query forms; and (7) any regularly prepared reports produced from that database.

**REQUEST FOR PRODUCTION NO. 28.**

For each of 2015, 2016, 2017, 2018, and 2019, data sufficient to identify Writers in that year who (a) were represented by UTA, (b) terminated UTA, or (c) signed with UTA, and for each Writer, data sufficient to identify the Writer's former Talent Agency or new Talent Agency, as the case may be.

**REQUEST FOR PRODUCTION NO. 29.**

All Documents or data relating to Studio revenue and budgets for any Project.

**REQUEST FOR PRODUCTION NO. 30.**

All Documents or data relating to Writer compensation for any Project.

**REQUEST FOR PRODUCTION NO. 31.**

24

All Documents analyzing, discussing, or relating to the financial impact Packaging has on UTA, Talent Agencies, Studios, Writers, or the Guilds and any underlying data used to conduct the analysis or that otherwise is referenced in the Document.

**REQUEST FOR PRODUCTION NO. 32.**

All Documents prepared by UTA or any of its financial or consulting advisors that analyzes UTA's Packaging practices, Packaging Fees, or the future of Packaging.

**REQUEST FOR PRODUCTION NO. 33.**

All Documents prepared in connection with WME's efforts to launch an initial public offering in 2019 that analyze, discuss, or reference Packaging or Packaging Fees.

**REQUEST FOR PRODUCTION NO. 34.**

All Documents analyzing, discussing, or relating to the effect Packaging Fees have on the output or quality of the film and television industries, as alleged at Paragraph 57 of the First Consolidated Complaint, and any underlying data that supports UTA's allegations as to output as alleged at Paragraph 57 of the First Consolidated Complaint.

**REQUEST FOR PRODUCTION NO. 35.**

All Documents reflecting Communications between UTA and any other Talent Agency or between UTA and ATA concerning the response of such Talent Agency or ATA, or between or among any member of ATA, whether or not UTA was an immediate party to such Communication, relating to actions or positions to be taken by one or more Talent Agencies in response to the following: (a) the Guilds' February 21, 2019 Communication transmitting a Copy of a proposed Code of Conduct, including development of ATA bargaining positions in response thereto;

(b) the June 19, 2019 Communication from the Guilds to withdraw consent to ATA and is members engaging in collective negotiations regarding a successor to the AMBA; (c) Communications from WGAW Executive Director David Young to each member of the ATA Negotiating Committee to negotiate individually with each member Agency regarding its individual agreement to the Code of Conduct; and (d) Communications among ATA members relating to positions to be taken is further discussion with the Guilds created or forwarded after a June 28, 2019 letter from the Guilds' counsel to ATA Negotiating Committee members advising them to cease and desist from collective discussions.

**REQUEST FOR PRODUCTION NO. 36.**

All Documents reflecting Communications between UTA and any other Talent Agency or between UTA and ATA concerning the response of such Talent Agency or ATA , or between or among any member of ATA, whether or not UTA was an immediate party to such Communication, concerning actions or positions to be taken by one or more Talent Agencies in response to the following:  (a) the action by Verve, on or about May 16, 2019, to sign a franchise agreement with the Guilds, (b) the action taken by Kaplan Stahler, on or about June 22, 2019, to sign a franchise agreement with the Guilds, (c) the action taken by Buchwald, on or about July 25, 2019, to sign a franchise agreement with the Guilds, (d) the action taken by Abrams Artists Agency, on or about November 13, 2019, to sign a franchise agreement with the Guilds, (e) the action taken by RBEL, on or about November 18, 2019, to sign a franchise agreement with the Guilds, or (f) the action taken by Pantheon, on or about March 15, 2019, to sign a franchise agreement with the Guilds.  For the avoidance of doubt, this Request should be deemed to include all Documents that reference or refer to a Talent Agency's determination, intention, or plan not to work with, or otherwise not to deal with, Abrams Artists Agency, Buchwald, Kaplan Stahler Agency,

Pantheon, RBEL, or Verve (or any their clients), in any capacity whatsoever.

**REQUEST FOR PRODUCTION NO. 37.**

All Documents reflecting Communications between UTA and any other Talent Agency, or between UTA and ATA concerning the response of such Talent Agency or ATA, or between or among any member of ATA, whether or not UTA was an immediate party to such Communication, concerning actions or positions to be taken by one or more Talent Agencies in response to the to the WGAW's March 20, 2019 authorization to lawyers to "negotiate overscale terms and conditions of employment for individual Writers" as described in Answer and Counterclaim Paragraph 399, and Communications by UTA with attorneys that were potentially covered by the WGA's authorization.

**REQUEST FOR PRODUCTION NO. 38.**

All Documents, including policies, standards, guidelines, or warnings, concerning UTA's compliance with U.S. federal and state antitrust laws.

**REQUEST FOR PRODUCTION NO. 39.**

All Documents, including policies, standards, guidelines, or warnings, concerning the ATA's compliance with U.S. federal and state antitrust laws.

**REQUEST FOR PRODUCTION NO. 40.**

All Documents discussing, concerning, or reflecting the exchange of Competitively Sensitive Information among Talent Agencies, whether between individual Talent Agencies or by way of a third-party intermediary such as the ATA.

**REQUEST FOR PRODUCTION NO. 41.**

All Documents reflecting, concerning, or relating to the impact of Packaging, Packaging Fees, the present disputes with the Guilds, the Code of Conduct, or the termination of the AMBA on investments by shareholders of Talent Agencies.

**REQUEST FOR PRODUCTION NO. 42.**

All Documents reflecting, concerning, or relating to UTA's policies and practices regarding the retention, destruction, disposal, or preservation of Documents and ESI and, if such policies or practices have been different with respect to any category of Documents over different time periods, Documents sufficient to (a) identify each such category and time period and (b) describe UTA's retention policy or practice with respect to each such category and time period.

**REQUEST FOR PRODUCTION NO. 43.**

All Documents referring or relating to written policies, procedures, and guidelines related to UTA's computers, computer systems, electronic data, or electronic media, including, by way of example and not limitation: (i) backup tape rotation schedules; (ii) electronic data retention, preservation, and destruction schedules; (iii) employee usage policies for company computers, telephones, and other technology; (iv) company-wide monitoring software; (v) electronic media deployment, allocation, and maintenance procedures for new employees, current employees, or departed employees; and (vi) personal or home computer usage policies for work-related activities.

**REQUEST FOR PRODUCTION NO. 44.**

All Documents and Communications constituting, discussing, reflecting, concerning, or relating to information shared either (a) between or among UTA and one or more private equity firms or funds, or (b) between or among any private equity firms or funds (including Silver Lake and TPG), regarding the business of Talent Agencies, including Packaging, UTA's ability to obtain Packaging Fees, the Talent Agencies' expansion into content production and ownership, UTA's ability to restrict access to Talent that it represents, or the present disputes with the Guilds.

**REQUEST FOR PRODUCTION NO. 45.**

All Documents between or among Talent Agencies, either directly or by way

of a third-party such as the ATA, reflecting, concerning, or relating to UTA's decision (including the concealment thereof) to assemble a Package or Joint Package based on the amount of Packaging Fees that UTA would earn, rather than the fee that the Writer would earn.

**REQUEST FOR PRODUCTION NO. 46.**

All Documents between or among Talent Agencies, either directly or by way of a third-party such as the ATA, reflecting, concerning, or relating to promises, threats, or future plans by a Talent Agency to not do business with any other Talent Agency (including Abrams Artists Agency, Buchwald, Kaplan Stahler Agency, Pantheon, RBEL, or Verve), any other Talent Agency's clients, or any Writer(s).

**REQUEST FOR PRODUCTION NO. 47.**

All ATA Board of Director and Board committee minutes, pre-meeting Board packets, presentations and any other such Documents relating to, regarding, or referencing:

(1)   any proposed or actual agreement or understanding between or among Talent Agencies, including any Plaintiff and Counter-Defendant, concerning the provision of Talent Agency Services;

(2)   any investigations by any Person into the legality of such agreements or understandings;

(3)   any findings from such investigations; or

(4)   any resolutions or other Board or committee decisions arrived at after consideration of the results of any such investigations.

**REQUEST FOR PRODUCTION NO. 48.**

All Documents relating to the voluntary or involuntary termination, retirement, resignation, discipline, discharge, reassignment, transfer, or suspension of any employee who was terminated, disciplined, discharged, or suspended, or who

retired or resigned as a result of his or her alleged participation in, involvement in, or knowledge of any agreement, understanding, plan, contract, combination, or conspiracy, express or implied, regarding the provision of Talent Agency Services between UTA and any other Talent Agency.

**REQUEST FOR PRODUCTION NO. 49.**

All Documents relating to the voluntary or involuntary termination, retirement, resignation, discipline, discharge, reassignment, transfer, or suspension of any employee who was terminated, disciplined, discharged, or suspended, or who retired or resigned as a result of his or her alleged participation in, involvement in, or knowledge of any potential or actual conflict of interest related to UTA's provision of Talent Agency Services.

**REQUEST FOR PRODUCTION NO. 50.**

All Communications and filings, made at any time, with the U.S. Department of Justice or the Federal Trade Commission, including all filings and submissions made pursuant to the Hart-Scott-Rodino Act.

**REQUEST FOR PRODUCTION NO. 51.**

Produce the following Documents for each officer of UTA and for each of UTA's employees, agents or contractors who either (1) has or had any direct or indirect responsibility for or participated in setting, recommending, preparing, reviewing, approving, adjusting, evaluating, or disclosing rates, prices, or any other terms or conditions for the provision of Talent Agency Services; (2) attended any meetings of the ATA; (3) had any meeting or Communication relating to Packaging with any present or former officer, director, employee, or agent of another Talent Agency; or (4) was voluntarily or involuntarily terminated, or was disciplined, discharged, reassigned, transferred, or suspended, as a result of his or her alleged participation in, involvement in, or knowledge of any agreement, understanding,

plan or contract, combination, or conspiracy, express or implied, relating to the Provision of Talent Agency Services between UTA and any other Talent Agency:

(a) The personal and company copy of all electronic or manual diaries, calendars, pocket calendars, calendar pads, appointment books, or appointment notes;

(b) Voice mail, answering machine messages, e-mail, text messages, or other correspondence to and from each such person relating to any communication between Talent Agencies regarding Packaging;

(c) The personal and company copy of all trip and travel logs, records, and supporting Documents;

(d) The personal and company copy of all expense reimbursement or entertainment records and supporting Documents;

(e) The personal and company copy of all telephone number logs, telephone message logs, directories, notebooks, card files (such as Rolodex cards) or memoranda;

(f) All long distance or cellular telephone bills, statements and records and supporting Documents recording or relating to long distance or cellular telephone calls by such officers, employees, agents, or contractors; and

(g) The personal and company copies of all Documents relating to actual or proposed participation or membership in the ATA or any committee or subcommittee thereof relating to Packaging, including meeting minutes, agendas, attendance lists, handouts, notes, and publications.

**REQUEST FOR PRODUCTION NO. 52.**

All Documents distributed at, prepared in connection with, taken to, received at, or creating during any meeting attended by UTA and any other Talent Agency at which there was a discussion, presentation, or Communication regarding Packaging.

**REQUEST FOR PRODUCTION NO. 53.**

All Documents discussing or reflecting (prospectively or retrospectively) UTA's Communications with the trade press, including *Deadline*, *Variety* and *The Hollywood Reporter*, regarding (a) Packaging, (b) Packaging Fees, (c) this lawsuit, (d) the Code of Conduct, or (e) the Guilds.

**REQUEST FOR PRODUCTION NO. 54.**

All Documents concerning or reflecting UTA's Communications with any Writer regarding (a) Packaging, (b) Packaging Fees, (c) this lawsuit, (d) the Code of Conduct, or (e) the Guilds.

**REQUEST FOR PRODUCTION NO. 55.**

All Documents concerning or reflecting UTA's Communications with any Studio regarding (a) Packaging, (b) Packaging Fees, (c) this lawsuit, (d) the Code of Conduct, or (e) the Guilds, or (f) the Guilds' efforts to require Studios to deal only with franchised Talent Agencies.

**REQUEST FOR PRODUCTION NO. 56.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to (a) UTA's fiduciary duties to its clients, or (b) any potential or actual conflict of interest arising from UTA's provision of Talent Agency Services, including all Documents constituting, reflecting, concerning, or relating to UTA's policies and practices regarding topics (a) and (b), and all Communications with any Writer or any other Person regarding topics (a) and (b).

**REQUEST FOR PRODUCTION NO. 57.**

For the period January 1, 2014 to the present, all Documents constituting, analyzing, discussing, or relating to UTA's disclosure of information concerning any potential or actual conflict of interest arising from UTA's provision of Talent

Agency Services, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 58.**

For the period January 1, 2014 to the present, all Documents constituting, analyzing, discussing, or relating to UTA's disclosure of information regarding Packaging or Packaging Fees to UTA's clients, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 59.**

For the period January 1, 2014 to the present, all Documents constituting, reflecting, concerning, analyzing, discussing, or relating to any UTA client's waiver of or consent to any actual or potential conflict of interest relating to Packaging or Packaging Fees.

**REQUEST FOR PRODUCTION NO. 60.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to UTA's negotiation of any profit definition for any Writer, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 61.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to UTA's collection or non-collection of "double commission," as defined in the AMBA, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 62.**

For the period January 1, 2014 to the present, all Documents reflecting,

33

concerning, analyzing, discussing, or relating to UTA's refund of any commission to any Writer as a result of Packaging in a Project, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 63.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to UTA's negotiation of Packaging Fees on any Project on which UTA procured or sought to procure the employment of a single Talent element, including all policies and practices related thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 64.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, or relating to any offer by UTA to procure the employment of any Writer by a Studio for less compensation than that Writer had previously earned on any other Project.

**REQUEST FOR PRODUCTION NO. 65.**

All Documents from any time reflecting, concerning, analyzing, discussing, or relating to UTA's provision of Talent Agency Services to Counterclaimant Barbara Hall.

**REQUEST FOR PRODUCTION NO. 66.**

All Documents from any time reflecting, concerning, analyzing, discussing, or relating to UTA's provision of Talent Agency Services to Counterclaimant Deirdre Mangan.

**REQUEST FOR PRODUCTION NO. 67.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to (a) UTA's preference or decision

34

not to procure or attempt to procure employment for any client of UTA on any Project on which UTA was not receiving a Packaging Fee, or (b) any attempt by UTA to prevent, objection by UTA to, or comment or question by UTA concerning the employment of any Talent not represented by UTA on any Project on which UTA sought to receive or did receive a Packaging Fee, or (c) UTA's preference or decision to procure or attempt to procure employment for any client of UTA on those Projects on which UTA was receiving Packaging Fees, including all policies and practices regarding topics (a), (b), or (c) and all Communications with any Writer or any other Person regarding topics (a), (b), or (c).

**REQUEST FOR PRODUCTION NO. 68.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to UTA's attempt to procure employment for any client of UTA at any Studio with which UTA has any Affiliation, including all policies and practices relating thereto and all Communications with any Writer or any other Person relating thereto.

**REQUEST FOR PRODUCTION NO. 69.**

From the period of January 1, 1999 to the present, all agreements and contracts between UTA and any Studio concerning any Affiliation between said Studio and UTA.

**REQUEST FOR PRODUCTION NO. 70.**

All documents supporting UTA's contention in the First Consolidated Complaint that UTA's receipt of Packaging Fees benefits Writers represented by UTA.

**REQUEST FOR PRODUCTION NO. 71.**

For the period January 1, 2014 to the present, all Documents reflecting, concerning, analyzing, discussing, or relating to the market valuation of Packaging,

including all policies and practices relating thereto and all Communications with any Person relating thereto.

**REQUEST FOR PRODUCTION NO. 72.**

All Documents that concern, discuss, or refer to a Writer's Communication of his or her preference not to be employed on a Project on which any Talent Agency was receiving Packaging Fees or of his or her preference for any Talent Agency not to receive Packaging Fees on any Project on which the Writer was employed, or any Communication constituting or reflecting any question from any Writer concerning his or her employment on a Project on which any Talent Agency was receiving Packaging Fees or concerning the payment of Packaging Fees on such a Project, as well as UTA's response to any such Communication, as alleged in Paragraph 35 of the First Consolidated Complaint.

**REQUEST FOR PRODUCTION NO. 73.**

All Documents that support UTA's allegation that it "often . . . earns less from such productions on a packaging-fee model than [it] would have earned on a more traditional commission-based model", as alleged at Paragraph 50 of the First Consolidated Complaint.

**REQUEST FOR PRODUCTION NO. 74.**

All Documents that concern, discuss, relate to, or refer any Communication by any employee, executive, officer, director, or manager of UTA to either (a) a Studio, (b) a producer, (c) a Writer, (d) a lawyer, or (e) a Talent manager in which such employee, executive, officer, director, or manager of UTA stated any intention, on behalf of himself, herself, or UTA (alone or in conjunction with any other Talent Agencies), not to do business with, not to deal with, not to allow Talent represented by UTA to do business with, not to allow Talent represented by UTA to deal with, "blacklist," "blackball," or put in the "penalty box" the recipient or the recipient's

1    employer.

2    **REQUEST FOR PRODUCTION NO. 75.**

3         All Documents that concern, discuss, relate to or refer to any "blacklist" or

4    any similar list of (i) individuals, including Writers, lawyers, or managers, or (ii)

5    entities, such as Studios, whom UTA (alone or in conjunction with any other Talent

6    Agencies) has refused to do business with, to deal with, to allow Talent represented

7    by UTA to do business with, to allow Talent represented by UTA to deal with, or

8    whom UTA has otherwise "blackballed" or put in the "penalty box" as those terms

9    are commonly understood in the industry.

10    **REQUEST FOR PRODUCTION NO. 76.**

11         All Documents that concern, discuss, analyze, relate to, or refer to a Writer's

12    invocation, or intention to invoke, any of the "narrowly-tailored regulations"

13    provided for in the 1976 AMBA that are alleged at Paragraphs 78 and 79 of the First

14    Consolidated Complaint.

15    **REQUEST FOR PRODUCTION NO. 77.**

16         All Documents in which any director, officer, manager, executive or

17    employee of UTA refers to any Studio or Studios as a "client" or "clients" of theirs

18    or of UTA's.

19    **REQUEST FOR PRODUCTION NO. 78.**

20         Documents sufficient to show the existence, terms, and signatories to any joint

21    defense agreement or common interest agreement entered into among the Agencies

22    and any other Persons.

23    **REQUEST FOR PRODUCTION NO. 79.**

24         All Documents that discuss or otherwise concern any offer or proposal made

25    to the ATA or any Agency regarding either (a) the Code of Conduct, or (b) a

26    franchise agreement.

27

28

**REQUEST FOR PRODUCTION NO. 80.**

All UTA balance sheets, financial statements, monthly income statements, monthly cash flow statements, and general ledgers.

**REQUEST FOR PRODUCTION NO. 81.**

Documents concerning any injury to UTA, as alleged at Paragraph 190 of the First Consolidated Complaint.

DATED: December 20, 2019          ALTSHULER BERZON LLP


                                  /s/ Stacey Leyton
                                  Stacey Leyton


                                  Stephen P. Berzon
                                  sberzon@altber.com
                                  Stacey Leyton
                                  sleyton@altber.com
                                  P. Casey Pitts
                                  cpitts@altber.com
                                  Rebecca C. Lee
                                  rlee@altber.com
                                  Andrew Kushner
                                  akushner@altber.com

                                  177 Post Street, Suite 300
                                  San Francisco, California 94108
                                  Telephone: (415) 421-7151
                                  Facsimile: (415) 362-8064


                                  Anthony R. Segall
                                  asegall@rsglabor.com
                                  Juhyung Harold Lee
                                  hlee@rsglabor.com
                                  ROTHNER, SEGALL & GREENSTONE
                                  510 South Marengo Avenue
                                  Pasadena, California 91101
                                  Telephone: (626) 796-7555
                                  Facsimile: (626) 577-0124


                                  W. Stephen Cannon
                                  scannon@constantinecannon.com
                                  CONSTANTINE CANNON LLP
                                  1001 Pennsylvania Ave, NW, Ste. 1300N
                                  Washington, DC 20004
                                  Telephone: (202) 204-3500
                                  Facsimile: (202) 204-3501


                                  Ethan E. Litwin (*pro hac vice* pending)
                                  elitwin@constantinecannon.com
                                  CONSTANTINE CANNON LLP
                                  335 Madison Avenue, 9th Floor
                                  New York, NY 10017
                                  Telephone: (212) 350-2700
                                  Facsimile: (212) 350-2701

1

2

3

*Attorneys for Defendants and Counterclaimants*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS AND COUNTERCLAIMANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
Case No. 2:19-cv-05465-AB-AFM

# EXHIBIT D

1          UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4      HONORABLE ANDRE BIROTTE, JR., JUDGE PRESIDING

5                    ---

6

7

8    **WILLIAM MORRIS ENDEAVOR          )**
     **ENTERTAINMENT, LLC ,            )**
9                                      )
                                       )
10                                     )
                 Plaintiff,            )
11                                     )No. CV 19-5465
          VS.                          )
12                                     )
     **WRITERS GUILDS OF AMERICA, WEST, INC.,)**
13   et al.,                           )
                                       )
14                                     )
                 Defendants.           )
15   _____)

16

17         Reporter's Transcript of Proceedings
                  **MOTION HEARING**
18           Los Angeles, California
             **TUESDAY, JANUARY 24, 2020**
19

20

21

22

23         ANNE KIELWASSER, CRR, RPR, CSR
            Federal Official Court Reporter
24         350 West First Street, Suite 4455
            Los Angeles, California 90012
25            Telephone: (213) 894-2969
              anne.kielwasser@gmail.com

```
1                    A P P E A R A N C E S

2

3     ON BEHALF OF THE PLAINTIFF:

4     David L Greenspan
      Winston and Strawn LLP
5     200 Park Avenue
      New York, NY 10166
6     212-294-6700
      Fax: 212-294-4700
7     E-mail: Dgreenspan@winston.com

8     Jeffrey L Kessler
      Winston and Strawn LLP
9     200 Park Avenue
      New York, NY 10166
10    212-294-6700
      Fax: 212-294-4700
11    E-mail: Jkessler@winston.com

12

13    Patrick J Somers
      Kendall Brill and Kelly LLP
      10100 Santa Monica Boulevard Suite 1725
14    Los Angeles, CA 90067
      310-556-2700
15    Fax: 310-556-2705
      E-mail: Psomers@kbkfirm.com
16
      Steven A Marenberg
17    Irell and Manella LLP
      1800 Avenue of the Stars Suite 900
18    Los Angeles, CA 90067-4276
      310-277-1010
19    Fax: 310-203-7199
      E-mail: Smarenberg@irell.com
20

21

22

23

24       (APPEARANCES CONTINUED ON NEXT PAGE)

25
```

```
1                       A P P E A R A N C E S

2
         ON BEHALF OF THE DEFENDANTS:
3

4        Anthony R Segall
         Rothner Segall and Greenstone
5        510 South Marengo Avenue
         Pasadena, CA 91101-3115
6        626-796-7555
         Fax: 626-577-0124
7        E-mail: Asegall@rsglabor.com

8        Ethan E Litwin
         Constantine Cannon LLP
9        335 Madison Avenue 9th Floor
         New York, NY 10017
10       212-350-2700
         Fax: 212-350-2701
11       E-mail: Elitwin@constantinecannon.com

12       Stacey M Leyton
         Altshuler Berzon LLP
13       177 Post Street Suite 300
         San Francisco, CA 94108
14       415-421-7151
         Fax: 415-362-8064
15       E-mail: Sleyton@altshulerberzon.com

16       Rebecca C Lee
         Altshuler Berzon LLP
17       177 Post Street Suite 300
         San Francisco, CA 94108
18       415-421-7151
         Fax: 415-362-8064
19       E-mail: Rlee@altshulerberzon.com

20       Stephen P Berzon
         Altshuler Berzon LLP
21       177 Post Street Suite 300
         San Francisco, CA 94108
22       415-421-7151
         Fax: 415-362-8064
23       E-mail: Sberzon@altshulerberzon.com

24

25
```

| | |
|---|---|
| 1 | TUESDAY, JANUARY 24, 2020                10:43 A.M. |
| 2 | ~ ~ ~ |
| 3 | P R O C E E D I N G S |
| 10:43:25   4 | ~ ~ ~ |
| 10:43:25   5 | COURT CLERK:  Calling civil case 19-5465.  William |
| 10:43:34   6 | Morris Endeavor Entertainment, LLC versus Writers Guild of |
| 10:43:41   7 | America. |
| 10:43:42   8 | Counsel, please state your appearances for |
| 10:43:46   9 | the record. |
| 10:44:03   10 | THE COURT:  Why don't we start with the |
| 10:44:05   11 | plaintiffs. |
| 10:44:08   12 | MR. SOMERS:  Good morning, Your Honor.  Patrick |
| 10:44:09   13 | Somers on behalf of CAA, Your Honor. |
| 10:44:09   14 | THE COURT:  All right, good morning. |
| 10:44:13   15 | MR. MARENBERG:  Good morning, Your Honor.  Steve |
| 10:44:15   16 | Marenberg on behalf of the United Talent Agency. |
| 10:44:15   17 | MR. GREENSPAN:  Good morning, Your Honor.  David |
| 10:44:18   18 | Greenspan for WME. |
| 10:44:18   19 | THE COURT:  Good morning. |
| 10:44:21   20 | MR. KESSLER:  Good morning, Your Honor.  Jeffrey |
| 10:44:21   21 | Kessler also on behalf of WME. |
| 10:44:22   22 | THE COURT:  All right, good morning. |
| 10:44:23   23 | For the defense. |
| 10:44:24   24 | MS. LEYTON:  Good morning, Your Honor.  Stacy |
| 10:44:27   25 | Leyton on behalf of defendants and counter claimants. |

| | | |
|---|---|---|
| 10:44:28 | 1 | **THE COURT:**  Good morning. |
| 10:44:29 | 2 | **MR. BERZON:**  Good morning, Your Honor.  Stephen |
| 10:44:31 | 3 | Berzon on behalf of WGA and defendants and counter claimants. |
| 10:44:35 | 4 | **THE COURT:**  Good morning. |
| 10:44:35 | 5 | **MS. LEE:**  Good morning, Your Honor.  Rebecca Lee |
| 10:44:38 | 6 | on behalf of the counter claimants. |
| 10:44:42 | 7 | **MR. LITWIN:**  Good morning, Your Honor.  Ethan |
| 10:44:44 | 8 | Litwin on behalf of defendants and counterclaims. |
| 10:44:49 | 9 | **MR. SEGALL:**  Good morning, Your Honor.  Anthony |
| 10:44:53 | 10 | Segall on behalf of defendants and counter claimants. |
| 10:44:53 | 11 | **THE COURT:**  All right, good morning to you all. |
| 10:44:54 | 12 | We're here on this motion to dismiss the |
| 10:44:56 | 13 | counterclaims. |
| 10:44:58 | 14 | I did not issue a tentative in this case. |
| 10:45:01 | 15 | I've got a number of questions that I wanted to ask, try to |
| 10:45:05 | 16 | get some clarity on some things.  Why don't I start with the |
| 10:45:12 | 17 | plaintiffs. |
| 10:45:13 | 18 | Who from the plaintiff has drawing the short |
| 10:45:17 | 19 | straw?  Would that be you, Mr. Kessler? |
| 10:45:21 | 20 | **MR. KESSLER:**  Well, Your Honor, we have divided it |
| 10:45:22 | 21 | up.  So I'm doing the standing arguments of both the |
| 10:45:22 | 22 | antitrust and RICO. |
| 10:45:22 | 23 | **THE COURT:**  All right. |
| 10:45:24 | 24 | **MR. KESSLER:**  I don't know if want to start there, |
| 10:45:26 | 25 | but we have each of the subjects divided up. |

| | | |
|---|---|---|
| 10:45:29 | 1 | **THE COURT:** All right, that's exactly where I want |
| 10:45:31 | 2 | to start with, antitrust and RICO. So, why don't step to the |
| 10:45:31 | 3 | lectern please. |
| 10:45:31 | 4 | **MR. KESSLER:** Very good, Your Honor. |
| 10:45:42 | 5 | **THE COURT:** All right. So, just assume, just for |
| 10:45:46 | 6 | the sake of this discussion, and I'm making this -- |
| 10:45:48 | 7 | admittedly, it's a big assumption. |
| 10:45:49 | 8 | But let's assume, okay, that I -- that |
| 10:45:54 | 9 | somehow the guilds don't have standing to bring this |
| 10:45:58 | 10 | antitrust claim, wouldn't the individual writers, though, |
| 10:46:01 | 11 | have standing? I mean, because it strikes me that -- |
| 10:46:06 | 12 | Aren't they selling their own talent in the |
| 10:46:09 | 13 | same labor market as the agencies, and then -- and wouldn't |
| 10:46:11 | 14 | they have a claim that there was some sort of -- that these |
| 10:46:15 | 15 | collusive packaging agreements restrained their ability to |
| 10:46:18 | 16 | trade. |
| 10:46:19 | 17 | **MR. KESSLER:** So, Your Honor, we need to break it |
| 10:46:21 | 18 | up for the price-fixing conspiracy and the boycott |
| 10:46:27 | 19 | conspiracy. |
| 10:46:27 | 20 | **THE COURT:** Okay. |
| 10:46:27 | 21 | **MR. KESSLER:** I get to the same place, but the |
| 10:46:29 | 22 | analysis is a little bit different for each one. |
| 10:46:33 | 23 | **THE COURT:** Okay. |
| 10:46:33 | 24 | **MR. KESSLER:** With respect to the alleged |
| 10:46:35 | 25 | price-fixing conspiracy, the market participants are the |

| | |
|---|---|
| 11:04:13 | 1 |
| 11:04:16 | 2 |
| 11:04:19 | 3 |
| 11:04:23 | 4 |
| 11:04:27 | 5 |

