1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   WILLIAM MORRIS ENDEAVOR            Case No. 2:19-cv-05465-AB (AFMx)
     ENTERTAINMENT, LLC, *et al*.,
                                        **ORDER GRANTING IN PART AND
12                                      DENYING IN PART PLAINTIFFS
                        Plaintiffs and  AND COUNTERCLAIM
13                      Counterclaim    DEFENDANTS' MOTION TO
                        Defendants,     DISMISS [Dkt. No. 54]**
14
15   v.

16
     WRITERS GUILD OF AMERICA,
17   WEST, INC., *et al.*,

18
                        Defendants and
19                      Counterclaimants.

20

21   **I.  INTRODUCTION**

22          Before the Court is Plaintiffs and Counterclaim Defendants William Morris

23   Endeavor Entertainment, LLC's ("WME"), Creative Artists Agency, LLC's ("CAA"),

24   and United Talent Agency, LLC's ("UTA") (collectively "the Agencies") motion to

25   dismiss Counterclaimants Writers Guild of America, West, Inc.'s, Writers Guild of

26   America, East, Inc.'s ("the Guilds"), Patricia Carr's, Ashley Gable's, Barbara Hall's,

27

28

1   Deric A. Hughes's, Deirdre Mangan's, David Simon's,[1] and Meredith Stiehm's
2   (collectively "Counterclaimants") consolidated counterclaims. (Dkt. No. 54.)
3   Counterclaimants oppose the Agencies' motion. (Dkt. No. 67). The Court heard oral
4   argument regarding the Agencies' motion on January 24, 2020. For the reasons stated
5   below, the Court **GRANTS IN PART** and **DENIES IN PART** the Agencies' motion
6   to dismiss. Any amended complaint shall be filed within fourteen (14) days of the date
7   of issuance of this order.

8   **II. BACKGROUND**

9       This case arises from a dispute between three of the largest talent agencies in
10  Hollywood and two labor unions that represent writers in the entertainment industry.
11  In their consolidated counterclaims, Counterclaimants allege as follows: The Guilds
12  serve as the exclusive collective bargaining representative for their writer-members in
13  negotiations with film and television producers. (Dkt. No. 44 ¶ 265.) Although the
14  Guilds serve as their writer-members' exclusive collective bargaining representative,
15  writers have traditionally retained talent agents (and the agencies with which those
16  talent agents are associated) to represent them in their dealings with production
17  companies. (*Id.* ¶ 271.) The Guilds' Working Rule 23 provides that writer-members
18  may only be represented by talent agencies that sign an appropriate franchise
19  agreement with the Guilds. (*Id.* ¶ 272.)

20      Prior to this dispute, from 1976 to April 2019, the Guilds were parties to the
21  Artists' Manger Basic Agreement ("AMBA"). (*Id.* ¶ 367.) The AMBA permitted
22  talent agencies to engage in a practice known as "packaging," albeit while reserving
23  the Guilds' objections to agencies accepting packaging fees. (*Id.* ¶ 368.) Packaging
24  refers to a practice by which a talent agency presents one or more creative elements of
25  a production to a studio. (*Id.* ¶ 51.) In exchange for packaging creative elements—

26
27  _____
28  [1] Counterclaimant David Simon voluntarily dismissed his fifth through eleventh
    claims for relief. (Dkt. No. 55.)

including writers, actors, and directors—talent agencies receive packaging fees from the studios. (*Id.*) In television, packaging fees are normally structured around a standardized "3-3-10" formula. (*Id.* ¶ 279.) The upfront fee is defined as 3% of the "license fee" paid by the studio for the program (normally between $30,000 and $75,000 per episode). (*Id.*) An additional fee is defined as 3% of the license fee, but payment of this fee is deferred until the show achieves net profits. (*Id.*) And finally, the back-end fee is defined as 10% of the show's modified adjusted gross receipts. (*Id.*) The deferred 3% fee and the 10% back-end fee are generally taken "off the top," meaning that the Agencies get paid before any other profit participant and other profit participants' shares are reduced proportionately. (*Id.*) In film, talent agencies also receive packaging fees, which are typically paid from a film's budget. (*Id.* ¶ 322.)

Before the advent of packaging, talent agents were paid by commission, calculated as a percentage of their clients' compensation. (*Id.* ¶ 6.) The Guilds allege that a commission-based payment system aligned writers' and talent agents' interests, incentivizing talent agents to maximize their writer-clients' compensation to receive higher commissions. (*Id.*)

The Agencies' receipt of packaging fees, however, financially harms writers and the Guilds, and creates inherent conflicts of interest. (*Id.* ¶¶ 300–44.) In particular, packaging fees harm writers by: (1) reducing writers' employment opportunities, (2) reducing the quality of audiovisual productions by lowering production budgets, (3) reducing writers' salaries and profit participation by lowering production budgets, (4) reducing the Agencies' incentives to protect and increase their writer-clients' compensation, and (5) reducing the Agencies' incentives to help writers negotiate over missing pay. (*Id.* ¶¶ 300–29.) Packaging fees harm the Guilds by: (1) reducing the amount of dues the Guilds receive from their writer-members, (2) forcing the Guilds to divert resources to monitor packaging and teach their members about packaging fees, and (3) forcing the Guilds to engage in political advocacy and public outreach with regard to packaging fees. (*Id.* ¶¶ 337 –44.) Because packaging fees are paid

3.

directly from production budgets, Counterclaimants allege that an inherent conflict of interest between the Agencies and their writer-clients exists in every package agreement. (*Id.* ¶ 307.)