1  cause had been applied quite strictly.  I mean, frankly, Your

2  Honor, I know that because I've actually lost a RICO case in

3  the Central District at the motion to dismiss stage because I

4  didn't have sufficient proximate cause pled with regard

5  to that.  I got leave to replead, and I did something else.

6          But the point is, Your Honor, it is

7  completely their burden to do that.  So, again, Your Honor, I

8  think on standing that it simply doesn't exist either for the

9  antitrust claims or for the RICO claims.

10          And one last point, Your Honor, unless you

11  have anther question, both AGC and Eagle were granted on

12  motions to dismiss.  And I think that's important because

13  what that shows is that these type of determinations really

14  can easily be made on the face of the pleadings.  It's not

15  like this is something --

16          Nothing is going to change the factual

17  relationship here based on -- based on discovery, for

18  example.

19          **THE COURT:**  Okay.  Thank you.

20          Let me just see, what else did I have?

21          I had a question.  My next question dealt

22  with the supplement jurisdiction.

23          So, who's drawing the short straw on that, if

24  anyone?

25          **MR. MARENBERG:**  I have, Your Honor.

| | | |
|---|---|---|
| 11:05:34 | 1 | Steve Marenberg. |
| 11:05:34 | 2 | **THE COURT:**  Okay. |
| 11:05:39 | 3 | **MR. KESSLER:**  Thank you, Your Honor. |
| 11:05:39 | 4 | **THE COURT:**  Thank you.  I suspect you'll be back |
| 11:05:41 | 5 | up again. |
| 11:05:42 | 6 | But, Mr. Marenberg, so, again, if I were to |
| 11:05:48 | 7 | dismiss all of the Guilds's federal claims as you request, |
| 11:05:52 | 8 | okay, shouldn't the Court still exercise supplemental |
| 11:05:55 | 9 | jurisdiction?  Because you still have federal claims that are |
| 11:05:57 | 10 | at issue in the case, and wouldn't these state law claims -- |
| 11:06:03 | 11 | aren't they compulsory counterclaims that have to stay with |
| 11:06:08 | 12 | the case? |
| 11:06:09 | 13 | **MR. MARENBERG:**  So, Your Honor, the answer to the |
| 11:06:11 | 14 | last question, specific question is no, they are not |
| 11:06:14 | 15 | compulsory counterclaims.  Under Rule 13, because they were |
| 11:06:19 | 16 | pending in state court at the time that our claims, that you |
| 11:06:24 | 17 | rightly mention would stay, were filed, the counterclaims are |
| 11:06:28 | 18 | not -- the -- the counterclaims are not compulsory |
| 11:06:33 | 19 | counterclaims, they are permissive counterclaims. |
| 11:06:37 | 20 | Now, in either -- |
| 11:06:37 | 21 | **THE COURT:**  Okay.  So, they're permissive |
| 11:06:40 | 22 | counterclaims.  But they come from the same transacting |
| 11:06:40 | 23 | requirements. |
| 11:06:41 | 24 | Look, it's not like I'm wanting for |
| 11:06:44 | 25 | additional work.  But, I mean, why would it makes sense to |

11:22:20  1    They don't get a packaging fee unless they're selling a

11:22:25  2    talent services to a studio.

11:22:27  3              Mr. Kessler also said, and he misrepresented

11:22:32  4    what our injury claim here is, he said:  I think that studios

11:22:37  5    have less resources to pay writers.  That is not what we

11:22:42  6    allege, and this is absolutely critical to the standing

11:22:45  7    argument.

11:22:45  8              What we allege is that the budgets for a

11:22:48  9    project are fixed, and that a packaging fee reduces dollar

11:22:53  10   for dollar the money in that budget that could go to anything

11:22:59  11   else, including paying writers.

11:23:01  12        **THE COURT:**  But is that an important point that

11:23:02  13   the budget could go to anything else?  So, it could go to

11:23:06  14   writers, but it could not go to writers, right?

11:23:11  15        **MR. LITWIN:**  That is true, but we have alleged,

11:23:12  16   Your Honor, not only in specific cases where it hasn't gone

11:23:16  17   to writers but also we have shown through macro evidence that

11:23:20  18   writer salary is stagnated during the period the packaging

11:23:24  19   fees were exploding.  And that is certainly an issue that we

11:23:28  20   would seek discovery on to -- and, you know, later on in this

11:23:32  21   case.  But that is the key allegation here, and that's what

11:23:37  22   distinguishes this case from Eagle.

11:23:40  23              I want to turn to Eagle for a minute, Your

11:23:43  24   Honor.  The agencies are completely distinguished from the

11:23:46  25   vessel owners in that case.

11:23:48  1        The vessel owners were the employers.  Here

11:23:51  2   the agents are the intermediary.  They work for us.  The

11:23:58  3   vessel owners owned the fish that they were selling to the

11:24:03  4   canneries.  The agents, as I just said, don't own the writing

11:24:07  5   services they're selling to the studios.

11:24:10  6        Similarly, the Guild members are in a

11:24:13  7   completely different position from the seamen and the Eagle

11:24:16  8   crew.  The crew had no direct dealings with the defendant

11:24:21  9   canneries.  The crew only dealt with their employer, the

11:24:25  10  vessel owner.  And indeed in that case, the crew argued they

11:24:29  11  should be deemed to be quote, "indirect sellers."  That's not

11:24:33  12  what we're alleging here.

11:24:34  13       We allege specifically and repeatedly that we

11:24:36  14  deal directly with both the studios and the agents because

11:24:40  15  the agents are the intermediaries.

11:24:44  16       Here, the writers specifically retained the

11:24:47  17  agents to broker the deals on their behalf.  The agents are

11:24:52  18  the writer's agents.  The writers also deal directly with the

11:24:57  19  studios because the studios are their employers.

11:25:01  20       The crew of the Eagle had no ownership

11:25:04  21  interest in the fish.  They had at best the derivative

11:25:09  22  interest in the proceeds of any sale.  Here it's undisputed

11:25:13  23  that the writers own their services and their scripts.

11:25:17  24       In fact, Your Honor, this entire case can be

11:25:19  25  summed up by the fact that the agency so vociferously argue

11:25:28  1    that the Eagle case applies.  They rely on Eagle because they

11:25:28  2    don't see the writers as their clients.  They see the studios

11:25:33  3    as their clients, and they see the writers, quiet frankly,

11:25:36  4    Your Honor, as the fish who they get to sell at their whim at

11:25:41  5    their discretion.

11:25:42  6         THE COURT:  So, let me ask you --

11:25:44  7              Well, I think I know some of the answer.  But

11:25:47  8    we talked about Eagle, a case that I think one side likes to

11:25:53  9    talk about, the other side doesn't.  What about Lenhoff

11:25:57  10   Enterprise?  In that case, it sounds eerily similar, you

11:25:57  11   know, talking about, you know, this meeting that occurred

11:26:08  12   back in the '90s, a 3-3-10 rate.  So, how is that --

11:26:12  13             You know, in that case, these allegations

11:26:13  14   were not sufficient.  How is that different?

11:26:17  15        MR. LITWIN:  It's differently only because the

11:26:20  16   agencies have totally misrepresented what happened in that

11:26:23  17   case.  So if I could walk Your Honor through it.

11:26:23  18        THE COURT:  Okay.

11:26:27  19        MR. LITWIN:  The agents' argument, as they say on

11:26:30  20   page 6 of their Reply brief, the Lenhoff dismissed the exact

11:26:34  21   same price-fixing claim.  Counterclaimants assert here that

11:26:39  22   the agencies conspired to fix a 3-3-10 packaging fee.

11:26:43  23             But Lenhoff only asserted one antitrust

11:26:47  24   claim.  It's at pages 20 to 23 of the Third Amended

11:26:52  25   Complaint.  In that claim he sets forth a claim for

11:26:55  1    exclusionary conduct.  There is no reference to price-fixing

11:27:00  2    in that sole antitrust claim.

11:27:03  3              In fact, if you look through the entirety of

11:27:06  4    the Third Amended Complaint, the term "price-fixing" never

11:27:09  5    comes up.  An allegation of price-fixing never comes up in

11:27:15  6    the entire Complaint, and I challenge Mr. Kessler to come up

11:27:18  7    here and quote from the Third Amended Complaint where it

11:27:22  8    refers to price-fixing.

11:27:24  9              Now, on page 76 -- on paragraph 76 of the

11:27:33  10   Lenhoff claim, he sets forth his allegation, and it's an

11:27:38  11   allegation among UTA and ICM, two agencies, to jointly

11:27:43  12   monopolize the scripted TV market and exclude smaller

11:27:47  13   agencies.  That is not anywhere close to this case.

11:27:50  14             Now, after the Third Amended Complaint was

11:27:54  15   dismissed, Lenhoff moved the Court to reconsider its ruling.

11:28:01  16   In support of that motion, Lenhoff submitted a sworn

11:28:05  17   declaration that recounted details of a confession that was

11:28:08  18   made by Sam Haskel, who was the former TV head at William

11:28:16  19   Morris, and that's pled in detail at paragraph 350 of our

11:28:20  20   Complaint.

11:28:21  21             Now, importantly, the substance of that

11:28:24  22   declaration, which was submitted on the motion for

11:28:27  23   reconsideration was not before the Ninth Circuit.  What the

11:28:31  24   Ninth Circuit said, and I quote from the Lenhoff decision:

11:28:35  25   "The district court's denial of Lenhoff's motion for

11:28:40  1  reconsideration is therefore not properly before us."

11:28:43  2  And Lenhoff noted specifically in its

11:28:47  3  appellate brief, quote:  "The Complaint did not plead this

11:28:53  4  1990s agreement to fix the price -- to fix the package series

11:28:57  5  price.  That's at page 14, footnote 8 of his opening

11:29:03  6  appellate brief.

11:29:04  7  Most importantly, Lenhoff didn't move to --

11:29:08  8  to amend his pleadings to make a price-fixing claim at any

11:29:12  9  point.  The only relevance that he asserted in argument, both

11:29:18  10  in his brief and before the Ninth Circuit was that this new

11:29:24  11  evidence of a price-fixing conspiracy only was relevant to

11:29:28  12  show the cozy relationship among the agencies, nothing more.

11:29:33  13  So, it was completely irrelevant to the issue

11:29:36  14  before the Ninth Circuit, which is whether Lenhoff had stated

11:29:41  15  a cognizable antitrust claim about a conspiracy among the

11:29:45  16  agents to eliminate a specific paragraph about outside

11:29:52  17  funding in the Screen Actors Guild contract.  It had nothing

11:29:57  18  to do with this case.

11:30:01  19  The Ninth Circuit's ruling in fact was

11:30:03  20  specifically limited to the pleadings, and the Ninth Circuit

11:30:06  21  never opined on the sufficiency of any allegation regarding

11:30:12  22  price-fixing because there was no price-fixing claim to opine

11:30:17  23  on.

11:30:17  24  What the Court said is, with respect to

11:30:20  25  Lenhoff's argument that the Uber agencies conspired to fix

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 11:30:24 | 1 |
| 11:30:31 | 2 |
| 11:30:35 | 3 |
| 11:30:41 | 4 |
| 11:30:43 | 5 |
| 11:30:46 | 6 |
| 11:30:50 | 7 |
| 11:30:55 | 8 |
| 11:30:58 | 9 |
| 11:30:59 | 10 |
| 11:31:03 | 11 |
| 11:31:03 | 12 |
| 11:31:06 | 13 |
| 11:31:09 | 14 |
| 11:31:12 | 15 |
| 11:31:18 | 16 |
| 11:31:23 | 17 |
| 11:31:26 | 18 |
| 11:31:29 | 19 |
| 11:31:31 | 20 |
| 11:31:34 | 21 |
| 11:31:37 | 22 |
| 11:31:38 | 23 |
| 11:31:40 | 24 |
| 11:31:43 | 25 |

1  the 3-3-10 packaging fee.  The Third Amended Complaint makes

2  only a passing reference to the Uber agency's charging such a

3  fee.  Those allegations are at paragraph 53 of the Lenhoff

4  Third Amended Complaint, and in that paragraph, he only

5  alleges that they charged that fee.

6          There is no reference to any conspiracy, any

7  price fixing or any antitrust violation associated with the

8  charging of a packaging fee.

9          THE COURT:  All right, thank you.

10          Let's talk about the group boycott claim for

11  a second.

12          MR. LITWIN:  Yes, Your Honor.

13          THE COURT:  What do you allege are the specific

14  factual allegations that show that these agencies actually

15  conspired not to bargain with the Guild?

16          It strikes me that, if anything, that people

17  didn't want to negotiate.  But what would you contend are the

18  factual allegations to show that they conspired not to

19  bargain?

20          MR. LITWIN:  Your Honor, and before I go into the

21  specific factual allegations, let me say you're exactly

22  right.  When the guilds --

23          THE COURT:  Should I mark that down?

24          MR. LITWIN:  Please.  I'm happy to specify if you

25  like.

| | | |
|---|---|---|
| 11:31:44 | 1 | The guilds revoked consent to collective |
| 11:31:49 | 2 | negotiations on July 19th.  From that point on, any |
| 11:31:53 | 3 | coordinated negotiation among the agencies regarding the |
| 11:31:56 | 4 | negotiation of a contract with the guilds was an antitrust |
| 11:32:02 | 5 | violation. |
| 11:32:04 | 6 | They could have done many different things, |
| 11:32:07 | 7 | here, Your Honor.  They could have said individually:  We |
| 11:32:11 | 8 | want to negotiate, but we're not negotiating on these |
| 11:32:14 | 9 | packaging fees. |
| 11:32:15 | 10 | THE COURT:  What authorities supports the notion |
| 11:32:16 | 11 | that that is antitrust violation?  I mean, you just -- |
| 11:32:24 | 12 | It's a group decision that they made not to |
| 11:32:27 | 13 | bargain. |
| 11:32:28 | 14 | MR. LITWIN:  You cannot make a group decision. |
| 11:32:31 | 15 | And it's -- |
| 11:32:32 | 16 | You cannot take a group decision when the -- |
| 11:32:37 | 17 | when the guilds have not consented to collective negotiation. |
| 11:32:42 | 18 | That's the whole point of a guild's -- a union's ability to |
| 11:32:46 | 19 | consent to collective negotiation. |
| 11:32:48 | 20 | They're not an employer.  They don't have |
| 11:32:51 | 21 | rights under the labor laws. |
| 11:32:54 | 22 | THE COURT:  All right. |
| 11:32:54 | 23 | MR. LITWIN:  So, it's just like if Wal-Mart and |
| 11:32:58 | 24 | K-Mart and maybe a bunch of other companies that I think of |
| 11:33:02 | 25 | because I'm old, and they're all going out of business, if |

| | |
|---|---|
| 11:33:06 | 1 | they got together and went to, you know, Samsung and said: |
| 11:33:10 | 2 | This is how we're going to negotiate with you, and behind the |
| 11:33:13 | 3 | scenes they're agreeing on what their negotiation strategy |
| 11:33:18 | 4 | is, they're not allowed to do that. |
| 11:33:20 | 5 | They could have done any -- |
| 11:33:21 | 6 | They could have said individually, we don't |
| 11:33:23 | 7 | want to talk to you.  But that's not what they did.  And we |
| 11:33:27 | 8 | have specific evidence of that, Your Honor.  At paragraphs |
| 11:33:31 | 9 | 392 to 94, we recount the e-mail trail that came in on June |
| 11:33:37 | 10 | 25th in response to an offer to individually negotiate with |
| 11:33:44 | 11 | us.  And there was an initial e-mail that came that said, you |
| 11:33:48 | 12 | know, we don't want to talk to you outside of the ATA.  And |
| 11:33:54 | 13 | then Karen Stuart, the executive director of the ATA said: |
| 11:34:00 | 14 | This is great.  Can I share this with the group? |
| 11:34:03 | 15 | And once she shared that e-mail with |
| 11:34:05 | 16 | everybody else, shockingly, we got the same responses back. |
| 11:34:11 | 17 | That is direct evidence of a coordinated negotiation |
| 11:34:17 | 18 | strategy. |
| 11:34:17 | 19 | But, secondly, we also know that their |
| 11:34:23 | 20 | negotiation strategy committee continued to meet after June |
| 11:34:27 | 21 | 19th.  Guild members were specifically told, and we allege |
| 11:34:33 | 22 | this in our Complaint, in our claims, rather, that this |
| 11:34:38 | 23 | committee whose purpose was to strategize on negotiations |
| 11:34:46 | 24 | with the Guild continue to meet well after June 19th, and |
| 11:34:51 | 25 | incidentally, well, after we had written a cease and desist |

| | | |
|---|---|---|
| 11:34:55 | 1 | letter to the agencies telling them to knock it off. |
| 11:35:01 | 2 | **THE COURT:**  Okay. |
| 11:35:02 | 3 | **MR. LITWIN:**  Now, I do have a -- |
| 11:35:05 | 4 | I'm sorry, Your Honor. |
| 11:35:07 | 5 | **THE COURT:**  I have some questions I want to shift |
| 11:35:09 | 6 | in the RICO claims.  Is that Ms. Leyton? |
| 11:35:14 | 7 | **MR. LITWIN:**  Yes, Your Honor.  Thank you. |
| 11:35:21 | 8 | **MS. LEYTON:**  Thank you, Your Honor. |
| 11:35:34 | 9 | **THE COURT:**  All right, Ms. Leyton, with respect to |
| 11:35:36 | 10 | the RICO, okay, again, I just want to make sure I understand. |
| 11:35:38 | 11 | Your argument is that these repackaging fees, they violate |
| 11:35:41 | 12 | the Section 302 of the Labor Management Relations Act. |
| 11:35:47 | 13 | But hasn't that statute been narrowly |
| 11:35:51 | 14 | construed to apply to payments made by employers in |
| 11:35:55 | 15 | collective bargaining?  I mean, these agencies, they're not |
| 11:35:59 | 16 | Union representatives.  And so I'm trying to see how this |
| 11:36:03 | 17 | fits into -- as a RICO case. |
| 11:36:07 | 18 | **MS. LEYTON:**  No, Your Honor.  That statute has not |
| 11:36:09 | 19 | been narrowly construed to apply only to the collective |
| 11:36:09 | 20 | bargaining context. |
| 11:36:13 | 21 | Initially, I'd like to point Your Honor, |
| 11:36:15 | 22 | direct Your Honor to the terms of the 302, and the terms of |
| 11:36:18 | 23 | 302 talk about it being a crime and being the basis for a |
| 11:36:22 | 24 | racketeering conspiracy. |
| 11:36:24 | 25 | **THE COURT:**  Right, for an employer -- |

11:36:26  1          **MS. LEYTON:**  Exactly.  To provide anything of

11:36:29  2    value to any representative of his or her employees.  And so

11:36:32  3    that does not talk about only labor organizations.  The labor

11:36:35  4    organization is -- is the term that is used to mean a Union.

11:36:38  5    So, it is to any representative of any of its employees.

11:36:41  6          **THE COURT:**  So, then, just indulge me for a

11:36:44  7    second.

11:36:44  8              So, under that interpretation, could an

11:36:47  9    employer or would an employer violate Section 302 by making

11:36:51  10   payments to the employees' attorneys in litigation?

11:36:57  11         **MS. LEYTON:**  Your Honor, if the attorney is

11:37:00  12   representing -- if the attorney were exercising delegated

11:37:05  13   authority from the Union to represent an individual writer in

11:37:08  14   some kind of negotiation, then in that case it would not be a

11:37:12  15   difficult question, that there would be a 302 violation.

11:37:16  16         **THE COURT:**  But -- and help me understand.  I

11:37:18  17   thought the whole purpose, is probably the wrong word, but

11:37:24  18   isn't the whole theory behind 302 is to prevent like

11:37:28  19   kickbacks and bribes?

11:37:30  20         **THE WITNESS:**  Yes, Your Honor.

11:37:30  21         **THE COURT:**  In essence you're saying these are

11:37:34  22   kickbacks or bribes?

11:37:34  23         **MS. LEYTON:**  Your Honor -- yes, Your Honor, that

11:37:35  24   these are kickbacks or bribes.

11:37:39  25              The 302 is phrased so that it doesn't require

11:37:39  1    any showing --

11:37:42  2                 This -- this particular provision of 302,

11:37:43  3    some of the other ones are different, does not require a

11:37:46  4    showing of any intent or effect of bribery.  It doesn't

11:37:49  5    require them to show that this has the effect of changing

11:37:52  6    someone's allegiance.  It can be an innocent purchase of a

11:37:55  7    dinner.  It can be in Korholz case, which is cited in the

11:37:59  8    papers.  It was somebody providing basically a loan to a

11:38:01  9    Union official who was trying to deal with some difficult

11:38:06  10   economic circumstances.

11:38:08  11              THE COURT:  In those cases -- I mean, any payment,

11:38:10  12   whether it's known or unknown?  I mean, it just strikes me as

11:38:10  13   odd to say this is a kickback or a bribe that everybody knew

11:38:21  14   about from 1990 something until the present day.  But I mean

11:38:22  15   is that your position?  It doesn't matter whether it was done

11:38:26  16   out in the open or in secret, just this payment -- this

11:38:30  17   packaging constitutes, in essence, a kickback or a bribe.

11:38:32  18              MS. LEYTON:  Yes, Your Honor.  It is very clear

11:38:35  19   that 302 does not depend on whether something is done in the

11:38:37  20   open, whether it's done in private, whether it's done with

11:38:39  21   the intent to bribe or with some innocent intent to help

11:38:39  22   somebody out.