In carrying out these harms to writers and the Guilds, Counterclaimants allege that the Agencies conspired to set the 3-3-10 packaging fee structure. (*Id.* ¶¶ 345–61.) In particular, Counterclaimants allege that in the 1990s, several talent agencies— including William Morris, Endeavor (now WME), and CAA—agreed to offer the same packaging fee terms and base license fees to studios. (*Id.* ¶¶ 350–51.) Such discussions occurred between Lee Gabler of CAA and Ari Emanuel of now WME, as well as a former agency senior executive. (*Id.* ¶ 350.) Representatives of various talent agencies recently admitted in *The Hollywood Reporter* that there is "near uniform price-fixing of package fees on TV shows," and the Agencies, through the Association of Talent Agents ("ATA"), recently stated that "package fees have remained fairly constant in broadcast TV for the past two decades." (*Id.* ¶ 349.) Further, because the Agencies frequently jointly package television series, the Agencies exchange competitively sensitive information about their packaging fee practices with one another. (*Id.* ¶ 353.) Counterclaimants allege that a March 17, 2019 study published by the ATA analyzing the impact of eliminating front-end fees evidences this conspiratorial agreement among the Agencies. (*Id.* ¶ 356.)

Because of the allegedly harmful effects of packaging fee arrangements, on April 6, 2018, the Guilds provided the ATA with notice of intent to terminate the AMBA. (*Id.* ¶ 373.) The Guilds contemporaneously published proposals for a new agreement to replace the AMBA, which would have barred talent agencies from accepting packaging fees on any project on which their writer-clients work. (*Id.*) Between April 2018 and April 2019, the Guilds and the ATA unsuccessfully attempted to negotiate a new agreement to replace the AMBA. (*Id.* ¶ 377.)

In March 2019, the Guilds' members voted to authorize the Guilds to implement a new Code of Conduct upon expiration of the AMBA on April 6, 2019.

4.

(*Id.* ¶ 380.) The Code of Conduct prohibits talent agents franchised by the Guilds from earning a packaging fee on a project where they represent a Guild member. (*Id.* ¶ 379.) On April 13, 2019, the Guilds implemented the Code of Conduct and, pursuant to Working Rule 23, instructed their members to terminate any agent that had not agreed to the Code of Conduct's terms. (*Id.* ¶ 382.)

At some point following the implementation of the Code of Conduct, the Agencies, through the ATA, stated that the Code of Conduct was unacceptable to all talent agencies and that they were "firmly opposed to the [Guilds'] Code [of Conduct]." (*Id*. ¶ 382.) After Verve, a non-ATA members talent agency, agreed to the Code of Conduct, "the Agencies and their co-conspirators, through the ATA, promised to retaliate against Verve and its clients . . . and promised similar retaliation against any other agency that broke ranks and dealt with the Guilds[.]" (*Id*. ¶ 385.) After the Guilds withdrew their consent to collective negotiations through the ATA, individual ATA-member talent agencies uniformly rejected the Guilds' offers to meet individually and negotiate each agency's consent to the Code of Conduct. (*Id*. ¶ 390– 392.) The Guilds allege that these rejections were "illegally coordinated by the ATA[,]" as evidenced by an e-mail from an ATA official, Karen Stuart, asking if she could "share with the group" an e-mail from Stephen Kravit of The Gersh Agency that "under no circumstances will The Gersh Agency meet with you separate from the ATA." (*Id.* ¶ 393–94.) The Guilds point to similarly-worded e-mails from other ATA-member talent agencies as further evidence of this allegedly illegal coordination among ATA members to not negotiate with the Guilds individually. (*Id.* ¶ 394.)

On March 29, 2019, the Guilds authorized lawyers and talent managers to represent the Guilds' writer-members in lieu of the Agencies. (*Id*. ¶ 399.) On April 12, 2019, the ATA's counsel sent the Guilds a letter stating that having lawyers and talent managers represent the Guilds' writer-members in lieu of the Agencies violated California Labor Code § 17200 *et seq*., threatening suit. (*Id.* ¶ 400–01.) The ATA sent an additional letter on April 18, 2019, threatening to bring legal action against lawyers

5.

1    who negotiated employment contracts on behalf of writers. (*Id.* ¶ 402.)