11:38:43  23                 And in fact, the purposes of 302 are very

11:38:46  24   much implicated here.  The Union could be deducting these

11:38:49  25   above-scale individual negotiations on its own.  The Union

| | | |
|---|---|---|
| 11:38:54 | 1 | doesn't have to delegate this authority.  Under their |
| 11:38:56 | 2 | reasoning, if the Union were negotiating the above scale |
| 11:38:57 | 3 | bargains for individual writers and were getting something |
| 11:39:00 | 4 | from the employer, the Union would be guilty of a 302 |
| 11:39:03 | 5 | violation. |
| 11:39:04 | 6 | Here the Union has delegated that authority |
| 11:39:06 | 7 | to agents that are -- were franchised by the Guild and the |
| 11:39:10 | 8 | agents were getting a thing of value from the employer.  That |
| 11:39:14 | 9 | thing of value that they're getting, in fact, we've alleged, |
| 11:39:17 | 10 | presents an inherit conflict of interest in every case |
| 11:39:20 | 11 | whether the agents happened to act fairly or overcome that |
| 11:39:24 | 12 | conflict of interest or not.  It presents an inherent |
| 11:39:26 | 13 | conflict of interest which is exactly what 302 targets. |
| 11:39:28 | 14 | And I'd actually like to point, Your Honor, |
| 11:39:30 | 15 | to a couple of cases that I think support this point. |
| 11:39:30 | 16 | **THE COURT:**  All right. |
| 11:39:33 | 17 | **MS. LEYTON:**  The United States versus Ryan case, |
| 11:39:35 | 18 | and that these are both cited in our opposition papers, |
| 11:39:38 | 19 | explains:  That Congress did not mean the narrower NLRA |
| 11:39:43 | 20 | definitions to apply to the definitions of term under 302, |
| 11:39:47 | 21 | which is part of the Labor Management Relations Act, and in |
| 11:39:50 | 22 | fact Congress considered when it was adopting 302, an |
| 11:39:53 | 23 | amendment that would have made it applicable only to entities |
| 11:39:56 | 24 | that represented two or more employees, and Congress decided |
| 11:39:59 | 25 | not to amend the statute in that way. |

| | | |
|---|---|---|
| 11:40:01 | 1 | And so Congress decided to -- specifically |
| 11:40:03 | 2 | decided to have the very broad language, any representative |
| 11:40:06 | 3 | of any of its employees.  And that's different from |
| 11:40:10 | 4 | language -- the language in other subsections of Section 302, |
| 11:40:14 | 5 | which are specifically targeted at labor organizations. |
| 11:40:17 | 6 | I'd also like to call Your Honor's attention |
| 11:40:19 | 7 | to the Tenth Circuit case Korholz, K-O-R-H-O-L-Z.  That was a |
| 11:40:25 | 8 | situation where a company did provide a loan to a Union |
| 11:40:29 | 9 | officer, and the defense was that the Union wasn't the |
| 11:40:34 | 10 | majority bargaining representative at that plant.  And what |
| 11:40:36 | 11 | the Tenth Circuit held is that doesn't matter because the |
| 11:40:38 | 12 | Union and the Union official had been authorized by three |
| 11:40:41 | 13 | employees to negotiate and deal with the employer on terms of |
| 11:40:44 | 14 | employment.  And so because some individual employees at that |
| 11:40:48 | 15 | plant had authorized the Union or the Union representative to |
| 11:40:50 | 16 | act on their behalf, that implicated 302 and was covered by |
| 11:40:55 | 17 | Section 302. |
| 11:40:56 | 18 | THE COURT:  Okay.  It just strikes me as a very |
| 11:41:08 | 19 | broad interpretation of 302.  I -- I understand your point, |
| 11:41:12 | 20 | but I guess I'm sort of concerned that this is now viewed as |
| 11:41:16 | 21 | criminal conduct, in essence, but it's been going on for 40 |
| 11:41:22 | 22 | years and no one said anything about it?  And this whole time |
| 11:41:27 | 23 | I guess we're to believe, either, A, they didn't realize |
| 11:41:31 | 24 | those criminal conducts, or they did but it wasn't worth |
| 11:41:35 | 25 | raising?  Is that -- |

11:41:36  1          Again, I guess, it's more -- less of a

11:41:38  2     question and more of a statement.  I guess I'm just concerned

11:41:42  3     about what to me seems a newfound interpretation, one that I

11:41:46  4     am concerned --

11:41:53  5          I'm not sure that's the intent of 302, but

11:41:55  6     I'll let you argue any more on that.  I think you've

11:41:55  7     addressed it, but I'm just being candid with you.  I'm

11:41:58  8     just -- I'm concerned about this interpretation.

11:42:02  9          **MS. LEYTON:**  Sure, Your Honor.  There are often

11:42:03  10    disputes over whether 302 covers particular types of actions

11:42:07  11    by employers.  In fact, there was an extension that the

11:42:11  12    Eleventh Circuit made to cover neutrality agreements.

11:42:13  13    Sometimes people had not thought of whether this is a

11:42:16  14    violation of 302 because there was not the attention focused

11:42:19  15    on this practice.

11:42:20  16          And I would like to point out, this is not a

11:42:21  17    common practice with the Sports Unions.  The Sports Unions

11:42:23  18    have codes of conduct that prohibit this type of kickback

11:42:26  19    arrangement.  This is a practice that has been ubiquitous and

11:42:30  20    has been increasingly common in Hollywood, but it is not the

11:42:34  21    only practice that may have been going on for many, many

11:42:36  22    years that people did not previously call it as unlawful.

11:42:40  23    And -- and so that is our position here.

11:42:42  24          **THE COURT:**  All right.  Are you dealing with

11:42:44  25    associational standing?

| | | |
|---|---|---|
| 12:36:19 | 1 | So, this matter will remain under submission until the Court |
| 12:36:24 | 2 | issues its final rulings. |
| 12:36:25 | 3 | Have a wonderful weekend and safe travel for |
| 12:36:28 | 4 | those who are traveling. |
| 12:36:30 | 5 | Thank you. |
| 12:36:35 | 6 | COURT CLERK:  This Court is in recess. |
| 12:36:37 | 7 | (Recess taken.) |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
1                    C E R T I F I C A T E

2    I hereby certify that the foregoing is a true and correct

3    transcript of the stenographically recorded proceedings in

4    the above matter.

5    Fees charged for this transcript, less any circuit fee

6    reduction and/or deposit, are in conformance with the

7    regulations of the judicial conference of the United States.

8

9

10   /S/Anne Kielwasser                    1/30/2020
     _____               _____
11   Anne Kielwasser, CRR, RPR, CSR        Date
     Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

'

**'90s** [1] - 33:12

**/**

**/S/Anne** [1] - 87:10

**1**

**1/30/2020** [1] - 87:10
**10** [5] - 46:20, 46:23, 47:1, 55:16, 84:13
**10017** [1] - 3:9
**10100** [1] - 2:13
**10166** [2] - 2:5, 2:9
**10:43** [1] - 4:1
**11** [3] - 56:4, 56:12, 76:3
**12** [2] - 73:22, 73:23
**125** [1] - 76:12
**13** [1] - 19:15
**14** [2] - 35:5, 56:12
**14,700** [1] - 69:16
**15** [2] - 70:21, 76:12
**152** [2] - 67:14, 77:9
**1725** [1] - 2:13
**177** [3] - 3:13, 3:17, 3:21
**1800** [1] - 2:17
**19** [4] - 12:4, 12:9, 62:10, 73:6
**19-5465** [2] - 1:11, 4:5
**1990** [1] - 41:14
**1990s** [1] - 35:4
**19th** [4] - 12:9, 37:2, 38:21, 38:24

**2**

**20** [1] - 33:24
**200** [2] - 2:5, 2:9
**2014** [1] - 45:21
**2019** [3] - 12:4, 12:12, 73:6
**2020** [2] - 1:18, 4:1
**212-294-4700** [2] - 2:6, 2:10
**212-294-6700** [2] - 2:6, 2:10
**212-350-2700** [1] - 3:10
**212-350-2701** [1] - 3:10
**213** [1] - 1:25
**23** [1] - 33:24
**24** [2] - 1:18, 4:1

**244** [1] - 54:2
**249** [1] - 54:2
**25th** [2] - 38:10, 85:16
**26** [1] - 56:19
**270** [1] - 8:24
**278** [1] - 8:24
**280** [1] - 65:3

**3**

**3-3-10** [6] - 33:12, 33:22, 36:1, 46:20, 72:9, 83:18
**300** [3] - 3:13, 3:17, 3:21
**302** [54] - 39:12, 39:22, 39:23, 40:9, 40:15, 40:18, 40:25, 41:2, 41:19, 41:23, 42:4, 42:13, 42:20, 42:22, 43:4, 43:16, 43:17, 43:19, 44:5, 44:10, 44:14, 52:19, 52:21, 53:15, 54:11, 56:24, 56:25, 58:5, 58:24, 59:17, 64:13, 65:16, 65:18, 66:2, 66:17, 66:22, 76:10, 76:16, 76:20, 76:21, 77:17, 77:24, 78:3, 78:8, 79:3, 79:11, 79:16, 79:21, 79:22, 80:11, 80:12, 80:13, 81:7
**308** [2] - 54:13, 56:19
**309** [2] - 54:13, 56:19
**310** [1] - 56:12
**310-203-7199** [1] - 2:19
**310-277-1010** [1] - 2:18
**310-556-2700** [1] - 2:14
**310-556-2705** [1] - 2:15
**311** [1] - 56:4
**313** [2] - 28:4, 56:12
**314** [1] - 28:11
**316** [1] - 56:4
**318** [1] - 29:13
**321** [1] - 28:14
**325** [1] - 56:19
**33** [1] - 65:4
**333** [2] - 8:24, 9:1
**335** [2] - 3:9, 68:11
**349** [2] - 72:12, 72:16
**350** [3] - 1:24, 34:19, 84:16
**392** [1] - 38:9

**4**

**4** [3] - 27:11, 67:15, 77:9
**40** [1] - 43:21
**415-362-8064** [3] - 3:14, 3:18, 3:22
**415-421-7151** [3] - 3:14, 3:18, 3:22
**424** [8] - 27:18, 60:18, 60:19, 60:20, 60:21, 61:19, 61:20, 84:3
**429** [1] - 27:3
**43** [1] - 64:22
**4455** [1] - 1:24
**450** [1] - 27:4
**476** [1] - 27:4
**498** [1] - 27:4

**5**

**5** [2] - 67:14, 67:15
**50** [1] - 73:13
**503** [3] - 56:5, 56:12, 56:19
**510** [1] - 3:5
**53** [1] - 36:3

**6**

**6** [1] - 33:20
**626-577-0124** [1] - 3:6
**626-796-7555** [1] - 3:6

**7**

**70** [1] - 84:25
**71** [1] - 8:24
**76** [2] - 34:9

**8**

**8** [1] - 35:5
**8.02** [2] - 47:16, 57:13
**894-2969** [1] - 1:25

**9**

**900** [1] - 2:17
**90012** [1] - 1:24
**90067** [1] - 2:14
**90067-4276** [1] - 2:18
**91101-3115** [1] - 3:5
**94** [1] - 38:9
**94108** [3] - 3:13, 3:17, 3:21

**9th** [1] - 3:9

**A**

**A.M** [1] - 4:1
**abandoned** [1] - 12:20
**ABC** [3] - 25:9, 25:15
**ability** [4] - 6:15, 37:18, 53:14, 84:18
**able** [1] - 81:9
**above-scale** [3] - 41:25, 80:1, 80:7
**absent** [1] - 75:12
**absolutely** [5] - 31:6, 56:24, 59:19, 79:25, 80:19
**accept** [1] - 29:9
**acceptable** [1] - 30:7
**according** [1] - 70:4
**accusations** [1] - 64:18
**acknowledge** [1] - 53:6
**acknowledged** [1] - 49:3
**acquire** [1] - 58:4
**acquired** [1] - 65:21
**acquiring** [1] - 57:22
**Act** [10] - 15:24, 39:12, 42:21, 53:3, 53:11, 53:12, 59:11, 65:22, 77:16, 82:14
**act** [10] - 15:25, 16:1, 16:4, 16:13, 17:8, 17:9, 42:11, 43:16, 60:5, 70:18
**acting** [1] - 30:6
**action** [4] - 53:5, 59:19, 79:1, 82:13
**actions** [3] - 44:10, 47:19, 57:19
**activity** [3] - 65:12, 71:2, 71:4
**actor** [1] - 25:17
**actors** [2] - 9:21, 63:7
**Actors** [1] - 35:17
**acts** [1] - 64:19
**actual** [2] - 11:8, 69:3
**addition** [5] - 21:15, 21:22, 54:14, 78:14, 80:11
**additional** [3] - 19:25, 57:13, 57:16
**address** [8] - 15:24, 20:14, 26:19, 51:5, 51:7, 58:24, 68:4, 70:16
**addressed** [2] - 44:7, 72:11

**addresses** [1] - 72:8
**addressing** [3] - 26:1, 26:3, 75:22
**adjudicated** [2] - 52:11, 52:19
**admitted** [2] - 70:22, 74:11
**admittedly** [1] - 6:7
**adopted** [1] - 77:17
**adopting** [1] - 42:22
**adverse** [1] - 16:14
**advisory** [1] - 59:14
**advocacy** [1] - 56:9
**advocated** [1] - 71:18
**affect** [3] - 13:16, 14:6, 75:11
**affected** [1] - 53:25
**affects** [1] - 62:4
**affirmatively** [2] - 24:17, 29:8
**AGC** [10] - 7:19, 10:11, 11:15, 13:6, 13:21, 15:17, 15:22, 16:25, 18:11, 63:10
**agencies** [53] - 6:13, 13:12, 13:19, 14:19, 21:4, 21:6, 22:1, 24:9, 26:24, 28:7, 29:17, 30:13, 31:24, 33:16, 33:22, 34:11, 34:13, 35:12, 35:25, 36:14, 37:3, 39:1, 39:15, 46:21, 49:12, 52:18, 54:10, 61:25, 63:13, 64:18, 64:25, 66:14, 66:15, 67:18, 70:23, 70:24, 71:3, 73:25, 74:5, 74:7, 74:16, 78:16, 78:24, 79:2, 79:3, 79:20, 80:15, 82:1, 82:8, 83:21, 84:9, 84:24, 85:20
**agency** [18] - 32:25, 47:12, 47:16, 50:23, 56:6, 56:16, 61:6, 61:8, 62:19, 66:18, 67:8, 68:12, 74:1, 74:2, 74:18, 84:7, 84:12
**Agency** [4] - 4:16
**agency's** [9] - 27:13, 36:2, 55:16, 55:22, 56:15, 74:11, 74:13, 74:15, 84:23
**agent** [27] - 14:1, 29:8, 30:20, 46:25, 47:2, 47:17, 47:23, 48:3, 48:5, 49:18, 50:10, 50:11, 50:17, 57:10,

57:11, 57:18, 57:25, 58:1, 58:3, 58:16, 60:10, 66:8, 66:9, 67:23, 68:5, 68:6
**agent's** [7] - 47:20, 47:21, 57:21, 57:23, 58:15, 62:23, 68:12
**agents** [50] - 7:1, 11:5, 12:4, 12:12, 12:19, 13:18, 17:21, 28:5, 29:1, 30:1, 30:9, 30:22, 32:2, 32:4, 32:14, 32:15, 32:17, 32:18, 35:16, 42:7, 42:8, 42:11, 47:6, 48:20, 49:4, 53:18, 54:2, 54:3, 54:4, 54:6, 54:12, 54:15, 54:17, 58:5, 61:15, 62:15, 66:2, 67:24, 68:1, 68:7, 68:14, 76:25, 77:11, 78:15, 79:2, 79:6, 79:25, 82:7, 83:2
**agents'** [1] - 33:19
**aggressive** [2] - 56:9, 56:10
**ago** [1] - 73:13
**agree** [9] - 13:13, 13:14, 49:20, 61:17, 62:19, 63:8, 63:13, 66:24, 67:3
**agreed** [1] - 85:5
**agreeing** [1] - 38:3
**Agreement** [1] - 48:20
**agreement** [12] - 9:4, 9:14, 35:4, 49:13, 49:15, 49:16, 64:22, 64:25, 72:13, 72:23, 74:12, 85:9
**agreements** [9] - 6:15, 16:19, 44:12, 48:21, 48:25, 79:21, 79:23, 80:4, 80:6
**ahead** [4] - 11:24, 20:16, 48:8, 68:19
**aimed** [1] - 65:22
**al** [1] - 1:13
**allegation** [15] - 9:1, 11:4, 12:13, 25:10, 28:1, 31:21, 34:5, 34:10, 34:11, 35:21, 60:7, 68:11, 73:17, 74:20
**allegations** [26] - 8:21, 11:11, 12:12, 13:25, 14:3, 14:5, 14:9, 28:2, 33:13, 36:3, 36:14, 36:18, 36:21, 46:17, 64:17, 64:21,

66:15, 68:10, 72:8, 72:16, 73:2, 73:8, 73:10, 73:19, 73:24, 84:4
**allege** [18] - 9:5, 9:9, 12:8, 12:21, 26:25, 29:23, 31:6, 31:8, 32:13, 36:13, 38:21, 46:18, 54:1, 54:15, 60:21, 60:22, 63:3, 84:16
**alleged** [26] - 6:24, 7:3, 13:1, 15:23, 16:10, 17:8, 17:14, 31:15, 42:9, 55:1, 56:3, 56:4, 56:12, 56:18, 61:4, 61:10, 62:5, 63:17, 72:23, 82:5, 82:23, 83:3, 83:17, 83:18, 83:19, 85:5
**allegedly** [7] - 7:14, 7:20, 23:8, 60:4, 61:15, 61:25, 69:3
**alleges** [1] - 36:5
**allegiance** [1] - 41:6
**alleging** [2] - 32:12, 85:15
**allow** [5] - 13:21, 49:9, 49:11, 51:5, 57:4
**allowed** [4] - 24:11, 38:4, 50:23, 57:3, 64:23, 78:18, 78:22
**almost** [2] - 51:4, 76:24
**Altshuler** [3] - 3:12, 3:16, 3:20
**AMBA** [10] - 24:11, 24:13, 24:16, 48:19, 48:24, 49:3, 49:6, 49:7, 64:22
**ambit** [1] - 63:10
**amend** [4] - 35:8, 42:25, 72:18, 79:1
**amended** [1] - 83:20
**Amended** [6] - 33:24, 34:4, 34:7, 34:14, 36:1, 36:4
**amendment** [1] - 42:23
**AMERICA** [1] - 1:12
**America** [1] - 4:7
**amount** [2] - 7:13, 48:4
**analogy** [2] - 63:15, 63:20
**analysis** [4] - 6:22, 7:19, 8:4, 8:12
**analyzing** [1] - 21:12
**ANDRE** [1] - 1:4

Angeles [5] - 1:18, 1:24, 2:14, 2:18, 22:11
**angry** [1] - 52:12
**Anne** [1] - 87:11
**ANNE** [1] - 1:23
anne.kielwasser@ gmail.com [1] - 1:25
**answer** [9] - 16:4, 19:13, 20:16, 20:20, 24:16, 27:16, 27:19, 33:7, 70:21
**answered** [1] - 76:5
**anther** [1] - 18:11
**Anthony** [2] - 3:4, 5:9
**antitrust** [39] - 5:22, 6:2, 6:10, 7:23, 8:7, 11:23, 13:25, 14:11, 14:12, 15:20, 15:21, 18:9, 20:23, 21:9, 21:23, 23:11, 26:2, 26:6, 27:1, 27:20, 33:23, 34:2, 35:15, 36:7, 37:4, 37:11, 51:16, 51:17, 54:5, 60:17, 60:24, 62:7, 62:14, 64:2, 74:8, 75:6, 75:20, 85:21
**apologize** [1] - 83:7
**Appeal** [2] - 45:20, 48:1
**appeal** [2] - 23:19, 83:20
**appealed** [1] - 53:10
**appearances** [1] - 4:8
**APPEARANCES** [1] - 2:24
**appeared** [1] - 49:8
**appellate** [2] - 35:3, 35:6
**applicable** [2] - 42:23, 77:19
**applied** [1] - 18:1
**applies** [7] - 8:5, 8:8, 11:15, 15:18, 16:24, 33:1, 80:14
**apply** [7] - 8:9, 39:14, 39:19, 42:20, 65:14, 75:14, 80:13
**applying** [2] - 59:18, 64:15
**appreciate** [2] - 83:13, 85:24
**appropriate** [1] - 22:12
**April** [3] - 12:12, 12:20, 62:10
**area** [1] - 23:24
**arguably** [2] - 14:23, 67:23

**argue** [5] - 17:14, 29:19, 29:23, 32:25, 44:6
**argued** [4] - 27:9, 32:10, 52:18, 83:16
**arguing** [3] - 14:18, 68:15, 79:8
**argument** [13] - 31:7, 33:19, 35:9, 35:25, 39:11, 50:4, 52:24, 53:16, 57:9, 71:1, 77:23, 78:15, 84:2
**arguments** [6] - 5:21, 24:8, 45:25, 85:24, 85:25
**arise** [1] - 57:18
**arrangement** [4] - 44:19, 47:12, 48:11, 58:13
**Arroyo** [2] - 65:17, 68:3
**art** [1] - 66:4
**article** [1] - 82:12
**Article** [3] - 59:12, 81:21, 81:23
**artificially** [2] - 61:2, 84:3
**artisan** [1] - 20:25
**Artist** [1] - 48:19
**Artists** [1] - 48:24
asegall@rsglabor. com [1] - 3:7
**assert** [4] - 15:9, 33:21, 48:14, 79:1
**asserted** [2] - 33:23, 35:9
**assertion** [1] - 17:5
**assertions** [1] - 17:6
**assess** [2] - 16:6, 58:2
**assessment** [1] - 69:4
**assigned** [3] - 22:15, 52:5
**associated** [2] - 36:7, 69:14
**Association** [1] - 45:21
**association** [5] - 45:23, 46:8, 66:23, 73:15
**associational** [12] - 15:10, 15:13, 15:14, 26:19, 26:20, 44:25, 45:3, 45:12, 46:8, 58:25, 68:17, 75:20
**assume** [9] - 6:5, 6:8, 13:7, 20:5, 25:8, 48:15, 58:20, 62:21, 75:7
**assuming** [4] - 15:25, 17:15, 17:16, 17:22

**assumption** [2] - 6:7, 24:23
**ATA** [7] - 38:12, 38:13, 73:10, 74:6, 74:9, 85:19, 85:20
**attempted** [1] - 79:5
**attention** [4] - 8:23, 22:20, 43:6, 44:14
**attenuated** [1] - 81:25
**attorney** [6] - 40:11, 40:12, 48:10, 48:11, 48:13, 48:15
**attorneys** [1] - 40:10
**authorities** [1] - 37:10
**authority** [8] - 40:13, 42:1, 42:6, 57:5, 66:14, 79:25, 80:8, 80:9
**authorize** [2] - 49:4, 80:7
**authorized** [3] - 43:12, 43:15, 77:6
**available** [7] - 7:5, 10:9, 11:10, 15:5, 27:22, 53:11, 56:1, 56:23, 61:21, 63:19, 81:20
**Avenue** [5] - 2:5, 2:9, 2:17, 3:5, 3:9
**avoid** [1] - 59:10
**aware** [3] - 49:7, 65:5, 70:8

## B

**back-end** [1] - 63:5
**back-ends** [1] - 75:14
**back-peddling** [1] - 22:16
**backwards** [1] - 59:5
**Banker** [1] - 73:13
**Barbara** [2] - 23:7, 50:3
**bargain** [11] - 12:5, 36:15, 36:19, 37:13, 73:7, 73:9, 73:19, 74:1, 74:14, 74:17, 80:3
**bargaining** [24] - 17:12, 17:15, 39:15, 39:20, 43:10, 62:18, 65:19, 65:24, 66:3, 66:5, 66:6, 66:4, 76:16, 76:17, 76:21, 79:21, 79:23, 80:4, 80:6, 80:12, 80:21, 80:25, 81:4
**bargains** [1] - 42:3
**barred** [2] - 50:5, 50:6

**Base** [1] - 48:20
**based** [6] - 7:13, 18:17, 28:2, 52:21, 65:25
**basis** [10] - 16:21, 16:22, 21:25, 24:23, 25:2, 39:23, 46:18, 67:25, 70:12, 82:18
**bear** [1] - 71:7
**befall** [1] - 58:1
**befalling** [1] - 82:17
**beforehand** [1] - 16:19
**behalf** [24] - 4:13, 4:16, 4:21, 4:25, 5:3, 5:6, 5:8, 5:10, 26:22, 30:15, 32:17, 43:16, 45:9, 45:23, 47:19, 56:10, 57:12, 57:19, 69:8, 77:7, 80:25, 81:1, 81:4, 81:9
**BEHALF** [2] - 2:3, 3:2
**behaving** [1] - 65:12
**behind** [3] - 38:2, 40:18, 79:17
**below** [1] - 20:21
**benefit** [5] - 47:18, 48:4, 57:11, 57:22, 58:4
**benefiting** [2] - 47:12, 47:23
**benefits** [2] - 29:3, 57:18
**Berzon** [5] - 3:12, 3:16, 3:20, 3:20, 5:3
**BERZON** [1] - 5:2
**best** [4] - 32:21, 57:24, 68:7, 69:6
**better** [2] - 23:19, 58:3
**between** [8] - 7:25, 20:9, 30:10, 61:9, 61:12, 64:25, 80:22, 84:16
**big** [2] - 6:7, 15:6
**bind** [2] - 66:7, 66:20
**binding** [2] - 72:5, 72:21
**BIROTTE** [1] - 1:4
**bit** [3] - 6:22, 46:10, 51:9
**blame** [1] - 13:1
**blown** [1] - 75:5
**body** [1] - 66:1
**Boulevard** [1] - 2:13
**bound** [1] - 68:13
**boycott** [18] - 6:18, 11:20, 11:22, 12:3, 12:16, 13:2, 13:22, 21:1, 23:3, 23:11, 36:10, 62:8, 62:11,