2         After the Agencies brought this suit, Counterclaimants filed their Answer and

3    Counterclaims, alleging the following causes of action: : (1) *per se* price-fixing in

4    violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, (2) *per se* group boycott in

5    violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, (3) *per se* price-fixing in

6    violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16700, (4) *per se* group

7    boycott in violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16700, (5) breach

8    of fiduciary duty, (6) constructive fraud, (7) unfair competition, (8) investment of

9    racketeering income in violation of 18 U.S.C. § 1962(a), (9) maintenance of a

10   racketeering enterprise in violation of 18 U.S.C. § 1962(b), (10) control of a

11   racketeering enterprise in violation of 18 U.S.C. § 1962(c), (11) racketeering

12   conspiracy in violation of 18 U.S.C. § 1962(d), (12) declaratory relief under 28 U.S.C.

13   §§ 2201, 2202, (13) breach of contract, and (14) promissory estoppel. (*Id.* ¶¶ 405–

14   603.) The Agencies move to dismiss each cause of action.

## III.   LEGAL STANDARD

16        Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to

17   dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed.

18   R. Civ. P. 12(b)(6).

19        To defeat a Rule 12(b)(6) motion to dismiss, the complaint must provide

20   enough factual detail to "give the defendant fair notice of what the. . . claim is and the

21   grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

22   The complaint must also be "plausible on its face," that is, it "must contain sufficient

23   factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

24   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). A

25   plaintiff's "factual allegations must be enough to raise a right to relief above the

26   speculative level." *Twombly,* 550 U.S. at 555. "The plausibility standard is not akin to

27   a 'probability requirement,' but it asks for more than a sheer possibility that a

28   defendant has acted unlawfully." *Id*. Labels, conclusions, and "a formulaic recitation

of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed under Rule 12(b)(6) for the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (internal quotation marks omitted).

A court generally may not consider materials other than facts alleged in the complaint and documents that are made a part of the complaint. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996). However, a court may consider materials if (1) the authenticity of the materials is not disputed and (2) the plaintiff has alleged the existence of the materials in the complaint or the complaint "necessarily relies" on the materials. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted). The court may also take judicial notice of matters of public record outside the pleadings and consider them for purposes of the motion to dismiss. *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Lee*, 250 F.3d at 689-90.

## IV.    DISCUSSION

### 1.  Counterclaimants lack antitrust standing to pursue their federal price-fixing claim.

The Agencies move to dismiss Counterclaimants' first cause of action for *per se* price-fixing in violation of the Sherman Act on the ground that Counterclaimants lack antitrust standing to pursue this claim.

"In addition to the traditional limitations upon standing imposed by the Constitution, Congress imposed additional limitations upon those who can recover damages under the antitrust laws." *Pool Water Prods. v. Olin* Corp., 258 F.3d 1024, 1034 (9th Cir. 2001) To demonstrate antitrust standing, the private party bringing suit

must show antitrust injury. *Id.* Antitrust injury is made up of five elements: (1) unlawful conduct, (2) causing injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, (4) that is of the type the antitrust laws were intended to prevent, and (5) that the injured party be a participant in the same market as the alleged malefactor. *See Glen Holly Entmt., Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1008 (9th Cir. 2003). To be a participant in the same market as the alleged malefactor, "the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Id.* (quoting *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987)).

The Agencies contend that Counterclaimants' allegations, accepted as true, demonstrate that Counterclaimants do not participate in the same market as the Agencies and suffer derivative injury only. In particular, the Agencies contend that Counterclaimants' allegations demonstrate that they neither buy nor sell packages, and that they do not otherwise participate in any market in which packages are bought and sold. (Dkt. No. 54 at 6.) In opposition, Counterclaimants do not argue that they buy or sell packages, or that they participate in the talent representation market where packages are bought and sold. (*See* Dkt. No. 67 at 25–30.) Indeed, Counterclaimants' allegations unambiguously demonstrate that studios—not the Guilds or their writer-members—purchase packages from the Agencies, and that the Agencies and their non-party competitors sell packages to the studios. (*See* Dkt. No. 44 ¶¶ 10, 11, 14, 19, 279, 280, 316, 317, 324, 328, 332, 333.) The core of Counterclaimants' *per se* price-fixing claim is that "[r]ather than compete with each other, the Agencies and their co-conspirators have instead collusively agreed to propose the same packaging fee terms to [production] *studios*." (*Id.* ¶ 10) (alterations added). The injuries Counterclaimants allege—that writer-members suffer decreased profit participation, decreased employment opportunities, decreased production quality, and that the Guilds receive lower union dues while expending money to inform their members of the harms of packaging and publicly advocate against the practice—all derive from the allegedly

8.

higher prices paid by production studios that employ writers. *See Eagle*, 812 F.2d at 541–42 (holding that where, as here, an "employer reacts to [a] loss by terminating employees, or when employees receive diminished salary or commissions, as a result of the employers' weakened market position," the employee suffers derivative injury only). Accordingly, because Counterclaimants' allegations demonstrate that they neither buy nor sell talent representation services, and that their injuries are entirely derivative of the allegedly higher prices paid by production studios, Counterclaimants have not shown antitrust injury.[2] The Court therefore **GRANTS** without leave to amend the Agencies' motion to dismiss Counterclaimants' first cause of action for *per se* price-fixing in violation of the Sherman Act.