62:17, 73:2, 73:5, 74:21, 84:22
**breach** [24] - 11:3, 17:7, 17:19, 22:13, 23:16, 24:1, 24:10, 24:19, 24:24, 45:4, 45:5, 45:16, 45:23, 46:11, 46:12, 46:16, 50:3, 50:4, 51:25, 54:22, 55:5, 68:16, 69:5, 75:9
**breached** [2] - 21:4, 21:7
**break** [2] - 6:17, 15:2
**bribe** [3] - 41:13, 41:17, 41:21
**bribery** [1] - 41:4
**bribes** [3] - 40:19, 40:22, 40:24
**Brick** [1] - 8:2
**brief** [13] - 14:1, 14:4, 27:10, 27:11, 27:12, 33:20, 35:3, 35:6, 35:10, 51:5, 53:17, 82:22, 85:3
**briefing** [1] - 26:25
**briefs** [2] - 29:23, 51:13
**Brill** [1] - 2:13
**bring** [9] - 6:9, 22:17, 26:21, 45:4, 67:25, 69:7, 69:8, 69:9
**bringing** [3] - 7:21, 27:1, 45:23
**broad** [2] - 43:2, 43:19
**broader** [2] - 75:18, 78:3
**broken** [1] - 85:13
**broker** [2] - 30:10, 32:17
**brokering** [2] - 30:21, 30:23
**Brothers** [1] - 28:13
**brought** [3] - 21:25, 22:12, 67:24
**budget** [7] - 25:12, 31:10, 31:13, 55:20, 56:2, 56:22, 75:16
**budgets** [2] - 31:8, 84:4
**bunch** [1] - 37:24
**burden** [1] - 18:7
**business** [2] - 37:25, 78:20
**but-for** [1] - 84:20
**buy** [2] - 8:17, 30:13
**buyer** [1] - 30:1
**buyers** [1] - 10:5

---

**C**

**CA** [6] - 2:14, 2:18, 3:5, 3:13, 3:17, 3:21
**CAA** [3] - 4:13, 58:23, 74:18
**Caldwell** [1] - 73:12
**calendar** [1] - 76:9
**CALIFORNIA** [1] - 1:2
**California** [16] - 1:18, 1:24, 23:19, 23:20, 23:21, 23:22, 45:19, 45:20, 48:1, 49:17, 49:23, 55:5, 55:7, 58:6, 68:12, 81:8
**candid** [1] - 44:7
**canneries** [2] - 32:4, 32:9
**Cannon** [1] - 3:8
**cannot** [5] - 37:14, 37:16, 57:11, 58:5, 81:5
**capable** [2] - 7:21, 75:22
**capacity** [2] - 45:12, 45:18
**care** [1] - 8:11
**Carr** [1] - 69:13
**case** [74] - 4:5, 5:14, 7:9, 8:6, 10:1, 10:2, 10:4, 11:1, 12:24, 15:12, 15:19, 18:2, 19:10, 19:12, 22:9, 22:10, 22:15, 27:7, 31:21, 31:22, 31:25, 32:10, 32:24, 33:1, 33:8, 33:10, 33:13, 33:17, 34:13, 35:18, 39:17, 40:14, 41:7, 42:10, 42:17, 43:7, 45:24, 46:22, 46:25, 47:22, 48:10, 48:22, 50:13, 52:4, 52:5, 52:10, 52:11, 52:17, 53:4, 53:9, 53:21, 53:24, 54:6, 55:5, 55:22, 59:12, 69:11, 71:6, 71:8, 71:13, 71:18, 75:5, 77:3, 78:2, 78:23, 79:11, 82:5, 82:12, 82:21, 83:14, 83:24, 85:2, 85:3
**cases** [19] - 8:3, 22:17, 31:16, 41:11, 42:15, 46:7, 46:21, 47:6, 53:20, 53:21, 54:8, 55:6, 73:1, 78:19, 78:23, 80:15, 80:25,

83:11, 83:12
**caused** [3] - 14:19, 27:14, 46:12
**cease** [1] - 38:25
**center** [1] - 80:24
**central** [2] - 51:24, 76:23
**Central** [2] - 17:25, 18:3
**CENTRAL** [1] - 1:2
**certain** [2] - 49:12, 71:15
**certainly** [5] - 26:20, 31:19, 48:16, 61:14, 74:15
**certify** [1] - 87:2
**chain** [2] - 62:17, 81:25
**challenge** [4] - 16:11, 34:6, 53:24, 60:6
**change** [2] - 18:16, 72:17
**changed** [1] - 25:25
**changing** [1] - 41:5
**charge** [1] - 66:6
**charged** [2] - 36:5, 87:5
**charging** [3] - 36:2, 36:8, 62:1
**charities** [1] - 84:10
**chose** [2] - 22:7, 22:11, 80:1
**Circuit** [23] - 7:17, 10:16, 11:11, 15:4, 34:23, 34:24, 35:10, 35:14, 35:20, 43:7, 43:11, 44:12, 53:4, 59:9, 64:1, 72:6, 72:8, 72:14, 73:14, 79:13, 81:19, 82:20, 83:17
**circuit** [5] - 11:14, 15:18, 53:7, 59:7, 87:5
**Circuit's** [1] - 35:19
**circuits** [1] - 11:15
**circulated** [1] - 73:10
**circumstances** [4] - 21:19, 21:21, 41:10, 70:1
**cite** [5] - 29:7, 50:13, 53:20, 53:21
**cited** [9] - 41:7, 42:18, 45:22, 48:1, 72:12, 72:20, 78:22, 82:21, 83:5
**civil** [2] - 4:5, 73:21
**claim** [62] - 6:10, 6:14, 7:3, 7:12, 7:16, 7:23, 8:9, 8:10, 10:5, 11:2,

11:3, 11:9, 12:3, 13:22, 13:25, 15:2, 15:3, 15:11, 15:17, 24:21, 31:4, 33:21, 33:24, 33:25, 34:2, 34:10, 35:8, 35:15, 35:22, 36:10, 46:12, 50:3, 50:5, 50:9, 51:17, 52:18, 52:20, 52:21, 53:2, 53:7, 55:13, 59:23, 59:25, 60:11, 60:20, 61:24, 62:4, 62:24, 63:14, 67:25, 69:8, 69:9, 70:2, 72:19, 74:19, 75:20, 76:10, 84:22, 84:23
**claimant** [1] - 12:14
**claimants** [15] - 4:25, 5:3, 5:6, 5:10, 12:11, 17:13, 21:18, 22:11, 45:11, 53:13, 53:18, 60:22, 60:24, 65:2
**claimed** [2] - 10:6, 12:15
**claiming** [1] - 12:23
**claims** [70] - 7:22, 8:5, 8:6, 10:22, 11:1, 11:8, 14:11, 14:12, 15:9, 15:13, 15:16, 18:9, 19:7, 19:9, 19:10, 19:16, 20:4, 20:19, 20:20, 20:23, 21:5, 21:6, 21:9, 21:12, 21:17, 21:18, 21:23, 22:7, 22:13, 22:17, 22:20, 23:3, 23:11, 23:13, 23:16, 23:17, 24:20, 25:20, 26:2, 26:16, 26:21, 27:1, 27:2, 27:5, 30:19, 38:22, 39:6, 45:4, 45:23, 46:10, 51:11, 51:13, 51:15, 51:25, 52:8, 52:9, 53:2, 54:5, 63:4, 64:5, 67:24, 75:6, 75:9, 75:19, 75:20, 75:22, 85:11
**clarity** [2] - 5:16, 73:4
**class** [2] - 16:8, 79:1
**clause** [1] - 70:24
**cleaning** [1] - 59:1
**clear** [9] - 10:25, 13:24, 15:18, 29:22, 41:18, 48:9, 54:6, 68:2, 83:23
**clearer** [1] - 27:24
**clearly** [2] - 7:19, 28:17

**CLERK** [2] - 4:5, 86:6
**client** [6] - 16:9, 23:7, 28:13, 29:2, 29:9, 48:17
**client's** [2] - 30:23, 46:25
**clients** [9] - 22:2, 28:6, 28:9, 28:10, 29:15, 33:2, 33:3, 47:7, 56:10
**close** [3] - 11:14, 34:13, 57:8
**closest** [1] - 60:9
**cocounsel** [1] - 83:16
**code** [7] - 12:5, 13:4, 13:13, 13:14, 13:19, 62:19, 70:23
**codes** [1] - 44:18
**cognizable** [1] - 35:15
**colleague** [4] - 10:16, 17:10, 64:7, 82:15
**colleagues** [1] - 15:24
**collect** [2] - 50:11, 71:14
**collecting** [1] - 50:23
**collective** [20] - 17:11, 17:15, 37:1, 37:17, 37:19, 39:15, 39:19, 65:19, 65:24, 66:3, 66:5, 68:4, 76:16, 76:20, 79:21, 79:23, 80:4, 80:6, 80:12, 80:21
**collectively** [3] - 73:7, 74:14, 85:1
**college** [1] - 73:13
**collusive** [1] - 6:15
**combination** [1] - 16:23
**combine** [1] - 17:2
**combined** [1] - 76:18
**comity** [3] - 20:13, 23:14, 23:20
**Comment** [1] - 57:12
**commission** [3] - 49:21, 84:10, 84:11
**commissions** [4] - 23:8, 50:11, 50:17, 50:23
**commitment** [1] - 57:23
**committee** [2] - 38:20, 38:23
**committing** [2] - 54:11, 79:6
**common** [4] - 17:1, 44:17, 44:20, 64:20
**community** [1] - 46:3
**Community** [1] - 45:21

**companies** [2] - 37:24, 85:4
**company** [1] - 43:8
**compensated** [1] - 30:21
**compensation** [10] - 7:7, 7:15, 10:13, 14:23, 28:10, 46:19, 51:23, 52:21, 55:19, 56:1
**compete** [1] - 85:11
**competed** [1] - 11:7
**competing** [1] - 68:7
**competition** [1] - 23:16
**competitive** [1] - 85:10
**competitor** [1] - 85:13
**complained** [1] - 29:6
**Complaint** [32] - 8:24, 8:25, 9:3, 12:13, 14:3, 14:4, 16:12, 16:17, 17:17, 24:22, 27:4, 28:3, 29:8, 29:14, 33:25, 34:4, 34:6, 34:7, 34:14, 34:20, 35:3, 36:1, 36:4, 38:22, 54:1, 54:16, 54:25, 61:16, 68:11, 72:18, 73:20, 79:1
**complaints** [2] - 21:24, 72:7
**complete** [1] - 62:6
**completely** [6] - 11:7, 18:7, 31:24, 32:7, 35:13, 52:1
**complex** [3] - 7:24, 22:16, 22:20
**comply** [1] - 49:12
**comprehensive** [1] - 65:20
**compulsory** [6] - 19:11, 19:15, 19:18, 20:6, 51:12, 51:14
**conceded** [2] - 49:10, 59:6
**concern** [2] - 66:18, 80:20
**concerned** [4] - 43:20, 44:2, 44:4, 44:8
**concerns** [2] - 23:14, 73:5
**conclusion** [6] - 11:16, 65:25, 69:13, 71:18, 72:17
**conclusory** [3] - 17:4, 28:1, 60:21
**concocted** [2] - 27:10, 27:13

**condition** [1] - 76:24
**conditions** [1] - 76:23
**conduct** [13] - 12:5, 13:5, 13:13, 13:15, 13:19, 20:23, 21:1, 34:1, 43:21, 44:18, 62:20, 70:23, 85:21
**conducted** [1] - 47:19
**conducts** [1] - 43:24
**conference** [2] - 52:6, 87:7
**confession** [1] - 34:17
**conflict** [38] - 11:2, 17:6, 17:20, 21:6, 24:22, 24:25, 28:15, 42:10, 42:12, 42:13, 47:8, 47:14, 47:23, 48:14, 48:15, 49:17, 49:18, 51:9, 51:22, 54:19, 54:22, 55:14, 55:18, 55:21, 55:25, 56:5, 56:14, 57:6, 58:8, 58:11, 58:15, 60:11, 63:4, 69:23, 81:7, 81:8
**conflict-free** [1] - 28:15
**conflicted** [1] - 54:4
**conflicts** [8] - 49:5, 55:1, 56:9, 56:22, 56:23, 58:17, 79:5, 83:4
**conformance** [1] - 87:6
**confusion** [1] - 63:12
**Congress** [12] - 42:19, 42:22, 42:24, 43:1, 57:2, 65:23, 78:12, 78:17, 78:22, 79:4, 80:20, 81:3
**connect** [2] - 60:12, 62:6
**connected** [2] - 12:23, 60:8
**connection** [9] - 10:4, 13:7, 47:18, 61:9, 61:12, 61:13, 62:1, 63:23, 63:25
**connections** [1] - 57:19
**consent** [3] - 37:1, 37:19, 58:15
**consented** [1] - 37:17
**consequence** [1] - 16:14
**consequences** [1] - 13:1
**considerations** [2] - 20:12, 22:5
**considered** [4] - 7:24,

42:22, 65:23, 77:23
**consistent** [1] - 68:12
**conspiracy** [21] - 6:18, 6:19, 6:25, 8:12, 11:6, 12:4, 12:8, 12:21, 13:8, 14:5, 27:21, 35:11, 35:15, 36:6, 39:24, 60:25, 63:17, 73:5, 74:19, 84:19, 84:20
**conspired** [5] - 20:24, 33:22, 35:25, 36:15, 36:18
**Constantine** [1] - 3:8
**constituent** [1] - 30:3
**constitutes** [1] - 41:17
**constitutional** [1] - 59:11
**construction** [1] - 78:13
**constructive** [10] - 22:13, 23:17, 45:5, 45:17, 46:15, 51:25, 55:6, 69:5, 69:9, 75:9
**construed** [3] - 39:14, 39:19, 71:24
**contend** [1] - 36:17
**contest** [2] - 50:14, 51:13
**context** [7] - 39:20, 62:13, 62:14, 68:3, 71:16, 71:22, 78:11, 80:16
**contingency** [1] - 46:24
**continue** [7] - 38:24, 50:23, 50:24, 54:7, 56:8, 70:25, 82:4
**CONTINUED** [1] - 2:24
**continued** [1] - 38:20
**continuing** [2] - 50:10
**contract** [5] - 35:17, 37:4, 45:5, 50:3, 50:4
**contradict** [1] - 83:16
**control** [2] - 83:24, 85:4
**controversy** [1] - 59:13
**convenience** [2] - 20:12, 20:14
**conversation** [1] - 83:21
**convince** [1] - 13:3
**coordinated** [3] - 37:3, 38:17, 85:18
**coordinating** [1] - 85:20
**core** [5] - 21:5, 22:12,

24:7, 51:21
**correct** [5] - 26:23, 65:10, 67:5, 74:21, 87:2
**correctly** [2] - 14:18, 24:7
**corrupt** [1] - 66:19
**costing** [1] - 29:15
**costs** [4] - 46:22, 47:3
**counsel** [4] - 16:11, 58:23, 60:18, 72:3
**Counsel** [3] - 4:8, 23:23, 70:13
**counter** [16] - 4:25, 5:3, 5:6, 5:10, 12:11, 12:14, 21:18, 22:10, 45:11, 53:13, 53:18, 60:22, 60:24, 65:2
**counter-claimant** [1] - 12:14
**counterclaim** [3] - 27:16, 27:19, 69:18
**counterclaimants** [4] - 27:7, 27:12, 33:21, 82:6
**counterclaims** [12] - 5:8, 5:13, 19:11, 19:15, 19:17, 19:18, 19:19, 19:22, 21:3, 51:14, 60:10
**couple** [8] - 26:23, 42:15, 51:8, 56:13, 70:16, 72:2, 73:18, 81:12
**course** [1] - 75:15
**court** [13] - 17:24, 19:16, 22:19, 46:3, 52:4, 52:8, 52:9, 52:15, 52:19, 52:20, 53:8, 75:23, 77:23
**COURT** [95] - 1:1, 4:5, 4:10, 4:14, 4:19, 4:22, 5:1, 5:4, 5:11, 5:23, 6:1, 6:5, 6:20, 6:23, 8:14, 9:8, 11:21, 11:24, 12:1, 14:15, 14:17, 16:18, 18:19, 19:2, 19:4, 19:21, 20:7, 20:10, 20:14, 22:22, 23:23, 24:6, 25:4, 25:13, 25:21, 26:4, 26:8, 28:19, 28:24, 29:12, 31:12, 33:6, 33:18, 36:9, 36:13, 36:23, 37:10, 37:22, 39:2, 39:5, 39:9, 39:25, 40:6, 40:16, 40:21, 41:11, 42:16, 43:18, 44:24, 45:2, 45:14,

48:8, 48:18, 49:24, 50:25, 51:3, 52:12, 54:23, 57:15, 58:19, 59:2, 64:8, 65:7, 66:21, 67:2, 67:7, 67:10, 67:20, 68:15, 68:19, 70:13, 70:20, 75:24, 76:2, 76:6, 76:8, 76:14, 77:8, 79:14, 81:11, 81:15, 81:17, 83:5, 85:23, 86:6
**Court** [24] - 1:23, 8:7, 8:15, 15:19, 19:8, 22:11, 34:15, 35:24, 45:20, 48:1, 52:2, 59:8, 68:2, 71:7, 71:21, 77:23, 78:2, 82:3, 85:3, 85:8, 86:1, 86:6, 87:11
**Court's** [1] - 65:17
**court's** [1] - 34:25
**courthouse** [1] - 22:21
**courts** [3] - 23:19, 23:20, 55:7
**cover** [1] - 44:12
**coverage** [2] - 51:17, 85:11
**covered** [1] - 43:16
**covers** [1] - 44:10
**cozy** [1] - 35:12
**create** [1] - 10:8
**created** [1] - 30:1
**creates** [2] - 47:22, 58:8
**credence** [1] - 65:11
**crew** [5] - 32:8, 32:9, 32:10, 32:20
**crime** [2] - 39:23, 65:12
**criminal** [17] - 15:25, 16:3, 16:13, 17:8, 17:9, 17:14, 43:21, 43:24, 58:24, 59:17, 60:4, 60:12, 64:19, 65:12, 66:23, 76:9, 79:10
**critical** [1] - 31:6
**CRR** [2] - 1:23, 87:11
**CSR** [2] - 1:23, 87:11
**cut** [1] - 72:10
**CV** [1] - 1:11

## D

**damages** [25] - 8:5, 8:8, 15:3, 15:7, 15:8, 15:10, 15:11, 15:13,

15:15, 16:24, 27:1, 27:7, 45:8, 45:11, 45:12, 53:1, 55:12, 59:16, 59:22, 59:24, 59:25, 60:13, 62:24, 62:25, 63:1
**danger** [1] - 81:6
**date** [1] - 12:7
**Date** [1] - 87:11
**David** [2] - 2:4, 4:17
**deal** [25] - 9:18, 13:10, 13:15, 20:3, 25:5, 30:21, 32:14, 32:18, 41:9, 43:13, 47:24, 55:15, 56:6, 58:23, 65:18, 66:12, 68:7, 71:5, 72:2, 72:20, 77:7, 79:22, 83:12, 85:6, 85:12
**dealing** [3] - 24:1, 44:24, 76:22
**dealings** [1] - 32:8
**deals** [13] - 32:17, 47:15, 54:11, 56:11, 56:16, 66:7, 69:1, 70:22, 71:3, 71:9, 80:2, 80:3, 80:7
**dealt** [3] - 18:21, 32:9, 72:6
**decide** [5] - 13:17, 49:20, 52:2, 62:15, 70:9
**decided** [4] - 42:24, 43:1, 43:2, 52:20
**decidedly** [1] - 67:18
**decision** [19] - 12:18, 24:9, 34:24, 37:12, 37:14, 37:16, 45:19, 45:20, 45:21, 47:25, 48:1, 58:14, 58:16, 65:17, 65:18, 79:13, 81:19, 81:21, 83:25
**decisions** [3] - 12:25, 22:23, 66:6
**declaration** [5] - 34:17, 34:22, 53:14, 59:17, 83:17
**declaratory** [8] - 26:21, 27:6, 45:15, 53:3, 59:13, 59:19, 81:23, 82:9
**Declaratory** [5] - 53:2, 53:11, 53:12, 59:10, 82:14
**deducting** [1] - 41:24
**deemed** [1] - 32:11
**defendant** [4] - 32:8, 79:1, 83:22, 85:19
**defendants** [7] - 1:14, 4:25, 5:3, 5:8, 5:10,

45:24, 69:18
**DEFENDANTS** [1] - 3:2
**defense** [4] - 4:23, 43:9, 51:16, 51:17
**defenses** [2] - 46:2, 46:5
**deferred** [1] - 56:21
**defined** [2] - 67:13, 78:6
**defines** [3] - 67:14, 67:15, 77:10
**definition** [3] - 77:14, 77:18, 77:25
**definitional** [1] - 71:6
**definitions** [2] - 42:20
**delegate** [2] - 42:1, 57:4
**delegated** [4] - 40:12, 42:6, 79:25, 80:8
**delegation** [1] - 66:14
**deliver** [2] - 67:2, 67:3
**denial** [2] - 34:25, 82:23
**denied** [1] - 10:18
**deposit** [1] - 87:6
**depressing** [1] - 51:23
**deprivation** [3] - 55:8, 55:9, 82:24
**deprive** [1] - 46:7
**deprived** [2] - 28:15, 46:1
**deprives** [1] - 69:17
**derivative** [5] - 10:19, 10:22, 10:24, 17:1, 32:21
**derived** [1] - 16:25
**derives** [1] - 16:25
**desist** [1] - 38:25
**despite** [2] - 58:17, 83:15
**detail** [2] - 26:20, 34:19
**detailing** [1] - 28:7
**details** [1] - 34:17
**determinations** [1] - 18:13
**detrimental** [1] - 50:19
**detrimentally** [1] - 50:22
**develop** [1] - 29:19
**dgreenspan@ winston.com** [1] - 2:7
**Diaz** [2] - 82:21, 83:6
**different** [23] - 6:22, 13:15, 21:13, 21:24, 21:25, 22:1, 23:4, 25:17, 32:7, 33:14, 37:6, 41:3, 43:3,

62:13, 63:9, 68:9, 68:14, 78:13, 80:5, 83:25
**differently** [2] - 33:15, 59:8
**difficult** [2] - 40:15, 41:9
**dinner** [1] - 41:7
**direct** [9] - 7:20, 8:23, 10:2, 10:4, 32:8, 38:17, 39:22, 63:25
**directed** [1] - 60:18
**directly** [4] - 7:9, 32:14, 32:18, 84:5
**director** [3] - 25:18, 30:6, 38:13
**directors** [2] - 9:21, 63:6
**disability** [1] - 53:23
**disclose** [12] - 24:9, 24:17, 48:4, 48:16, 48:21, 48:22, 49:4, 49:19, 58:8, 58:11, 69:22, 82:25
**disclosed** [5] - 21:20, 24:14, 55:3, 69:21, 70:1
**disclosing** [1] - 49:18
**discovery** [9] - 18:17, 29:21, 31:20, 52:1, 75:4, 75:5, 75:8, 75:19
**discretion** [1] - 33:5
**discuss** [2] - 15:6, 23:24
**discussed** [1] - 28:20
**discussion** [2] - 6:6, 68:23
**disinterestedly** [1] - 58:2
**dismiss** [4] - 5:12, 18:3, 18:12, 19:7
**dismissed** [4] - 33:20, 34:15, 52:4, 75:21
**displaced** [1] - 53:10
**dispute** [1] - 46:18
**disputed** [1] - 29:21
**disputes** [1] - 44:10
**distinction** [1] - 27:8
**distinguished** [1] - 31:24
**distinguishes** [1] - 31:22
**distracted** [1] - 23:1
**District** [2] - 17:25, 18:3
**district** [1] - 34:25
**DISTRICT** [2] - 1:1, 1:2
**dive** [1] - 20:21
**divide** [2] - 7:24, 58:22

**divided** [2] - 5:20, 5:25
**division** [1] - 22:16
**doctrine** [1] - 8:1
**dollar** [4] - 31:9, 31:10, 84:6
**done** [11] - 20:2, 37:6, 38:5, 41:15, 41:19, 41:20, 62:13, 64:24, 65:1, 68:25
**double** [1] - 50:23
**doubt** [1] - 79:4
**down** [10] - 15:15, 22:3, 23:12, 36:23, 57:15, 59:21, 71:10, 71:24
**drawing** [1] - 5:18, 18:23
**drew** [1] - 24:4, 25:24
**due** [3] - 16:20, 27:20, 60:24
**dues** [1] - 83:5
**during** [2] - 31:18, 65:22
**duties** [3] - 21:7, 68:8, 68:12
**duty** [26] - 11:3, 17:7, 17:19, 21:4, 22:13, 23:17, 24:2, 24:11, 24:20, 24:21, 24:24, 45:5, 45:16, 46:12, 47:17, 48:6, 48:21, 54:17, 54:22, 55:6, 58:11, 68:16, 69:5, 69:9, 70:2, 75:9
**dynamic** [1] - 84:14