### 2. Counterclaimants' Cartwright Act price-fixing claim states a claim upon which relief can be granted.

The Agencies move to dismiss Counterclaimants' third cause of action—*per se* price-fixing in violation of the Cartwright Act, California Business & Professions Code § 16700 *et seq.*—on the ground that Counterclaimants fail to plausibly allege a price-fixing agreement among the Agencies.

"The elements of [a] Cartwright Act claim are the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts." *See Marsh v. Anestesia Servs. Med. Grp., Inc.*, 132

---

[2] Counterclaimants' reliance on *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) does not demonstrate otherwise. In *McCready*, the Supreme Court "carved a narrow exception to the market participant requirement for parties whose injures are 'inextricably intertwined' with the injuries of market participants." *Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 n.5 (9th Cir. 1999) (quoting *McCready*, 457 U.S. at 484). This narrow exception applied where the injury suffered by the plaintiff was "the very means by which . . . [defendant] sought to achieve its illegal ends," and where plaintiff's harm was "a necessary step in effecting the ends of the alleged illegal conspiracy." *See McCready*, 457 U.S. at 479. Here, the injuries suffered by Counterclaimants are neither the means by which the Agencies allegedly sought to propose the same packaging fee structure nor are they a step in effecting the alleged conspiracy—rather, Counterclaimants' alleged injuries are the derivative *result* of the Agencies' alleged price-fixing scheme, as in *Eagle*.

Cal. Rptr. 3d 660, 670–71 (Ct. App. 2011) (internal quotations omitted). "California requires a high degree of particularity in the pleading of Cartwright Act violations . . . and therefore generalized allegations of antitrust violations are usually insufficient." *Id.* (internal quotation marks omitted).

Here, Counterclaimants allege that "in or around 1995-1996, and continuing through to the present," with the exact start date unknown, the Agencies and their co-conspirators entered into a continuing agreement to fix and maintain the 3-3-10 packaging fee structure and to charge the same base license fees to studios. (*See* Dkt. No. 44 ¶ 452–76; 350–58.) Counterclaimants allege that this price-fixing conspiracy was set in a meeting by Lee Gabler of CAA and Ari Emanuel of then Endeavor and now WME, and that the Agencies have maintained this price-fixing conspiracy by sharing competitively sensitive information when they jointly package television series. (*Id.* ¶ 350–54.) Counterclaimants further allege that they suffered injury from this price-fixing conspiracy in the form of reduced compensation and employment opportunities, and reduced quality of talent representation services.[3] (*Id.* ¶ 472.) Accordingly, Counterclaimants have pleaded specific factual allegations showing the formation and operation of a conspiracy, wrongful acts done pursuant to the conspiracy, and resulting injury, nudging Counterclaimants' allegations across the line from conceivable to plausible.[4] The Court accordingly **DENIES** the Agencies' motion

---

[3] Because "the more restrictive definition of 'antitrust injury' under federal law does not apply to the Cartwright Act," *Knevelbaard Dairies v. Kraft Foods, Inc*., 232 F.3d 979, 991 (9th Cir. 2000) (quoting *Cellular Plus, Inc. v. Superior Court*, 18 Cal. Rptr. 2d 308 (Ct. App. 1993)), Counterclaimants' Cartwright Act claims do not suffer from the same standing deficit as their Sherman Act price-fixing claim.

[4] The Agencies' reliance on *Lenhoff v. United Talent Agency*, 729 F. App'x 528 (9th Cir. 2018) (mem.) does not demonstrate otherwise. Unlike the present case, the allegations found insufficient in *Lenhoff* did not include the detailed descriptions of individuals who reached an agreement or information regarding the sharing of sensitive information while jointly packaging television series. Indeed, the Third Amended Complaint at issue in *Lenhoff* "made only passing reference to [talent agencies] charging such a [3-3-10] fee." *Id.* at 530; *see also Lenhoff Enterprises, Inc.*

to dismiss Counterclaimants' third cause of action for *per se* price-fixing in violation of the Cartwright Act.

### 3. Counterclaimants' group boycott claims fail to state claims upon which relief can be granted.

The Agencies move to dismiss Counterclaimants' second and fourth claims for relief, *per se* group boycott in violation of the Sherman Act and the Cartwright Act, on the ground that Counterclaimants fail to plausibly plead a group boycott by the Agencies.