## E

**e-mail** [13] - 2:7, 2:11, 2:15, 2:19, 3:7, 3:11, 3:15, 3:19, 3:23, 38:9, 38:11, 38:15, 73:11
**e-mails** [1] - 85:17
**Eagle** [18] - 7:9, 7:10, 10:1, 10:2, 10:10, 10:17, 11:15, 11:16, 18:11, 31:22, 31:23, 32:7, 32:20, 33:1, 33:8, 63:12, 63:15
**earn** [1] - 84:18
**easily** [1] - 18:14
**economic** [1] - 41:10
**economy** [1] - 20:12
**educate** [1] - 70:5
**eerily** [1] - 33:10
**effect** [5] - 7:6, 41:4, 41:5, 66:16, 82:10

effects [2] - 10:8, 10:10
efficiency [2] - 21:15, 22:3
efficient [1] - 20:19
efforts [1] - 84:17
either [6] - 18:8, 19:20, 43:23, 60:15, 61:12, 64:5
elected [1] - 80:8
element [1] - 11:25
elements [7] - 23:18, 30:3, 46:11, 46:15, 46:17, 48:17, 55:13
Eleventh [2] - 44:12, 79:13
eliminate [1] - 35:16
elitwin@ constantinecannon .com [1] - 3:11
embrace [1] - 60:20
employee [3] - 48:12, 67:11, 81:4
employee's [1] - 76:23
employees [17] - 10:18, 11:1, 40:2, 40:5, 42:24, 43:3, 43:13, 43:14, 67:4, 67:5, 67:8, 77:5, 78:10, 80:14, 80:17, 80:23, 81:10
employees' [1] - 40:10
employer [23] - 10:19, 10:23, 32:9, 37:20, 39:25, 40:9, 42:4, 42:8, 43:13, 48:12, 57:4, 57:6, 66:23, 66:24, 76:22, 77:7, 80:23, 81:1, 81:4, 81:6
employers [4] - 32:1, 32:19, 39:14, 44:11
employment [6] - 43:14, 76:23, 76:24, 82:24, 84:24
enacted [1] - 65:20
end [7] - 47:2, 47:5, 47:25, 62:17, 63:5, 65:4, 72:14
end-structure [1] - 65:4
ENDEAVOR [1] - 1:8
Endeavor [2] - 4:6, 28:12
ended [1] - 13:8
ends [2] - 75:14
enforcement [1] - 56:11
engage [1] - 24:18
engaged [1] - 12:21

engaging [1] - 54:4
ensuring [1] - 56:25
Enterprise [1] - 33:10
ENTERTAINMENT [1] - 1:8
Entertainment [1] - 4:6
entire [3] - 32:24, 34:6, 68:1
entirely [2] - 8:22, 9:5
entirety [1] - 34:3
entities [1] - 42:23
entitled [4] - 29:19, 71:19, 83:1
entity [7] - 57:5, 77:3, 78:19, 78:21, 80:22, 81:1, 81:5
equivalent [1] - 63:14
essence [1] - 40:21, 41:17, 43:21, 45:8
essentially [1] - 52:21
establish [3] - 46:17, 82:20, 83:6
established [2] - 55:13, 73:14
establishes [1] - 55:4
estate [1] - 48:5
et [1] - 1:13
Ethan [2] - 3:8, 5:7
evaluate [1] - 70:10
event [1] - 72:22
evidence [14] - 29:20, 31:17, 35:11, 38:8, 38:17, 62:20, 69:4, 69:10, 69:14, 69:19, 69:20, 72:11, 72:13
exact [1] - 33:20
exactly [11] - 6:1, 10:20, 11:11, 13:20, 36:21, 40:1, 42:13, 63:21, 72:1, 76:25, 85:15
examining [1] - 75:2
example [9] - 16:5, 16:9, 18:18, 23:6, 25:8, 48:7, 48:9, 54:12, 57:21
examples [3] - 29:7, 29:14, 68:25
except [1] - 26:2
exclude [1] - 34:12
exclusionary [1] - 34:1
exclusive [4] - 76:17, 77:5, 80:2, 84:23
excuse [1] - 58:11
excuses [1] - 50:20
executive [1] - 38:13
executives [2] - 28:12, 64:20

exemption [1] - 51:18
exercise [2] - 19:8, 24:3
exercising [3] - 40:12, 79:25, 80:9
exist [2] - 18:8, 84:21
existence [2] - 46:12, 49:18
expanded [1] - 8:20
expanding [1] - 83:4
expense [1] - 28:6
experience [1] - 65:21
expired [1] - 53:23
explain [2] - 46:9, 46:10
explained [4] - 25:10, 54:24, 58:10, 81:22
explaining [1] - 78:23
explains [4] - 42:19, 47:17, 47:22, 57:10
exploding [1] - 31:19
expressly [2] - 24:11, 49:5
extension [1] - 44:11
extensive [2] - 75:3
extent [5] - 55:10, 55:11, 77:2, 78:24, 79:8
extraordinarily [1] - 12:7
Eyanku [1] - 71:9

## F

face [1] - 18:14
fact [28] - 8:23, 10:3, 13:12, 17:8, 29:21, 32:24, 32:25, 34:3, 35:19, 41:23, 42:9, 42:22, 44:11, 46:6, 48:16, 48:21, 55:4, 55:5, 58:8, 58:11, 61:6, 61:16, 63:8, 68:6, 68:10, 68:21, 79:9, 85:17
factor [1] - 23:12
facts [2] - 47:15, 84:1
factual [6] - 18:16, 36:14, 36:18, 36:21, 46:4, 46:5
failing [2] - 23:7, 28:9
failure [2] - 62:6, 82:25
fair [3] - 47:25, 48:3, 54:18
fairly [3] - 42:11, 47:7, 58:16
fairness [2] - 20:12, 22:5

familiar [1] - 16:24
far [2] - 82:19
fashion [2] - 60:22, 85:12
favor [2] - 23:12, 52:16
favorable [1] - 56:7
Fax [2] - 2:6, 2:10, 2:15, 2:19, 3:6, 3:10, 3:14, 3:18, 3:22
Federal [1] - 1:23
federal [10] - 8:2, 19:7, 19:9, 27:5, 52:8, 52:20, 52:22, 64:5, 65:21, 68:13
fee [33] - 7:5, 10:21, 16:1, 16:12, 16:15, 17:8, 25:11, 30:20, 31:1, 31:9, 33:22, 36:1, 36:3, 36:5, 36:8, 47:12, 55:2, 55:23, 56:6, 58:6, 58:7, 58:13, 60:9, 61:6, 61:7, 61:8, 61:11, 80:16, 80:18, 82:3, 84:5, 84:8, 87:5
fees [18] - 14:20, 28:14, 31:19, 37:9, 39:11, 46:19, 50:18, 54:10, 61:5, 61:10, 61:15, 71:14, 71:19, 71:23, 82:4, 82:9, 84:18, 87:5
few [1] - 77:13
fewer [2] - 10:9, 14:1
fiduciary [26] - 11:3, 17:7, 17:19, 21:7, 22:13, 23:16, 24:1, 24:11, 24:20, 24:21, 24:24, 45:5, 45:16, 45:23, 46:11, 46:16, 48:6, 49:19, 51:25, 54:22, 55:6, 57:10, 68:16, 69:8, 70:2, 75:9
figure [1] - 63:2
file [1] - 83:20
filed [1] - 19:17
filling [1] - 64:12
filmed [1] - 25:16
final [2] - 56:20, 86:2
finally [3] - 63:11, 74:22, 84:15
fine [2] - 22:14, 76:7
fire [1] - 12:19
fired [4] - 12:12, 53:19, 54:12, 54:16
first [17] - 15:1, 15:3, 22:9, 26:25, 28:23,

29:5, 50:7, 52:25, 60:25, 61:2, 61:18, 65:15, 77:14, 78:16, 79:24, 81:18, 83:14
First [1] - 1:24
fish [2] - 32:3, 32:21, 33:4
fit [2] - 48:18
fits [1] - 39:17
fix [9] - 11:9, 33:22, 35:4, 35:25, 61:4, 61:10, 61:24, 72:13
fixed [5] - 7:14, 31:9, 61:25, 84:5, 85:14
fixing [22] - 6:18, 6:25, 7:16, 8:12, 10:5, 11:4, 11:13, 33:21, 34:1, 34:4, 34:5, 34:8, 35:8, 35:11, 35:22, 36:7, 62:5, 63:17, 72:9, 72:18, 83:24
Floor [1] - 3:9
focus [3] - 21:1, 21:3, 76:10
focused [3] - 20:23, 44:14, 61:23
following [4] - 12:15, 60:22, 65:22, 73:9
footnote [1] - 35:5
forces [1] - 85:10
forecloses [1] - 53:6
foregoing [1] - 87:2
foreseeable [1] - 14:21
form [1] - 83:4
former [1] - 34:18
forms [1] - 49:11
forth [4] - 20:3, 27:3, 33:25, 34:10
forum [1] - 22:7
forward [4] - 26:15, 68:24, 69:3, 70:9
four [2] - 85:4, 85:6
fourth [2] - 56:13, 85:7
franchised [1] - 42:7
Francisco [3] - 3:13, 3:17, 3:21
frankly [5] - 10:3, 11:14, 13:24, 18:1, 33:3
fraud [11] - 22:13, 23:17, 45:5, 45:17, 46:15, 50:20, 51:25, 55:6, 69:5, 69:9, 75:9
frauds [2] - 50:5, 50:7
free [2] - 28:15, 84:9
front [1] - 25:11
full [1] - 84:11

fully [4] - 7:21, 48:4, 69:22, 70:8
fundamental [1] - 62:11
fundamentally [1] - 68:8
funding [1] - 35:17
funds [1] - 29:3
future [3] - 13:17, 62:13, 62:14

## G

game [1] - 83:25
generally [2] - 10:17, 30:7
Gersh [2] - 74:2, 74:16
given [6] - 8:18, 26:13, 29:6, 56:1, 68:24, 83:9
gram [1] - 52:13
granted [1] - 18:11
great [2] - 26:4, 38:14
greater [2] - 26:19, 85:9
GREENSPAN [1] - 4:17
Greenspan [2] - 2:4, 4:18
Greenstone [1] - 3:4
grips [1] - 25:16
group [17] - 11:20, 11:22, 12:3, 12:16, 13:22, 16:8, 23:3, 23:11, 36:10, 37:12, 37:14, 37:16, 38:14, 62:8, 62:11, 62:17, 84:22
groups [1] - 80:5
guess [9] - 8:14, 13:5, 43:20, 43:23, 44:1, 44:2, 48:19, 60:19, 79:15
Guild [35] - 4:6, 21:9, 25:23, 26:13, 26:22, 27:19, 27:22, 29:6, 32:6, 35:17, 36:15, 38:21, 38:24, 42:7, 45:3, 45:10, 45:12, 49:6, 53:17, 54:15, 54:16, 54:17, 60:25, 61:6, 61:7, 61:21, 70:5, 73:6, 79:9, 80:1, 80:2, 80:7, 80:9, 82:11
Guild's [1] - 75:20
guild's [1] - 37:18
guilds [8] - 6:9, 14:18, 26:20, 26:25, 36:22,

37:1, 37:4, 37:17
GUILDS [1] - 1:12
Guilds [8] - 53:13, 54:6, 59:23, 60:15, 60:23, 61:14, 61:16, 82:6
Guilds' [1] - 83:3
Guilds's [1] - 19:7
guilty [1] - 42:4

## H

Hall [6] - 23:7, 50:3, 50:9, 50:13, 50:16, 50:22
handed [1] - 10:16
handling [1] - 68:17
Hangarder [1] - 53:21
happy [1] - 36:24
harm [11] - 27:11, 46:16, 55:4, 55:5, 55:10, 57:25, 58:2, 60:5, 60:8, 61:14
harmed [3] - 25:3, 68:25, 69:3
harms [4] - 82:17, 82:18, 82:19, 83:3
Haskel [3] - 26:16, 28:11, 34:18
head [3] - 46:15, 50:6, 51:7, 52:16, 54:20, 57:7, 59:4, 59:8, 60:3, 60:14, 63:3, 63:11, 64:3, 64:6, 76:1, 76:5, 76:11, 76:15, 77:13, 78:8, 81:13, 81:16, 83:7, 83:14, 85:2
Honor's [3] - 8:23, 43:6, 82:16
HONORABLE [1] - 1:4
horizontal [1] - 85:10
hour [2] - 51:4, 76:10
hump [1] - 73:12
hurt [2] - 17:20, 63:18
hypothetical [1] - 21:17

## I

ICM [3] - 34:11, 74:2, 74:16
idea [1] - 62:11
identify [2] - 14:2, 16:11
III [3] - 59:12, 81:21, 81:23
illegal [1] - 27:20,

60:25
Illinois [1] - 8:2
illustrate [1] - 69:6
impact [2] - 17:15, 66:11
implicated [2] - 41:24, 43:16
implicates [1] - 56:24
implicitly [1] - 53:10
important [6] - 10:15, 15:3, 18:12, 27:8, 28:13, 31:12
importantly [4] - 8:4, 34:21, 35:7, 66:13
imposed [1] - 85:9
inaction [1] - 50:15
INC [1] - 1:12
incentivized [2] - 28:5, 29:1
incidentally [1] - 38:25
inclinations [1] - 71:25
include [4] - 8:20, 47:3, 75:5, 75:8
includes [1] - 72:16
including [6] - 28:9, 29:7, 31:11, 47:4, 60:23, 78:19
inconsistent [4] - 22:22, 22:25, 23:2, 23:10
increasingly [1] - 44:20
incurred [2] - 62:25, 63:2
indeed [2] - 32:10, 68:6
independent [3] - 47:13, 55:24
independently [2] - 13:12, 56:8
indicate [1] - 53:9
indirect [5] - 7:6, 8:2, 10:10, 13:20, 32:11
indirectly [1] - 7:15
individual [46] - 6:10, 7:3, 12:10, 12:14, 13:22, 14:11, 15:16, 16:2, 17:13, 21:17, 21:18, 21:19, 21:21, 22:6, 23:6, 25:2, 27:6, 40:13, 41:25, 42:3, 43:14, 45:11, 46:2, 47:15, 53:13, 53:18, 53:24, 60:16, 60:23, 62:18, 66:9, 67:16, 67:22, 67:23, 68:22, 69:25, 71:11, 74:12, 75:11, 77:10,

78:15, 78:21, 79:2, 80:2, 80:3, 82:6
individualized [3] - 46:7, 60:3, 69:2
individually [14] - 11:18, 12:5, 13:9, 13:11, 17:16, 37:7, 38:6, 38:10, 62:21, 73:9, 73:19, 74:1, 74:17, 85:1
individuals [8] - 21:25, 55:12, 67:20, 70:10, 75:13, 77:12, 80:25, 81:23
individuals' [2] - 75:6, 75:19
indue [1] - 27:19
indulge [2] - 40:6, 54:21
indulgence [1] - 82:16
inextricably [1] - 51:15
infer [1] - 74:12
inference [1] - 70:7
inflated [2] - 61:2, 84:3
inflation [1] - 61:10
inflict [1] - 12:25
influence [2] - 66:16, 66:19
information [2] - 55:9, 82:25
inherent [9] - 42:12, 47:14, 47:23, 55:1, 56:5, 56:14, 57:6, 58:17, 81:6
inherently [1] - 76:17
inherit [1] - 42:10
inimimical [1] - 65:23
initial [1] - 38:11
injunction [1] - 15:14
injunctive [17] - 8:5, 8:9, 15:2, 15:4, 15:5, 26:21, 27:5, 45:14, 45:15, 53:5, 53:6, 53:15, 53:17, 59:6, 59:9, 59:22, 81:19
injuries [1] - 10:18
injury [25] - 7:3, 7:23, 7:25, 8:7, 10:22, 11:12, 13:21, 13:25, 14:18, 15:20, 16:3, 16:21, 17:2, 21:21, 27:15, 27:20, 31:4, 46:13, 46:14, 53:22, 54:8, 60:24, 62:7, 64:2
innocent [3] - 41:6, 41:21, 79:12
insist [2] - 49:21, 79:3

**instances** [1] - 71:15
**instead** [3] - 17:18, 49:22, 84:7
**instinct** [2] - 65:11, 74:21
**instincts** [1] - 64:14
**Instruments** [1] - 72:25
**insurance** [2] - 85:4, 85:5
**integrity** [1] - 65:24
**intended** [2] - 52:15, 57:3
**intends** [1] - 79:4
**intent** [5] - 41:4, 41:21, 44:5, 79:17
**intentionally** [1] - 55:6
**interest** [42] - 11:2, 17:6, 17:20, 21:7, 24:23, 24:25, 32:21, 32:22, 42:10, 42:12, 42:13, 46:4, 46:24, 47:2, 47:8, 47:9, 47:14, 47:23, 51:10, 51:20, 51:23, 54:19, 54:22, 55:1, 55:16, 55:17, 55:22, 55:25, 56:6, 57:21, 58:8, 58:12, 58:15, 60:11, 74:12, 74:13, 74:15, 76:8, 79:5, 81:7, 81:8
**interesting** [1] - 68:21
**interests** [8] - 28:6, 28:8, 51:19, 55:19, 56:25, 57:17, 58:3, 58:17
**interference** [2] - 17:11, 17:14
**interim** [1] - 63:2
**intermediaries** [1] - 32:15
**intermediary** [2] - 30:9, 32:2
**interpretation** [5] - 40:8, 43:19, 44:3, 44:8, 81:21
**intertwined** [1] - 51:15
**invention** [1] - 76:18
**inviting** [2] - 71:25, 78:25
**involved** [1] - 21:8
**involvement** [1] - 70:12
**involves** [1] - 9:21
**Irell** [1] - 2:17
**irrational** [1] - 74:10
**irrelevant** [3] - 35:13, 48:2, 84:1
**issue** [26] - 5:14,

**J**

**JANUARY** [2] - 1:18, 4:1
**Jeffrey** [2] - 2:8, 4:20
**jkessler@winston. com** [1] - 2:11
**jobs** [1] - 10:9
**jointly** [1] - 34:11
**JR** [1] - 1:4
**judge** [2] - 23:21, 52:6
**Judge** [8] - 22:15, 22:19, 52:5, 52:6, 52:10, 52:13, 52:14, 75:21
**JUDGE** [1] - 1:4
**judgment** [3] - 59:13, 59:19, 82:9
**Judgment** [5] - 53:2, 53:11, 53:12, 59:11, 82:14
**judicial** [1] - 87:7
**July** [1] - 37:2
**June** [10] - 12:4, 12:8, 12:9, 12:22, 38:9, 38:20, 38:24, 62:10, 73:6, 85:16
**jurisdiction** [4] - 18:22, 19:9, 51:9, 51:11

**K**

**K-Mart** [1] - 37:24
**K-O-R-H-O-L-Z** [1] - 43:7
**Karen** [2] - 38:13, 73:10
**Kargil** [1] - 8:6
**keep** [1] - 75:19
**keeping** [1] - 23:13
15:17, 19:10, 20:17, 22:4, 26:12, 29:16, 29:21, 30:18, 31:19, 35:13, 51:10, 51:24, 52:19, 52:22, 53:8, 53:9, 53:22, 55:12, 59:5, 62:9, 68:18, 71:10, 74:22, 76:16, 82:16
**issues** [14] - 21:20, 23:15, 23:21, 46:7, 52:1, 58:23, 58:24, 58:25, 64:5, 68:22, 69:2, 71:6, 79:22, 86:2
**itself** [3] - 53:5, 56:14, 73:15

**Kelly** [1] - 2:13
**Kendall** [4] - 2:13, 64:11, 72:24, 73:16
**kept** [1] - 9:10
**KESSLER** [21] - 4:20, 5:20, 5:24, 6:4, 6:17, 6:21, 6:24, 8:21, 9:12, 11:22, 11:25, 12:2, 14:16, 15:1, 16:20, 19:3, 58:22, 59:3, 76:1, 76:4, 76:7
**Kessler** [13] - 2:8, 4:21, 5:19, 25:10, 26:8, 27:9, 27:16, 27:25, 28:21, 31:3, 34:6, 58:20, 76:2
**Kessler's** [1] - 84:2
**key** [1] - 31:21
**kickback** [3] - 41:13, 41:17, 44:18
**kickbacks** [3] - 40:19, 40:22, 40:24
**Kielwasser** [2] - 87:10, 87:11
**KIELWASSER** [1] - 1:23
**kimpit** [1] - 64:19
**kind** [2] - 40:14, 46:13
**Klein** [1] - 73:12
**knee** [1] - 64:11
**knock** [1] - 39:1
**knowing** [1] - 47:10
**knowledge** [2] - 58:10, 65:3
**known** [2] - 41:12, 70:4
**knows** [2] - 12:15, 20:2
**Korholz** [3] - 41:7, 43:7, 77:3

**L**

**labor** [16] - 6:13, 37:21, 40:3, 43:5, 51:17, 65:21, 66:4, 66:19, 67:16, 67:18, 68:13, 77:10, 77:12, 78:1, 80:13
**Labor** [3] - 39:12, 42:21, 77:15
**lack** [1] - 29:24
**language** [4] - 43:2, 43:4, 66:22
**last** [6] - 18:10, 19:14, 25:23, 46:20, 49:8, 83:19
**Leyton's** [1] - 69:21
**liable** [1] - 78:16
**light** [1] - 65:21
**law** [20] - 12:24, 17:1,

19:10, 23:15, 23:22, 27:5, 30:8, 45:4, 47:22, 49:17, 49:23, 52:21, 55:5, 58:6, 66:4, 68:13, 73:20, 75:23, 81:8
**lawful** [1] - 12:16
**lawfulness** [1] - 49:14
**laws** [3] - 37:21, 74:8, 85:22
**lawyer** [2] - 46:24, 47:7
**lawyers** [1] - 69:15
**leads** [1] - 11:16
**learned** [1] - 73:20
**least** [2] - 23:24, 79:6
**leave** [1] - 18:5
**lectern** [1] - 6:3
**Lee** [2] - 3:16, 5:5
**LEE** [1] - 5:5
**left** [4] - 21:24, 53:1, 56:17, 59:1
**legal** [1] - 46:4
**legislative** [1] - 66:1
**legitimate** [2] - 51:19, 51:20
**lend** [2] - 67:2, 67:3
**Lenhoff** [17] - 33:9, 33:20, 33:23, 34:10, 34:15, 34:16, 34:24, 35:2, 35:7, 35:14, 36:3, 72:4, 72:5, 72:8, 72:20, 72:24, 83:14
**Lenhoff's** [2] - 34:25, 35:25
**less** [17] - 7:4, 10:7, 10:9, 10:13, 10:24, 11:10, 25:12, 25:15, 29:9, 31:5, 44:1, 56:17, 63:18, 63:24, 76:9, 82:19, 87:5
**letter** [1] - 39:1
**Leyton** [10] - 3:12, 4:25, 25:24, 26:18, 39:6, 39:9, 58:19, 75:25, 76:8, 81:11
**LEYTON** [27] - 4:24, 26:1, 39:8, 39:18, 40:1, 40:11, 40:23, 41:18, 42:17, 44:9, 45:1, 45:10, 45:15, 48:9, 49:2, 50:6, 51:2, 51:7, 52:14, 54:24, 57:16, 76:15, 77:13, 79:24, 81:12, 81:16, 81:18

**likelihood** [1] - 85:13
**limited** [1] - 35:20
**line** [1] - 63:20
**link** [1] - 84:15
**linkage** [2] - 11:8, 11:9
**linked** [3] - 10:13, 11:4, 14:9
**literally** [3] - 9:19, 71:15, 71:24
**litigate** [2] - 20:1, 20:19
**litigation** [1] - 40:10
**LITWIN** [18] - 5:7, 26:7, 26:18, 28:23, 29:5, 29:13, 31:15, 33:15, 33:19, 36:12, 36:20, 36:24, 37:14, 37:23, 39:3, 39:7, 83:7, 83:13
**Litwin** [8] - 3:8, 5:8, 26:2, 26:5, 61:22, 62:9, 68:23, 83:9
**lives** [1] - 59:8
**LLC** [2] - 1:8, 4:6
**LLP** [8] - 2:4, 2:8, 2:13, 2:17, 3:8, 3:12, 3:16, 3:20
**LMRA** [4] - 77:17, 77:19, 77:20
**loan** [2] - 41:8, 43:8
**location** [1] - 25:17
**Lofts** [1] - 45:21
**logical** [1] - 61:12
**look** [22] - 9:14, 14:3, 16:9, 17:9, 19:24, 34:3, 60:4, 61:23, 62:16, 64:17, 65:16, 67:12, 68:10, 70:2, 71:8, 71:10, 71:22, 71:23, 72:14, 73:24, 83:9, 85:25
**looking** [2] - 66:21, 79:17
**loop** [1] - 9:11
**Los** [5] - 1:18, 1:24, 2:14, 2:18, 22:11
**lose** [2] - 73:22, 73:23
**lost** [2] - 18:2, 83:5
**low** [1] - 10:5
**lower** [5] - 46:23, 47:3, 47:5, 55:20, 62:2
**loyal** [1] - 28:15

**M**

**macro** [1] - 31:17
**Madison** [1] - 3:9
**mail** [3] - 2:7, 2:11, 2:15, 2:19, 3:7, 3:11,

3:15, 3:19, 3:23, 38:9, 38:11, 38:15, 73:11
**mails** [1] - 85:17
**main** [1] - 29:17
**majority** [1] - 43:10
**Malhal** [1] - 79:13
**malpractice** [1] - 85:5
**man** [1] - 78:18
**Management** [2] - 39:12, 42:21
**Managers** [1] - 48:20
**managers** [2] - 20:25, 69:15
**Manella** [1] - 2:17
**manifestly** [1] - 27:2
**Manquest** [1] - 71:8
**MARENBERG** [15] - 4:15, 18:25, 19:13, 20:5, 20:8, 20:11, 20:17, 22:24, 24:4, 24:16, 25:6, 25:14, 70:16, 70:21, 76:11
**Marenberg** [8] - 2:16, 4:16, 19:1, 19:6, 58:25, 70:14, 83:15, 85:18
**Marengo** [1] - 3:5
**mark** [1] - 36:23
**Market** [1] - 45:20
**market** [15] - 6:13, 6:25, 7:8, 7:19, 8:7, 8:16, 8:19, 29:24, 29:25, 34:12, 45:20, 61:18, 84:25, 85:4
**Mart** [2] - 37:23, 37:24
**material** [5] - 47:18, 48:17, 49:19, 57:18, 58:12
**matter** [7] - 7:23, 30:5, 41:15, 43:11, 77:3, 86:1, 87:4
**matters** [2] - 66:2, 85:17
**maximizing** [3] - 55:18, 55:19, 55:23
**maximum** [1] - 55:25
**mean** [24] - 6:11, 8:16, 13:8, 14:21, 18:1, 19:25, 21:5, 22:23, 26:13, 28:24, 37:11, 39:15, 40:4, 41:11, 41:12, 41:14, 42:19, 48:22, 59:7, 65:8, 65:9, 78:1, 83:10, 83:23
**meaning** [2] - 67:12, 77:21
**means** [7] - 66:5, 71:12, 73:17, 76:16,