"[T]o establish a *per se* violation of Sherman Act § 1 for an unlawful group boycott, [Counterclaimants] must plead that there was [1] a horizontal agreement [2] among direct competitors." *Sambreel Holdings LLC v. Facebook, Inc*., 906 F. Supp. 2d 1070, 1076 (S.D. Cal. 2012) (citing *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000)). However, "mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement." *In re Musical Instruments and Equipment Antitrust Litig*., 798 F.3d 1186, 1196 (9th Cir. 2015).

Here, Counterclaimants allege that the Agencies have entered into a horizontal agreement to: (1) take a common stance with the Guilds in negotiations over a new franchise agreement, (2) refuse to negotiate with the Guilds on an individual basis, (3) threaten lawyers and talent managers with litigation, and (4) blacklist any agency that agrees to the Guilds' Code of Conduct. (Dkt. No. 44 at ¶¶ 432–51.) However, Counterclaimants' specific factual allegations show only that the ATA, a trade association of talent agents, (1) stated its disapproval of talent agencies negotiating individually with the Guilds, (2) sent two letters warning of potential legal consequences of having talent managers or attorneys negotiate employment terms for

---

*v. United Talent Agency, Inc*., et al., 2:15-cv-01086-BRO-FFM (C.D. Cal. April 20, 2016).

1   Guild-members, (3) stated that agreeing to the Code of Conduct would hurt a talent

2   agency's business, and (4) distributed to ATA members one talent agency's response

3   to the Guilds' request to negotiate individually. (*Id.* ¶¶ 382–97; 399–404.) Rather than

4   demonstrating a horizontal agreement among competitors, these allegations show, at

5   most, participation by the Agencies "in trade association meetings where information

6   is exchanged and strategies are advocated[.]" *In re Musical Instruments and*

7   *Equipment Antitrust Litig.*, 798 F.3d at 1196. Further, Counterclaimants' allegations

8   that individual talent agencies refused to negotiate individually with the Guilds

9   through similarly worded responses, (Dkt. No. 44 ¶ 394), does not plausibly allege a

10   horizontal agreement among the Agencies. *See In re Musical Instruments and*

11   *Equipment Antitrust Litig.*, 798 F.3d at 1193 ("[M]ere allegations of parallel

12   conduct—even consciously parallel conduct—are insufficient to state a claim under §

13   1 [of the Sherman Act]"); *see also Name.Space, Inc. v. Internet Corp. for Assigned*

14   *Names and Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015) ("[T]he analysis under

15   the Cartwright Act . . . is identical to that under the Sherman Act."). Accordingly,

16   because Counterclaimants have not plausibly alleged a horizontal agreement among

17   the Agencies, the Court **GRANTS** the Agencies' motion to dismiss Counterclaimants'

18   second and fourth causes of action.

19   **4. Counterclaimants fail to plead racketeering activity.**

20   The Agencies move to dismiss Counterclaimants' eighth through eleventh

21   causes of action on the ground that Counterclaimants fail to plead racketeering activity

22   in violation of federal RICO laws.

23   Counterclaimants allege that by receiving packaging fees from studios that

24   employ writers, the Agencies have engaged in racketeering activity within the

25   meaning of 18 U.S.C. § 1961(1)(C). Section 1961(1)(C) defines "racketeering

26   activity" as "any act which is indictable under title 29 United States Code, section 186

27   (dealing with restrictions on payments and loans to labor organizations)[.]" 18 U.S.C.

28   § 1961(1)(C). Section 186(a)(1) ("Section 302(a)") makes it unlawful for "any

12.

employer or association of employers . . . to pay, lend, or deliver, or agree to pay lend, or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce[.]" 29 U.S.C. § 186(a)(1). Section 186(b)(1) ("Section 302(b)") makes it unlawful for "any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by [29 U.S.C. § 186(a)]." 29 U.S.C. § 186(b)(1). The coverage of these provisions "extends not just to official bargaining representatives but to 'any person authorized by the employees to act for them in dealing with employers.'" *Oregon Columbia Brick Masons Joint Apprenticeship Training Committe v. Gardner*, 448 F.3d 1082, 1088 (9th Cir. 2006) (quoting *United States v. Ryan*, 350 U.S. 299, 302 (1956)). In determining whether these provisions apply to the Agencies' receipt of packaging fees from studios that employ writers, the Court must be mindful that "penal laws are to be construed strictly, [though] they are not to be construed so strictly as to defeat the obvious intention of the legislature." *See Arroyo v. United States*, 359 U.S. 419, 424 (1959) (alteration added). The core purpose of these provisions of the Labor Management Relations Act ("LMRA") "is to prevent corruption of employee representatives who are chosen by, and have a statutory duty to represent the interests of, other employees." *See Oregon Columbia Brick Masons*, 448 F.3d at 1088.