76:17, 76:21, 79:10
**meant** [2] - 77:24, 79:4
**measure** [1] - 64:20
**medical** [1] - 85:4
**meet** [3] - 16:22, 38:20, 38:24
**meeting** [1] - 33:11
**meets** [1] - 17:22
**member** [1] - 69:3
**members** [30] - 10:9, 21:1, 26:22, 27:20, 27:22, 32:6, 38:21, 45:9, 45:24, 51:20, 54:14, 54:16, 54:18, 59:25, 60:3, 60:16, 60:23, 60:25, 61:6, 61:7, 61:14, 61:21, 66:20, 68:24, 70:6, 70:8, 73:14, 75:12, 82:6, 82:11
**mention** [2] - 19:17, 60:19
**mentioned** [3] - 20:18, 55:15, 79:14
**Meredith** [3] - 69:8, 69:10, 69:12
**merely** [2] - 10:19, 62:4
**merits** [2] - 46:5, 46:10
**met** [1] - 16:2
**middle** [2] - 78:18
**might** [12] - 13:14, 13:15, 25:15, 25:16, 25:17, 46:6, 52:15, 70:4, 71:7, 71:8, 85:13
**mind** [1] - 14:21
**minute** [3] - 29:11, 31:23, 83:19
**minutes** [3] - 81:15, 81:17, 83:12
**misrepresented** [3] - 31:3, 33:16, 60:20
**misspoke** [2] - 76:12, 76:13
**misstatements** [1] - 26:24
**mode** [1] - 46:19
**model** [3] - 27:14, 29:15, 46:20
**moment** [2] - 25:22, 54:21
**money** [14] - 10:7, 10:9, 11:10, 17:21, 29:9, 29:15, 31:10, 56:17, 56:22, 60:11, 63:5, 63:24, 67:3, 84:6

**Monica** [1] - 2:13
**monopolize** [1] - 34:12
**months** [2] - 12:19, 13:2
**morning** [16] - 4:12, 4:14, 4:15, 4:17, 4:19, 4:20, 4:22, 4:24, 5:1, 5:2, 5:4, 5:5, 5:7, 5:9, 5:11, 83:11
**MORRIS** [1] - 1:8
**Morris** [4] - 4:6, 28:12, 34:19, 49:10
**most** [5] - 15:3, 28:13, 35:7, 54:16, 83:10
**MOTION** [1] - 1:17
**motion** [5] - 5:12, 18:3, 34:16, 34:22, 34:25
**motions** [1] - 18:12
**move** [4] - 11:19, 14:14, 35:7, 52:15
**moved** [1] - 34:15
**moving** [1] - 50:2
**MR** [67] - 4:12, 4:15, 4:17, 4:20, 5:2, 5:7, 5:9, 5:20, 5:24, 6:4, 6:17, 6:21, 6:24, 8:21, 9:12, 11:22, 11:25, 12:2, 14:16, 15:1, 16:20, 18:25, 19:3, 19:13, 20:5, 20:8, 20:11, 20:17, 22:24, 24:4, 24:16, 25:6, 25:14, 26:7, 26:18, 28:23, 29:5, 29:13, 31:15, 33:15, 33:19, 36:12, 36:20, 36:24, 37:14, 37:23, 39:3, 39:7, 58:22, 59:3, 64:10, 65:10, 67:1, 67:6, 67:9, 67:12, 67:21, 68:17, 68:20, 70:16, 70:21, 76:1, 76:4, 76:7, 76:11, 83:7, 83:13
**MS** [28] - 4:24, 5:5, 26:1, 39:8, 39:18, 40:1, 40:11, 40:23, 41:18, 42:17, 44:9, 45:1, 45:10, 45:15, 48:9, 49:2, 50:6, 51:2, 51:7, 52:14, 54:24, 57:16, 76:15, 77:13, 79:24, 81:12, 81:16, 81:18
**multiple** [2] - 80:16, 80:17
**multiplied** [1] - 69:16

**Musical** [1] - 72:25
**must** [2] - 55:2, 55:3

### N

**name** [1] - 71:9
**named** [1] - 83:22
**narrow** [1] - 77:25
**narrower** [1] - 42:19
**narrowing** [1] - 78:12
**narrowly** [2] - 39:13, 39:19
**National** [1] - 77:15
**natural** [1] - 67:22
**naturally** [1] - 64:14
**nature** [3] - 25:6, 48:4, 54:21
**necessarily** [1] - 77:19
**need** [6] - 6:17, 26:23, 52:2, 58:7, 69:2, 69:13
**needs** [1] - 47:9
**negotiate** [12] - 13:9, 13:14, 13:15, 28:9, 30:22, 36:17, 37:8, 38:2, 38:10, 43:13, 74:9, 85:1
**negotiates** [1] - 66:10
**negotiating** [5] - 37:8, 42:2, 48:10, 80:23, 81:1
**negotiation** [8] - 37:3, 37:4, 37:17, 37:19, 38:3, 38:17, 38:20, 40:14
**negotiations** [5] - 28:16, 37:2, 38:23, 41:25, 56:9
**net** [1] - 55:10
**network** [1] - 25:9
**neutrality** [1] - 44:12
**never** [5] - 13:14, 34:4, 34:5, 35:21, 74:25
**New** [3] - 2:5, 2:9, 3:9
**new** [7] - 12:5, 27:11, 27:13, 35:10, 52:24, 53:16, 83:8
**newfound** [1] - 44:3
**next** [2] - 18:21, 50:1
**NEXT** [1] - 2:24
**nexus** [2] - 20:9, 21:10
**Ninth** [20] - 7:17, 10:15, 11:11, 15:4, 34:23, 34:24, 35:10, 35:14, 35:19, 35:20, 53:4, 59:9, 64:1, 72:6, 72:7, 72:14, 73:13, 81:19, 82:20, 83:16

**NLRA** [7] - 42:19, 77:16, 77:18, 77:21, 77:25, 78:4, 78:6
**nobody** [1] - 59:15
**non** [1] - 48:14
**non-waivable** [1] - 48:14
**none** [3] - 11:3, 17:22, 61:15
**nonetheless** [2] - 47:7, 70:9
**note** [2] - 28:11, 52:12
**noted** [2] - 10:16, 35:2
**notes** [2] - 23:25, 49:25
**nothing** [27] - 12:18, 16:10, 16:16, 17:17, 17:18, 18:16, 22:18, 30:24, 35:12, 35:17, 50:13, 53:9, 54:7, 58:20, 61:5, 61:24, 66:3, 68:5, 72:15, 72:17, 73:11, 73:17, 74:10, 74:19, 75:14, 78:3, 79:20
**notice** [2] - 48:25, 83:20
**notion** [1] - 37:10
**nowhere** [1] - 76:20
**number** [1] - 5:15
**numerous** [1] - 78:19
**NY** [3] - 2:5, 2:9, 3:9

### O

**obtain** [2] - 57:23, 69:19
**obtains** [1] - 57:5
**occur** [2] - 58:2, 62:12
**occurred** [3] - 33:11, 73:5, 73:6
**occurring** [1] - 65:13
**odd** [1] - 41:13
**OF** [4] - 1:2, 1:12, 2:3, 3:2
**offense** [1] - 66:23
**offer** [2] - 38:10, 79:11
**Office** [1] - 71:14
**office** [1] - 71:19
**officer** [1] - 43:9
**Official** [1] - 1:23
**official** [3] - 41:9, 43:12, 87:11
**often** [2] - 44:9, 84:11
**old** [1] - 37:25
**ON** [3] - 2:3, 2:24, 3:2
**once** [4] - 12:17, 38:15, 60:2, 75:19
**one** [37] - 6:22, 11:13,

13:18, 18:10, 22:5,
24:8, 24:20, 29:7,
29:14, 33:8, 33:23,
43:22, 44:3, 53:24,
54:21, 55:15, 59:15,
60:9, 61:1, 61:22,
62:18, 62:19, 63:17,
70:18, 71:5, 71:6,
72:4, 73:9, 73:20,
74:1, 77:8, 81:3,
82:15, 83:21, 85:14
ones [4] - 41:3, 63:16,
63:21, 63:23
open [6] - 41:16,
41:20, 65:1, 65:4,
65:7, 79:9
opening [1] - 35:5
opine [1] - 35:22
opined [1] - 35:21
opinion [4] - 59:14,
72:8, 72:15, 72:21
opportunities [1] -
82:24
opportunity [2] - 46:1,
51:5
opposite [1] - 61:7
opposition [3] - 42:18,
45:22, 82:22
order [2] - 64:12,
69:22
organization [5] -
40:4, 66:19, 67:17,
77:11, 78:1
organizational [1] -
83:3
organizations [5] -
40:3, 43:5, 67:19,
77:12, 80:13
otherwise [2] - 47:20,
49:22
outlined [1] - 82:17
outside [3] - 13:21,
35:16, 38:12
outside-the-realm [1]
- 13:21
overall [1] - 14:22
overcharge [1] - 10:21
overcharged [1] - 11:6
overcome [3] - 42:11,
47:8, 64:4
overlap [4] - 20:18,
21:11, 75:1, 75:2
overlapping [2] - 52:1,
52:2
overpaying [1] - 7:5
overstatement [1] -
75:1
own [16] - 6:12, 8:21,
9:18, 12:25, 13:1,
15:11, 30:2, 30:4,

30:5, 30:8, 30:16,
32:4, 32:23, 41:25,
71:1
owned [1] - 32:3
owner [1] - 32:10
owners [8] - 10:8,
10:12, 31:25, 32:1,
32:3, 63:14, 63:15,
63:22
ownership [1] - 32:20

**P**

package [13] - 7:5,
9:13, 9:20, 11:6,
16:1, 16:12, 16:15,
24:10, 25:9, 30:3,
35:4, 61:5, 70:25
packaged [2] - 30:17,
75:16
packages [6] - 7:1,
7:2, 8:18, 30:2, 63:8
packaging [68] - 6:15,
9:4, 10:21, 11:2,
14:20, 14:22, 16:19,
24:12, 24:14, 24:22,
24:25, 25:3, 25:5,
25:11, 27:14, 28:14,
29:15, 29:24, 29:25,
30:20, 31:1, 31:9,
31:18, 33:22, 36:1,
36:8, 37:9, 41:17,
46:19, 47:12, 48:25,
49:4, 49:9, 49:11,
49:12, 49:14, 50:18,
54:10, 55:2, 55:23,
56:6, 58:6, 58:7,
58:12, 60:5, 60:8,
61:7, 61:10, 61:11,
61:16, 62:4, 62:5,
64:23, 64:24, 65:1,
65:4, 70:6, 75:11,
75:12, 80:16, 80:18,
82:3, 82:4, 82:9,
84:5, 84:18, 84:19,
84:21
pact [1] - 85:10
PAGE [1] - 2:24
page [4] - 27:11,
33:20, 34:9, 35:5
pages [1] - 33:24
paid [12] - 7:12, 10:23,
16:13, 23:8, 25:17,
47:4, 48:11, 61:14,
63:4, 84:7, 84:10,
84:11
panoply [1] - 21:24
papers [6] - 29:18,
41:8, 42:18, 45:22,
48:1, 52:25

paragraph [18] - 9:9,
27:18, 28:4, 28:11,
29:13, 34:9, 34:19,
35:16, 36:3, 36:4,
60:18, 60:20, 70:21,
72:12, 76:12, 77:9,
84:3, 84:16
Paragraph [1] - 65:3
paragraphs [11] -
8:24, 9:14, 27:3,
28:20, 38:8, 54:1,
54:13, 54:25, 56:4,
56:12, 56:18
Park [2] - 2:5, 2:9
part [17] - 8:13, 11:20,
11:21, 15:6, 20:15,
27:1, 42:21, 50:14,
50:18, 51:16, 51:18,
57:8, 61:3, 61:18,
61:20, 65:20, 66:2
part-performance [1]
- 50:14
partial [1] - 50:8
participant [1] - 9:19
participants [1] - 6:25
participate [2] - 29:25,
70:11
participating [1] -
57:11
participation [7] - 8:8,
47:2, 55:17, 56:16,
56:18, 63:5, 69:11
particular [5] - 8:13,
13:17, 17:25, 41:2,
44:10
parties [6] - 7:22,
21:2, 49:13, 52:7,
57:19, 63:9
parts [1] - 15:9
party [8] - 9:19, 9:23,
47:13, 47:18, 57:22,
57:23, 58:4, 64:9
Pasadena [1] - 3:5
passed [3] - 65:16,
65:18, 77:16
passing [1] - 36:2
passthrough [1] - 8:3
past [1] - 64:22
patching [1] - 70:8
Patent [1] - 71:14
patent [1] - 71:19
Patrick [2] - 2:12, 4:12
Patty [1] - 69:12
Paul [1] - 85:2
pay [8] - 17:8, 31:5,
61:7, 61:11, 61:15,
67:2, 67:3, 83:1
paying [3] - 31:11,
50:17, 61:6
payment [8] - 41:11,

41:16, 48:16, 48:17,
66:18, 78:18, 78:20,
82:3
payments [3] - 39:14,
40:10, 53:14
peculiar [1] - 65:19
peddling [1] - 22:16
pending [1] - 19:16
people [7] - 36:16,
44:13, 44:22, 53:24,
65:12, 68:25, 71:10
percent [8] - 46:20,
46:23, 47:1, 55:16,
56:21, 84:13, 84:25
percentage [5] - 7:13,
46:21, 46:23, 47:5,
63:25
perfectly [2] - 22:14,
75:22
perform [1] - 9:15
performance [2] -
50:8, 50:14
performed [1] - 50:9
performing [1] - 50:18
perhaps [1] - 8:15
period [1] - 31:18
permission [1] - 73:7
permissive [4] -
19:19, 19:21, 20:7,
20:8
permit [1] - 71:3
permits [1] - 70:24
person [4] - 67:22,
69:4, 70:1
persuasive [1] - 72:21
phrased [1] - 40:25
place [4] - 6:21, 13:2,
49:1, 64:23
placed [1] - 49:11
plaintiff [4] - 1:10,
5:18, 7:10, 23:6
PLAINTIFF [1] - 2:3
plaintiffs [9] - 4:11,
5:17, 7:11, 7:18,
22:6, 22:10, 25:2,
76:19, 79:19
plant [2] - 43:10,
43:15
plausible [1] - 70:7
plead [7] - 16:21,
17:17, 27:19, 29:20,
35:3, 73:21, 73:23
pleaded [2] - 73:25,
74:20
pleading [1] - 16:2
pleadings [5] - 18:14,
29:23, 35:8, 35:20,
72:23
pled [6] - 16:12, 18:4,
24:21, 27:15, 28:18,

34:19
plural [1] - 78:7
point [32] - 7:9, 10:15,
11:17, 12:17, 15:3,
18:6, 18:10, 24:19,
27:18, 28:4, 31:12,
35:9, 37:2, 37:18,
39:21, 42:14, 42:15,
43:19, 44:16, 47:11,
52:3, 52:17, 52:25,
54:9, 54:25, 69:21,
70:18, 71:5, 78:5,
79:24, 81:14, 82:15
pointed [2] - 14:4,
77:15
points [7] - 51:3, 51:6,
51:8, 56:13, 72:2,
81:13, 82:8
policy [4] - 7:23,
53:23, 65:21, 85:11
policyholders [1] -
85:6
portion [2] - 8:9, 8:10
position [6] - 32:7,
41:15, 44:23, 47:21,
49:13, 58:1
possibility [3] - 47:1,
53:22, 54:8
possible [2] - 28:10,
56:1
Post [3] - 3:13, 3:17,
3:21
power [1] - 66:20
practice [6] - 44:15,
44:17, 44:19, 44:21,
65:6, 71:16
practices [3] - 14:22,
54:4, 65:23
precedent [2] - 71:23,
72:5
precluded [1] - 59:19
predecessor [1] -
49:10
predicate [2] - 16:1,
16:4
prefer [2] - 74:9, 74:13
premise [1] - 24:21
preposterous [1] -
64:21
present [9] - 41:14,
46:1, 47:9, 55:14,
55:21, 56:5, 57:6,
58:18, 69:19
presentation [1] -
26:19
presents [4] - 42:10,
42:12, 56:14, 81:6
preserve [1] - 53:8
preserving [1] - 84:18
president [1] - 28:24

**PRESIDING** [1] - 1:4
**presumably** [1] - 82:2
**pretty** [3] - 29:22, 50:4, 83:23
**prevent** [3] - 40:18, 54:18, 79:5
**preventing** [1] - 8:2
**previously** [1] - 44:22
**price** [30] - 6:18, 6:25, 7:14, 7:16, 8:12, 11:4, 11:6, 11:9, 11:13, 33:21, 34:1, 34:4, 34:5, 34:8, 35:4, 35:5, 35:8, 35:11, 35:22, 36:7, 61:4, 61:10, 61:24, 62:5, 63:17, 72:9, 72:18, 83:24, 85:11
**price-fix** [4] - 11:9, 61:4, 61:10, 61:24
**price-fixed** [1] - 7:14
**price-fixing** [20] - 6:18, 6:25, 7:16, 8:12, 11:4, 11:13, 33:21, 34:1, 34:4, 34:5, 34:8, 35:8, 35:11, 35:22, 62:5, 63:17, 72:9, 72:18, 83:24
**prices** [5] - 10:6, 11:7, 61:2, 72:13, 84:3
**principal** [7] - 47:20, 48:3, 57:12, 57:20, 57:24, 58:1, 70:3
**principal's** [3] - 57:17, 58:3, 58:14
**principals** [1] - 68:13
**principles** [1] - 65:15
**priorities** [1] - 28:7
**private** [1] - 41:20
**problem** [8] - 12:2, 13:6, 15:23, 25:20, 56:24, 60:2, 62:10, 62:11
**problems** [1] - 65:19
**procedure** [1] - 73:21
**proceeding** [1] - 45:17
**Proceedings** [1] - 1:17
**proceedings** [1] - 87:3
**proceeds** [1] - 32:22
**process** [5] - 17:12, 17:15, 65:24, 68:4, 68:5
**procure** [1] - 84:23
**product** [1] - 14:7
**production's** [1] - 14:22
**productions** [1] - 14:6
**professionals** [1] -

83:2
**profit** [13] - 14:23, 46:21, 47:1, 47:5, 55:17, 55:18, 55:24, 56:8, 56:15, 56:17, 56:18, 63:5
**profits** [2] - 48:6, 55:20
**program** [1] - 46:23
**prohibit** [1] - 44:18
**project** [2] - 30:16, 31:9
**projects** [1] - 84:4
**properly** [4] - 35:1, 52:19, 69:21, 70:10
**protect** [2] - 28:5, 29:2
**proves** [1] - 73:11
**provide** [5] - 30:9, 40:1, 43:8, 53:5, 80:5
**provides** [1] - 53:12
**providing** [2] - 10:7, 41:8
**provision** [4] - 41:2, 65:20, 80:13
**provisions** [1] - 80:12
**proximate** [9] - 15:22, 16:23, 17:1, 17:25, 18:4, 60:13, 82:16, 82:21, 83:6
**proximately** [1] - 14:19
**psomers@kbkfirm. com** [1] - 2:15
**purchase** [4] - 7:1, 10:6, 30:11, 41:6
**purchased** [1] - 61:1
**purchases** [1] - 2:3
**purely** [1] - 50:15
**purport** [1] - 49:16
**purpose** [6] - 38:23, 40:17, 68:3, 79:17, 79:22, 84:17
**purposes** [2] - 15:25, 41:23
**pursue** [1] - 58:4
**pursues** [1] - 57:18
**pursuing** [1] - 51:19
**put** [1] - 64:23
**putting** [2] - 9:21, 49:24

## Q

**quality** [13] - 14:1, 14:6, 14:9, 27:14, 27:15, 27:21, 28:17, 61:20, 62:2, 62:3, 62:5, 84:15, 84:16

**quantification** [1] - 46:13
**questions** [10] - 5:15, 8:13, 14:13, 39:5, 46:5, 51:1, 57:8, 64:6, 70:17, 75:10
**quickly** [1] - 59:4
**quiet** [1] - 33:3
**quite** [1] - 18:1
**quote** [10] - 25:15, 27:12, 27:21, 28:7, 32:11, 34:7, 34:24, 35:3, 57:9, 83:18
**quoted** [1] - 78:8
**quoting** [3] - 9:2, 10:17, 47:17

## R

**racketeering** [4] - 39:24, 70:18, 71:2, 71:3
**racketeers** [1] - 64:19
**raise** [4] - 22:7, 51:4, 53:16, 70:15
**raised** [4] - 46:6, 52:24, 62:13, 70:17
**raising** [1] - 43:25
**ranks** [1] - 85:14
**rate** [1] - 33:12
**rather** [2] - 38:22, 75:1
**rational** [1] - 74:13
**rationale** [2] - 57:13, 57:16
**reach** [1] - 78:3
**read** [1] - 71:15
**reading** [1] - 81:3
**reaffirmed** [1] - 73:16
**real** [3] - 48:5, 57:13, 72:22
**realize** [1] - 43:23
**really** [15] - 18:13, 20:18, 21:8, 22:3, 22:24, 24:20, 46:18, 50:9, 50:12, 53:22, 62:9, 75:2, 75:21, 78:1, 78:15
**realm** [1] - 13:21
**reason** [8] - 26:11, 29:5, 50:8, 50:19, 54:3, 57:2, 65:13, 72:22
**reasoning** [1] - 42:2
**reasons** [3] - 50:7, 50:21, 64:3
**Rebecca** [2] - 3:16, 5:5
**receipt** [1] - 79:11
**received** [1] - 64:19

**recently** [1] - 71:7
**recess** [1] - 86:6
**Recess** [1] - 86:7
**reconsider** [1] - 34:15
**reconsideration** [2] - 34:23, 35:1
**record** [3] - 4:9, 72:15, 76:12
**recorded** [1] - 87:3
**recount** [1] - 38:9
**recounted** [1] - 34:17
**recovering** [1] - 64:11
**recur** [1] - 53:23
**recurrence** [1] - 54:8
**reduce** [2] - 14:22, 14:23
**reduced** [4] - 27:14, 27:23, 61:22, 85:13
**reduces** [2] - 14:1, 31:9
**reduction** [2] - 28:17, 87:6
**refer** [1] - 84:4
**reference** [3] - 34:1, 36:2, 36:6
**refers** [1] - 34:8
**reflect** [1] - 68:21
**reflects** [1] - 69:1
**refund** [1] - 23:7
**refusal** [2] - 73:8, 85:12
**refuse** [1] - 74:16
**refusing** [2] - 73:19, 74:1
**regard** [1] - 18:4
**regarding** [8] - 35:21, 37:3, 46:4, 60:13, 76:22, 83:17, 83:18, 84:15
**regardless** [1] - 30:16
**regret** [1] - 64:11
**regularly** [1] - 70:5
**regulations** [1] - 87:7
**rehire** [2] - 13:18, 62:15
**rehired** [1] - 62:22
**rejected** [4] - 11:12, 78:2, 78:12, 81:3
**related** [2] - 8:3, 83:20
**relates** [1] - 28:19
**Relations** [2] - 39:12, 42:21
**relationship** [9] - 8:19, 9:25, 18:17, 35:12, 46:16, 56:7, 76:25, 80:21, 80:22
**relationships** [2] - 22:2, 28:8
**relaxed** [1] - 55:7