As the Agencies correctly argue, although the LMRA has been on the books for over seventy years, Section 302 has been applied only to kickbacks made to union leaders or union-managed retirement funds. (Dkt. No. 54 at 18.) Further, Counterclaimants have made no showing that prohibiting studios from paying packaging fees to the Agencies furthers the LMRA's core purpose of "prevent[ing] corruption of employees representatives who are chosen by . . . other employees." *See Oregon Columbia Brick Masons*, 448 F.3d at 1088 (alteration added). Finally, according to Counterclaimants' allegations, it is the Guilds—not the employee-writers—who choose which talent agencies may represent writers in their negotiations

13.

with the studios. (*See* Dkt. No. 44 ¶¶ 131, 272) ("The Guilds' Working Rule 23 further provides that members may only be represented by agencies that sign an appropriate franchise agreement with the Guilds"); *see also Oregon Columbia Brick Mason*, 448 F.3d at 1089 ("Moreover, employee representatives . . . are chosen by the [Oregon State Apprenticeship and Training Council], not the employees themselves."). Accordingly, because Counterclaimants' allegations do not demonstrate that the Agencies are representatives within the meaning of Section 302, the Court **GRANTS** without leave to amend the Agencies' motion to dismiss Counterclaimants' eighth through eleventh causes of action.

**5. The Guilds lack organizational standing to bring claims for breach of fiduciary duty and constructive fraud on behalf of their members.**

The Agencies' seek to dismiss the Guilds' fifth and six claims for relief, breach of fiduciary duty and constructive fraud, on the ground that the Guilds lack organizational standing to pursue these claims on behalf of their members.

An organization has standing to bring suit on behalf of its members where "([1] its members would otherwise have standing to sue in their own right; [2] the interests [the organization] seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Hunt v. Wash. State Apply Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Agencies allege that the Guilds' claims for breach of fiduciary duty and constructive fraud require the participation of individual writer-members, negating organizational standing. The elements of a claim for breach of fiduciary duty are "(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by that breach." *See IIG Wireless, Inc. v. Yi*, 231 Cal. Rptr. 3d 771, 787 (Ct. App. 2018) (internal quotation marks omitted). "As a general principle, constructive fraud comprises any act, omission or concealment involving breach of legal or equitable duty, trust or confidence which results in damage to another even though the conduct is not otherwise fraudulent." *Assilzadeh v. Cal. Fed.*

14.

*Bank*, 98 Cal. Rptr. 2d 176, 186 (Ct. App. 2000). "Most acts by an agent in breach of his fiduciary duties constitute constructive fraud." *Id.*

Here, the Guilds' allegations demonstrate that a litany of individualized assessments would be necessary to determine whether the Agencies breached their fiduciary duties to individual writer-members. As the Agencies show, resolving the Guilds' breach of fiduciary duty and constructive fraud claims would require determining: (1) which writers were represented by the Agencies, (2) what the details of each writer's packaging arrangement were, (3) what information each individual writer received with respect to the details of each packaging arrangement, (4) whether any member(s) assented to those packaging terms after receiving such information, and (5) what damages each individual members suffered as a proximate cause of the Agencies' breach of fiduciary duties. Counterclaimants' conclusory allegation that "[t]he Agencies have never obtained their writer-clients' valid, informed consent" to receiving packaging fees (Dkt. No. 44 ¶ 334), does not negate the need for these individualized determinations. Accordingly, because the Guilds' breach of fiduciary duty and constructive fraud claims cannot be resolved without participation of the Guilds' individual members, the Court **GRANTS** the Agencies' motion to dismiss the Guilds' fifth and sixth causes of action.[5]

**6. Individual Counterclaimants' breach of fiduciary duty cause of action states a claim upon which relief can be granted.**

The Agencies move to dismiss individual Counterclaimants Patricia Carr's, Ashley Gable's, Barbara Hall's, Deric A. Hughes's, Deidre Mangan's, and Meredith Stiehm's fifth cause of action for breach of fiduciary duty on the ground that individual Counterclaimants fail to state a claim upon which relief can be granted.

As stated above, the elements of a claim for breach of fiduciary duty are (1)

---

[5] Because individual Counterclaimants allege breach of fiduciary duty and constructive fraud on their own behalf, the Guilds' lack of organizational standing does not affect the standing of these individual Counterclaimants to bring suit.

existence of a fiduciary duty, (2) breach of that fiduciary duty, and (3) damages proximately causes by the breach. *See IIG Wireless*, 231 Cal. Rptr. 3d at 787.