**releases** [1] - 48:20
**relevance** [1] - 35:9
**relevant** [4] - 30:18, 35:11, 46:4, 55:11
**reliance** [3] - 46:16, 50:19, 50:20
**relied** [1] - 50:22
**relief** [21] - 8:6, 8:10, 15:2, 15:4, 15:5, 15:7, 26:21, 27:6, 45:15, 51:8, 52:24, 53:3, 53:6, 53:15, 53:17, 59:7, 59:9, 59:22, 81:19, 81:24
**rely** [1] - 33:1
**remain** [2] - 54:2, 86:1
**remand** [1] - 74:22
**remedies** [1] - 27:3
**remedy** [1] - 53:10
**remember** [1] - 7:10
**remote** [2] - 7:24, 13:20
**remotely** [3] - 15:25, 64:15, 66:17
**remoteness** [2] - 15:22, 17:1
**repackaging** [1] - 39:11
**repeatedly** [1] - 32:13
**replead** [1] - 18:5
**Reply** [5] - 27:10, 27:12, 33:20, 51:13, 53:17
**reply** [1] - 52:25
**reported** [1] - 65:5
**Reporter** [2] - 1:23, 87:11
**Reporter's** [1] - 1:17
**represent** [6] - 40:13, 50:10, 50:24, 58:16, 80:16, 82:10
**representation** [14] - 14:2, 15:10, 26:14, 27:14, 27:15, 28:16, 49:21, 54:18, 55:9, 57:1, 61:17, 61:21, 62:2, 82:25
**representational** [5] - 27:22, 45:18, 61:1, 84:7, 84:9
**representative** [18] - 40:2, 40:5, 43:2, 43:10, 43:15, 66:5, 67:4, 67:10, 67:13, 67:16, 76:18, 77:4, 77:5, 77:6, 77:24, 78:9, 78:10, 80:14
**representatives** [4] - 39:16, 67:7, 77:10, 78:7

represented [3] - 42:24, 50:16, 54:15

representing [9] - 12:22, 26:14, 40:12, 48:12, 54:7, 70:3, 80:17, 80:22, 82:2

represents [1] - 66:9

request [1] - 19:7

require [5] - 40:25, 41:3, 41:5, 46:13, 47:18

required [4] - 12:19, 23:18, 49:12, 82:1

requirement [3] - 8:8, 59:12, 82:12

requirements [2] - 15:20, 19:23

resell [1] - 30:14

reserved [1] - 49:13

Resignations [1] - 77:15

resolve [1] - 23:21

resources [4] - 7:4, 31:5, 63:18, 83:4

respect [12] - 6:24, 10:12, 13:22, 14:17, 16:20, 35:24, 39:9, 60:15, 63:12, 64:5, 79:22, 85:11

respond [2] - 81:14, 82:8

responding [1] - 83:15

response [10] - 14:25, 16:18, 26:10, 28:20, 38:10, 58:21, 77:11, 77:14, 79:18, 84:17

responses [2] - 38:16, 77:13

rest [2] - 15:21, 66:11

restatement [3] - 47:16, 57:9, 57:13

restrained [1] - 6:15

restraint [1] - 85:10

restricted [1] - 8:17

restrictions [1] - 49:11

result [4] - 16:15, 23:10, 62:24, 85:25

resulted [1] - 60:5

retained [2] - 30:14, 32:16

retaining [1] - 21:16

revenue [1] - 83:5

reverse [1] - 46:24

reverse-contingency [1] - 46:24

revoked [1] - 37:1

rich [1] - 65:25

RICO [37] - 5:22, 6:2, 11:21, 14:14, 14:17,
15:5, 15:8, 15:11, 15:17, 15:21, 15:23, 16:1, 16:3, 16:21, 16:23, 17:22, 17:24, 18:2, 18:9, 39:6, 39:10, 39:17, 53:1, 53:4, 53:9, 58:24, 59:5, 59:24, 60:1, 60:12, 60:16, 75:6, 75:19, 81:20, 82:4, 82:21, 83:6

rightly [1] - 19:17

rights [1] - 37:21

rise [1] - 47:13

risk [3] - 22:22, 22:25, 23:2

risks [1] - 57:17

rlee@ altshulerberzon. com [1] - 3:19

Roberts [1] - 47:25

Rothner [1] - 3:4

RPR [2] - 1:23, 87:11

Rule [3] - 19:15, 73:22, 73:23

rule [4] - 57:10, 57:14, 57:17, 59:8

rules [3] - 49:12, 64:24, 68:12

ruling [2] - 34:15, 35:19

rulings [4] - 22:23, 22:25, 23:3, 86:2

run [1] - 77:8

runners [2] - 20:24, 75:15

Ryan [4] - 42:17, 65:17, 77:22, 78:12

S

safe [1] - 86:3

sake [1] - 6:6

salary [2] - 31:18, 84:11

sale [5] - 9:13, 30:19, 30:22, 30:24, 32:22

sales [1] - 9:24

Sam [1] - 34:18

Samsung [1] - 38:1

San [3] - 3:13, 3:17, 3:21

Santa [1] - 2:13

satisfy [1] - 73:22

sberzon@ altshulerberzon. com [1] - 3:23

scale [4] - 41:25, 42:2, 80:1, 80:7

scenario [1] - 66:25

scenes [1] - 38:3

scheme [1] - 66:1

school [1] - 73:21

Screen [1] - 35:17

scripted [1] - 34:12

scripts [2] - 30:5, 32:23

seaman [1] - 63:25

seamen [10] - 7:11, 7:12, 7:18, 10:1, 10:3, 10:12, 32:7, 63:21, 63:22

second [8] - 10:11, 11:25, 25:1, 36:11, 40:7, 55:21, 61:3, 61:20

secondly [2] - 27:9, 38:19

secret [1] - 41:16

Section [6] - 39:12, 40:9, 43:4, 43:17, 47:16, 77:17

see [9] - 9:16, 9:18, 9:20, 11:17, 18:20, 33:2, 33:3, 39:16, 60:4, 75:16

seek [4] - 31:20, 53:14, 59:13, 81:23

seeking [7] - 22:16, 27:7, 45:11, 45:12, 45:13, 51:22, 55:12

SEGALL [1] - 5:9

Segall [3] - 3:4, 3:4, 5:10

self [1] - 52:12

sell [7] - 7:1, 8:18, 30:2, 30:8, 30:15, 30:25, 33:4

sellers [1] - 32:11

selling [6] - 6:12, 30:7, 30:10, 31:1, 32:3, 32:5

sells [1] - 30:1

send [2] - 23:20, 52:12

sending [2] - 22:6, 22:18

sends [1] - 64:11

sense [8] - 17:11, 19:25, 46:11, 64:20, 66:5, 78:17, 78:22, 85:9

separate [1] - 7:7, 8:22, 9:2, 9:6, 9:9, 9:13, 9:16, 11:7, 29:18, 50:21, 55:11

series [1] - 35:4

serious [2] - 64:18, 78:25

served [1] - 58:3

service [1] - 85:12

services [18] - 9:16, 27:15, 27:22, 30:4, 30:6, 30:9, 30:11, 30:12, 30:13, 30:19, 30:23, 30:24, 31:2, 32:5, 32:23, 61:1, 84:9

set [2] - 27:3, 68:1

sets [2] - 33:25, 34:10

seven [3] - 21:17, 21:24, 21:25

several [2] - 28:2, 29:14

severance [1] - 48:11

share [4] - 38:14, 56:15, 56:17, 84:25

shared [1] - 38:15

shift [2] - 25:23, 39:5

ship [6] - 7:14, 10:5, 10:7, 10:12, 63:14, 63:15

shockingly [1] - 38:16

short [4] - 5:18, 18:23, 25:24, 81:13

show [2] - 20:24, 25:9, 25:12, 25:16, 35:12, 36:14, 36:18, 41:5, 55:8, 55:20, 69:20, 75:15, 75:17

show's [1] - 56:22

showing [2] - 41:1, 41:4

shown [2] - 31:17, 50:8

shows [4] - 18:13, 55:17, 68:8, 75:16

side [7] - 33:8, 33:9, 49:2, 70:17, 72:3, 76:15, 77:15

sides [1] - 85:24

sign [1] - 9:15

signed [1] - 13:19

significant [2] - 12:8, 12:10

signing [2] - 70:22, 71:3

similar [3] - 33:10, 45:25, 46:16

similarity [1] - 20:21

similarly [1] - 32:6

simply [5] - 18:8, 30:14, 30:20, 79:11, 84:1

single [6] - 12:14, 46:22, 52:10, 52:11, 55:2, 55:22

singular [1] - 78:9

sins [1] - 73:15

sitting [1] - 84:24

situation [3] - 43:8, 64:15, 72:7

sleyton@ altshulerberzon. com [1] - 3:15

slow [1] - 57:15

smaller [1] - 34:12

smarenberg@irell. com [1] - 2:19

so.. [1] - 26:17

sold [2] - 7:13, 10:13, 10:14

sole [1] - 34:2

solely [1] - 27:4

solution [1] - 23:19

someone [1] - 60:10

Somers [5] - 2:12, 4:13, 64:9, 70:19, 77:9

SOMERS [10] - 4:12, 64:10, 65:10, 67:1, 67:6, 67:9, 67:12, 67:21, 68:17, 68:20

sometimes [2] - 44:13, 71:10

somewhere [1] - 22:17

sophistication [1] - 70:3

sorry [5] - 9:8, 23:1, 26:5, 39:4, 57:16

sort [6] - 6:14, 8:18, 14:2, 26:13, 43:20, 79:17

sound [1] - 67:25

sounds [1] - 33:10

source [1] - 45:3

South [1] - 3:5

specific [24] - 12:24, 16:3, 19:14, 22:20, 28:2, 29:7, 31:16, 35:16, 36:13, 36:21, 38:8, 54:25, 60:4, 60:5, 62:23, 66:12, 68:24, 69:20, 73:18, 81:14, 81:20, 82:18, 82:19

specifically [12] - 24:13, 32:13, 32:16, 35:2, 35:20, 38:21, 43:1, 43:5, 61:17, 80:12, 82:5, 84:16

specificity [1] - 15:22

specifics [1] - 17:3

specify [2] - 36:24, 49:4

speculative [4] - 25:1, 25:18, 28:12, 82:19

spend [1] - 74:23

split [1] - 53:7

**Sports** [2] - 44:17
**squarely** [1] - 11:16
**St** [1] - 85:2
**Stacey** [1] - 3:12
**Stacy** [1] - 4:24
**stage** [2] - 18:3, 53:7
**stagnated** [1] - 31:18
**standard** [3] - 16:23, 17:23, 46:19
**standards** [2] - 16:2, 17:24
**standing** [33] - 5:21, 6:9, 6:11, 7:22, 10:11, 10:18, 11:17, 12:17, 14:11, 14:14, 15:13, 15:14, 18:8, 26:9, 26:13, 26:15, 26:19, 26:20, 29:16, 29:24, 31:6, 44:25, 45:4, 46:8, 58:23, 58:25, 59:15, 60:15, 64:4, 68:17, 81:22, 81:23, 82:12
**standpoint** [1] - 57:24
**Stars** [1] - 2:17
**start** [13] - 4:10, 5:16, 5:24, 6:2, 21:12, 26:5, 59:4, 61:2, 64:13, 64:22, 65:15, 75:2, 82:1
**started** [4] - 17:6, 22:8, 22:16, 64:10
**state** [13] - 4:8, 19:10, 19:16, 20:3, 23:15, 27:5, 45:4, 52:4, 52:9, 52:19, 72:18, 75:23
**statement** [2] - 28:25, 44:2
**statements** [1] - 73:25
**STATES** [1] - 1:1
**States** [3] - 42:17, 77:22, 87:7
**status** [1] - 52:6
**statute** [15] - 39:13, 39:18, 42:25, 50:5, 50:20, 64:15, 65:13, 67:13, 68:1, 68:4, 71:11, 71:15, 71:17, 71:20, 71:22
**statutes** [2] - 53:25, 72:1
**statutory** [3] - 50:7, 66:1, 81:20
**stay** [2] - 19:11, 19:17
**stem** [1] - 17:7
**stems** [2] - 57:14, 57:17
**stenographically** [1] - 87:3

**step** [5] - 6:2, 62:18, 62:19, 64:16, 79:16
**Stephen** [2] - 3:20, 5:2
**Steve** [2] - 4:15, 19:1
**Steven** [1] - 2:16
**Stiehm** [8] - 16:10, 16:11, 16:14, 60:7, 60:8, 69:8, 69:11, 69:12
**still** [19] - 13:14, 19:8, 19:9, 26:9, 46:6, 47:9, 48:3, 50:16, 50:17, 54:10, 54:15, 54:17, 58:16, 64:1, 70:9, 82:8, 82:10
**stop** [2] - 51:22, 83:4
**stopped** [1] - 79:10
**stopping** [1] - 82:10
**straightforward** [1] - 21:23
**strategize** [1] - 38:23
**strategy** [3] - 38:3, 38:18, 38:20
**straw** [4] - 5:19, 18:23, 24:4, 25:24
**Strawn** [2] - 2:4, 2:8
**street** [1] - 20:3
**Street** [4] - 1:24, 3:13, 3:17, 3:21
**strict** [1] - 66:22
**strictly** [1] - 18:1
**strikes** [5] - 6:11, 36:16, 41:12, 43:18, 45:6
**strong** [1] - 50:4
**structure** [1] - 65:4
**structures** [1] - 64:24
**Stuart** [2] - 38:13, 73:10
**studio** [7] - 14:6, 28:13, 29:8, 30:24, 31:2, 64:20, 66:25
**studio's** [1] - 28:6, 56:1, 84:17
**studios** [23] - 7:1, 7:4, 7:21, 25:9, 28:8, 28:16, 29:2, 30:11, 30:14, 30:20, 31:4, 32:5, 32:14, 32:19, 33:2, 56:7, 61:5, 62:1, 63:4, 63:16, 63:22, 64:19
**subject** [1] - 47:9
**subjects** [1] - 5:25
**submission** [1] - 86:1
**submit** [1] - 60:14
**submitted** [3] - 15:12, 34:16, 34:22
**subscribing** [1] - 70:23

**Subsection** [3] - 67:14, 67:15
**subsections** [1] - 43:4
**substance** [1] - 34:21, 85:16
**substantially** [2] - 27:23, 61:22
**sue** [1] - 22:9
**sued** [4] - 23:7, 49:10, 74:5, 74:8
**suffer** [2] - 21:22, 61:14
**suffered** [5] - 27:20, 59:22, 59:24, 59:25, 60:24
**suffering** [1] - 25:15
**sufficiency** [1] - 35:21
**sufficient** [8] - 11:12, 18:4, 33:14, 72:16, 72:23, 73:3, 82:20, 83:5
**sufficiently** [1] - 74:24
**suggest** [2] - 16:3, 25:18
**suggestion** [1] - 52:10
**suggests** [1] - 9:9
**Suite** [6] - 1:24, 2:13, 2:17, 3:13, 3:17, 3:21
**summed** [1] - 32:25
**sunset** [1] - 70:24
**Superior** [1] - 22:11
**superior** [1] - 22:19
**supersede** [1] - 57:22
**supplement** [1] - 18:22
**supplemental** [3] - 19:8, 51:8, 51:11
**support** [3] - 27:13, 34:16, 42:15
**supports** [1] - 37:10
**supposed** [1] - 27:13
**supposedly** [1] - 63:18
**suppression** [1] - 82:23
**Supreme** [12] - 8:7, 15:19, 59:7, 65:17, 68:2, 71:7, 71:21, 77:23, 78:2, 85:2, 85:3, 85:8
**supreme** [1] - 53:7
**surface** [1] - 20:21
**surgery** [1] - 64:12
**surrounding** [1] - 70:2
**suspect** [1] - 19:4
**switch** [1] - 13:19
**sworn** [1] - 34:16
**systemwide** [2] - 46:18, 82:18

**table** [1] - 84:25
**talent** [34] - 6:12, 8:19, 27:21, 29:3, 30:25, 31:2, 47:3, 61:1, 61:17, 61:21, 62:23, 64:18, 64:25, 66:2, 66:8, 66:9, 66:14, 66:15, 66:18, 67:5, 67:8, 67:18, 67:23, 67:24, 67:25, 68:5, 68:6, 68:7, 68:11, 68:14, 79:20, 80:18, 83:21, 84:24
**Talent** [1] - 4:16
**tall** [1] - 64:12
**targeted** [1] - 43:5
**targets** [3] - 42:13, 76:21, 79:11
**telephone** [1] - 1:25
**television** [1] - 28:15
**ten** [1] - 77:16
**tentative** [2] - 5:14, 26:12
**Tenth** [2] - 43:7, 43:11
**term** [10] - 34:4, 40:4, 42:20, 66:4, 76:23, 77:24, 78:6, 78:11, 78:13
**terms** [31] - 12:25, 14:10, 17:25, 21:14, 23:12, 23:20, 24:10, 24:14, 24:18, 25:5, 39:22, 43:13, 49:19, 56:11, 57:23, 58:12, 59:3, 59:20, 60:1, 66:10, 69:22, 71:11, 76:22, 77:20, 77:24, 78:4, 78:5, 80:23, 85:6, 85:14
**terribly** [1] - 64:18
**test** [2] - 69:18, 69:25
**testable** [1] - 69:24
**THE** [95] - 2:3, 3:2, 4:10, 4:14, 4:19, 4:22, 5:1, 5:4, 5:11, 5:23, 6:1, 6:5, 6:20, 6:23, 8:14, 9:8, 11:21, 11:24, 12:1, 14:15, 14:17, 16:18, 18:19, 19:2, 19:4, 19:21, 20:7, 20:10, 20:14, 22:22, 23:23, 24:6, 25:4, 25:13, 25:21, 26:4, 26:8, 28:19, 28:24, 29:12, 31:12, 33:6, 33:18, 36:9, 36:13, 36:23,

37:10, 37:22, 39:2, 39:5, 39:9, 39:25, 40:6, 40:16, 40:20, 40:21, 41:11, 42:16, 43:18, 44:24, 45:2, 45:14, 48:8, 48:18, 49:24, 50:25, 51:3, 52:12, 54:23, 57:15, 58:19, 59:2, 64:8, 65:7, 66:21, 67:2, 67:7, 67:10, 67:20, 68:15, 68:19, 70:13, 70:20, 75:24, 76:2, 76:6, 76:8, 76:14, 77:8, 79:14, 81:11, 81:15, 81:17, 83:9, 85:23
**themselves** [2] - 78:16, 79:6
**theory** [3] - 27:11, 27:13, 40:18
**therefore** [4] - 7:6, 10:7, 10:24, 35:1
**they've** [4] - 12:18, 20:24, 59:24, 74:11
**thinking** [2] - 22:3, 75:4
**third** [10] - 21:2, 47:16, 47:18, 56:3, 56:5, 57:18, 57:22, 57:23, 58:4, 74:18
**Third** [6] - 33:24, 34:4, 34:7, 34:14, 36:1, 36:4
**three** [10] - 12:19, 21:25, 43:12, 56:20, 56:21, 72:7, 74:4, 81:15, 81:17, 85:5
**tied** [3] - 7:15, 64:1, 78:4
**today** [4] - 26:24, 27:9, 27:17, 84:20
**together** [3] - 9:21, 38:1, 85:21
**took** [2] - 13:2, 25:11
**top** [1] - 28:12
**torn** [1] - 26:12
**total** [1] - 62:6
**totally** [1] - 33:16
**trace** [1] - 17:16
**trade** [3] - 6:16, 73:15
**Trademark** [1] - 71:14
**trail** [1] - 38:9
**transacting** [1] - 19:22
**transaction** [1] - 7:7, 9:9, 9:24, 25:7, 47:13, 47:24, 48:2, 55:2, 55:24, 66:12, 69:20
**transaction-specific**

[2] - 66:12, 69:20
**transactions** [10] - 8:22, 9:2, 9:6, 9:17, 29:18, 30:10, 30:18, 47:19, 56:8, 59:18
**Transcript** [1] - 1:17
**transcript** [2] - 87:3, 87:5
**travel** [1] - 86:3
**traveling** [1] - 86:4
**treat** [1] - 47:7
**treble** [2] - 27:1, 62:24
**tries** [2] - 17:18, 85:18
**trouble** [1] - 26:16
**true** [6] - 17:22, 23:6, 23:9, 30:16, 31:15, 87:2
**truly** [1] - 71:2
**try** [1] - 5:15
**trying** [6] - 21:22, 39:16, 41:9, 52:16, 53:24, 69:16
**TUESDAY** [2] - 1:18, 4:1
**tuna** [3] - 7:13, 10:5, 10:6
**turn** [4] - 29:16, 31:23, 52:23, 64:7
**turning** [2] - 84:2, 84:22
**TV** [3] - 14:8, 34:12, 34:18
**twist** [1] - 15:19
**two** [12] - 10:8, 15:8, 20:9, 34:11, 42:24, 50:7, 50:20, 62:19, 69:14, 73:25, 74:8, 83:11
**twofold** [1] - 24:20
**Twombly** [4] - 16:2, 17:3, 72:24, 73:12
**tying** [1] - 71:16
**type** [4] - 18:13, 44:18, 49:20, 84:14
**types** [2] - 17:2, 44:10

### U

**U.S** [2] - 30:8, 71:14
**Uber** [2] - 35:25, 36:2
**ubiquitous** [1] - 44:19
**UCL** [3] - 23:15, 52:18, 52:20
**ultimate** [1] - 47:24
**ultimately** [2] - 48:3, 49:9
**uncertainty** [1] - 13:16
**unconflicted** [2] - 57:1, 82:24

**unconflictive** [1] - 55:9
**undeniable** [1] - 85:17
**under** [35] - 7:8, 8:6, 8:21, 15:5, 15:18, 16:21, 19:15, 21:16, 27:5, 30:7, 37:21, 40:8, 42:1, 42:20, 49:22, 53:2, 53:11, 55:4, 58:5, 58:6, 59:12, 72:25, 73:22, 73:23, 74:8, 77:25, 81:8, 81:20, 82:13, 82:21, 83:5, 83:6, 85:21, 86:1
**undisclosed** [1] - 48:6
**undisputed** [1] - 32:22
**unfair** [4] - 22:6, 22:18, 23:16, 52:20
**unfairly** [1] - 69:17
**Union** [35] - 7:10, 7:18, 10:6, 10:10, 12:6, 13:9, 15:9, 15:15, 39:16, 40:4, 40:13, 41:9, 41:24, 41:25, 42:2, 42:4, 42:6, 43:8, 43:9, 43:12, 43:15, 51:19, 51:22, 57:3, 57:4, 64:25, 66:8, 66:16, 69:7, 78:21, 80:7, 80:24, 81:9
**Union's** [1] - 51:20
**union's** [1] - 37:18
**Unions** [2] - 44:17
**unions** [1] - 81:22
**unit** [1] - 66:6
**United** [4] - 4:16, 42:17, 77:22, 87:7
**UNITED** [1] - 1:1
**unknown** [1] - 41:12
**unlawful** [1] - 44:22
**unless** [6] - 8:12, 18:10, 30:25, 31:1, 57:7, 64:6
**unlike** [1] - 81:7
**unpublished** [1] - 83:25
**untrue** [1] - 27:2
**up** [18] - 5:21, 5:25, 6:18, 7:25, 14:20, 15:2, 19:5, 27:25, 32:25, 34:5, 34:6, 49:3, 58:22, 59:1, 71:6, 75:5, 83:8
**upfront** [1] - 56:20
**upheld** [1] - 45:22
**UTA** [4] - 23:8, 25:8, 34:11, 74:8

### V

**valid** [1] - 49:22
**value** [8] - 40:2, 42:8, 42:9, 57:4, 67:3, 77:4, 79:12, 81:5
**values** [1] - 57:6
**variation** [1] - 23:18
**various** [1] - 66:10
**vary** [1] - 21:19
**vastly** [1] - 75:18
**venue** [2] - 22:12, 22:14
**verboten** [1] - 85:21
**versus** [8] - 4:6, 42:17, 62:10, 71:9, 72:24, 73:12, 73:16, 77:22
**vessel** [6] - 10:7, 31:25, 32:1, 32:3, 32:10, 63:22
**vicinity** [1] - 66:17
**victim** [1] - 63:16
**victims** [3] - 7:20, 63:23
**view** [1] - 8:15
**viewed** [1] - 43:20
**violate** [3] - 39:11, 40:9, 53:14
**violates** [2] - 48:6, 82:3
**violation** [8] - 36:7, 37:5, 37:11, 40:15, 42:5, 44:14, 59:17, 60:12
**violations** [4] - 54:11, 75:6, 75:7, 79:7
**virtually** [1] - 9:3
**Visa** [2] - 72:24, 73:16
**visit** [1] - 73:14
**vociferously** [1] - 32:25
**vS** [1] - 1:11

### W

**wage** [1] - 82:23
**wages** [2] - 76:25, 80:5
**Wagner** [1] - 65:22
**waivable** [4] - 48:13, 48:14, 48:15, 81:8
**waive** [3] - 49:5, 49:16, 81:9
**waived** [1] - 55:3
**waiver** [4] - 47:10, 49:22, 65:8, 65:10
**Wal** [1] - 37:23
**Wal-Mart** [1] - 37:23

**walk** [2] - 33:17, 45:2
**wants** [1] - 20:15
**Warner** [1] - 28:13
**waves** [1] - 20:22
**ways** [2] - 28:7, 82:18
**weeds** [2] - 71:10, 71:24
**weekend** [1] - 86:3
**welcome** [1] - 64:9
**WEST** [1] - 1:12
**West** [1] - 1:24
**WGA** [5] - 5:3, 20:24, 21:2, 21:23, 23:11
**whatsoever** [1] - 74:20
**whim** [1] - 33:4
**whole** [6] - 37:18, 40:17, 40:18, 43:22, 62:11, 66:7
**wholistic** [1] - 8:15
**wide** [1] - 70:11
**widely** [1] - 65:5
**WILLIAM** [1] - 1:8
**William** [4] - 4:5, 28:12, 34:18, 49:10
**wins** [1] - 23:9
**Winston** [2] - 2:4, 2:8
**wish** [2] - 51:3, 70:15
**withdrew** [1] - 73:7
**withholds** [1] - 84:12
**WITNESS** [1] - 40:20
**WME** [4] - 4:18, 4:21, 28:25, 74:8
**won** [1] - 7:21
**wonderful** [1] - 86:3
**word** [1] - 40:17
**words** [6] - 9:5, 11:5, 16:22, 22:25, 62:3, 63:14
**worker** [2] - 80:24, 81:2
**workers** [3] - 80:6, 81:2, 81:5
**workplace** [1] - 77:6
**works** [1] - 70:8
**world** [1] - 84:20
**worse** [2] - 14:7, 21:14
**worth** [1] - 43:24
**write** [1] - 27:11
**writer** [18] - 9:3, 9:15, 13:17, 16:7, 20:25, 25:19, 31:18, 40:13, 49:20, 56:10, 56:17, 58:17, 60:5, 66:10, 84:12, 84:13
**writer's** [7] - 30:15, 30:24, 32:18, 55:18, 55:25, 56:15, 74:14
**writers** [61] - 6:10, 7:4,

7:6, 7:11, 9:23, 10:4, 11:8, 13:23, 14:1, 14:10, 14:19, 14:24, 15:10, 15:16, 16:2, 21:8, 21:9, 24:10, 24:15, 25:23, 26:9, 26:15, 28:15, 29:6, 30:10, 30:15, 30:19, 31:5, 31:11, 31:14, 31:17, 32:16, 32:18, 32:23, 33:2, 33:3, 42:3, 47:4, 48:25, 51:24, 54:2, 54:3, 54:7, 54:12, 58:9, 62:3, 63:20, 66:11, 68:8, 69:14, 69:15, 80:16, 80:18, 82:2, 82:11, 82:17, 83:1
**WRITERS** [1] - 1:12
**Writers** [2] - 4:6, 49:6
**writers'** [1] - 12:2
**writers's** [1] - 56:11
**writing** [7] - 30:4, 30:11, 30:12, 30:13, 30:19, 30:23, 32:4
**written** [1] - 38:25
**wrote** [1] - 85:3

### Y

**years** [9] - 20:2, 43:22, 44:22, 64:22, 65:22, 70:25, 71:4, 73:13, 77:16
**York** [3] - 2:5, 2:9, 3:9

### Z

**zone** [1] - 64:2

# EXHIBIT E

| | |
|---|---|
| **From:** | Casey Pitts |
| **To:** | Greenspan, David; Leiden, Diana Hughes; Marenberg, Steve |
| **Cc:** | Stacey Leyton; Kessler, Jeffrey L.; ~Daum, Nicholas; Levin, Adam; Payne, Stephen; Mittleman, Harry; Obi, Shawn R.; Mercier-Dalphond, Isabelle; ~Somers, Patrick; ~Kendall, Richard; Lee, Gilbert S.; Lerner, Jim; Arguello, Sofia; Gordon, Ben; Rebecca Lee; Stephen P. Berzon; ~Segall, Anthony; ~Lee, Juhyung; ~Cannon, Stephen; ~Litwin, Ethan; Andrew Kushner |
| **Subject:** | RE: WME v WGA -- discovery meet & confer |
| **Date:** | Tuesday, February 25, 2020 2:45:42 PM |

David,

The stay proposal set forth below is accepted to the Guilds.  We believe that the 30-day stay run from our discussion of your proposal during last Wednesday's meet and confer, i.e., through March 20.