The allegations of the individual Counterclaimants show that the Agencies acted as the agents for individual Counterclaimants in their negotiations with production studios. (Dkt. No. 44 ¶¶ 299–321.) Further, individual Counterclaimants allege that they were never given the details of packaging arrangements while they were represented by the Agencies. (*Id.* ¶ 333); *see Assilzadeh*, 98 Cal. Rptr. 2d at 186 ("The agent's duty to disclose material information to the principal includes the duty to disclose reasonably obtainable material information." (internal quotation marks omitted)). Individual Counterclaimants allege that, as a result of the Agencies' failure to disclose material terms of packaging arrangements, they suffered damages including "lost wages, [and] lost employment opportunities." (Dkt. No. 44 ¶ 505.) Accordingly, because individual Counterclaimants have stated a claim for breach of fiduciary duty, the Court **DENIES** the Agencies' motion to dismiss individual Counterclaimants' fifth cause of action.

### 7. Individual Counterclaimants fail to meet Rule 9(b)'s heightened pleading standard for their constructive fraud claim.

The Agencies move to dismiss individual Counterclaimants' sixth cause of action for constructive fraud on the ground that individual Counterclaimants fail to meet the heightened pleading standard under Federal Rule of Civil Procedure 9(b).

As stated above, "constructive fraud comprises any act, omission or concealment involving breach of legal or equitable duty, trust or confidence which results in damage to another even though the conduct is not otherwise fraudulent." *Assilzadeh*, 98 Cal. Rptr. 2d at 186. "Most acts by an agent in breach of his fiduciary duties constitute constructive fraud." *Id.* "Like fraud claims, constructive fraud claims [under California law] are subject to the particularity requirements of Rule 9(b)." *See EduMoz, LLC v. Republic of Mozambique*, No. CV 13-02309-MMM (CWx), 2014

WL 12802921, at *30 (C.D. Cal. July 21, 2014) (alteration added).[6] To state a viable claim under Rule 9(b), "[t]he complaint must specify such facts as the times, dates, places, and benefits received, and other details of the alleged fraudulent activity*." See Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993); *see also Vess*, 317 F.3d at 1106 ("Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." (internal quotation marks omitted)).

Here, individual Counterclaimants' constructive fraud allegations are co-extensive with their breach of fiduciary duty allegations. (*See* Dkt. No. 44 ¶¶ 508–14.) These allegations fail to specify times, dates, or places in which the Agencies' alleged fraudulent conduct occurred. Accordingly, because individual Counterclaimants do not include sufficient factual allegations to determine the "when, where, and how" of the Agencies' purportedly fraudulent conduct, the Court **GRANTS** the Agencies' motion to dismiss individual Counterclaimants' sixth cause of action.

### 8. The Guilds lack Article III standing to bring a UCL cause of action on their own behalf.

The Agencies move to dismiss the Guilds' UCL cause of action on the ground that the Guilds lack standing to assert this claim on their own behalf.

Although California permits any "person who has suffered injury in fact and has lost money or property as a result of . . . unfair competition" to bring suit for an injunction under the UCL, *see* Cal. Bus & Prof. Cod § 17204, the Guilds must still "demonstrate the requisite injury to establish Article III standing." *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1022 (9th Cir. 2004). "In the context

---

[6] Although Counterclaimants contend that Rule 9(b)'s heightened pleading standard does not apply to constructive fraud claims under California law, the case relied on by Counterclaimants in support of this proposition contains no such holding of law. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) (holding that "in a case where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)").

1  of injunctive relief, the plaintiff must demonstrate a real or immediate threat of an
2  irreparable injury." *Id.* at 1021 (emphases omitted).

3        Here, the Guilds assert a UCL claim on their own behalf based on the Agencies'
4  alleged violations of the LMRA, California's constructive fraud provision, and
5  California agency law. (*See* Dkt. No. 44 ¶¶ 515–28.) However, the Guilds' allegations
6  clearly demonstrate that they "currently ha[ve] no contractual relationship with [the
7  Agencies] and therefore [are] not personally threatened by their conduct [in charging
8  packaging fees]." *See Hangarter*, 373 F.3d at 1022 (alterations added). Accordingly,
9  because the Guilds' allegations fail to demonstrate that they face a real or immediate
10  threat of irreparable injury, the Court **GRANTS** the Agencies' motion to dismiss the
11  Guilds' UCL claim.

12      **9.  Individual Counterclaimants' UCL cause of action states a claim upon**
13          **which relief can be granted.**

14        The Agencies move to dismiss individual Counterclaimants' UCL claim on the
15  ground that individual Counterclaimants fail to plead facts satisfying the UCL's
16  unlawfulness or unfairness prong.

17        California's UCL defines "unfair competition" to include "any unlawful, unfair,
18  or fraudulent business act or practice." Cal. Bus. & Prof. Code § 172000. "Its
19  coverage is sweeping, embracing anything that can properly be called a business
20  practice and that at the same time is forbidden by law." *Roskind v. Morgan Stanley*
21  *Dean Witter & Co.*, 95 Cal. Rptr. 2d 258, 261 (Ct. App. 2000) (internal quotation
22  marks omitted). Breach of fiduciary duty constitutes an unlawful business practice
23  under California's UCL. *Cf. Svane v. Rysewyk*, No. D044746, 2006 WL 650090, at *1
24  (Ct. App. 2006) (unpublished) ("In a bifurcated proceeding, the trial court found as a
25  result of the jury's findings of constructive fraud and breach of fiduciary duty that
26  defendants violated the UCL[.]").