During our last phone call, we also agreed to follow up by email regarding our next phone call to continue the meet and confer process.  What are the Agencies' periods of availability on Thursday and Friday of this week?

Casey

P. Casey Pitts
*(Pronouns: He, him, his)*
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151 (tel)
(415) 362-8064 (fax)

_____

   This e-mail may contain material that is confidential, privileged, and/or attorney work product for the sole use of the intended recipient.  Any review, reliance or distribution by others, or forwarding without express permission, is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies.

**From:** Greenspan, David <DGreenspan@winston.com>
**Sent:** Friday, February 21, 2020 6:19 PM
**To:** Casey Pitts <cpitts@altshulerberzon.com>; Leiden, Diana Hughes <DHLeiden@winston.com>; Marenberg, Steve <SMarenberg@irell.com>
**Cc:** Stacey Leyton <sleyton@altshulerberzon.com>; Kessler, Jeffrey L. <JKessler@winston.com>; ~Daum, Nicholas <ndaum@kbkfirm.com>; Levin, Adam <AXL@msk.com>; Payne, Stephen <spayne@irell.com>; Mittleman, Harry <HMittleman@irell.com>; Obi, Shawn R. <SObi@winston.com>; Mercier-Dalphond, Isabelle <IMercier@winston.com>; ~Somers, Patrick <psomers@kbkfirm.com>; ~Kendall, Richard <rkendall@kbkfirm.com>; Lee, Gilbert S. <gsl@msk.com>; Lerner, Jim <JLerner@winston.com>; Arguello, Sofia <SArguello@winston.com>; Gordon, Ben <BGordon@winston.com>; Rebecca Lee <rlee@altshulerberzon.com>; Stephen P. Berzon <sberzon@altshulerberzon.com>; ~Segall, Anthony <asegall@rsglabor.com>; ~Lee, Juhyung <hlee@rsglabor.com>; ~Cannon, Stephen <scannon@constantinecannon.com>; ~Litwin, Ethan <elitwin@constantinecannon.com>; Andrew Kushner <akushner@altshulerberzon.com>
**Subject:** RE: WME v WGA -- discovery meet & confer

Casey,

As you requested we put in writing, here's what I had suggested during our meet-and-confer about a "stay" of the below-list of RFPs.

We appreciate Counterclaimants' concerns about an indefinite stay, while at the same time Plaintiffs are not willing to agree to oblige themselves to make a production one-week after the Court issues its decision on the motion to dismiss (in the event our motion is denied), because that would require us to do significant work (e.g., searching for, collecting, and reviewing potentially responsive documents) in the meantime, which is precisely what we are trying to avoid by seeking your agreement to temporarily put these RFPs on hold. Our proposed solution is to simply agree to stay the RFPs for 30-days, with each side reserving its rights about what comes next in the event we still do not have a decision. Thus, for example, at that point Counterclaimants would be free to insist on a prompt production, Plaintiffs would be free to seek a stay, or perhaps we would reach another compromise. Let us know if this works.

Thanks,
Dave

---

**From:** Casey Pitts <cpitts@altshulerberzon.com>
**Sent:** Wednesday, February 19, 2020 9:59 AM
**To:** Leiden, Diana Hughes <DHLeiden@winston.com>; Greenspan, David <DGreenspan@winston.com>; Marenberg, Steve <SMarenberg@irell.com>
**Cc:** Stacey Leyton <sleyton@altshulerberzon.com>; Kessler, Jeffrey L. <JKessler@winston.com>; ~Daum, Nicholas <ndaum@kbkfirm.com>; Levin, Adam <AXL@msk.com>; Payne, Stephen <spayne@irell.com>; Mittleman, Harry <HMittleman@irell.com>; Obi, Shawn R. <SObi@winston.com>; Mercier-Dalphond, Isabelle <IMercier@winston.com>; ~Somers, Patrick <psomers@kbkfirm.com>; ~Kendall, Richard <rkendall@kbkfirm.com>; Lee, Gilbert S. <gsl@msk.com>; Lerner, Jim <JLerner@winston.com>; Arguello, Sofia <SArguello@winston.com>; Gordon, Ben <BGordon@winston.com>; Rebecca Lee <rlee@altshulerberzon.com>; Stephen P. Berzon <sberzon@altshulerberzon.com>; ~Segall, Anthony <asegall@rsglabor.com>; ~Lee, Juhyung <hlee@rsglabor.com>; ~Cannon, Stephen <scannon@constantinecannon.com>; ~Litwin, Ethan <elitwin@constantinecannon.com>; Andrew Kushner <akushner@altshulerberzon.com>
**Subject:** Re: WME v WGA -- discovery meet & confer

Diana,

While again reserving all of our rights and arguments with respect to the relevance of the listed RFPs to the Agencies' claims as well as to our counterclaims, and without conceding anything regarding the scope of our other RFPs, we are willing to add the additional three RFPs you have identified to the set of RFPs to which the Agencies can postpone their production of responsive documents.  However, we continue to believe that postponing those responses indefinitely, regardless of the amount of time the Judge might take to issue a decision, could leave us in a situation where we do not have sufficient time to complete necessary fact discovery, and that we should agree for the time being only to postpone the Agencies' obligation to respond to March 20, 2020 or one week following issuance of the Judge's decision on the motion to dismiss, whichever is sooner.

P. Casey Pitts
*(Pronouns: He, him, his)*
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151 (tel)
(415) 362-8064 (fax)

_____

This e-mail may contain material that is confidential, privileged, and/or attorney work product for the sole use of the intended recipient.  Any review, reliance or distribution by others, or forwarding without express permission, is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies.

**From:** Leiden, Diana Hughes <DHLeiden@winston.com>
**Sent:** Friday, February 14, 2020 12:48 PM
**To:** Casey Pitts <cpitts@altshulerberzon.com>; Greenspan, David <DGreenspan@winston.com>; Marenberg, Steve <SMarenberg@irell.com>
**Cc:** Stacey Leyton <sleyton@altshulerberzon.com>; Kessler, Jeffrey L. <JKessler@winston.com>; ~Daum, Nicholas <ndaum@kbkfirm.com>; Levin, Adam <AXL@msk.com>; Payne, Stephen <spayne@irell.com>; Mittleman, Harry <HMittleman@irell.com>; Obi, Shawn R. <SObi@winston.com>; Mercier-Dalphond, Isabelle <IMercier@winston.com>; ~Somers, Patrick <psomers@kbkfirm.com>; ~Kendall, Richard <rkendall@kbkfirm.com>; Lee, Gilbert S. <gsl@msk.com>; Lerner, Jim <JLerner@winston.com>; Arguello, Sofia <SArguello@winston.com>; Gordon, Ben <BGordon@winston.com>; Rebecca Lee <rlee@altshulerberzon.com>; Stephen P. Berzon <sberzon@altshulerberzon.com>; ~Segall, Anthony <asegall@rsglabor.com>; ~Lee, Juhyung <hlee@rsglabor.com>; ~Cannon, Stephen <scannon@constantinecannon.com>; ~Litwin, Ethan <elitwin@constantinecannon.com>; Andrew Kushner <akushner@altshulerberzon.com>
**Subject:** RE: WME v WGA -- discovery meet & confer

Casey,

Thank you for your response. We have considered your proposal below and would agree to the following revised list, with the RFP numbers in bold where they differ from your proposed list (with full reservation of rights, including as to the propriety of any of these RFPs): WME RFP Nos. 5, 10, 16, 17, 18, 36, 37, 38, 39, 40, **45**, 46, 47, **48**, **51** and 52. This pared-down list leaves 64 RFPs from WGA for each Agency to deal with pending Judge Birotte's ruling. Our proposal remains to defer addressing these RFPs pending Judge Birotte's ruling, rather than set a concrete deadline to produce responsive documents next month or a week after Judge Birotte's order, as you proposed. We are not sure what your basis is for assuming that "the Court will take a fair amount of time to issue a decision" given the relative speed at which he issued an order on WGA's motion to dismiss, but in any event this would defeat the purpose of the stay, as that timeframe would require the Agencies to search for an incredibly broad swath of documents and prepare document productions *before* we know whether WGA's Counterclaims will survive.

Please let us know your position by email or during our follow-up meet and confer on the 19th.

Best,
Diana

**Diana Hughes Leiden**

**Partner**

Winston & Strawn LLP

T: +1 213-615-1700

D: +1 213-615-1924

F: +1 213-615-1750

winston.com



**From:** Casey Pitts <cpitts@altshulerberzon.com>

**Sent:** Monday, February 10, 2020 5:18 PM

**To:** Greenspan, David <DGreenspan@winston.com>; Marenberg, Steve <SMarenberg@irell.com>

**Cc:** Stacey Leyton <sleyton@altshulerberzon.com>; Leiden, Diana Hughes <DHLeiden@winston.com>; Kessler, Jeffrey L. <JKessler@winston.com>; ~Daum, Nicholas <ndaum@kbkfirm.com>; Levin, Adam <AXL@msk.com>; Payne, Stephen <spayne@irell.com>; Mittleman, Harry <HMittleman@irell.com>; Obi, Shawn R. <SObi@winston.com>; Mercier-Dalphond, Isabelle <IMercier@winston.com>; ~Somers, Patrick <psomers@kbkfirm.com>; ~Kendall, Richard <rkendall@kbkfirm.com>; Lee, Gilbert S. <gsl@msk.com>; Lerner, Jim <JLerner@winston.com>; Arguello, Sofia <SArguello@winston.com>; Gordon, Ben <BGordon@winston.com>; Rebecca Lee <rlee@altshulerberzon.com>; Stephen P. Berzon <sberzon@altshulerberzon.com>; ~Segall, Anthony <asegall@rsglabor.com>; ~Lee, Juhyung <hlee@rsglabor.com>; ~Cannon, Stephen <scannon@constantinecannon.com>; ~Litwin, Ethan <elitwin@constantinecannon.com>; Andrew Kushner <akushner@altshulerberzon.com>

**Subject:** Re: WME v WGA -- discovery meet & confer

David,

While we continue to believe that all of our discovery requests are relevant to both our defense of the Agencies' claims and pursuit of the pending counterclaims, do not concede that issuance of an order dismissing the counterclaims would justify a refusal to respond to any request, and reserve all rights, we would be willing to accept a mutual compromise of the parties' positions that would postpone the Agencies' obligation to produce documents responsive to WME RFPs 5, 10, 16, 17, 18, 36, 37, 38, 39, 40, 46, 47, and 52.  Given the tight discovery timeline and the possibility that the Court will take a fair amount of time to issue a decision on the Agencies' motion to dismiss, however, we do not believe that it makes sense to postpone the Agencies' responses to those RFPs indefinitely pending issuance of that decision.  Instead, we would be willing to postpone the deadline to produce responsive documents to March 20 or one week following issuance of an order regarding the Agencies' motion, whichever date is earlier.  Postponing the deadline to respond to the identified

RFPs in this manner will allow us to focus on the remaining requests right now, and will give the
Court eight weeks to issue a decision.


Casey



P. Casey Pitts
*(Pronouns: He, him, his)*
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151 (tel)
(415) 362-8064 (fax)

_____

This e-mail may contain material that is confidential, privileged, and/or attorney work product for the sole use
of the intended recipient.  Any review, reliance or distribution by others, or forwarding without express permission,
is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies.

**From:** Greenspan, David <DGreenspan@winston.com>
**Sent:** Thursday, February 6, 2020 4:39 PM
**To:** Marenberg, Steve <SMarenberg@irell.com>; Casey Pitts <cpitts@altshulerberzon.com>
**Cc:** Stacey Leyton <sleyton@altshulerberzon.com>; Leiden, Diana Hughes
<DHLeiden@winston.com>; Kessler, Jeffrey L. <JKessler@winston.com>; ~Daum, Nicholas
<ndaum@kbkfirm.com>; Levin, Adam <AXL@msk.com>; Payne, Stephen <spayne@irell.com>;
Mittleman, Harry <HMittleman@irell.com>; Obi, Shawn R. <SObi@winston.com>; Mercier-
Dalphond, Isabelle <IMercier@winston.com>; ~Somers, Patrick <psomers@kbkfirm.com>; ~Kendall,
Richard <rkendall@kbkfirm.com>; Lee, Gilbert S. <gsl@msk.com>; Lerner, Jim
<JLerner@winston.com>; Arguello, Sofia <SArguello@winston.com>; Gordon, Ben
<BGordon@winston.com>; Rebecca Lee <rlee@altshulerberzon.com>; Stephen P. Berzon
<sberzon@altshulerberzon.com>; ~Segall, Anthony <asegall@rsglabor.com>; ~Lee, Juhyung
<hlee@rsglabor.com>; ~Cannon, Stephen <scannon@constantinecannon.com>; ~Litwin, Ethan
<elitwin@constantinecannon.com>; Andrew Kushner <akushner@altshulerberzon.com>
**Subject:** RE: WME v WGA -- discovery meet & confer

Dear Casey,

I am writing on behalf of WME, as well as UTA and CAA, to follow-up on our February 3, 2020 meet
and confer call.  During that call, we had indicated that there are a number of document requests in
Counterclaimants' First Request for Production of Documents ("RFPs") that the Agencies believe are
related solely to your clients' Counterclaims.  You had asked that the Agencies identify for you the
specific RFPs, and that in turn you would consider with your clients agreeing to defer further meet-
and-confers or demands for production in conjunction with these RFPs until after Judge Birotte's

ruling.  We have put together such a list with the hope that we can reach agreement and avoid burdening the Court with what we believe would be an unnecessary stay motion.

With a full reservation of rights, including as to both the propriety of any RFP and whether any RFP *not* on our list relates in whole or in part to the Counterclaims, and in the interest of compromise, the Agencies propose the parties agree to defer dealing with the following RFPs pending the issuance of the Court's ruling:

WME RFP Nos. 5, 10, 16-18, 20, 29, 36-40, 45-49, 51, 52, 56, 58-64, 66, 73-77 [to the extent the RFP numbering differs as to the other Agencies, we refer to those RFPs that correspond to the WME numbering].

We note that this still leaves 45 Counterclaimant RFPs to deal with pending Judge Birotte's ruling.  As a practical matter, this is more than enough to keep us all busy—coupled with the RFPs that we have served concerning our affirmative claims—and to keep moving forward on discovery while we await the Court's ruling.  Please let us know your position by email or we can pick this up on our Tuesday call.

On a separate topic, we wanted to inform you that we have each inquired and learned that none of the respective Agencies has existing organization charts setting forth the requested information regarding the identity and reporting lines for potentially relevant personnel.  We are therefore each working with our clients to compile this information.  In this regard, we request that you similarly provide us with WGAW and WGAE organization charts, or the same type of information in another form, so that we too can start thinking about potential custodians.

Thanks,
Dave

---

**From:** Marenberg, Steve <SMarenberg@irell.com>
**Sent:** Thursday, January 30, 2020 8:41 PM
**To:** Casey Pitts <cpitts@altshulerberzon.com>; Greenspan, David <DGreenspan@winston.com>
**Cc:** Stacey Leyton <sleyton@altshulerberzon.com>; Leiden, Diana Hughes <DHLeiden@winston.com>; Kessler, Jeffrey L. <JKessler@winston.com>; ~Daum, Nicholas <ndaum@kbkfirm.com>; Levin, Adam <AXL@msk.com>; Payne, Stephen <spayne@irell.com>; Mittleman, Harry <HMittleman@irell.com>; Obi, Shawn R. <SObi@winston.com>; Mercier-Dalphond, Isabelle <IMercier@winston.com>; ~Somers, Patrick <psomers@kbkfirm.com>; ~Kendall, Richard <rkendall@kbkfirm.com>; Lee, Gilbert S. <gsl@msk.com>; Lerner, Jim <JLerner@winston.com>; Arguello, Sofia <SArguello@winston.com>; Gordon, Ben <BGordon@winston.com>; Rebecca Lee <rlee@altshulerberzon.com>; Stephen P. Berzon <sberzon@altshulerberzon.com>; ~Segall, Anthony <asegall@rsglabor.com>; ~Lee, Juhyung <hlee@rsglabor.com>; ~Cannon, Stephen <scannon@constantinecannon.com>; ~Litwin, Ethan <elitwin@constantinecannon.com>; Andrew Kushner <akushner@altshulerberzon.com>
**Subject:** RE: WME v WGA -- discovery meet & confer

Casey,

Your position concerning a stay of discovery on the Counterclaims is disappointing. While I will not attempt to refute every misstatement in your email here, your suggestion that our proposal is "delinquent" ignores the procedural history of this case, including the postponement of the hearing on the Agencies' Motion to Dismiss the Guilds' Counterclaims (which was originally scheduled to occur before our discovery responses were due), the fact that the matter is now under submission, and the colloquy and the Court's questions and comments at the hearing itself.  Moreover, putting aside the overbreadth of many of the discovery requests even if the Counterclaims eventually proceed, it is undeniable that the Guilds' requested discovery is extremely burdensome and expensive, and a short postponement may eliminate the potentially needless expense of some or all of such discovery as it appears likely some or all of the claims to which it relates will be dismissed. We are happy to further discuss the issue of a stay on Monday, but, given your position, reserve all our rights.

Concerning the Agencies' discovery requests to the Guilds (which were served much earlier than the Guild's discovery requests to UTA and the other Agencies), I do not take your email as refusing to meet and confer regarding our requests on Monday, but if I am wrong, please let me know immediately. The meet and confer process is not a one way street.  But, provided we can discuss both sides' requests on Monday, we are willing to start by discussing a stay as well as the issues in your letter. (However, we will expect to move on to the Agencies' requests at an appropriate point in the call, as well as the numerous deficiencies in the Guilds' responses).

Finally, while it is not productive for us to continue to debate each sides' responses here in advance of the call, we of course disagree with your characterizations of our responses and your position that the Guilds' woefully deficient responses are somehow sufficient or appropriate.

Regards,

Steve

**Steven A. Marenberg**
*Partner*
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Direct: 310.203.7547 | Mobile: 310.617.9332
Fax: 310.282.5647
www.irell.com

---

**From:** Casey Pitts <cpitts@altshulerberzon.com>
**Sent:** Thursday, January 30, 2020 1:06 PM
**To:** Marenberg, Steve <SMarenberg@irell.com>; Greenspan, David <DGreenspan@winston.com>
**Cc:** Stacey Leyton <sleyton@altshulerberzon.com>; Leiden, Diana Hughes <DHLeiden@winston.com>; Kessler, Jeffrey L. <JKessler@winston.com>; ~Daum, Nicholas <ndaum@kbkfirm.com>; Levin, Adam <AXL@msk.com>; Payne, Stephen <spayne@irell.com>;

Mittleman, Harry <HMittleman@irell.com>; Obi, Shawn R. <SObi@winston.com>; Mercier-Dalphond, Isabelle <IMercier@winston.com>; ~Somers, Patrick <psomers@kbkfirm.com>; ~Kendall, Richard <rkendall@kbkfirm.com>; Lee, Gilbert S. <gsl@msk.com>; Lerner, Jim <JLerner@winston.com>; Arguello, Sofia <SArguello@winston.com>; ~Gordon, Benjamin <bgordon@winston.com>; Rebecca Lee <rlee@altshulerberzon.com>; Stephen P. Berzon <sberzon@altshulerberzon.com>; ~Segall, Anthony <asegall@rsglabor.com>; ~Lee, Juhyung <hlee@rsglabor.com>; ~Cannon, Stephen <scannon@constantinecannon.com>; ~Litwin, Ethan <elitwin@constantinecannon.com>; Andrew Kushner <akushner@altshulerberzon.com>
**Subject:** RE: WME v WGA -- discovery meet & confer

Steve,

We obviously view last week's hearing differently, and we are not willing to agree to a general stay of discovery on the Guilds' counterclaims.  We believe seeking such a stay would be particularly inappropriate at this point given that the Agencies never raised the idea of such a stay at any point during the pre-CMC meet and confer, did not request such a stay in the Joint CMC statement, and did not raise the idea of or seek a stay at any point prior to their deadline for responding to the Guilds' requests.  Given that the Court requires the parties to meet and confer in advance of filing such a motion, the first order of business during Monday morning's meet and confer must be the Agencies' delinquent proposal for such a stay, including a discussion of the ways in which the Guilds' discovery requests are relevant not only to the pending counterclaims but also to the Agencies' antitrust and LMRA claims.  As noted in our letter, the Guilds' requests cannot be cleanly separated between requests relevant to the Agencies' claims and requests relevant to the still-pending counterclaims.  As a result, the stay you propose will only lead to further disputes about its scope.

As you acknowledge, the Guilds—unlike the Agencies—have already agreed to produce a wide range of documents in response to the Agencies' discovery requests.  Contrary to your representation, the Guilds' production is not limited to the categories you have identified.  Both Guilds have agreed to produce, for example, not simply "mass" communications, but also communications with individual members relating to Code of Conduct or Working Rule 23.  This is in marked contrast to the Agencies.  UTA, for example, has committed to produce *only* an organizational chart, documents showing UTA personnel who participated in the ATA, UTA's retention and preservation policies and practices, and certain documents upon which UTA intends to rely to support certain allegations in the complaint (which are of course already subject to mandatory discovery under Rule 26).

We will be prepared at the appropriate time during the meet and confer process to explain why the range of documents the Guild has already agreed to produce is appropriate given what the Guild possesses; the specific claims being pursued by the Agencies against the Guilds; and the irrelevance of, and substantial burden of searching for, other documents.  It is inappropriate to have that discussion, however, when the Agencies are still refusing to produce almost *any* documents.  Accordingly, on Monday morning we should start by working through each of the Guilds' requests to discuss why the Agencies have no basis for seeking a stay of their obligation to respond to that request, and what the Agencies are willing to produce in response to that request.  This is the only appropriate approach given that the Agencies have insisted that the scope of their initial agreement to produce documents must be determined through the meet and confer process, rather than by exchanging adequate written responses and objections.

Casey


P. Casey Pitts
*(Pronouns: He, him, his)*
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108

(415) 421-7151 (tel)
(415) 362-8064 (fax)

_____

This e-mail may contain material that is confidential, privileged, and/or attorney work product for the sole use of the intended recipient.  Any review, reliance or distribution by others, or forwarding without express permission, is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies.

**From:** Marenberg, Steve <SMarenberg@irell.com>
**Sent:** Thursday, January 30, 2020 10:36 AM
**To:** Casey Pitts <cpitts@altshulerberzon.com>; Greenspan, David <DGreenspan@winston.com>
**Cc:** Stacey Leyton <sleyton@altshulerberzon.com>; Leiden, Diana Hughes <DHLeiden@winston.com>; Kessler, Jeffrey L. <JKessler@winston.com>; ~Daum, Nicholas <ndaum@kbkfirm.com>; Levin, Adam <AXL@msk.com>; Payne, Stephen <spayne@irell.com>; Mittleman, Harry <HMittleman@irell.com>; Obi, Shawn R. <SObi@winston.com>; Mercier-Dalphond, Isabelle <IMercier@winston.com>; ~Somers, Patrick <psomers@kbkfirm.com>; ~Kendall, Richard <rkendall@kbkfirm.com>; Lee, Gilbert S. <gsl@msk.com>; Lerner, Jim <JLerner@winston.com>; Arguello, Sofia <SArguello@winston.com>; ~Gordon, Benjamin <bgordon@winston.com>; Rebecca Lee <rlee@altshulerberzon.com>; Stephen P. Berzon <sberzon@altshulerberzon.com>; ~Segall, Anthony <asegall@rsglabor.com>; ~Lee, Juhyung <hlee@rsglabor.com>; ~Cannon, Stephen <scannon@constantinecannon.com>; ~Litwin, Ethan <elitwin@constantinecannon.com>; Andrew Kushner <akushner@altshulerberzon.com>
**Subject:** RE: WME v WGA -- discovery meet & confer

Casey -- I'm responding to your latest email on behalf of UTA as well as WME and CAA. We are pleased to see you accept our proposal to meet and confer and believe a discussion will be much more efficient and productive at this stage than further prefatory exchanges of letters or emails.

We are available Monday at 9 am to meet and confer regarding the severe problems with the Guilds' responses to the Agencies' document requests, including, for example: 1) limiting production to external communications and refusing to produce internal documents; 2) limiting production to documents related to "official actions" of the Union; 3) imposing artificial limitations and re-writing the requests; 4) refusing to produce drafts of documents, such as drafts of the Code of Conduct; 5) limiting production to "mass" communications with members; and 6) asserting that "no documents" exist based on artificial limits/definitions or rewriting of the requests.

We are of course willing to discuss Counterclaimants' requests and your letters to the Agencies on the Monday call as well. In light of your agreement to meet and confer, I'll defer any detailed response to your letter, including the assertion that that the Agencies' offer to meet and confer somehow negates the Agencies' substantive objections and constitutes a waiver, until then. For now, let's just say we disagree and leave it at that.

With respect to discovery related only to the Counterclaims (which we identified in our responses), we do not think it is appropriate to move forward with discovery on those claims at all given that (although we don't expect you to acquiesce on the merits) any fair observer of the hearing on the 24th would conclude there is a significant chance that all, or at least some, of the Counterclaims will

be dismissed from this action. We believe a stay of discovery on the Counterclaims pending the Court's ruling is appropriate under the circumstances, and that it would be much more efficient to agree to a stay so as to avoid burdening the Court (and the parties) with a motion to stay discovery that would likely not be heard until around the same time as (if not after) the Court issues its ruling on the motion to dismiss. Nevertheless, given the significant overbreadth and burden of Counterclaimants' requests, which seek sweeping discovery into many subjects that are not relevant to the Agency claims that the Court has ruled will go forward, we are prepared to bring a stay motion if Counterclaimants are unwilling to reach an agreement. Please let us know as soon as possible your position so that, if such a motion is necessary, we can begin the work of preparing it right away.

Regards,

Steve

**Steven A. Marenberg**
*Partner*
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Direct: 310.203.7547 | Mobile: 310.617.9332
Fax: 310.282.5647
www.irell.com