27        As stated above, individual Counterclaimants have sufficiently alleged a cause
28  of action for breach of fiduciary duty by the Agencies. Accordingly, because

18.

individual Counterclaimants' adequately allege a predicate violation in support of their UCL claim, the Court **DENIES** the Agencies' motion to dismiss individual Counterclaimants' UCL claim.

### 10. Counterclaimants' claim for declaratory relief survives.

The Agencies move to dismiss Counterclaimants' claim for declaratory relief on the ground that all of Counterclaimants' substantive claims fail. However, Counterclaimants seek declaratory relief with respect to their Cartwright Act *per se* price-fixing claim, breach of fiduciary duty claim, and UCL claim, all of which survive the Agencies' motion to dismiss. (*See* Dkt. No 44 at Prayer for Relief ¶¶ 4,7, 9). Accordingly, the Court **DENIES** the Agencies' motion to dismiss Counterclaimants claim for declaratory relief.

### 11. Counterclaimant Barbara Hall's breach of contact and promissory estoppel causes of action state claims upon which relief can be granted.

The Agencies' move to dismiss Counterclaimant Barbara Hall's ("Hall") breach of contract and promissory estoppel causes of action.

First, the Agencies move to dismiss Hall's breach of contract claim on the ground that it is barred by the statute of frauds. Hall alleges that in 2012 or 2013, UTA orally agreed to refund all commissions UTA charged her for her work on *Madam Secretary* in exchange for UTA's ability to continue to represent Hall as her talent agency. (Dkt. No. 44 ¶ 595.) Hall alleges that she fully performed under the oral agreement by allowing UTA to serve as her talent agency from 2012 to 2019. (*Id.* ¶ 596). Despite this alleged performance, Hall alleges that UTA breached its oral promise by failing to refund all commissions UTA charged Hall for her work on *Madam Secretary*. (*Id.* ¶ 597.) Although California law generally requires that "[a]n agreement that by its terms is not to be performed within a year from the making thereof" must be in writing, *see* Cal. Civ. Code § 1624(a), "part performance allows . . . enforcement of a contract that lacks the requisite writing." *See In re Marriage of Benson*, 116 P.3d 1152, 1159–60 (Cal. 2005). Because Hall's allegations demonstrate

19.

part performance of her oral agreement with UTA, the statute of frauds does not bar her breach of contract claim.

Second, the Agencies move to dismiss Hall's promissory estoppel claim on the ground that Hall has not sufficiently alleged facts showing detrimental reliance. "The elements of promissory estoppel are (1) a promise, (2) the promisor should reasonably expect the promise to induce action or forbearance on the part of the promisee . . ., (3) the promise induces action or forbearance by the promise or a third person ([i.e.,] detrimental reliance), and (4) injustice can be avoided only be enforcement of the promise." *See West v. JPMorgan Chase Bank, N.A.*, 154 Cal. Rptr. 3d 285, 303 (Ct. App. 2013) (alteration added). Here, Hall alleges that she detrimentally relied on UTA's oral promise to refund all commissions it charged her "by continuing to allow UTA, rather than another talent agency, to serve as her talent agency from 2012 to April 2019" (*See* Dkt. No. 44 ¶ 601). These allegations clearly show that UTA's alleged promise to reimburse commissions it charged to Hall induced Hall to continue retaining UTA as her talent agency, satisfying the detrimental reliance element of a promissory estoppel claim.

Accordingly, because Hall's breach of contract claim is not barred by the statute of frauds, and because Hall sufficiently alleges detrimental reliance in support of her promissory estoppel claim, the Agencies' motion to dismiss these causes of action is **DENIED**.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** the Agencies' motion to dismiss. In particular, the Court **GRANTS** the Agencies' motion to dismiss Counterclaimants' first, second, fourth, sixth, eighth, ninth, tenth, and eleventh causes of action. Counterclaimants' first and eighth through eleventh causes of action are dismissed without leave to amend. The Court **GRANTS** the Agencies' motion to dismiss Counterclaimants' fifth cause of action to the extent it is brought by the Guilds on behalf of their members, and **GRANTS** the Agencies'

1    motion to dismiss Counterclaimants' seventh cause of action to the extent it is brought

2    by the Guilds on their own behalf. The Agencies' motion to dismiss

3    Counterclaimants' remaining causes of action is **DENIED**. Any amended complaint

4    shall be filed within fourteen (14) days of the date of issuance of this order.

5    **IT IS SO ORDERED.**

6

7    Dated: April 27, 2020                    _____

8                                             HONORABLE ANDRÉ BIROTTE JR.
                                             UNITED STATES DISTRICT COURT JUDGE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21.